## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE UNITEDHEALTH GROUP INCORPORATED SHAREHOLDER DERIVATIVE LITIGATION | Master File No. 06-1216 JMR/FLN <br><br> JURY TRIAL DEMANDED |

## LEAD PLAINTIFFS' AMENDED AND CONSOLIDATED VERIFIED DERIVATIVE AND CLASS ACTION COMPLAINT

Lead Plaintiffs Public Employees' Retirement System of Ohio, State Teachers' Retirement System of Ohio, St. Paul Teachers' Retirement Fund Association, Public Employees' Retirement System of Mississippi, Jacksonville Police & Fire Pension Fund, Louisiana Municipal Police Employees' Retirement System, Louisiana Sheriffs' Pension & Relief Fund, Fire & Police Pension Association of Colorado, Connecticut Retirement Plans and Trust Funds, and Jan Brandin (collectively, "Lead Plaintiffs"), by and through their attorneys, on behalf of themselves and all other similarly situated shareholders of UnitedHealth Group, Inc. ("UnitedHealth" or the "Company"), and derivatively on behalf of UnitedHealth, allege, upon personal knowledge as to themselves and their own acts and upon information and belief and in reliance on the investigation of their counsel as to all other matters, as follows:

## NATURE OF THE ACTION

1.     Lead Plaintiffs bring this derivative action on behalf of Nominal Defendant UnitedHealth, and class action on behalf of themselves and all other similarly situated shareholders, against certain of UnitedHealth's executive officers (the "Officer Defendants," as defined below) and members of its Board of Directors (the "Director

Defendants," as defined below and, collectively, "Defendants").  This action arises from Defendants' fraudulent scheme to grant, obtain, approve, and/or acquiesce in the issuance of unlawfully "backdated" stock options to the Officer Defendants, including UnitedHealth's Chairman and Chief Executive Officer, Defendant William W. McGuire ("McGuire"), and its President and Chief Operating Officer, Defendant Stephen J. Hemsley ("Hemsley").  As explained in more detail below, Defendants engaged in the fraudulent options scheme with an express intent and purpose of providing the Officer Defendants with billions of dollars of windfall compensation at the direct expense of UnitedHealth.

2.     McGuire, Hemsley, and other Officer Defendants have received UnitedHealth stock options from at least 1996 through 2002 with abnormally low and statistically anomalous exercise prices.  As explained in more detail below, statistical analysis of these option grants shows that it is virtually impossible that the grants occurred on the claimed dates.  Furthermore, on May 11, 2006, amid the Securities and Exchange Commission's ("SEC") and other investigations into the options scheme at the Company, UnitedHealth **admitted** that there was a "***significant deficiency***" in how it had administered its stock option plans, and announced that, as a result, it would be required to restate its financial results by cutting net income by as much as $286 million over the last three years.  As detailed herein, the administration of the Company's stock option plans was more than "significantly deficient," it was an outright fraud in violation of the Company's stock option plans, and federal and state laws.

3.      A stock option provides a recipient with the right to buy a share of company stock at a set price called the "exercise" or "strike" price on a future date, typically at the end of a fixed period of time called the vesting period.  Thus, the lower the exercise price of a stock option the more profitable it is for the grantee.

4.      Stock option compensation is intended to align the interests of executives with those of shareholders and to provide executives with incentives to maximize future shareholder value.  To achieve this goal, many companies' stock option plans, including UnitedHealth's, provide that the exercise price of an option cannot be *less* than the market price of the stock on the date on which the board of directors, or a committee thereof, grants the option.   At UnitedHealth, the Director Defendants consistently violated this and other provisions of the Company's stock option plans in order to illegally maximize the grantees' stock option profits.  As such, and as detailed below, the Director Defendants' acts were *ultra vires – i.e.*, unauthorized and beyond the scope of power granted to the Director Defendants.

5.      More specifically, between 1996 and 2002, the Director Defendants granted McGuire, Hemsley and certain other Officer Defendants millions of stock options with strike prices based on the dates with the ***lowest closing share price of the year for four years in a row***, and at other relative low points or troughs throughout the period.  As reported by *The Wall Street Journal* on March 18, 2006, a statistical analysis of these grants concluded that the chance of these grants actually having occurred on these dates

as claimed was *1 in 200 million*.[1]  Moreover, a statistical study conducted by Lead Plaintiffs regarding grants issued to the Officer Defendants from 1996 through 2002 demonstrates that UnitedHealth's stock price declined by an abnormally high amount (an average of -10%) during the fifteen days immediately preceding the grants, and increased by an abnormally high amount (an average of 17%) during the fifteen days immediately after the purported grant dates.  The likelihood of averaging such stellar returns in the fifteen days following option grants over this seven-year period is extraordinarily low to nonexistent.

6.      These shocking statistical findings are explained by the recent revelations about how UnitedHealth administered its stock option plans.  As recently became apparent, the exercise prices for the Officer Defendants' option grants were not random or lucky.  Rather, in violation of federal and state law, and the Company's stock option plans, Defendants orchestrated and executed a scheme to time and/or backdate option grants to coincide with particularly low share prices while fraudulently representing to the Company and its shareholders that the exercise prices of the granted options were tied to the date of the grant.

7.      Since at least 1996, the Director Defendants have violated their fiduciary duties to the Company by improperly delegating to McGuire—who stood to benefit the most from option grants—the ability to unilaterally set the grant dates for his own option

---

[1]      *See* Charles Forelle and James Bandler, *The Perfect Payday – Some CEOs Reap Millions By Landing Stock Options When They Are Most Valuable; Luck – Or Something Else?*, WALL STREET JOURNAL, March 18, 2006 at A1.

grants and option grants to the other Officer Defendants.  The delegation of this authority to McGuire was not only a breach of the Director Defendants' fiduciary duties, but also an outright violation of the Company's stock option plans, which required independent directors to administer the plan and only allowed for delegation of authority in a limited number of situations, none of which is relevant here.  The Director Defendants also either knowingly or recklessly permitted McGuire to abuse his power to set grant dates by allowing McGuire to fraudulently backdate the option grants to himself and other Officer Defendants and to lie to the Company and the shareholders about the true dates of the grants.  The Director Defendants' actions in this regard were *ultra vires* and could not be viewed as valid exercises of business judgment.  The Director Defendants' actions were designed solely to enable McGuire to abuse the process and loot the Company of hundreds of millions of dollars.

8.     In blatant violation of his fiduciary duty of loyalty and good faith, McGuire did exactly that.  For years, he unilaterally picked dates for option grants for himself and effectively the other Officer Defendants and repeatedly illegally backdated the option grants to dates on which the stock price was at an especially low point during the quarter or fiscal year, providing the grantees with in-the-money options carrying an immediate "paper profit."  Thus, the claimed dates of the grants in question were untrue.  The options were actually granted on different dates and, with the benefit of hindsight, falsely ascribed to dates that were more favorable to the Officer Defendants. This manipulation was akin to picking lottery numbers on the day after the winning numbers are reported in the news or betting on a horse after the race has ended, and still reaping the benefits.

5

Despite this blatant manipulation, the Director Defendants either knowingly or, at a minimum, recklessly approved McGuire's fraudulent selection of grant dates and the Officer Defendants either knowingly or recklessly accepted the fraudulent grants.

9.     This fraudulent options-backdating scheme was not disclosed to the Company or its shareholders.   On the contrary, as detailed below, the Director Defendants caused the Company to issue fraudulent proxy statements and fraudulent financial statements, and the Officer Defendants filed with the SEC Form 4s and 5s with fraudulent grant dates for the options received.

10.     Moreover, as detailed below, from 2003 through 2005, McGuire continued to select option grant dates for himself and effectively for other executive officers in violation of the Company's stock option plans.   As such, each of these grants was *ultra vires*.

11.     McGuire and the Officer Defendants amassed a fortune in stock options as a result of this fraudulent scheme.   McGuire's and Hemsley's unexercised stock options alone were valued at approximately ***$2.3 billion*** as of December 2005, and the other Officer Defendants' unexercised stock options are worth hundreds of millions of dollars. Moreover, McGuire, Hemsley and the other Officer Defendants also reaped hundreds of millions of dollars in profits from exercising certain of the backdated stock options.

12.     Defendants' fortunes were amassed at the direct expense of the Company and to the detriment of its shareholders.   As such, they must be returned.   Manipulating the timing of stock option grants (through backdating or otherwise) carries an inherent cost to the issuer and represents a direct and continuing waste of valuable corporate

assets. Specifically, when the grant date of an option is manipulated to an earlier date on which the stock closed at a lower price, the grantee pays less for the stock and the corporation, the counterparty to the option grant, is deceived into accepting less for its stock when the option is exercised. The proceeds obtained, and yet to be obtained, by these executives through exercising their backdated stock options are therefore siphoned, on a dollar for dollar basis, directly from UnitedHealth.

13.     Moreover, when options are backdated to lower the exercise price for the benefit of the insiders (as they were here), the stated purpose behind an employee stock option plan—providing incentives to executives to work hard to benefit the Company and its shareholders in the future—is undermined to the detriment of the Company and its shareholders, because the options are already in the money. Accordingly, backdating options results in corporate waste because it serves no legitimate corporate purpose.

14.     Also, because applicable laws require an issuer of options to account for options granted with an exercise price that is lower than the stock price on the grant dates as a compensation-related expense, backdating options conceals this extra compensation and, consequently, results in the overstatement of the issuer's net income and earnings.

15.     As explained in more detail below, the built-in paper profit to recipients of backdated stock options carries with it numerous tax, accounting, and disclosure obligations. Defendants, however, avoided these obligations, violated the securities laws, and breached their duty of candor to shareholders, by materially misrepresenting or concealing the backdated nature of the options in numerous public filings such as SEC Form 10-Ks, proxy statements, and Form 4s and 5s. Defendants used these deceptive

public filings to perpetuate their fraud, reelect the very directors who participated in this fraudulent scheme and flood the market with excessive amounts of UnitedHealth stock options, which directly harmed shareholders by diluting their equity interest in the Company. In these filings, Defendants repeatedly and fraudulently misrepresented that (a) options were granted at fair market value at the date of the grant; (b) the option grants were aligning the Company's interests with its executives; and (c) the Board was administering, reviewing and monitoring the grants in accordance with the Company's stock option plans. As detailed below, each of these statements was materially false and misleading. Defendants also failed to disclose adequately that the stock option grants at issue were backdated or otherwise manipulated in direct violation of federal and state laws and the Company's stock option plans. Finally, Defendants also failed to account properly for the backdated option grants and violated Generally Accepted Accounting Principles ("GAAP") by failing to recognize compensation expenses incurred when the improperly backdated options were granted.

16.    Accordingly, Lead Plaintiffs, on behalf of themselves and all other similarly situated shareholders, and derivatively on behalf of UnitedHealth, seek relief for the damages sustained, and to be sustained, by UnitedHealth and its shareholders as a result of Defendants' violations of state and federal law through the fraudulent manipulation of the Company's stock options, including their violation of the Securities Exchange Act of 1934 ("Exchange Act") and Rules promulgated thereunder, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross mismanagement, waste of corporate assets, unjust enrichment and rescission. Specifically, Lead Plaintiffs seek

to cancel unexercised backdated options; have all of the financial gains from the recipients who exercised such options returned to UnitedHealth (including the Officer Defendants' short-swing profits); and hold accountable UnitedHealth's directors and officers who knowingly or recklessly and in bad faith granted, obtained, approved and/or acquiesced in the issuance of backdated options, or otherwise participated in this fraudulent scheme.

## JURISDICTION AND VENUE

17.     This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.  This Court also has exclusive jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Lead Plaintiffs have brought claims under, *inter alia*, Sections 10(b), 14(a) and 16(b) of the Exchange Act, 15 U.S.C. § 78j(b), 15 U.S.C. § 78n(a), and 15 U.S.C. § 78p(b), respectively, and Rules 10b-5 and 14a-9 promulgated thereunder.  This Court also has supplemental jurisdiction over the non-federal claims asserted herein pursuant to 28 U.S.C. § 1367(a).

18.     Venue is proper pursuant to 28 U.S.C. § 1401, as the Company may properly sue Defendants, and Lead Plaintiffs may properly sue the Company and Defendants in this District, the Company's principal place of business and state of incorporation.

19.     Lead Plaintiffs demand a trial by jury for all issues triable of right by a jury.

## PARTIES

## LEAD PLAINTIFFS

20.     Lead Plaintiff Public Employees' Retirement System of Ohio ("PERS") provides for the retirement of state, county, municipal and certain other Ohio employees and holds assets of approximately $73 billion.  PERS currently holds UnitedHealth common shares, intends to retain shares in UnitedHealth through the duration of the litigation, and owned UnitedHealth common stock at the time of wrongdoing that is the subject of this litigation.

21.     Lead Plaintiff State Teachers' Retirement System of Ohio ("STRS") serves approximately 400,000 active, inactive and retired Ohio public educators and has assets of approximately $53 billion.    STRS currently holds UnitedHealth common shares, intends to retain shares in UnitedHealth through the duration of the litigation, and owned UnitedHealth common stock at the time of wrongdoing that is the subject of this litigation.

22.     Lead Plaintiff Connecticut Retirement Plans And Trust Funds (the "Connecticut Retirement Fund"), is a public pension fund that invests assets on behalf of public employees in the State of Connecticut.  With assets valued at approximately $23 billion, the Connecticut Retirement Fund consists of six pension funds and eight trust funds, representing, among others, approximately 160,000 teachers, police officers, firefighters, and state and municipal employees who are pension plan participants and beneficiaries.    Connecticut Retirement Fund currently holds UnitedHealth common shares, intends to retain shares in UnitedHealth through the duration of the litigation, and

owned UnitedHealth common stock at the time of wrongdoing that is the subject of this litigation.

23.     Lead Plaintiff St. Paul Teachers' Retirement Fund Association ("St. Paul Teachers") is a defined-benefit pension fund for public school teachers in St. Paul, Minnesota and has assets of approximately $1 billion.  St. Paul Teachers currently holds UnitedHealth common shares, intends to retain shares in UnitedHealth through the duration of the litigation, and owned UnitedHealth common stock at the time of wrongdoing that is the subject of this litigation.

24.     Lead Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi") provides retirement benefits to all non-federal public employees in the State of Mississippi.  Mississippi currently holds UnitedHealth common shares, intends to retain shares in UnitedHealth through the duration of the litigation, and owned UnitedHealth common stock at the time of wrongdoing that is the subject of this litigation.

25.     Lead Plaintiff Jacksonville Police & Fire Pension Fund ("Jacksonville") is a defined-benefit pension fund for police officers and firefighters in Jacksonville, Florida. Jacksonville currently holds UnitedHealth common shares, intends to retain shares in UnitedHealth through the duration of the litigation, and owned UnitedHealth common stock at the time of wrongdoing that is the subject of this litigation.

26.     Lead Plaintiff Louisiana Municipal Police Employees' Retirement System ("Louisiana Police") is a defined-benefit pension fund for police officers in the State of Louisiana.  Louisiana Police currently holds UnitedHealth common shares, intends to

11

retain shares in UnitedHealth through the duration of the litigation, and owned UnitedHealth common stock at the time of wrongdoing that is the subject of this litigation.

27.     Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") is a defined-benefit pension fund for sheriffs in the State of Louisiana with $1.6 billion in net assets as of April 30, 2006.  Louisiana Sheriffs currently holds UnitedHealth common shares, intends to retain shares in UnitedHealth through the duration of the litigation, and owned UnitedHealth common stock at the time of wrongdoing that is the subject of this litigation.

28.     Lead Plaintiff Fire & Police Pension Association of Colorado currently holds UnitedHealth common shares, intends to retain shares in UnitedHealth through the duration of the litigation, and owned UnitedHealth common stock at the time of wrongdoing that is the subject of this litigation.

29.     Lead Plaintiff Jan Brandin is a resident of Massachusetts.  He currently holds 4,460 shares of UnitedHealth common shares, has continuously been a shareholder of UnitedHealth since 1994, and intends to retain shares through the duration of this litigation.

30.     Lead Plaintiffs have retained experienced counsel, and Lead Plaintiffs and their counsel will fairly and adequately represent and protect the interests of UnitedHealth and its shareholders in this action.

## NOMINAL DEFENDANT

31.     Nominal Defendant UnitedHealth is a Minnesota corporation with its principal executive offices and place of business located at 9900 Bren Road East, Minnetonka, Minnesota.  UnitedHealth is a diversified health care company, which offers healthcare benefit plans, health care benefits management, data and information services, drug development and marketing services, and specialized care services, through six operating subsidiaries: UnitedHealthcare, Ovations, AmeriChoice, Uniprise, Specialized Care Services and Ingenix.  UnitedHealth common stock trades on the New York Stock Exchange under the symbol "UNH."

## THE DIRECTOR DEFENDANTS

32.     The following parties, sometimes referred to herein as the "Director Defendants," served at various times during the period 1996 through April 2006 and currently serve as members of the Board of Directors of UnitedHealth (the "Board") as follows:

### William W. McGuire

33.     Director Defendant William W. McGuire, M.D., is the Chairman of the Board and CEO of UnitedHealth, positions he has held since 1991.  McGuire joined the Company as Executive Vice President in November 1988, served as COO from May 1989 to June 1995, served as President from November 1989 until May 1999, and has been a director of UnitedHealth since 1989.  McGuire is also the Chair of the Company's Executive Committee.  During the relevant period, the Compensation Committee, which was responsible for the Company's stock option and stock-based incentive plans,

13

regularly adopted recommendations by McGuire concerning the allocation of incentive compensation amounts to executives.

34.     McGuire's 1999 Employment Agreement with the Company also granted to McGuire the ability to set the dates of his own stock option grants through oral notification to Director Defendant William G. Spears.  The Director Defendants also knowingly or recklessly permitted McGuire to abuse his power to set grant dates by allowing McGuire to fraudulently backdate the option grants.  Due to this arrangement, and by virtue of his Board membership, McGuire directly participated in, approved of, received and personally benefited from the fraudulently backdated stock option grants described herein, despite having received significant salary and bonus compensation from the Company during the relevant period.  During fiscal 1996 through 2005, McGuire received a total of $16.95 million in salary and approximately $32 million in bonus payments.  To date, McGuire has reaped proceeds of more than $420 million from stock option exercises.  As of December 31, 2005, McGuire had an additional 29,562,496 exercisable options outstanding with an "in-the-money" value of more than *$1.6 billion*.

35.     As Chairman of the Board of Directors, McGuire owed a duty of loyalty and good faith to UnitedHealth and its shareholders to act in the best interests of the Company.  Rather than fulfill this and other fiduciary duties that McGuire owed to UnitedHealth, he knowingly or recklessly manipulated and entered into fraudulent and self-dealing stock option grants with the Company that induced the Company to issue McGuire and other Officer Defendants UnitedHealth stock options that were priced

14

below the fair market value of the stock on the date of the grants at the direct expense of the Company.

36.     Because of McGuire's positions and direct personal involvement in the fraud, he knew the adverse non-public information about UnitedHealth's grants of manipulated stock options, as well as the Company's finances, tax obligations and accounting practices.  Notwithstanding, McGuire signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 2001-2005. In addition, McGuire signed and filed with the SEC Form 4s and 5s regarding the backdated stock option grants at issue here, which fraudulently misrepresented the dates of the grants.

**Stephen J. Hemsley**

37.     Director Defendant Stephen J. Hemsley has served as COO of UnitedHealth since 1998 and President since 1999.  Hemsley joined the Company in May 1997 as Senior Executive Vice President and he has been a director of UnitedHealth since February 2000.

38.     As a member of the Board, Hemsley owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company. Rather than fulfill this and other important fiduciary duties Hemsley owed to UnitedHealth, he knowingly or recklessly approved and/or otherwise permitted and accepted the backdated stock options at issue in this case.

39.     Hemsley has received and personally benefited from the fraudulently issued stock option grants described herein, despite having received significant salary and bonus compensation from the Company during the relevant period.  During fiscal 1998 through 2005, Hemsley received a total of more than $7 million in salary and approximately $13.5 million in bonus payments.   To date, Hemsley has reaped proceeds of approximately $109 million from stock option exercises.  As of December 31, 2005, he had an additional 12,320,000 exercisable options outstanding with an "in-the-money" value of more than *$660 million*.

40.     As a director, Hemsley owed a duty to UnitedHealth to be reasonably informed about the Company's compensation practices, and to act in the best interests of the Company.   Notwithstanding, Hemsley signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 2001-2005. In addition, Hemsley filed with the SEC Form 4s and 5s, which fraudulently misrepresented the dates of the grants.

41.     Prior to joining the Company, Hemsley was a Managing Partner and the CFO of Arthur Andersen LLP ("Arthur Andersen").  From before 1996 until May 15, 2002, Arthur Andersen was UnitedHealth's outside auditor.  The current CFO of the Company, Patrick J. Erlandson, is also a former Arthur Andersen partner.

**William G. Spears**

42.     Director Defendant William G. Spears ("Spears") has been a director of UnitedHealth since 1991.  Spears is also a member of the Company's Executive

Committee.  As a Board member and as a member of the Compensation Committee (from at least 1996 to the present) and Chairman of such Committee (1997 to 2004), Spears owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company.  Rather than fulfill this and other important fiduciary duties, Spears knowingly or recklessly, and in bad faith, approved and/or otherwise permitted the backdated stock options at issue in this case.  Specifically, pursuant to McGuire's 1999 Employment Agreement with the Company, as Chairman of the Compensation Committee, Spears was the sole individual to whom McGuire was required to provide oral notification of the date of McGuire's option grants.  Spears violated his duties of loyalty and care to the Company by knowingly or recklessly, and in bad faith, granting fraudulently manipulated options to McGuire and others.

43.    As of UnitedHealth's most recent Proxy Statement, Spears beneficially owned 392,590 stock options that were exercisable within 60 days of the date of the Proxy, with a total market value of approximately $22 million.[2]

44.    Spears also signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 2001-2005.

---

[2]    The total market value on March 21, 2006 for options issued to Spears and other Defendants is calculated by multiplying the number of options granted by $56.21, the closing price of UnitedHealth common stock on that date.

**Douglas W. Leatherdale**

45.     Director Defendant Douglas W. Leatherdale ("Leatherdale") has been a director of UnitedHealth since 1983.  Leatherdale is also a member of UnitedHealth's Executive Committee.

46.     As a member of the Board of Directors, Leatherdale owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company.  Rather than fulfill this and other important fiduciary duties, Leatherdale knowingly or recklessly, and in bad faith, approved and/or otherwise permitted the backdated stock options at issue in this case, yet Leatherdale currently sits on a special Board committee overseeing the options investigation.  As of UnitedHealth's most recent Proxy Statement, he beneficially owned 426,190 stock options that were exercisable within 60 days of March 21, 2006, with a total market value of approximately $24 million.

47.     As a member of the Audit Committee (from at least 1996 to the present), and Chairman of such Committee (from at least 1996 to 2004), Leatherdale also oversaw and reviewed the Company's financial reporting and public disclosure activities. Leatherdale also signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 2001-2005.

**William C. Ballard, Jr.**

48.     Director Defendant William C. Ballard, Jr. ("Ballard") has been a director of UnitedHealth since 1993.  Ballard is also a member of the Company's Executive

Committee. As a member of the Board and Compensation Committee (1997 to 1999), Ballard owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company. Rather than fulfill this and other important fiduciary duties, Ballard knowingly or recklessly, and in bad faith, approved and/or otherwise permitted the backdated stock options at issue in this case. As of UnitedHealth's most recent Proxy Statement, Ballard beneficially owned 302,000 stock options which were exercisable within 60 days of March 21, 2006 with a total market value of almost $17 million.

49. As a member of the Audit Committee (1999 to the present), and Chairman of such Committee (2004 to the present), Ballard oversaw and reviewed the Company's financial reporting and public disclosure activities. Ballard also signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 2001-2005.

**Richard T. Burke**

50. Director Defendant Richard T. Burke ("Burke") has been a director of UnitedHealth since 1977 and was its CEO until February 1988. As a member of the Board, Burke owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company. Rather than fulfill this and other important fiduciary duties, Burke knowingly or recklessly, and in bad faith, approved and/or otherwise permitted the backdated stock options at issue in this case, yet Burke currently sits on a special Board committee overseeing the options investigation. As of

UnitedHealth's most recent Proxy Statement, Burke beneficially owned 422,270 stock options that were exercisable within 60 days of March 21, 2006, with a total market value of approximately $23.7 million.

51.     As a member of the Audit Committee (2003), Burke also oversaw and reviewed the Company's financial reporting and public disclosure activities.  In addition, Burke signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 2001-2005.

**James A. Johnson**

52.     Director Defendant James A. Johnson ("Johnson") has been a director of UnitedHealth since 1993.  As a member of the Board of Directors, and as a member of the Compensation Committee (2003 to the present) and Chairman of such Committee (2004 to the present), Johnson owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company.  Rather than fulfill this and other important fiduciary duties, Johnson knowingly or recklessly, and in bad faith, approved and/or otherwise permitted the backdated stock options at issue in this case, yet Johnson currently sits on a special Board committee overseeing the options investigation.  As of UnitedHealth's most recent Proxy Statement, Johnson beneficially owned 410,020 stock options which were exercisable within 60 days of March 21, 2006, with a total market value of approximately $23 million.

53.     As a member of the Audit Committee (from at least 1996 to 2002), Johnson oversaw and reviewed the Company's financial reporting and public disclosure activities.

20

Johnson also signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 1996-2005.

**Thomas H. Kean**

54.    Director Defendant Thomas H. Kean ("Kean") has been a director of UnitedHealth since 1993. As a member of the Board of Directors, and as a member of the Compensation Committee (1996 to 2003), Kean owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company. Rather than fulfill this and other important fiduciary duties, Kean knowingly or recklessly, and in bad faith, approved and/or otherwise permitted the backdated stock options at issue in this case. As of UnitedHealth's Proxy Statement, Kean beneficially owned 389,840 stock options which were exercisable within 60 days of March 21, 2006, with a total market value of almost $22 million.

55.    As a member of the Audit Committee (2004 to the present), Kean also oversaw and reviewed the Company's financial reporting and public disclosure activities. In addition, Kean signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 1996-2005.

**Mary O. Mundinger**

56.    Director Defendant Mary O. Mundinger, Ph.D. ("Mundinger") has been a director of UnitedHealth since 1997. As a Board member and as a long-time member of the Compensation Committee (1997 to the present), Mundinger owed a duty of loyalty,

care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company.   Rather than fulfill this and other important fiduciary duties, Mundinger knowingly or recklessly, and in bad faith, approved and/or otherwise permitted the backdated stock options at issue in this case.   According to UnitedHealth's most recent Proxy Statement, Mundinger beneficially owned 314,320 stock options that were exercisable within 60 days of March 21, 2006, with a total market value of approximately $17.7 million.

57.   Mundinger also signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 1997-2005.

**Robert L. Ryan**

58.   Director Defendant Robert L. Ryan ("Ryan") has been a director of UnitedHealth since 1996.   As a Board member and as a member of the Compensation Committee (1996 to 1998), Ryan owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company.   Rather than fulfill this and other important fiduciary duties Ryan knowingly or recklessly, and in bad faith, approved and/or otherwise permitted the backdated stock options at issue in this case.   As of UnitedHealth's most recent Proxy Statement, Ryan beneficially owned 170,370 UnitedHealth stock options that were exercisable within 60 days of March 21, 2006, with a total market value of approximately $9.6 million.

59.    Ryan also signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 1996-2005.

**Gail R. Wilensky**

60.    Director Defendant Gail R. Wilensky, Ph.D. ("Wilensky") has been a director of UnitedHealth since 1993.  As a Board member she owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company.  Rather than fulfill this and other important fiduciary duties, Wilensky knowingly or recklessly, and in bad faith, approved and/or otherwise permitted the backdated stock options at issue in this case.

61.    As of UnitedHealth's March 21, 2006 Proxy Statement, Wilensky beneficially owned 251,510 stock options that were exercisable within 60 days of March 21, 2006, with a total market value of approximately $14 million.

62.    Wilensky also signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ended December 31, 1996-2005.

**Donna E. Shalala**

63.    Director Defendant Donna E. Shalala, Ph.D. ("Shalala") has been a director of UnitedHealth since 2001.  As a Board member Shalala owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company.  Rather than fulfill this and other important fiduciary duties, Shalala

knowingly or recklessly, and in bad faith, approved and/or otherwise permitted the backdated stock options at issue in this case.

64.     As of UnitedHealth's most recent Proxy Statement, Shalala beneficially owned 100,000 stock options that were exercisable within 60 days of March 21, 2006, with a total market value of $5.6 million.

65.     Shalala also signed the Company's public filings knowingly or with reckless disregard for the fact that they were materially false and/or misleading, including the Form 10-Ks for fiscal years ending December 31, 2002-2005.

66.     Shalala is the President of the University of Miami in Florida and has been since 2001.  Shalala served as the U.S. Secretary of Health and Human Services from January 1993 until January 2001.  Shalala is also currently a director of Gannett Co., Inc., of which Director Defendant Johnson is also a director.

## THE OFFICER DEFENDANTS

67.     The following parties, sometimes referred to herein together with Director Defendants McGuire and Hemsley as the "Officer Defendants," served during the relevant period as officers with direct and substantial management positions at UnitedHealth.  As officers of the Company, each of the Officer Defendants owed a duty of loyalty, care and good faith to UnitedHealth and its shareholders to act in the best interests of the Company.  Rather than fulfill this and other important fiduciary duties they owed to UnitedHealth, the Officer Defendants knowingly or recklessly manipulated and entered into fraudulent and self-dealing stock option grants with the Company that induced the Company to issue each of them UnitedHealth stock options that were priced

below the fair market value of the stock on the date of the grants at the direct expense of the Company. Moreover, each Officer Defendant signed and filed with the SEC Form 4s and 5s relating to backdated option grants at issue here that fraudulently misrepresented the dates of the grants.

68.     Officer Defendant Arnold H. Kaplan ("Kaplan"), at relevant times, was UnitedHealth's CFO.

69.     Officer Defendant David P. Koppe ("Koppe"), at relevant times, was UnitedHealth's CFO until his resignation on June 30, 1998.

70.     Officer Defendant David J. Lubben ("Lubben"), at relevant times, has been Secretary and General Counsel of UnitedHealth.   Before joining UnitedHealth on September 11, 1996 as the Company's General Counsel, for more than 19 years Lubben was affiliated with Dorsey & Whitney LLP, the law firm that currently represents the Defendants in this matter.   Lubben was a Partner in that firm's corporate group and had served as UnitedHealth's principal outside counsel since the early 1980's.   According to UnitedHealth's most recent proxy statement, Lubben beneficially owned 1,426,580 stock options that were exercisable within 60 days of March 21, 2006.

71.     Officer Defendant Thomas P. McDonough ("McDonough"), at relevant times, was UnitedHealth's CEO for Strategic Business Services.

72.     Officer Defendant Jeannine M. Rivet ("Rivet"), at relevant times, was UnitedHealth's Executive Vice President and CEO for UnitedHealth Care and Ingenix.

73.     Officer Defendant Robert J. Sheehy ("Sheehy"), at relevant times, was UnitedHealth's CEO for UnitedHealth Care.

25

74.     Officer Defendant R. Channing Wheeler ("Wheeler"), at relevant times, was UnitedHealth's CEO for Uniprise.

75.     Officer Defendant Travers H. Wills ("Wills"), at relevant times, was UnitedHealth's COO until his resignation on June 30, 1998.

## OBLIGATIONS AND DUTIES OF THE DEFENDANTS

76.     By reason of their positions as directors and/or officers and fiduciaries of UnitedHealth, and because of their ability to control the business, corporate and financial affairs of UnitedHealth, each Defendant owed UnitedHealth the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including in the administration of the Company's stock options and incentive plans and in ensuring that UnitedHealth operated in compliance with all applicable federal and state laws, rules and regulations, and that UnitedHealth refrained from engaging in any unsound or illegal business practices.  Furthermore, each Defendant owed the Company and its shareholders duties of loyalty, good faith and candor, which required Defendants to refrain from engaging in self-interested transactions with the Company, and to disclose material facts relating to their dealings with the Company.

77.     To discharge these duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of UnitedHealth.  By virtue of these duties, Defendants were required, *inter alia*, to:

> a.     Manage, conduct, supervise, and direct the employees, businesses and affairs of UnitedHealth in accordance with laws, rules and regulations, and the charter and by-laws of UnitedHealth;

26

      b.      Manage and supervise the administration of UnitedHealth's various stock option and incentive plans in a manner consistent with the plans' objectives;

      c.      Ensure prudence and soundness of policies and practices undertaken or proposed to be undertaken by UnitedHealth;

      d.      Remain informed as to how UnitedHealth was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including, but not limited to, maintaining and implementing adequate financial controls;

      e.      Supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by UnitedHealth and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of UnitedHealth; and

      f.      Preserve and enhance UnitedHealth's reputation as befits a public corporation.

78.     Moreover, the Director Defendants generally, and members of the Compensation Committee specifically, were responsible for administering the Company's stock option plans. According to the Company's proxy statements, the Compensation Committee is responsible for overseeing the Company's compensation, employee benefits and stock-based programs. The Compensation Committee also negotiates and administers the Company's employment arrangements with its Chief Executive Officer and President, supervises incentive and equity-based compensation for the Company's employees and reviews and monitors directors' compensation programs.

79.     Furthermore, Defendants, particularly the Director Defendants generally, and specifically the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and ensuring that

the Company's financial statements were based on accurate financial information.
According to GAAP, to accomplish the objectives of accurately recording, processing,
summarizing and reporting financial data, a corporation must establish an internal
accounting control structure.  Among other things, Defendants were required to:

      a.    Make and keep books, records, and accounts, which, in reasonable detail, fairly and accurately reflect the transactions and dispositions of assets of the issuer; and

      b.    Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

          i.    Transactions are executed in accordance with management's general or specific authorization; and

          ii.    Transactions are recorded as necessary to permit preparation of financial statements.

    80.    Additionally, UnitedHealth's Audit Committee Charter provides that the Audit Committee shall, among other things:

      a.    Serve as an independent and objective party to monitor the Company's financial reporting process and internal control system;

      b.    Review the Company's annual financial statements and any other significant reports or financial information prior to submission to any governmental body, or the public, including without limitation (i) any certification, report, opinion or review rendered by the independent accountants, and (ii) the Annual Report on Form 10-K;

      c.    Review the integrity of the Company's financial reporting processes, both internal and external;

      d.    Consider the independent outside auditor's judgments about the quality and appropriateness of the Company's accounting principles as applied to its financial reporting;

      e.    Review tax and/or legal and regulatory matters that may have a material impact on the financial statements and related reserve positions; and

       f.    Ensure that management has the proper review system in place to ensure that the Company's financial statements, reports, and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

81.    By knowingly or recklessly implementing and/or permitting the backdating option scheme, the Director Defendants failed at upholding these duties.   More specifically, the Director Defendants breached the fiduciary duties they each owe to the Company in the following ways:

82.    First, as described in more detail below, the Board's delegation of the right to select stock option grant dates to McGuire was *ultra vires* – a clear violation of the Company's 1991 and 2002 Stock Option Plans.   Furthermore, each time McGuire selected a grant date for himself and effectively other Officer Defendants, his action was also *ultra vires*.

83.    Second, McGuire's pattern of backdating his and effectively the other Officer Defendants' option grants illustrates that each and every time he picked a grant date, he breached his fiduciary duty to put the Company's interests ahead of his own.

84.    Third, as described in more detail below, the Director Defendants approved or permitted the backdating of stock options to the Officer Defendants, in direct violation of the Company's stock option plans which required that stock options be priced at no less than 100% of the fair market value on the "date of the grant of such option." Furthermore, the Director Defendants failed to provide the appropriate checks and balances necessary to ensure that the backdating did not occur.  Their failure to review McGuire's selection of grant dates before approving them was either an intentional or a

29

severely reckless violation of their fiduciary duties – a clear bad faith breach of the duty of care for which they are not entitled to the protection of the business judgment rule. Finally, relinquishing their duty for over nine years by allowing an interested party— McGuire—to set a material term of his own compensation is an impermissible breach of the duty of loyalty and good faith.

85.    The Director Defendants, including McGuire, also breached their duty of candor by failing to disclose the fraudulent options scheme.

86.    Finally, the Officer Defendants breached their fiduciary duties by knowingly or recklessly accepting the fraudulently backdated option grants.

## THE OPTION BACKDATING SCHEME

87.    Defendants either knowingly or recklessly participated in an options backdating scheme with the direct intent and purpose of enriching the Officer Defendants at the expense of UnitedHealth.  Pursuant to this scheme, the Officer Defendants received billions of dollars of option grants purportedly issued on unusually favorable and statistically improbable dates during at least the period from 1996 through 2002, resulting in hundreds of millions, if not billions, of undisclosed and illegal compensation.  The stock option grants at issue here were claimed to have been granted at or near the stock's annual or quarterly low, and/or immediately before a substantial run-up in the stock price. Statistical analysis of this pattern of stock option grants reveals that the pattern could not have been random or fortuitous.  Rather, the only statistical explanation (consistent with Defendants' recent disclosure that there were "significant deficiencies" in UnitedHealth's

30

stock option grants) is that these stock option grants were backdated to allow the Officer Defendants to enjoy the largest possible returns at the expense of the Company.

88.    The scheme was implemented by delegating to McGuire unilateral power to choose the dates for his own (and effectively the other Officer Defendants') option grants, in direct violation of the Company's stock option plans.  As set forth more fully below, in violation of state and federal law and the Company's stock option plans, McGuire repeatedly picked the dates of the grants that were the best for him and the other Officer Defendants and the worst for the Company, cheating the Company out of billions of dollars for the benefit of the Officer Defendants.  None of these facts were disclosed to UnitedHealth's shareholders so this fraudulent scheme continued for at least nine years.

**The 1991 Option Plan**

89.    Prior to 2002, the Company's stock option program for employees, including McGuire, Hemsley, and the other Officer Defendants was governed by the 1991 Stock and Incentive Plan, as amended and restated effective May 14, 1997 (the "1991 Plan").  The 1991 Plan provided for the mechanism by which options were granted to key employees.

90.    The 1991 Plan provided that it "shall be administered by a committee (the 'Committee') of two or more directors of the Company, ***none of whom shall be officers or employees of the Company*** and all of whom shall be 'Non-Employee Directors' with respect to the Plan . . ."  1991 Plan at Section 3(a) (emphasis added).  The 1991 Plan further stated that, among other things, "the Committee shall have plenary authority . . . to determine the purchase price of the Common Shares covered by each option . . . [and]

31

to determine the employees to whom and the time or times at which such options and awards shall be granted and the number of shares to be subject to each." *Id.* at 3(b).

91.     The 1991 Plan also provided that the Committee, in certain limited and express situations, can delegate authority to the CEO to administer certain features of the 1991 Plan:

> The Chief Executive Officer of the Company shall have the authority, as granted by the Committee pursuant to clause (x) of the preceding subsection, to grant, pursuant to the Plan, options or other awards to eligible persons *who are not considered by the Company as its officers or directors* for purposes of Section 16 of the Securities Exchange Act of 1934, as amended.

*Id.* at 3(c) (emphasis added).

92.     In other words, the 1991 Plan provided that a committee of *independent* directors would be charged with administering the plan.  Although this committee could delegate certain limited authority to McGuire to authorize option grants to *non-officer/director* employees, the committee was expressly precluded from delegating to McGuire any authority with respect to the issuance of options to officers or directors (including himself).

93.     Importantly, the 1991 Plan also provided that:

> The option price for all Incentive Stock Options granted under the Plan *shall* be determined by the Committee but shall *not be less than 100%* of the fair market value of the Common Shares at the date of grant of such option.  The option price for options granted under the Plan which do not qualify as Incentive Stock Options and, if applicable, the price for all awards shall also be determined by the Committee.  For the purposes of the preceding sentence and for all other valuation purposes under the Plan, the fair market value of the Common Shares shall be determined by the Committee but shall not be less than the closing price of the stock on the

32

date for which fair market value is being determined as reported on any
national securities exchange on which common shares are then traded.

*Id.* at Section 5 (emphasis added).  In other words, the 1991 Plan **required** that the

Committee set the price for all options granted under the plan and **required** that the

Committee set the exercise price no lower than the fair market value of the underlying

stock **on the date the Committee grants the options**.  As detailed below, this is not what

happened.

### McGuire's 1996 Employment Agreement

94.     Effective as of January 1, 1996, UnitedHealth entered into an employment

agreement (the "1996 Agreement") with McGuire "for the purpose of setting forth the

terms and conditions of [McGuire's] employment by [UnitedHealth] and to protect

[UnitedHealth's] knowledge, expertise, customer and provider relationships, and the

confidential information [UnitedHealth] has developed about its customers, providers,

products, operations, and services."   The 1996 Agreement superseded all previous

agreements and was in effect until the 1999 Agreement (defined below) took effect.

95.     Through the 1996 Agreement, the Director Defendants (who approved or

otherwise allowed this agreement to be executed) provided McGuire with a lucrative pay

package, including an annual base salary of $1.1 million and at least 250,000

nonqualified stock options annually, as well as providing him with significant benefits,

including severance and retirement packages.

96.     In addition to this compensation, in violation of the 1991 Plan, the Director

Defendants delegated to McGuire the right to select the dates for his own option grants

33

by including the following provision in the 1996 Agreement: "The Options shall be granted semi-annually or *at such time or times as are mutually acceptable to Executive and the Company*. The exercise price for the Options shall initially be the fair market value of shares of [UnitedHealth] Common Stock at the time of the grant as determined by the Board of Directors . . ." The delegation of power to select the timing of McGuire's option grants to the most interested party—McGuire himself—violated the 1991 Plan's provision that *independent* directors administer the Plan and was therefore an *ultra vires* act not entitled to business judgment rule protection. As detailed below, McGuire took full advantage of this provision and consistently backdated the dates of his (and effectively the other Officer Defendants') option grants for his own benefit and to the detriment of the Company.

**McGuire's 1999 Employment Agreement**

97.     Effective as of October 13, 1999, UnitedHealth entered into an employment agreement (the "1999 Agreement") with McGuire "for the purpose of setting forth the terms and conditions of [McGuire's] employment by [UnitedHealth] and to protect [UnitedHealth's] knowledge, expertise, customer and provider relationships, and the confidential information [UnitedHealth] has developed about its customers, providers, products, operations, and services." The 1999 Agreement superseded any previous employment agreement between McGuire and the Company and had an initial term of five years, which was renewed automatically each year "unless either party shall have delivered a written notice to the other party of its intention not to renew this Agreement at least 120 days prior to October 13 of any such year."

34

98.     As in the 1996 Agreement, in the 1999 Agreement, the Director Defendants yet again awarded McGuire a very lucrative pay package, including (a) an initial $1.6 million annual salary, which the Board could raise, but not lower, at any time and in any amount so long as it raised McGuire's salary at least $100,000 each year, (b) options to purchase at least 325,000 shares of UnitedHealth each year, (c) an initial grant of options to buy 1 million shares of UnitedHealth stock, and (d) a full panoply of benefits, including lucrative severance and retirement packages.

99.     The 1999 Agreement also provided that the "exercise price for the Annual Option shall be the closing price for UnitedHealth Group Common Stock on the date of issuance."[3]

100.    Moreover, through the 1999 Agreement, in blatant violation of their fiduciary duties and the 1991 Plan, the Director Defendants effectively abdicated control over the timing (and therefore exercise price, because the price is set according to the date of the grant) of McGuire's option grants and left it up to McGuire to unilaterally select the dates for his option grants.  The 1999 Agreement provided: "The Annual Options shall be granted on such a date or dates as *[McGuire] requests by oral notification* to the Chair of the Compensation and Human Resources Committee (with such notification confirmed promptly in writing)." (Emphasis added.)

---

[3]     Effective October 13, 1999, the Company also entered into an amended employment agreement with Hemsley, which similarly provided: "The exercise price for each share of common stock underlying the Annual Options shall be the fair market price of one share of United Health Group Common Stock at the time of the grant."

101.   As in the case with the 1996 Agreement, this provision was *ultra vires*, because the 1991 Plan specifically required that a committee of **independent** directors administer and set the date for option grants.  Thus, it was outside the Board's authority to delegate this power to McGuire.  Although the 1991 Plan provided that the Compensation Committee may delegate certain responsibilities to McGuire, it clearly limited such matters **only** to grants to **non-officer/director** employees.  Thus, this was again an improper and *ultra vires* delegation of power in violation of the 1991 Plan.

102.   Moreover, even if the 1991 Plan did not contain the provisions referenced above and the Board's delegation of power was not *ultra vires*, there was no legitimate business purpose for the Board's decision to abdicate control over McGuire's option grants to McGuire himself.  Rather than act in the Company's best interest—as they were required to do—by approving this provision and later allowing McGuire to backdate his (and effectively other Officer Defendants') option grants, the Director Defendants either intentionally or recklessly violated their fiduciary duties to the Company.

103.   The 1999 Agreement itself was also backdated so that the Agreement's "Special Stock Option Grant" to McGuire of 1 million options would fall on October 13, 1999, the date of the lowest market close of the year.  Defendants accomplished this by first disclosing in a September 16, 1999 press release that McGuire had "entered into [a] new, long-term employment agreement" with UnitedHealth.  Details of the agreement such as the effective date of the Agreement were not disclosed at that time however.  This September 1999 disclosure gave McGuire the opportunity to wait and see (with the

36

benefit of hindsight) when UnitedHealth's stock price would reach a low and then disclose the effective date of the Agreement.

104.    In fact, six months later, an unsigned and undated version of the contract was made public in the Company's 1999 Form 10-K, filed with the SEC on March 30, 2000.  The 1999 Employment Agreement stated that the date the contract went into effect -- and thus the date the 1 million options pursuant to the 1999 Agreement were granted to McGuire -- was October 13, 1999, incidentally the stock's ***lowest market close of the year***.

105.    The 1999 Agreement also provided that McGuire had to wait nine years to begin exercising his one-time special option grant of 1 million options -- which has multiplied to 8 million options following three stock splits -- unless the Company hit certain earnings targets or enjoyed a "substantial increase" in its share price, according to the 1999 proxy statement.  The goal of meeting the share price target became much easier because the 1999 Employment Agreement set the strike price on October 13, 1999, the lowest stock price of the year.  Similarly, the goal of meeting the earnings targets also became easier as a result of the Company's improper failure to account for the backdated stock options as employee compensation, as more fully discussed below.  Indeed, McGuire's Form 4 filed with the SEC on February 23, 2006, states that McGuire received the right to exercise at least part of his Special Option Grant on October 13, 2000, eight years ahead of schedule.  On February 23, 2006, less than six and a half years from the purported October 13, 1999 grant date, McGuire exercised 729,504 options from this grant, realizing more than $39.4 million in profits.

37

**The 2002 Option Plan**

106.    In 2002, the Company restructured its option plan, rolling the 1991 Plan, as well as several other option plans that did not involve McGuire's options, into one comprehensive plan, the 2002 Stock Incentive Plan (Amended and Restated May 15, 2002) (the "2002 Plan," and collectively with the 1991 Plan, the "Plans").  The 2002 Plan was submitted to the Company's shareholders for approval at its annual meeting held on May 15, 2002.  The 2002 Plan provided that "the Plan *shall* be administered by the Committee," which is defined as "a committee of the Board of Directors of the Company designated by such board to administer the Plan and composed of not less than two directors."

107.    As reflected in the Proxy Statement dated April 2, 2002 and submitted to shareholders in connection with the 2002 Annual Meeting, the 2002 Plan (like the 1991 Plan) had been structured in a manner to comply with Section 162(m) of the Tax Code regarding the deductibility of executive compensation in excess of $1 million paid to the Company's chief executive officer and four other most highly compensated executive officers. Thus, the 2002 Plan provided that "to the extent required by Section 162(m) of the [Tax] Code, the Committee shall be composed solely of two or more 'outside directors' within the meaning of Section 162(m) of the Code."  2002 Plan at Section 3(a).

108.    The 2002 Plan further provided that "[u]nless otherwise *expressly* provided in the Plan, all designations, determinations, interpretations and other decisions under or with respect to the [2002] Plan or any Award *shall* be within the *sole* discretion of the Committee . . ."  *Id.* (emphasis added).  Moreover, like the 1991 Plan, the 2002 Plan *only*

38

authorized the Committee to delegate decisions regarding option grants to employees who are *not* officers and directors. Also, like the 1991 Plan, the 2002 Plan provided that the exercise price of options granted under the 2002 Plan "***shall not be less than 100% of the Fair Market Value*** of a Share on the date of grant of such Option." (Emphasis supplied.)

109.    Nonetheless, the Board failed to conform McGuire's employment Agreement to the 2002 Plan and McGuire continued to unilaterally select the dates for his option grants. Because each time McGuire selected – and the Board allowed him to select – a grant date for his options, each such grant violated the Company's stock option plans and constituted an *ultra vires* act, such grants should be rescinded and, to the extent the options were exercised, the proceeds should be disgorged.

**The Fraudulent Grants**

110.    As described above, at least as far back as 1996, McGuire was allowed to set the grant dates for his own (and effectively, the other Officer Defendants') options. In blatant violation of his fiduciary duty of good faith and loyalty, the Company's stock option plans, and federal and state law, McGuire abused this power and backdated the dates for his and effectively certain other Officer Defendants' grants. The other Defendants either knowingly or recklessly participated in this fraudulent options scheme by approving, ratifying, permitting and/or accepting the grants, and by making false statements to the SEC, the Company and its shareholders regarding actual grant dates of the option grants at issue here.

39

111.   Because the 1991 and the 2002 Plans specifically provide that the strike price for options granted pursuant to either plan cannot be less than 100 percent of the fair market value of the security *on the date on which the option is granted* and because under the Plans the dates of the grants should be selected by independent committee of the Board, McGuire's acts in that regard were not only blatant breaches of his fiduciary duties but also *ultra vires*.

112.   *1996 Options*.   In 1996, UnitedHealth issued McGuire and four other UnitedHealth executives a total of 400,000 options, as follows:

| Purported Date of Option Grant | Recipient | Option Grant | Exercise or Base Price |
|---|---|---|---|
| 7/30/1996 | McGuire | 250,000 | $33.75 |
| 7/30/1996 | Wills | 60,000 | $33.75 |
| 7/30/1996 | Koppe | 35,000 | $33.75 |
| | **Total** | **345,000** | |
| 10/24/1996 | David A. George | 15,000 | $35.50 |
| | **Total** | **15,000** | |

113.   In the first grant, McGuire, Wills, and Koppe received 385,000 options, purportedly granted on July 30, 1996, with a strike price of $33.75.  (Adjusted for splits, 3.08 million options at approximately $4.22 per share.)  This date fell ***near the bottom of the largest dip in the stock price in the entire year***.  Moreover, this stock option grant followed a July 11, 1996 announcement in which the Company predicted lower second quarter earnings because of higher costs.  In response to the earnings announcement, UnitedHealth shares fell by approximately 30%.  Indeed, during the fifteen days preceding the purported grant, UnitedHealth's stock price declined by 26% and during the fifteen days following the purported grant, it increased by 14%.

40

114.    In the second grant, David A. George, Executive Vice President, Strategic Services at that time, received 15,000 options, purportedly granted on October 24, 1996, with a strike price of $33.50.   (Adjusted for splits, 120,000 options at approximately $4.19 per share).  This date fell on ***the lowest stock price for the fourth quarter*** of 1996 and in a sharp dip in the price.  During the fifteen days preceding the purported grant, UnitedHealth's stock price declined by 14% and during the fifteen days following the purported grant, it increased by 22%.

115.    A graph demonstrating the timing of the 1996 grants is set forth below:



116.    *1997 Options*.  In 1997, UnitedHealth issued McGuire and other Officer Defendants 830,000 options on two purported grant dates, as follows:

| Purported Date of Option Grant | Recipient | | Option Grant | Exercise or Base Price |
|---|---|---|---|---|
| 2/11/1997 | McGuire | | 250,000 | $46.875 |
| 2/11/1997 | Wills | | 90,000 | $46.875 |
| 2/11/1997 | Koppe | | 30,000 | $46.875 |
| 2/11/1997 | McDonough | | 30,000 | $46.875 |
| | | **Total** | **400,000** | |
| 10/27/1997 | McGuire | | 200,000 | $43.0625 |
| 10/27/1997 | Wills | | 100,000 | $43.0625 |
| 10/27/1997 | McDonough | | 45,000 | $43.0625 |
| | | **Total** | **345,000** | |

117.   In the first grant, McGuire, Wills, Koppe and McDonough received a total of 440,000 options (including 250,000 to McGuire himself), purportedly granted on February 11, 1997, with a strike price of $46.875.  (Adjusted for splits, 3.52 million options (2 million to McGuire alone) at approximately $5.86 per share.)  This grant again *fell at the end of a significant trough* in the market price of Company's shares.  During the fifteen days preceding the purported grant, UnitedHealth's stock price had increased by only 4% and during the fifteen days following the purported grant, it increased by 12%.

118.   In the second grant, McGuire, Wills, and McDonough received a total of 390,000 options, purportedly granted on October 27, 1997, with a strike price of $43.0625.  (Adjusted for splits, 3.12 million options (1.6 million to McGuire) at approximately $5.38 per share.)  This grant again fell on a particularly fortuitous day for the Officer Defendants: *the lowest stock price of the year*.  Moreover, the grant again fell right after the Company's stock price took a sharp fall, followed by an immediate increase.  During the fifteen days preceding the purported grant, UnitedHealth's stock

42

price declined by 11% and during the fifteen days following the purported grant, it increased by 25%.

119.   A graph demonstrating the timing of these 1997 grants is set forth below:



120.   *1998 Options*.  In 1998, UnitedHealth issued McGuire and other Officer Defendants a total of 1,054,639 options, purportedly granted on four different dates, as follows:

| Purported Date of Option Grant | Recipient | Option Grant | Exercise or Base Price |
|---|---|---|---|
| 1/20/1998 | McGuire | 250,000 | $47.9375 |
| | **Total** | **250,000** | |
| 2/6/1998 | Hemsley | 60,000 | $52.5000 |
| 2/6/1998 | Rivet | 51,052 | $52.5000 |
| 2/6/1998 | Wheeler | 20,000 | $52.5000 |
| 2/6/1998 | Lubben | 23,587 | $52.5000 |
| 2/6/1998 | Koppe | 20,000 | $52.5000 |
| | **Total** | **174,639** | |
| 8/17/1998 | Hemsley | 100,000 | $31.9375 |
| | **Total** | **100,000** | |

43

| Purported Date of Option Grant | Recipient | Option Grant | Exercise or Base Price |
|---|---|---|---|
| 10/16/1998 | McGuire | 240,000 | $40.0000 |
| 10/16/1998 | Hemsley | 120,000 | $40.0000 |
| 10/16/1998 | Rivet | 60,000 | $40.0000 |
| 10/16/1998 | Wheeler | 60,000 | $40.0000 |
| 10/16/1998 | Lubben | 50,000 | $40.0000 |
| | **Total** | **530,000** | |

121.   In the first grant, UnitedHealth issued McGuire 250,000 options, purportedly granted on January 20, 1998, with a strike price of $47.9375 – *just $1.13 more than the lowest market close for the entire first half of 1998*.[4]  (Adjusted for splits, 2 million options at approximately $5.99 per share.)  Moreover, the grant again fell at the end of a significant trough in the Company's share price and was followed by a sharp increase in the price of UnitedHealth stock.   During the fifteen days following the purported grant, UnitedHealth's share price increased by 13%.  Moreover, in the months following the grant, the stock rose sharply and continuously.  In February, the share price surpassed $60.00; in March, the stock rose above $65.00; and in April, the share price closed as high as $72.50, representing a greater than *50%* paper return in the three months immediately following McGuire's January 1998 grant.

122.   In the second grant, Hemsley, Rivet, Wheeler, Lubben and Koppe received a total of 174,639 options, purportedly granted on February 6, 1998, with a strike price of $52.50 per share.  (Split adjusted to 1,387,112 options at $6.56 per share).  Again, this

---

[4]     The stock closed at $46.81 on January 26, 1998.

grant was followed by a sharp increase in the stock price. During the fifteen days following the purported grant, UnitedHealth's stock price increased by 17%.

123.    In the third grant, Hemsley received an option to purchase 100,000 shares, purportedly granted on August 17, 1998, with a strike price of $31.31 (Split adjusted to 300,000 options at $3.91 per share).  This price was again ***the lowest market close for the entire year***, and again conveniently timed at the end of a sharp trough in the Company's stock price.  This stock option grant followed an August 6, 1998 earnings announcement in which UnitedHealth surprised investors with a $900 million pretax charge in the second quarter of 1998.  As a result of the announcement, UnitedHealth's shares plunged 28%, falling $15 per share.  In fact, during the fifteen days preceding the purported grant, UnitedHealth's stock price declined by ***43%*** and during the fifteen days following the purported grant, it increased by ***16%.***

124.    In the fourth grant, McGuire, Hemsley, Rivet, Wheeler and Lubben received a total of 530,000 options, purportedly granted on October 16, 1998, with a strike price of $40.00 per share.  (Adjusted for splits, 2.12 million options (1.96 million options to McGuire alone) at approximately $5.00 per share.)  This price came, again, ***at the end of a very significant trough*** in the Company's stock price.  In fact, during the fifteen days preceding the purported grant, UnitedHealth's stock price increased by only 3% and during the fifteen days following the purported grant, it increased by ***28%*** relative to the $40.00 strike price.

125.    A graph demonstrating the timing of these 1998 grants is set forth below:



126.    These favorable 1998 grants were particularly egregious because the Company boasted in its proxy materials that, due to the fact that business was slower than expected that year, the Compensation Committee had accepted McGuire's recommendation that he receive no cash bonus in addition to his $1.3 million salary.  In reality, McGuire was giving with one hand and taking with the other – posturing as an accountable CEO while secretly reaping millions of dollars in improper compensation through backdated options at the Company's expense.

127.    *1999 Options*.  In 1999, UnitedHealth issued 3,413,572 options to McGuire and the Officer Defendants (2.075 million and 1.1 million to McGuire and Hemsley alone), on two purported dates, as follows:

| Purported Date of Option Grant | Recipient | Option Grant | Exercise or Base Price |
|---|---|---|---|
| 2/17/1999 | McGuire | 250,000 | $46.8125 |
| 2/17/1999 | Hemsley | 100,000 | $46.8125 |

46

| | | Total | 350,000 | |
|---|---|---|---|---|
| 10/13/1999 | McGuire | | 1,825,000 | $40.1250 |
| 10/13/1999 | Hemsley | | 910,000 | $40.1250 |
| 10/13/1999 | Rivet | | 99,812 | $40.1250 |
| 10/13/1999 | Wheeler | | 138,760 | $40.1250 |
| 10/13/1999 | Kaplan | | 90,000 | $40.1250 |
| | | Total | 3,063,572 | |

128.    In the first grant, McGuire received 250,000 options and Hemsley received 100,000 options, purportedly granted on February 17, 1999, with a strike price of $46.81. (Adjusted for splits, 2 million and 800,000 options for McGuire and Hemsley, respectively, at approximately $5.85 per share.) *This grant again followed a large drop in the share price and preceded significant gains.*  During the fifteen days following the purported grant, UnitedHealth's stock price increased by 12%.

129.    In the second grant, McGuire, Hemsley, Rivet, Wheeler and Kaplan received a staggering total of 3,063,572 options, purportedly granted on October 13, 1999, with a strike price of $40.13 – once again *the lowest market close for the entire year*.  (Adjusted for splits, this grant represented a whopping 24.5 million options at a strike price of approximately $5.02 per share.)  Not only was this the lowest closing price of the year, but it fell, yet again, at the very bottom of a dramatic trough in UnitedHealth's share price.  In fact, during the fifteen days preceding the purported grant, UnitedHealth's stock price *declined by 33%* and during the fifteen days following the purported grant, it *increased by 32%*.  The October 1999 option grant, falling at the very bottom of this dramatic dip in stock price, was at that time the largest McGuire had received (1.825 million non-split-adjusted options).

47

130.    A graph demonstrating the timing of these 1999 grants is set forth below:



131.    *2000 Options*.   In 2000, UnitedHealth issued McGuire and other Officer

Defendants 600,000 options on two purported dates, as follows:

| Purported Date of Option Grant | Recipient | Option Grant | Exercise or Base Price |
|---|---|---|---|
| 3/8/2000 | McGuire | 325,000 | $47.63 |
| 3/8/2000 | Hemsley | 150,000 | $47.63 |
| 3/8/2000 | Rivet | 20,000 | $47.63 |
| 3/8/2000 | Wheeler | 30,000 | $47.63 |
| 3/8/2000 | Lubben | 20,000 | $47.63 |
| | **Total** | **545,000** | |
| 7/26/2000 | Rivet | 20,000 | $78.19 |
| 7/26/2000 | Wheeler | 20,000 | $78.19 |
| 7/26/2000 | Lubben | 15,000 | $78.19 |
| | **Total** | **55,000** | |

132.    In the first grant, McGuire, Hemsley, Rivet and Wheeler received a total of

545,000 options dated March 8, 2000, with a strike price of $47.63 – yet again **the lowest**

*market close for the entire year*, and, yet again, at the bottom of a large trough in UnitedHealth's stock price. (Adjusted for splits, 4.36 million options at $5.95 per share). During the fifteen days preceding the purported grant, UnitedHealth's stock price declined by 20% and during the fifteen days following the purported grant, it increased by 17%.

133.    In the second grant, Rivet, Wheeler and Lubben received a total of 55,000 options dated July 26, 2000, with a strike price of $78.19 – *the lowest market close for the entire second half of the year*, and at the end of a sharp decline of the Company's stock price. (Split adjusted to 440,000 options at $9.77 per share). During the fifteen days preceding the purported grant, UnitedHealth's stock price declined by 12% and during the fifteen days following the purported grant, it increased by 18%.

134.    A graph demonstrating the timing of these 2000 grants is set forth below:



135.  *2001 Options*.  In 2001, UnitedHealth issued a total of 1,180,250 options to McGuire, Hemsley, and other Officer Defendants, as follows:

| Purported Date of Option Grant | Recipient | Option Grant | Exercise or Base Price |
|---|---|---|---|
| 1/17/2001 | McGuire | 650,000 | $52.6875 |
| 1/17/2001 | Hemsley | 300,000 | $52.6875 |
| 1/17/2001 | Rivet | 75,000 | $52.6875 |
| 1/17/2001 | Wheeler | 56,250 | $52.6875 |
| 1/17/2001 | Sheehy | 75,000 | $52.6875 |
| | Total | 1,156,250 | |
| 9/21/2001 | Wheeler | 24,000 | $59.95 |
| | Total | 24,000 | |

136.  In the first grant, McGuire, Hemsley, Rivet, Wheeler and Sheehy received a total of 1,156,250 options, purportedly granted on January 17, 2001, with a strike price of $52.6875 – **pennies from the lowest market close for the entire year**.[5]  (Split adjusted to 4.625 million options at $13.17 per share).  Again, this price also fell at the bottom of a dramatic trough in UnitedHealth's share price.  During the fifteen days preceding the purported grant, UnitedHealth's stock price declined by 13% and during the fifteen days following the purported grant, it increased by 17%.

137.  In the second grant, Wheeler received 24,000 options, purportedly granted on September 21, 2001, with a strike price of $59.95 – **the lowest market close for the entire second half of 2001**.  (Split adjusted to 96,000 options at $14.99 per share).  This price again fell at the bottom of a dramatic trough in UnitedHealth's share price.  During

---

[5]  The lowest market close for the year 2001 was $51.56 on January 19, 2001.

the fifteen days preceding the purported grant, UnitedHealth's stock price declined by 12% and during the fifteen days following the purported grant, it increased by 12%.

138.    A graph demonstrating the timing of these 2001 grants is set forth below.



139.    *2002 Options*.    In 2002, UnitedHealth issued 1,325,000 options to McGuire, Hemsley and other Officer Defendants, as follows:

| Purported Date of Option Grant | Recipient | Option Grant | Exercise or Base Price |
|---|---|---|---|
| 1/7/2002 | McGuire | 650,000 | $69.5500 |
| 1/7/2002 | Hemsley | 300,000 | $69.5500 |
| 1/7/2002 | Wheeler | 75,000 | $69.5500 |
| 1/7/2002 | Sheehy | 75,000 | $69.5500 |
| 1/7/2002 | Lubben | 75,000 | $69.5500 |
| | **Total** | **1,175,000** | |
| 8/5/2002 | Wheeler | 50,000 | $82.14 |
| 8/5/2002 | Sheehy | 50,000 | $82.14 |
| 8/5/2002 | Lubben | 50,000 | $82.14 |
| | **Total** | **150,000** | |

140.   In the first grant, McGuire, Hemsley, Wheeler and Lubben received a total of 1,175,000 options, purportedly granted on January 7, 2002, with a strike price of $69.55 – *again just pennies from the lowest market close for the entire year*.[6]   (Adjusted for splits, this grant represented 4.7 million options with a strike price of $17.3875). During the fifteen days preceding the purported grant, UnitedHealth's stock price declined by 1% and during the fifteen days following the purported grant, it increased by 5%.

141.   In the second grant, Wheeler, Sheehy and Lubben received a total of 150,000 options, purportedly granted on August 5, 2002, with a strike price of $82.14 – *the lowest market close for the third quarter of 2002*.   (Adjusted for splits, 600,000 options at $20.54 per share).   This price again fell at the bottom of a dramatic trough in UnitedHealth's share price.   During the fifteen days preceding the purported grant, UnitedHealth's stock price declined by 11% and during the fifteen days following the purported grant, it increased by 10%.

142.   A graph demonstrating the timing of these 2002 grants is set forth below.

---

[6]   The lowest market close for the year 2002 was $68.13 on March 4, 2002.



143.   The Sarbanes-Oxley Act, enacted July 30, 2002, mandated that beginning in 2003 companies promptly disclose option grants, thus making it difficult to significantly backdate options.  However, UnitedHealth's stock option grants to McGuire post-2002 remained illegal and *ultra vires* because they were a product of a violation of the 2002 Option Plan.

144.   As discussed above (*supra* ¶¶ 106-09), the 2002 Plan required option grants to be approved by a committee comprised solely of independent directors, and *expressly precluded* that committee from delegating to any other individual the authority to approve option grants made to officers and directors of the Company.  In spite of this prohibition, following the adoption of the 2002 Plan and until at least August 5, 2005, the UnitedHealth Board continued to permit McGuire to select the dates for his own option grants, and for option grants made to other UnitedHealth employees.  With respect to the option grants to the executive directors and officers (including McGuire himself), such

grants were *ultra vires* as they violated the prohibition in the 2002 Plan against the Committee delegating any authority with respect to the grant of options to officers of the Company.

145.   *2003 Options*.  In 2003, UnitedHealth issued 1,225,000 (split adjusted to 2.45 million options) options to McGuire, and other Officer Defendants, as follows:

| Purported Date of Option Grant | Recipient | Option Grant | Exercise or Base Price |
|---|---|---|---|
| 2/12/2003 | McGuire | 650,000 | $80.24 |
| 2/12/2003 | Hemsley | 300,000 | $80.24 |
| 2/12/2003 | Lubben | 50,000 | $80.24 |
| 2/12/2003 | Sheehy | 50,000 | $80.24 |
| 2/12/2003 | Wheeler | 50,000 | $80.24 |
| | **Total** | **1,100,000** | |
| 11/28/2003 | Lubben | 50,000 | $53.90 |
| 11/28/2003 | Sheehy | 50,000 | $53.90 |
| 11/28/2003 | Wheeler | 25,000 | $53.90 |
| | **Total** | **125,000** | |

146.   2004 *Options*.   In 2004, UnitedHealth issued 2,405,000 options (split adjusted to 4.81 million options) to McGuire and other UnitedHealth officers, including certain Officer Defendants, as follows:

| Purported Date of Option Grant | Recipient | Option Grant | Exercise or Base Price |
|---|---|---|---|
| 2/11/2004 | McGuire | 1,300,000 | $59.40 |
| 2/11/2004 | Hemsley | 600,000 | $59.40 |
| | **Total** | **1,900,000** | |
| 8/6/2004 | David S. Wichmann | 75,000 | $61.35 |
| | **Total** | **125,000** | |
| 12/7/2004 | Lubben | 123,000 | $79.70 |
| 12/7/2004 | Sheehy | 103,000 | $79.70 |
| 12/7/2004 | David S. Wichmann | 154,000 | $79.70 |
| | **Total** | **380,000** | |

147.   *2005 Options*.   Prior to August of 2005, UnitedHealth issued 1,425,000 options (split adjusted to 2.85 million options) to McGuire and other Officer Defendants, as follows:

| Purported Date of Option Grant | Recipient | Option Grant | Exercise or Base Price |
|---|---|---|---|
| 2/3/2005 | McGuire | 650,000 | $90.56 |
| 2/3/2005 | Hemsley | 300,000 | $90.56 |
| | **Total** | **950,000** | |
| 5/2/2005 | McGuire | 200,000 | $94.68 |
| 5/2/2005 | Hemsley | 125,000 | $94.68 |
| 5/2/2005 | Richard H. Anderson | 50,000 | $94.68 |
| 5/2/2005 | David S. Wichmann | 50,000 | $94.68 |
| 5/2/2005 | Lubben | 50,000 | $94.68 |
| | **Total** | **475,000** | |

148.   From 2003 through August of 2005, therefore, UnitedHealth granted McGuire and other officers of the Company a total of 5,055,000 options (split adjusted to 12,310,000 options) in seven separate grants.   Because the grant dates for each of these options grants were selected by McGuire, each of these grants violated the terms of the 2002 Plan, and was *ultra vires*.

**Statistical Evidence Points to Options Manipulation**

149.   Statistical analysis shows that the pattern of the Officer Defendants' option grants for at least the period from 1996 through 2002 cannot be a coincidence or random luck.   Indeed, when *The Wall Street Journal* analyzed several years of option grants to McGuire, it found that "[i]n all, the odds of such a favorable pattern occurring by chance would be **one in 200 million or greater**.   Odds such as those are 'astronomical,' said

David Yermack, an associate professor of finance at New York University. . ." (emphasis added).

150.   The results of a statistical study conducted by Lead Plaintiffs regarding grants at issue in this action awarded from 1996 through 2002, which analyzed, among other factors, the stock price returns during the fifteen-day periods immediately preceding and following the purported grant date, demonstrates that there is compelling evidence, consistent with UnitedHealth's recent disclosure of "significant deficiencies" regarding stock option practices, that backdating, or some other form of manipulation, occurred. Specifically, on average the stock price returns were abnormally negative, an average of -10%, in the fifteen days before the purported grant dates, and abnormally positive, an average of 17%, in the fifteen days after the purported grant dates.  The likelihood of such average high returns, according to Lead Plaintiffs' analysis, is extraordinarily low to non-existent.  These windfall returns, in conjunction with Defendants' recent admissions, are strong evidence of backdating or some other form of manipulation.

**The Officer Defendants Reaped Hundreds of Millions of Dollars
in Profit by Exercising the Fraudulent Option Grants_____**

151.   As set forth below, the Officer Defendants have already reaped astronomical profits in connection with exercises of fraudulent option grants at issue in this case.

| DATE | OFFICER DEFENDANT | NO. OF OPTIONS EXERCISED | PRICE PAID | VALUE OF OPTIONED SHARES | PROFIT |
|---|---|---|---|---|---|
| 12/11/2001 | Hemsley | 350,000 | $6,701,500 | $24,500,000 | $17,798,500 |
| 7/30/2003 | Hemsley | 800,000 | $7,805,326 | $42,504,000 | $34,698,674 |
| 11/30/2004 | Hemsley | 800,000 | $8,025,040 | $64,479,999 | $56,454,959 |
| | | | | **Subtotal** | **$108,952,133** |
| | | | | | |
| 4/1/1998 | Lubben | 14,631 | $685,828 | $944,577 | $258,749 |
| 5/12/2000 | Lubben | 16,667 | $666,680 | $1,163,565 | $496,885 |
| 1/25/2002 | Lubben | 77,912 | $1,562,915 | $5,803,704 | $4,240,789 |
| 5/21/2003 | Lubben | 80,000 | $1,722,504 | $7,726,272 | $6,003,768 |
| 2/17/2004 | Lubben | 153,332 | $1,533,946 | $9,247,760 | $7,713,814 |
| 2/3/2005 | Lubben | 155,824 | $1,952,846 | $14,050,977 | $12,098,131 |
| | | | | **Subtotal** | **$30,812,136** |
| | | | | | |
| 7/30/2003 | McGuire | 1,174,752 | $10,185,020 | $62,414,574 | $52,229,554 |
| 11/30/2004 | McGuire | 1,654,000 | $18,688,478 | $133,312,400 | $114,623,922 |
| 2/23/2006 | McGuire | 2,300,000 | $11,511,453 | $135,930,000 | $124,418,547 |
| | | | | **Subtotal** | **$291,272,023** |
| | | | | | |
| 1/25/2002 | Sheehy | 62,956 | $1,185,007 | $5,875,008 | $4,690,001 |
| 5/16/2003 | Sheehy | 30,000 | $500,625 | $2,862,375 | $2,361,750 |
| 12/19/2003 | Sheehy | 150,000 | $1,500,000 | $8,421,780 | $6,921,780 |
| 9/22/2004 | Sheehy | 90,000 | $974,378 | $6,345,774 | $5,371,396 |
| 4/29/2005 | Sheehy | 140,000 | $1,645,000 | $13,028,330 | $11,383,330 |
| | | | | **Subtotal** | **$30,728,257** |
| | | | | | |
| 12/5/2000 | Wheeler | 40,000 | $1,600,000 | $4,800,300 | $3,200,300 |
| 10/18/2002 | Wheeler | 101,417 | $1,991,556 | $10,074,410 | $8,082,854 |
| 10/1/2003 | Wheeler | 200,000 | $2,006,260 | $9,980,980 | $7,974,720 |
| | | | | **Subtotal** | **$19,257,874** |
| | | | | | |
| | | | | **TOTAL** | **$481,022,622** |

152.   As detailed above, each of these grants was obtained as a result of fraud and deceit by the Officer Defendants, and *ultra vires* conduct of the Director Defendants. Consequently, these grants were invalid and should be rescinded, and all gains realized on sales of shares underlying these grants should be returned to the Company.

## Short Swing Profits

153.   As detailed in the chart below, Defendants McGuire, Hemsley, Koppe, Lubben, Rivet, Sheehy, Wheeler and Wills (the "Section 16(b) Defendants"), who were officers – and in the case of McGuire and Hemsley, also directors – of UnitedHealth at all relevant times, purchased and sold or sold and purchased shares of UnitedHealth securities from fraudulent option grants within a period of less than six months as follows:

| BUY/ SELL | PURPORTED TRANSACTION DATE | SHARES | PRICE | | PROFIT |
|---|---|---|---|---|---|
| **McGuire** | | | | | |
| BUY | 2/11/1997 | 250,000 | $46.8800 | | |
| SELL | 5/22/1997 | 65,000 | $51.1635 | | $278,427.50 |
| SELL | 5/23/1997 | 85,000 | $51.1744 | | $365,024.00 |
| | | | *Total* | | *$643,451.50* |
| BUY | 10/27/1997 | 200,000 | $43.0625 | | |
| SELL | 4/3/1998 | 200,000 | $68.3936 | | |
| | | | *Total* | | *$5,066,620.00* |
| SELL | 10/31/2000 | 400,000 | $55.5542 | | $1,146,680.00 |
| SELL | 11/1/2000 | 130,000 | $53.0668 | | $49,309.00 |
| SELL | 11/2/2000 | 74,000 | $53.0668 | | $28068.20 |
| SELL | 11/2/2000 | 46,000 | $53.0668 | | $17,447.80 |
| BUY | 1/17/2001 | 650,000 | $52.6875 | | |

| BUY/ SELL | PURPORTED TRANSACTION DATE | SHARES | PRICE | PROFIT |
|---|---|---|---|---|
| | | | *Total* | *$1,241,505.00* |
| SELL | 12/11/2001 | 484,000 | $70.00 | $217,800.00 |
| SELL | 12/11/2001 | 166,000 | $70.00 | $74,700.00 |
| BUY | 1/7/2002 | 650,000 | $69.55 | |
| | | | *Total* | *$292,500.00* |
| | | | **Total Profit** | **$7,244,076.50** |
| **Hemsley** | | | | |
| SELL | 12/11/2001 | 300,000 | 70.00 | $135,000.00 |
| BUY | 1/7/2002 | 300,000 | 69.55 | |
| | | | *Total* | *$135,000* |
| | | | **Total Profit** | **$135,000** |
| **Koppe** | | | | |
| BUY | 2/6/1998 | 20,000 | 52.25 | |
| SELL | 4/2/1998 | 30,000 | 68.47 | |
| | | | **Total Profit** | **$324,400** |
| **Lubben** | | | | |
| BUY | 2/6/1998 | 23,587 | 52.25 | |
| SELL | 4/1/1998 | 14,631 | 64.56 | |
| | | | *Total* | *$180,107.61* |
| BUY | 3/8/2000 | 5,000 | 23.81 | |
| BUY | 3/8/2000 | 5,000 | 23.81 | |
| BUY | 3/8/2000 | 5,000 | 23.81 | |
| BUY | 3/8/2000 | 5,000 | 23.81 | |
| SELL | 5/12/2000 | 16,667 | 69.81 | |
| | | | *Total* | *$766,682* |
| BUY | 7/26/2000 | 3,750 | 39.09 | |
| BUY | 7/26/2000 | 3,750 | 39.09 | |
| BUY | 7/26/2000 | 3,750 | 39.09 | |

| BUY/ SELL | PURPORTED TRANSACTION DATE | SHARES | PRICE | PROFIT |
|---|---|---|---|---|
| BUY | 7/26/2000 | 3,750 | 39.09 | |
| SELL | 8/22/2000 | 10,000 | 93.26 | $270,850 |
| SELL | 11/8/2000 | 10,000 | 110.50 | $714,100 |
| | | | *Total* | *$984,950* |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| SELL | 4/30/2001 | 80,000 | 65.68 | |
| | | | *Total* | *$974,250* |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| SELL | 1/25/2002 | 77,912 | 74.49 | |
| | | | Total | $370,500 |
| | | | **Total Profit** | **$3,276,489.61** |
| **Rivet** | | | | |
| BUY | 10/27/1997 | 45,000 | 43.06 | |
| SELL | 12/1/1997 | 900 | 52.50 | $8,496 |
| SELL | 12/1/1997 | 100 | 52.56 | $950 |
| SELL | 12/30/1997 | 1,000 | 49.00 | $5,940 |
| SELL | 12/31/1997 | 2,000 | 50.00 | $13,880 |
| SELL | 12/31/1997 | 1,000 | 50.19 | $7,130 |
| | | | *Total* | *$36,396* |
| BUY | 2/6/1998 | 51,052 | 52.25 | |
| SELL | 4/2/1998 | 10,000 | 66.00 | |
| | | | *Total* | *$137,500* |
| BUY | 3/8/2000 | 20,000 | 23.81 | |
| SELL | 5/8/2000 | 18,520 | 66.00 | $382,122 |

60

| BUY/ SELL | PURPORTED TRANSACTION DATE | SHARES | PRICE | PROFIT |
|---|---|---|---|---|
| SELL | 5/9/2000 | 25,800 | 67.88 | $1,048,382 |
| BUY | 7/26/2000 | 20,000 | 39.09 | |
| | | | *Total* | *$1,430,504* |
| SELL | 1/9/2001 | 10,000 | 55.00 | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| | | | *Total* | *$23,100* |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| SELL | 2/21/2002 | 23,000 | 75.00 | |
| | | | *Total* | *$102,187.50* |
| | | | **Total Profit** | **$1,729,687.50** |
| **Sheehy** | | | | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| BUY | 1/17/2001 | 18,750 | 52.69 | |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| BUY | 1/7/2002 | 18,750 | 69.55 | |
| SELL | 1/25/2002 | 62,956 | 74.50 | |
| | | | **Total Profit** | **$1,373,070.36** |

| BUY/ SELL | PURPORTED TRANSACTION DATE | SHARES | PRICE | | PROFIT |
|---|---|---|---|---|---|
| **Wheeler** | | | | | |
| BUY | 3/8/2000 | 30,000 | 23.81 | | |
| SELL | 5/17/2000 | 29,313 | 75.38 | | |
| | | | *Total* | | *$1,511,671.41* |
| BUY | 7/26/2000 | 20,000 | 39.09 | | |
| SELL | 12/5/2000 | 37,400 | 120.00 | | $2,754,034 |
| SELL | 12/5/2000 | 1,500 | 120.06 | | $121,455 |
| SELL | 12/5/2000 | 1,100 | 120.19 | | $89,210 |
| BUY | 1/17/2001 | 14,062 | 52.69 | | |
| BUY | 1/17/2001 | 14,062 | 52.69 | | |
| BUY | 1/17/2001 | 14,062 | 52.69 | | |
| BUY | 1/17/2001 | 14,062 | 52.69 | | |
| | | | *Total* | | *$2,964,699* |
| BUY | 9/21/2001 | 6,000 | 59.95 | | |
| BUY | 9/21/2001 | 6,000 | 59.95 | | |
| BUY | 9/21/2001 | 6,000 | 59.95 | | |
| BUY | 9/21/2001 | 6,000 | 59.95 | | |
| SELL | 10/4/2001 | 31,190 | 67.90 | | |
| | | | *Total* | | *$190,800* |
| BUY | 8/5/2002 | 12,500 | 82.14 | | |
| BUY | 8/5/2002 | 12,500 | 82.14 | | |
| BUY | 8/5/2002 | 12,500 | 82.14 | | |
| BUY | 8/5/2002 | 12,500 | 82.14 | | |
| SELL | 10/18/2002 | 101,417 | 99.34 | | |
| | | | *Total* | | *$860,000* |
| | | | **Total Profit** | | **$5,527,170.41** |
| | | | | | |
| **Wills** | | | | | |
| BUY | 2/11/1997 | 90,000 | 46.88 | | |
| SELL | 2/19/1997 | 16,000 | 52.13 | | $84,000 |
| SELL | 2/20/1997 | 44,000 | 51.82 | | $217,360 |

| BUY/ SELL | PURPORTED TRANSACTION DATE | SHARES | PRICE | PROFIT |
|---|---|---|---|---|
| SELL | 5/23/1997 | 50,000 | 51.00 | $123,600 |
| | | | *Total* | *$424,980* |
| BUY | 10/27/1997 | 100,000 | 43.06 | |
| SELL | 4/2/1998 | 18,200 | 68.75 | $467,558 |
| SELL | 4/3/1998 | 31,800 | 68.20 | $799,452 |
| | | | *Total* | *$1,267,010* |
| | | | **Total Profit** | **$1,691,990** |

154.   With respect to each transaction referenced above, the Section 16(b) Defendants filed Forms 4 and 5 with the SEC that falsely claimed that they were entitled to the exemption from Section 16(b) pursuant to SEC Rule 16b-3(d).

155.   This exemption was unavailable, however, because:  (i) any purported approval by the UnitedHealth Board of the fraudulently backdated (or otherwise manipulated) option grants at issue herein was contrary to the terms of the Plans and was therefore *ultra vires*; (ii) the Board abdicated control to McGuire over his own options grants, and the grants were not truly made by a committee of non-employee directors; (iii) Defendants failed to disclose in the Company's proxy statements that they had backdated the option grants at issue and shareholders did not at any time ratify, in compliance with Exchange Act Section 14 or otherwise, the fraudulent grants alleged herein; and (iv) the fraudulent option grants to the Section 16(b) Defendants were accompanied by sales of Company common stock within six months of the purported date of the grants.  Therefore, the option grants in the foregoing chart do not qualify for

63

the exemption of SEC Rule 16b-3(d).  As such, the short swing profits gained by the Officer Defendants in connection with the fraudulent grants should be disgorged.

**The Board Attempts to Correct *Ultra-Vires* Power Grant, Freezes Compensation and Grants Fewer Options**

156.    In the spring of 2005, the SEC began investigating stock option practices, including possible backdating, at various companies.  As a result of this new public scrutiny of stock option practices, in mid 2005, the Board began dealing with the Company's options problems on a going-forward basis without remedying past harms. First, the Company, with very little fanfare, reduced the total number of options granted to McGuire in 2005 from a split-adjusted 2.6 million options in one installment to a split-adjusted 1.7 million options in two installments.  Next, effective as of August 5, 2005, the Company amended McGuire's employment agreement, among other things, to take back the *ultra vires* delegation of power that allowed McGuire to select grant dates for his own options and return that power to the Compensation Committee.    Apparently to compensate for this change, the amendment gave McGuire a substantial raise in base cash compensation.

157.    As noted above, in March 2006, the *Wall Street Journal* exposé on companies' suspicious stock option grants singled out UnitedHealth as the most blatant abuser.  The *Journal* article explained that a study of twelve stock option grants to McGuire through mid-2002 established that annual option grants repeatedly were dated on the very day that UnitedHealth stock hit its low price for the year or in advance of sharp stock price increases.  Following this article, the SEC began a formal investigation

regarding the Company's stock option practices, and the Company retained outside counsel to review the Company's policies with respect to option grants.

158.  In its latest Definitive Proxy Statement (filed on April 7, 2006), UnitedHealth stated:

> In light of recent focus by the Securities and Exchange Commission and others on stock option grant practices by publicly traded companies, the Company's Chairman and Chief Executive Officer recommended that the Board of Directors appoint a Committee comprised of independent directors to retain and work with outside counsel to review the Company's current and historic stock option grant practices.  The Board of Directors accepted this recommendation and formed a Committee of independent directors.  The Committee has engaged independent counsel to assist in its review.

UnitedHealth added that "in response to a call from the staff of the Securities and Exchange Commission, the Company has advised the staff of the appointment of the Committee and counsel."

159.  In addition, on April 19, 2006, McGuire told analysts that he would recommend to Company's Board that UnitedHealth "forego for the foreseeable future further equity-based grants or awards for our most senior and longest tenured executives for whom equity positions are well established from prior years of service."  At that same time, McGuire denied that UnitedHealth had engaged in stock option manipulation, asserting that "to my knowledge, every member of management in this company believes that at the time we collectively followed appropriate practices for those option grants which affected all of our employees, not simply selected executives, and that such activities were within guidelines and consistent with our stated program objectives."

However, McGuire did not directly answer an analyst's question about whether he backdated stock options. Rather, he stated that "[w]e sleep with good conscience."

160.   On May 1, 2006, according to *Reuters*, the Company announced "that it had discontinued equity-based awards to its two most senior managers [*i.e.*, McGuire and Hemsley] and that it would cease other perks like paying for personal use of corporate aircraft." The Board did nothing, however, to address the billions of dollars of unexercised options that McGuire and the other Officer Defendants hold from earlier option grants, including the grants challenged in this lawsuit.

161.   On May 11, 2006, the Company acknowledged a "***significant deficiency***" in how it had administered its stock option plans and announced that it may be forced to restate its financial results for the period from 2003 to the present, ***reducing net earnings by approximately $286 million for only the past three years***. UnitedHealth also announced that it may lose tax deductions that were taken based on the improper options grants.

162.   On May 17, 2006, UnitedHealth announced that it had received a request from the Internal Revenue Service for documents from 2003 to the present relating to stock options and other compensation for the executive officers named in UnitedHealth's proxy statements. UnitedHealth also announced that it had also received a subpoena from the United States Attorney for the Southern District of New York requesting documents from 1999 to the present relating to the granting of stock options. As further consequences of the options backdating scheme, UnitedHealth has been named as a defendant in securities fraud class actions related to the same misrepresentations at issue

in the SEC investigation and the Attorney General for the State of Minnesota is also investigating the misconduct alleged herein. The Company must now expend valuable resources contending with such investigations, all made necessary by the manipulation of the option grants to gratuitously enrich UnitedHealth's executives.

163.   UnitedHealth's stock price also dropped significantly amid the disclosures relating to the options scheme. As set forth in the chart below, after rising steadily for several years, UnitedHealth's stock price began to decline in January of this year, and fell precipitously following the March 18 article that appeared in the *Journal*.



164.   Finally, on August 1, 2006, the Company announced that it will have to delay filing its quarterly report for the second quarter of 2006 pending the investigations into manipulation of option grants, which could expose UnitedHealth to fines and even delisting, and other negative consequences. For example, on August 28, 2006, UnitedHealth disclosed in a Form 8-K filed with the SEC that the Company "received a

purported notice of default from persons claiming to hold certain of its debt securities alleging a violation of the Company's indenture governing its debt securities," which followed the Company's failure to timely file its quarterly report for the second quarter of 2006.

165.    The full extent of the impact that the wrongful manipulation of option grant dates will have on UnitedHealth and its financial statements has yet to be disclosed, but to date it includes:

⟩    lost payments to the Company upon the exercise of fraudulent stock options grants;

⟩    increased capital costs as a result of the loss of market capitalization and reputational damage in the marketplace;

⟩    Millions of dollars of costs incurred to carry out internal investigations including legal fees; and

⟩    Millions of dollars of costs incurred in defending UnitedHealth and certain officers and directors in securities class actions and potentially hundreds of million of dollars to resolve such action or satisfy adverse judgments.

**Improper Disclosure and Accounting
of Defendants' Compensation**

166.    The Officer Defendants were motivated to engage in the fraudulent backdating scheme because the backdating provided them with a built-in, illegal and undisclosed paper profit.  As a result, the Officer Defendants were unjustly enriched. The grants of secretly backdated, in-the-money options disguised the fact that the Company was unknowingly conferring on the Officer Defendants higher, unusual and excessive compensation without disclosure or shareholder approval of this kind of payment.  This paper gain also carried with it numerous tax, accounting, and disclosure

obligations.  The discount from receiving in-the-money options is generally treated as a compensation expense under GAAP, specifically Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (October 1972) ("APB 25").

167.   Pursuant to APB 25, the applicable GAAP provision at the time of the option grants set forth herein, if the stock's market price on the date of grant exceeds the exercise price of the options, the corporation must recognize the difference as an expense, which directly impacts earnings.  Defendants caused UnitedHealth not to expense this additional fraudulent compensation to the Officer Defendants even though the backdated stock options at issue in this action were priced below the fair market value of the Company's stock at the date of grant and issuance.  Thus, Defendants caused the Company to violate GAAP.

168.   As noted above, in its Form 10-Q, filed on May 10, 2006, the Company has already disclosed that UnitedHealth "has identified a significant deficiency in its internal controls relating to stock option plan administration and accounting for and disclosure of stock option grants."  The Form 10-Q further disclosed that the results of the internal review of the Company's stock option granting practices to date "indicate that the Company may be required to record adjustments to non-cash charges for stock-based compensation expense in periods prior to January 1, 2006, in accordance with [APB 25]. Any such charges could be material and, in such event, would require restatement of the Company's historical financial statements prepared in accordance with APB 25."

169.   Moreover, pursuant to Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"), compensation in excess of $1 million per year,

including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if:  (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

170.    The option backdating scheme also caused UnitedHealth to violate Section 162(m) of the Internal Revenue Code.  Compensation from exercised stock options issued in connection with the backdating scheme was not deductible under Section 162(m) of the Internal Revenue Code.  Accordingly, if the Company is required to make any adjustments to non-cash charges through a restatement or otherwise, as disclosed in the Company's May 10, 2006 10-Q, this may "result in compensation related to certain exercised stock options, previously thought to be deductible, to be nondeductible under Section 162(m) of the Internal Revenue Code.  In that event, the Company may be required to pay additional taxes and interest associated with deductions it previously took for compensation associated with such exercised stock options and the Company may lose additional deductions in future periods."

171.    Thus, Defendants were motivated to avoid correct accounting for the improper grants, because the proper accounting would have resulted in UnitedHealth

having lowered earnings and smaller tax deductions. By inflating revenue and earnings, McGuire and Hemsley were able to achieve performance targets specified in their October 13, 1999 special stock options grants, thereby accelerating their ability to exercise options pursuant to those grants. Consequently, Defendants misrepresented or concealed the backdated nature of the options in numerous public filings such as Form 10-Ks, proxy statements, and Form 4s and 5s, as further explained below.

**Dissemination of False and Misleading Statements**

      **Proxy Statements**

      172.   The failure to disclose the secret options timing scheme to set strike prices to achieve maximum benefit for McGuire and the Officer Defendants constituted a breach of fiduciary duty of candor and constituted materially misleading misstatements and omissions in violation of the securities laws, including the proxy rules. Each and every violation of the SEC's proxy rules not only deprives shareholders of their right to cast an informed vote, it also exposes the Company to substantial fines from the SEC.

      173.   Specifically, from 1997 to 2006, the Company, with the knowledge, approval, participation or reckless disregard of each Defendant, for the sole purpose and with the effect of concealing the manipulation of the option grants, as alleged herein, disseminated to shareholders and filed with the SEC annual proxy statements that contained material misstatements and omissions falling into four general categories: (i) statements that the Compensation Committee administered the Company's stock option plains, without disclosure of the Committee's abdication of such authority to McGuire regarding his own option grants and the fraudulent backdating of the options at

issue here; (ii) statements failing to disclose that the stated purpose of option grants to UnitedHealth executives – *i.e.*, linking a significant portion of their compensation to the future performance of the Company – was significantly undermined to the detriment of the Company because the option grants described in the proxies were backdated; (iii) misstatements that the options granted were priced at the fair market value on the date of the grant, when in fact they were fraudulently backdated, and (iv) misstatements relating to the amount of compensation received by the Officer Defendants in the relevant period.

174.   The Company's proxy statements were submitted to shareholders in connection with the annual election of directors, as well as for shareholder approval of proposals offered by both management and other shareholders, including the adoption of the 2002 Plan.  The Proxy Statements' materially misleading statements and omissions are set forth below (all emphasis supplied):

**<u>1997 Proxy</u>**

175.   UnitedHealth's 1997 definitive proxy statement was filed with the SEC on Schedule 14A on March 27, 1997 (the "1997 Proxy"). (All of the Director Defendants except Shalala, Mundinger and Hemsley were directors at this time.)

176.   The 1997 Proxy contained at least the following false and misleading statements about the operation and administration of the stock option plan and McGuire's executive compensation package:

> The Board of Directors has delegated to the Compensation and Stock Option Committee (the "Committee") the authority to make certain decisions with respect to the compensation of the Company's Chief Executive Officer, as well as various aspects of other compensation and fringe benefit matters applicable to all of the

Company's employees including executive officers. ***In addition, the Committee administers the Company's stock option and stock based incentive plans.***

) The Committee believes it is important to link a significant portion of Dr. McGuire's potential compensation to future Company performance. As part of his overall compensation package, Dr. McGuire receives grants of stock options and restricted stock awards from time to time. In 1996, Dr. McGuire was granted options for 250,000 shares of Company common stock with each share having an exercise price of $33.750 ***which was the fair market value of one share of stock on the grant date.***

) The 1996 [Employment] Agreement provides that Dr. McGuire will receive annually non-qualified stock options to purchase a minimum of 250,000 shares of the Company's Common Stock ***at a exercise price equal to the fair market value of the shares of the Company's Common Stock on the date of grant***, subject to certain adjustments.

177. These statements were false because the options granted to McGuire did not carry the fair market value on the date of the grant, but were in fact backdated. They also were false and misleading because they failed to disclose that the Committee had abdicated all responsibility for selecting stock option grant dates to McGuire, and that the Committee had permitted McGuire to backdate option grants to maximize his own (and the Officer Defendants') profits.

178. Finally, the Summary Compensation Table from the 1997 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by McGuire, Wills, and Koppe in fiscal year 1996 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1996.

179. Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash)

73

earned by the named executive officer during the fiscal year covered . . ."
(17 C.F.R. § 229.402(b)(2)(iii)(B).) Additionally, the Instructions to Item
402(b)(2)(iii)(A) and (B) further provide the following items be disclosed in the
Summary Compensation Table:

    i.    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

    ii.    Above-market earnings or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period . . .

    iii.    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)

180. The disclosures of "Annual Compensation" and "Securities Underlying Options/SARs" are materially misleading absent the disclosure of the additional compensation received by the Officer Defendants as a result of the backdated options. Additionally, the Option/SAR Grants in Last Fiscal Year Table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though the options granted in 1996 were backdated.

74

**1998 Proxy**

181.    UnitedHealth's 1998 definitive proxy statement was filed with the SEC on Schedule 14A on March 27, 1998 (the "1998 Proxy"). (All of the Director Defendants except Shalala and Hemsley were directors at this time.)

182.    The 1998 Proxy contained at least the following false and misleading statements about the operation and administration of the stock option plan and McGuire's executive compensation package:

⟩ The Compensation and Human Resources Committee is generally responsible for overseeing the Company's compensation, employee benefit, and stock-based programs. *The Committee also negotiates and administers the Company's employment arrangements with its Chief Executive Officer, supervises bonus programs for the Company's employees and reviews and monitors director compensation programs.*

⟩ The Committee believes it is important to link a significant portion of Dr. McGuire's potential compensation to future Company performance. As part of his overall compensation package, Dr. McGuire receives grants of stock options and restricted stock awards from time to time. In 1997, Dr. McGuire received two stock option grants. On February 11, 1997, Dr. McGuire was granted options for 250,000 shares of Company Common stock with each share having an exercise price of $46.875, *which was the fair market value of one share of stock on the grant date*….On October 27, 1997, along with other Company executives, Dr. McGuire received an additional grant of options. Dr. McGuire's grant was for 200,000 shares of Company Common Stock, with each share having an exercise price of $43.0625. *That price was the fair market value of one share of stock on the grant date*.

⟩ Under th[e 1996 Employment Agreement], each year Dr. McGuire will receive non-qualified stock options to purchase a minimum of 250,000 shares of the Company's Common Stock *at an exercise price equal to the fair market value of the shares of the Company's Common Stock on the date of grant*, subject to certain adjustments.

183.   These statements were materially misleading because they failed to disclose that the Committee had abdicated all responsibility for selecting stock option grant dates to McGuire, and that the Committee had permitted McGuire to backdate option grants to maximize his own (and the Officer Defendants') profits.  These statements also were materially misleading because, in fact, options were not granted at an exercise price equal to the fair market value of UnitedHealth shares on the grant date, but were backdated.

184.   Finally, the Summary Compensation Table from the 1998 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company in violation of Items 402(b)(2)(iii)(B) and 402(c)(2)(iv) of Regulation S-K by: (i) Defendants McGuire, Wills, Koppe and McDonough in fiscal year 1997 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1997; and (ii) Defendants McGuire, Wills, Koppe and McDonough in fiscal year 1997 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1997.

**1999 Proxy**

185.   UnitedHealth's 1999 definitive proxy statement was filed with the SEC on Schedule 14A on April 13, 1999 (the "1999 Proxy").  (All of the Director Defendants except Shalala and Hemsley were directors at this time.)

186.   The 1999 Proxy contained at least the following false and misleading statements about the operation and administration of the stock option plan and Dr. McGuire's executive compensation package:

76

⟩ The Compensation and Human Resources Committee is responsible for overseeing UnitedHealth Group's compensation, employee benefit, and stock-based programs. The Committee also negotiates and administers UnitedHealth Group's employment arrangements with its Chief Executive Officer, supervises bonus programs for UnitedHealth Group's employees and reviews and monitors director compensation programs.

⟩ ***The Committee believes it is important to link a significant portion of Dr. McGuire's potential compensation to future Company performance****. As part of his overall compensation package, Dr. McGuire receives grants of stock options and restricted stock awards from time to time. In 1998, Dr. McGuire received two stock option grants. On January 20, 1998, Dr. McGuire was granted an option to purchase 250,000 shares of Company common stock with an exercise price of $47.9375 per share, **which was the fair market value of one share of stock on the grant date**…. On October 16, 1998, along with other Company executives, Dr. McGuire received an additional option to purchase 240,000 shares of UnitedHealth Group's common stock with an exercise price of $40.00 per share…*

187. This disclosure was misleading for the same reasons that almost identical statements were misleading in prior years. Specifically, the options were not actually granted with an exercise price equal to the fair market value of UnitedHealth shares on the date of grant, but were backdated, and, because of this, the options granted did not align the grantees in interest with the Company and its shareholders.

188. Finally, the Summary Compensation Table from the 1999 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company in violation of Items 402(b)(2)(iii)(B) and 402(c)(2)(iv) of Regulation S-K by: (i) Defendants McGuire, Rivet, Wheeler, Lubben, Wills and Koppe in fiscal year 1998 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1998 (ii) Defendants McGuire, Hemsley, Rivet, Wheeler, Lubben, Wills

and Koppe in fiscal year 1998 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1998; and (iii) Defendants McGuire, Hemsley, Rivet, Wheeler, Lubben, Wills and Koppe in fiscal year 1998 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1998.

**2000 Proxy**

189.   UnitedHealth's 2000 definitive proxy statement was filed with the SEC on Schedule 14A on April 7, 2000 (the "2000 Proxy").   (All of the Director Defendants except Shalala were directors at this time.)

190.   The 2000 Proxy contained at least the following false and misleading statements about the operation and administration of the stock option plan and McGuire's executive compensation package:

> *The Compensation and Human Resources Committee is responsible for overseeing UnitedHealth Group's compensation, employee benefit and stock-based programs.* The Committee also negotiates and administers UnitedHealth Group's employment arrangements with its Chief Executive Officer and President, supervises incentive compensation programs for UnitedHealth Group's employees and reviews and monitors director compensation programs.

> *The Committee believes it is important to link a significant portion of Dr. McGuire's potential compensation to future Company performance.* As part of his overall compensation package, Dr. McGuire receives grants of stock options and restricted stock awards from time to time. In 1999, Dr. McGuire received two stock option grants in addition to the option grant referred to above. On February 17, 1999, Dr. McGuire was granted an option to purchase 250,000 shares of UnitedHealth Group Common Stock with an exercise price of $46.8125 per share, *which was the fair market value of the stock on the grant date*…. On October 13, 1999, along with other Company executives, Dr. McGuire received an additional option to purchase 825,000 shares of UnitedHealth Group Common Stock

with an exercise price of $40.125 per share, *which was the fair market value of the stock on the grant date*.

In connection with entering into the employment agreement, Dr. McGuire received the Special Option. The Special Option vests in 200,000 share increments upon achievement of certain earnings per share targets during the period 2000 through 2004, and vests completely upon the achievement of a minimum trading price for UnitedHealth Group Common Stock. The Special Option also vests after October 13, 2008, the ninth anniversary of the date of grant, or upon a Change of Control (as defined in the agreement). In addition to the Special Option, Dr. McGuire received a special one-time bonus on January 4, 2000 in consideration of his services to UnitedHealth Group over the past several years.

191. These disclosures were misleading because they failed to disclose that the Committee had permitted McGuire to backdate option grants to maximize his own (and the Officer Defendants') profits. These statements also were materially misleading because, in fact, options were not granted at an exercise price equal to the fair market value of UnitedHealth shares on the grant date, but were backdated.

192. Furthermore, the statement that "October 13, 2008" was the "ninth anniversary of the date of the grant" was materially misleading because the 1999 Agreement itself was backdated in order to give Dr. McGuire another windfall grant of 1 million "special" options.

193. Finally, the Summary Compensation Table from the 2000 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company in violation of Items 402(b)(2)(iii)(B) and 402(c)(2)(iv) of Regulation S-K by: (i) Defendants McGuire, Hemsley, Rivet, and Wheeler in fiscal year 1997 as a result of their receipt of fraudulently backdated stock options at less than fair market

value in 1997; (ii) Defendants McGuire, Hemsley, Rivet, Wheeler, and Kaplan in fiscal year 1998 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1998; and (iii) Defendants McGuire, Hemsley, Rivet, Wheeler and Kaplan in fiscal year 1999 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1999.

**2001 Proxy**

194.    UnitedHealth's 2001 definitive proxy statement was filed with the SEC on Schedule 14A on April 6, 2001 (the "2001 Proxy").

195.    The 2001 Proxy contained at least the following false and misleading statements about the operation and administration of the stock option plan and Dr. McGuire's executive compensation package:

⟩    The Compensation and Human Resources Committee is responsible for overseeing UnitedHealth Group's compensation, employee benefit and stock-based programs. The Committee also negotiates and administers UnitedHealth Group's employment arrangements with its Chief Executive Officer and President, supervises incentive compensation programs for UnitedHealth Group's employees and reviews and monitors director compensation programs.

⟩    The Committee believes it is important to link a significant portion of Dr. McGuire's potential compensation to future Company performance. As part of his overall compensation package, Dr. McGuire receives grants of stock options and restricted stock awards from time to time. Pursuant to the terms of his employment agreement, the Company granted to Dr. McGuire in 2000 an option to purchase 650,000 shares at an exercise price of $23.8125 per share, *which was the fair market value of the stock on the grant date*.

196.    These statements were materially false and misleading, because, in fact, the Committee delegated responsibility for setting a material term of the option plan to the

80

most interested party—McGuire—and it did not supervise him in so doing.  Nor did the Board ever disclose that the Committee allowed McGuire unfettered discretion in picking a date and that he used that discretion to select a date that was best for him, worst for the Company. Not only did the 2001 Proxy fail to disclose that McGuire was given free reign to select his own option grant date, but it also failed to disclose that the options granted were backdated.  The representation, therefore, that the exercise price for the options granted to McGuire in 2000 was equal to "the fair market value of the stock on the grant date" was an outright misrepresentation.

197.    Finally, the Summary Compensation Table from the 2001 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company in violation of Items 402(b)(2)(iii)(B) and 402(c)(2)(iv) of Regulation S-K by: (i) Defendants McGuire, Hemsley, Rivet, Wheeler, and Lubben in fiscal year 1998 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1998; (ii) Defendants McGuire, Hemsley, Rivet, Wheeler, and Lubben in fiscal year 1999 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1999; and (iii) Defendants McGuire, Hemsley, Rivet, Wheeler, and Lubben in fiscal year 2000 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 2000.

**2002 Proxy**

198.    UnitedHealth's 2002 definitive proxy statement was filed with the SEC on Schedule 14A on April 2, 2002 (the "2002 Proxy").   This proxy statement was particularly important because the shareholders were being asked to approve the 2002

Plan, which specifically provided that "[u]nless otherwise **expressly** provided in the Plan, all designations, determinations, interpretations and other decisions with respect to the Plan or any Award **shall** be within the **sole** discretion of the Committee . . ."

199.   Given that the 2002 Plan appeared to correct the *ultra vires* delegation of authority to McGuire, the following misstatements were particularly misleading:

> The Compensation and Human Resources Committee is responsible for overseeing the Company's compensation, employee benefit and stock-based programs.  The Committee also negotiates and administers the Company's employment arrangements with its Chief Executive Officer and President, **supervises incentive and equity-based compensation programs for the Company's employees and reviews and monitors director compensation programs**.

*   *   *

> **[The] 2002 Stock Plan is to be administered by [the] Compensation and Human Resources Committee, members of which are all independent directors**.

*   *   *

> **The 2002 Stock Plan will be administered by the Company's Compensation and Human Resources Committee (the "Committee"), each member of which will be an "outside director" within the meaning of Section 162(m) of the Internal Revenue Code of 1986 (the "Code")**.  The Committee will have the authority to establish rules for the administration of the 2002 Stock Plan, to select the individuals to whom awards are granted, to determine the types of awards to be granted and the number of shares of Common Stock covered by the awards, and to **set the vesting and other terms and conditions of awards**.

200.   Although the 2002 Plan *only* permitted the Committee to delegate authority relating to option grants to non-executive employees, the Committee, in fact, continued to delegate responsibility for setting a material term of the option plan to the most interested party – McGuire himself.  Just as prior to the 2002 Plan, the Committee continued to

allow McGuire unfettered discretion in picking the date of his option grants, and McGuire continued to use that discretion to select a date that was best for him and worst for the Company. In addition, as described above, the Company's option plan was not administered in accordance with Section 162(m) of the Internal Revenue Code because the Company has not recognized the backdated options as ordinary compensation.

201.   The 2002 Proxy additionally contained the following statements that were misleading:

> ***The Committee believes it is important to link a significant portion of Dr. McGuire's potential compensation to future Company performance.*** As part of his overall compensation package, Dr. McGuire receives grants of stock options and restricted stock awards from time to time. Pursuant to the terms of his employment agreement, the Company granted to Dr. McGuire in 2001 an option to purchase 650,000 shares at an exercise price of $52.6875 per share, which was ***the fair market value of the stock on the grant date***.

202.   These statements are materially false and misleading because, among other things, the Director Defendants failed to disclose that the stated purpose of option grants to McGuire and other Officer Defendants – *i.e.*, linking a significant portion of his compensation to the future performance of the Company – was significantly undermined to the detriment of the Company because the options granted to those officers were backdated. Moreover, the last statement referenced above was also materially false and misleading because it states that options granted to McGuire were at fair market value on the date of the grant when, in fact, as detailed above, the dates of the option grants were backdated.

203.    The 2002 Proxy additionally stated that "[s]tock options and stock appreciation rights *may not be granted at less than 100% of fair market value on date of grant*."  This statement was materially false and misleading to the extent that it did not disclose that some option grants were backdated.  Furthermore, this statement was false and misleading because the Company failed to disclose that McGuire had been permitted to manipulate the process by back-dating stock options for himself and other executives always picking, a grant date that was best for him.

204.    The 2002 Proxy also falsely reported that options granted to Hemsley, Rivet, Wheeler and Sheehy were granted on January 17, 2001, and falsely reported that options granted to Wheeler were granted on September 21, 2001.

205.    Finally, the Summary Compensation Table from the 2002 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company in violation of Items 402(b)(2)(iii)(B) and 402(c)(2)(iv) of Regulation S-K by: (i) Defendants McGuire, Hemsley, Rivet, and Wheeler in fiscal year 1999 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 1999; (ii) Defendants McGuire, Hemsley, Rivet, and Wheeler in fiscal year 2000 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 2000; and (iii) Defendants McGuire, Hemsley, Rivet, Wheeler and Sheehy in fiscal year 2001 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 2001.

**2003 Proxy**

206.    UnitedHealth's 2003 definitive proxy statement was filed with the SEC on Schedule 14A on April 8, 2003 (the "2003 Proxy") and was materially false and misleading.

207.    First, it provided:

> The Compensation and Human Resources Committee is ***responsible for overseeing our compensation, employee benefit and stock-based programs***. The Committee also negotiates and administers our employment arrangements with our Chief Executive Officer and President, ***supervises incentive and equity-based compensation programs for our employees and reviews and monitors director compensation programs***.

208.    For the reasons stated above, this simply was not the case.  The Committee had, in fact, abdicated responsibility over the Company's stock option plans by ceding to McGuire the ability to choose option grant dates and to backdate option grants.  Thus, this statement was materially false and misleading.

209.    Second, the 2003 Proxy stated:

> ***The Committee believes it is important to link a significant portion of Dr. McGuire's potential compensation to future Company performance***.  As part of his overall compensation package, Dr. McGuire receives grants of stock options from time to time.  Pursuant to the terms of his employment agreement, in 2002 we granted Dr. McGuire an option to purchase 650,000 shares of our common stock at an exercise price of $69.55 per share, ***which was the fair market value of the stock on the grant date.***

210.    Again, these statements were misleading for the same reasons that identical or substantially similar statements were misleading in the 2002 Proxy.   By backdating stock option grants, the exercise price for the options granted did not, in fact, equal the "fair market value of the stock on the grant date."  Further, by backdating option grants,

Defendants tied McGuire's equity-based compensation to the historical performance of the Company, not its future performance.

211.    Third, the 2003 Proxy also falsely reported that options granted to McGuire, Hemsley, Wheeler, Sheehy and Lubben were granted on January 7, 2002, and falsely reported that options granted to Wheeler, Sheehy and Lubben were granted on August 5, 2002, when in fact these options were backdated, as detailed above.

212.    Fourth, in describing the 2002 Plan, the 2003 Proxy also stated that: "The exercise price for all options granted under the Stock Incentive Plan is the closing sale price of our common stock on the date the option is granted." This statement is false because, as detailed above, in 2002, McGuire and other Officer Defendants did not receive their stock options on the date the options were granted. Rather, the dates of the 2002 grants were backdated.

213.    Further, the 2003 Proxy stated that:

Section 162(m) of the Internal Revenue Code generally disallows a tax deduction to publicly held companies for compensation exceeding $1 million paid to each of the Company's chief executive officer and four other most highly compensated executive officers. Qualifying performance-based compensation will not be subject to the deduction limit if certain requirements are met. ***The Company's 2002 Stock Incentive Plan and Executive Incentive Plan are structured in a manner that we believe complies with the statute's requirements.*** Accordingly, the Company generally does not expect compensation associated with stock options, stock appreciation rights or performance awards issued under the 2002 Stock Incentive Plan, or compensation paid under the Executive Incentive Plan, to be subject to the deduction limit.

214.    This statement was false and misleading because, in fact, options granted under the 2002 Plan did not comply with the requirements of Section 162(b) because the

Compensation Committee abdicated to McGuire the responsibility for selecting the grant dates for himself and the four other most highly compensated executive officers, and because stock options granted to McGuire and the Officer Defendants in 2002 were back-dated, and therefore did not qualify as performance-based compensation, subject to the deduction.

215.    In addition, the Summary Compensation Table from the 2003 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company in violation of Items 402(b)(2)(iii)(B) and 402(c)(2)(iv) of Regulation S-K by:  (i) Defendants McGuire, Hemsley, Wheeler and Lubben in fiscal year 2000 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 2000; (ii) Defendants McGuire, Hemsley, Wheeler and Sheehy in fiscal year 2001 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 2001; and (iii) Defendants McGuire, Hemsley, Wheeler, Sheehy and Lubben in fiscal year 2002 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 2002.

216.    Finally, there was also a shareholder proposal relating to stock options that was put to shareholder vote pursuant to the 2003 Proxy.  Specifically, the American Federation of State, County and Municipal Employees Pension Plan proposed "that the shareholders of [UnitedHealth] urge the Board of Directors to adopt a policy that the cost of employee and director stock options be recognized in [UnitedHealth's] income statement."  A stated reason for this proposal was that "voluntarily expensing stock options sends a signal to the market that a company is committed to transparency and

corporate governance best practices." The Board unanimously recommended that the shareholders vote against this resolution, stating, among other things, that such proposals would *not* be in the "***best interest of the company***." This statement was materially false and misleading. Had this program been adopted, options granted to employees would have been expensed, reducing net income and ending the options backdating scheme, which looted the Company of hundreds of millions of dollars. Unfortunately, on the Board's recommendation, this resolution failed by a vote of 115 thousand to 124 thousand, missing the requisite 50% pass-threshold by just 2%.

### 2004 Proxy

217.   UnitedHealth's 2004 definitive proxy statement was filed with the SEC on Schedule 14A on April 9, 2004 ("2004 Proxy") and was materially false and misleading.

218.   First, the 2004 Proxy stated:

> We have ***continuously encouraged*** the alignment of employee and shareholder interests through equity-based incentive programs, and our target is for our employees and directors to hold, in the aggregate, at least 10% of our fully diluted shares outstanding in the form of owned shares, unexercised stock options or restricted stock grants subject to future vesting conditions.

219.   The statement that the Director Defendants "***continuously encouraged*** the alignment of employee and shareholder interests through equity-based incentive programs" was materially false and misleading, because, as detailed above, the option grants to McGuire and other Officer Defendants since at least 1996 were backdated. As a result, the stated purpose of option grants to McGuire and other Officer Defendants – *i.e.*,

linking a significant portion of his compensation to the future performance of the Company – was significantly undermined to the detriment of the Company.

220.   Second, the 2004 Proxy also contained the following statement:

*The Committee believes it is important to link a significant portion of Dr. McGuire's potential compensation to future Company performance.* As part of his overall compensation package, Dr. McGuire receives grants of stock options from time to time. Pursuant to the terms of his employment agreement, in 2003 we granted Dr. McGuire an option to purchase 1,300,000 shares of our common stock at an exercise price of $40.12 per share, which was *the fair market value of the stock on the grant date*.

\*       \*       \*

During each calendar year of the [1999] agreement, Dr. McGuire receives a non-qualified stock option to purchase a minimum of 1,300,000 shares of the Company's common stock with an exercise price equal to *the fair market value on the date of grant*.

221.   These statements were materially false and misleading, because, among other things, the Director Defendants failed to disclose that the grants of options to McGuire in year 2003 were in violation of the Company's stock option plans and, as such, *ultra vires*.  Moreover, the second statement referenced above, was also materially false and misleading because, as detailed above, during years 1999 through 2002, McGuire did not receive his option grants on the dates of the grants.  Rather, the dates of the grants were backdated.

222.   Third, in describing the 2002 Plan, the 2004 Proxy also stated that: "The exercise price for all options granted under the Stock Incentive Plan is the closing sale price of our common stock on the date the option is granted."  This statement is false because, as detailed above, in 2002, McGuire and other Officer Defendants did not

receive their stock options on the date the options were granted.  Rather, the dates of the 2002 grants were backdated.

223.   Further, like the 2003 Proxy, the 2004 Proxy stated that:

Section 162(m) of the Internal Revenue Code generally disallows a tax deduction to publicly held companies for compensation exceeding $1 million paid to each of the Company's chief executive officer and four other most highly compensated executive officers. Qualifying performance-based compensation will not be subject to the deduction limit if certain requirements are met. ***The Company's 2002 Stock Incentive Plan and Executive Incentive Plan are structured in a manner that we believe complies with the statute's requirements.*** Accordingly, the Company generally does not expect compensation associated with stock options, stock appreciation rights or performance awards issued under the 2002 Stock Incentive Plan, or compensation paid under the Executive Incentive Plan, to be subject to the deduction limit.

224.   This statement was false and misleading for the same reasons that it was in 2003.

225.   In addition, the Summary Compensation Table from the 2004 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company in violation of Items 402(b)(2)(iii)(B) and 402(c)(2)(iv) of Regulation S-K by:  (i) Defendants McGuire, Hemsley, Wheeler and Sheehy in fiscal year 2001 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 2001; and (ii) Defendants McGuire, Hemsley, Lubben, Wheeler and Sheehy in fiscal year 2002 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 2002.

226.   Finally, the 2004 Proxy contained two shareholder proposals related to stock options.  First, the American Federation of State, County and Municipal Employees

Pension Plan proposed "that shareholders of [UnitedHealth] urge the Board of Directors to adopt a policy that the cost of employee and director stock options be recognized in [UnitedHealth's] income statement." One stated reason for this resolution was that "voluntarily expensing stock options sends a signal to the market that a company is committed to transparency and corporate governance best practices."

227. The Board unanimously recommended a vote against this resolution claiming that it was against the "best interest of the Company" and failing to disclose that the backdating of UnitedHealth stock option grants had resulted in significant unrecognized and undisclosed expenses to the Company. The Board's recommendation was materially false and misleading. Despite the efforts of the Board – two years in a row – to defeat this proposal, finally, in 2004, it passed by receiving the affirmative vote of 53% of the outstanding shares.

228. Second, the Sheet Metal Workers' National Pension Fund made the following proposal to utilize performance and time-based restricted share programs in lieu of stock options. One stated reason for this proposal was because "stock option plans, as generally constituted, all too often provide extraordinary pay for ordinary performance."

229. The Board unanimously recommended a vote against this proposal, stating, among other things, that "the stock options awarded to these executive officers are inherently performance-based, because a holder of the options receives no benefit unless the Company's stock price increases over a multi-year period after the date of the stock option grant." As detailed above, this statement is materially false and misleading,

because the options granted to the Officer Defendants were backdated and thus not "inherently performance-based."

230.   On the Board's recommendation, this proposal failed, only receiving the support of 5% of the outstanding shares.

**2005 Proxy**

231.   UnitedHealth's 2005 definitive proxy statement was filed with the SEC on Schedule 14A on April 7, 2005 ("2005 Proxy") and was materially misleading.

232.   The 2005 Proxy repeated some of the same things as had been said in the past:

> *The Compensation and Human Resources Committee is responsible for overseeing our compensation, employee benefit and stock-based programs.*  The Committee also negotiates and administers our employment arrangements with our Chief Executive Officer and President, performs the annual Chief Executive Officer evaluation, *supervises incentive and equity-based compensation programs for our employees and reviews and monitors director compensation programs.*

> The Committee believes that stock ownership programs, including stock option, restricted stock grant, stock purchase and other similar programs are other valuable tools to provide executive officers with long-term interest in the Company's performance.  The Committee believes that these programs contribute to employee productivity and loyalty.  *We have continuously encouraged the alignment of employee and shareholder interests through equity-based incentive programs.*

> Equity-based awards are granted to our executive officers under the UnitedHealth Group 2002 Stock Incentive Plan.  Historically, the Committee has utilized executive stock options because a holder of an option benefits only if the Company's stock price increases after the date of grant.

233.   These statements are materially false and misleading.  Among other things, and as detailed above, the 2005 Proxy failed to disclose that the Committee, in violation

of the Company's stock option plans, abdicated its responsibility of administering the plans to McGuire, and that historically, the Committee did not utilize the executive stock options so that a holder of an option benefited only if the Company's stock price increased after the grant, because at least in years 1996-2002, the dates of the grants to McGuire and Officer Defendants were backdated.

234.   In discussing, McGuire's compensation, the 2005 Proxy Statement further stated:

> During each calendar year of the [1999] agreement, Dr. McGuire receives a non-qualified stock option to purchase a minimum of 1,300,000 shares of the Company's common stock with an exercise price equal to ***the fair market value on the date of grant***.

235.   This statement was materially false and misleading because, as detailed above, during years 1999 through 2002, McGuire did not receive his option grants on the dates of the grants.  Rather, the dates of the grants were backdated.

236.   In describing the 2002 Plan, the 2005 Proxy also stated that: "The exercise price for all options granted under the Stock Incentive Plan is the closing sale price of our common stock on the date the option is granted."  This statement is false because, as detailed above, in 2002, McGuire and other Officer Defendants did not receive their stock options on the date the options were granted.  Rather, the dates of the 2002 grants were backdated.

237.   Further, like the 2003 and 2004 Proxies, the 2005 Proxy stated that:

> Section 162(m) of the Internal Revenue Code generally disallows a tax deduction to publicly held companies for compensation exceeding $1 million paid to each of the Company's chief executive officer and four other most highly compensated executive officers. Qualifying performance-

based compensation will not be subject to the deduction limit if certain requirements are met. ***The Company's 2002 Stock Incentive Plan and Executive Incentive Plan are structured in a manner that we believe complies with the statute's requirements.*** Accordingly, the Company generally does not expect compensation associated with stock options, stock appreciation rights or performance awards issued under the 2002 Stock Incentive Plan, or compensation paid under the Executive Incentive Plan, to be subject to the deduction limit.

238.    This statement was false and misleading for the same reasons it was in 2003 and 2004.

239.    In addition, the Summary Compensation Table from the 2005 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company in violation of Items 402(b)(2)(iii)(B) and 402(c)(2)(iv) of Regulation S-K by Defendants McGuire, Hemsley, Lubben and Sheehy in fiscal year 2002 as a result of their receipt of fraudulently backdated stock options at less than fair market value in 2002.

240.    Finally, the 2005 Proxy also contained two shareholder proposals relating to stock options. First, the AFL-CIO proposed to adopt a policy that a significant portion of future equity compensation grants to senior executives shall be shares of stock that require the achievement of performance goals as a prerequisite to vesting. If such a resolution was adopted, it would have effectively ended the option backdating scheme because McGuire would no longer receive options at all.

241.    The Board unanimously recommended that shareholders vote against this proposal in favor of the existing options plan, stating expressly that:

While the Board strongly supports the concept of performance-based compensation arrangements, the Board believes that adoption of this

94

proposal is not necessary and is ***not in the best interests of UnitedHealth Group and its shareholders*** at this time because UnitedHealth Group's compensation programs already include a high level of pay-for-performance, historically accomplished through a combination of fixed price stock options and a greater emphasis on at-risk, performance-based cash incentive compensation.

\* \* \*

UnitedHealth Group believes strongly in linking employee compensation to Company performance. Our philosophy is to pay higher-than-market average total compensation over periods of sustained excellent performance. Both the cash compensation and number of stock options granted to our executives are based on performance. ***In addition, the stock options awarded to executives are inherently performance-based, because a holder of the options receives no benefit unless the Company's stock price increases over a multi-year period after the date of the stock option grant***. The Board of Directors believes that the current use of stock options as one portion of this overall compensation program achieves the alignment of the interests of UnitedHealth Group's senior executives with the interests of its shareholders. UnitedHealth Group's Compensation and Human Resources Committee (which is composed solely of independent non-management directors) authorizes grants of stock options under the UnitedHealth Group Incorporated 2002 Stock Incentive Plan.

\* \* \*

***The Compensation and Human Resources Committee is responsible for ensuring that UnitedHealth Group's executives are compensated in a manner that both furthers UnitedHealth Group's business strategies and aligns their interests with those of the shareholders***. Accordingly, the Compensation and Human Resources Committee and management have structured UnitedHealth Group's compensation programs so that a significant portion of executives' total compensation is at risk, tied both to annual and long-term financial performance of UnitedHealth Group as well as to the creation of value for its shareholders.

242. These statements are materially false and misleading because, among other things, contrary to the express statement in the disclosure, tying the grant of equity compensation to performance goals would have been in the best interests of UnitedHealth and its shareholders. These statements are also misleading because, as detailed above,

the undisclosed backdated option grants to the Officer Defendants were not "inherently performance-based." On the recommendation of the Board, this resolution failed, receiving only 30% support.

243. The United Brotherhood of Carpenters and Joiners of America also made a proposal to shareholders regarding stock options, asking the shareholders to adopt a policy that a significant portion of future stock option grants to senior executives shall be performance-based and premium-priced. This proposal, if adopted, may have stopped, or at least curbed, McGuire's ability to manipulate the strike price for his options as this provision was designed to take some of the discretion out of the process. Furthermore, if the second suggestion was adopted, and options were "premium-priced," picking a favorable grant date would be insignificant because the strike price would no longer be blindly linked to the grant date.

244. The Board unanimously recommended a vote against this proposal for the same reasons that the Board recommended voting against the AFL-CIO's proposal. Additionally, the Board added that the proposed resolution was not necessary because "the Company's compensation programs are already substantially performance-based." These statements were materially false and misleading because, as detailed above, the backdated stock options provided significant financial benefits to the Company's executives even in the absence of the Company's performance.

245. Based, in part, on the Board's recommendation, the shareholders rejected this proposal as well, as it received just 33% support.

**2006 Proxy**

246.    UnitedHealth's 2006 definitive proxy statement was filed with the SEC on Schedule 14A on April 7, 2006 ("2006 Proxy") and was materially misleading for many of the same reasons as in past years.

247.    The 2006 Proxy again contained the decade-old refrain:

The Compensation and Human Resources Committee consists of Messrs. Johnson (Chair) and Spears and Dr. Mundinger, each of whom is an independent director under the rules of the New York Stock Exchange and the Securities and Exchange Commission. ***The Compensation and Human Resources Committee is responsible for overseeing our compensation, employee benefit and stock-based programs***. The Committee also negotiates and administers our employment arrangements with our Chief Executive Officer and President and Operating Officer, performs the annual Chief Executive Officer and President and Chief Operating Officer evaluations, ***supervises incentive and equity-based compensation programs for our employees, and reviews and monitors director compensation programs***. The Compensation and Human Resources Committee held four regular meetings and four special meetings in 2005.

248.    These statements are materially false and misleading for the same reasons that they were in prior years.  The process of granting options at UnitedHealth simply was not a fair process conducted by a group of independent directors, it was a process designed to bestow windfall option grants to senior management.  Moreover, Defendants failed to disclose that the Committee abdicated its responsibility to manage the stock option plans to McGuire, and permitted McGuire to select the dates of his stock options, and those of the Officer Defendants, in violation of the 2002 Plan.

249.    In describing the 2002 Plan, the 2006 Proxy also stated that: "The exercise price for all options granted under the Stock Incentive Plan [*i.e.* the 2002 Plan] is the closing sale price of our common stock on the date the option is granted."  This statement

97

is false because, as detailed above, in 2002, McGuire and other Officer Defendants did not receive their stock options on the date the options were granted. Rather, the dates of the 2002 grants were backdated.

250.   Further, like the 2003, 2004 and 2005 Proxies, the 2006 Proxy stated that:

Section 162(m) of the Internal Revenue Code generally disallows a tax deduction to publicly held companies for compensation exceeding $1 million paid to each of the Company's chief executive officer and four other most highly compensated executive officers. Qualifying performance-based compensation will not be subject to the deduction limit if certain requirements are met. ***The Company's 2002 Stock Incentive Plan and Executive Incentive Plan are structured in a manner that we believe complies with the statute's requirements.*** Accordingly, the Company generally does not expect compensation associated with stock options, stock appreciation rights or performance awards issued under the 2002 Stock Incentive Plan, or compensation paid under the Executive Incentive Plan, to be subject to the deduction limit.

251.   This statement was false and misleading for the same reasons it was in the prior years. Indeed, even though at this point UnitedHealth finally took back the *ultra vires* grant of power to McGuire prospectively, because the Company did nothing to fix the illegal option grants prior to this point, every grant under the 2002 Plan up until this point was illegal, *ultra vires* and failed to comply with Section 162m of the Internal Revenue Code.

252.   Under each of these proxies, various Director Defendants were reelected despite their knowing or severely reckless participation in the stock option timing scheme. Specifically, the following Director Defendants were up for reelection in the following years:

⟩ 2002: Kean, Ryan, Spears and Wilensky;

〉  2003:  Johnson, Leatherdale, McGuire and Mundinger;

〉  2004:  Shalala, Ballard, Burke and Hemsley;

〉  2005:  Kean, Ryan, Spears and Wilensky.

〉  2006:  Johnson, Leatherdale, McGuire and Mundinger.

253.  UnitedHealth's Board is divided into three classes.  Each class serves a three year term.  Shalala's, Ballard's, Burke's and Hemsley's terms will not expire until 2007.   Kean's, Ryan's, Spear's and Wilensky's terms will not expire until 2008. Johnson's, Leatherdale's, McGuire's and Mundinger's terms will not expire until 2009.

**Other False and Misleading Statements**

254.  The Defendants also caused the Company to issue false and misleading public statements in Form 10-Ks issued during the relevant time period, as follows:

a.   Form 10-K for fiscal year ended December 31, 2001, filed with the SEC on April 1, 2002 ("2001 10-K"), signed by Defendants McGuire, Ballard, Burke, Hemsley, Johnson, Kean, Leatherdale, Mundinger, Ryan and Wilensky.

b.   Form 10-K for fiscal year ended December 31, 2002 ("2002 10-K"), filed with the SEC on March 19, 2003, signed by Defendants McGuire, Ballard, Burke, Hemsley, Johnson, Kean, Leatherdale, Mundinger, Ryan, Shalala, Spears and Wilensky;

c.   Form 10-K for fiscal year ended December 31, 2003, filed with the SEC on March 15, 2004 ("2003 10-K"), signed by Defendants McGuire, Ballard, Burke, Hemsley, Johnson, Kean, Leatherdale, Mundinger, Ryan, Shalala, Spears and Wilensky;

d   Form 10-K for fiscal year ended December 31, 2004, filed with the SEC on March 1, 2005 ("2004 10-K"), signed by Defendants McGuire, Ballard, Burke, Hemsley, Johnson, Kean, Leatherdale, Mundinger, Ryan, Shalala, Spears and Wilensky; and

e.   Form 10-K for fiscal year ended December 31, 2005, filed with the SEC on February 24, 2006 ("2005 10-K"), signed by Defendants

> McGuire, Ballard, Burke, Hemsley, Johnson, Kean, Leatherdale, Mundinger, Ryan, Shalala, Spears and Wilensky.

255.   In each of the foregoing Form 10-K's, or the Annual Reports to Shareholders incorporated therein, Defendants caused UnitedHealth to misrepresent that the Company properly accounted for its stock-based compensation.

256.   The Company's Annual Report to Shareholders for FY 2001 ("2001 Annual Report") incorporated by reference into the 2001 10-K, included the following materially false and misleading statements under the headings "Stock-Based Compensation":

> "We do not recognize compensation expense in connection with employee stock option grants because we grant stock options at exercise prices that equal or exceed the fair market value of the stock on the date the options are granted"
>
> *     *     *
>
> "Stock options are granted at an exercise price not less than the fair market value of the common stock at the date of grant."

257.   The Company's Annual Reports to Shareholders for FY 2002 and 2003, incorporated by reference into the 2002 and 2003 10-Ks, respectively, included the following materially false and misleading statements under the headings "Stock-Based Compensation Plans":

> "We account for activity under our stock-based employee compensation plans under the recognition and measurement principles of […] Accounting Principles Board […] Opinion No. 25, 'Accounting for Stock Issued to Employees.'  Accordingly, we do not recognize compensation expense in connection with employee stock option grants because we grant stock options at exercise prices not less than the fair value of our common stock on the date of grant"
>
> *     *     *

"Stock options are granted at an exercise price not less than the fair value of our common stock on the date of grant."

258.   The 2004 and 2005 10-Ks included the following materially false and misleading statements under the headings "Stock-Based Compensation Plans":

"We account for activity under our stock-based employee compensation plans under the recognition and measurement principles of Accounting Principles Board Opinion No. 25, 'Accounting for Stock Issued to Employees.'   Accordingly, we do not recognize compensation expense in connection with employee stock option grants because we grant stock options at exercise prices not less than the fair value of our common stock on the date of grant."

*      *      *

"Stock options are granted at an exercise price not less than the fair value of our common stock on the date of grant."

259.   The foregoing statements were false and misleading because, as the Company has now admitted, UnitedHealth did not, in fact, properly account for equity-based compensation.   To the contrary, as discussed above, UnitedHealth backdated stock options and thus issued options with exercise prices *below* the fair market value of the stock on the actual date of the grant, and failed to disclose or properly account for this extra compensation paid to the grant recipients.

260.   The financial statements included in the foregoing Form 10-K filings were materially false and misleading, because, among other things, Defendants caused the Company to understate compensation expenses and tax liabilities it was required to incur when the improperly backdated options were granted and/or exercised, and therefore overstated earnings from operations and net earnings.   In this respect, the following Form 10-Ks contained the following materially false and misleading statements:

a.      The 1997 Annual Report (incorporated by reference into the 1997 10-K) falsely stated the Company's earnings from operations as $581 million and $742 million; and net earnings as $326 million and $460 million, for the years ended December 31, 1996 and December 31, 1997, respectively;

b.      The 1998 Annual Report (incorporated by reference into the 1998 10-K) falsely stated the Company's earnings from operations as $581 million, $742 million, and a loss of $42 million; and net earnings as $326 million, $460 million, a loss of $166 million for the years ended December 31, 1996, December 31, 1997, and December 31, 1998, respectively;

c.      The 1999 Annual Report (incorporated by reference into the 1999 10-K) falsely stated the Company's earnings from operations as $742 million, a loss of $42 million, and positive $943 million; and net earnings as $460 million, a loss of $166 million and positive $568 million for the years ended December 31, 1997, December 31, 1998, and December 31, 1999, respectively;

d.      The 2000 Annual Report (incorporated by reference into the 2000 10-K) falsely stated the Company's earnings from operations as a loss of $42 million, positive $943 million, and positive $1.2 billion; and net earnings as a loss of $166 million, positive $568 million and positive $736 million for the years ended December 31, 1998, December 31, 1999, and December 31 2000, respectively;

e.      The 2001 Annual Report (incorporated by reference into the 2001 10-K) falsely stated the Company's earnings from operations as $943 million, $1.2 billion, and $1.566 billion; and net earnings as $568 million, $736 million, and $913 million, for the years ended December 31, 1999, December 31, 2000, and December 31, 2001, respectively;

f.      The 2002 Annual Report (incorporated by reference into the 2002 10-K) falsely stated the Company's earnings from operations as $1.2 billion, $1.566 billion, and $2.186 billion; and net earnings as $736 million, $913 million, and $1.352 billion for the years ended December 31, 2000, December 31, 2001, and December 31, 2002, respectively;

g.      The 2003 Annual Report (incorporated by reference into the 2003 10-K) falsely stated the Company's earnings from operations as

$1.566 billion, $2.186 billion, and $2.935 billion; and net earnings as $913 million, $1.352 billion, and $1.825 billion for the years ended December 31, 2001, December 31, 2002, and December 31, 2003, respectively;

h.     The 2004 10-K falsely stated the Company's earnings from operations as $2.186 billion, $2.935 billion, and $4.101 billion; and net earnings as $1.352 billion, $1.825 billion, and $2.587 billion for the years ended December 31, 2002, December 31, 2003, and December 31, 2004, respectively; and

i.     The 2005 10-K falsely stated the Company's earnings from operations as $2.935 billion, $4.101 billion, and $5.373 billion; and net earnings as $1.825 billion, $2.587 billion, and $3.3 billion for the years ended December 31, 2003, December 31, 2004, and December 31, 2005, respectively.

261.   Moreover, each of the foregoing Form 10-Ks were materially false and misleading because they incorporated by reference the false and misleading disclosures regarding executive compensation in the proxies issued during the year in which each Form 10-K was issued.  Finally, each of the foregoing Form 10-Ks was materially false and misleading, because they failed to disclose the options backdating scheme.

262.   Indeed, as discussed above, on May 11, 2006, the Company already acknowledged a "*significant deficiency*" in how it had administered its stock option plans and announced that it may be forced to restate its financial results for the period from 2003 to the present, *reducing net earnings by approximately $286 million for only the past three years*.  UnitedHealth also announced that it may lose tax deductions that were taken based on the improper options grants.

263.   In addition, during the relevant period, each of the Officer Defendants filed with the SEC Form 4s and 5s that falsely represented to the Company, the SEC and the

103

shareholders that the fraudulent grants at issue herein actually occurred on the dates indicated thereon.

264.   Finally, in connection with each of the fraudulent option grants, the Officer Defendants entered into option agreements with the Company that fraudulently misrepresented the dates of the grants.

## DERIVATIVE ALLEGATIONS

265.   Lead Plaintiffs bring Counts I through IX derivatively on behalf of the Company pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

266.   UnitedHealth has failed to exercise its right to pursue these claims and the Company has repeatedly declined to comment or provide any further detail regarding the allegations made herein.

267.   Lead Plaintiffs were and are shareholders at all relevant times and there is no collusion between the parties.

268.   Lead Plaintiffs fairly and adequately represent the interests of the shareholders of UnitedHealth in enforcing the rights of the Company.

269.   This action is not collusive to confer jurisdiction on this Court which it otherwise would not have.

## DEMAND FUTILITY ALLEGATIONS

270.   Lead Plaintiffs' class action claim (Count X) is not subject to the requirement that plaintiffs, as shareholders of the Company, make a demand on the UnitedHealth Board of Directors because it is a direct claim based upon the Director Defendants' breach of their duty of candor in connection with the solicitation of

shareholder votes, and is brought in the right of the shareholders whose right to cast an informed vote was violated.

271.   Lead Plaintiffs' derivative claims for misstatements and omissions from proxy statements under Section 14(a) of the Exchange Act (Count II) are not subject to the demand requirement because business judgment – the lynchpin of the demand requirement – does not apply to disclosure decisions.

272.   Moreover, other than for purposes of asserting the Section 16(b) claim addressed below, Plaintiffs did not make a demand on the UnitedHealth Board prior to instituting this action regarding any of the derivative claims because:  (1) the wrongful acts complained of herein – *i.e.*, the stock option backdating scheme, including the delegation to McGuire of the authority to choose the stock option grant dates – were not only illegal and self-dealing, but also *ultra vires*, or outside the scope of the Boards' authority, and were not, nor could they have been, the product of a valid or good faith exercise of business judgment; (2) the entire fairness doctrine applies here; and (3) there is not a majority of disinterested and independent directors on UnitedHealth's board to appropriately consider a demand as all of UnitedHealth's twelve directors have disabling interests or conflicts.  As such, demand should be excused.

273.   The wrongs complained of herein were unlawful, *ultra vires* and not a product of a valid exercise of business judgment.  As detailed above, Defendants' scheme to grant, obtain, approve, and/or acquiesce in the issuance of backdated stock options to the Officer Defendants was unlawful, lacked any legitimate business purpose and was not a product of a valid exercise of business judgment.   As such, demand should be excused

105

as futile.  Moreover, as detailed above the conduct of the Director Defendants here was *ultra vires*, because the Compensation Committee delegated to McGuire their authority to determine the grant date of his own (and effectively the other Officer Defendants') options in direct violation of the express terms of the 1991 and 2002 Plans that only allowed a delegation of the authority to grant options to non-officers and non-directors. Claims alleging *ultra vires* acts are not subject to the demand requirement because the business judgment rule does not protect *ultra vires* acts.

274.   The option grants were not otherwise the product of the valid exercise of business judgment because the Compensation Committee allowed McGuire to essentially determine his own compensation.  Whenever a director is entrusted to make a decision about a corporate transaction in which that director has a financial interest, the entire fairness doctrine is triggered.  The doctrine carries a presumption that the transaction was accomplished to favor the interests of the director over the corporation, and the director carries the burden of demonstrating that the transaction was actually entirely fair to the corporation.  Given that presumption and burden-shifting, the business judgment rule is rebutted, and demand is not required.  As detailed above, the Compensation Committee gave McGuire the authority to choose the stock option grant dates issued under the Plan. The Committee also knowingly or recklessly permitted McGuire to exceed this authority and allowed McGuire to set the vast majority of his own compensation through backdating his option grants.  McGuire, therefore, had a financial interest in his own option grants from the Company and bears the burden of demonstrating that the grants were entirely fair to the Company.

275.   The Board brought no business judgment to bear on the issuance of the options, as that decision was left to McGuire and the Board took no action.  As such, the Board is estopped from claiming the protections of the business judgment rule and demand is excused.

276.   A reasonable doubt exists as to whether a majority of UnitedHealth's Board of Directors is disinterested and independent.  Even if the entire fairness doctrine was not triggered here, Lead Plaintiffs can show that at least 50% of the current Board is disabled from considering a demand due to their participation and approval of the backdating scheme, their interest, and their lack of independence.

277.   The twelve members of UnitedHealth's board at the time of the filing of this Complaint were Defendants McGuire, Hemsley, Spears, Ryan, Kean, Ballard, Mundinger, Johnson, Burke, Leatherdale, Shalala, and Wilensky.  Two of these Directors (Defendants McGuire and Hemsley) were financially self-interested in the fraudulently backdated or otherwise manipulated option grants at issue here as recipients of the grants, and demand is therefore excused as to these individuals.  Six additional Directors (Defendants Spears, Ryan, Kean, Ballard, Mundinger and Johnson) directly participated in granting these fraudulent options to the Officer Defendants as members of the Compensation Committee during the relevant time period, and also have personal ties to McGuire and other Directors that further make them beholden to McGuire and other Director Defendants, as discussed below.

278.   Four of the Directors who served on the Compensation Committee during the relevant time period also served on the Audit Committee (Defendants Ryan, Kean,

107

Ballard and Johnson), and three additional Directors also served on the Audit Committee (Leatherdale, Wilensky and Burke), and thus directly participated in the preparation of, and approved of, the materially false and misleading financial statements issued by the Company during the relevant time period at issue in this case.

279.    Thus, eleven of the twelve current members of the UnitedHealth Board of Directors either personally benefited from backdated stock options, were members of the Compensation Committee that was directly responsible for authorizing the backdated grants, or were members of the Audit Committee that was directly responsible for approving of the Company's materially false and misleading financial statements.

280.    Each member of the UnitedHealth Board also receives generous stock option grants by virtue of their election to and service on the Board.  These stock options, some of which remained unexercised at the time of the commencement of this litigation, have proven enormously profitable for the Director Defendants who, as discussed below, collectively hold approximately $240 million in UnitedHealth securities.  The Director Defendants know that their ability to continue to reap the financial benefits from service as UnitedHealth directors depends on their ability to get re-nominated for election which, in turn, requires McGuire's approval.  Accordingly, the Director Defendants' financial interest in continuing to serve as a director UnitedHealth renders them incapable of considering a demand here.

**Defendant McGuire**

281.    Defendant McGuire is not disinterested as he personally benefited from the backdated stock options at issue.  Further, McGuire dominates and exerts power over the

UnitedHealth Board through his position as Chairman of the Board, and his longstanding relationships and past history with Board members. For the reasons detailed below, McGuire is not capable of impartially and independently considering a pre-suit demand and, through his control over the Board, he also renders the majority of the Board incapable of doing so.

282.   First, Defendant McGuire is not disinterested as he personally received and benefited from backdated stock option grants in 1996, 1997, 1998, 1999, 2000, 2001 and 2002, and illegal *ultra vires* option grants in 2003, 2004 and 2005, and personally obtained hundreds of millions of dollars in unlawful compensation as a result. For example, as set forth above, McGuire purportedly received 1,825,000 options dated October 13, 1999, at an exercise price of $40.125, the lowest market close for the entire year, 325,000 options dated March 8, 2000, at an exercise price of $47.63, again the lowest market close for the entire year, and 650,000 options dated January 17, 2001, at an exercise price of $52.69, pennies from the lowest market close for the entire year. Between 1996 and the present McGuire has exercised 7,274,000 stock options netting him a profit of $420,620,159. As of December 31, 2005, McGuire had 29,562,496 exercisable options outstanding with an "in-the-money" value of more than $1.6 billion.

283.   Second, as set forth below, Defendant McGuire has received, and continues to receive, millions of dollars in salary, bonuses and other types of compensation:

| Year | Salary | Bonus |
|------|--------|-------|
| 1996 | $ 1,100,000 | $ 0 |
| 1997 | $ 1,200,000 | $ 0 |
| 1998 | $ 1,300,000 | $ 0 |
| 1999 | $ 1,588,461 | $ 2,978,365 |

| | | |
|---|---|---|
| 2000 | $ 1,696,154 | $ 3,053,077 |
| 2001 | $ 1,796,154 | $ 3,722,000 |
| 2002 | $ 1,896,154 | $ 5,275,000 |
| 2003 | $ 1,996,154 | $ 5,550,000 |
| 2004 | $ 2,176,923 | $ 5,550,000 |
| 2005 | $ 2,200,000 | $ 5,808,000 |
| **Total** | **$ 16,950,000** | **$ 31,936,442** |

284.   As set forth in the 2006 Proxy, the Compensation Committee negotiates and administers the Company's employment arrangements with McGuire, performs their evaluations, and supervises incentive and equity-based compensation programs for UnitedHealth's employees, including McGuire.   McGuire is thus incapable of disinterestedly and independently considering a demand to commence an action against the other Directors, particularly against Directors Johnson, Spears and Mundinger, who as the current members of the Compensation Committee, control his compensation. Moreover, given McGuire's personal exposure to liability from the allegations described herein, he suffers from an irreconcilable conflict in considering the prosecution of those involved.

285.   Third, McGuire exerts domination and control over UnitedHealth, its officers and its Board, rendering the Board incapable of considering a pre-suit demand. Specifically, McGuire's 1999 Employment Agreement with the Company provided in 1999, and continues to provide, that during the five-year periods of his employment, the Board of Directors *shall nominate* McGuire as a director for election by the stockholders of UnitedHealth to the Board and the Board *shall elect* McGuire as Chairman of the Board.   Pursuant to this arrangement, and as Chairman and CEO of the Company, McGuire controlled UnitedHealth and has controlled the Board through longstanding

110

personal and professional entanglements and relationships with other Board members. For example, McGuire and his wife have each donated $2,000 to the election campaign of Director Defendant Kean's son, who is running for the U.S. Senate for New Jersey, and in 2006, McGuire's family foundation made a $4 million donation to the University of Minnesota Foundation, of which Director Defendants Johnson and Leatherdale are trustee and lifetime director, respectively.  Assets of McGuire's family foundation are also managed by the New York firm Spears Grisanti & Brown LLC, of which Director Defendant Spears is a Senior Principal, and to which the foundation pays significant fees.

286.   Thus, demand is futile as to Defendant McGuire.

**Defendant Hemsley**

287.   Defendant Hemsley is also not disinterested as he personally benefited from the backdated stock options at issue.  For the reasons detailed below, Hemsley is not capable of impartially and independently considering a pre-suit demand and, through his control over the Board, he also renders the majority of the Board incapable of doing so.

288.   First, Defendant Hemsley is not disinterested as he personally received and benefited from backdated or otherwise manipulated stock option grants in 1998, 1999, 2000, 2001 and 2002, and personally obtained hundreds of millions of dollars in unlawful compensation as a result.  For example, as set forth above, Hemsley purportedly received 910,000 options dated October 13, 1999, at an exercise price of $40.125, the lowest market close for the entire year, 150,000 options dated March 8, 2000, at an exercise price of $47.63, again the lowest market close for the entire year, and 300,000 options dated January 17, 2001, at an exercise price of $52.69, pennies from the lowest market

close for the entire year.  Between 1996 and the present, Hemsley exercised 1,950,000 stock options, netting him a profit of $108,952,137.  As of December 31, 2005, Hemsley had 12,320,000 exercisable options outstanding with an "in-the-money" value of more than $660 million.

289.   Second, as set forth below, Defendant Hemsley has received, and continues to receive, millions of dollars in salary, bonuses and other types of compensation:

| Year | Salary | Bonus |
|------|--------|-------|
| 1998 | $ 559,615 | $ 0 |
| 1999 | $ 747,116 | $ 1,167,368 |
| 2000 | $ 871,154 | $ 1,306,731 |
| 2001 | $ 900,000 | $ 1,575,000 |
| 2002 | $ 980,769 | $ 2,300,000 |
| 2003 | $ 1,000,000 | $ 2,325,000 |
| 2004 | $ 1,038,462 | $ 2,325,000 |
| 2005 | $ 1,000,000 | $ 2,452,000 |
| **Total** | **$ 7,097,116** | **$ 13,451,099** |

290.   As in the case of McGuire, according to the 2006 Proxy, the Compensation Committee negotiates and administers the Company's employment arrangements with Hemsley, performs his evaluations, and supervises incentive and equity-based compensation programs for UnitedHealth's employees, including Hemsley.  Hemsley is thus incapable of disinterestedly and independently considering a demand to commence an action against the other Directors, particularly against Directors Johnson, Spears and Mundinger, who as the current members of the Compensation Committee, control his compensation.  Moreover, given Hemsley's personal exposure to liability from the allegations described herein, he suffers from an irreconcilable conflict in considering the prosecution of those involved.

291.   Thus, demand is futile as to Defendant Hemsley.

**Compensation Committee Members:  Defendants Spears,**
**Ryan, Kean, Ballard, Mundinger and Johnson**

292.   The Compensation Committee was directly responsible for administering and managing the Company's executive compensation program and its stock option plans.  Its members during the relevant time period therefore approved, ratified, and were otherwise responsible for the backdated or otherwise manipulated stock option grants. Such members could not have acted in good faith or with the requisite care and concern for the best interest of the Company and its shareholders, because no legitimate process could have been employed that would have allowed the backdating of stock options and the cover-up of such improprieties.   Indeed, as detailed above, the process that was employed by the Compensation Committee with respect to the option grants at issue here was in direct violation of the Company's Stock Option Plans and therefore unlawful, unauthorized and *ultra vires*.

293.   As members of the Compensation Committee during the relevant time period who were responsible for approving the UnitedHealth stock option grants, Defendants Spears, Ryan, Kean, Ballard, Mundinger and Johnson knew, or recklessly disregarded, that they were approving stock option grants after the fact in a manner that was unlawful and not a valid exercise of business judgment.  Accordingly, there is significant doubt that these Director Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing and loyalty.  The following chart shows which of these

Directors were serving as members of the Compensation Committee during the years in which the wrongful option grants purportedly occurred:

| Purported Date of Option Grant | Members of Compensation Committee During Year of Purported Option Grant |
|---|---|
| 7/30/1996 | Spears (Chair), Ryan, Kean and Ballard |
| 10/24/1996 | |
| 2/11/1997 | Spears (Chair), Ryan, Kean, Ballard and Mundinger |
| 10/27/1997 | |
| 1/20/1998 | |
| 2/6/1998 | |
| 8/17/1998 | |
| 10/16/1998 | |
| 2/17/1999 | Spears (Chair), Kean and Mundinger |
| 10/13/1999 | |
| 3/8/2000 | |
| 7/26/2000 | |
| 1/17/2001 | |
| 9/21/2001 | |
| 1/7/2002 | |
| 8/5/2002 | |
| 2/12/2003 | Spears (Chair), Johnson and Mundinger |
| 11/28/2003 | |
| 2/11/2004 | Johnson (Chair), Spears and Mundinger |
| 12/7/2004 | |
| 2/3/2005 | |
| 5/2/2005 | |

294.   Thus, for these reasons, demand is futile as to Defendants Spears, Ryan, Kean, Ballard, Mundinger and Johnson.

**Defendant Spears**

295.   Defendant Spears is further incapable of objectively evaluating a pre-suit demand.   Spears acted as Chairman of the Compensation Committee from before the execution of McGuire's 1996 Employment Agreement -- which Spears himself signed on

114

behalf of the Company -- through the execution of McGuire's 1999 Employment Agreement and until at least May 12, 2004.

296.    Pursuant to McGuire's 1999 Employment Agreement, as Chairman of the Compensation Committee Spears was the sole individual to whom McGuire was required to provide oral notification of the date of McGuire's option grants.  On information and belief, Spears violated his duties of loyalty and care to the Company by approving stock option grants after the fact in a manner that was unlawful and not a valid exercise of business judgment.  As a result, these backdated options fraudulently enriched McGuire, harmed the Company, and, unbeknownst to shareholders, violated the terms of the Stock Plans by granting in-the-money options.

297.    Although Spears is personally implicated in the backdating scheme, he has made statements to the press that pre-judge the propriety of the grants.  For the March 18, 2006 *Wall Street Journal* article "The Perfect Payday," Spears stated to the author that McGuire's October 13, 1999 option grant of 1.825 million shares at a strike price of $40.13, the lowest closing price of the year, was not backdated but was awarded concurrently with the signing of McGuire's employment contract.  However, as detailed herein, it is highly unlikely that the 1999 Employment Agreement truly went into effect on October 13, 1999.

298.    Spears is also a Senior Principal of New York firm Spears Grisanti & Brown LLC, which manages money belonging to McGuire's family foundation, to which the foundation pays significant fees.

299.    Thus, demand is futile as to Defendant Spears.

115

**Defendant Ryan**

300.   As disclosed in public filings, UnitedHealth has admitted that Ryan is deemed a non-independent director of the Company under the Rules of the New York Stock Exchange.  This is due to the fact that, until April 29, 2005, Ryan was Senior Vice President and Chief Financial Officer of Medtronic, Inc., where one of UnitedHealth's executive officers, Richard H. Anderson, serves as a member of the compensation committee.

**Defendant Ballard**

301.   Defendant Ballard is further disqualified from considering a demand because he is, since 1992 Of Counsel to Greenebaum, Doll & McDonald, PLLC, a Louisville, Kentucky law firm that up to June 30, 2004 has represented UnitedHealth and derived significant fees from that representation.

302.   Thus, demand is futile as to Defendant Ballard.

**Defendant Kean**

303.   Defendant Kean is further disqualified from considering a demand because Kean's son, Thomas H. Kean, Jr., is currently running for the U.S. Senate for New Jersey and has received $25,000 in political contributions from UnitedHealth-affiliated donors, including $2,000 each from Burke, McGuire and McGuire's wife.

304.   Thus, demand is futile as to Defendant Kean.

**Defendant Johnson**

305.   Defendant Johnson is further disqualified from considering a demand because Johnson is a trustee of the University of Minnesota Foundation, which received a

116

$4 million gift from McGuire's family foundation in 2006. Moreover, on September 5, 2006, the AFL-CIO, the largest U.S. labor union, asked for the resignation of James A. Johnson from the Board of the Company (as well as boards of the other companies Johnson serves on) due to, among other things, pending investigations relating to the stock option backdating scheme.

306.   Johnson's personal ties to some Defendants and significant involvement in the stock option scheme at United Health raises a reasonable doubt as to whether he could impartially authorize suit against himself and other Defendants.

307.   From 1990 until January 1999, Johnson served as the Chairman and CEO of Fannie Mae, a federally chartered financial services company providing products and services related to home mortgages, and from January 1999 until December 1999, Johnson was also the Chairman of Fannie Mae's Executive Committee. In May of 2006, federal regulators criticized Johnson for allegedly creating a culture at Fannie Mae that had contributed to the company's regulatory problems – *i.e.*, after regulators uncovered accounting manipulations in 2004, Fannie Mae admitted to overstating income by $11 billion in past years. In an interview with *Barron's*, James Lockhart, executive director of the Office of Federal Housing Enterprise Oversight, Fannie Mae's regulator, said: "Cultures grow over time and, obviously, in my mind, Johnson was very much involved in starting a culture of arrogance at the organization, which eventually led to all of the problems they had and are still having."

308.   Johnson is also currently a director of home builder KB Home, which announced in 2006 that, with the assistance of outside counsel, it has been and is

reviewing stock option grants to KB Home's highly-paid chief executive, Bruce Karatz. Johnson is currently a member of, and was the chairman of, KB Home's compensation and stock-option committee from 1995 through 2000. Four grants to Karatz between 1998 and 2001 were favorably (and possibly fraudulently) timed. In early 2006, Institutional Shareholders Services ("ISS"), which researches corporate governance for large investors, recommended that its clients who own shares of KB Home withhold their votes for Johnson, who is a member of the compensation committee of that company's board of directors, because KB's bonus plans are too generous and lead to "runaway compensation."

309. Johnson is also a director of Gannett Co., Inc. ("Gannett") (of which Director Defendant Donna E. Shalala is also a director) and Temple-Inland, Inc. ("Temple-Inland"). ISS, which covers some 3,500 companies worldwide, each year accuses only about 2% of them of paying compensation that is not commensurate with performance. But both Gannett and Temple-Inland were among that group in 2005, and Johnson is the head of both companies' compensation committees.

310. Johnson also serves as a director and chair of the compensation committee at Goldman Sachs. The Corporate Library, another top source of corporate-compensation data, has similarly objected to the pay at Goldman Sachs, where Johnson has been a board member since 1999. According to the Corporate Library, compensation at Goldman is wildly inconsistent with that of its peers.

311.   In addition to being a member of the five boards described above, Johnson also is, and has been since 1996, a director of the retailer Target, and chairs its compensation committee.

312.   Thus, demand is futile as to Defendant Johnson.

**Audit Committee Members:  Defendants Leatherdale, Wilensky, Johnson, Ryan, Ballard, Burke and Kean**

313.   By its charter, the primary functions of the UnitedHealth Audit Committee during the relevant time period included:  (1) Serving as an independent and objective party to monitor the Company's financial reporting process and internal control system; (2) Reviewing the Company's annual financial statements and any other significant reports or financial information prior to submission to any governmental body, or the public, including without limitation (i) any certification, report, opinions or review rendered by the independent accountants, and (ii) the Annual Report on Form 10-K and Management's Discussion and Analysis of Financial Condition and Results of Operations contained therein; and (3) Ensuring that management has the proper review system in place to ensure that the Company's financial statements, reports, and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

314.   Thus, as members of UnitedHealth's Audit Committee, Defendants Leatherdale, Wilensky, Johnson, Ryan, Ballard, Burke and Kean were responsible for ensuring that UnitedHealth's internal controls were adequate and that the Company's quarterly and annual financial statements were accurate.  However, UnitedHealth's

internal controls were deficient, and its financial statements were inaccurate as demonstrated by UnitedHealth's admission that there was a "*significant deficiency*" in how it had administered its stock option plans, and its announcement that, as a result, it would be required to restate its financial results by cutting net income by as much as $286 million over the last three years. The Audit Committee was directly responsible for approving the Company's materially false and misleading financial statements. Accordingly, there is significant doubt that these Director Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing and loyalty in connection with this action. The following chart shows which of these Directors were serving as members of the Audit Committee during the years in which the wrongful option grants purportedly occurred:

| Purported Date of Option Grant | Members of Audit Committee During Fiscal Year of Purported Date of Option Grant |
|---|---|
| 7/30/1996 | Leatherdale (Chair), Wilensky and Johnson |
| 10/24/1996 | |
| 2/11/1997 | |
| 10/27/1997 | |
| 1/20/1998 | |
| 2/6/1998 | |
| 8/17/1998 | |
| 10/16/1998 | |
| 2/17/1999 | Leatherdale (Chair), Johnson, Ryan and Ballard |
| 10/13/1999 | |
| 3/8/2000 | |
| 7/26/2000 | |
| 1/17/2001 | |
| 9/21/2001 | |
| 1/7/2002 | |
| 8/5/2002 | |

| 2/12/2003 | Leatherdale (Chair), Burke, Ryan and Ballard |
| 11/28/2003 | |
| 2/11/2004 | Ballard (Chair), Leatherdale and Kean |
| 12/7/2004 | |
| 2/3/2005 | |
| 5/2/2005 | |

315. Thus, for these reasons, demand is futile as to Defendants Leatherdale, Wilensky, Johnson, Ryan, Ballard, Burke and Kean.

**Defendant Leatherdale**

316. Defendant Leatherdale is also the retired Chairman and CEO of The St. Paul Companies, Inc. (1990 to October 2001), from which UnitedHealth has purchased insurance products in disclosed and undisclosed amounts. Leatherdale is also a lifetime director of the University of Minnesota Foundation, which received a $4 million gift from McGuire's family foundation in 2006.

317. Thus, demand is futile as to Defendant Leatherdale.

*           *           *

318. Additionally, there is also substantial reason to doubt that the current members of the Board are sufficiently independent to prosecute this action as the Director Defendants have themselves each individually gained tremendous wealth through their own receipt and exercise of UnitedHealth stock options. In fact, the current members of the Board other than McGuire and Hemsley have collectively profited in excess of $100 million through exercising UnitedHealth stock options that they each received for their service on the Board since 1997. As a result of this enormous compensation, which is highly unusual for service on the board of a public company, much of which was

121

bestowed upon them by McGuire, these Directors are beholden to, and controlled by, McGuire, and lack any independence.  Specifically, upon information and belief:

a.    Defendant Ballard obtained in excess of $7.9 million through the exercise of stock options since 1997;

b.    Defendant Burke obtained in excess of $24.3 million through the exercise of stock options since 1997;

c.    Defendant Johnson obtained in excess of $9.0 million through the exercise of stock options since 1997;

d.    Defendant Kean obtained in excess of $15.1 million through the exercise of stock options since 1997;

e.    Defendant Leatherdale obtained in excess of $26.7 million through the exercise of stock options since 1997;

f.    Defendant Mundinger obtained in excess of $1.6 million through the exercise of stock options since 1997;

g.    Defendant Ryan obtained in excess of $2.1 million through the exercise of stock options since 1997;

h.    Defendant Spears obtained in excess of $21.1 million through the exercise of stock options since 1997; and

i.    Defendant Wilensky obtained in excess of $4.8 million through the exercise of stock options since 1997.

319.    Demand is also excused with respect to the entire Board for the additional reason that the Board abdicated its duty to revoke the Compensation Committee's authority to set executive compensation when it became clear that the Committee was not actually exercising that authority.  The Committee abandoned its duties by granting McGuire, who is undeniably interested in the decision, the sole power to determine the issue date of his and the other employees' options.  The Board had the duty to take back its authority to set executive compensation when the Committee failed to appropriately

122

fulfill that duty.  Their failure to do so is an abdication which negates application of the business judgment rule and excuses demand.

320.   Demand is further excused with respect to the entire Board for the reason that the repeated recommendations by the Board that shareholders vote against shareholder proposals in the 2003, 2004 and 2005 Proxies that would have increased the transparency of, and likely revealed the true costs to the Company of, the option grants to the Officer Defendants, demonstrates that the Directors were incapable of exercising disinterested business judgment with respect to option grants.

321.   Moreover, the Board's appointment of interested board members to an internal committee investigating the Company's option grant practices further demonstrates that the Board is incapable of independently evaluating a demand.  As shown by the facts discussed above, it would be impossible to create an independent and disinterested committee from the Board to assess the legality of the option grants.  Yet, Defendants announced in the 2006 Proxy and in a Form 8-K, both filed with the SEC on April 7, 2006, that in light of the "recent focus" by the SEC and others on stock option grant practices, McGuire had recommended that the Board appoint a committee of purportedly "independent directors" to retain and work with outside counsel to "review the Company's current and historic stock option grant practices."

322.   The Board formed such a committee (the "Directors' Committee"), comprised of Defendants Leatherdale, Burke and Johnson, who have engaged "independent counsel" (William McLucas of Wilmer Cutler Pickering Hale and Dorr LLP) to assist in their review.  For the reasons discussed above, however, none of the

123

directors on the committee are independent or disinterested.  For example, Leatherdale was Chairman of the Audit Committee from at least 1996 through 2003; Burke was a member of the Audit Committee in 2003; and Johnson was a member of the Audit Committee in 1999 through 2002 and a member of the Compensation Committee in 2003, and Chair of such Committee from 2004 to the present.  As detailed above, both of these Committees were directly involved and responsible for the conduct herein, and the members of these committees, including Leatherdale, Burke and Johnson, are directly exposed to liability arising out of conduct challenged herein.

323.    Indeed, apparently recognizing that the Directors' Committee is not independent and disinterested, in May 2006, the Company announced that it had initiated a separate internal and "independent" review of the Company's stock option granting practices.  Similarly, on June 26, 2006, the Board established yet another committee, the separate Special Litigation Committee ("SLC"), to investigate the claims in this action and with the power to review the findings of the Directors' Committee.[7]  The Board's resolution establishing the SLC recognized that the Board created the SLC because, "the Board, in its discretion, seeks review of the claims in [this action] . . . by individuals who are both independent and *disinterested*."  (Emphasis added.)  Accordingly, demand is excused as to the members of the Directors' Committee – Defendants Leatherdale, Burke and Johnson.

---

[7]  The SLC is made up of two members, former Minnesota Supreme Court Justice Edward Stringer and former Chief Justice of the Minnesota Supreme Court Kathleen Blatz.

## CLASS ACTION ALLEGATIONS

324.   Lead Plaintiffs bring Count X (the "Class Count") of this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated shareholders of UnitedHealth who owned UnitedHealth common stock at any time during 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005 and/or 2006, at the time the 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 Proxy Statements, respectively, were circulated to solicit their votes in various matters. Excluded from the Class are Defendants, their affiliates and assigns as well as anyone who received stock options from UnitedHealth, whether or not vested or exercised, with strike prices that were improperly backdated or otherwise manipulated.

325.   The Class Count is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. UnitedHealth has approximately 1.36 billion shares of common stock outstanding held by individuals and entities numerous to bring separate actions. It is reasonable to assume that holders of the common stock are geographically dispersed throughout the United States.

b.     There are questions of law and fact that are common to the class and that predominate over questions affecting any individual class member. The common questions include: (1) whether defendants made misrepresentations of fact in UnitedHealth's proxy statements from 1997 through the present, (2) whether these misstatements were material, (3) whether the Director Defendants owed a duty of candor to UnitedHealth's shareholders that required them to make complete and accurate disclosures in UnitedHealth's proxy statements, (4) whether the misstatements resulted in a breach of the fiduciary duty of candor owed to the shareholders, and (5) whether shareholders were harmed by the misleading statements.

326.   Lead Plaintiffs are committed to prosecuting the Class Count and have retained competent counsel experienced in litigation of this nature.   Lead Plaintiffs' claims are typical of the claims of the other members of the Class.   Accordingly, Lead Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

327.   Lead Plaintiffs anticipate that there will be no difficulty in the management of the Class Count as a class action.

328.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

329.   The prosecutions of separate actions would create the risk of:

      a.      inconsistent or varying adjudications which would establish incompatible standards for conduct for the defendants; and/or

      b.      adjudications that would as a practical matter be dispositive of the interests of other members of the Class.

## SPECIAL PLEADING MATTERS: TOLLING OF THE STATUTE OF LIMITATIONS

330.   Section 541.05 of the Minnesota Statutes establishes a six year limitations period for breach of fiduciary duty claims.   Accordingly, claims relating to Defendants' breach of their fiduciary duties in connection with options granted by the Company from 2000 to the present date unquestionably are timely.   There is no timeliness issue, therefore, with regard to the claims asserted in Counts IV through IX (asserting derivative claims regarding option grants insofar as they relate to grants made in 2000 through

126

2005), and Count X (asserting direct claims based on Defendants' breach of their duty of candor relating to the Company's failure to disclose the Defendants' pervasive options backdating practices, to the extent such claims relate to disclosures made from 2000 through 2006), set forth below.

331.   The remaining Counts are likewise timely.  As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through fraudulent backdating, by issuing false and misleading proxy statements, by falsely reassuring UnitedHealth's public investors that UnitedHealth's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed.

332.   UnitedHealth's public investors had no reason to know of Defendants' options backdating scheme and breach of their fiduciary duties (and because Defendants concealed the backdating scheme, Lead Plaintiffs could not in exercise of their diligence discover the scheme) until March 18, 2006, when *The Wall Street Journal* published its article detailing the option practices of UnitedHealth.  Lead Plaintiffs promptly filed this case upon discovery of these facts and have made diligent efforts to uncover additional facts set forth herein.

333.   Moreover, as fiduciaries of UnitedHealth and its public shareholders, Defendants cannot rely on any limitations defense where they withheld from UnitedHealth and its public shareholders the facts that give rise to the claims asserted herein, *i.e.*, that UnitedHealth Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates

had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

334.   Finally, the two year statute of limitations under Exchange Act Section 16(b) is tolled because Defendants did not make, and have not yet made, proper filings with the SEC setting forth their option grants and alerting the investment community to the disgorgeable profits.

## CAUSES OF ACTION

## COUNT I

## DERIVATIVE CLAIM FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER
(Against Director Defendants and Lubben, Wheeler and Sheehy)

335.   Lead Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

336.   This Count is brought on behalf of UnitedHealth pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c) promulgated thereunder against all Director Defendants and the "10(b) Officer Defendants" – hereafter defined as McGuire, Hemsley, Lubben, Wheeler and Sheehy.

337.   From March 2001 to the present (the "10(b) Period"), the Director Defendants and the 10(b) Officer Defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails, and or the facilities of a national securities exchange knowingly or recklessly:

　　　　a.   Employed devices, schemes, and/or artifices to defraud UnitedHealth in connection with grants to, and exercises by, the

128

        10(b) Officer Defendants of fraudulently-priced UnitedHealth stock options;

    b.    Made untrue statements of material fact to the Company, the SEC and the Company's shareholders and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, in order to defraud UnitedHealth in connection with grants to, and exercises by, the 10(b) Officer Defendants of fraudulently-priced UnitedHealth stock options; and/or

    c.    Engaged in acts, practices, and a course of conduct that operated as a fraud or deceit upon UnitedHealth, causing UnitedHealth to issue fraudulently-priced stock options and permitting the exercise of such options, at the Company's expense.

338.   During the 10(b) Period, each Director Defendant was a direct and necessary participant in the fraudulent options scheme and acted with knowledge, or reckless disregard, of the wrongdoing alleged herein.  Each Director Defendant implemented, perpetuated and/or furthered the scheme by, among other things, knowingly or recklessly:

    d.    delegating to McGuire the authority to unilaterally set the date of option grants to himself and effectively the other Officer Defendants;

    e.    approving and/or permitting the backdated option grants to McGuire and other Officer Defendants, and, in the case of Defendant McGuire, backdating his and effectively the  other Officer Defendants' option grants; and

    f.    knowingly or recklessly causing the Company to issue materially false and misleading statements such as the Company's proxy statements and Form 10-Ks during the 10(b) Period concerning the nature and validity of the fraudulent stock option grants at issue in this action.

339.   During the 10(b) Period, as described in detail above, each 10(b) Officer Defendant knowingly or recklessly directly participated in the option backdating scheme

by, among other things, knowingly accepting the backdated option grants and signing and filing with the SEC Form 4s and 5s which fraudulently misrepresented the dates of the grants at issue in this case.

340. Defendants' deceptive conduct referenced above had the direct purpose and effect of misleading and defrauding UnitedHealth and its shareholders because it induced the Company to issue the option grants to the Section 10(b) Officer Defendants at prices below fair market value on the date of the grants thereby depriving the Company of adequate compensation for the shares issued in connection with such option grants.

341. The Company relied upon Defendants' materially false and misleading statements and omissions in connection with the issuance of the fraudulent option grants at issue in this action. Had the Company and the shareholders not been defrauded by Defendants' false and misleading statements and omissions, the Company would not have issued the options at fraudulently manipulated prices and the options backdating scheme would have been stopped in its tracks.

342. The Director and 10(b) Officer Defendants acted with scienter throughout the 10(b) Period, in that they either knowingly implemented the fraudulent options scheme and had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were readily available to them.

343. As detailed herein, UnitedHealth suffered and continues to suffer significant damage as a direct result of the issuance of fraudulently-priced stock options

to the 10(b) Officer Defendants, the exercise or potential exercise of such options, and the Director Defendants' materially false and misleading statements and omissions, which harm was a direct and proximate result of Defendants' misconduct.

344.    Through their positions of control and authority as officers and directors of the Company, each Defendant was able to and did control the conduct complained of herein and the content of the public statements disseminated by UnitedHealth.

345.    Defendants are liable to the Company as a result of the acts alleged herein.

<u>COUNT II</u>

**<u>DERIVATIVE CLAIM FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER BASED UPON MATERIAL MISSTATEMENTS IN AND OMISSIONS FROM THE 2004 THROUGH 2006 PROXY STATEMENTS</u>**
(Against Director Defendants)

346.    Lead Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

347.    Each of the Director Defendants caused UnitedHealth to issue the 2004 through 2006 Proxy Statements to solicit shareholder votes for the election of directors. Each of the Director Defendants also caused UnitedHealth to issue the 2004 and 2005 Proxy Statements to recommend against shareholder proposals in each such Proxy Statement relating to stock options issued by the Company.

348.    As alleged in detail above, these Proxy Statements contained materially false and misleading statements and omissions, including the failure to disclose that: (a) in violation of the Company's stock option plans, McGuire—through backdating options for himself and effectively other Officer Defendants—was fabricating dates for option

131

grants that were the best possible dates for him, and the worst possible dates for the Company; (b) in complete violation of their fiduciary duties, the Board acquiesced in McGuire's selection of false grant dates; (c) McGuire and the other Officer Defendants received significant undisclosed compensation through the improper option grants; and (d) McGuire and the Officer Defendants' receipt of such compensation involved significant undisclosed tax and accounting implications for the Company.

349.   Since the 2004 through 2006 Proxy Statements were required to include compensation information regarding the prior three fiscal years, the 2004 through 2006 Proxy Statements made material misrepresentations and omissions pertaining to McGuire and other Officer Defendants' undisclosed compensation resulting from option grants that occurred as far back as the year 2001.

350.   The misrepresentations and omissions in each Proxy Statement were material to shareholders in voting on each Proxy Statement.  The Proxy Statements were an essential link in Defendants' unlawful stock option manipulation scheme, as the truth would have brought an end to shareholders' endorsement of the Director Defendants and the Officer Defendants and the Company's compensation policies, including the fraudulent stock option scheme.

351.   The Board's failure to include these material facts in the 2004 through 2006 Proxy Statements rendered the Proxy Statements materially false and misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

352.   As a direct and proximate result of the issuance of false and misleading Proxy Statements, the Company has suffered harm, because, among other things, the

132

Director Defendants who, as alleged herein, knowingly and/or recklessly orchestrated the option scheme, continued to receive the undisclosed compensation and perpetuated the fraud at UnitedHealth's expense.

353.    As a direct and proximate result of the issuance of false and misleading Proxy Statements, the Company has also been exposed to SEC and other government enforcement actions as well as penalties, fines and civil liabilities for violations of federal and state law, as well as large tax liabilities and unrecorded and unreported employee compensation expenses that caused its financial statements to be false.

## COUNT III

### DERIVATIVE CLAIM ON BEHALF OF UNITEDHEALTH FOR VIOLATION OF SECTION 16(b) OF THE EXCHANGE ACT
(Against McGuire, Hemsley, Koppe, Lubben, Rivet,
Sheehy, Wheeler and Wills)

354.    Lead Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

355.    At all relevant times, McGuire, Hemsley, Koppe, Lubben, Rivet, Sheehy, Wheeler and Wills (the "Section 16(b) Defendants") were officers of the Company, and McGuire and Hemsley were also directors of the Company.

356.    As set forth above, during the period of 1996 through at least 2002, the Section 16(b) Defendants engaged in sales of the Company's stock at various times that occurred within six months of the improper option grants.  These sale transactions took place within the statutory six month short-swing profit period proscribed by Section 16(b).

357.   A demand that UnitedHealth and its Board of Directors to commence an action against the Section 16(b) Defendants more than 60 days prior to the filing of this complaint, and the UnitedHealth Board has failed to commence such an action.

358.   The Section 16(b) Defendants falsely claimed on Form 4s and 5s filed in connection which such sales that they were entitled to the exemption from Section 16(b) pursuant to SEC Rule 16b-3(d).  In fact, the Section 16(b) Defendants were not entitled to the exemptions because:  (i) any purported approval by the UnitedHealth Board of the fraudulently backdated (or otherwise manipulated) option grants at issue herein was contrary to the terms of the Plans and was therefore *ultra vires*; (ii) the Board abdicated control to McGuire over his own options grants, and the grants were not truly made by a committee of non-employee directors; (iii) the Director Defendants failed to disclose in the Company's proxy statements that they had backdated (or otherwise manipulated) the option grants at issue and shareholders did not at any time ratify, in compliance with Exchange Act Section 14 or otherwise, the fraudulent grants alleged herein; and (iv) the fraudulent option grants to the Section 16(b) Defendants were accompanied by sales of Company common stock within six months of the purported date of the grants.

359.   As a result, the Section 16(b) Defendants garnered short-swing profits, which are subject to disgorgement, as described below:

McGuire:  Total profits to be disgorged of $7,157,841.

Hemsley:  Total profits to be disgorged of $157,500.

Koppe:  Total profits to be disgorged of $324,400.

Lubben:  Total profits to be disgorged of $3,276,489.61

Rivet:  Total profits to be disgorged of $1,729,687.50.

Sheehy:  Total profits to be disgorged of $1,373,070.36.

Wheeler:  Total profits to be disgorged of $5,527,170.41.

Wills:  Total profits to be disgorged of $1,691,990.

360.   The Section 16(b) Defendants are liable to the Company pursuant to Section 16(b) as a result of the acts alleged herein.

## COUNT IV

## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
(Against All Defendants)

361.   Lead Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

362.   Defendants, by reason of their positions as fiduciaries of the Company, owed duties to UnitedHealth and its shareholders of undivided loyalty, good faith, fair dealing, due care, candid disclosure, and diligence in the management and administration of the affairs of the Company, including administration of stock option plans, financial accounting, auditing and reporting.

363.   As detailed herein, Defendants knowingly or recklessly, and in bad faith, breached their fiduciary duties to UnitedHealth and its shareholders by violating their fiduciary responsibilities and mismanaging the Company in several ways, including:

a.     The Director Defendants:

i.     Implemented, approved, ratified and/or otherwise permitted the fraudulent options scheme to occur at the expense of UnitedHealth and in direct violation of the Company's stock option plans which required that the exercise price be no less

135

than the fair market value of the stock on the date of the grants;

ii.     Abdicated their duty to manage, control and supervise the stock option plans by, *inter alia*, allowing the most interested party—McGuire—to unilaterally set the strike price for backdated stock options even though such delegation was in direct violation of UnitedHealth's stock option plans and therefore *ultra vires*; and

iii.    Made false and misleading statements concerning the validity and prices of stock option grants at issue in this action which perpetuated the options fraud at the direct expense of UnitedHealth;

b.   Defendant McGuire. In addition to the above allegations relating to all Director Defendants, McGuire:

i.     controlled or improperly influenced material terms of an interested party transaction between himself and the Company, *i.e.*, the determination of the strike prices of his own options, which terms were unfair to the Company; and

ii.    selected, backdated and manipulated the grant dates of his own (and effectively other Officer Defendants') stock options in violation of the Company's stock option plans, and signed and filed materially false and misleading Form 4s and 5s relating to these grants.

c.   The Officer Defendants knowingly or recklessly entered into self-interested transactions with the Company with the intent to defraud UnitedHealth and to enrich themselves through fraudulently-priced UnitedHealth stock options, and signed and filed with the SEC materially false and misleading Form 4s and 5s relating to these grants.

364.   As a direct and proximate result of Defendants' breach of fiduciary duty, the Company has sustained, and will continue to sustain, substantial harm.

365.   Defendants are liable to the Company as a result of the acts alleged herein.

136

## COUNT V

## DERIVATIVE CLAIM FOR AIDING AND
## ABETTING A BREACH OF FIDUCIARY DUTY
(Against Director Defendants)

366.   Lead Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

367.   Defendants, by reason of their positions as fiduciaries of the Company, owed duties to UnitedHealth and its shareholders of undivided loyalty, good faith, fair dealing, due care, candid disclosure, and diligence in the management and administration of the affairs of the Company, including administration of stock option plans, financial accounting, auditing and reporting.   As detailed above, Defendants knowingly or recklessly, and in bad faith, breached these fiduciary duties.

368.   In addition to violating their fiduciary duties as set forth above, by virtue of their role in the Company and duty to administer the Company's stock option plans, the Director Defendants were able to, and in fact did, render aid and assistance to the Officer Defendants in their breaches of fiduciary duty by, among other things:

      a.   Knowingly or recklessly, and in bad faith, approving and/or ratifying or otherwise permitting the issuance of backdated stock option grants; and

      b.   Delegating to McGuire (contrary to the terms of the Company's option plans) the power to unilaterally set the dates for his and effectively the other Officer Defendants' option grants.

369.   As a direct and proximate result of the Director Defendants' aiding and abetting the Officer Defendants' breach of fiduciary duty, the Company has sustained, and will continue to sustain, substantial harm.

370.   The Director Defendants are liable to the Company as a result of the acts alleged herein.

## COUNT VI

### DERIVATIVE CLAIM FOR WASTE OF CORPORATE ASSETS
(Against All Defendants)

371.   Lead Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

372.   Each Defendant owed to the Company the obligation to protect the Company's assets from undue loss or waste.

373.   Each Defendant breached his or her obligation to the Company and wasted corporate assets by, among other things, knowingly or recklessly proposing, implementing, agreeing to, approving and/or ratifying the backdated option grants without corporate authority to do so, without consideration to the Company and/or without proper corporate purpose.

374.   As a direct and proximate result of Defendants' waste of corporate assets, the Company has sustained, and will continue to sustain, substantial harm.

375.   Defendants are liable to the Company as a result of the acts alleged herein.

## COUNT VII

### DERIVATIVE CLAIM FOR GROSS MISMANAGEMENT
(Against All Defendants)

376.   Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

138

377.   By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of UnitedHealth in a manner consistent with the operations of a publicly held company.

378.   As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, UnitedHealth has suffered substantial damages, monetary and otherwise, including damage to UnitedHealth's reputation.

379.   Defendants are liable to the Company as a result of this misconduct and breaches of duty alleged herein.

## COUNT VIII

## DERIVATIVE CLAIM FOR RESCISSION
(Against Officer Defendants)

380.   Lead Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

381.   As a result of the acts alleged herein, all stock option grants to Officer Defendants at issue in this action were obtained through the Officer Defendants' fraud, deceit, abuse of control or severe recklessness.  Further, the backdated stock options and the shares underlying these options were not duly authorized by the Board, as was legally required, because they were not authorized in accordance with the terms of the UnitedHealth stock option plans approved by UnitedHealth shareholders and filed with the SEC.

382.   As a result, all stock option grants to the Officer Defendants are invalid and should, therefore, be rescinded, with all shares obtained and gains realized on sales of shares returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT IX

## DERIVATIVE CLAIM FOR UNJUST ENRICHMENT
(Against Officer Defendants)

383.   Lead Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

384.   As alleged in detail herein, as a result of the *ultra vires* conduct of the Director Defendants, the Officer Defendants knowingly or recklessly received fraudulently-priced stock options which were invalid *ab initio*.  As described above, the Officer Defendants have exercised hundreds of thousands of these invalid options at fraudulently low prices and then sold the shares at large profits.  The Officer Defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments.  The Officer Defendants should be required to return the shares obtained and disgorge the profits which they have and/or will otherwise unjustly obtain at the expense of the Company in connection with exercising the fraudulently issued options.

385.   As a direct and proximate result of the acts alleged herein, the Director Defendants wrongfully deprived the Company of substantial wealth and were unjustly enriched thereby.

140

386.   The Director Defendants are liable to the Company as a result and should be required to disgorge their unjust gains and return them to the Company.

## COUNT X

### CLASS CLAIM FOR BREACH OF FIDUCIARY DUTY OF CANDOR BASED UPON DEFENDANTS' FAILURE TO DISCLOSE THE BACKDATING OF STOCK OPTIONS FROM 1997 THROUGH 2006
(Against Director Defendants)

387.   Lead Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

388.   Lead Plaintiffs bring this claim on behalf of themselves and on behalf of the Class of similarly-situated shareholders of UnitedHealth during the relevant time period.

389.   Each of the Director Defendants had a fiduciary duty of candor to UnitedHealth's shareholders.

390.   Each of the Director Defendants (except Shalala, Mundinger and Hemsley) caused UnitedHealth to issue the 1997 Proxy and to make the disclosures contained in the 1997 10K.

391.   Each of the Director Defendants (except Shalala and Hemsley) caused UnitedHealth to issue the 1998 Proxy and to make the disclosures contained in the 1997 10K.

392.   Each of the Director Defendants (except Shalala and Hemsley) caused UnitedHealth to issue the 1999 Proxy and to make the disclosures contained in the 1997 10K.

141

393.   Each of the Director Defendants (except Shalala) caused UnitedHealth to issue the 2000 Proxy and to make the disclosures contained in the 1997 10K.

394.   Each of the Director Defendants caused UnitedHealth to issue the 2001 Proxy and to make the disclosures contained in the 1997 10K.

395.   Each of the Director Defendants caused UnitedHealth to issue the 2002 Proxy Statement to solicit shareholder votes for the election of directors, and to solicit shareholder votes for the adoption of a new, restructured Stock Incentive Plan, and to make the disclosures contained in the 1997 10K.

396.   Each of the Director Defendants caused UnitedHealth to issue the 1997 through the 2006 Proxy Statements to solicit shareholder votes for the election of directors.  Each of the Director Defendants also caused UnitedHealth to issue the 2003, 2004 and 2005 Proxy Statements to recommend against two shareholder proposals in each such Proxy Statement relating to stock options issued by the Company.

397.   As alleged in detail above, these Proxy Statements and 10Ks contained materially false and misleading statements and omissions, including failure to disclose that: (a) in violation of the Company's stock option plans, McGuire—through backdating options for himself and other Officer Defendants—was fabricating dates for option grants that were the best possible dates for him, and the worst possible dates for the Company; (b) in complete violation of their fiduciary duties, the Board agreed to McGuire's selection of false grant dates; (c) McGuire and the other Officer Defendants received significant undisclosed compensation through the improper option grants; and (d)

142

McGuire and the Officer Defendants' receipt of such compensation involved significant undisclosed tax and accounting implications for the Company.

398.   The Director Defendants' failure to include these material facts in the Proxy Statements rendered them materially false and misleading and constituted a violation of their fiduciary duty of candor.

399.   Lead Plaintiffs and the Class were harmed by these misstatements because they were disenfranchised, denied their right to exercise an informed vote and continued to elect the very directors who implemented and perpetuated the fraud.  Moreover, as a result of the fraudulent stock option scheme, UnitedHealth was caused to issue hundreds of thousands of shares at fraudulent prices, which materially diluted shareholders' equity holdings.

400.   Defendants are liable to Lead Plaintiffs and the Class as a result of this misconduct and breaches of duty alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on behalf of UnitedHealth for certain claims, and on behalf of themselves and on behalf of the Class for other claims, demand judgment as follows:

A.   Awarding to the Company money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein;

B.      Awarding to the Company restitution from each of the Officer Defendants and ordering disgorgement of all profits, benefits, and/or other compensation obtained by the Officer Defendants as a result of the acts and transactions complained of herein;

C.      Issuing a preliminary injunction prohibiting Defendants from exercising any of the fraudulently issued options at issue herein, and forming a constructive trust to hold all executory option contracts issued to the Officer Defendants;

D.      Issuing a permanent injunction declaring as void all option grants at issue in this action, rescinding such option grants and prohibiting the Officer Defendants from exercising such grants;

E.      Rescinding all option contracts granted to the Officer Defendants as a result of the acts and transactions complained of herein and the cancellation, nullification, and declaration as void of any and all current or future obligations of the Company under all executory contracts obtained by the Officer Defendants as a result of the acts and transactions complained of herein;

F.      If the options contracts are not rescinded, repricing all the options granted to the Officer Defendants as a result of the acts and transactions complained of herein, to the fair market price on the actual dates of the grants; and

G.      Ordering the Directors of UnitedHealth to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect UnitedHealth and its shareholders from a repetition of the wrongful conduct described herein, including, but not limited to, rescinding the 2002 Stock Incentive Plan, and whatever further action as may be necessary and appropriate to

144

strengthen the Board's supervision of operations and develop and implement procedures

for greater shareholder input into the policies and guidelines of the Board;

H.    Certifying the class;

I.    Awarding pre- and post-judgment interest on the damages awards;

J.    Awarding to Plaintiffs the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

K.    Granting such other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.


Dated:  September 21, 2006          CHESTNUT & CAMBRONNE, P.A.
                                    s/ Karl Cambronne
                                    Karl L. Cambronne (#14321)
                                    Lead Counsel
                                    Jack L. Chestnut (#16378)
                                    Jeffrey D. Bores (#227699)
                                    3700 Campbell Mithun Tower
                                    222 South Ninth Street
                                    Minneapolis, MN 55402
                                    (612) 339-7300
                                    (612) 336-2940 (fax)

SHAPIRO HABER & URMY LLP
Thomas G. Shapiro
Edward F. Haber
Michelle H. Blauner
53 State Street
Boston, MA 02109
(617) 439-3939

145

BERNSTEIN, LITOWITZ, BERGER & GROSSMANN, LLP
Chad Johnson
Beata Gocyk-Farber
Adam Wierzbowski
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400
Fax:  (212) 554-1444

GRANT & EISENHOFER, PA
Jay Eisenhofer
Michael Barry
Sidney Liebesman
Cynthia Calder
45 Rockefeller Center, 15th Floor
New York, NY  10111
(646) 722-8500
Fax:  (646) 722-8501

RICE, MICHELS & WALTHER LLP
Brian Rice
Karin Peterson
206 East Bridge—Riverplace
10 Second Street Northeast
Minneapolis, MN  55413
(612) 676-2300
Fax:  (612) 676-2319

COUNSEL FOR LEAD PLAINTIFFS