UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA


In re UnitedHealth Group         )        Master File No.
Incorporated Shareholder         )        06-CV-1216 (JMR/FLN)
Derivative Litigation            )

_____         ORDER

In re UnitedHealth Group         )
Incorporated PSLRA               )        06-CV-1691 (JMR/FLN)
Litigation                       )        CLASS ACTION

     On November 29, 2006, this Court entered an Order, to which all parties assented. The Order restrained the release of certain property claimed by Dr. William McGuire, former Chairman of the Board and CEO of UnitedHealth Group. Dr. McGuire is a defendant in both matters captioned above. The Order was extended with the continuing assent of all parties, pending the report of UnitedHealth Group's Special Litigation Committee ("SLC"). The SLC issued its report on December 6, 2007. The Court now revisits its Order.[1]

     The parties in Civil No. 06-1216, as a step in concluding and settling their lawsuit, jointly move for dissolution of the injunction. The California Public Employees' Retirement System ("CalPERS"), lead plaintiff in Civil No. 06-1691, asks the Court to maintain it.

     The Court concludes the injunction must be maintained, subject to the terms of this Order.

---

[1] While styled an "Order," the Court's restraint acted as a de facto injunction. This Order discusses the continued restraint on the property. As such, the Court deems it appropriate to call its restraint what it really is: a preliminary injunction, to be analyzed under Rule 65 of the Federal Rules of Civil Procedure (Fed. R. Civ. P).

1

I.   Background

This case arises from allegations that certain officers and directors of UnitedHealth Group Incorporated ("UHG") were granted or received stock options artificially timed - "backdated" - to coincide with low points in the company's stock price. Prominent among these individuals was Dr. William McGuire, UHG's CEO and Chairman of its Board of Directors from 1991. Dr. McGuire departed from UHG, at the Board's request, in November 2006. At his departure, he claimed he was entitled to, among other things, UHG stock options worth over $1 billion.

At his departure, Dr. McGuire was a named defendant in numerous pending lawsuits, falling generally into three categories: (1) federal shareholder derivative suits filed against UHG and its officers and directors ("derivative litigation"); (2) federal securities class actions filed under the Private Securities Litigation Reform Act ("PSLRA litigation"); and (3) state derivative suits under Minnesota law. The federal actions lie before this Court. The third case-group is lodged in Minnesota's state court. The Securities and Exchange Commission ("SEC") has filed its own lawsuit. See Securities and Exchange Comm'n v. McGuire, 07-CV-4779. The SEC case was filed and settled co-terminously with the Special Litigation Committee's report, on December 6, 2007.

The federal and state derivative lawsuits are brought by shareholders on behalf of the company and against its current and former corporate leadership. Minnesota law permits a board of directors, faced with such actions, to appoint a Special Litigation Committee. Minn. Stat. § 302A.241 subd. 1 (2006). UHG's Board has opted to do so.

The Board's July 19, 2006 resolution authorizing the Special Litigation Committee conferred upon it "complete power and authority to investigate [the claims raised in the derivative

2

litigation] and analyze the legal rights or remedies of the Company and determine whether those rights or remedies should be pursued." (SLC Report, Appendix B). All information available to the Court suggests the SLC was properly constituted under Minnesota law. The SLC's members are two retired Minnesota Supreme Court justices. The Court knows its members to be persons of unquestioned integrity and probity.

The SLC issued its report on December 6, 2007. The report proposed a settlement of both state and federal shareholder derivative suits. Premised upon that settlement, the federal shareholder derivative plaintiffs have joined the defendants in asking the Court to lift its injunction and release stock options and other property in excess of the proposed settlement sums to Dr. McGuire.[2] Dr. McGuire advises the Court of his wish to pursue unidentified charitable and business opportunities. CalPERS opposes lifting the injunction, claiming release of the funds will jeopardize its ability to collect a judgment, should it prevail in the PSLRA litigation.

After considering the parties' submissions, the Court finds it appropriate to maintain the present injunction, pursuant to the terms of this Order.

II. <u>Analysis</u>

The Eighth Circuit Court of Appeals has established a four-part standard for issuance of a preliminary injunction. <u>See Dataphase Sys., Inc. v. C L Sys., Inc.</u>, 640 F.2d 109, 113 (8th Cir. 1981). A district court must consider:

> (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will

---

[2] The Court had previously lifted a portion of its injunction, releasing to Dr. McGuire stock options worth approximately $137 million, in March, 2007.

succeed on the merits; and (4) the public interest. <u>Id.</u> No single factor is determinative. <u>Id.</u> The question is whether the balance of equities so favors the party seeking the injunction, that justice requires the Court to preserve the status quo until the merits are determined. <u>Id.</u>

A. <u>Threat of irreparable harm to PSLRA plaintiffs</u>

"The authority of a trial court to issue a preliminary injunction to ensure the preservation of an adequate remedy is well established." <u>Airlines Reporting Corp. v. Barry</u>, 825 F.2d 1220, 1227 (8th Cir. 1987). Under appropriate circumstances, an injunction is proper, even where only money damages are sought. In such cases, a court must consider two factors: the non-movant's resources, and the potential magnitude of eventual damages. <u>Id.</u>

The Court finds that, while Dr. McGuire's resources are great, the potential damages may be even greater. Dr. McGuire points to UHG's financial strength and argues it is well able to pay any judgment in favor of the PSLRA plaintiffs. He further claims UHG's bylaws oblige it to indemnify him to the fullest extent permitted by Minnesota law. He claims that even if plaintiffs obtain a judgment against him, that judgment will necessarily be paid from the company's coffers. McGuire Letter Brief, December 11, 2007, at 2-3 [06-CV-1216, Docket No. 311].

A jury, if it found Dr. McGuire liable for violations of the securities laws, would have to consider the nature of his conduct and its relationship to plaintiffs' loss, and determine what percentage of the plaintiffs' loss was attributable to him. 15 U.S.C. § 78u-4(f)(2),(3). Dr. McGuire would be liable for at least this percentage. 15 U.S.C. § 78u-4(f)(2)(B)(i). If the jury found Dr. McGuire knowingly violated the law, he would be subject to joint and several liability. 15 U.S.C. § 78u-4(f)(2)(A).

Dr. McGuire replies that, in either case, the plaintiffs can look to UHG to collect their judgment – either through joint and

4

several liability if knowing fraud is found, or otherwise through indemnification. CalPERS urges the Court not to imply a right to indemnification into the federal securities laws, citing, e.g., Eichenholtz v. Brennan, 52 F.3d 478, 484 (3d Cir. 1995); Deephaven Capital Management, LLC v. Schnell, 2007 WL 101821, *3-4 (D. Minn., Jan. 8, 2007). CalPERS may be correct, but the Court need not imply such a right.

Minnesota's Business Corporations Act expressly requires a company such as UHG to indemnify its directors, officers and employees under appropriate circumstances. Minn. Stat. § 302A.521, subd. 2. But it is Dr. McGuire who bears the burden of establishing his entitlement to indemnification. Id., subd. 6(a)(5). To be indemnified under Minnesota law, Dr. McGuire must have (a) acted in good faith; (b) received no improper personal benefit; and (c) reasonably believed that his conduct was in the best interest of the corporation. Id., subd. 2 (a)(2),(3) and (5). If these conditions are satisfied, Dr. McGuire has a right to be indemnified by UHG – even if UHG is the party obtaining a judgment against him. 18 Minn. Prac., Corp. Law & Prac. § 10.19 (2007). Dr. McGuire's assurances that UHG will satisfy his obligations are premised on his ability to satisfy these conditions.

His confidence may be open to question. The Minnesota Supreme Court, while stating that public policy "supports indemnification," has yet to answer whether "attempted indemnification for illegal or even intentional misconduct would be invalid as a matter of public policy." St. Paul Fire & Marine Ins. Co. v. Perl, 415 N.W.2d 663, 667 (Minn. 1987) (construing predecessor statute). The Court of Appeals recently held that a corporate officer convicted of "knowingly and intentionally aiding and abetting" a crime did not, as a matter of law, act with the good faith required by the indemnification statute. Augustine v. Arizant, Inc., 735 N.W.2d 740, 744-45 (Minn. Ct. App. 2007). The Court of Appeals also

upheld a district court's denial of indemnification of a corporate officer who provided "inconsistent and changing explanations" for missing company property. Oarfin Records, Inc. v. DeLange, 2003 WL 348168, *3 (Minn. Ct. App., Feb. 12, 2003) (unpublished). These questions are amplified and further examined in the probability of success on the merits discussion below. But under Minnesota law, Dr. McGuire's right to indemnity cannot be considered conclusively established.[3]

The Court also considers the sums Dr. McGuire claimed on his separation from UHG. Words such as "huge," "fantastic," "astounding," "staggering," or "astronomical," do not describe $1 billion. Such a sum can only be thought of as "transcendent," or in terms of the gross national product of smaller members of the United Nations.

On the present record, the Court cannot definitively suggest a total sum to which the PSLRA plaintiffs may ultimately be entitled. But, if their allegations prove true - and the Court outlines some of the presently-available information suggesting they may be true, below - Dr. McGuire may be personally liable for extraordinarily substantial sums. Secondarily, as is more extensively analyzed below, there is a possibility that the SLC's proposed settlement may be open to review. If these sums, or even a reasonable proportion of them, fall personally upon Dr. McGuire there remains a need to protect the funds presently under restraint.

This Dataphase factor weighs in favor of maintaining the

---

[3] Nor is it clear that joint and several liability begins precisely where indemnity ends. The parties have cited no case, and this Court is aware of none, construing PSLRA together with the Minnesota Business Corporation Act on the issue of indemnity. Without such guidance, it seems possible that Dr. McGuire might be liable for his percentage of responsibility, yet not able to meet the statutory requirements for indemnification.

injunction.

B.   <u>Balance of harms between parties</u>

The parties do not dispute Dr. McGuire's likely entitlement to some portion of the assets presently held.  Dr. McGuire calls the year-long restraint a "seizure of [his] assets without first obtaining a judgment against him."  McGuire Letter Brief, December 11, 2007, at 1 [06-CV-1216, Docket No. 311].  Notwithstanding this statement, the Court recalls that until the present, the doctor has acquiesced in the injunction.

Dr. McGuire's wish for funds with which to engage in charitable activities and to pursue business interests is balanced against the need to protect funds to satisfy any judgment in the PSLRA litigation and any possible further sum needed to resolve the shareholders derivative settlement.

The Court finds the balance of hardships favors the PSLRA plaintiffs.  To the extent Dr. McGuire finds himself in need of cash, the Court has been, and explicitly states it remains, willing to afford him access to reasonable portions of the restrained funds.  This arrangement will certainly allow him to meet any specific pressing commitments.  The Court has already indicated its willingness to allow Dr. McGuire to satisfy the fine and disgorgement required by his settlement with the SEC.

While the Court will not deny Dr. McGuire reasonable funding, it is disinclined to release sums which could jeopardize a successful plaintiffs' recovery.  The Court finds this formulation will minimize any hardship to Dr. McGuire.  Indeed, other than complaining he does not wish to have this Court control the funds he claims, he offers no specific need for ready money.  He simply claims he is:

> ... unable to carry out his plans for philanthropic activities and new business ventures.  He has been subject to fluctuations in the market price of UHG stock without any ability to make independent investment

7

>decisions, and, if enjoined from exercising the stock options in question, faces the risk of loss due to market fluctuations. In addition, he stands to lose a substantial amount of money if he is unable to exercise the remaining options in 2007, because of lost interest on excess tax withholding that cannot be recovered until mid-2009, at the earliest.

(McGuire Letter Brief, December 6, 2007, at 5 [06-CV-1216, Docket No. 305].) The Court weighs this proffered show of harm against the possibility that PSLRA plaintiffs may not be able to recover the full amount of a judgment and finds the balance of harms favors the PSLRA plaintiffs.

Accordingly, this factor favors maintaining the injunction.

C.  <u>Probability of success on the merits</u>

The Court finds the most significant factor in this case is the probability of success on the merits. See <u>Shrink Missouri Government PAC v. Adams</u>, 151 F.3d 763, 764 (8th Cir. 1998); <u>S & M Constructors, Inc., v. Foley Co.</u>, 959 F.2d 97, 98 (8th Cir. 1992) (per curiam). A PSLRA case is civil action. As such, the PSLRA plaintiffs need only prove their case by a preponderance of the evidence. At the preliminary injunction stage, plaintiffs are "not required to prove a mathematical probability (greater than fifty percent) of success on the merits." <u>Heartland Academy Community v. Waddle</u>, 335 F.3d 684, 690 (8th Cir. 2003); <u>Dataphase</u>, 640 F.2d at 113. The Court finds the PSLRA plaintiffs easily meet their burden.

Dr. McGuire has agreed to settle the Securities and Exchange Commission's lawsuit against him. The SEC settlement binds him to return nearly $400,000,000 to UHG, and pay a $7,000,000 civil fine, apparently the largest ever assessed by the SEC.[4] But importantly, the McGuire/SEC settlement explicitly bars Dr. McGuire from denying

---

[4] The SEC's fine is equal to approximately 1.75% of the funds returned to UHG.

the substantive allegations in the SEC's Complaint. (McGuire Consent to SEC Settlement at 5, ¶ 12.)

The SEC's Complaint, like the Consolidated Complaint in the PSLRA litigation, claims Dr. McGuire violated Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, as well as Exchange Act Rules 10b-5 and 14a9. Compare SEC v. McGuire, 07-CV-4779, Complaint [Docket No. 1], ¶¶ 5, 31-33, 43-45, with Consolidated PSLRA Complaint [06-CV-1691, Docket No. 149], ¶¶ 214, 248-311. In essence, the SEC and PSLRA Complaints claim the information UHG disseminated about its stock options was materially false and misleading, leading investors to believe UHG paid its employees less, and therefore earned more, than it actually did.

Both Complaints assert Dr. McGuire either knew the information was false and misleading or was reckless in not knowing it. And Dr. McGuire has agreed he will not deny these allegations or suggest they are unfounded. For purposes of determining preliminary relief, the Court finds Dr. McGuire's agreement not to dispute is equivalent to admission. This conclusion is fully consistent with the SLC's report, which fearlessly declares "some of the claims against Dr. McGuire may have merit." SLC Report at 59. In spite of this staunch declaration, the SLC opted against making any of its own factual findings concerning Dr. McGuire's wrongdoing or the cupidity involved in his actions. Id. Its report does refer to the Board's Independent Committee (the "WilmerHale Report"), which in turn:

> reference[s] interviews with Dr. McGuire in which he maintained that he had not selected dates for option grants using the benefit of hindsight, but rather believed that some event had occurred, such as a telephone call, a meeting or a discussion with at least one member of the Compensation Committee - usually Mr. Spears - to support the timing of each grant.

Id. at 24. The SLC carefully notes the WilmerHale Report's conclusion that "'[c]ertain facts run contrary'" to the doctor's

assertions, such as:
> the lack of direct or circumstantial evidence to support his account, and statistical analyses showing that almost 80% of options granted before 2002 (when Sarbanes-Oxley Act became effective and required disclosure of certain option grants within two days of issuance) occurred on dates when the stock price was the lowest, second lowest, or third lowest of the respective quarter.

Id. at note 15.

On this record CalPERS has clearly shown a significant probability of success on the merits in the PSLRA litigation. Accordingly, this Dataphase factor weighs strongly in support of maintaining the injunction.

The ultimate question in the derivative suit, is whether a sentient and alert corporate Board of Directors -- faced with a Chairman and Chief Executive Officer who cannot deny having knowingly or recklessly (i) backdated options, (ii) engaged in substantial undisclosed financial engagements with the chair of the Board's compensation committee, (iii) submitted false and misleading reports to the SEC, and (iv) responded falsely or disingenuously to the Board's inquiries about his financial dealings in the company's options – would conclude he is entitled to depart from its employ while claiming pelf approaching $800,000,000.  While UHG at one time may have agreed to pay him these sums, it seems conceivable to the Court that the Board might well have decided – in light of the conduct Dr. McGuire has admitted in the SEC litigation – that this payout was uncalled for.

The Special Litigation Committee, has apparently made a business judgment favoring settling the Board's and UHG's possible claims against its former officers on terms outlined in its report. But its lack of any findings leaves no tracks showing why or how its business judgment can be considered reasonable.  Its business judgment may close the inquiry, leaving a Court mute, and charged only with the ministerial duty to sign off on the deal and dismiss

the derivative suit. Or there may be other alternatives. Ultimately, the Court asks whether Minnesota law makes an SLC an impenetrable "black box," whose decisions and evaluative processes are immune from review in a shareholders' derivative suit. Put another way, does the business judgment rule foreclose any action, beyond the Court's rubber stamping an SLC's decision?

The Court has not yet been asked to approve the SLC's proposed settlement. But if the Court releases the sums Dr. McGuire claims, beyond the terms of the proposed settlement, any further "approval" is an empty act. On the other hand, if Minnesota law permits inquiry into the SLC's analysis and the basis for its decisions, there may be a ground upon which to preserve additional assets pending approval of the settlement.

The Minnesota legislature has provided a mechanism by which the Court can ascertain its obligation. It lies in Minnesota Statutes Section 480.065, under which a question can be certified to the Minnesota Supreme Court, "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this state." Minn. Stat. § 480.065 subd. 3 (2006).

Courts nationwide have developed two lines of analysis when considering the deference due to the finding of an SLC. One holds an SLC's decision essentially unreviewable. See Auerbach v. Bennett, 393 N.E.2d 994, 996 (N.Y. 1979), and its progeny. The other allows review of an SLC's business judgments. See Zapata Corp. v. Maldonado, 430 A.2d 779, 788 (Del. 1981), and its progeny.

The Minnesota legislature initially enacted the Auerbach rule in Minnesota Statute § 302A.243. The statute was first construed in Black v. NuAire, Inc., 426 N.W.2d 203, 208 (Minn. Ct. App. 1988). The Court of Appeals found § 302A.243 "preclude[s] our courts from reviewing the merits" of an SLC's recommendation to dismiss a shareholder derivative suit. Id. at 209-210. The next

year, Minnesota's legislature repealed § 302A.243; but when the Court of Appeals next considered the question, it reaffirmed the Auerbach rule. See Skoglund v. Brady, 541 N.W.2d 17, 20-21 (Minn. Ct. App. 1996); Drilling v. Berman, 589 N.W.2d 503, 507 (Minn. Ct. App. 1999).

Opinions of the Minnesota Court of Appeals, while of interest, are not controlling precedent. The Minnesota Supreme Court was not called upon to address the question until indirectly raised in the case of a not-for-profit corporation, in Janssen v. Best & Flanagan, 662 N.W.2d 876, 888 n. 5 (Minn. 2003). The Court explicitly declined to "adopt a particular version of the business judgment rule for use with Minnesota nonprofit organizations today." Id. The opinion referenced Black, Skoglund and Drilling, apparently assuming without deciding that the Auerbach rule would otherwise apply. Id. at 884, 888.

The choice between allowing a review of an SLC's business judgment as in Zapata, or of denying review, as suggested by Auerbach, or any path between, is a matter of public policy. On such a question, this Court opts to ask Minnesota's highest court to define the policy Minnesota's legislature has enacted into law.

With these thoughts in mind, the Court certifies the following question to the Minnesota Supreme Court:

> Does Minnesota's business judgment rule foreclose a court from a) examining the reasonableness of, or b) rejecting on the merits, a settlement of a derivative action proposed by a Special Litigation Committee duly constituted under Minnesota Statutes § 302A.241 subd. 1?

D.   The public interest

Recent years have shown the public's interest in corporate executive compensation. The financial packages provided to the heads of the New York Stock Exchange and General Electric offer only a few examples. Current public discussion, both in the realm of securities regulation and the public media, concerning executive

stock options and backdating of those instruments illustrate again the public's interest in these questions. The Minnesota Supreme Court's decision to defer consideration of the degree or standard of review afforded a special litigation committee's decisions further implicates the public interest.

The Court finds the public interest strongly favors maintaining the funds currently held under the Court's injunction, particularly in a case where the party claiming access to those funds has shown no imminent need, and where the Court assures the claimant that his present needs will be satisfied while the questions, described above, are pending.

As such, the fourth <u>Dataphase</u> factor, too, supports maintaining the court's injunction, so long as Dr. McGuire's needs are protected, as they will be under the terms of this Order.

E.   <u>Bond</u>

Federal Rule of Civil Procedure 65(c), as recently amended, states the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  With 65(c) clearly in mind, the Court finds this to be the unusual case in there is no immediate need for a bond.  The sums held under the injunction are fully secure.  The Court will release funds as necessary to prevent hardship to Dr. McGuire.  For the present purposes, the Court is satisfied that a bond is not necessary.

III. <u>Conclusion</u>

For the foregoing reasons, IT IS ORDERED that:

1.  CalPERS' motion to extend the Order dated November 29, 2006 ("Order"), as extended and clarified by Orders dated July 30, 2007, October 11, 2007, November 30, 2007, and December 6, 2007, is granted, according to the terms of this Order, pending the

Minnesota Supreme Court's answer to the following certified question:

> Does Minnesota's business judgment rule foreclose a court from a) examining the reasonableness of, or b) rejecting on the merits, a settlement of a derivative action proposed by a Special Litigation Committee duly constituted under Minnesota Statutes § 302A.241 subd. 1?

Upon receipt of the Minnesota Supreme Court's answer to the certified question, this Court will entertain further proceedings concerning the preliminary injunction presently in place.

2. CalPERS is directed to submit the moving party's brief in the Minnesota Supreme Court.

3. The derivative parties' joint motion to dissolve the Order is denied without prejudice.

Dated: December 26, 2007

s/ JAMES M. ROSENBAUM  
JAMES M. ROSENBAUM  
United States Chief District Judge
