**UNITED STATES DISTRICT COURT**
**DISTRICT COURT OF MINNESOTA**

|  |  |
|---|---|
| )<br>In Re: UnitedHealth Group Incorporated )<br>Shareholder Derivative Litigation )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Master File No. 06-1216 JMR/FLN<br><br>**MEMORANDUM OF LAW**<br>**OF THE SPECIAL**<br>**LITIGATION COMMITTEE**<br>**IN SUPPORT OF ITS**<br>**MOTION FOR PRELIMINARY**<br>**APPROVAL AND DISMISSAL** |

## INTRODUCTION

In late 2007, the parties settled the shareholder derivative actions filed in this

Court and the Minnesota state court on behalf of UnitedHealth Group Incorporated (UHG

or the Company).  The Special Litigation Committee of UHG (SLC) issued its report

regarding the disposition of those shareholder derivative claims on December 6, 2007.

Thereafter, this Court asked the Minnesota Supreme Court to define the scope and depth

of the Court's review of the settlement in the federal derivative action.  The Minnesota

Supreme Court recently answered the Court's certified question, ruling that under

Minnesota law, a special litigation committee's disposition of shareholder derivative

claims is reviewed by examining only the committee's independence and good faith.

The SLC now moves for preliminary approval of its disposition of the federal

shareholder derivative claims and for dismissal of those claims.

## BACKGROUND

In the spring of 2006, certain stock option practices of UHG gained notoriety in the national press after the *Wall Street Journal* published an article questioning whether UHG's stock option program involved backdating.[1]  Shortly thereafter, attorneys brought shareholder derivative actions in this Court[2] and state court against certain UHG officers and directors, alleging those officers and directors had damaged UHG by their participation in, or lack of oversight of, the Company's stock option program.  Other stockholders brought direct claims in this Court against UHG and some of its officers and directors, alleging various violations of the Private Securities Litigation Reform Act (PSLRA).  In addition, several regulators, including the SEC, commenced investigations into the Company's stock option practices.

UHG appointed a committee of three independent board members to investigate the Company's stock option practices (the Internal Directors' Committee).  The Internal Directors' Committee in turn retained the law firm of Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) to conduct the investigation.  WilmerHale interviewed 80 witnesses, reviewed in excess of 26 million pages of documents, and retained financial and forensic experts to assist in the process.[3]

---

[1] *See* Berens Aff. Ex. 1 (C. Forelle & J. Bandler, *The Perfect Payday*, Wall St. J., March 18, 2006, at 1).

[2] On March 29, 2006, UHG shareholder Jan Brandin commenced a shareholder derivative lawsuit on behalf of the Company in this Court.  In July 2006, *Brandin* was consolidated with seven other derivative actions under the caption *In re UnitedHealth Group Inc. Shareholder Derivative Litig.*, Master File No. 06-1216 JMR/FLN (the federal derivative action).

[3] *See* Berens Aff. Ex. 2 (WilmerHale Report at 1).

After a six-month investigation, WilmerHale issued an extensive, detailed report to the UHG Board (WilmerHale Report), which the Company also made public. Berens Aff. Ex. 2 (WilmerHale Report). The WilmerHale Report criticized several aspects of the Company's stock option practices and recommended various actions. *Id.* Thereafter, UHG instituted a number of personnel, financial, and governance changes, including accepting the resignations of the Company's CEO, Dr. William W. McGuire, its General Counsel, David J. Lubben, and William G. Spears, a Director and the Chairman of the Company's Compensation Committee.

In addition, while the Internal Directors' Committee was conducting its investigation, the UHG Board passed a resolution on June 26, 2006, which established the SLC and stated in part:

> [t]hat the Board does hereby designate . . . a special litigation committee of the Board (the "Special Litigation Committee") that has complete power and authority to investigate the Derivative Claim and the claims raised in the Derivative Actions and analyze the legal rights or remedies of the Company and determine whether those rights or remedies should be pursued.[4]

The UHG Board sought to ensure the SLC's independence by appointing two former justices of the Minnesota Supreme Court who had never served on the Company's Board: former Chief Justice Kathleen A. Blatz and former Justice Edward C. Stringer (collectively referred to as the Justices). *See* Blatz Aff. ¶ 2; Stringer Aff. ¶ 2.[5]

---

[4] *See* Stringer Aff. Ex. 1 (June 26, 2006 Board Resolution).

[5] As appointed members of the SLC, the Justices were deemed directors of the Company for purposes of their disposition of the shareholder derivative claims. *See* Minn. Stat. §302A.241, subd. 7 (providing that "[c]ommittee members are deemed to be directors for

Prior to accepting their appointments, the Justices confirmed they did not have any material personal, professional, financial or familial ties with the Company, or with any of the named parties in the shareholder derivative actions. *See* Blatz Aff. ¶¶ 2, 4; Stringer Aff. ¶¶ 2, 4. The Justices, acting in their SLC capacity, promptly retained their own counsel and financial and legal experts to assist them after confirming those advisors did not have any material personal, professional, financial or familial ties with the Company, or with any of the named parties in the shareholder derivative actions. *See* Blatz Aff. ¶¶ 8-12; Stringer Aff. ¶¶ 8-12.

The Justices began the SLC process by examining in depth the scope of their duties as SLC members and the actions they should take to properly discharge those duties. *See* Blatz Aff. ¶ 13; Stringer Aff. ¶ 13. In furtherance of their obligation to act independently and in good faith, Justices Blatz and Stringer determined that the best course was to conduct, with the assistance of legal counsel, their own extensive, independent investigation of UHG's stock option practices with direct and active participation by both of the Justices. *See* Blatz Aff. ¶ 13; Stringer Aff. ¶ 13. The Justices also determined the specific procedures they would follow to ensure that their investigation was adequate, appropriate, independent and pursued in good faith. *See* Blatz Aff. ¶ 13; Stringer Aff. ¶ 13.

For example, the Justices decided not to rely on witness interviews conducted by WilmerHale although they had access to them, but rather to conduct their own interviews

---

purposes of sections 302A.251, 302A.255, and 302A.521"). Minn. Stat. § 302A.251, subd. 1 sets forth the fiduciary duties owed by directors.

of witnesses, including named defendants.  *See* Blatz Aff. ¶ 14; Stringer Aff. ¶ 14.  The

Justices also determined that they and their legal counsel would personally review

documents to ensure that the scope of the SLC investigation would proceed as they had

determined.  *See* Blatz Aff. ¶ 14; Stringer Aff. ¶ 14.

     The Company provided the SLC with full access to all documents that the SLC

requested, including documents that were privileged and/or work product.  *See* Blatz Aff.

¶ 15; Stringer Aff. ¶ 15.  Other than providing access to documents and witnesses, the

Company played no role in the way the SLC conducted its investigation of the

shareholder derivative claims.  *See* Blatz Aff. ¶ 15; Stringer Aff. ¶ 15.

     Similarly, after appointing the SLC, the UHG Board of Directors had no role in

the way the SLC conducted its investigation.  During the investigation and upon the

SLC's request, current and former directors appeared in formal interviews and provided

additional documents.  *See* Blatz ¶ 16; Stringer Aff. ¶ 17.

     Beginning in July 2006, the SLC members devoted substantial time to their

investigation.  *See* Blatz Aff. ¶ 17; Stringer Aff. ¶ 18.  Each member personally reviewed

thousands of pages of source documents including witness interview memoranda

prepared by WilmerHale in the course of the WilmerHale investigation.  *See* Blatz Aff. ¶

17; Stringer Aff. ¶ 18.  Each member also prepared for and formally interviewed fifty

witnesses, including all named defendants other than McGuire and Lubben,[6] a former

Board member, key current and former employees in the Company's legal, human

---

[6] As set forth in the SLC Report, these two individuals were unavailable for interviews by
the SLC.  Blatz Aff. Ex. 1 (SLC Report at 59 n.35, 63 n.42).

resources, accounting, finance and other departments, heads of business segments and other individuals who might potentially have relevant information about the Company's stock option practices. *See* Blatz Aff. ¶ 21; Stringer Aff. ¶ 22.[7] As a result, the Justices gained significant knowledge about UHG, its stock option practices, and the role, if any, of each defendant in those practices. *See* Blatz Aff. ¶ 21; Stringer Aff. ¶ 23.

In addition, the SLC met with attorneys representing the shareholder derivative plaintiffs, various defendants, the Company and also its insurance carriers. *See* Blatz Aff. ¶ 26; Stringer Aff. ¶ 26. The Justices reviewed written submissions from plaintiffs and various defendants, consulted with legal and financial experts and independently reviewed cases and other materials to fully inform themselves of the legal framework for analyzing the shareholder derivative claims. *See* Blatz Aff. ¶¶ 8-12, 26; Stringer Aff. ¶¶ 8-12, 26.

The SLC did not conclude its investigation until the Justices were satisfied that they had received the information necessary for a thorough understanding of all of the relevant parties' positions and views and that the SLC was in a position to make an informed and reasoned judgment about the disposition of the derivative claims with respect to each defendant. *See* Blatz Aff. ¶ 28; Stringer Aff. ¶ 28.

Upon completion of the investigatory phase, the SLC began its deliberations, carefully considering each derivative claim against each defendant and whether the pursuit of those claims would be in the best interests of the Company in light of all the

---

[7] During the SLC's investigation, a database comprised of more than 66 million pages of documents was searched for relevant documents. *See* Blatz Aff. ¶ 25; Stringer Aff. ¶ 19.

facts and circumstances.  *See* Blatz Aff. ¶ 29; Stringer Aff. ¶ 29.

In this process, the SLC concluded it would be in the best interests of the

Company to attempt to settle certain derivative claims.  *See* Blatz Aff. ¶ 30; Stringer Aff.

¶ 30.  To that end, beginning in the summer of 2007, the SLC members participated in

the mediation of the shareholder derivative claims.  *See* Blatz Aff. ¶ 30; Stringer Aff. ¶

30.  Extensive negotiations over several months culminated in a global settlement of all

shareholder derivative claims on behalf of all parties.  Settlements with certain

defendants and further remedial steps yielded a return to the Company of assets which

were valued at the time of settlement at $499.3 million (Black Scholes) or $495.1 million

(intrinsic).  *See* Blatz Aff. ¶ 30; Stringer Aff. ¶ 30; *see also* Blatz Aff. Ex. 1 (SLC Report

at 74-75).  The above amounts do not include the arbitration award against Mr. Spears,

which provided the Company with an additional $7.25 million in value (Black Scholes)

as of the time of the settlement.  *See* Blatz Aff. ¶ 30; Stringer Aff. ¶ 30.

Prior to the SLC settlement, voluntary actions taken in 2006 by various individuals

resulted in the return to the Company of over $388.6 million (Black Scholes) or $427.6

million (intrinsic), which combined with the settlement reached with the SLC yielded a

total return to the Company of $887.9 million (Black Scholes) or $922.7 million

(intrinsic).  *See* Blatz Aff. ¶ 30; Stringer Aff. ¶ 30; *see also* Blatz Aff. Ex. 1 (SLC Report

at 74-75).[8]

---

[8] Again, these amounts did not include the amount obtained in the arbitration with Mr.
Spears, which added another $7.25 million of value (Black Scholes) as of the date of the
award.  *See* Blatz Aff. ¶ 30; Stringer Aff. ¶ 30.

On December 6, 2007, the SLC issued its 89-page report (SLC Report) setting forth its disposition of the shareholder derivative claims. *See* Blatz Aff. ¶ 31; Stringer Aff. ¶ 31. The Report set forth the factors weighed by the SLC when making its determinations, but did not set forth detailed findings of fact because the SLC determined that such findings were not in the bests interests of the Company, primarily because of the potential impact on other litigation pending against the Company. *See* Blatz Aff. ¶ 31; Stringer Aff. ¶ 31; *see* Blatz Aff. Ex. 1 (SLC Report). The SLC Report, however, described among other things: (1) the background of the UHG stock option practices; (2) the appointment of the SLC; (3) the background of the two members of the SLC, the advisors they retained, and the independence of all of those individuals from UHG and the named defendants; (4) the steps in the SLC's process; (5) the background and roles of the individuals named in the shareholder derivative suits and the claims asserted against them; (6) the background and roles of other individuals interviewed by the SLC; (7) categories and sources of documents reviewed by the SLC during its investigation and referenced during witness interviews; (8) the legal framework on which the SLC relied and the factors it considered in reaching its disposition of the derivative claims asserted against the named defendants; and (9) a description of the settlements reached with three individuals, Dr. McGuire and Messrs. Lubben and Spears. Stringer Aff. ¶ 31; *see also* Blatz Aff. Ex. 1 (SLC Report).

The SLC Report described the material terms of the settlement reached with Dr. McGuire as follows:

•Dr. McGuire will surrender all right, title and interest to options to purchase 9,223,360 shares of Company stock.  The options to be relinquished include 5,598,360 options (split-adjusted) granted to Dr. McGuire on October 13, 1999 and 3,625,000 options granted between 2003 and 2006.  The economic value relinquished by Dr. McGuire as the result of his agreement to surrender outstanding options was approximately $321.9 million (Black Scholes) or $320.3 million (intrinsic).

•Dr. McGuire will surrender his rights pursuant to the Company's Supplemental Executive Retirement Plan (SERP).[9]  The Company values these rights at approximately $91.3 million.  The surrender of the SERP rights will result in an economic and accounting benefit to the Company equal to that amount.

•Dr. McGuire will surrender his rights to approximately $8.1 million of the funds in his Executive Savings Plan (ESP), *i.e.*, the portion of his ESP attributable to incentive-based compensation.  The surrender of these ESP rights will result in an economic and accounting benefit to the Company equal to that amount.

•Dr. McGuire will relinquish any claim for any post-employment benefits, including use of Company airplanes, office, secretarial and administrative support, and Company-paid life and health insurance.

The SLC Report summarized the McGuire settlement as follows:

[T]he total economic value relinquished by Dr. McGuire . . . is approximately $421.3 million (Black Scholes) or $419.7 million (intrinsic). When added to the value previously relinquished to the Company by Dr. McGuire in connection with the repricing of options in 2006 – approximately $181.0 million (Black Scholes) or $198.8 million (intrinsic) – the total value of rights relinquished by Dr. McGuire is $602.3 million (Black Scholes) or $618.5 million (intrinsic).

Blatz Aff. Ex. 1 (SLC Report at 60-61)(certain footnotes omitted).

The SLC Report described the material terms of the settlement reached with Mr.

Lubben as follows:

•Mr. Lubben will repay to the Company compensation from the exercise of options earlier in 2007 in the sum of $20.55 million.

---

[9] The SLC Report noted that "Dr. McGuire's rights in his SERP were fully vested, and he would have been entitled to them regardless of how his departure from the Company in 2006 was characterized."  Blatz Aff. Ex. 1 (SLC Report at 61 n.38).

•Mr. Lubben will relinquish rights to severance benefits in the amount of $1.95 million.

•Mr. Lubben will surrender all right, title and interest to options to purchase 273,000 shares of Company stock.  The economic value of those stock options was approximately $5.5 million (Black Scholes) or $2.9 million (intrinsic).

The SLC Report summarized the settlement with Mr. Lubben as follows:

Mr. Lubben will … relinquish[] option rights and repaid cash to the Company in the amount of approximately $28.0 million (Black Scholes) or $25.4 million (intrinsic).  When added to the value Mr. Lubben previously relinquished to the Company in connection with the repricing of stock options in November 2006 – $2.7 million (Black Scholes) or $3.6 million (intrinsic) – the total value relinquished to the Company is approximately $30.7 million (Black Scholes) or $29.0 million (intrinsic).

Blatz Aff. Ex. 1 (SLC Report at 63-64)(footnotes omitted).

As regards the settlement with Mr. Spears, the SLC Report stated that:

On November 26, 2007, a settlement agreement (Spears Agreement) was executed by the SLC and Mr. Spears, which provides that the fair settlement value of the claims against Mr. Spears in the Derivative Actions will be submitted to binding arbitration with former U.S. District Court Judge Layn R. Phillips serving as arbitrator.

*Id.* (SLC Report at 65-66).  As stated previously, the binding arbitration with Mr. Spears resulted in an additional $7.25 million in value to the Company (Black Scholes) as of the time of the settlement.  Blatz Aff. ¶ 30; Stringer Aff. ¶ 30.

The SLC concluded that all remaining shareholder derivative claims should be dismissed.  Blatz Aff. Ex. 1 (SLC Report at 74).

On December 26, 2007, this Court certified a question to the Minnesota Supreme Court seeking clarification of the scope of a court's review of a special litigation committee's disposition of shareholder derivative claims under Minnesota law.  As

discussed more fully below, the Minnesota Supreme Court ruled, in no uncertain terms, that under Minnesota law a court's scope of review of a special litigation committee's decisions, including those relating to the disposition or settlement of claims against specific defendants, should focus solely on the independence and good faith of the special litigation committee. *See In re United Health Group Inc. S'holder Derivative Litig.*, 754 N.W.2d 544, 559 (Minn. 2008) (*In re United Health Group*).

The SLC is now before this Court asking for preliminary approval of the settlement of the shareholder derivative claims asserted in this action and dismissal of those claims based upon the legal principals set forth by the Minnesota Supreme Court in *In re United Health Group*.

## ARGUMENT

### I.   The Context of the SLC's Process and Disposition of the Shareholder Derivative Claims.

Minn. Stat. § 302A.241, subd. 1 (2006) empowers corporations on whose behalf shareholder derivative claims have been made to establish a special litigation committee comprised of "one or more independent directors or other independent persons to consider legal rights or remedies of the corporation and whether those rights and remedies should be pursued."

Under Minnesota law, a special litigation committee is charged with fully informing itself of the legal and factual issues underlying the derivative claims and determining whether pursuit of those claims is in the best interests of the corporation. *Janssen v. Best & Flanagan*, 662 N.W.2d 876, 884 (Minn. 2003).

The SLC here conducted its investigation, deliberated, and determined the disposition of the shareholder derivative claims precisely as Minnesota law prescribes, with the overarching focus of doing what was in UHG's best interests. *See* Blatz Aff. ¶ 32; Stringer Aff. ¶ 32.

## II.     The Minnesota Supreme Court's Answer to the Certified Question.

In its order of December 26, 2007, this Court certified the following question to the Minnesota Supreme Court:

> Does Minnesota's business judgment rule foreclose a court from a) examining the reasonableness of, or b) rejecting on the merits, a settlement of a derivative action proposed by a Special Litigation Committee duly constituted under Minnesota Statutes § 302A.241 subd.1?

*In re United Health Group Inc. S'holder Derivative Litig.*, Nos. 06-CV-1216, 06-CV-1691, 2007 WL 4571127, at *7 (D. Minn. Dec. 26, 2007).

Under Minn. Stat. § 480.065, subd. 3, the Minnesota Supreme Court may answer a question of law presented by the federal court "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision or statute of the state." Based on this authority, the Minnesota Supreme Court accepted the certified question by order dated April 22, 2008, but "reformulated" the question as follows:

> To what extent does the business judgment rule as recognized in Minnesota law require a court, in deciding whether to approve a proposed settlement of a shareholder derivative action, to defer to the decision of a Special Litigation Committee duly constituted under Minn. Stat. § 302A.241, subd. 1 (2006), that the derivative action should be settled on specific terms?

On August 14, 2008, the Minnesota Supreme Court answered the certified question in a clear, comprehensive and firm statement of Minnesota substantive law.  *In re United Health Group*, 754 N.W.2d 544 (Minn. 2008).  In deciding the issue, the Court examined the two contrasting standards of a court's review of a special litigation committee's exercise of its business judgment in the disposition of shareholder derivative claims.  *Id.* at 554-59.  One line of cases, which stems from the New York state court case of *Auerbach v. Bennett*, 393 N.E.2d 994 (N.Y. 1979), focuses solely on a special litigation committee's procedure, limiting a court's review to an examination of the good faith and independence of a special litigation committee.  *In re United Health Group*, 754 N.W.2d at 554-55 (discussing *Auerbach* standard of review).

The second standard of review, which originated in *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981), examines independence and good faith of the special litigation committee, but adds an additional step in which the court also examines a special litigation committee's substantive decisions by exercising the court's own independent business judgment when reviewing those decisions.  *In re United Health Group*, 754 N.W.2d at 555-56 (discussing *Zapata* standard of review).

The Minnesota Supreme Court carefully and thoroughly analyzed the *Auerbach* and *Zapata* standards of review to determine which test would be best under Minnesota law for a court's review of a settlement of a derivative action recommended by a special litigation committee in the exercise of its business judgment.  *Id.* at 556-59.  The Court noted the rationale for the business judgment rule, weighed which standard of review led to a result that fulfilled the purposes of the business judgment rule, and concluded that

"[t]he reasons for adopting a test modeled on the *Auerbach* standard are *numerous and compelling*." *Id.* at 556 (emphasis added).

The Court identified the following "compelling" reasons for its adoption of the *Auerbach* standard:  (1) "courts are not qualified to evaluate the business judgment of an SLC"; (2) "it is unclear how a court's 'business judgment' should be defined"; (3) a shareholder derivative suit "although brought by a shareholder, belongs to the corporation . . . [a]ccordingly, the corporation should have the prerogative of weighing the benefits and detriments of bringing a lawsuit"; (4) "the *Auerbach* standard avoids the 'lengthy and complicated' proceedings that characterize business judgment determinations under *Zapata*"; (5) "allowing courts to second-guess the decision of an SLC undermines the SLC process itself"; and (6) "a court applying its own 'business judgment' is prone to act on its own biases and predilections."  *Id.* at 556-57 (citations omitted).

The Minnesota Supreme Court observed that reviewing courts are "not qualified to evaluate" the business judgment exercised by a special litigation committee, and even if they were qualified, it would be improper to second guess the "unique amalgamation" of factors which may underlie the business judgment of a special litigation committee, thereby leading to unpredictable results.  *Id.* at 556.  The Court also stated that any argument that a reviewing court might be better aware of "matters of  . . . public policy" was "indefensible."  *Id.* at 558.

In adopting the *Auerbach* standard, the Minnesota Supreme Court also examined in detail the criticisms of the standard and concluded they were "largely unfounded."  *Id*. The Court rejected outright the notions that special litigation committees are biased

because of their very structure or that members of special litigation committees will be improperly affected by the empathy they might feel for the directors subject to their investigation. *Id*. The Court also dismissed any concerns that derivative lawsuits have lost their credibility because some meritorious claims may be dismissed or settled by special litigation committees. *Id*. at 559. Finally, the Court noted that the twenty-nine years of post-*Auerbach* experience have eroded the strength of the argument that the *Auerbach* test would lead to the eventual death of the shareholder derivative suit. *Id*. at 558.

The Minnesota Supreme Court thus adopted a test "modeled on the *Auerbach* standard," in holding in clear and unequivocal terms that:

> [U]nder the Minnesota business judgment rule, a court should defer to an SLC's decision to settle a shareholder derivative action if (1) the members of the SLC possessed a disinterested independence and (2) the SLC's investigative procedures and methodologies were adequate, appropriate, and pursued in good faith.

*Id*. at 559. The Court concluded that the foregoing standard will "ensure[] a robust review of the SLC and its investigative procedures." *Id*.

## III. The Court Should Grant Preliminary Approval and Dismiss the Shareholder Derivative Claims.

The SLC asks the Court to preliminarily approve the SLC's exercise of its business judgment in the disposition of the shareholder derivative claims in the federal action and to dismiss the shareholder derivative claims because the SLC and its process clearly meet both prongs of the Minnesota Supreme Court's test.

A.      **The members of the SLC possess a disinterested independence.**

In its answer to the certified question, the Minnesota Supreme Court held that the business judgment rule "'shields the deliberations and conclusions of the SLC only if the SLC's members possess a disinterested independence and do not stand in a dual relation which prevents an unprejudicial exercise of judgment.'" *In re United Health Group Litig.*, 754 N.W.2d at 555 (quoting *Auerbach*, 393 N.E.2d at 1001). In other words, a special litigation committee must be "'sufficiently independent from the board of directors to dispassionately review the derivative lawsuit.'" *Id.* at 554 (quoting *Janssen*, 662 N.W.2d at 888)).

The Court ruled that a reviewing court is to consider the totality of the circumstances when evaluating a special litigation committee's independence, which may include a review of the following factors: (1) whether the committee's members are defendants in the litigation; (2) whether members are exposed to direct and substantial liability; (3) whether the members are outside, non-management directors; (4) whether the members were on the board when the alleged wrongdoing occurred; (5) whether the members participated in the alleged wrongdoing; (6) whether the members approved conduct involving the alleged wrongdoing; (7) whether the members or their affiliated firms had business dealings with the corporation other than as directors; (8) whether the members had business or social relationships with one or more of the defendants; (9) whether the members received advice from independent counsel or other independent advisors; (10) the severity of the alleged wrongdoing; and (11) whether the committee had a sufficient number of members to do the job. *Id.* at 560 n.11 (citing 2 Dennis J.

Block et al., *The Business Judgment Rule:  Fiduciary Duties of Corporate Directors*
1746-53 (5th ed. 1998)).

An examination of the foregoing factors as applied to the facts of this case
demonstrates the independence of this SLC:  (1) neither Justice was a defendant, and thus
had no exposure to any type of liability in the shareholder derivative litigation; (2) neither
Justice was ever a UHG director, and thus neither played any role in any alleged
wrongdoing, neither approved conduct involving any alleged wrongdoing, and both were
even more removed than outside, non-management directors would be; (3) neither the
Justices nor their advisors had material business dealings with UHG; (4) neither Justice
had business or close personal relationships with any named defendant; (5) the Justices
received advice both from independent counsel and other independent advisors; (6) the
breadth and depth of the SLC investigation was appropriate to the severity of the alleged
wrongdoing; and (7) the size of the committee was appropriate to the work load of the
investigation and the determinations made by the committee.

Other factors demonstrate the independence of this SLC.  The Company played no
role in the conduct of the SLC's investigation of the shareholder derivative claims other
than providing the SLC with access to documents and witnesses.  *See* Blatz Aff. ¶ 15;
Stringer Aff. ¶ 15.  The SLC chose the employees it wished to interview and conducted
those interviews independently.  *See* Blatz Aff. ¶ 14; Stringer Aff. ¶ 14.

In addition, after appointing the SLC, the UHG Board of Directors had no role in
the way the SLC conducted its investigation.  During the investigation and upon the

SLC's request, current and former directors appeared in formal interviews and provided additional documents.  *See* Blatz ¶ 16; Stringer Aff. ¶ 17.

Indeed, the resolution appointing the SLC expressly provided that the SLC "has complete power and authority to investigate" the shareholder derivative claims, *see* Stringer Aff. Ex. 1 (June 26, 2006 Board Resolution); and the SLC made the decision to conduct its own independent investigation, rather than relying on the WilmerHale Report, investigation, fact finding, or interviews.  *See* Blatz Aff. ¶ 14; Stringer Aff. ¶ 14; *cf. Janssen*, 662 N.W.2d at 888 (holding that a special litigation committee was not independent where the resolution establishing it directed the committee to rely on facts previously developed by counsel for the corporation).

Based on the foregoing, the Court should conclude that the SLC possessed a disinterested independence.

**B.      The Expansion Provision does not alter this analysis.**

The June 26, 2006 Board resolution appointing the SLC also contained the following provision:

> FURTHER RESOLVED, that the number of members of the Special Litigation Committee can be expanded in the future through Board action if the Board deems appropriate.[10]

In its ruling on the certified question, the Minnesota Supreme Court commented that "the mere retention of that power by a board could influence SLC members to alter their recommendations so as to avoid having their votes rendered meaningless."  *In re UnitedHealth Group*, 745 N.W.2d at 560.  Nonetheless, the Court noted that "the

---

[10] *See* Stringer Aff. Ex. 1 (June 26, 2006 Board Resolution).

existence of an expansion provision is *one factor* in a court's totality-of-the-circumstances evaluation of an SLC's independence." *Id.* (emphasis added).

Here, the Court should conclude that the expansion provision should not forestall preliminary approval and dismissal of the federal shareholder derivative claims because the provision did not alter or otherwise affect in any way the SLC's independence and its disposition of the shareholder derivative claims.  First, the expansion provision was never utilized by the UHG Board, nor is the SLC aware of any evidence that the UHG Board ever intended or even considered the use of this provision.  *See* Blatz Aff. ¶ 5; Stringer Aff. ¶ 5.  Second, the existence of the expansion provision did not influence in any manner the SLC or its investigation, deliberation or disposition of the shareholder derivative claims.  *See* Blatz Aff. ¶ 5; Stringer Aff. ¶ 5.  Third, in light of the mandate in Minnesota that a company gets only one bite of the SLC apple, it is reasonable to assume that the expansion provision was provided in the resolution not as a mechanism to control the SLC process, which would be a self-defeating motive, but rather to assure the process could be brought to conclusion in the event of some unforeseen circumstance that would prevent one or both appointed SLC members from completing the mandate of this resolution.  Fourth, there has been no suggestion from any party in this proceeding that the mere existence of the expansion provision could or did influence the SLC's independence or its process.  On this record, the Court should conclude that the existence of the expansion provision does not impact the independence of this SLC.

    **C.**    **The SLC's investigative procedures and methodologies were adequate, appropriate, and pursued in good faith.**

The second element of the test adopted by the Minnesota Supreme Court calls for the reviewing court to analyze the procedures by which a special litigation committee gathered the factual data underlying its decision regarding the disposition of the shareholder derivative claims.  *In re United Health Group*, 754 N.W.2d at 559 (citing *Auerbach*, 393 N.E.2d at 1001-03).   Simply put, the focus here is on process.

In *Auerbach*, the New York Court of Appeals examined the issues of the adequacy and good faith of the special litigation committee's process in terminating a shareholder derivative action against the company and its auditor for alleged breaches of duty in failing to detect payments by employees to foreign officials.  *Auerbach*, 393 N.E.2d at 1001-03.  Concluding that the special litigation committee had conducted its investigation in good faith, the Court specifically noted the following regarding the special litigation committee process:  (1) prompt engagement of special counsel for guidance; (2) examination of prior work of a special audit committee; (3) interviews of the law firm that conducted an investigation on behalf of that special audit committee; and (4) review of testimony before the SEC.  *Id.* at 1003.  The *Auerbach* Court also gave weight to the fact that the special litigation committee conducted personal interviews with individuals who have "participated in any way in the questioned payments."  *Id.*

As in *Auerbach*, the SLC here:  (1) promptly engaged its own counsel to assist in its process; (2) not only examined the prior work performed by a specially appointed internal committee of independent UHG board members and their counsel, WilmerHale, but also conducted its own separate and exhaustive search of documents gathered by WilmerHale; (3) on several occasions interviewed attorneys at WilmerHale; (4) reviewed

the witness interview memoranda prepared by WilmerHale; (5) conducted its own

personal interviews with its counsel of all but two of the individual defendants and also

of a substantial number of other individuals who had knowledge of the UHG stock option

practices; and (6) reviewed written submissions made by lead plaintiffs' counsel, the

Company and defendants. Applying the newly adopted Minnesota standard modeled on

*Auerbach*, this Court should conclude that the foregoing factors demonstrate that the SLC

here conducted its process in good faith.

*In re Oracle Sec. Litig.* provides some guidance on the adequacy of a special

litigation committee's process and its good faith in the context of a shareholder derivative

settlement proposed by a special litigation committee. The federal district court from the

Northern District of California approved the settlement. *In re Oracle Sec. Litig.*, 852 F.

Supp. 1437 (N.D. Cal. 1994).[11] In finding that the committee's process was adequate,

the *Oracle* Court relied on the following factors: (1) the committee retained independent

counsel who had never had "a previous connection or relationship with Oracle or any of

the individual defendants"; (2) the committee "reviewed large numbers of pleadings,

transcripts, depositions, filings, corporate papers and other documents"; (3) the

---

[11] The *Oracle* Court applied Delaware state substantive law – i.e., the *Zapata* standard – when approving the shareholder derivative settlement because Oracle was a Delaware corporation. *See In re Oracle Sec. Litig.*, 852 F. Supp. at 1441 n.2. That standard, as discussed *supra*, also requires a reviewing court to determine if a special litigation committee is independent and whether its investigation was conducted in good faith. In fact, the *Zapata* and *Auerbach* standards converge for purposes of this determination. *See, e.g., In re United Health Group*, 754 N.W.2d at 555-56 (discussing similarity of the analysis of good faith and independence under both standards); *accord Hasan v. CleveTrust Realty Investors*, 729 F.2d 372, 378 (6th Cir. 1984) ("While [*Zapata* and *Auerbach*] diverge on the issue of the judicial deference appropriate to the substantive business judgments of a special litigation committee, they are convergent in their approach to the issues of good faith and thoroughness."); *see id.* (discussing convergence of the two standards for purposes of assessing a special litigation committee's independence).

committee's counsel conducted extensive interviews of the parties' counsel and the

committee reviewed those interview notes; and (4) the committee reviewed "all available

materials in connection with the SEC investigation of Oracle."  *Id.* at 1442.

As to the first factor considered in *Oracle*, the SLC here retained independent

counsel who had no connection or relationship with UHG or any of the named

defendants.  *See* Blatz Aff. ¶¶ 8-9; Stringer Aff. ¶¶ 8-9.  The SLC also hired a law

professor well-versed in corporate law and governance matters, a forensic accounting

firm and a damages expert.  *See* Blatz Aff. ¶¶ 10-12; Stringer Aff. ¶¶ 10-12.

The second factor relied on in *Oracle* was the special litigation committee's

review of a large number of documents.  *In re Oracle Sec. Litig.*, 852 F. Supp. at 1442.

Here, the SLC reviewed thousands of pages of documents during the course of its

process.  *See* Blatz Aff. ¶ 17; Stringer Aff. ¶ 18.  The SLC had the benefit of more than

66 million pages of documents gathered by WilmerHale, which documents were then

independently searched by the SLC's counsel.  *See* Blatz Aff. ¶ 25; Stringer Aff. ¶ 19.

The SLC gathered additional documents that it deemed relevant to its investigation and

disposition of the shareholder derivative claims.  *See* Blatz Aff. ¶ 20; Stringer Aff. ¶ 20.

The SLC also interviewed Company employees knowledgeable about the Company's

records to satisfy itself that it had access to the documents relevant to its inquiry.  *See*

Blatz Aff. ¶ 23; Stringer Aff. ¶ 25.  In addition, the SLC also received and considered

written submissions from counsel for lead plaintiffs, the Company and several of the

defendants.  *See* Blatz Aff. ¶ 26; Stringer Aff. ¶ 26; *In re Oracle Sec. Litig.*, 852 F. Supp.

at 1442.

The *Oracle* Court also relied on the fact that the special litigation committee had reviewed notes from the interviews that its counsel conducted with counsel for the parties.  *Id.*  Here, the SLC had far more personal involvement in the interview process than the members of the special litigation committee in *Oracle*.  The Justices actively participated in all fifty witness interviews.  *See* Blatz Aff. ¶ 21; Stringer Aff. ¶ 22.  During the course of its investigation, the SLC met well over one hundred times, including meetings to determine the scope, direction and results of the investigation; to conduct fifty witness interviews; to meet with its own counsel and other advisors; to deliberate, to mediate and to prepare its report.  *See* Stringer Aff. ¶ 27.  The SLC also met with counsel for the Company, for defendants, for individual witnesses and for the plaintiffs.  *See* Blatz Aff. ¶ 26; Stringer Aff. ¶ 26.  The SLC's personal involvement in the extensive investigation, including its active role in meetings and witness interviews, is another factor that undisputedly demonstrates the adequacy of this SLC's process.

The final factor cited in *Oracle* was the committee's review of materials pertaining to an investigation by the SEC.  *In re Oracle Sec. Litig.*, 852 F. Supp. at 1442.  Here, the SLC met with the SEC, and also reviewed the extensive materials gathered during the WilmerHale investigation.  *See* Blatz Aff. ¶¶ 22, 25; Stringer Aff. ¶¶ 19, 24. This factor also confirms the adequacy of the SLC's process.

In *Drilling v. Berman*, the Minnesota Court of Appeals applied the *Auerbach* standard of review when examining the good faith and independence of a special litigation committee that decided to terminate a derivative lawsuit.  *Drilling v. Berman*, 589 N.W.2d 503, 506, 509-11 (Minn. Ct. App. 1999).  The *Drilling* Court examined a

number of factors that also support a finding that the SLC here acted in good faith.  For example, one factor considered in *Drilling* was the extent of the involvement of the corporation and the defendants in the special litigation committee's investigation.  *Id.* at 510.  Here, the SLC conducted its own independent investigation to ensure independence.  It asked for, and received, voluminous documents from the Company and others.  The Company made its employees available for interviews, but the SLC chose the employees it wished to interview and conducted those interviews independently.  *See* Blatz Aff. ¶¶ 15, 21; Stringer Aff. ¶¶ 15, 22.

The *Drilling* Court also examined the adequacy and reliability of the information supplied to the special litigation committee.  *Drilling,* 589 N.W.2d at 509-10.  This SLC had the benefit of millions of pages of documents gathered by WilmerHale which were then independently searched by the SLC's counsel.  *See* Blatz Aff. ¶ 25; Stringer Aff. ¶ 19.  Further, the SLC also gathered additional documents that it deemed relevant to its investigation and disposition of the shareholder derivative claims; met with Company employees knowledgeable about the Company's records to satisfy itself that it had access to the documents relevant to its inquiry; and with its counsel, conducted independent interviews of fifty witnesses.  *See* Blatz Aff. ¶¶ 19, 21, 23-24; Stringer Aff. ¶¶ 21, 22, 25.  On this record, the Court should conclude that the information on which the SLC relied was both adequate and reliable.

In summary, all of the foregoing factors demonstrate that the SLC's investigative procedures and methodologies were adequate, appropriate, and pursued in good faith.  *See Strougo v. Bassini*, 112 F. Supp. 2d 355, 357 (S.D.N.Y. 2000) (finding that a special

litigation committee acted in good faith and "pursued its investigation in a thorough and diligent manner" where the SLC conducted a five-month investigation, interviewed eleven witnesses and personally reviewed "approximately 36,000 pages of documents").[12]

> **D.      In answering the certified question, the Minnesota Supreme Court expressly rejected the argument that the substantive standard of review of a special litigation committee's actions should be based on Minn. R. Civ. P. 23.09, a procedural rule.**

In their submission on the certified question, the state derivative plaintiffs asked the Minnesota Supreme Court to adopt a standard of review of a special litigation committee's actions based on Minn. R. Civ. P. 23.09.  *In re United Health Group.*, 754 N.W.2d at 551 (discussing same).  Rule 23.09 provides that a shareholder derivative action "shall not be dismissed or compromised without the *approval* of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."  State derivative plaintiffs argued that Rule 23.09 – and its "approval" requirement – provides justification for the Court's adoption of a less deferential standard of court review, i.e., the *Zapata* standard of review.

Accordingly, the Court examined whether the vague "approval" language of Minn. R. Civ. P. 23.09 should define "the boundaries of the Minnesota business judgment rule" as it applies to the court's review of a special litigation committee's disposition of claims.

---

[12] Although *Strougo* applied the *Zapata* standard, it is still instructive because the *Auerbach and Zapata* standards converge for purposes of a court's inquiry into a special litigation committee's good faith and independence.  *See supra* n.11 (discussing same).

*In re United Health Group*, 754 N.W.2d at 551.  The Court, applying the *Erie* doctrine,[13] stated that:

> Because the federal district court in this instance is exercising supplemental jurisdiction over matters of state law, we must determine whether Rule 23.09 is substantive or procedural.

*Id.* at 552.  The Court reasoned that "Rule 23.09 sets forth no substantive standards to guide the consideration and approval of a settlement and grants no rights that one party may enforce against another."  *Id.*  The Court thus determined that "[i]n accordance with the *Erie* doctrine, we hold that Rule 23.09 is a procedural rule and therefore cannot be applied by a federal court exercising supplemental jurisdiction over claims asserted under state law."  *Id.*

### E.    In answering the certified question, the Minnesota Supreme Court declined to address arguments concerning Fed. R. Civ. P. 23.1.

Like the state derivative plaintiffs, the federal derivative plaintiffs also asserted Fed. R. Civ. P. 23.1, a federal rule, allows a federal court to be less deferential to a special litigation committee's recommendations than the *Auerbach* standard.  The wording of Fed. R. Civ. P. 23.1 is identical to that of Minn. R. Civ. P. 23.09, *see supra*, with both Rules providing that a shareholder derivative action "shall not be dismissed or

---

[13] The *Erie* doctrine provides that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.  And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern.  There is no federal general common law.  Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts.  And no clause in the Constitution purports to confer such a power upon the federal courts."  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

compromised without the approval of the court." *Compare* Fed. R. Civ. P. 23.1 *with*

Minn. R. Civ. P. 23.09.  Like the lead state plaintiffs, federal lead plaintiffs argued that

Fed. R. Civ. P. 23.1's use of the words "approval of the court" "mandates review of a

proposed settlement for its reasonableness and fairness, regardless of the content of the

Minnesota business judgment rule." *In re United Health Group*, 754 N.W.2d at 552

(discussing argument).

Although the Minnesota Supreme Court expressly rejected this same argument

concerning Minn. R. Civ. P. 23.09, it declined to address the arguments regarding its

federal counterpart –  Fed. R. Civ. P. 23.1 – because "the certified question process

provides no opportunity for a state court to render an opinion on matters of federal law."

*In re United Health Group*, 754 N.W.2d at 552.  The question is now properly before this

Court.

F.     **This Court should apply Minnesota's substantive business judgment
       rule, and not a procedural rule, for its review of all claims asserted in
       this action.**

The Court should conclude that Minnesota's substantive business judgment rule

must be applied to both the state and federal law claims asserted in this action.

1.     **Under *Erie*, Fed. R. Civ. P. 23.1 does not trump Minnesota's
       business judgment rule to the extent this Court is exercising
       supplemental jurisdiction over state law claims.**

In answering the certified question, the Minnesota Supreme Court's adoption of

the *Auerbach* standard represents this state's substantive law and that this substantive

standard may not be altered by Minn. R. Civ. P. 23.09, a state procedural rule.  *See In re*

*United Health Group.*, 754 N.W.2d at 551-52 (discussing same).  The Minnesota

Supreme Court's rejection of Rule 23.09, the state counterpart to Fed. R. Civ. P. 23.1, as defining a standard of review also informs this federal court's analysis under *Erie* to the extent this Court is exercising supplemental jurisdiction over the state law claims asserted in this federal action.

Under *Erie,* federal courts sitting in diversity or exercising supplemental jurisdiction must apply state substantive law. *See, e.g., Emmenegger v. Bull Moose Tube Co.,* 324 F.3d 616, 625 (8th Cir. 2003) (holding that a federal court exercising supplemental jurisdiction must apply state substantive law when determining prejudgment interest rate) (citation omitted);[14] *Meleen v. Hazelden,* Civ. No. 4-87-920, 1989 WL 45232 at *2 (D. Minn. May, 1 1989) (determining in a diversity case "the Court must apply state law as declared by statute or by opinion of the Supreme Court of the State of Minnesota") (citing *Erie*).

The Minnesota Supreme Court answered this Court's certified question by clearly defining the contours of the business judgment rule under Minnesota law regarding the deference a court must pay to decisions made by a special litigation committee – itself a creature of state substantive law.  This rule is now the substantive law of this state.  *See In re United Health Group.*, 754 N.W.2d at 549-50 (explaining Court accepted the certified question because the answer could be outcome determinative); *id.* at 552 (concluding that Minn. R. Civ. P. 23.09 cannot alter litigants' substantive rights under business judgment rule).  Under *Erie*, this Court is bound by that substantive law to the

---

[14] *See also Schwan's Sales Enter., Inc. v. Sig Pak, Inc.*, 476 F.3d 594, 595 (8th Cir. 2007) (diversity jurisdiction) (citing *Erie*, 304 U.S. at 78).

extent it is exercising supplemental jurisdiction.  *See, e.g., Witzman v. Gross*, 148 F.3d

988, 990 (8th Cir.1998).

Indeed, if this Court were to find that Fed. R. Civ. P. 23.1 provides some different,

less deferential standard for its review of this SLC's disposition of state law shareholder

derivative claims, then the Minnesota Supreme Court's answer to the certified question

would be eviscerated.  Under *Erie*, this Court may not use a federal rule of procedure to

substantively modify, abridge or alter state substantive law – i.e., Minnesota's business

judgment rule – for purposes of a federal court's exercise of supplemental jurisdiction

over the state law claims.  *See, e.g., Erie,* 304 U.S. 64 at 79; *see also* Rules Enabling Act,

28 U.S.C. § 2072(b); *Oritz v. Fireboard Corp.*, 527 U.S. 815, 845 (1999); *Hanna v.

Plumer*, 380 U.S. 460, 465-67 (1965); *Exxon Corp. v. Burglin*, 42 F.3d 948, 951 (5th Cir.

1995).  To use a federal rule in this manner would violate the principles of comity by

which federal district courts are now bound under the *Erie* doctrine.  *Erie,* 304 U.S. 64 at

76; *see also Gobuty v. Kavanagh*, 141 F.R.D. 136, 138-39 (D. Minn. 1992).  The SLC

requests that the Court reject any argument that Fed. R. Civ. P. 23.1 permits expanded

inquiry beyond that permitted under the business judgment rule for purposes of its

preliminary approval of the SLC's disposition of the state law claims asserted in this

action.

> **2.** **The Court should also look to Minnesota's business judgment rule for the purposes of its review of the federal law claims in this action.**

The U.S. Supreme Court has ruled that state substantive law governs the powers of

a corporation's directors to initiate, terminate or settle shareholder derivative claims –

even for claims based on federal substantive law – thus federal courts must apply the law of the appropriate state when analyzing the scope of those powers.  *See Burks v. Lasker*, 441 U.S. 471, 477-80 (1979) (remanding case to district court with direction to apply appropriate state substantive law when determining whether directors had power to terminate shareholder derivative suit alleging violations of the federal Investment Advisors Act and the federal Investment Company Act).

The U.S. Supreme Court has also ruled that Fed. R. Civ. P. 23.1 is merely a procedural rule, so in cases where an issue of substantive law arises which touches on Rule 23.1 (for example, what would constitute an effective "demand"), federal courts must again look to state law for guidance, even where the shareholder derivative claims are predicated on federal law.  *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 98 (1991); *see also Burks*, 441 U.S. at 477-80.  The only exception is when the application of the state law would frustrate the policies underlying the federal statute or statutes giving rise to the shareholder derivative claims.  *Kamen,* 500 U.S. at 98, 107-09.

In *Kamen*, a shareholder brought a derivative suit in federal court alleging violations of the federal Investment Company Act.  *Id.* at 92.  The complaint alleged that the plaintiff made no demand on the board of directors because such a demand would have been futile.  *Id.* at 94.  The district court dismissed the complaint on the ground that plaintiff had failed to plead facts excusing demand with sufficient particularity to satisfy Rule 23.1.  *Id.*  The Seventh Circuit Court of Appeals affirmed, concluding that plaintiff's failure to make a pre-complaint demand "was fatal to her case."  *Id.* (discussing Seventh Circuit's decision)   In affirming, the Seventh Circuit "adopted as a rule of federal

common law the [American Law Institute's] so-called 'universal demand' rule, under which the futility exception is abolished." *Id.* (discussing the Seventh Circuit's decision)(quotation omitted).

The U. S. Supreme Court reversed.  The Court held that although Fed. R. Civ. P. 23.1 "*contemplates* both a demand requirement and the possibility that the demand may be excused [in shareholder derivative suits brought in federal court] it does not *create* a demand requirement of any particular dimension." *Id.* at 96 (italics in original).  The Court further determined that "as a rule of procedure issued pursuant to the Rules Enabling Act, Rule 23.1 cannot be understood to 'abridge, enlarge or modify any substantive right.'" *Id.* (quoting 28 U.S.C. § 2072(b)).  The Court thus remanded the case to the lower court to look to Maryland law to determine the issue of the alleged futility of a demand.  *Id.* at 108-09.

The U.S. Supreme Court further explained that the presumption that state law should provide the rule of law is particularly compelling in the area of corporate law.  *Id.* at 98-99; *see also Burks,* 441 U.S. at 478 (noting that corporations are creatures of state law).  Consequently, the Court in *Kamen* held that:

> [G]aps in [federal] statutes bearing on the allocation of governing power within the corporation should be filled with state law 'unless the state la[w] permit[s] action prohibited by [those statutes], or unless [the] application [of state law] would be inconsistent with the federal policy underlying the cause of action.'

*Kamen*, 500 U.S. at 99 (quoting *Burks,* 441 U.S. at 479).[15]

---

[15] In *Kamen*, the U.S. Supreme Court also determined that the application of state law regarding the contours of the futility exception would not be inconsistent with the federal

Like the "demand" requirement in Rule 23.1, the court "approval" requirement set forth in Rule 23.1 for the settlement, voluntary termination or compromise of shareholder derivative claims does not define a standard of review of "any particular dimension." *Compare Kamen*, 500 U.S. at 96.  The demand requirement under Rule 23.1 and the business judgment rule at issue in this case are based on identical principles of the laws of corporate governance – the "regulation of the role and power of a board of directors in determining the wisdom, or lack of such, regarding litigation brought in the corporation's name."  *RCM Sec. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1326-27 (2d Cir. 1991). Moreover, the application of the Minnesota business judgment rule, as set forth in *In re United Health Group*, 754 N.W.2d at 561, would neither frustrate the policies underlying the federal securities laws upon which the federal shareholder derivative claims are based nor would it permit conduct under the state law that is prohibited by federal law.  *See, e.g.*, *Lewis v. Anderson*, 615 F.2d 778, 783-84 (9th Cir. 1979) (applying California's business judgment rule to a special litigation committee's decision to terminate a shareholder derivative lawsuit asserting 10b-5 claims after concluding that the business judgment rule presented no threat to the overriding purposes of Section 10(b) and Rule 10b-5, and that the business judgment rule and these federal securities rules "can coexist harmoniously"); *see also Abramowitz v. Posner*, 513 F. Supp. 120, 130 (S.D.N.Y. 1981) (concluding that the business judgment rule is consistent with the federal policies

---

statute at issue, *Kamen,* 500 U.S. at 107-08, and further held that in adjudicating derivative claims brought under the Investment Company Act, federal courts "must apply the demand futility exception as it is defined by the law of the state of incorporation."  *Id.* at 108-09.

underlying Section 10(b) of the Securities Act of 1934 and Rule 10b-5).  This Court should thus look to state substantive law – the Minnesota Supreme Court's answer to this Court's certified question – to define the standard of review for the SLC's disposition of all the federal claims asserted in this derivative action.  Those standards are independence and good faith only.

The SLC thus asks this Court to preliminarily approve its disposition of all of the shareholder derivative claims arising under federal law because:  (1) the members of the SLC possessed a disinterested independence; and (2) the SLC's investigative procedures and methodologies were adequate, appropriate, and pursued in good faith.

     **3.**      **The Court should not look to either the state or federal procedural rules regarding the approval of class action settlements when determining whether to grant preliminary approval of the SLC's disposition of the derivative claims.**

For the same reasons set forth above, the Court should not apply either the state or federal standard of review for class action settlements when ruling on the SLC's  motion for preliminary approval and dismissal.

     **a.**      **The Minnesota Supreme Court expressly rejected an inquiry into reasonability or adequacy when adopting the *Auerbach* standard of review.**

In its submission to the Minnesota Supreme Court on the certified question, lead plaintiffs' counsel argued that the Court should adopt the class action standard of review set forth in Minn. R. Civ. P. 23.05(a).  Minn. R. Civ. P. 23.05(a) permits a court to approve a class action settlement only after finding the class action settlement to be "fair, reasonable, and adequate."

33

Although the Minnesota Supreme Court did not cite Minn. R. Civ. P. 23.05(a), by adopting the *Auerbach* standard, the Court rejected without discussion the arguments by lead plaintiffs' counsel that the Court should either adopt that class action approval standard or otherwise permit a court to inquire into the reasonability and adequacy of a shareholder derivative settlement proposed by a special litigation committee. *See In re United Health Group,* 754 N.W.2d at 551-53. Pursuant to the *Erie* analysis set forth above, this Court should not apply the "fair, reasonable and adequate" standard set forth in Minn. R. Civ. P. 23.05(a) for purposes of an entirely different type of a case when exercising supplemental jurisdiction over the state law shareholder derivative claims asserted in this action.

> **b.** **The Court should not look to Fed. R. Civ. P. 23(e)(2) – the federal procedural rule regarding the standard for approval of class action settlements – when determining whether to grant preliminary approval.**

Like its Minnesota counterpart, Fed. R. Civ. P. 23(e)(2) provides that a court may only approve a class action settlement only upon a finding that it is "fair, reasonable and adequate." Because the federal class action standard of court review imposes a different, less deferential standard than the Minnesota Supreme Court's newly announced *Auerbach* standard, this Court should not look to the federal class action standard of review when deciding this motion for the same reasons that it may not use Fed. R. Civ. P. 23.1 to circumvent the Minnesota Supreme Court's answer to the certified question. *See supra* (discussing same); *see, e.g., Kamen*, 500 U.S. at 98; *Burks*, 441 U.S. at 477-80.

## <u>CONCLUSION</u>

For the foregoing reasons, the SLC asks this Court to grant preliminary approval of its disposition of the federal shareholder derivative claims and to dismiss those claims.

Dated:  October 16, 2008                    KELLY & BERENS, P.A.


                                            s/Barbara P. Berens
                                            Barbara P. Berens #209788
                                            Paul R. Hannah # 40502
                                            Erin K. Lisle #238168
                                            3720 IDS Center
                                            80 South Eighth Street
                                            Minneapolis, MN 55402
                                            (612) 349-6171