# UNITED STATES DISTRICT COURT
# DISTRICT COURT OF MINNESOTA

---

|  |  |
|---|---|
| )<br>In Re:  UnitedHealth Group Incorporated )<br>Shareholder Derivative Litigation            )<br>                                                        )<br>                                                        )<br>                                                        )<br>                                                        )<br>                                                        )<br>                                                        ) | Master File No. 06-1216 JMR/FLN<br><br>**AFFIDAVIT OF THE<br>HONORABLE KATHLEEN A.<br>BLATZ** |

---

STATE OF MINNESOTA     )
                                       ) ss
COUNTY OF HENNEPIN   )

1.      I am a member of the Special Litigation Committee (SLC) of the Board of

Directors (Board) of UnitedHealth Group Incorporated (UHG or the Company).  I present

this testimony to the Court in support of the SLC's motion for preliminary approval of its

disposition of the federal shareholder derivative claims asserted in the above-captioned

action and for dismissal of those claims.

2.      On June 26, 2006, the Board passed a formal resolution establishing the

Special Litigation Committee as follows:

> The Board does hereby designate. . . a special litigation committee
> of the Board (the "Special Litigation Committee") that has complete
> power and authority to investigate the Derivative Claim and the
> claims raised in the Derivative Actions and analyze the legal rights
> or remedies of the Company and determine whether those rights or
> remedies should be pursued.

I was appointed to the Committee along with former Minnesota Supreme Court Justice

Edward C. Stringer.  We serve as the two members of the SLC.

3.      My curriculum vitae is as follows: I graduated *summa cum laude*, Phi Beta Kappa, from the University of Notre Dame in 1976, and earned a masters degree in social work from the University of Minnesota in 1978.  In 1984, I received my J.D. *cum laude* from the University of Minnesota Law School.

In 1978, I was elected to the first of eight terms in the Minnesota House of Representatives.  While serving in the legislature, I was an attorney in private practice at the law firm of Popham, Haik, Schnobrich & Kaufman Ltd., and later as an assistant Hennepin County Attorney in the Hennepin County Attorney's Office.

In 1994, I was appointed to the Hennepin County District Court, serving as a trial judge until 1996.  In 1996, I was appointed Associate Justice of the Minnesota Supreme Court and was appointed Chief Justice in 1998.  I retired from my position as Chief Justice on January 10, 2006.

After leaving the Minnesota Supreme Court, I was elected to the Board of the RiverSource Mutual Funds, and served as a Jurist in Residence at the William Mitchell College of Law.  I currently serve on the Board of Governors of the University of St. Thomas Law School, having chaired the Board from May, 2006 until May, 2008.  I also am a licensed lawyer in the State of Minnesota.

4.      At the time of my appointment to the SLC, I understood that the Board of Directors of UHG sought to ensure the independence of the SLC by appointing two former justices of the Minnesota Supreme Court who had never served on the Company's Board.  Before I agreed to serve on the SLC I confirmed that I did not have any material

2

personal, professional, financial or familial ties with the Company, or with any of the
named parties in the state and federal derivative actions.

5.      The June 26, 2006 Board resolution appointing the SLC also contains the
following provision:

> FURTHER RESOLVED, that the number of members of the Special
> Litigation Committee can be expanded in the future through Board action if
> the Board deems appropriate.

The Company did not expand the SLC.  The existence of the expansion
provision did not influence me, or the SLC's investigation, deliberation or
disposition of the shareholder derivative claims.  I am not aware of any evidence
that the UHG Board ever intended or even considered the use of this provision.  I
have served as a member of the SLC with complete confidence that the SLC was
independent of the Company.  I had no concerns that the Company would expand
the Committee barring some catastrophic event such as a serious disability or
death of a member.

6.      Prior to my appointment to the SLC, in April of 2006, the UHG Board of
Directors appointed a Committee of Independent Directors (Internal Directors'
Committee) to conduct a review of the Company's stock option granting practices from
1994 through 2006.  The Internal Directors' Committee was composed of Messrs. James
A. Johnson (Chair), Richard T. Burke, and Douglas W. Leatherdale.  In turn, the
Committee engaged the law firm of Wilmer Cutler Pickering Hale and Dorr LLP
(WilmerHale) as counsel to assist in its review.

7.     At the time of my appointment, the WilmerHale investigation was in progress. Ultimately, I became aware that WilmerHale had interviewed approximately 80 witnesses, had reviewed in excess of 26 million pages of documents, and had retained financial and forensic experts to assist in the process. On October 15, 2006, the Internal Directors' Committee released its report setting forth the evidence developed and conclusions reached during the investigation (the "WilmerHale report"). The SLC viewed the findings and conclusions of the WilmerHale report as informative, but did not limit its investigation in any manner by reason of such findings and conclusions.

8.     In July 2006, the SLC retained Kelly & Berens, P.A. (Kelly & Berens) as its lead counsel to provide legal advice and assist the SLC with all phases of its work, including document collection and review, planning and administration of the SLC's investigation, preparation for and participation in all witness interviews, retention of various consultants, the potential resolution of claims against certain defendants in the state and federal derivative actions, preparation of the SLC's Report, and other matters relating to the work of the SLC.

Important to me in selecting Kelly & Berens was the focus of its practice on civil litigation, without limitation to any substantive area of law. Kelly & Berens has substantial experience in securities, antitrust, commercial and employment litigation, as well as derivative actions and defending businesses in class action litigation. Incident to its practice, Kelly & Berens has significant experience in corporate internal investigations, including witness interviews, and retrieval and collection of documents

and electronic information.  It also has substantial experience in the organization and use of document databases.

In selecting Kelly & Berens, we assured ourselves that the firm had no material prior professional, personal, financial or familial relationship with UHG, with any of the named parties in the state and federal derivative actions, or with either member of the SLC.

9.     The SLC also retained Munger, Tolles & Olson LLP (MTO) as counsel to assist with the potential resolution of claims against certain defendants in the state and federal derivative actions and with the SLC's Report.  Important to me in selecting MTO was its broad experience in conducting internal corporate investigations, and in counseling boards of directors and independent committees and special litigation committees of boards of directors.  Specifically, MTO has extensive experience in representing companies, independent committees, and individual directors and officers in connection with allegations of stock option backdating.

Justice Stringer and I also assured ourselves that MTO had no material prior professional, personal, financial or familial relationship with UHG, with any of the named parties in the state and federal derivative actions, or with either member of the SLC.

10.     The SLC engaged Professor Lyman P.Q. Johnson to advise and counsel it on various issues concerning corporate law and governance.  Professor Johnson received his B.A., *magna cum laude,* from Carleton College and his J.D., *magna cum laude*, from the University of Minnesota Law School.  Professor Johnson is currently the Robert O.

Bentley Professor of Law at Washington and Lee University Law School, where he teaches courses in Corporation Law, Corporate Finance, Securities Regulation, Partnerships and Business Planning. Professor Johnson also occupies the Laurence and Jean LeJeune Distinguished Chair in Law at the University of St. Thomas School of Law in Minneapolis. He has been retained as a consultant or expert witness on numerous corporate and securities law issues and his scholarship focuses on this area of the law. Based on the information provided to the SLC, we determined that Professor Johnson had no material prior professional, personal, financial or familial relationship with UHG, with any of the named parties in the state and federal derivative actions, or with either member of the SLC.

11.    The SLC engaged Kroll's Litigation Consulting and Forensics practice (Kroll) to assist and advise it on various accounting and other issues. Kroll's services include forensic accounting and asset valuation. The professional at Kroll with primary responsibility for this undertaking was Douglas E. Farrow, who is a Certified Public Accountant and a Certified Fraud Examiner. Mr. Farrow was at the time a Managing Director at Kroll and had more than twenty years of experience assisting corporations, attorneys and their clients in a broad array of financial, economic and accounting matters. Prior to joining Kroll, Mr. Farrow was a partner with KPMG LLP's Forensic & Litigation Services, where he specialized in the investigation of accounting irregularities. Kroll has previously assisted management, boards or special committees and counsel with several stock option investigations. Mr. Farrow is currently the Office Coordinating Partner for the Forensic & Litigation Services practice of KPMG LLP in Los Angeles. Based on the

information provided to the SLC, we determined that Kroll had no material prior professional, personal, financial or familial relationship with UHG, with any of the named parties in the state and federal derivative actions, or with either member of the SLC.

12.     The SLC also engaged Professor Bradford Cornell of CRA International to advise it on various economic and damages issues. Dr. Cornell holds B.A., M.S., and Ph.D. degrees from Stanford University. He has been a Professor of Finance at the University of Arizona, the University of Southern California, and the University of California at Los Angeles. He is currently a Visiting Professor of Financial Economics at the California Institute of Technology. Since 1999, he has been a Senior Consultant with CRA International, a firm that provides professional consulting services in connection with finance issues. Based on the information provided to the SLC, we determined that Dr. Cornell had no material prior professional, personal, financial or familial relationship with UHG, with any of the named parties in the state and federal derivative actions, or with either member of the SLC.

13.     Justice Stringer and I began the SLC process by exploring in-depth the scope of our duties as SLC members and the actions we would take to properly discharge those duties. In furtherance of our obligation to act independently and in good faith, Justice Stringer and I concluded it would be necessary to conduct, with the assistance of legal counsel, an extensive, independent investigation of UHG's stock option practices in which we both directly and actively participated. We also determined the specific

procedures we would follow to ensure that our investigation was adequate, appropriate and pursued in good faith.

14.     Justice Stringer and I determined that we should not rely on witness interviews conducted by WilmerHale, but that we should conduct, again with the assistance of legal counsel, our own interviews of witnesses, including named defendants. We also determined that we and our counsel would personally review documents to ensure that the scope of our investigation was not dictated by some other entity.

15.     The Company provided Justice Stringer and me with full access to all documents we requested for review, including documents that were privileged and/or work product. Other than providing access to documents and witnesses, however, the Company played no role in the way we conducted our investigation of the shareholder derivative claims.

16.     Subsequent to Justice Stringer's and my appointment to the SLC, the UHG Board of Directors had no role in the way we conducted our investigation. During the investigation and upon our request, current and former directors appeared in formal interviews and provided additional documents.

17.     From July of 2006 through December of 2007, Justice Stringer and I conducted a detailed investigation into a wide range of issues relating to the Company's historical stock option granting practices, and into thirty-two specific grants made during the period from 1994 to 2005, which grants are identified in our report. I personally reviewed thousands of pages of documents including witness interview memoranda prepared by WilmerHale in the course of its investigation. We examined each of the

named defendants' roles in the stock option practices and in connection with specific grants. We reached the conclusions set forth in our report based on our review of the evidence developed during our investigation and in light of our mandate to determine the course that would be in the best interests of the Company.

18.     Specifically, Justice Stringer and I began meeting in July 2006 with counsel on a regular basis to design and implement the most efficient and effective investigatory process. We determined that the first step would be the collection and review of documentary evidence relevant to the Company's stock option granting practices and the role of each individual defendant and other witnesses of those practices. Ultimately, notebooks of relevant materials – comprised of documents selected through comprehensive searches of the document database administered by Kroll OnTrack and documents gathered from the Company and other sources – were prepared for us. Justice Stringer and I personally reviewed these notebooks and numerous other materials.

19.     Justice Stringer and I conducted our investigation in accordance with the fundamental principles of independence and good faith. Although our charge overlapped to some extent with that of the Board's Internal Directors' Committee, our focus was broader in that it centered on all factors that must be taken into account in determining what would be in the Company's best interests with regard to the multiple claims in the state and federal derivative actions. To that end, we requested and received substantial materials directly from the Company, its auditors and others, including such things as:

> • Materials used in connection with the Company's 2006 restatement of earnings, which included, among other things: (i) information about the

Company's stock option administration; (ii) data related to the revised measurement dates for various grants; (iii) expense and tax information relating to more than 48,000 individual stock option grants covering approximately 15,000 employees; and (iv) historical daily pricing information for the Company's stock from January 1, 1994 through December 31, 2006.

• The Company's filings with the SEC, including proxy statements, reports filed on SEC Forms 10-K and 10-Q, and Forms 3, 4 and 5 for Section 16 officers.

• Board and Board committee materials, including minutes, meeting materials and written actions.

• Corporate governance documents, including, among other things, the Company's bylaws and the charters of the Board committees.

• Work papers from outside auditors for the relevant periods, including planning documents, schedules, memoranda, correspondence and other relevant materials.

• Other relevant supporting financial and accounting records, schedules and related documents.

20.    Later in our investigation we sent follow-up requests to the named defendants, certain Company custodians and others, seeking relevant documents not previously produced.

21.     Justice Stringer and I, with counsel, conducted a total of fifty separate interviews.  Specifically, we requested interviews with all of the defendants named in the state and federal derivative actions; all of them, other than Dr. McGuire and Mr. Lubben, were interviewed.  We also prepared for and interviewed current and former Board members, key current and former employees in the Company's legal, human resources, accounting, finance and other departments, heads of business segments and other individuals thought to have potentially relevant information about the Company's stock option granting practices.  The foregoing witnesses were all represented by legal counsel.

As a result, we gained significant knowledge about UHG, its stock option granting process, and the role, if any, of each defendant in that process.

22.     We met with several representatives of the U.S. Securities and Exchange Commission. We also met with Dr. Erik Lie, the University of Iowa professor whose statistical studies were cited in the Wall Street Journal entitled *The Perfect Payday*.  Dr. Lie has written several articles related to stock option granting practices, including *On the Timing of CEO Stock Option Awards*, 51 Mgmt. Sci. 802-12 (May 2005) and *Does Backdating Explain the Stock Price Pattern Around Executive Stock Option Grants?* 83 J. of Fin. Econ. 271-95 (Feb. 2007) (co-authored with Randall A. Herron).  In September 2006, Dr. Lie testified about stock options backdating before the U.S. Senate Committee on Banking, Housing and Urban Affairs.

23.     We also met with UHG employees involved in the retention of Company records in order to ensure that relevant documents had been collected and received, and

to determine whether additional documents should be collected.

24.     Our interviews began on November 1, 2006, and concluded on July 26, 2007. Both Justice Stringer and I attended the vast majority of the interviews in person, and when not in person, we participated by telephone conference. We each actively participated in the interviews, personally questioning witnesses at length. The interviews were extremely thorough, in most cases lasting for a full day or longer. We and our counsel questioned witnesses about their roles relating to the Company and its stock option granting practices, including specific option grants, organizational and governance issues, Board and Board committee practices, and the specific nature of the witnesses' involvement with the Company's stock option granting practices. We and our counsel also questioned witnesses about numerous documents, including relevant emails, Company SEC filings and disclosures, Board and Board committee materials, and other documents.

25.     Justice Stringer and I met with WilmerHale attorneys involved in the Internal Directors' Committee's investigation of the Company's stock option granting practices. WilmerHale attorneys provided information regarding those practices, the scope of the WilmerHale investigation and its collection of Company documents. We were provided with extensive materials gathered by WilmerHale, including memoranda of witness interviews and more than a million pages of hard copy documents. We also acquired our own copy of the Kroll OnTrack online database which included more than sixty-six million pages of electronic documents. We obtained access to metadata for many electronic documents, which revealed such information as the dates on which

documents were created and last edited, and the identity of the persons who had created

them. Both hard copy and electronic documents were independently searched, reviewed,

and analyzed in the course of our investigation.

26.    Justice Stringer and I determined that it would be useful to meet with

various counsel, including counsel for Dr. McGuire, Mr. Lubben and selected Directors,

to understand the parties' respective positions on factual and legal issues. We also met

with Company counsel and counsel for the plaintiffs in the state and federal derivative

actions to ensure that we fully understood their views with respect to various matters,

and with the Company's and Board's insurance counsel to ensure that we were aware of

insurance issues that might have some bearing on our deliberations. In addition, we

reviewed written submissions from plaintiffs and various defendants, and independently

reviewed cases and other materials to fully inform ourselves of the legal framework for

analyzing the shareholder derivative claims.

27.    Throughout our investigation, Justice Stringer and I met regularly to review

the evidence developed to date and to ascertain what additional information might be

necessary or desirable. As we entered our deliberative phase, we also received and

considered written submissions and compilations of documents from counsel who had

been appointed Lead Plaintiffs' Counsel in the state and federal derivative actions and

from counsel for some of the individual defendants. We considered these materials in

determining whether claims against each defendant should be pursued.

28.    Justice Stringer and I did not conclude our investigation until we were

satisfied that we had received all pertinent information necessary for a thorough

understanding of all of the relevant parties' positions and views, and that the SLC was in a position to make an informed and reasoned judgment about the disposition of the derivative claims.

29.     Upon completion of the investigatory phase, Justice Stringer and I deliberated for more than four months, carefully considering each derivative claim against each defendant and whether the pursuit of those claims would be in the best interests of the Company in light of all the facts and circumstances.

30.     As we proceeded with our deliberations, we determined that it would be in the best interests of the Company to attempt to resolve, by settlement, claims asserted against certain defendants.  To that end, plaintiffs and defendants sought the assistance of an experienced and independent mediator, former United States District Court Judge Layn R. Phillips.  Numerous and extensive negotiations and mediation sessions were held between and among Judge Phillips, ourselves and our counsel, the Company's and individual Board members' counsel, plaintiffs' counsel in the state and federal derivative actions and several of their clients and certain named defendants and their counsel. Extensive negotiations over several months culminated in a global settlement of all shareholder derivative claims on behalf of all parties.

As a result of settlements with certain defendants and further remedial steps, the Company would obtain a return of assets which were valued at the time of settlement at $499.3 million (Black Scholes) or $495.1 million (intrinsic).

Prior to the SLC settlement, voluntary actions taken in 2006 by various individuals resulted in the return to the Company of over $388.6 million (Black Scholes) or $427.6

million (intrinsic), which combined with the settlement reached with the SLC, yielded a total return to the Company of $887.9 million (Black Scholes) or $922.7 million (intrinsic).

The above amounts do not include the arbitration award against Mr. Spears, which provided the Company with an additional $7.25 million of value (Black Scholes) as of the time of the settlement.

31.     On December 6, 2007, we issued an 89-page Report which set forth our disposition of the shareholder derivative claims.  In issuing our Report, we decided it was not in the best interests of the Company to include detailed findings of fact, primarily because of other pending litigation.  Attached as Exhibit 1 to this Affidavit is a copy of our Report.

32.     We conducted our investigation, deliberated, and determined the disposition of the shareholder derivative claims as prescribed by Minnesota law, with the overarching focus of doing what was in UHG's best interests.  As a result of our investigation and our meetings with all relevant constituencies that we could identify, I am confident that we have received all the pertinent information necessary for a thorough understanding of all of the relevant parties' positions and views, and for us to reach an informed and reasoned judgment as to the best interests of the Company with respect to the derivative claims.

Dated this _16_ day of October, 2008.

_____
Kathleen A. Blatz

Subscribed and sworn to before

me this 10th day of October, 2008

Notary Public

NICOLE ANN McCORMICK
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010