1

1       UNITED STATES DISTRICT COURT

2       DISTRICT OF MINNESOTA

3       Civil Nos. 06-1216(JMR/FLN)
                   06-1691(JMR/FLN)
4   Hennepin County District Court File No. 27-CV-07-8085

5

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
6
IN RE:  UNITEDHEALTH GROUP INCORPORATED SHAREHOLDER
7   DERIVATIVE LITIGATION

8   IN RE:  UNITEDHEALTH GROUP INCORPORATED PSLRA LITIGATION

9   UNITEDHEALTH GROUP Litigation, Hennepin County District
    Court
10
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
11

12

13       TRANSCRIPT OF PROCEEDINGS HAD BEFORE

14   UNITED STATES DISTRICT COURT **JUDGE JAMES M. ROSENBAUM**

15   HENNEPIN COUNTY DISTRICT COURT **JUDGE GEORGE McGUNNIGLE**

16       United States Courthouse

17       Minneapolis, Minnesota

18       December 12, 2008

19

20

21

22

23

24

25       Reported By:  Dawn M. H. Hansen, RMR-CRR

```
 1     APPEARANCES:

 2     For the Plaintiffs        Karl L. Cambronne
                                 Chestnut & Cambronne
 3                               222 S. 9th Street, Suite 3700
                                 Minneapolis, MN 55402
 4
                                 C. Chad Johnson
 5                               Bernstein Litowitz Berger &
                                 Grossman, LLP
 6                               1285 Avenue of the Americas
                                 38th Floor
 7                               New York, NY 10019

 8                               Vernon J. Vander Weide
                                 Head, Seifert & Vander Weide
 9                               333 S. Seventh Street, Suite 840
                                 Minneapolis, MN 55402
10

11     For the Defendants        Peter W. Carter
                                 Dorsey & Whitney, LLP
12                               50 S. 6th Street, Suite 1500
                                 Minneapolis, MN 55402
13
                                 Steve W. Gaskins
14                               Flynn, Gaskins & Bennett LLP
                                 333 S. 7th Street, Suite 2900
15                               Minneapolis, MN 55402

16                               David M. Brodsky
                                 Latham & Watkins
17                               885 3rd Avenue
                                 New York, NY 10022
18
                                 Carl H. Loewenson, Jr.
19                               Morrison Foerster
                                 1290 Avenue of the Americas
20                               New York, NY 10104

21                               Seth L. Levine
                                 Foley & Lardner, LLP
22                               90 Park Avenue
                                 New York, NY 10016
23
                                 Richard G. Mark
24                               Briggs & Morgan
                                 80 S. Eighth St., Suite 2200
25                               Minneapolis, MN 55402
```

```
 1                              David Hashmall
                                Felhaber Larson Fenlon & Vogt
 2                              220 S. Sixth Street, Suite 2200
                                Minneapolis, MN 55402
 3

 4     ALSO PRESENT:            Barbara Podlucky Berens
                                Kelly & Berens, P.A.
 5                              3720 IDS Center
                                Minneapolis, MN 55402
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              P R O C E E D I N G S

 2            (In open court; 9 o'clock a.m.)

 3            THE CLERK:  Your Honors, the matter on the

 4   calendar is In Re UnitedHealth Group Incorporated

 5   Shareholder Derivative Litigation, 06-1216.  Minnesota No.

 6   27-CV-07-8085.  Will counsel please state their appearances

 7   for the record?

 8            MR. CAMBRONNE:  Morning, Your Honors, Karl

 9   Cambronne appearing on behalf of the federal derivative

10   plaintiffs.

11            JUDGE ROSENBAUM:  Mr. Cambronne.

12            MR. JOHNSON:  Good morning, Your Honors, Chad

13   Johnson at Bernstein Litowitz on behalf of six of the

14   institutional investors for lead plaintiffs in the federal

15   action.

16            JUDGE ROSENBAUM:  Counsel.

17            MR. VANDER WEIDE:  Morning, Your Honors, Vern

18   Vander Weide on behalf of the state derivative shareholder

19   plaintiffs.

20            JUDGE ROSENBAUM:  Mr. Vander Weide.

21            MS. BERENS:  Barbara Berens of Kelly and Berens on

22   behalf of the UnitedHealth Special Litigation Committee, and

23   I have with me both Justices Blatz and Stringer.

24            JUDGE ROSENBAUM:  Counsel.

25            MR. CARTER:  Good morning, Your Honors, Peter
```

5

1    Carter representing all defendants with the exception of Mr.

2    Spears, Mr. Lubben, and Dr. McGuire.

3            MR. LOEWENSON:  Carl Loewenson, Jr., from Morrison

4    and Foerster, for defendant William Spears.

5            MR. LEVINE:  Good morning.  Seth Levine, Foley &

6    Lardner, for David Lubben.  I'm joined by Rick Mark from

7    Briggs & Morgan.

8            JUDGE ROSENBAUM:  Counsel.

9            MR. BRODSKY:  Morning, Your Honors, David Brodsky

10   from Latham and Watkins representing Dr. McGuire.

11           MR. GASKINS:  Good morning, Your Honors --

12           JUDGE ROSENBAUM:  What, you layin' back today or

13   what?

14           JUDGE McGUNNIGLE:  Good morning, counsel,

15   including Mr. Gaskins.

16           JUDGE ROSENBAUM:  The reluctant Mr. Gaskins.  Good

17   morning.  Mr. Hashmall I see hiding back there, and the rest

18   of the federal bar of the state of Minnesota.  Counsel, you

19   may proceed.

20           MS. BERENS:  May it please the Court.  Umm, I am

21   going to be speaking on behalf of the UnitedHealth Group

22   Special Litigation Committee, and what I would like to cover

23   is first off the standard of review that I believe these

24   courts should both apply, and then get into the two specific

25   factors that the Minnesota Supreme Court set forth and the

1    reasons why my clients have amply satisfied the two prongs

2    of that test.

3         The Federal District Court certified a question to

4    the Minnesota Supreme Court.  In this past summer the

5    Minnesota Supreme Court clearly adopted one of the two

6    contrary standards of review for an SLC's disposition of

7    shareholder derivative claims.  And the policy reasons I

8    think for the Minnesota Supreme Court's decision are

9    instructive in terms of why the court turned left rather

10   than right, or I guess right rather than left.

11        The court, the Minnesota Supreme Court, examined

12   the two contrary standards that have grown up in the case

13   law, the state law case law, regarding the deference due a

14   special litigation committee when determining whether to

15   proceed, settle, or dismiss with prejudice shareholder

16   derivative claims.  And the Minnesota Supreme Court first of

17   all looked at whose claims an SLC is taking a look at, and I

18   think it was critical to the court's analysis that the

19   claims that a special litigation committee is investigating,

20   ah, deliberating on and ultimately disposing of in one

21   fashion or another, are derivative claims.  They are claims

22   that are owned by the corporation, and the Minnesota Supreme

23   Court felt in that instance where the claims are those of

24   the corporation.  It is the corporation, or in instances

25   where the corporation's board are conflicted out, a duly

1    appointed special litigation committee should be the body

2    that determines in the first instance what happens to these

3    shareholder derivative claims.

4         The court examined whether or not a court after

5    the fact under Zapata should be exercising its own

6    independent business judgment to determine whether or not

7    the special litigation committee's disposition of claims

8    should be approved or not.  And the Minnesota Supreme Court

9    focused on the fact that in its opinion the district

10   reviewing court, be it state or federal, was not qualified

11   to exercise its own independent business judgment, because

12   it is not in the position of a special litigation committee

13   where the committee can look at an amalgam, as this

14   committee did, of an extraordinary number of factors, facts,

15   and the law to reach a determination about what is in the

16   best interests of the corporation.

17        JUDGE ROSENBAUM:  Are they looking out for the

18   corporation, and what obligations have they to the

19   shareholders?

20        MS. BERENS:  Your Honor, I would argue that

21   ultimately the shareholders are an indirect benefit of

22   recovery.

23        JUDGE ROSENBAUM:  I mean, the board, a board of

24   directors is typically the shareholders' representative in

25   the management of the company, then they select the

8

1    directors, and it goes on from there, they are officers.

2    What is the relationship between the directors, or I'm

3    sorry, the, ah, the SLC and the shareholders?

4            MS. BERENS:  Well, Your Honor, I think the --

5            JUDGE ROSENBAUM:  I mean, who are they looking out

6    for here?

7            MS. BERENS:  I understand, Your Honor, thank you.

8    I believe that indirect beneficiaries of a settlement or

9    ultimately the prosecution or the dismissal of derivative

10   claims arguably inures to the benefit of the shareholders,

11   but I think it is just one component of what an SLC should

12   be examining, because, for example, if an SLC made a

13   determination, and I'm speaking in the abstract and not

14   about this particular association -- but if an SLC

15   determined that claims have merit, but which prosecuting

16   those claims ultimately the corporation might fail, for

17   whatever reason, umm, then the shareholders' interests would

18   be aligned with the corporation's interests, that --

19           JUDGE ROSENBAUM:  I mean, on some level you'd like

20   to have them aligned, it seems to me.

21           MS. BERENS:  Absolutely, Your Honor.

22           JUDGE ROSENBAUM:  They do own it.

23           MS. BERENS:  Pardon -- yes.

24           JUDGE ROSENBAUM:  Sometimes people forget that,

25   but --

1          MS. BERENS:  And I agree with that, Your Honor.

2     Obviously that's a function of corporate law.  And I think

3     a, a properly constituted SLC doing its job of acting in

4     good faith and independently is examining all kinds of

5     factors, including the shareholders' best interests.

6          JUDGE ROSENBAUM:  Okay.

7          MS. BERENS:  So I think that is absolutely one of

8     the factors that an SLC should consider.

9          JUDGE McGUNNIGLE:  Including but not limited to?

10          MS. BERENS:  Yes, Your Honor.  I would say

11     including but not limited to.

12          JUDGE McGUNNIGLE:  What or who are the other

13     indirect beneficiaries, if it's including but not limited

14     to?

15          MS. BERENS:  I think there's more direct

16     beneficiaries, Your Honor.  And, for example, in this

17     particular instance where, umm, a settlement was reached,

18     the direct beneficiaries of that settlement was the

19     corporation, if and when this settlement is approved.  Umm,

20     the amount of money that has been recovered from the three

21     individuals with whom settlements have been reached, that

22     money flows directly back to the corporation.  So the

23     corporation's actually a direct beneficiary of that.  In

24     addition, I think, ah, there are others that are probably

25     beneficiaries of that sort of dissolution, or disposition,

1    and that would be company employees.  Umm, I think

2    beneficiaries would be, ah, also people with whom the

3    corporation does business.  And I think these are all things

4    that an SLC doing its job takes into account when it is

5    making its determination about what's in the best interests

6    of the corporation.

7         I'm going back to the factors underlying the

8    Minnesota Supreme Court's decision.  And the Minnesota

9    Supreme Court made clear that they did not want to undermine

10   the special litigation process, and they wanted to avoid the

11   type of extensive inquiry and probably lengthy inquiry that

12   would be necessitated by adoption of the Zapata standard.

13        With that policy justification, the Minnesota

14   Supreme Court held that the reviewing court is confined to a

15   procedural inquiry that focuses on two separate factors.

16   One, the independence of the special litigation committee

17   appointed, and two, whether its procedures were adequate,

18   whether they were conducted in good faith, and whether they

19   were appropriate.  And this Special Litigation Committee is

20   I believe unique under both of these prongs.  I'd like to

21   address independence first, if I may.

22        The two members of this SLC are former justices of

23   the Minnesota Supreme Court, amply qualified to make

24   determinations about both the factual and legal

25   underpinnings of the shareholder derivative claims asserted

1  in both of these actions.  They are independent in the true

2  essence of the word.  They both made the determination

3  before they agreed to be on the Special Litigation Committee

4  that they had no material personal, financial, business, or

5  other relationships with either the corporation or any of

6  the named defendants.  I think this Special Litigation

7  Committee is rare in that instance, because neither of these

8  members had been on the board, they were not involved in any

9  fashion in the challenged conduct, they did not approve the

10  challenged conduct at issue here, and they also relied on

11  independent advisors and counsel in the context of their

12  investigation.  So I would argue that clearly they meet the

13  standard of independence.

14        JUDGE ROSENBAUM:  I will -- far be it from me to

15  speak for my brother, but I don't think either one of us

16  harbor huge doubts in this particular area.

17        JUDGE McGUNNIGLE:  Judge Rosenbaum speaks for me

18  in that regard.

19        MS. BERENS:  Well, I won't dwell on that factor

20  any longer.

21        JUDGE ROSENBAUM:  They are two estimable, fine

22  people, and they are well known to the Court, and that is

23  not one of the problems in this case.

24        JUDGE McGUNNIGLE:  Well known to both Courts, I

25  might add.

1          JUDGE ROSENBAUM:  But not so well known since

2     they've been appointed because I can't talk to 'em anymore.

3          MS. BERENS:  Well, on your side that's true.  On

4     my side I spent a lot of time talking to 'em.

5          JUDGE ROSENBAUM:  Well, I guess it's a

6     compensating balance.  Okay.

7          MS. BERENS:  The second factor focuses on the

8     procedures of the SLC process.  And again I would argue that

9     this special litigation committee did extraordinary work in

10    this case.  Both justices were personally involved,

11    extensively involved from the very beginning.  A 15-month

12    investigation was conducted where the company was not

13    involved other than --

14         JUDGE ROSENBAUM:  Barbara, what are we supposed to

15    do, at least what am I supposed to do with the fact that

16    they didn't tell me how they made their decision in any

17    fashion?  I mean, basically what we have is a black box.

18    And when the Minnesota Supreme Court says that I'm to be

19    concerned about their procedures, all I was told is what

20    streets they walked on.

21         MS. BERENS:  Well, I, I disagree in one sense,

22    Your Honor.  I think what the special litigation report laid

23    out was a number of things that I think the Court can hang

24    its hat on, if you will.  And I'll set aside the issue of

25    whether or not an SLC is required under the Minnesota

1   Supreme Court opinion to do anything more than this Special

2   Litigation Committee has done for purposes of its report.

3   But I think what the Special Litigation Committee did was,

4   first of all it made a determination because of the ongoing

5   PSLRA litigation, umm, that detailed findings of fact were

6   not appropriate.  It also had the benefit of the Wilmer Hale

7   report which I think went into great detail about a lot of

8   the allegations that were underlying this particular

9   shareholder derivative litigation.  But they, I think what

10  the SLC did was a lot more than that.  They laid out the --

11          JUDGE ROSENBAUM:  Let me back up to the first

12  one --

13          MS. BERENS:  Sure.

14          JUDGE ROSENBAUM:  -- because the first one, it

15  almost strikes me as a circular argument.  It is quite

16  frequent that you will get a PSLRA and a collateral,

17  parallel, whatever you want to call it, shareholders

18  derivative.  And if that says, if the answer to that is, and

19  if there's a PSLRA we don't have to tell you what we did,

20  then we're all done with the inquiry altogether.

21          MS. BERENS:  Well, Your Honor, I think frequently

22  in a lot of cases, and particularly cases --

23          JUDGE ROSENBAUM:  Then of course you can add in,

24  while we're at it, whether or not there's a Department of

25  Justice or, ah, umm, you know securities investigation at

1    the same time.  Any time you say that, then all of a sudden

2    according to that argument I have to salute the flag.

3              MS. BERENS:  Well, Your Honor, I think in a lot of

4    cases --

5              JUDGE ROSENBAUM:  Which may be the rule, I'm not

6    sure.  But that's the issue.

7              MS. BERENS:  That is indeed the issue.

8              JUDGE ROSENBAUM:  Well, at least I hit it, okay.

9              MS. BERENS:  Of course.  Well, I think in a lot of

10   cases, Your Honor, it is a little different in that both the

11   class action and the derivative claims are asserted in the

12   same action, so some of that is not true, but I understand

13   your point about the circular argument.  And I think the

14   answer to that is twofold.  I think clearly under a Zapata

15   standard, the Court is literally sitting as an additional

16   member of the SLC.

17             JUDGE ROSENBAUM:  Um hmm.

18             MS. BERENS:  And is obviously privy to anything

19   and everything that an SLC considered.  Ah, I think in this

20   SLC report, however, the justices did lay out the framework

21   for the actions they took, and they set forth a number of

22   factors that were weighed in the process.  And they did it,

23   a detailed description of the type of factors.  And, for

24   example, they described the fact finding process that went

25   on, umm, in terms of the witnesses, the witnesses were

1    identified, the fifty witnesses that were interviewed

2    extensively by the SLC.  They described that those witness

3    interviews were generally a day or more.  They described the

4    types of questions that the witnesses were asked, and they

5    also noted in the report that witnesses were generally

6    forthcoming, primarily forthcoming in response to those

7    questions.  They talked about the focus of their

8    investigation and what types of records were looked at.

9    What types of materials were obtained from third parties,

10   the types of advisors on which the SLC relied.

11        The SLC also laid out in great detail the legal

12   structure on which they judged the shareholder derivative

13   claims.  So to the extent the Court wants to look at the

14   legal framework that they operated in, that's clearly set

15   forth.  And, for example, umm, the Section 14 claims, the

16   SLC determined that the complaint failed to state a claim

17   because the plaintiffs failed to allege the appropriate

18   elements to state a claim.

19        So I think the detailed facts underlying

20   determinations were not laid forth.  But, for example, with

21   some of the employee officer defendants, the SLC report said

22   these people weren't even involved in the stock option

23   process, so I think the Court can take comfort in the fact

24   that the SLC examined these people and found they didn't

25   even have personal involvement in the challenged practices.

1     With other defendants, for example some of the director

2     defendants, the SLC pointed out in the report that the stock

3     options that were given to directors were given on a routine

4     basis.  Prescheduled, a certain number of, used to be once a

5     year, then it became quarterly, so again, there was, umm, an

6     indication that in its deliberative process the SLC carved

7     these people out because they were in a unique position.

8          With the three defendants with which all the

9     parties have reached settlement, the SLC reached the

10    conclusion that for remaining claims, carved out, for

11    example, the Section 14 claims, the claims had some merit.

12         And I think again, the Court can take comfort in

13    the fact that this wasn't a rubber stamped process.  This

14    was a process where this SLC went in, without a preconceived

15    bias as regards what the board did or did not do, or the

16    corporate officers did or did not do, and in a way that was

17    probably less explicit than in the Wilmer Hale report --

18         JUDGE ROSENBAUM:  Charmingly put.

19         MS. BERENS:  Thank you, Your Honor.  But --

20         JUDGE McGUNNIGLE:  Are we to look at the

21    procedures, as you've been talking about them, in effect as

22    circumstantial evidence that the findings, whatever

23    findings, or whatever facts the SLC relied on were

24    sufficient to support their various decisions and

25    recommendations?

1          MS. BERENS:  I wouldn't put it that way, Your

2     Honor, because I think that starts crossing over into

3     Zapata.  I think the real difference, I don't believe under

4     the Minnesota Supreme Court's decision you get into

5     sufficiency unless I think from the face of the report.  The

6     process seems so deficient that it may, for example, suggest

7     that the SLC was not acting in good faith.  And I think

8     within those two prongs, I think there is indeed some room

9     to look at procedure and, as the court explicitly held,

10     adequacy of procedure.  And I know during oral argument at

11     the Minnesota Supreme Court the question was asked of

12     Marianne Short, well, are you arguing that if an SLC reaches

13     a settlement of one dollar that the court can't challenge

14     that?  And I think the answer in the opinion is that would

15     probably go toward both good faith and arguably adequacy of

16     the procedures, because --

17          JUDGE ROSENBAUM:  What procedure would be lacking

18     in such a settlement?

19          MS. BERENS:  Well, Your Honor, I think it could be

20     a couple of things.  I think in the con -- in the context of

21     the mediation process, if the mediation resulted in a

22     settlement, there would be an argument that there weren't

23     arms' length negotiations, that there was some sort of

24     collusion between the parties.  There might be an argument

25     that the SLC didn't spend sufficient time digging in to the

1    merits of the claims, so it -- and in this case uniquely

2    that the plaintiffs' counsel, the lead plaintiffs' counsel,

3    too, would be inclined to take a lesser amount or a minimal

4    amount.  So I think it's a continuum, and I don't think it's

5    entirely black and white.  But I do think in a case like

6    this where I think the procedures were clearly adequate, the

7    investigation was extraordinarily extensive, the Special

8    Litigation Committee was personally and actively involved,

9    and didn't rely on lawyers to do the interviews.  I mean,

10   these two justices sat there and made their own independent

11   credibility determinations witness by witness by witness.  I

12   think in a case like this, too, where the amount of the

13   settlement is substantial, and the mediation was attended by

14   virtually all the parties to the two independent shareholder

15   derivative actions, I think the Court can take assurance

16   that this was not some back room deal that was reached.

17          Settlement.  We did reach settlements with three

18   of the individual defendants.  We are here today to ask

19   that -- both courts to preliminarily approve it.  There may

20   be some question, I think the courts are probably in

21   different positions for purposes of review, and I want to

22   address just briefly those differences.

23          I think for purposes of Judge McGunnigle, I think

24   the state Supreme Court has spoken, and they have also

25   rejected the notion that the Minnesota Rule 23 provides some

1       other substantive standard on which the Court should look

2       beside the two factors that the Supreme Court set forth.

3               I think for purposes of you, Judge Rosenbaum, I

4       think there may be also some questions about --

5               JUDGE ROSENBAUM:  I think your argument there is,

6       while the Minnesota Supreme Court reminded me that they're

7       not in the business of interpreting the federal rules, but

8       you were nice enough in your brief to tell me that the

9       Supreme Court of the United States has, and this is

10      procedure and I'm supposed to look to state substantive, at

11      least according to your argument.

12              MS. BERENS:  That's correct, Your Honor.

13              JUDGE ROSENBAUM:  Okay, well, at least I read it.

14              MS. BERENS:  And I appreciate that.

15              JUDGE ROSENBAUM:  Well, I do the best I can.  All

16      right.

17              MS. BERENS:  In light of that I would --

18              JUDGE ROSENBAUM:  Can you tell us, because I do

19      not, I'm not, it is not clear to me, were the sums set at

20      the settlement, the settlement sums?  Or were the sums based

21      on values of shares which will be transferred at later

22      times?

23              MS. BERENS:  Ah --

24              JUDGE ROSENBAUM:  Because quite obviously, we are

25      dealing with a -- you could hardly look in the newspaper

1    without seeing somebody ballyhooing how big the numbers

2    were, and I just, are we still talking about the same things

3    here?

4              JUDGE McGUNNIGLE:  And as I read the papers that I

5    read, it appears to me, tell me if I'm wrong, that the

6    amounts that are set forth are based on valuation of

7    options, correct?  Both in terms of intrinsic value and, ah,

8    and the value based on the two professors --

9              MS. BERENS:  Intellectuals.

10             JUDGE McGUNNIGLE:  Right.  I should know that

11   because in a former life I settled at least one case based

12   on that model.  I checked yesterday, and the price of the

13   stock, at least as I see it, has gone down about 60 percent

14   since the settlement was reached.  What would the value be

15   today?  I notice in the, ah, in the, ah, notice that Mr.

16   Vander Weide provided a couple days ago, there was a blank

17   for the current value.  And I'm interested in knowing what

18   that is, what are we going to fill in?

19             MS. BERENS:  Well, let me, let me back up and tell

20   you what, what I think is key about these settlements.  To

21   answer your question, Judge Rosenbaum, the settlements, two

22   of the three, have other components besides just stock

23   options.  And I'll detail these, although I'm assuming my

24   counsel will also be in a position, the ones that are

25   representing the settling defendants, but one thing the SLC

1    looked at was the give backs that the company voluntarily

2    received from various people, including these three

3    defendants, two of the three defendants, excuse me, back in

4    2006.  So that component is set in stone and that doesn't

5    vary because that transaction occurred back at the, in the

6    fourth quarter of 2006.  In addition, as regards Dr.

7    McGuire, 99.4, roughly, million of the settlement that was

8    reached was in --

9              JUDGE ROSENBAUM:  Is that percent or dollars?

10             MS. BERENS:  That's dollars.  99.4 -- I wish it

11   were percent, given what the market's done, Your Honor, but

12   it's dollars -- was benefits that he was entitled to as the

13   SLC noted, no matter how his departure from the corporation

14   was characterized.

15             JUDGE ROSENBAUM:  Okay, this is the stuff, this is

16   the deferred compensation, the other executive items, and

17   things like that, those were cut off.

18             MS. BERENS:  Those were returned to the company.

19             JUDGE ROSENBAUM:  And then relinquished.

20             MS. BERENS:  Correct, Your Honor, so that 99.4

21   million is set in stone.  At the time of the settlement,

22   roughly another 420 million, be it Black Scholes or

23   intrinsic, in stock option value would have been returned as

24   of the timing, I think it was December 4th of 2007, that

25   those stock options were valued, and unfortunately the stock

1   was in the 55-dollar range at that point in time.  We reran

2   some numbers this week, and I won't, I don't want them set

3   in stone --

4           JUDGE ROSENBAUM:  It's 14 dollars 30 cents?

5           MS. BERENS:  No, actually the company's writing

6   them a check.  No, I shouldn't joke, but, no, umm, roughly

7   about 168 million.  So there has been a significant decline

8   in the value of the settlement that Dr. McGuire agreed to.

9           JUDGE ROSENBAUM:  A fair number of the options are

10  just plain under water, I presume.

11          MS. BERENS:  Yes, there are, there are.  There's

12  some, they range in value, my memory is, from like 8 dollars

13  strike price per share up to about 60 dollars per share.  So

14  that's one reason there's a significant number of the

15  options that are under water.

16          JUDGE ROSENBAUM:  So we've lost 160 million off

17  the settlement?

18          MS. BERENS:  Umm, I think even a little more than

19  that.

20          JUDGE ROSENBAUM:  More?

21          MS. BERENS:  Yeah, yeah.

22          JUDGE ROSENBAUM:  Okay.

23          MS. BERENS:  Although I suppose in terms of if you

24  want to look at the total assets that an individual had

25  before and after settlement, that boat has also sunk, so

1    that is one thing that the SLC did look at is, is the amount

2    that each individual had as a result of the stock option

3    granting process, and frankly also the amount that was

4    allegedly attributable to the backdating, as people have

5    called it.

6          With Mr. Lubben it's a little different, because

7    over $20 million of the settlement he reached with the other

8    parties was in options that had already been exercised.  So

9    of that amount, that 20 million is, is set in stone, if you

10   will, and then there was -- there was a component, a stock

11   option component that has fluctuated.  I think we valued it

12   between 2.2 maybe and 5.5 million.  There was a significant

13   difference between intrinsic/Black Scholes, and, umm, we're

14   looking at a lot less for that, you know, we're looking in

15   the range of, it's pretty low.  I mean, it's under 500,000

16   right now.  Because some of those options are just under

17   water.  But, ah, Lubben did give up a significant amount of

18   cash, so that part is protected.

19         And then, ah, with Mr. Spears, that was all

20   options, and for the first two, the dollar amounts, the

21   components of the settlement were all negotiated in advance

22   in the arms' length mediation.  So it was determined what

23   benefits, what cash, what tranches of stock options were

24   given up, all that was set out.  The figures were reconciled

25   amongst the parties, a market value price was agreed on at

1    the time of the mediation, completion of the mediation

2    process.  With Mr. Spears it was a little bit different.  In

3    terms of what occurred, the parties reached an agreement

4    that they would go to a binding arbitration to determine

5    what amount Mr. Spears would be returning, and that was,

6    indeed, composed of stock options, and there was a range

7    and, ah, Mr. Phillips, Judge Phillips conducted the binding

8    arbitration, and awarded 7.25 million in --

9              JUDGE ROSENBAUM:  Options.

10             MS. BERENS:  -- stock options, entirely stock

11   options.  Valued as of the date of the settlement.  Again,

12   unfortunately, because the market fluctuations, that has

13   gone down substantially.  So --

14             JUDGE McGUNNIGLE:  So what is the number that

15   we're going to put in the notice?

16             MS. BERENS:  Well, what we would propose to do,

17   Your Honors, is they're complicated calculations, and if

18   indeed preliminary approval is granted and a date is picked

19   on which the notice goes out, then a figure could be

20   calculated.  Two days, probably, is what you'd need, market

21   close two days before the shareholder notice goes out, and

22   then the notice would indicate that, you know, this is using

23   X price as of Y date.

24             JUDGE McGUNNIGLE:  And I assume again then that

25   would be a range?

1          MS. BERENS:  Both the Black Scholes and the

2     intrinsic.

3          JUDGE McGUNNIGLE:  Um hmm.

4          MS. BERENS:  That's correct.

5          JUDGE McGUNNIGLE:  Thank you.

6          MS. BERENS:  One final thing I'd like to say, Your

7     Honors.  Unfortunately Minnesota law is particularly harsh

8     when it comes to an SLC process, and I'll explain why.  It's

9     not in terms of what the reviewing court can do, but in

10    terms of what the SLC process is allowed to do.  And in the

11    JNC case, unfortunately affirmed, in my view, by the

12    Minnesota Supreme Court, the SLC process gets one bite of

13    the apple.  And if a court decides that either prong of the

14    test is not satisfied, the case goes to trial.  I would urge

15    the Court not to undo all this extraordinary work, because I

16    don't think we can go back to the drawing board based on the

17    Minnesota Supreme Court's determination that once the apple

18    has been bitten, you don't get a second bite.

19         JUDGE ROSENBAUM:  I thank you.

20         MS. BERENS:  Thank you, Your Honors.

21         JUDGE McGUNNIGLE:  Thank you.

22         JUDGE ROSENBAUM:  Mr. Cambronne.

23         MR. CAMBRONNE:  Good morning, Your Honors.

24         JUDGE ROSENBAUM:  You might want to reach over to

25    the side of the lectern -- the other side.

1          MR. CAMBRONNE:  Your Honors, my purpose, primary

2     purpose here today was to tell you procedurally how we would

3     encourage the Courts to act.  Let me pick up, though, at the

4     outset on a few questions that you asked Barbara Berens and

5     give you our perspective as plaintiffs' counsel in this

6     matter.

7          The Court expressed some concern I think about,

8     well, how do we know what happened?  There was some cryptic

9     comments by an SLC and how can we get our arms around that?

10    Well, let me add to that by saying that this day, today, is

11    not the day that you will have a fulsome record before you.

12    What you're going to have at the time of a final hearing is

13    an explanation that really adds a lot of detail --

14          JUDGE ROSENBAUM:  I think we understand that today

15    the question is whether the proposed settlement falls within

16    the broad area which may be regarded as a settlement area, a

17    full determination will lie at a later time, but obviously

18    the questions are ones which have been percolating.

19          MR. CAMBRONNE:  Right.  And what I was going to

20    just say are two things:  First of all you can, I know you,

21    the judges are of a mind, and I am here to say publicly and

22    openly that this SLC did a heck of a job.  They worked hard,

23    they brought to bear considerable expertise and talent and

24    intelligence, and there are just a lot of hours to this

25    process.  And one of the reasons I know that is because this

1    was a very unique resolution that is going to be presented

2    to you because it involved us as plaintiffs' counsel in both

3    the federal and the state case.  That is, it was Mr. Carter

4    and myself who initially talked about a mediation a year ago

5    last summer.  We asked Judge Layn Phillips to mediate, who

6    happens to be in the courtroom, by the way.  We're delighted

7    to have him here.

8              JUDGE ROSENBAUM:  Judge Phillips is here?

9              MR. CAMBRONNE:  He is.

10             JUDGE ROSENBAUM:  Ah.  You are welcome.

11             MR. CAMBRONNE:  But anyway, after the parties, if

12   you will, in the litigation, underlying litigation said

13   let's try to find a way, we contacted the SLC and said let's

14   make this kind of unusual, let's make it a three-legged

15   stool, if you will, bring together an SLC, advocates on both

16   sides of the question, and work together, the mediation that

17   unfolded over many, many sessions involving very difficult

18   issues, involving a lot of give and take between, for

19   instance, us, plaintiffs' counsel, and the SLC, no, that's

20   not good enough, or, yeah, we think that's the right thing

21   to do, ah.  The process, if you will, of bringing together

22   the product that is before you involved not only the

23   imprimatur of a very skilled mediator, Judge Layn Phillips,

24   but it brought together the viewpoints of plaintiffs'

25   counsel, who in this matter are obviously very partisan and

1    very aggressive.  So I think you can find some solace in

2    knowing that we have had a very vital role in writing this,

3    and we, too, are going to say today, and next whenever the

4    hearing is, that we think this is a good settlement.

5              JUDGE ROSENBAUM:  Let me ask you the same question

6    that I asked your sister.

7              MR. CAMBRONNE:  All right.

8              JUDGE ROSENBAUM:  Who did the SLC represent in

9    this case?

10             MR. CAMBRONNE:  Okay.  In, in, in this case -- I'm

11   going to emphasize the word "this" -- this case was brought

12   by primarily institutional shareholders and raised the

13   issue, and said what has happened is wrong, and it is the

14   shareholder case, albeit called derivative, that brought

15   about the result that you have here today both in terms of

16   monetary recovery and governance reforms.  So it cannot be,

17   umm, disputed in the least, as far as I'm concerned, that

18   the shareholder constituency, if you will, that stakeholder

19   in the whole process is an important constituency that was

20   represented at the table.  So although the benefit of this

21   settlement goes to the corporation, those benefits hopefully

22   flow back to the shareholders.  And therefore, you know,

23   Barbara even mentioned some other constituency like

24   employees and the like, but I think when it comes right down

25   to it, we're looking at a corporation that benefits and that

1    benefit flows dramatically and directly to the shareholders.

2         JUDGE ROSENBAUM:  Presumably enhanced value to the

3    corporation would enhance the value of the shares, but other

4    than in the metaphysics of that I'm just trying to figure

5    out whose team everybody was playing on.

6         MR. CAMBRONNE:  All right.  And keep in mind the

7    visual three-legged stool that was at this mediation, ah,

8    two skilled and, make no doubt about it, these two SLC

9    members did a fabulous job, but they're there, they're maybe

10   thinking of things a little differently than we are, we're

11   there, defendants and their skilled counsel had a different

12   view, and it was, it was a long process to get there.

13        But now, to answer another question that the

14   judges, you judges raised here, well, things have changed.

15   Things have changed in terms of stock value.  In fact, it's

16   changed so much that if we were to have done our valuation

17   to fill in that blank Tuesday, as opposed to the close of

18   the market today, it's supposed to be a big, bad day today

19   on Wall Street --

20        JUDGE ROSENBAUM:  Yesterday was a good one for the

21   corporation according to the New York Times this morning.

22        MR. CAMBRONNE:  There you go.  But then today with

23   the fallout from the lack of a bailout of the --

24        JUDGE ROSENBAUM:  Company doesn't make cars, does

25   it?

1          MR. CAMBRONNE:  As far as I know not, Your Honor.

2     As far as I know.

3          JUDGE ROSENBAUM:  Thought we'd missed something

4     there.

5          MR. CAMBRONNE:  There we are, we are geared up,

6     this is intentional --

7          JUDGE ROSENBAUM:  I have my own interest in this.

8     The federal judges' raise is in this settlement too -- not

9     in the settlement, it's in the bailout.  All right.

10          MR. CAMBRONNE:  All right.

11          JUDGE McGUNNIGLE:  The raise or lack of raise?

12          JUDGE ROSENBAUM:  Yeah.  The lack of raise.

13          MR. CAMBRONNE:  We are a -- we just made the

14     decision, if you were to agree, these two courts, to launch

15     this process, if you will, the smartest thing to do was to

16     do a new valuation as close to the time the notice went out

17     as possible.  Judge McGunnigle, I think you asked, well,

18     what is it today, and I say this, I'm going to give you a

19     number that we did on the back of the napkin sometime I

20     think it was in November, and it was circa $441 million of

21     value of options that, umm --

22          JUDGE ROSENBAUM:  Is that lock, stock, and barrel

23     all the parties?

24          MR. CAMBRONNE:  Yeah, not only, there's some

25     nuances here, some called settlements, some called other

1    remediation.  That's everybody.  That's everybody.  But now

2    the important thing -- and that was at a point in time

3    during the month of November.  This is going to be at a

4    different time in hopefully the month of December.  But the

5    important thing to say is, you know, we stood up with great

6    pride about a year ago in front of you, Judge Rosenbaum, and

7    said this is a 900-plus million dollar settlement, and it

8    was at that time.  And we said it was the largest, we think,

9    derivative settlement in the history of the nation.  I can

10   tell you right now it still is, even with the market drop,

11   so what you're dealing with, of course, is a significant,

12   and we like to think historic, case in terms of recovery in

13   the context of a derivative action and that even ignores the

14   fact that there's been a tremendous amount of, umm, of, ah,

15   governance changes that are significant and substantive

16   which we'll elaborate on another day.

17          But what has happened here is we've come to you

18   with a proposed form of notice, and that form of notice was

19   the subject of vetting and argument and dispute and

20   controversy until this week, and both of you have now

21   received the new form of notice that has been changed

22   slightly, and we've shared it with you, but we have two

23   blanks in there, we have one for whatever day you were going

24   to figure out to value, and that can be done very quickly,

25   we're geared up to do that with the aid and assistance of

1    Barbara Berens, and the other one is a date on which we can

2    reconvene here.  As the Courts know, this is not an opt-out

3    case, this is not a claim form case, anything of that sort,

4    so we're going to suggest to you, and I mean we collectively

5    here, that if it's convenient for the Courts, we'd like to

6    have a hearing sometime in February.  We are assuming we can

7    have notice go out the month of December, and if we could do

8    that, and that logistically is in the cue here, if you can

9    find time during the month of February where we can

10   reconvene and talk about the issues.  For instance, Barbara

11   Berens stood before you today and gave her view of how the

12   lens through which you two should look at this particular

13   case in terms of deciding whether or not to approve.  Well,

14   that's all well and good, but I respectfully submit that's

15   not what we have to do today.  Ultimately you folks are

16   going to have to deal with that, and grapple with that

17   issue.  But I suggest that that day is hopefully in the

18   month of February and we can, umm, we can talk about that

19   further.

20        So we have a notice for you, hopefully it passes

21   muster, by the way, and I know the Courts, having appeared

22   before both of you, you like to see certain things in

23   certain notices.  This one, let me highlight what this has.

24   This has a website that every lawyer in this room who thinks

25   something ought to be on that website, and we'll key it up

1     on there, and it will be there.  So you can click on

2     anything.  The other thing it has is not one but two 1-800

3     numbers for people to, ah, to, ah, ask questions in a

4     convenient, easy way.  We have intentionally gone out of our

5     way to make sure that the clerks in the Hennepin County

6     District Court and downstairs here are not going to be

7     burdened by questions, which they'd have to refer out

8     anyway.  We've made it as simple as we can in terms of

9     getting more information about this settlement, and

10    hopefully that is consistent with the Courts' desire also,

11    and that's what we tried to do anyway.

12           JUDGE McGUNNIGLE:  Given what we're afraid might

13    happen to the state judicial branch in terms of budget, we

14    may not have anyone to answer the phone anyway.

15           JUDGE ROSENBAUM:  Put a machine down there, and

16    you can pick it up, picked up with a tape every afternoon,

17    it'll be fine.

18           MR. CAMBRONNE:  There you go.

19           JUDGE ROSENBAUM:  You guys are going to have to

20    finance the machine too.

21           MR. CAMBRONNE:  Anyway, now that, we're here

22    today, this has been a long and arduous process.  We've

23    taken trips to the Minnesota Court of Appeals, we've been in

24    the trenches, we've looked at millions of documents, we

25    collectively in this room say this is a good settlement, and

1    you ought to approve it.  We will address the issue and we

2    have some differences of view, frankly, on, to what extent

3    you can look at some things and to what extent you're not

4    supposed to.  We'll get that, we'll get that all sorted out

5    on another day, but that's the situation we present with,

6    and hopefully we ask, and you will grant hopefully the, this

7    preliminary approval.

8            JUDGE ROSENBAUM:  Thank you, counsel.

9            JUDGE McGUNNIGLE:  Thank you, counsel.

10           MR. VANDER WEIDE:  Again, Your Honors, may it

11   please both courts, I'm Vern Vander Weide representing the

12   state derivative plaintiffs.

13           In response to your first question, Judge

14   Rosenbaum, the state statute business corporation statute

15   identifies the constituencies of a corporation's board of

16   directors and they are as follows:  They are, of course, the

17   shareholders, which is a comfort to investors, also

18   creditors, employees, vendors, customers, and the community

19   or communities in which those, that corporation operates.

20   That's a product of the heyday of the corporate takeover era

21   where states got concerned that companies the likes of

22   Dayton's was going to be taken over by some outfit in the

23   east, that far away place from which many lawyers are here

24   today, and so they erected these anti-takeover provisions,

25   one of which was to broaden the constituencies that

1    directors had to be mindful of.  And if you read, as I know

2    you have, the SLC's report, the SLC touches on these things,

3    and all of this, of course, is bound up in this rule called

4    the Business Judgment Rule, which only directors can,

5    according to the Minnesota Supreme Court, fully, properly,

6    efficiently, knowingly, wisely administer.

7         JUDGE ROSENBAUM:  They were zealous to tell me we

8    couldn't.

9         MR. VANDER WEIDE:  Excuse me, Your Honor?

10        JUDGE ROSENBAUM:  They were zealous to tell us we

11   couldn't.

12        MR. VANDER WEIDE:  It seems that's what they said.

13        JUDGE ROSENBAUM:  Yes, so I saw that.

14        MR. VANDER WEIDE:  That's the -- and so when the

15   SLC here, which of course has stepped in the shoes of the

16   directors, not only for purposes of this particular lawsuit,

17   but it had to take into account all of these other factors,

18   and it recited what it did in that regard in terms of

19   corporate interests, so it's not just a matter whether the

20   litigation has merit, whether the company was damaged, but

21   also whether in light of all of that, or despite all of

22   that, the litigation should either go forward, be resolved,

23   dismissed, what have you, and that of course brings us here.

24        So, and I would reiterate, ah, that we're only

25   here asking the Court to preliminarily approve this deal.

1    It's a very substantial deal.  I'm not going to recite all

2    the magnitudes and the superfluous adjectives.  However, if

3    we look at it in comparison to maybe a couple of yardsticks

4    that are relevant, because in absolute terms it is large.

5    It is still large even in its reduced value.  But also if

6    you compare it against, ah, the restated earnings that

7    UnitedHealth had to undertake as a result of this activity,

8    which if memory serves me was in the neighborhood of 1.2 to

9    1.3 billion dollars, this number at the time of the

10   settlement a year ago, $930 million is pretty close to that.

11          Another possible yardstick would be the class

12   action settlement, which I understood the Court is going to

13   be entertaining next week.  Again, this settlement in its

14   original numbers, ah, was very close to that, and I can tell

15   you that these were factors that were in the minds of a

16   negotiating -- all of us who participated in these

17   negotiations, to come up with a, a number that has real life

18   meaning in terms of external yardsticks.  Relevant to the

19   company.

20          So for those two reasons, ah, I would submit, Your

21   Honors, that there is plenty here in terms of these factors

22   for the Courts to grant preliminary approval.  If there are

23   some further things that need to be done, we will have some

24   time to do it.  But for now, this is, ah, this is

25   sufficient.

1            And with that, I will not reiterate what's in our

2    papers.  If the Courts have any questions I'd be happy to

3    entertain them, otherwise I've said my piece.

4            JUDGE McGUNNIGLE:  Thanks, Mr. Vander Weide.

5            MR. CARTER:  Good morning, Your Honors.

6            JUDGE ROSENBAUM:  Mr. Carter.

7            JUDGE McGUNNIGLE:  Mr. Carter.

8            MR. CARTER:  I want to start first by thanking

9    both Courts for the time today and the time the Courts have

10   devoted to this matter throughout its duration.  I can tell

11   you that your staff at various times has been barraged by

12   phone calls from lawyers, John and Michelle, Judge

13   McGunnigle, from your chambers, and Heather, Judge

14   Rosenbaum, from your chambers, they're always very

15   responsive, very professional, and frankly, umm, I think

16   allowed this case to stay on track, because lawyers were

17   making requests to either have hearings or a visit with the

18   Courts in chambers.  So we do appreciate that.

19           JUDGE McGUNNIGLE:  That's very timely, with

20   respect to my staff, because I'm about to do Michelle's

21   annual review.

22           MR. CARTER:  Please make sure that's in the file.

23           JUDGE ROSENBAUM:  It's also appreciated.  Umm, it

24   looks like we're driving the bus, but there's a lot of

25   things that go on behind in order to get us around here.

1    And on behalf of my staff, but personally I thank you for

2    recognizing some really good people.

3              JUDGE McGUNNIGLE:  It happens all too seldom that

4    lawyers acknowledge that.

5              MR. CARTER:  I realize we were a burden, and we do

6    appreciate the Courts' time.

7              We join in the SLC's motion.  I'm going to focus a

8    little bit on the process question that was asked Barbara

9    Berens.  Umm, I think when you look at the affidavits of

10   Justice Blatz and Justice Stringer, it truly is remarkable,

11   because, umm, they rolled up their sleeves, they clearly

12   looked at millions of documents.  They interviewed dozens of

13   people.  They hired experts, not just lawyers, but also

14   accountants, and an expert in corporate governance.  And

15   they did this over a lengthy period of time.  Over one year

16   of investigation.  And they took the time also to

17   deliberate.  That is also set forth in the report.  And I've

18   been involved in, umm, a handful of SLC processes before,

19   and I can tell this, the Court, that this was truly

20   extraordinary.  And I think if the Court is, umm, concerned

21   about process and the black box, I actually believe that

22   there's a great amount of detail in those affidavits and in

23   the SLC report, umm, that will give the Courts comfort that

24   this was a process that was thorough, it was complete, it

25   was adequate, and it was conducted in good faith.  Indeed,

1    on their list of interviewees, which was provided as an

2    attachment to the report, they interviewed everybody from

3    the board of directors to the CEO to administrative

4    assistants.  It was a deep and broad investigation.  And

5    that was appropriate, because the board, when it created the

6    SLC, gave the SLC complete power to determine the claims.

7    And as a result, the justices did what one would hope they

8    would do in a situation where they had those decisions to

9    make.  I think the results speak for themselves.  I actually

10   believe that this SLC will be looked at in the future as a

11   model for SLCs.

12           One of the things that I have a slightly different

13   view on than my colleague, Barbara Berens, is she made

14   reference to the dollar settlement and whether or not the

15   dollar settlement would somehow bleed into the question of

16   good faith and independence.  And I believe the Minnesota

17   Supreme Court opinion is very clear, that the inquiry is

18   limited to good faith and independence.  And if we had had a

19   recommendation from an SLC that said in our judgment, in

20   exercising the business judgment, we don't think it's in the

21   best interests of the company to pursue a lawsuit.  That

22   should also be given deference as long as the SLC was

23   independent, and as long as the SLC conducted its

24   investigation in good faith.  And in many instances, because

25   there's a risk benefit of any time a corporation has to

1    decide whether to bring a lawsuit, there may be many risks

2    in pursuing a lawsuit, including, umm, indemnification

3    requirements, including how much money is really out there,

4    including just the distraction and pain of litigation.  Umm,

5    that is often the case, and indeed in many SLC situations,

6    the SLC does recommend the claims not be brought for some of

7    those same reasons.  I don't think the value of the

8    settlement is frankly relevant to the Courts' decision at

9    this point.  I will say it's historic.  The number of

10   options, despite the vagaries of the market, does not

11   change, the number of options that are relinquished because,

12   Judge Rosenbaum, you asked specifically about the

13   shareholders, umm, there's no question that one of the

14   beneficiaries of options being returned or relinquished will

15   be the shareholders, because what happens is that that is an

16   anti-dilutive of that.

17              JUDGE ROSENBAUM:  Right.

18              MR. CARTER:  In fact I think they are in many ways

19   the primary sharehold -- or the primary beneficiaries.

20   There is the corporation benefits, but the shareholders I

21   think get an extra bang for the buck.

22              We ask that the Court preliminarily approve this

23   settlement.

24              The one thing I do want to alert the Court to is

25   that we do intend to dispute the attorneys' fees at the

1    appropriate time, which we believe to be at the final

2    settlement approval hearing, because there is a number of --

3    fee number that the plaintiffs have put into the notice --

4            JUDGE McGUNNIGLE:  It's a not-to-exceed number.

5            MR. CARTER:  It's a not-to-exceed number.  We've

6    not seen their fee petition to date, but we believe that

7    that number is outrageous.

8            JUDGE ROSENBAUM:  All right.

9            MR. CARTER:  Thank you.

10           JUDGE ROSENBAUM:  Thank you, counsel.  Anyone

11   else?

12           JUDGE McGUNNIGLE:  Anyone else?

13           JUDGE ROSENBAUM:  Have anything further?

14           JUDGE McGUNNIGLE:  No.

15           JUDGE ROSENBAUM:  I thank you.  For my sake, and I

16   appreciate your appearance.  Judge McGunnigle and I, I

17   think, are of a mind to take the matter under advisement.

18           JUDGE McGUNNIGLE:  Yes.  That's what I'm prepared

19   to do.  I also want to express my appreciation for the way

20   this motion was briefed and argued.  I would have expected

21   nothing less from the lawyers, all of whom I know, and many

22   of whom I've had cases against, and so I appreciate, I

23   always appreciate competence and professionalism in the

24   briefing and arguments I have.

25           JUDGE ROSENBAUM:  One of the -- it's been a tough

1    case, but it's been really high quality work.  Great fun to

2    work with.  Thank you very much.  We'll be in recess.

3            MR. BRODSKY:  Your Honor, there is another matter

4    that is just on the federal docket.

5            JUDGE ROSENBAUM:  Yes, that is a question of a

6    release of a, ah, an injunction?  I seem to recall it.

7            JUDGE McGUNNIGLE:  I'll take my leave.

8            JUDGE ROSENBAUM:  I think we'll step off.  You

9    guys can realign yourselves.  And I'll come back in a couple

10   seconds.

11           MR. BRODSKY:  Thank you, Your Honor.

12           (Recess.)

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1                                CERTIFICATE

2

3

4

5       I, Dawn Marie Higby Hansen, do certify that the above

6   and foregoing transcript is a true, correct, and accurate

7   transcription of my stenographic notes taken in the above

8   proceedings.

9

10

11                          s/ Dawn M. H. Hansen
                                Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25