## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IN RE UNITEDHEALTH GROUP
INCORPORATED SHAREHOLDER
DERIVATIVE LITIGATION

Master File No. 06-1216 JMR/FLN

## LEAD PLAINTIFFS' COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR APPROVAL OF AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................................ 1

II.  ARGUMENT ............................................................................................................. 6

    A.   THE FEE REQUEST IS REASONABLE AND APPROPRIATE AND SHOULD BE
        APPROVED BY THE COURT ............................................................................. 6

        1.   LEAD PLAINTIFFS CONFERRED A SUBSTANTIAL BENEFIT ON
            UNITEDHEALTH AND ITS SHAREHOLDERS .......................................... 8

        2.   THE RISKS INVOLVED, THE DIFFICULTY AND NOVELTY OF THE
            ISSUES AND THE SKILL REQUIRED ALL SUPPORT COUNSEL'S FEE
            REQUEST ......................................................................................... 16

        3.   LEAD PLAINTIFFS' COUNSEL PURSUED THIS ACTION ON A
            CONTINGENT BASIS ........................................................................ 22

        4.   LEAD PLAINTIFFS' COUNSEL ARE WELL-RESPECTED ATTORNEYS
            EXPERIENCED IN SECURITIES DERIVATIVE LITIGATION .................... 24

        5.   AWARDS IN SIMILAR CASES SUPPORT THE REASONABLENESS OF
            LEAD PLAINTIFFS' COUNSEL'S FEE REQUEST ................................. 24

        6.   LACK OF SHAREHOLDER OBJECTIONS ............................................. 27

    B.   LEAD PLAINTIFFS' COUNSEL'S EXPENSES WERE REASONABLY INCURRED
        AND SHOULD BE REIMBURSED .................................................................... 27

CONCLUSION ...................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Aetna Inc. Sec. Litig.*,
   MDL No. 1219, 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) ......................25-26

*Allen v. Amalgamated Transit Union*,
   554 F.2d 876 (8th Cir. 1977) ......................................................................................... 7

*In re Apple Computer Sec. Litig.*,
   No. C-84-20148, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ............... 21

*In re Apollo Group, Inc. Sec. Litig.*,
   No. CV 04-2147, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) ................. 21

*In re AremisSoft Corp. Sec. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002) .................................................................................... 25

*In re Autodesk, Inc. S'holder Deriv. Litig.*,
   No. C 06-7185, 2008 U.S. Dist. LEXIS 101015 (N.D. Cal. Dec. 15, 2008) .............. 18

*Behrens v. Wometco Enters., Inc.*,
   118 F.R.D. 534 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990) ....................... 25

*Bosch v. Meeker Coop. Light & Power Assoc.*,
   101 N.W.2d 423 (Minn. 1960) .................................................................................6-9

*In re Cablevision Systems Corp. Options Backdating Litig.*,
   Index No. 06/12743 (Sup. Ct. N.Y.) .......................................................................... 26

*In re Charter Comms., Inc. Sec. Litig.*,
   No. 4:02-CV-1186, 2005 U.S. Dist. LEXIS 14772 (E.D. Mo. June 30, 2005) .......... 25

*City of Pontiac General Employees' Ret. Sys. v. Langone, et al.*,
   No. 2006-cv-122302 (Ga. Sup. Ct. June 10, 2008) ................................................... 26

*In re CNET Networks, Inc. S'holder Deriv. Litig.*,
   483 F. Supp. 2d 947 (N.D. Cal. 2007) ....................................................................... 18

*Cohn v. Nelson*,
   375 F. Supp. 2d 844 (E.D. Mo. 2005) .............................................................. 24, 25, 27

*In re Computer Scis. Corp. Deriv. Litig.*,
   244 F.R.D. 580 (C.D. Cal. 2007) ............................................................................... 18

*DeBoer v. Metton Mortgage Co.*,
    64 F.3d 1171 (8th Cir. 1995) ...................................................................... 27

*Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)........................................................................ 22

*In re Extreme Networks, Inc.*,
    573 F. Supp. 2d 1228 (N.D. Cal. 2008) ...................................................... 18

*In re Finisar Corp. Deriv. Litig.*,
    542 F. Supp. 2d 980 (N.D. Cal. 2008) ........................................................ 18

*Hulliung v. Bolen*,
    548 F. Supp. 2d 336 (N.D. Tex. 2008) ....................................................... 23

*In re InfoSonics Corp. Deriv. Litig.*,
    No. 06cv1336, 2007 U.S. Dist. LEXIS 66043 (S.D. Cal. Sept. 4, 2007) ................... 18

*Johnson v. Georgia Highway Express*,
    488 F.2d 714 (5th Cir. 1974) .................................................................. 7, 8

*Kamen v. Kemper Fin. Servs. Inc.*,
    500 U.S. 90 (1991)..................................................................................... 8

*In re King Res. Co. Sec. Litig.*,
    420 F. Supp. 610 (D. Colo. 1976)............................................................... 21

*Laborers Int'l Union of N. America v. Bailey*,
    No. 07-56461, 2009 U.S. App. LEXIS 1418 (9th Cir. Jan. 23, 2009)....................... 17

*In re Linear Tech. Corp. Deriv. Litig.*,
    No. C-06-3290, 2006 U.S. Dist. LEXIS 90986 (N.D. Cal. Dec. 7, 2006)................... 18

*Maher v. Zapata Corporation*,
    714 F.2d 436 (5th Cir. 1983) .................................................................. 9, 17

*Mills v. Elec. Auto-Lite Co., et al.*,
    396 U.S. 375 (1970)................................................................................. 6-8

*In re MIPS Techs., Inc. Deriv. Litig.*,
    542 F. Supp. 2d 968 (N.D. Cal. 2008) ........................................................ 18

*In re Monster Worldwide, Inc. Deriv. Litig.*,
    No. 06-108700 (Sup. Ct. N.Y.) ................................................................ 26

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................. 26

*In re Openwave Sys., Inc., S'holder Deriv. Litig.*,
    No. C 06-03468, 2008 U.S. Dist. LEXIS 32589 (N.D. Cal. Feb. 12, 2008) .............. 23

*In re PMC-Sierra, Inc. Deriv. Litig.*,
    No. C 06-05330, 2007 U.S. Dist. LEXIS 64879 (N.D. Cal. Aug. 22, 2007) ............. 18

*Risberg v. McArdle*,
    529 F. Supp. 2d 213 (D. Mass. 2008) ......................................................... 18

*In re Rite Aid Corp. Sec. Litig.*,
    362 F. Supp. 2d 587 (E.D. Pa. 2005) ......................................................... 25

*Tandy-crafts, Inc. v. Initio Partners*,
    562 A.2d 1162 (Del. 1989) ........................................................................ 9

*United Handicapped Fed. v. Andre*,
    622 F.2d 342 (8th Cir. 1980) ..................................................................... 9

*In re VeriSign, Inc., Deriv. Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ...................................................... 18

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) ....................................................... 25

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .................................................................. 25

*In re Walt Disney Co. Deriv. Litig.*,
    907 A.2d 693 (Del. Ch. 2005)................................................................... 23

*Winters v. Stemberg*,
    529 F. Supp. 2d 237 (D. Mass. 2008) ......................................................... 23

*In re Xcel Energy, Inc., Secs. Deriv. & "ERISA" Litig.*,
    364 F. Supp. 2d 980 (D. Minn. 2005)......................................................... 16

## STATUTES

Fed. R. Civ. P. 23.1............................................................................... 17

Minn. Stat. § 302A.467 (2008)............................................................... 6

Counsel for the Court-appointed Lead Plaintiffs, Public Employees' Retirement System of Ohio, State Teachers' Retirement System of Ohio, St. Paul Teachers' Retirement Fund Association, Public Employees' Retirement System of Mississippi, Jacksonville Police & Fire Pension Fund, Louisiana Municipal Police Employees' Retirement System, Louisiana Sheriffs' Pension & Relief Fund, Fire & Police Pension Association of Colorado, Connecticut Retirement Plans and Trust Funds, and Jan Brandin ("Lead Plaintiffs"), hereby move for an award of attorneys' fees and the reimbursement of litigation expenses (the "Fee Request") in connection with the prosecution and settlement of this shareholder derivative action.[1]

## I.  PRELIMINARY STATEMENT

Lead Plaintiffs and their counsel successfully prosecuted this action over a period of more than two and a half years and have achieved significant monetary recoveries and corporate governance reforms on behalf of Nominal Defendant UnitedHealth Group Incorporated ("UnitedHealth" or the "Company").  The settlement of this action brings to a successful conclusion this complex litigation which arose out of one of the largest corporate frauds in American history based on current and former UnitedHealth executives backdating billions of dollars in Company stock options.

The settlement, which was reached with the substantial assistance of the Hon. Layn R. Phillips, U.S.D.J. (Ret.), a highly respected mediator with broad experience

---

[1]    Counsel for Court-appointed Lead Plaintiffs are Chestnut & Cambronne, P.A.; Bernstein Litowitz Berger & Grossmann LLP; Grant & Eisenhofer P.A.; Shapiro Haber & Urmy LLP; and Rice, Michels & Walther LLP ("Lead Plaintiffs' Counsel").  This motion is made for the benefit of all plaintiffs' counsel who contributed to the prosecution of this action.

mediating complex commercial cases, is historic.  The value of the Company's monetary recovery achieved in connection with this litigation totaled approximately $900 million at the time the Company announced this settlement on December 6, 2007.  Joint Decl. Ex. A.[2]  The value of the recovery changes based on changes in UnitedHealth's stock price, but at the time of its announcement, and to this day, the monetary recovery on behalf of UnitedHealth is the largest shareholder derivative recovery in history.  Furthermore, Lead Plaintiffs' prosecution of this action resulted in the Company's adoption of wide-ranging and beneficial corporate governance reforms.  *See* Joint Decl. ¶¶54-58.   These achievements were accomplished as a result of the dedication and oversight of Lead Plaintiffs and the unwavering efforts of Lead Plaintiffs' Counsel, who spent immense time and resources, and brought to bear the skill and expertise necessary to achieve these excellent results for UnitedHealth.

As discussed more fully below, this action, which Lead Plaintiffs' Counsel prosecuted on an entirely contingent basis, presented significant risks and challenges to recovery.  The challenges faced by Lead Plaintiffs' Counsel included that UnitedHealth's appointment of a special litigation committee (the "SLC") raised the looming possibility that the SLC would move to dismiss this case without the parties first achieving a recovery on behalf of the Company that Lead Plaintiffs found to be adequate.  Lead

---

[2]   References to "Joint Decl." are to the Joint Declaration in Support of Proposed Settlement of Derivative Action and Award of Attorneys' Fees and Reimbursement of Litigation Expenses, filed concurrently herewith.  The Joint Declaration describes in detail the history of this litigation, the efforts of Lead Plaintiffs' Counsel and the terms of the settlement.

Plaintiffs' Counsel overcame this risk with a successful litigation strategy that involved working cooperatively with the SLC through numerous in-person meetings, telephone conferences and written submissions that helped ensure the parties remained focused on achieving a significant recovery on behalf of UnitedHealth.  An additional risk faced by Lead Plaintiffs came in the form of Defendants' motion to dismiss, which argued that Lead Plaintiffs had failed to adequately plead that demand on the UnitedHealth Board of Directors prior to bringing suit would have been futile (a dispositive issue in derivative litigation). *Id.* ¶34.  Lead Plaintiffs also faced the risk that, since the action arose against individual UnitedHealth executives and directors for damages in the hundreds of millions of dollars, even if Lead Plaintiffs were successful in proving liability, the Defendants might be unable to satisfy a judgment or could dissipate the assets that would eventually form the basis of the action's recovery.

Lead Plaintiffs' Counsel successfully overcame these (and other) significant risks and achieved the recovery in this action through their diligent efforts, which included:

- Bringing to light numerous specific facts regarding the Defendants' misconduct by investigating the complex issues underpinning the initial and amended complaints and retaining and consulting extensively with experts in several important areas, including statistics (concerning the overwhelming likelihood of options backdating at UnitedHealth), damages and corporate governance (*Id.* ¶¶25-27, 29, 32);

- Further developing the facts surrounding the Defendants' misconduct by reviewing, reorganizing and carefully analyzing over 16.4 million pages of documents produced by Defendants, summarizing 65 depositions of UnitedHealth personnel conducted in related litigation, and sharing with the SLC our insights from that review (*Id.* ¶44);

- Placing the burden on Defendants to come forward with facts supporting their lack of liability by filing a motion for partial summary judgment setting forth evidence demonstrating their misconduct (which was pending at the time of the settlement) (*Id.* ¶¶36-38);

- Protecting the interests of the Company by successfully seeking injunctive relief against Defendant McGuire for the creation of a constructive trust holding his backdated options;

- Benefiting UnitedHealth and its shareholders today and in the future by drafting, proposing and negotiating far-reaching corporate governance reforms adopted by the Company that were praised by the SLC (*Id.* ¶¶54-58); and

- Initiating and actively participating in the complex mediation and arbitration process overseen by Judge Phillips over the course of several months that led to the large monetary recovery for UnitedHealth (*Id.* ¶¶51-53).

In addition to the efforts described above, as detailed in the Joint Declaration, Lead Plaintiffs' Counsel also filed a number of motions to compel discovery, successfully opposed motions to intervene in the action filed by non-parties that would have delayed the successful resolution of this action, and filed briefing and argued before the Minnesota Supreme Court in connection with this Court's certification of a question to that court. *Id.* ¶¶41-48, 60-61. Lead Plaintiffs' Counsel spent over 34,737 hours and incurred $803,591.78 in expenses prosecuting this case – time and expenses that Lead Plaintiffs' Counsel knew would not be compensated or reimbursed unless a significant recovery on behalf of the Company was achieved. As compensation for the efforts expended to obtain these outstanding results for the Company, Lead Plaintiffs' Counsel are applying for attorneys' fees and litigation expenses in the amount of $47 million.

The settlement could not have been achieved without the leadership of the Lead

Plaintiffs and the efforts of Lead Plaintiffs' Counsel representing them.  The Fee Request was approved at arm's-length by all Lead Plaintiffs, including nine sophisticated institutional investors with experience as lead plaintiffs in securities class and derivative actions and in retaining and negotiating fees with counsel.  The Lead Plaintiffs have significant shareholdings in UnitedHealth and observed counsel's dedicated efforts to obtain the outstanding recovery.  For instance, the mediation in this action was attended by representatives of a number of these institutions, including the Attorney General of Mississippi on behalf of the Mississippi Public Employees' Retirement System, the Executive Director of St. Paul Teachers' Retirement Fund Association, the General Counsel of the Fire & Police Pension Association of Colorado, and the Ohio Attorney General on behalf of the Public Employees' Retirement System of Ohio and the State Teachers' Retirement System of Ohio.

Counsel for the Company has indicated that Defendants intend to object to Plaintiffs' Fee Request.  Any objection filed by the Company or the Defendants, however, should be considered in light of the following:  (i) the serious misconduct at issue here took place over the course of at least six years; (ii) during that time period, and in the years that followed, the Company and the Defendants failed to stop or disclose the stock option backdating that significantly harmed the Company and benefited Defendants; (iii) not until Lead Plaintiffs filed this litigation did the Company's Board of Directors appoint an SLC to investigate stock option backdating at UnitedHealth; and (iv) not until Lead Plaintiffs filed this action did the Company and Defendants take any steps to re-price or relinquish improperly-granted UnitedHealth stock options, recoup cash and

other monetary benefits from the Defendants and improve the Company's stock option granting practices.

For all of the foregoing reasons and those discussed further below, Lead Plaintiffs' Counsel respectfully request that the Court grant this motion for attorneys' fees and reimbursement of litigation expenses.

## II.  ARGUMENT

### A.  THE FEE REQUEST IS REASONABLE AND APPROPRIATE AND SHOULD BE APPROVED BY THE COURT

An award of attorneys' fees in a shareholder derivative suit is appropriate when the corporation derives a "substantial benefit" from the litigation. *Mills v. Elec. Auto-Lite Co., et al.*, 396 U.S. 375, 395-96 (1970) (citing *Bosch v. Meeker Cooperative Light & Power Association*, 101 N.W.2d 423, 426 (Minn. 1960)).[3]  In *Bosch*, the Minnesota Supreme Court stated:

> We have approved the common-law rule that, where an action brought by a stockholder on behalf of himself and other stockholders, or of the corporation, involving the internal affairs of the corporation, results in a pecuniary benefit to the corporation, attorneys' fees and other expenses incurred by the stockholder in the prosecution of the action are chargeable to the corporation.

---

[3]  *See also* Minn. Stat. § 302A.467 (2008) (stating that if a corporate officer or director violates the Minnesota Business Corporations Act the court may grant just and reasonable equitable relief and award expenses, "including attorneys' fees and disbursements," to the shareholder [bringing an action or aiding in recovery etc.]); Minn. Stat. Ann. § 302A.467 Reporter's Notes - 1981 (West 2004) (reporting that this statute "gives the courts wide discretion in determining the relief to be granted and the situations in which relief should be ordered").

101 N.W.2d 423, 425. In the words of the *Bosch* court: "Since the corporation is the beneficiary of the recovery of funds or of the corrective benefit of the action, it should stand the expense of it." *Id*. at 426.

The Eighth Circuit Court of Appeals has held that the reasonableness of an attorneys' fee award is governed by factors set forth by the Fifth Circuit Court of Appeals in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 719-20 (5th Cir. 1974). *See, e.g., Allen v. Amalgamated Transit Union*, 554 F.2d 876, 884 (8th Cir. 1977). The *Johnson* factors that courts consider are:

> (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee for similar work in the community; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or the circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The undesirability of the case; (11) The nature and length of the professional relationship with the client; and (12) Awards in similar cases.

*Johnson*, 488 F.2d at 719-20 (internal quotations omitted). Not all of the individual *Johnson* factors will apply in every case and courts have discretion as to which factors to apply and the relative weight to assign to each. The *Johnson* factors most relevant to this action are each addressed below. Under *Mills* and *Johnson*, the Fee Request warrants approval by this Court.

### 1.   LEAD PLAINTIFFS CONFERRED A SUBSTANTIAL BENEFIT ON UNITEDHEALTH AND ITS SHAREHOLDERS

There should be no dispute that Lead Plaintiffs' Counsel conferred a substantial benefit on the Company through the prosecution and successful settlement of this action. The *Johnson* factor addressing the "results obtained" is in fact particularly relevant here. The U.S. Supreme Court has defined a "substantial benefit" as "something more than technical in its consequence and one that accomplishes a result which *corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation . . .*" *Mills*, 396 U.S. at 396 (emphasis added); *See also Bosch*, 101 N.W.2d at 366-67. The determination of whether a "substantial benefit" has been achieved is for the trial court to decide, "in light of the facts and circumstances of the particular case." *Bosch*, 101 N.W.2d at 366.

The purpose of a derivative action is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of the 'faithless directors and managers.'" *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 95 (1991). The recovery on behalf of the Company resulting from this litigation—whether valued when certain settlements were reached on December 5, 2007, or more recently—is the largest shareholder derivative recovery not only in the District of Minnesota and the Eighth Circuit but the entire nation.

Moreover, this action has remedied and prevented *ultra vires* stock option backdating by UnitedHealth officers and directors, and Lead Plaintiffs' Counsel are entitled to attorneys' fees for achieving that substantial benefit. As the Fifth Circuit

stated in *Maher v. Zapata Corporation*, "Influencing the future conduct of management may serve the interests of the corporation as fully as a recovery for past misconduct." 714 F.2d 436, 466 (5th Cir. 1983).  And, in the words of the Minnesota Supreme Court, "it would be unrealistic to deny that derivative suits instituted in good faith to correct or prevent misconduct of corporate officers and directors may be of substantial benefit." *Bosch*, 101 N.W.2d at 426.

Lead Plaintiffs' litigation efforts preceded and resulted in substantial benefits for UnitedHealth at various points in time.[4]  Lead Plaintiffs' Amended Complaint, filed September 21, 2006, detailed numerous allegations regarding the Defendants' unlawful scheme to backdate UnitedHealth stock options and included statistical analysis of numerous improper option grants.  Joint Decl. ¶¶25-27, 29, 32.  Those allegations included the improper delegation to McGuire of the ability to grant UnitedHealth stock options, and the conflict of interest resulting from Defendant William Spears (a former member of UnitedHealth's Board of Directors and the head of its Compensation Committee) acting as McGuire's money manager while simultaneously approving McGuire's employment agreement (which granted McGuire millions of backdated stock options).  Joint Decl. ¶¶26-27.

---

[4]  *See United Handicapped Fed. v. Andre*, 622 F.2d 342, 347 (8th Cir. 1980) ("The chronological sequence of events is an important factor in determining whether or not it can be inferred that the defendants guided their actions in response to plaintiffs' lawsuit."); *See also Tandy-crafts, Inc. v. Initio Partners*, 562 A.2d 1162 (Del. 1989) ("Once it is determined that action benefiting the corporation chronologically followed the filing of a meritorious suit, the burden is upon the corporation to demonstrate 'that the lawsuit did not in any way cause their action.'").

On October 15, 2006, as a result of this litigation, UnitedHealth announced that its outside counsel retained to investigate the allegations of stock option backdating at the Company, Wilmer Cutler Pickering Hale & Dorr ("WilmerHale"), had issued a report of its findings. *Id.* ¶33. The report confirmed the factual underpinnings of the Amended Complaint, *i.e.*, that stock options were routinely backdated at UnitedHealth, that Defendant McGuire exercised control over the stock option granting process at the Company and that Defendant Spears had a significant conflict of interest related to his financial dealings with McGuire while serving on the Company's Compensation Committee (including as its Chairman from 1997 to 2004). *Id.*

Also on October 15, 2006, as a further result of this litigation, the Company announced Defendants McGuire and Hemsley had "voluntarily" repriced UnitedHealth stock options granted to them. *Id.* In addition, the Company's October 15 press release announced the departures from UnitedHealth of Defendants McGuire, Spears, and David Lubben (UnitedHealth's former General Counsel and Secretary). *Id.* In the October 15 announcement, the Company announced that it was eliminating all delegated authority to management to make equity awards (as was previously granted to McGuire) and that it was significantly enhancing the Company's approval processes and internal controls related to stock option granting and administration. *Id.* Ex. C.

Lead Plaintiffs were pleased that the Company took steps announced on October 15, 2006 discussed above in response to the litigation, but the remedies did not adequately redress the harm to the Company. UnitedHealth in fact continued to face significant additional risks. Chief among those risks was that McGuire remained in

possession of millions of UnitedHealth stock options that were improperly granted to him and the exercise of those options could harm the Company.  Lead Plaintiffs accordingly continued to pursue, and obtained on November 29, 2006 (along with the lead plaintiff in the federal securities action filed against UnitedHealth, *In re UnitedHealth Group Incorporated PSLRA Litigation,* Master File No. 06-01691 JMR/FLN (the "Federal Securities Action")) an injunction preventing McGuire from exercising his options for an extended period of time.  Joint Decl. ¶¶39-40.

Additional benefits provided by Lead Plaintiffs' prosecution of this litigation resulted from the settlement of claims against Defendants McGuire and Lubben in connection with the mediation initiated by Lead Plaintiffs' Counsel and overseen by Judge Phillips, in which Lead Plaintiffs' Counsel actively participated.  *Id*. ¶14.  The terms of those settlements were announced on December 6, 2007.  The settlement with McGuire included McGuire's agreement to:   (i) surrender stock options to acquire 9,223,630 shares of Company stock valued at $320 million; (ii) surrender his interest in the Company's Supplemental Executive Retirement Plan, valued at $91 million; (iii) surrender approximately $8 million in his Executive Savings Plan account; and (iv) relinquish claims to other post-employment benefits under his employment agreement.  *Id*.  In the press release announcing these terms, UnitedHealth treated these benefits to the Company and the October 15, 2006 option re-pricings as related to one another.  *Id*. Ex. A.  The Company's press release stated:  "These amounts, combined with a previous repricing of all stock options awarded to Dr. McGuire from 1994 to 2002 [announced on

October 15, 2006], results in a *total value* to be relinquished by Dr. McGuire in excess of $600 million." *Id*. (emphasis added).

In the same December 6, 2007 press release, UnitedHealth announced that pursuant to Defendant Lubben's settlement agreement, Lubben would:  (i) surrender to UnitedHealth stock options to acquire 273,000 shares of common stock, which the SLC valued at in excess of $3 million; and (ii) pay to the Company $20.55 million of the compensation realized by him as a result of his March 2007 exercise of UnitedHealth stock options. *Id*. ¶15.  In the press release, UnitedHealth again aggregated the prior re-pricings with the settlement amounts, stating:  "These amounts, combined with a previous repricing of stock options awarded to Mr. Lubben [announced on October 15, 2006] result in a *total value* relinquished by Mr. Lubben of approximately $30 million." *Id*. Ex. A (emphasis added).

The December 6, 2007 UnitedHealth press release concluded by aggregating the total amounts of the December 2007 settlements with the total value of the prior re-pricings:  "The SLC has valued the total amounts to be relinquished pursuant to these settlement agreements together with the value previously and voluntarily relinquished by current and former executives through the surrender and repricing of options, to be *approximately $900 million*." *Id*. (emphasis added).  In other words, even the Company recognized that the October 15, 2006 re-pricings and relinquished options were all a result of this litigation.  After this recovery was announced on December 6, 2007, the market reacted favorably, with UnitedHealth's stock price increasing from an opening price of $54.56 on December 6, 2007, to a closing price in the days that followed of

$58.99 on December 21st, which was more than an 8% increase. Since then, market forces have driven down the prices of securities globally, including those of UnitedHealth, which has decreased the current value of the settlement. As of the close of the market on January 29, 2009, the total value of the monetary recovery was $658 million (Black Scholes)[5] or $718 million (intrinsic). *Id.* ¶20. Despite this decrease in value, at the time of its announcement, and to this day, the monetary recovery on behalf of UnitedHealth is the largest shareholder derivative recovery in history.

In addition to the monetary relief obtained through Lead Plaintiffs' litigation of this case, extraordinary and far-reaching corporate governance reforms have been achieved for the Company as a result of this litigation and through direct negotiations between Lead Plaintiffs' Counsel and counsel for UnitedHealth, Defendants and the SLC. *Id.* ¶¶52-58. During the course of the mediation leading up to the settlement, counsel for Lead Plaintiffs provided the SLC and the Company with memoranda on various legal points and a series of corporate governance proposals Lead Plaintiffs' Counsel prepared in consultation with our expert, which Lead Plaintiffs urged the Company and the Board to adopt. *Id.* Specifically, Lead Plaintiffs had retained and consulted with world-renowned expert in corporate governance, Professor Lucian A. Bebchuk, the William J. Friedman and Alicia Townsend Friedman Professor of Law, Economics, and Finance, and Director of the Program on Corporate Governance at Harvard Law School, in the

---

[5] The Black Scholes option pricing model calculates the present value of a stock option based on specific information about the terms of the option (e.g., the stock price, exercise price and expected term). The intrinsic value of a stock option is determined by taking the excess of the market price over the option exercise price as of a given date.

drafting of Lead Plaintiffs' corporate governance proposals submitted to the SLC and counsel for UnitedHealth.[6]   *Id.* ¶54.   In its report, the SLC praised Lead Plaintiffs' Counsel, their efforts, and their clients' involvement in this action, and pressed the Company to take plaintiffs' corporate governance proposals seriously:

> [T]he SLC … believes that additional steps should be considered to ensure that [UnitedHealth] is, and remains, at the very forefront of corporate responsibility and transparency.  *The institutional plaintiffs in the Federal Derivative Actions, through their counsel, have provided the SLC with a thoughtful and wide-ranging series of proposals aimed at achieving that result.*   The SLC has provided plaintiffs' proposal to the Company and urges the Company's directors and management to give serious consideration to the proposals, and to adopt or to recommend the adoption of those proposals that the Company deems to be in the best interests of [UnitedHealth's] shareholders.

Joint Decl. ¶56 (quoting SLC Report at 30 (citation omitted)) (emphasis added).   These proposals benefited the Company in that, among other things, UnitedHealth was able to use them to negotiate a settlement with the plaintiffs in the Federal Securities Action.  *Id.* ¶58.

The reforms adopted by the Company following initiation of the lawsuit included, among many others, the following:

(i)    The positions of Chairman of the Board and CEO have been separated;

(ii)   The Board initiated a process of electing five new independent

---

[6]  Trained in both law and economics, Professor Bebchuk holds an LL.M. and S.J.D. from Harvard Law School and an M.A. and Ph.D. in Economics from the Harvard Economics Department.   Joint Decl. ¶54.   Professor Bebchuk's research focuses on corporate governance, law and finance, and law and economics, and he has published more than seventy research articles in academic journals in law, economics, and finance.  *Id.*

directors within the next three years;

(iii)    Director independence standards were strengthened to exceed the standards of the SEC and the New York Stock Exchange;

(iv)    Equity awards were discontinued for certain of the Company's most senior and longest-tenured executives;

(v)    The delegation to management of the authority to approve stock option grants to non-executive employees and the delegation to the Chair of the Compensation Committee of the authority to approve stock option grants to executive officers were eliminated;

(vi)    Broad-based equity award grants will be considered once a year, at a Compensation Committee meeting held on the pre-established date of the annual shareholders' meeting;

(vii)    Equity compensation payable to existing directors was reduced by 40% and initial one-time grants of stock options to new directors were reduced by approximately 57%;

(ix)    The Board adopted a clawback policy that subjects 30 senior managers to the clawback of their entire annual and long-term cash incentive payments if any financial restatement (caused in whole or in part by their fraud or misconduct) would have originally caused the executive to have received a lower incentive payment;

(x)    Shareholders have voted in favor of a Board proposal to eliminate from the articles of incorporation supermajority provisions for the removal of directors and for the approval of certain business combinations;

(xi)    UnitedHealth has agreed to a process that will require its Board to approve, subject to its fiduciary duties, a shareowner-nominated candidate to the Board;

(xii)    UnitedHealth agreed to amend its bylaws to provide that if the Chairman of the Board is not an Independent Director, a Lead Independent Director shall be elected annually; and

(xiii)    The Company agreed that no members of its Board may sit on more than three additional public company boards (with an exception for one of its current directors).

*Id.* ¶57. These and numerous additional actions and corporate governance reforms adopted by the Company address, and were responsive to, concerns raised by the Lead Plaintiffs in this action. *Id.*

The parties additionally resolved Lead Plaintiffs' claims against Defendant Spears through a binding arbitration overseen by Judge Phillips. *Id.* ¶59. Both Lead Plaintiffs' Counsel and counsel for the SLC made presentations to Judge Phillips in connection with the Spears arbitration. *Id.* This was reflective of the collaborative manner in which Lead Plaintiffs' Counsel and the SLC worked together. *Id.* The Spears arbitration resulted in a recovery in the amount of $7.25 million for the benefit of the Company. *Id.*

In light of the fact that all of the foregoing measures were taken following the filing of this action and that Lead Plaintiffs' efforts contributed significantly to these results, it is only appropriate to treat the October 15, 2006 re-pricings and corporate governance changes, the McGuire injunction, the December 2007 settlement (including the significant additional corporate governance reforms adopted by the Company) and the Spears arbitration as comprising a combined substantial benefit to the Company that resulted largely from Lead Plaintiffs' efforts. In sum, Lead Plaintiffs' Counsel's efforts in this litigation conferred a substantial benefit on UnitedHealth.

> ## 2. THE RISKS INVOLVED, THE DIFFICULTY AND NOVELTY OF THE ISSUES AND THE SKILL REQUIRED ALL SUPPORT COUNSEL'S FEE REQUEST

As the Fifth Circuit Court of Appeals observed in *Maher v. Zapata Corporation*, shareholder derivative litigation is "notoriously difficult and unpredictable." 714 F.2d at 455, cited by, *In re Xcel Energy, Inc., Secs. Deriv. & "ERISA" Litig.*, 364 F. Supp. 2d

980 (D. Minn. 2005) (Doty, J.).   This case was no exception, and Lead Plaintiffs'
Counsel faced and overcame numerous significant barriers to recovery on behalf of the
Company.

This action was one of the first – if not the very first – options backdating
derivative lawsuits brought after the *Wall Street Journal* exposed the practice of option
backdating in March of 2006.   Joint Decl. ¶10.   Thus, at the time Lead Plaintiffs
commenced this now consolidated action, Lead Plaintiffs' Counsel were litigating in
uncharted territory.   *Id*.   There was no precedent in this area under Minnesota law, or
even under Delaware law.

This action was factually complex and there were serious risks in overcoming
potential legal defenses and in establishing liability and damages.   For instance,
Defendants argued in their motion to dismiss that Plaintiffs had failed to adequately plead
that a pre-suit demand on the Board of Directors would have been futile.[7]   Joint Decl.
¶34.   Numerous courts have dismissed derivative actions arising from alleged stock
option backdating based on the plaintiffs' failure to plead demand futility with
particularity.   *See, e.g.*, *Laborers Int'l Union of N. America v. Bailey*, No. 07-56461, 2009
U.S. App. LEXIS 1418, at *4 (9th Cir. Jan. 23, 2009) (finding plaintiffs "*did not satisfy
their heavy burden of overcoming the presumption of board independence*" because they
had "failed to plead with sufficient particularity that the option grants were approved by

---

[7]  Federal Rule of Civil Procedure 23.1 provides that when a shareholder files a derivative
action seeking to "enforce the right of a corporation," the shareholder must "allege with
particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff
desires from the directors … and the reasons for the plaintiffs failure to obtain the action
or for not making the effort."  Fed. R. Civ. P. 23.1.

or reasonably attributable to a majority of the board members") (emphasis added).[8]  Lead

Plaintiffs encountered and overcame a similar risk of dismissal in this case.[9]

In this action, there was also the looming possibility that the SLC would move to

dismiss this case and preclude Lead Plaintiffs from achieving a recovery on behalf of the

Company that Lead Plaintiffs believed was adequate.  Special litigation committees are

also successful under certain circumstances in staying discovery during the pendency of

their investigations.  In this action, the UnitedHealth Board of Directors appointed the

SLC on June 26, 2006 in response to the initiation of this consolidated derivative action

and the Defendants subsequently moved to dismiss or, in the alternative, to stay this

action during the pendency of the SLC's investigation.  Joint Decl. ¶¶31, 34-35.  Lead

Plaintiffs successfully opposed the motion but that outcome was far from certain.  *Id.*

¶¶34-35.

---

[8]  *See also In re Autodesk, Inc. S'holder Deriv. Litig.,* No. C 06-7185, 2008 U.S. Dist. LEXIS 101015 (N.D. Cal. Dec. 15, 2008); *In re Extreme Networks, Inc.*, 573 F. Supp. 2d 1228, 1242 (N.D. Cal. 2008); *Risberg v. McArdle*, 529 F. Supp. 2d 213, 226 (D. Mass. 2008); *In re Finisar Corp. Deriv. Litig.*, 542 F. Supp. 2d 980 (N.D. Cal. 2008); *In re MIPS Techs., Inc. Deriv. Litig.*, 542 F. Supp. 2d 968 (N.D. Cal. 2008); *In re PMC-Sierra, Inc. Deriv. Litig.*, No. C 06-05330, 2007 U.S. Dist. LEXIS 64879 (N.D. Cal. Aug. 22, 2007); *In re Computer Scis. Corp. Deriv. Litig.*, 244 F.R.D. 580, 591 (C.D. Cal. 2007); *In re CNET Networks, Inc. S'holder Deriv. Litig.*, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007); *In re VeriSign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173 (N.D. Cal. 2007); *In re InfoSonics Corp. Deriv. Litig.*, No. 06cv1336, 2007 U.S. Dist. LEXIS 66043 (S.D. Cal. Sept. 4, 2007); *In re Linear Tech. Corp. Deriv. Litig.*, No. C-06-3290, 2006 U.S. Dist. LEXIS 90986 (N.D. Cal. Dec. 7, 2006).

[9]  In addition, Defendants McGuire and Hemsley argued in response to Lead Plaintiffs' Motion for Partial Summary Judgment that they did not engage in illegal backdating because Minnesota law purportedly permits written actions of directors to be effective on the date specified in the written action, even where the corporate formalities are not completed until later.  Joint Decl. ¶37.  Lead Plaintiffs' motion for partial summary judgment was pending at the time of the settlement and this issue has not been decided.

After the SLC was appointed, counsel for Lead Plaintiffs had the hope that the SLC shared Lead Plaintiffs' mission of safeguarding the interests of, and seeking a significant recovery on behalf of, the Company.  However, it was not clear to Lead Plaintiffs the extent to which the SLC would pursue that goal jointly with Lead Plaintiffs. While simultaneously prosecuting this litigation against the Defendants, Lead Plaintiffs' Counsel opened lines of communication with the SLC to help ensure that the parties remained focused on the issues that mattered most to UnitedHealth and its shareholders – recovering significant sums from the Defendants and reforming the Company's corporate governance practices.  *Id*. ¶50.  Lead Plaintiffs' Counsel accomplished those goals by working collaboratively with the SLC and providing them with detailed information concerning facts uncovered during the course of discovery.  *Id*.  Those facts included information derived from Lead Plaintiffs' Counsel's review of approximately 16.4 million pages of documents.  *Id*. ¶¶44, 50.  As discussed above, Lead Plaintiffs also proposed corporate governance reforms drafted with our expert's assistance, which the SLC recognized as beneficial in the SLC's report, issued on December 6, 2007. *Supra* at page 14.

An additional risk faced by Lead Plaintiffs was the risk that McGuire might dissipate the significant assets that eventually formed part of the significant monetary recovery in this action, or even flee the jurisdiction.  This was not a naïve concern.  For instance, in the lawsuit involving stock option backdating at Comverse Technology, that company's former CEO, Jacob "Kobi" Alexander, fled the jurisdiction to Namibia once claims were filed against him and still remains a fugitive from justice.  In the instant case,

Lead Plaintiffs acted to avert that or similar outcomes that would have left the Company without redress against McGuire by successfully moving to enjoin McGuire from exercising his options during the pendency of this litigation in order to preserve assets that rightfully belonged to the Company.  Joint Decl. ¶¶39-40.

Another significant risk faced by Lead Plaintiffs was the potential that the Defendants might attempt to take certain actions in response to this litigation that would not provide the Company with full and adequate redress, but would, according to Defendants, moot Plaintiffs' claims.  As discussed above, on October 15, 2006, the Company announced certain corporate governance reforms and stock option re-pricings in response to this litigation that were significant, but which failed to adequately remedy the wrongdoing at issue.  Recognizing that those efforts were taken in response to this litigation, yet not satisfied with those steps alone, Lead Plaintiffs continued to litigate their claims and reached a settlement that more than doubled the Company's monetary recovery and significantly increased and improved the corporate governance reforms adopted by UnitedHealth.

Lead Plaintiffs' Counsel successfully overcame the risks involved in Defendants' motion to dismiss and if this action had reached trial, a trial would have imposed significant additional risks and costs on the parties, including the Company.  *See, e,g.,* Chris O'Brien & Jack Davis, *Brocade Legal Costs Jumped as Ex-CEO Fought Criminal Charges*, San Jose Mercury News (Oct. 11, 2007) (stating that Brocade had spent approximately $38.4 million in legal fees in 2007 defending allegations of backdating). It is also clear that even a victory at trial would be no guarantee that the judgment would

ultimately be sustained on appeal.  *See, e.g., In re Apollo Group, Inc. Sec. Litig.*, No. CV 04-2147, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) (finding no loss causation and overturning $277.5 million jury verdict in favor of plaintiffs and granting judgment notwithstanding the verdict to defendants); *In re Apple Computer Sec. Litig.*, No. C-84-20148, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) (overturning $100 million jury verdict in favor of plaintiff and entering judgment notwithstanding the verdict in favor of defendant).  Although the mediated settlement of this action has avoided the expense and risk of trial, Lead Plaintiffs' Counsel would have been prepared to meet the challenges a trial would have presented.

The reputations of defense counsel should also be weighed in determining reasonableness of the requested attorneys' fee, because such standing reflects the challenge faced by Lead Plaintiffs' Counsel.  *See In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976).  Defendants were represented by prominent and well-respected law firms, including, among others, Dorsey & Whitney; Flynn, Gaskins & Bennett; and Latham & Watkins.  Lead Plaintiffs' Counsel also worked with the SLC, whose members—a former Chief Justice and a former Associate Justice of the Minnesota Supreme Court—and its counsel (Kelly & Behrens) are highly regarded in the community.  Lead Plaintiffs' Counsel's ability to obtain the instant settlement by working collaboratively with the SLC and its counsel and arranging and actively participating in a complex mediation involving Lead Plaintiffs and counsel for UnitedHealth, Defendants and the SLC confirms the superior quality of Lead Plaintiffs' Counsel's representation. Joint Decl. ¶¶51-53.

Thus, in this action, while Lead Plaintiffs' Counsel succeeded in obtaining an excellent result for the Company and its shareholders, it cannot be disputed that they incurred substantial risk that the action would be unsuccessful.  This action required considerable skill and experience to successfully conclude, including the investigation and mastery of complex facts, the ability to develop creative legal theories, and the skill to respond to a host of legal defenses.

### 3.   LEAD PLAINTIFFS' COUNSEL PURSUED THIS ACTION ON A CONTINGENT BASIS

Lead Plaintiffs' Counsel undertook this action on a contingent basis, assuming a substantial risk that the action would yield little or no benefit to UnitedHealth.  Courts have consistently recognized that such risk is a key factor in assessing an award of attorneys' fees and the contingent nature of this action supports the Fee Request.  As stated by the Second Circuit in *Detroit v. Grinnell Corporation*:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.  Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

495 F.2d 448, 470-71 (2d Cir. 1974) (internal citation omitted).  The contingent nature of Lead Plaintiffs' Counsel's engagement in the action and the risk of litigation should be given substantial weight by the Court in reviewing the Fee Request.  When Lead Plaintiffs' Counsel undertook this litigation, they were aware that they would devote

many hours of hard work to the prosecution of a difficult case without any assurance of receiving any fees, or even reimbursement for out-of-pocket expenses.

The significant litigation risks Lead Plaintiffs' Counsel undertook in this litigation by prosecuting it on a contingent basis are demonstrated by the negative outcomes in other derivative actions alleging stock option backdating. *See, e.g., Hulliung v. Bolen*, 548 F. Supp. 2d 336, 338 (N.D. Tex. 2008) (dismissing derivative action alleging stock option backdating at Michael's Stores, Inc. for failure to adequately plead proxy violations under Securities Exchange Act of 1934 § 14(a)); *In re Openwave Sys., Inc., S'holder Deriv. Litig.*, No. C 06-03468, 2008 U.S. Dist. LEXIS 32589 (N.D. Cal. Feb. 12, 2008) (holding plaintiffs' allegations and statistical analyses were insufficient to allow a reasonable inference of backdating); *Winters v. Stemberg*, 529 F. Supp. 2d 237, 254 (D. Mass. 2008) (holding derivative action alleging stock option backdating at Staples, Inc. was not time-barred and that plaintiffs had properly alleged demand futility, but that plaintiffs had failed to plead securities fraud with particularity).  The risk of non-payment in contingent-fee derivative litigation is quite real and the requested fee and expense award appropriately reflects such risk.  For example, in *In re Walt Disney Co. Derivative Litigation*, derivative counsel devoted thousands of hours and incurred hundreds of thousands of dollars in expenses in connection with the prosecution of shareholder litigation through trial that resulted in no recovery and thus, no fee award, of any sort.  907 A.2d 693, 779 (Del. Ch. 2005).

### 4.   LEAD PLAINTIFFS' COUNSEL ARE WELL-RESPECTED ATTORNEYS EXPERIENCED IN SECURITIES DERIVATIVE LITIGATION

Lead Plaintiffs' Counsel's Declarations submitted herewith outline the experience and qualifications of the attorneys and their respective firms who worked on the action, the time expended in rendering their services, and the attorneys' standard hourly rates. As the firm résumés attached to the Declarations attest, Lead Plaintiffs' Counsel individually and collectively have decades of experience in representing shareholders in securities class and derivative actions across the country.  The firms are well known for their ability to litigate cases from inception through resolution, including trial.

### 5.   AWARDS IN SIMILAR CASES SUPPORT THE REASONABLENESS OF LEAD PLAINTIFFS' COUNSEL'S FEE REQUEST

It is recognized in this Circuit that a combined "lodestar" and multiplier method is a proper measure of attorneys' fees to be awarded in shareholder derivative litigation. *See, e.g., Cohn v. Nelson*, 375 F. Supp. 2d 844, 862, 866 (E.D. Mo. 2005).  Under the lodestar method of analyzing a fee request, the number of hours counsel worked is multiplied by the standard hourly rate for each professional to derive a "lodestar," which is enhanced "by a risk premium factor or 'multiplier' based on the risk of recovery and other considerations" to arrive at a reasonable fee.  *Id*.  In this case, Lead Plaintiffs' Counsel's total lodestar is $15,669,964.25.  *See* Joint Decl. Ex. D (Compendium of Lead Plaintiffs' Counsel Declarations).  The lodestar is broken down by law firm in the Declarations that each counsel is submitting herewith.  *See id*.  The lodestar represents 34,737.40 hours expended by attorneys and paraprofessionals during the prosecution of

this action and the requested attorneys' fees (excluding expenses) would represent a multiplier of 2.948. *Id.*

The requested multiplier compares favorably with multipliers awarded in other actions. As the Eastern District of Missouri observed, "In shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation." *Cohn v. Nelson*, 375 F. Supp. 2d at 862 (awarding attorneys' fees amounting to a 2.9 multiplier; citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052-54 (9th Cir. 2002) (listing 23 settlements and multipliers for each, in which the average multiplier is 3.28); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990) ("Most lodestar multiples awarded in cases like this are between 3 and 4.")).

The requested multiplier here also compares favorably, by analogy, with attorneys' fee awards in antitrust and securities class actions with significant, multi-million dollar recoveries. Courts in those cases have awarded fees resulting in multipliers from 3 to 5 and even higher. *See, e.g., In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005) (awarding fee equal to multiplier of 6.96 in recovery of $126.6 million); *In re Charter Comms., Inc., Sec. Litig.*, No. 4:02-CV-1186, 2005 U.S. Dist. LEXIS 14772, at *56 (E.D. Mo. June 30, 2005) (awarding 20% of $146 million settlement fund, representing 5.6 multiplier); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003) (3.5 multiplier); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 134-35 (D.N.J. 2002) (4.3 multiplier); *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at *49 (E.D. Pa. Jan. 4, 2001)

(awarding 30% of $82.5 million settlement fund, representing 3.6 multiplier); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 14% of $4.027 billion fund, representing 3.97 multiplier).

In terms of derivative action settlements, the amount of recovery in this case truly stands alone.  The requested attorneys' fees reasonably reflect that fact.  In derivative suits, there is often no monetary recovery for the company involved and the action settles for non-pecuniary benefits only.  Under those circumstances, courts have found that an award of reasonable fees is appropriate.  *See, e.g.*, *City of Pontiac General Employees' Ret. Sys. v. Langone, et al.,* No. 2006-cv-122302 (Findings of Fact in Support of Order and Final Judgment) (Ga. Sup. Ct. June 10, 2008) ($14.5 million attorneys' fees awarded in action resulting in corporate governance reforms which alleged, *inter alia*, stock option backdating at The Home Depot, Inc.) (Joint Decl. Ex. E).  Here, in addition to significant non-monetary benefits, a large monetary recovery has been achieved for the Company. Indeed, the monetary recovery in this action is several times larger than the next largest recoveries in stock option backdating derivative suits to date, which recoveries are themselves significant in their own right.  *See, e.g., In re Cablevision Systems Corp. Options Backdating Litig.*, Index No. 06/12743 (Sup. Ct. N.Y.) (Final Order and Stipulation of Settlement) (partial settlement valued at $34.4 million) (Joint Decl. Ex. F); *In re Monster Worldwide, Inc. Deriv. Litig.*, No. 06-108700 (Sup. Ct. N.Y.) (Final Order and Stipulation of Settlement) (monetary component of partial settlement valued at $32.3 million) (Joint Decl. Ex. G).

### 6.  LACK OF SHAREHOLDER OBJECTIONS

Pursuant to the Preliminary Approval Order in this action, UnitedHealth mailed notice to shareholders and advised them of the terms of the settlement and that Lead Plaintiffs' Counsel would request up to $47 million for attorneys' fees and litigation expenses combined.   Joint Decl. ¶69.   The Notice provided that the deadline for post-marking objections was Friday, January 23, 2009.   *Id.*   As of January 30, 2009, not a single shareholder – whether individual or institutional – has objected to the settlement or the requested attorneys' fees and expenses.   *Id.*   This demonstrates widespread approval of the settlement, the results achieved, and the efforts of Lead Plaintiffs' Counsel.   Courts regard the fact that there are few or no objections to a settlement as an important factor in approving a settlement and awarding fees.   *See DeBoer v. Metton Mortgage Co.,* 64 F.3d 1171, 1178 (8th Cir. 1995) ("The fact that only a handful of class members objected to the settlement . . . weighs in its favor.").

### B.  LEAD PLAINTIFFS' COUNSEL'S EXPENSES WERE REASONABLY INCURRED AND SHOULD BE REIMBURSED

Lead Plaintiffs' Counsel also request reimbursement for the reasonable and necessary expenses that they advanced to prosecute the action.   *See Cohn v. Nelson*, 375 F. Supp. 2d at 866.   These expenses total $803,591.78.   Joint Decl. ¶68.   Each of the expense categories for which reimbursement is sought is appropriate for payment based on the substantial benefit doctrine.

## CONCLUSION

For all of the foregoing reasons, Lead Plaintiffs respectfully request the Court grant the Fee Request, which includes reimbursement of reasonable litigation expenses.


Dated:  January 30, 2009                    CHESTNUT & CAMBRONNE, P.A.

                                       By /s/  Karl L. Cambronne
                                          Karl L. Cambronne #14321
                                          Jack L. Chestnut #16378
                                          Jeffrey D. Bores #227699
                                          3700 Campbell Mithun Tower
                                          222 South Ninth Street
                                          Minneapolis, MN 55402
                                          Telephone: (612) 339-7300
                                          Fax: (612) 336-2940

BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
Chad Johnson
Beata Farber
Adam Wierzbowski
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Fax: (212) 554-1444

SHAPIRO HABER & URMY LLP
Thomas G. Shapiro
Edward F. Haber
Michelle H. Blauner
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Fax: (617) 439-0134

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
Michael Barry
45 Rockefeller Center, 15th Floor
New York, NY 10111
Telephone: (646) 722-8500
Fax: (646) 722-8501

RICE, MICHELS & WALTHER LLP
Brian Rice, #14468X
Ann Walther, #21369X
Karin E. Peterson, #185048
206 East Bridge, Riverplace
10 Second Street Northeast
Minneapolis, MN 55413
Telephone: (612) 676-2300
Fax: (612) 676-2319

*Counsel for Lead Plaintiffs*

KLAUSNER & KAUFMAN, P.A.
Robert D. Klausner
10059 N.W. First Court
Plantation, FL 33323
Telephone: (954) 916-1202
Fax: (954) 916-1232

*Additional Counsel for Jacksonville Police*
*& Fire Pension Fund and Louisiana*
*Sheriffs' Pension & Relief Fund*