| IN RE UNITEDHEALTH GROUP INCORPORATED SHAREHOLDER DERIVATIVE LITIGATION | UNITED STATES DISTRICT COURT DISTRICT OF MINNESOTA Master File No. 06-1216 (JMR/FLN) |
| --- | --- |

| IN RE: UNITEDHEALTH GROUP INCORPORATED DERIVATIVE LITIGATION | HENNEPIN COUNTY DISTRICT COURT Court File No.: 27 CV 06-8085 Honorable George F. McGunnigle |
| --- | --- |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFFS' COUNSEL'S FEE APPLICATIONS

Peter W. Carter
Thomas P. Swigert
Katie C. Pfeifer
Michelle S. Grant
Gretchen A. Agee

DORSEY & WHITNEY LLP
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402
Telephone:  (612) 340-2600

*Attorneys for Defendants Stephen J.
Hemsley, William C. Ballard, Jr., Richard T.
Burke, James A. Johnson, Thomas H. Kean,
Douglas W. Leatherdale, Mary O.
Mundinger, Robert L. Ryan, Donna E.
Shalala, Gail R. Wilensky, Arnold H.
Kaplan, David P. Koppe, Thomas P.
McDonough, Jeannine M. Rivet, Robert J.
Sheehy, R. Channing Wheeler, and Travers
H. Wills*

## INTRODUCTION

As the Courts are well aware, the prosecution of the Derivative Actions,[1] including the factual investigation, legal analysis, mediation, and settlement was led by the statutorily authorized and duly appointed Special Litigation Committee ("SLC").  The Board resolution creating the SLC gave it the "complete power and authority" to conduct this investigation.  Pursuant to that mandate, the SLC and its counsel logged more than 20,000 hours, conducted more than 50 interviews, reviewed tens of millions of pages of documents, and brokered a global settlement of the Derivative Actions.  For these efforts and achievement, the SLC, its counsel and consultants billed UnitedHealth a total of $9.2 million.  In contrast, Plaintiffs' Counsel, who occupied a subordinate and secondary role to the SLC, claim to have expended over *42,000* hours, over twice that of the SLC and its advisers, for which they are seeking an astonishing *$64 million*, seven times that paid for the SLC's efforts.

Defendants do not dispute that the Derivative Actions resulted in a substantial benefit to UnitedHealth and its shareholders.  But it was the SLC, not Plaintiffs' Counsel, who were the drivers of that result.  The contribution by Plaintiffs' Counsel was at the margin of the efforts undertaken in the Actions, and their Fee Applications are not only wildly disproportionate to their role but also harmful to the very persons they were

---

[1]   "Derivative Actions" or "Actions" refer to the federal derivative actions consolidated in the United States District Court for the District of Minnesota ("Federal Action") and the state derivative actions consolidated in the Minnesota District Court for Hennepin County ("State Action").  The term "Plaintiffs' Counsel" refers collectively to counsel in both of the Derivative Actions.  The terms "Federal Counsel" and "State Counsel" refer to the counsel in the Federal and State Actions individually. "UnitedHealth" or the "Company" refers to UnitedHealth Group Incorporated.

seeking to represent, UnitedHealth and its shareholders.  Accordingly, the Courts should

deny the Fee Applications and instead award attorneys' fees commensurate with a

reasonable lodestar calculation and without the application of a multiplier.

## FACTUAL BACKGROUND

The factual background of these Actions is familiar to the Courts and will not be

repeated here.  Instead, Defendants highlight and correct certain misstatements made by

Plaintiffs' Counsel regarding the history of the Derivative Actions and Plaintiffs'

Counsel's involvement therein.

**I.      The Independent Committee Investigation And Resulting Remedial Actions
         Were Not in Response to the Derivative Actions.**

Plaintiffs' Counsel claim that the substantial benefits received by the Company as

a result of the Independent Committee investigation led by Wilmer Cutler Pickering Hale

& Dorr LLP ("WilmerHale") were in fact the result of the Derivative Actions.  Fed.

Counsel Mem. at 10.[2]  The claim is not true.   As recognized by the SLC, the appointment

of the Committee of Independent Directors (the "Independent Committee") on April 4,

2006, was in response to the publication on March 18, 2006, of The Wall Street Journal

article entitled, "The Perfect Payday," and the subsequent notification from the SEC that

it had commenced an informal inquiry.  SLC Report at 4-5.[3]

---

[2]    References to "Fed. Counsel Mem." are to the Lead Plaintiffs' Counsels'
       Memorandum of Law in Support of Motion for Approval of Award of Attorneys'
       Fees and Reimbursement of Litigating Expenses.

[3]    References to "SLC Report" are to the Report of the Special Litigation Committee
       [Docket No. 298].

Upon the Independent Committee's release of its report on October 15, 2006, in which it concluded that many of the Company's option grants to officers and other employees were "likely backdated," UnitedHealth announced that Dr. McGuire and Messrs. Lubben and Spears would leave the Company.  Id. at 27.  The Board and Company management also instituted an aggressive program to strengthen the Company's stock option practices and to improve other compensation and corporate governance policies and procedures.  Id. at 29-30 & App. C.  In addition, several executives voluntarily agreed to reprice their stock options.  Id. at 28-29.  Certain of these actions predated the Independent Committee's report and all of them were taken without any input from or involvement of Plaintiffs' Counsel and were independent of the derivative lawsuit.

## II.     The Fact Investigation, Legal Analysis, Mediation, and Settlement Efforts Were Led by the Special Litigation Committee, Not Plaintiffs' Counsel.

### A.     The SLC'S Investigation

On June 26, 2006, the UnitedHealth Board formed the SLC and appointed to it former Chief Justice of the Minnesota Supreme Court Kathleen A. Blatz and former Minnesota Supreme Court Justice Edward C. Stringer.  SLC Report at 15.  Thereafter, with the assistance of counsel and various consultants, the SLC conducted a comprehensive, fifteen-month investigation.  Id. at 32.  The SLC retained Kelly & Berens P.A. ("Kelly & Berens") as its lead counsel and also retained the law firm Munger, Tolles & Olson LLP to assist with the investigation.  Id. at 17-19.

In addition to legal counsel, the SLC engaged two professors, Lyman P.Q. Johnson and Bradford Cornell, to advise on issues concerning corporate law and

governance and economic and damages issues, respectively.  Id. at 20-22.  The SLC also

engaged Kroll's Litigation Consulting and Forensics practice to assist and advise on

various accounting and other issues.  Id. at 21.

The SLC collected extensive materials, including the documents gathered by the

counsel retained by the Independent Committee and documents requested from and

provided by UnitedHealth, the Company's auditors, and others.  The SLC also acquired

and utilized a copy of the Kroll OnTrack database that had been created by counsel to the

Independent Committee, which included more than sixty-six million pages of electronic

documents.  SLC Report at 33-35.  The SLC and its attorneys independently searched,

reviewed and analyzed both hardcopy and electronic documents during the course of the

investigation.  Id. at 33; Affidavit of The Honorable Kathleen A Blatz ("Blatz Aff.")

[Docket No. 350] at ¶ 19.

The Justices personally reviewed thousands of pages of documents.  They also

prepared for and formally interviewed fifty witnesses, including all named defendants

other than Dr. McGuire and Mr. Lubben; a former Board member; key current and

former employees in the Company's legal, human resources, accounting, finance and

other departments; heads of business segments; and others.  SLC Memo. at 5-6.[4]  The

interviews were thorough, lasting in many cases a full day or longer.  SLC Report at 36.

*Plaintiffs' Counsel did not participate in any of these interviews*.

---

[4]   References to the "SLC Memo" are to the Memorandum of Law of the [SLC] In
      Support of Its Motion for Preliminary Approval and Dismissal [Docket No. 347].

4

In addition to the numerous interviews, the SLC met with attorneys for the parties, and the Company and its insurance carriers. SLC Memo. at 6. The Justices also reviewed written submissions from the parties, consulted with legal and financial experts, and independently reviewed cases and other materials in order to analyze the claims. Id. The SLC also met with several representatives of the SEC and with Dr. Erik Lie, the University of Iowa Professor whose statistical studies were cited in The Wall Street Journal article. Blatz Aff. at ¶ 22.

Altogether, the Justices, Kelley & Berens, and Munger Tolles devoted **over 20,000 hours** of time to the investigation for which they and their consultants billed UnitedHealth a total of $ 9.2 million. Affidavit of Thomas Swigert ("Swigert Aff.") at ¶ 3.

**B.     The Federal and State Court Stays and Plaintiffs' Counsel's Subsidiary Role**

Upon the appointment of the SLC, Defendants moved to dismiss or, in the alternative, to stay the Federal Action pending the outcome of the SLC's investigation. The Federal Court granted the motion to stay by Order dated March 14, 2007. The Federal Court specifically acknowledged the primacy of the duly-appointed SLC, and noted that "when a board properly delegates its authority, courts will defer to the SLC's decision under the business judgment rule." Order at 3 [Docket No. 224]. Although the Order left discovery unaffected, it is clear from the Order that any discovery would be conducted simultaneously with the SLC's work. See id. at 5. Federal Counsel received discovery documents in the Federal Action only after the Court's March 14, 2007 Order,

and with full knowledge of the SLC's investigation.

Defendants in the State Action also moved to dismiss or, in the alternative, to stay the case based in part on the pendency of the SLC's investigation. The State Court granted the motion to stay. See Memorandum Opinion and Order to Stay Proceedings (filed Feb. 6, 2007). While the State Court subsequently allowed document discovery in the State Action to proceed, it directed counsel to coordinate their activities with Plaintiffs' counsel in the Federal Action. Order Amending Stay Order to Permit Limited Discovery (filed June 25, 2007). Thus, State Counsel were also aware of their limited role in the litigation during the SLC's investigation.

## III.   Plaintiffs' Counsel's Extensive and Costly Document Review and Deposition Summaries Did Not Assist the SLC or the Company.

Federal Counsel has provided no breakdown or detail as to how the over 34,700 hours they claimed to have devoted to this matter were spent. Nonetheless, as is apparent from the general narrative description they provide, the vast majority of their time was spent reviewing documents. Plaintiffs' Counsel participated in none of the SLC interviews and the other activities they describe were not time intensive. Their document review efforts were neither reasonable nor necessary.

To begin with, Plaintiffs' Counsel knew that the SLC was conducting its own review of these documents and that their duplicative review was not required to assist the SLC. Moreover, Plaintiffs did not even gain access to the database of the 16.4 million pages of documents they claim to have reviewed until July 2007, *a full year after the SLC was formed* and *after* the SLC had completed its document review and had begun

settlement negotiations.  In fact the documents were made available only a few days before the first mediation session.

In addition, while Plaintiffs' Counsel claim that the document review was "coordinated" among the firms, Joint Decl. ¶ 44,[5] they provide no description of how this was achieved or any other evidence to substantiate that claim.  Given that the Plaintiffs' firms had nearly the same and excessive recorded hours, it is questionable whether there was any coordination at all.

Finally, it appears that the review was conducted by inappropriately expensive counsel.  Firms experienced in complex litigation employ their most junior associates or outside contract counsel to perform extensive electronic document reviews.  Such counsel can typically be retained at $75 to $175 per hour.  Here, it appears that the document review conducted by Plaintiffs' Counsel was performed by far more senior attorneys billing at a blended rate approaching $450 per hour.

Plaintiffs' Counsel's decision to devote countless hours "summarizing 65 depositions of UnitedHealth personnel conducted in [the] related [PSLRA] litigation," Fed. Counsel Mem. at 4, is completely inexplicable given that these depositions did not even begin until January 2008, months *after* the Derivative Actions had been settled *with Plaintiffs' Counsel's approval*.  The fact that Plaintiffs' Counsel would continue to run up significant hours and fees after approving settlements, displays a shocking disregard for the interests of their clients, UnitedHealth and its shareholders.

---

[5]  References to "Joint Decl." are to the Joint Declaration in Support of Proposed Settlement of Derivative Action and Award of Attorneys' Fees and Reimbursement of Litigation Expenses.

**IV.     Plaintiffs' Counsel Played a Minimal Role in the Global Settlement of the Derivative Actions**

Upon completion of its investigatory phase, the SLC began its deliberations and ultimately concluded it would be in the best interests of the Company to attempt to settle some of the derivative claims.  SLC Memo at 7.  To that end, beginning in Summer 2007, the SLC led a mediation of the shareholder derivative claims.  The vast bulk of the negotiations and mediation that occurred over several months involved only the SLC, Judge Phillips and the settling defendants.

The settlement of the Derivative Actions resulted in the following benefits to the Company:

- Dr. McGuire surrendered options with a value that has fluctuated between $419.7 million (intrinsic) as of December 4, 2007 to $93.8 million (intrinsic) as of December 18, 2008; together with his rights under the Company's Supplemental Executive Retirement and Executive Savings Plans, worth 499.4 million;

- Mr. Lubben paid $20.55 million to the Company, relinquished severance benefits of $1.95 million and surrendered options having a value that has fluctuated between $5.5 million (intrinsic) as of December 4, 2007 to $0 (intrinsic) as of December 18, 2008;

- Mr. Spears surrendered options having a value of $7.25 million (Black Scholes) as of December 4, 2007.

Accordingly, the total economic benefit to the Company of these give backs by Dr. McGuire, Mr. Lubben and Mr. Spears has fluctuated between approximately $554 million and $223 million of which only $20.55 million was in cash returned to the Company.  The remainder was in the non-cash value of surrendered options and the

cancellation of the Company's SERP obligations and severance benefits to Dr. McGuire and Mr. Lubben.[6]

Thus, Plaintiffs' Counsel's claim that the Derivative Actions were responsible for producing a benefit to the Company valued variously from $895 million (Black Scholes), Fed. Counsel. Mem. at 12, to $713.9 million (intrinsic), St. Counsel Mem. at 8,[7] is simply incorrect.  The additional sums beyond those obtained through the derivative settlement (described above), are composed of non-cash items recovered through the voluntary repricing and surrender of options by Dr. McGuire, Mr. Lubben and other Company executives that followed the Wall Street Journal article and the Independent Committee review, all of which occurred over a year before the derivative settlement agreements were executed.

## V.     Plaintiffs' Counsel Embellish Their Role In Securing the Corporate Governance Reforms Adopted by the Company

UnitedHealth has adopted numerous corporate governance changes in response to the discovery of problems in its historical options granting practices.  However, as noted, many of these corporate governance changes were adopted in direct response to the report of the Independent Committee and were formulated and adopted without input from Plaintiffs' Counsel.  While at various times during the SLC's investigation, Federal Counsel did urge UnitedHealth to institute additional corporate governance reforms, and

---

[6]   Because the settlement involves the relinquishment of stock options, the value of the settlement changes as the value of UnitedHealth common stock changes.

[7]   References to "St. Counsel Mem." are to the Memorandum of Law in Support of Plaintiffs' Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses.

UnitedHealth had discussions with Plaintiffs' Counsel regarding these proposals, none were included in the terms of the derivative settlement agreements.

The additional corporate governance changes that were adopted by the Company resulted from the settlement of the PSLRA class action. These changes are described in Exhibits C and D to the Stipulation of Settlement in that action dated as of November 12, 2008.[8] These corporate governance changes were the product of substantial and lengthy negotiations between UnitedHealth and the lead plaintiff in the PSLRA action (CalPERS) and their respective counsel. While some of these changes were similar to those proposed by Plaintiffs' Counsel, Plaintiffs' Counsel did not participate in any of these negotiations.

## VI. Plaintiffs' Counsel's Pre-Trial Motion Practice Did Not Confer a Substantial Benefit on the Company.

Plaintiffs' Counsel overstate the benefits achieved for the Company through their pre-trial motion practice. Fed. Counsel Mem. at 4. For example, Federal Counsel did not overcome any significant obstacle and did not achieve any significant benefit for the Company by moving to enjoin Dr. McGuire from exercising his options during the pendency of the litigation. To the contrary, the motion was unopposed by Dr. McGuire and for good reason. Without the injunction, Dr. McGuire was at risk of his options expiring within 90 days of his departure from the Company. Moreover, Dr. McGuire could only have exercised these options with the acquiescence of the Company, which would have been unlikely during the pendency of the Actions.

---

[8]   See Affidavit of Ramzi Abadou in Support of Plaintiffs' Joint Motion for Preliminary Approval, Exhibit A [Docket No. 224].

Similarly, Federal Counsel's time and effort spent filing motions to compel discovery were not productive.  Two of the motions to compel *were denied* and the third motion was unnecessary because Defendants were in the process of complying with the document request when the motion to compel was filed.

## ARGUMENT

Plaintiffs' Counsels' fee requests totaling $64 million are grossly out of proportion to their contribution to these Actions and are unsupported by the law governing such requests.

## I.   PLAINTIFFS' COUNSEL FAILED TO ACT WITH PRUDENCE IN LITIGATING THE DERIVATIVE ACTIONS.

In these Derivative Actions, Plaintiffs stand as a fiduciary to UnitedHealth and its shareholders.  See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 549 (1949) ("[A] stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated."); Bartels v. Newirth, 75 Civ. 5664, 1976 U.S. Dist. LEXIS 13311, at *8 (S.D.N.Y. Sept. 9, 1976) ("[A] derivative plaintiff occupies the position of a fiduciary with respect to the company's shareholders; it is ultimately for their benefit, as well as for the corporation's benefit, that he sues.").  In representing Plaintiffs, Federal and State Counsel shared these fiduciary duties.  See, e.g., Rodriguez v. West Publ'g. Corp., Case No. CV 05-3222 R (MCx), 2007 U.S. Dist. LEXIS 74767, at *44 (C.D. Cal. Sept. 10,

11

2007) (finding in class action context that class counsel must take full account of fiduciary obligations when choosing appropriate course of action).

Thus, in determining what measures to take in litigating the Derivative Actions, Plaintiffs' Counsel had a fiduciary duty to avoid engaging in wasteful or duplicative activities.  See, e.g., Lake Harriet State Bank v. Venie, 138 Minn. 339, 346-47 (Minn. 1917) (stating that corporate fiduciary must act "solely for the benefit of the corporation and its stockholders, and to exercise ordinary business care and diligence to see that its property is not wasted").  It is patently evident Plaintiffs' Counsel failed to do so.

Within three months after the first of the derivative complaints were filed, UnitedHealth appointed the SLC and charged it with "complete power and authority to investigate the Derivative Claim and the claims raised in the Derivative Actions and analyze the legal rights or remedies of the Company and determine whether those rights or remedies should be pursued."  SLC Report, App. B.  UnitedHealth's appointment of the SLC was public, and was well known to Plaintiffs' Counsel.  Indeed, prior to **any** exchange of discovery documents in the Derivative Actions, both the Federal Court and the State Court had acknowledged the primary role of the SLC, staying the Derivative Actions pending the completion of its investigation.  See Order at 3 [Docket No. 224]; Memorandum Opinion and Order to Stay Proceedings (filed Feb. 6, 2007).  Thus, Plaintiffs' Counsel knew their role was subordinate and secondary.

It is difficult to reconcile Plaintiffs' Counsel's fiduciary duties with their Fee Applications.  For example, Plaintiffs' Counsel expended countless hours conducting a document review that was wholly duplicative of the one undertaken by the SLC, and

which occurred *after* the SLC had completed its investigation and had commenced settlement negotiations.  There also is no substantiation to Plaintiffs' Counsel's claim to have "coordinated" their review and it appears to have been conducted by inappropriately expensive counsel.

It is similarly impossible to reconcile Plaintiffs' Counsel's fiduciary duties with their decision to expend an enormous number of hours "summarizing" sixty-five depositions taken in the PSLRA class action, all of which occurred *after* the settlement agreements in the Derivative Actions had been executed, *and approved by Plaintiffs' Counsel.*

Plaintiffs' Counsel undertook this case for the benefit of the Company.  They therefore owed a fiduciary duty to the Company.  They failed to comport their litigation strategy with that duty.  In fact, instead of working in the best interests of the Company, their Fee Applications only erode the substantial benefit to the Company delivered by the Derivative Settlements.  Plaintiffs' Counsel's lack of prudence – which contravenes the interests of those they purportedly sought to benefit – should not be rewarded.  See, e.g., In re Cendant Corp. Litig., 264 F.3d 201, 272 (3d Cir. 2001) (stating that "lead counsel who seek an 'excessive' fee may have breached their fiduciary duties to the class").

## II.     PLAINTIFFS' COUNSEL'S LODESTAR CALCULATION IS UNREASONABLE.

### A.     The Hours Expended and Hourly Rates Are Unreasonable

In addition to failing to fulfill their fiduciary duties, the lodestar figure Plaintiffs' Counsel request is unreasonable.  Under both federal and Minnesota law, the starting

point in determining the reasonableness of the requested fee is to arrive at a lodestar figure by multiplying "the number of hours *reasonably* expended on the litigation" by "a *reasonable* hourly rate."  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (emphasis added); see also Nyman v. Investors Diversified Servs., Inc., No. Civ. 4-75-22, 1981 U.S. Dist. LEXIS 15710, at *3 (D. Minn. Oct. 27, 1981) (using lodestar method in derivative action to assess reasonableness of attorneys' fees requested); Milner Farmers Ins. Exch., 748 N.W.2d 608, 620-621 (Minn. 2008).

The billing evidence submitted by Plaintiffs' Counsel does not enjoy a presumption of reasonableness.  Instead, the district court "bears the responsibility of scrutinizing attorney fee requests."  Johnston v. Comerica Mortg. Corp., 83 F.3d 241, 246 (8th Cir. 1996); see also Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994) ("The task of determining a fair fee requires a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were *usefully and reasonably expended*." (emphasis added)).  The Court must exclude hours not "reasonably expended," as well as "excessive, redundant, or otherwise unnecessary" hours.  Hensley, 461 U.S. at 434; see also Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 173 (2d Cir. 1998).

It is apparent from Plaintiffs' Counsel's submission that a substantial number of the hours expended were unreasonable, excessive, and unnecessary.  Federal Counsel request lodestar amounts of approximately $15 million, reflecting 34,737 hours of purported work.  State Counsel claims a lodestar amount of approximately $3.5 million, reflecting 7,719 hours of alleged work.  These staggering numbers cannot be reconciled

with Plaintiffs' Counsel's limited role in the Derivative Actions.

To begin with, these claimed hours and the resulting fees are twice those expended by the SLC which was charged with and completed a comprehensive investigation. As noted, the SLC, together with its counsel and consultants, conducted a fifteen-month investigation, reviewed millions of pages of documents, interviewed fifty witnesses, attended dozens of conferences, met repeatedly with multiple parties, reviewed written submissions from Plaintiffs and various Defendants, consulted with legal and financial experts, met with representatives of the SEC and with Dr. Erik Lie, and drafted numerous reports and memoranda. By contrast, Plaintiffs' Counsel did not conduct or attend a single interview or deposition during the entire course of the Derivative Actions. The hours spent "summarizing" transcripts of depositions in the PSLRA class action that occurred months *after* the Derivative Actions had been settled are also completely unreasonable.

Moreover, the bulk of Plaintiffs' Counsel's claimed expenditures appear to relate to a review of documents that was duplicative, occurred after the SLC had already completed its review, when settlement negotiations had already commenced. Plaintiffs' Counsel also failed to staff this review properly with junior associates or contract attorneys. In addition, the fact that Defendants produced the bulk of the documents in electronic format should have significantly reduced the number of hours reasonably spent on review because of the ability to conduct targeted searches. See, e.g., Corinthian Mortg. Corp. v. Choicepoint Precision Mktg., LLC, 1:07cv832 (JCC), 2009 U.S. Dist. LEXIS 723, at *24-27 (E.D. Va.

Jan. 5, 2009) (reducing total fee based on inefficiencies in document review where documents were produced in a searchable native format).

Also, although State Counsel was directed "to coordinate access to the documents with Plaintiffs' counsel in the Federal Action," Order Amending Stay Order to Permit Limited Discovery (filed June 25, 2007), there is no evidence of any such coordination. Furthermore, although the various law firms that make up the Plaintiffs' Coordinating Committee were required to comply with certain procedures regarding coordination of effort "to prevent duplicative pleadings or discovery by plaintiffs," Order Designating Lead Plaintiffs and Plaintiffs' Counsel [Docket No. __] (filed July 7, 2006), there is no evidence such procedures were followed.

Plaintiffs' Counsel's duplicative and wasteful efforts are unreasonable and must be excised from the lodestar calculation.  See, e.g., FTR Consulting Group, Inc. v. Advantage Fund II Ltd., 02 Civ. 8608 (RMB), 2005 U.S. Dist. LEXIS 20013, at *18 (S.D.N.Y. Sept. 14, 2005) ("The Court's review of counsel's time records also reveals duplication of effort between the two plaintiff law firms."); Klein ex rel. SICOR Inc. v. Salvi, 02 Civ. 1862 (AKH), 2004 U.S. Dist. LEXIS 4844, at *28-29 (S.D.N.Y. Mar. 30, 2004) (lowering counsel's lodestar in part because of duplication of effort by lead counsel); Nyman, 1981 U.S. Dist. LEXIS 15710, at *6 (reducing lodestar because "it appears that some of the hours recorded were padded and that there was some unnecessary duplication of effort").

Nor is Plaintiffs' Counsel entitled to the billing rate of their choice.  They are only entitled to an hourly rate commensurate with comparably skilled lawyers in the

Minneapolis area.  See Bores v. Domino's Pizza LLC, 2008 WL 4755834, at *5 (D. Minn. Oct. 27, 2008) ("A reasonable hourly rate is the prevailing market rate in the *relevant legal community* for similar services provided by lawyers of comparable skill, experience, and reputation.").  Below are just a few examples of the deficiencies in Plaintiffs' Counsel's Fee Applications as they relate to the claimed hourly rates:

- Federal Counsel's fee application includes charges for hundreds of hours of time billed at $845 and $895 per hour, and hundreds more at $785 per hour. These hourly rates are not commensurate with the prevailing rates in the Minneapolis area.  See, e.g., Bores v. Domino's Pizza LLC, 2008 WL 4755834, at *5 (rejecting rates as high as $480 for a fifth year associate, other rates for attorneys "often at well over $500 per hour," and $800 for a partner as not "in line with those charged by lawyers of similar skill and experience in the Twin Cities area."); In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig., 2008 WL 682174, at *15 (D. Minn. Mar. 7, 2008) (capping attorney hourly rates for Plaintiffs' Lead Counsel Committee in complex multi-district litigation at $400 for attorneys and $150 for paralegals in order to determine an average hourly rate).  By comparison, the maximum rate charged by any of Plaintiffs' Counsel, resident in Minneapolis is $650 per hour.

- Plaintiffs' Counsel also failed to push work down to attorneys with lower and more appropriate billing rates.

  o For example, partners at Federal Counsel Chestnut & Cambronne recorded 6,327.5 hours to the case, more than two and a half times the total hours claimed by their associates, contract attorneys, paralegals, law clerks, and support staff combined (2,437.3 hours). Federal Counsel Rice, Michels & Walther did even worse, reporting a total of 1,732.70 hours, 84% of which were claimed by partners. No associate, counsel, or contract attorney at Rice, Michels recorded a single hour.

  o State Counsel was equally inept at delegation.  For example, State Counsel Gardy & Notis recorded 2,114.71 hours to the case, nearly 60% of which were claimed by partners.  Similarly, partners at State Counsel Faruqi & Faruqi recorded more than twice as many hours as all of their associates and paralegals combined.  In fact, the named partner, Nadeem Faruqi, alone billed more hours than all associates

and paralegals combined.

o Plaintiffs' Counsel's failure to delegate dramatically inflated their average hourly rates.   The blended average hourly rate for ***all*** Federal Counsel is ***$451 per hour***.  The State Counsel's collective average hourly rate is even higher at ***$457 per hour***.

- Federal Counsel's claimed hourly rate for contract attorneys is utterly indefensible.  Shapiro Haber and Urby request ***$510 per hour*** for work done by contract attorneys, an amount that exceeds Federal Counsel Rice, Michels & Walther's billing rate for partners.   Federal Counsel Chestnut & Cambronne and Bernstein Litowitz Berger & Grossmann also claim rates of approximately ***$300 per hour*** for contract attorneys.  These hourly grossly exceed the typical contract attorney rate of $75 to $125 per hour.

- Both Federal and State Counsel seek compensation for non-legal time that is not compensable under the lodestar.  For example, Federal Counsel Chestnut & Cambronne seeks $125 per hour for "support staff," but provide absolutely no explanation for the type of work being done, let alone whether such work was legal in nature.  Similarly, Federal Counsel Grant & Eisenhofer and Bernstein Litowitz Berger & Grossmann ("Berstein") seek $230 per hour for "case managers."  Again, there is no explanation to substantiate these costs.  Finally, State Counsel Robbins Umeda seeks compensation for thousands of dollars for "investigators," "litigation support" and "client relations."  Barring further explanation, none of these are compensable.  See, e.g., Bores, 2008 WL 4755834, at *7 ("Purely clerical or secretarial tasks are not compensable."); see also id. ("[C]ounsel is expected to exercise 'billing judgment,' which in the Court's view does not include seeking reimbursement for *de minimis* tasks.").

Plaintiffs' Counsel has made no attempt to justify their rates and for that reason alone they should be rejected or at least modified.  See, e.g., Bores, 2008 WL 4755834, at *5 n.8 ("Here, Dominos has (inappropriately) opted to dump on the Court the voluminous time records of its counsel, with little explanation concerning the hourly rates charged and even less explanation of the propriety of the hours expended."); see also id. at *6 (chastising counsel for failing to provide adequate information about the background or qualifications of attorneys and paralegals for whose time they sought compensation).

Accordingly, the Court should reject Plaintiffs' Counsel's lodestar figure and instead award a reasonable amount.

**B.    Plaintiffs' Counsel's Efforts Do Not Merit an Upward Adjustment of the Lodestar Figure.**

In addition to seeking an unreasonable lodestar amount, Federal Counsel also request an upward multiplier of 2.948. Fed. Counsel Mem. at 25. Although State Counsel seek a "percentage of fund" recovery, the multiplier yielded by their request is 4.82. St. Counsel Mem. at 10.

Under both Federal and Minnesota law, a multiplier is only justified "in certain 'rare' and 'exceptional' cases," and only when "supported by both 'specific evidence' on the record and detailed findings by the lower courts." Forshee v. Waterloo Indus., Inc., 178 F.3d 527, 532 (8th Cir. 1999) (quoting, Penn v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986)); see also Milner, 748 N.W.2d at 624 ("[A]n upward adjustment of the lodestar amount is warranted only in rare cases of 'exceptional success.'") (quoting Hensley, 461 U.S. at 435). Indeed, a multiplier is only appropriate when plaintiffs can overcome the "strong presumption that the lodestar amount represents a reasonable fee." See, e.g., Milner, 748 N.W.2d at 624.

In order to determine if the lodestar warrants revision, federal courts in Minnesota look to the twelve factors identified in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974). See Ladies Ctr., Nebraska, Inc. v. Thone, 645 F.2d 645, 647 (8th Cir. 1981); In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig. 364 F. Supp. 2d 980, 1003 (D. Minn. 2005); Nyman, 1981 U.S. Dist. LEXIS 15710, at *3 n.1.

These factors include:  the time and labor required; the novelty and difficulty of the

questions; the skill requisite to perform the legal service properly; the preclusion of other

employment by the attorney due to acceptance of the case; the customary fee for similar

work in the community; whether the fee is fixed or contingent; time limitations imposed

by the client or the circumstances; the amount involved and the results obtained; the

experience, reputation, and ability of the attorneys; the undesirability of the case; the

nature and length of the professional relationship with the client; and awards in similar

cases.  Ladies Ctr., 645 F.2d at 647; Nyman, 1981 U.S. Dist. LEXIS 15710, at *3 n.1.  A

review of these factors demonstrates that an upward adjustment is not warranted.

>　　　　　1.　　　Many Of The Johnson Factors Are Already Factored Into the
>　　　　　　　　　Courts' Initial Lodestar Determination.

As several courts have acknowledged, many of the Johnson factors are already

taken into account in the original lodestar calculation.  See, e.g., Blum v. Stenson, 465

U.S. 886, 898-99 (1984) (finding the novelty and complexity of the issues and the quality

of representation are subsumed in the lodestar figure); In re Enron Corp. Sec., Deriv. &

"ERISA" Litig., Civ. Action No. H-01-3624 Consolidated Cases, 2008 U.S. Dist. LEXIS

84708, at *88 (S.D. Tex. Sept. 8, 2008) (finding "the novelty and complexity of the

issues, the special skill and experience of counsel, quality of representation, and the

results obtained from the litigation" are all accounted for by the lodestar figure); Milner,

748 N.W.2d 608, 622 n.11 (holding that the "results obtained" by plaintiff is something

that should be factored into the actual lodestar amount).

Given that factors such as the novelty and difficulty of the questions; the skill requisite to perform the legal service properly; the customary fee for similar work in the community; and the experience, reputation, and ability of Plaintiffs' Counsel are all subsumed in the original lodestar calculation, the Courts should not consider them again when assessing the appropriateness of a multiplier.  See Easley v. Anheuser-Busch, Inc., 758 F.2d 251, 265 n.25 (8th Cir. 1985) (stating that "the court should not engage in 'double counting' by considering essentially the same factors twice to arrive at a total award").

> 2.    The Johnson Factors Taken As A Whole Do Not Establish That This Is A Rare And Exceptional Case Meriting Application Of A Multiplier.

Even including those factors that double-count the lodestar analysis, the majority of the Johnson factors militate against application of a multiplier.

First, the alleged risk of non-recovery and the difficulty and novelty of the issues in the Derivative Actions were not "rare and exceptional."  Indeed, Plaintiffs' Counsel went into this case with much more information than is typical in a derivative action.

For example, Professor Lie's research and its publication in The Wall Street Journal article provided Plaintiffs' counsel an invaluable roadmap and statistical support for their claims as well as useful exposure and media scrutiny.  As courts have observed, this type of negative media exposure puts tremendous pressure on defendants to settle and decreases the risks assumed by plaintiffs' counsel.  See In re Bristol-Myers Squib Sec. Litig., 361 F. Supp. 2d 229, 234 (finding that where "claims were precipitated by public events," the risk undertaken by counsel is especially slight).

21

In addition, early in the Derivative Actions, Plaintiffs' Counsel knew that the SEC was conducting its own investigation of UnitedHealth's stock options grants. Courts have acknowledged that such investigations reduce plaintiffs' counsel's risk. See In re Bausch & Lomb, Inc. Sec. Litig., 183 F.R.D. 78, 87 (W.D.N.Y. 1998) (finding SEC Investigation begun after commencement of securities action "clearly overlapped" and "put additional pressure on [defendant] to settle the case, and would also have given plaintiffs' counsel greater reason to believe that they could prevail."); In re Dreyfus Aggressive Growth Mut. Fund Litig., 2001 U.S. Dist. LEXIS 8418, at *20-21 (S.D.N.Y. June 22, 2001) (finding risk to be low "[t]here was substantial overlap between the government's investigations and the plaintiffs' claims"). Plaintiffs' risk was further minimized early in the litigation when the WilmerHale report, published to the world on October 15, 2006, concluded that many of the Company's options were "likely backdated."

Nor were the factual allegations here unusually difficult for Plaintiffs' Counsel to prove, given the extensive work already performed by Dr. Lie, WilmerHale and the SLC. Dozens of derivative and securities fraud class actions involving allegations of options backdating have been filed, and the Actions here were not the first. Indeed, one of the first such actions was filed over six months before the filing of the instant Derivative Actions.[9] Moreover, as the table below illustrates, Plaintiffs' Counsel's claim that "shareholder derivative suits involve complex claims that have an exceedingly high risk

---

[9]   On August 19, 2005, A securities fraud class action concerning allegations of options backdating was filed against Mercury Interactive Corp.  In re Mercury Interactive Corp. Sec. Litig., No. 5:05-cv-3395-JF (N.D. Cal.).

of being unsuccessful," St. Counsel Mem. at 13-14, Fed. Counsel Mem. at 17, 23, is not

accurate in the context of options backdating cases.  Settlements that achieved a monetary

recovery and/or corporate governance reforms have been obtained in nearly three dozen

options backdating derivative actions:

| | |
|---|---|
| Nabors Industries (2008) | Apple (2008) |
| HCC Insurance Holdings   (2008) | Citrix Systems (2008) |
| Tyson Foods (2008) | McAfee (2008) |
| Monster Worldwide (2008) | Sigma Design (2008) |
| Cheesecake Factory (2008) | Integrated Silicon Solutions (2008) |
| Hansen Natural Corporation (2008) | J2 Global Communications (2007) |
| Jabil Circuit (2008) | SafeNet (2007) |
| KV Pharma (2008) | Molex (2007) |
| Actel (2008) | Dean Foods (2007) |
| Apollo Group (2008) | Sepracor (2007) |
| Cablevision (2008) | McAfee (2007) |
| Electronics for Imaging (2008) | Meade Instruments (2007) |
| Infosonics     (2008) | Rambus (2007) |
| Foundry Networks (2008) | Barnes & Noble (2007) |
| Marvell Technology (2008) | Jabil Circuit (2007) |
| Home Depot (2008) | Research in Motion (2007) |
| Juniper Networks (2008) | Cyberonics (2007) [10] |

---

[10]   The D&O Diary, an online journal dedicated to directors and officers liability issues, maintains a database of derivative and class action settlements relating to stock options backdating.  Links to individual documentation for the listed settlements are available at http://69.177.1.186/clients/blog/optionsbackdatingtable.doc.

Breach of fiduciary duties allegations – which formed the core of the Derivative Actions – are straightforward, and commonplace in derivative actions.  To pursue these causes of action, Plaintiffs' Counsel were not required to master a new or complex area of the law.  To the contrary, these are areas with which an experienced litigator should be quite familiar.  Cf. Denney v. Jenkins & Gilchrist, 230 F.R.D. 317, 352 (S.D.N.Y. 2005), aff'd in part and vacated in part on other grounds by Denney v. Deutsche Bank, A.G., 443 F.3d 253 (2d Cir. 2006) (finding complexity to be a significant factor where "Class counsel had to expend significant time learning the complicated tax shelter business"); see also In re Shell Oil Refinery, 155 F.R.D. 552, 571 (E.D. La. 1993) (finding that the factual evidence on liability issues required consultation on subjects like refinery processes, chemical engineering, corrosion engineering, mechanical engineering, and explosion analysis).

Further, Plaintiffs' Counsel did not have to conduct the type of complex and time-consuming fact investigation normally required to establish liability in a derivative action. In preparing their consolidated complaints, Plaintiffs' Counsel did little more than review publicly available documents.  See generally In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 2007 U.S. Dist. LEXIS 9450, at *52 (S.D.N.Y. Jan. 31, 2007) (finding that fact investigation was not particularly complex where it was "limited largely to [the] review of public documents readily available to counsel, such as 'SEC filings, newspaper articles, internet websites, and previous and current litigations'" (citation omitted)).  The costly and time-consuming investigation necessary to master the facts was performed by The Independent Committee and the SLC and their counsel, at the Company's expense.

24

Neither the risk of non-recovery, nor the difficulty and novelty of the issues here were "rare and exceptional" and accordingly these factors do not warrant the application of a multiplier to the lodestar figure.

The remaining <u>Johnson</u> factors similarly militate against applying a multiplier. First, the amount of time and labor reasonably expended by Plaintiffs' Counsel (as opposed to what they claim) is not exceptional.  In fact, Plaintiffs' Counsel performed significantly less work than required in most class action cases (*e.g.*, they did not conduct even one deposition, produce one expert report or even begin to prepare for trial), and less than the primary entity investigating the matter, the SLC.  Moreover, given the primacy of the SLC's investigation, the reasonable time and labor expended by Plaintiffs' Counsel ***should be*** low.  Based on these circumstances, Plaintiffs' Counsel's time and labor is fully reflected in the reasonable lodestar amount.

Second, given the circumstances surrounding the Derivative Actions, it is difficult to conceive that Plaintiffs' Counsel were precluded from accepting other employment during a majority of the Action.  The State Action was stayed beginning on February 6, 2007. Similarly, the Federal Action was stayed on March 14, 2007.  While both counsel apparently engaged in a review of documents after those dates, the review was largely unnecessary and certainly duplicative.  Moreover, document review is not suitable for senior attorneys billing at high rates and is properly assigned to junior associates and/or contract attorneys.  Cf. <u>Ursic v. Bethlehem Mines</u>, 719 F.2d 670, 677 (3d Cir. 1983) ("A fee applicant cannot demand a high hourly rate . . . and then run up an inordinate amount of time researching that same law. . . .  Nor do we approve the wasteful use of highly skilled

and highly priced talent for matters easily delegable to non-professionals or less experienced associates."). Accordingly, this factor does not support a finding of a "rare and exceptional" case.

Third, the results obtained reflect in part UnitedHealth's sheer size. There is no doubt that the SLC brokered-settlement secured a substantial benefit to UnitedHealth, but the amount of that benefit was driven in large part by the work of the SLC in addition to UnitedHealth's size, the vast number of stock options it had issued throughout the years, and the increase in its stock price. Plaintiffs' Counsel cannot justify an increase in the lodestar figure based on the accomplishments of the SLC and economies of scale that are beyond their control. See, e.g., Rosenbaum v. MacAllister, 64 F.3d 1439, 1448 (10th Cir. 1995) ("[T]he high dollar figures necessarily involved in a corporation of this size cannot justify a multiplier."); cf. In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 339 (3rd Cir. 1998) ("[I]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.") (quoting In re First Fidelity Bancorporation Sec. Litig., 750 F. Supp. 160, 164 n.1 (D.N.J. 1990)).

When accounting for company size, a review of other options backdating cases reveals that these results, while substantial, are not so extraordinary as to warrant a multiplier, especially given the limited role of Plaintiffs' Counsel in their achievement. For example, plaintiffs pursuing a derivative action on behalf of Rambus, Inc., secured

cancellation of $22 million in stock options and $6.5 million in cash.[11]  Rambus,

however, has a market capitalization almost forty times smaller than UnitedHealth.[12]

Thus, an adjustment for size yields comparable numbers of $880 million in cancelled

stock options and $260 million in cash – a result consistent with that achieved in this

case.

Similarly, plaintiffs pursuing a derivative action against McAfee secured

cancellation of two million options valued at approximately $30 million.[13]  But McAfee

is seven and a half times smaller than UnitedHealth, and an adjustment for size yields a

comparable settlement of $225 million in cancelled stock options – a result again

consistent with that achieved in this case.[14]  Likewise, in a derivative action against

Maxim Integrated Products, Inc., plaintiffs secured a settlement valued at approximately

$28.5 million.[15]  After adjusting for the fact that Maxim is eight and a half times smaller

than UnitedHealth, the adjusted settlement value of approximately $242 million is also

---

[11]  See Nominal Defendant Rambus Inc.'s Amended Motion to Terminate Derivative
Litigation Pursuant to the Report of the Special Litigation Committee, In Re Rambus
Inc. Derivative Litigation, No. C-06-3513-JF, Dkt. No. 136 (N.D. Cal. Jan. 9, 2009).

[12]  All market capitalization figures are based on data provided by Yahoo! Finance,
http://finance.yahoo.com (last visited Feb. 3, 2009).  UnitedHealth has a market
capitalization of $35.6 billion, while Rambus has a market capitalization of $921
million.

[13]  See Notice of Motion and Motion for Preliminary Approval of Derivative Settlement
and Memorandum of Points and Authorities in Support Thereof, In re McAfee, Inc.
Derivative Litigation,  No. 5:06-CV-03484-JF, Dkt. No. 119 (N.D. Cal. Oct. 1, 2008).

[14]  McAfee has market capitalization of $4.66 billion.

[15]  See Letter from Michael J. Iannou, In re Maxim Integrated Products, Inc. Derivative
Litigation, No. C-06-3344-JW, Dkt. No. 187 (N.D. Cal.).

comparable to the settlement achieved here.[16]

Fourth, as already noted, Plaintiffs' Counsel's experience, reputation and ability are subsumed in the lodestar figure by the selection of a reasonable hourly rate and cannot serve as a basis for an enhancement absent rare circumstances.  Blum, 465 U.S. at 899 (finding an upward adjustment for experience, reputation, and ability appropriate "only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged").  More starkly, though, the excessive number of hours claims by Plaintiffs' Counsel – especially in light of their limited role in the Derivative Actions – actually militates against an upward adjustment.  See, e.g., Fears v. Wilhelmina Model Agency, Inc., 02 Civ. 4911 (HB), 2005 U.S. Dist. LEXIS 7961, at *24-25 (S.D.N.Y. May 5, 2005), aff'd in part and vacated in part, 473 F.3d 423 (2d Cir. 2007) (stating that this factor "is designed to reward 'particularly resourceful' legal work that 'secures substantial benefit . . . with a minimum of time invested'") (quoting In re "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1296, 1313 (E.D.N.Y. 1985)).  This factor does not support a multiplier.

Fifth, the Derivative Actions were extremely desirable to Plaintiffs' Counsel.  The desirability of the Derivative Actions is no more evident than by looking at the fact that at least *twelve* different derivative suits were filed, and numerous parties sought to be named lead counsel.  Once again, this factor does not support an upward adjustment.

---

[16]   Maxim has a market capitalization of $4.19 billion.

Sixth, Plaintiffs' Counsel has presented absolutely no evidence that they enjoyed a prior professional relationship with their clients, thereby weighing against increasing the lodestar figure.

Seventh, and finally, as for awards in similar cases, there is simply no comparison of the Derivative Actions to other cases in either Minnesota or the Eighth Circuit. Plaintiffs' Counsel were operating at the periphery of and secondary to the SLC, which took the lead in the investigating the allegations and settling the claims.  As such, the most relevant figure here is the SLC's work, or $9.2 million.  Plaintiffs' Counsel's lodestar request alone outstrips that amount by more than double.

Undeterred by the lack of comparable derivative cases, Federal Counsel attempts to justify a lodestar multiplier of 2.948 by comparing it to multipliers in securities class actions with multi-million dollar recoveries. Fed. Counsel Mem. at 24-26.  However, none of the "comparable" cases cited by Plaintiffs' counsel employed the lodestar method to calculate attorneys' fees.  Id. at 26-27.  Instead, each of those decisions involved a common fund of which a percentage was awarded to plaintiffs' counsel.  The lodestar method was only used as a "cross-check" on the fee award.  Moreover, the courts did not actually select the multipliers quoted by Plaintiffs' counsel, they were simply a function of the percentage of the common fund awarded.  Thus, those decisions do not provide a reasonable basis for comparison.  See Guidant, 2008 WL 682174, at *14 ("The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.") (quoting In re Rite Aid Corp., Sec. Litig., 396 F.3d 294, 306 (3d Cir. 2005); Rosenbaum v. MacAllister, 64 F.3d 1439, 1447-48 (10th Cir. 1995) (reversing percentage of fund

award that resulted in 3.16 multiplier and remanding for fee determination based on a full

lodestar analysis).

The only derivative action cited by Plaintiffs' counsel in support of their multiplier

is <u>Cohn v. Nelson</u>, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005), but that case did not

involve an SLC and the fee award was mutually agreed upon by the parties.  Thus, it too

provides no support for Plaintiffs' Counsel's multiplier.  Plaintiffs' Counsel cannot meet

their burden of showing that this was a "rare and exceptional" case warranting an upward

adjustment of the reasonable lodestar calculation.  Rather, the Johnson factors, taken as a

whole, demonstrate that this case was typical of modern derivative litigation.

Accordingly, the Courts should not apply a multiplier to the reasonable lodestar

calculation.

## III.   STATE COUNSEL IS NOT ENTITLED TO A PERCENTAGE OF THE RECOVERY

### A.   State Counsel Did Not Secure a Common Fund For UnitedHealth Shareholders.

State Counsel calculates their $17 million fee request based on the percentage of

recovery method used in common fund cases.  This, however, is not a common fund case,

and the percentage of recovery method is inapplicable.  A vast majority of the benefits

secured for UnitedHealth in these Actions came in non-cash form, including the repricing

and the cancellation of stock options.  Benefits like these do not constitute a common

fund, regardless of whether State Counsel assigns them a monetary value.  <u>See</u> <u>Mills et al.

v. Elec. Auto-Lite Co.</u>, 396 U.S. 375, 394 (1970) ("A successful suit of this type,

resulting in cancellation of the shares, does not bring a fund into court or add to the assets

of the corporation"); Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1326 (9th

Cir. 1999) ("[T]he class did not get a dime in cash.  If it had, this would probably be a

common fund case.  Because the class members got no cash, there was no common fund,

and class members do not pay the fee out of their money.").

Recognizing that there is no "common fund" here, State Counsel retreats to the

argument that the derivative settlement is "analogous to a common fund recovery."  But

neither of the cases cited by State Counsel supports this proposition.  In In re Xcel

Energy, Inc., 364 F. Supp. 2d 980, 1003-04 (D. Minn. 2005), the court did not attempt to

assign a value to the "therapeutic benefits" the derivative plaintiffs secured, nor did it

award a percentage of that recovery.  The court only approved a *negotiated* fee of

$250,000, which was less than half of the $540,452 lodestar figure.

State Counsel's reliance on Hawkins v. Thorp Loan and Thrift Co., 1992 WL

589727 (Minn. Dist. Ct. Feb. 21, 1992), is similarly misplaced.  In Hawkins, plaintiffs'

counsel negotiated a $47,750,000 settlement, which included $17,750,000 in cash and

$30,000,000 in coupons which could be used for future purchases from the defendant.  Id.

at *2.  In assessing the attorneys' fee request, the court found the settlement analogous to

past decisions involving common funds consisting of cash and stock, and calculated the

percentage of recovery based on the combined value of the cash and coupons.  Id. at *9.

The coupons at issue in Hawkins, however, were tangible property with a fixed value and

were indeed contributed to a common fund to be distributed to class members.  Here there

are no "coupons" or any other property with a fixed value being distributed to the class.

Similarly, none of the four stock option backdating cases relied upon by State

31

Counsel found that cancelled or re-priced stock options constituted a common fund.  State App., 9.  In <u>Ryan v. Gifford</u>, 2009 WL 18143 (Del. Ch. Jan. 2, 2009) and <u>In re Apple Computer Inc. Deriv. Litig.</u>, 2008 WL 4820784 (N.D. Cal. Nov. 5, 2008), the derivative settlement amounts relied upon by State Counsel consisted entirely of cash.  And in <u>In re Cablevision Sys. Corp. Options Backdating Litig.</u>, No. 06-12743 (N.Y. Sup. Ct. Sept. 15, 2008) and <u>In re Juniper Deriv. Actions</u>, No. 06-03396 (N.D. Cal. Nov. 10, 2008), the attorneys' fee awards were negotiated between the parties and the courts did not employ a common fund analysis.  Accordingly, there is no precedent and no basis for awarding a fee to State Counsel based on a percentage of recovery theory.

> **B.     State Counsel are Only Entitled to Fees Based on a Reasonable Lodestar.**

As demonstrated by Federal Counsel's fee request, the lodestar method is the proper approach for calculating fees in a "substantial benefit" case like this one, where a vast majority of the benefit to shareholders did not come in the form of a common fund.  <u>See also</u> <u>Milner</u>, 748 N.W.2d at 620-21; <u>Black v. NuAire, Inc.</u>, 426 N.W.2d 203, 212 (Minn. Ct. App. 1988).  Even a cursory analysis of the lodestar figure claimed by State Counsel, Vander Weide Aff., Ex. C-F,[17] reveals that it is, for the reasons outlined in Section III above, entirely unreasonable. Their request for a multiplier is also entirely unjustified.  As a result, their fee request must be substantially reduced.

---

[17]  References to "Vander Weide Aff." are to the Affidavit of Vernon J. Vander Weide in Support of Derivative Plaintiffs' Motion for Final Approval of the Settlement and Application for an Award of Attorneys' Fees and Reimbursement of Expenses.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that these Courts deny the Federal and State Counsels' Fee Applications and award an amount commensurate with a reasonable lodestar calculation and without the application of a multiplier.

Dated:  February 4, 2009                    **DORSEY & WHITNEY LLP**


By:    s/ Thomas P. Swigert
        Peter W. Carter (#0227985)
        Thomas P. Swigert (#0266309)
        Katie C. Pfeifer (#0309709)
        Michelle S. Grant (#0311170)
        Gretchen A. Agee (#0351532)
        50 South Sixth Street, Suite 1500
        Minneapolis, MN  55402-1498
        Telephone:  (612) 340-2600
        carter.peter@dorsey.com