# Exhibit D

LEXSEE



Warning
As of: Feb 04, 2009

CAROLYN FEARS, DONNA GIBBS, CAROL MCILVAINE (a.k.a. CAROL
ALSTON), SHARON SIMON, and TIFFANY CONNOR, on their own behalf and
on behalf of a class of similarly situated persons, Plaintiffs, -against- WILHELMINA
MODEL AGENCY, INC., FORD MODELS, INC., (f.k.a. FORD MODEL
AGENCY), GERARD W. FORD, ELITE MODEL MANAGEMENT, INC., CLICK
MODEL MANAGEMENT, INC., NEXT MANAGEMENT CORP., MFME
MODEL MANAGEMENT CO., LTD. (a.k.a. COMPANY MANAGEMENT), BOSS
MODELS, INC., ZOLI MANAGEMENT, INC., QUE MODEL MANAGEMENT,
DNA MODEL MANAGEMENT, LLC, IMAGES MANAGEMENT, IMG
MODELS, INC., and MODEL MANAGEMENT CORPORATION (f.k.a.
INTERNATIONAL MODEL MANAGERS ASSOCIATION, INC.), Defendants.

02 Civ. 4911 (HB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 7961; 2005-1 Trade Cas. (CCH) P74,783

May 5, 2005, Decided
May 5, 2005, Filed

**SUBSEQUENT HISTORY:** Reconsideration denied by,
Clarified by Fears v. Wilhelmina Model Agency, Inc.,
2005 U.S. Dist. LEXIS 10764 (S.D.N.Y., June 6, 2005)
Affirmed in part and vacated in part by, Remanded by
Masters v. Wilhelmina Model Agency, Inc., 2007 U.S.
App. LEXIS 191 (2d Cir. N.Y., Jan. 4, 2007)

**PRIOR HISTORY:** Fears v. Wilhelmina Model
Agency, Inc., 2004 U.S. Dist. LEXIS 8364 (S.D.N.Y.,
May 4, 2004)

**DISPOSITION:**    The court approved the settlement,
fees and expenses, and residual fund distribution, and the
court retained jurisdiction over the implementation,
enforcement, and performance of the settlement.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff class moved,
pursuant to Fed. R. Civ. P. 23, for approval of a final
proposed settlement, attorneys' fees and expenses, and
distribution of residual funds.

**OVERVIEW:** The final proposed settlement agreement
provided for the creation of a $ 21,855,000 settlement
fund plus interest. The agreement was reasonable. The
case involved an alleged price-fixing scheme in the
modeling industry by some of the industries' most
powerful agencies. The issues were thoroughly
investigated and aggressively litigated. Plaintiffs' success
was never assured and, if the case had continued,
plaintiffs would have had to prove a complex conspiracy
to artificially fix the commission structure in the
modeling industry. Fees were calculated so as to bear a
relationship to funds claimed by class members, rather
than a percentage of the entire fund; to do otherwise

2005 U.S. Dist. LEXIS 7961, *; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

would not only have been inequitable, but might provide an incentive for attorneys to be less aggressive in their attempts to attract class members to submit claims. In applying the Goldberger factors, the court found that a fair and appropriate fee was 17.2 percent of the entire fund, or $ 3,759,583.16. Class counsel was entitled to all claimed expenses. The court applied the cy pres doctrine in determining disposition of residual or unclaimed funds, given adoption of the charitable route for the funds.

**OUTCOME:** The court approved the settlement, fees and expenses, and residual fund distribution, and the court retained jurisdiction over the implementation, enforcement, and performance of the settlement.

**LexisNexis(R) Headnotes**

*Civil Procedure > Class Actions > Compromises*
*Civil Procedure > Class Actions > Prerequisites > General Overview*
*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN1]Pursuant to Fed. R. Civ. P. 23(e), a district court is required to approve any class action settlement once it is shown to be fair, adequate, and reasonable, and not a product of collusion. In making this assessment, courts consider: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN2]There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation, and a strong presumption of fairness attaches to proposed settlements that have been negotiated at arm's length.

*Civil Procedure > Class Actions > Class Counsel > Fees*
*Civil Procedure > Class Actions > Judicial Discretion*
*Civil Procedure > Remedies > Costs & Attorney Fees >*
*Attorney Expenses & Fees > Reasonable Fees*
[HN3]In every class action, there are a number of factors that enter into the court's decision with respect to fees. In particular, a reasonableness assessment requires the court to evaluate: (1) the time and labor expended by counsel, (2) the magnitude of the litigation, (3) the risk of the litigation, (4) the quality of representation, (5) the requested fee in relation to the settlement, and (6) public policy considerations. The ultimate determination of a reasonable fee award is within the district court's sound discretion.

*Civil Procedure > Class Actions > Judicial Discretion*
*Civil Procedure > Remedies > Costs & Attorney Fees >*
*Attorney Expenses & Fees > Reasonable Fees*
[HN4]The first Goldberger factor, and the traditional criteria in determining a reasonable common fund fee, requires consideration of the time and labor expended by counsel.

*Civil Procedure > Class Actions > Judicial Discretion*
*Civil Procedure > Remedies > Costs & Attorney Fees >*
*Attorney Expenses & Fees > Reasonable Fees*
[HN5]Contingency risk and quality of representation must be considered in setting a reasonable fee.

*Civil Procedure > Class Actions > Judicial Discretion*
*Civil Procedure > Remedies > Costs & Attorney Fees >*
*Attorney Expenses & Fees > Reasonable Fees*
*Securities Law > Self-Regulating Entities > National Association of Securities Dealers*
[HN6]In the context of a fee determination, risk must be judged as it appeared to counsel at the outset of the case, when they committed their capital (human and otherwise).

*Civil Procedure > Class Actions > Judicial Discretion*
*Civil Procedure > Remedies > Costs & Attorney Fees >*
*Attorney Expenses & Fees > Reasonable Fees*
[HN7]In the context of a fee determination, the "quality of representation" Goldberger factor is designed to reward particularly resourceful legal work that secures a substantial benefit with a minimum of time invested, or to decrease the objectively determined fee where the

2005 U.S. Dist. LEXIS 7961, *; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

benefit produced does not warrant awarding the full value of the time expended. To determine the quality of the representation, courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit. It is also reasonable to give some weight to the quality of opposing counsel.

*Civil Procedure > Class Actions > Judicial Discretion*
*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN8]In the context of a fee determination, the court is obligated to review the quality of plaintiffs' counsels' representation, and that review must eschew any rubber stamp approval, put another way, attorneys' conduct throughout the litigation must be factored into the quality of representation analysis.

*Civil Procedure > Class Actions > Judicial Discretion*
*Civil Procedure > Settlements > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
[HN9]Attorneys' fee awards should not dwarf funds claimed by class members.

*Civil Procedure > Class Actions > Class Action Fairness Act*
*Civil Procedure > Class Actions > Class Counsel > Fees*
*Securities Law > Liability > Private Securities Litigation > Attorney Fees*
[HN10]Attorneys' fees in class actions are to be crafted so as to be related to the claims filed.

*Civil Procedure > Class Actions > Judicial Discretion*
[HN11]Use of the cy pres doctrine depends, among other considerations, on the type of individual that makes up the class and the degree of difficulty in identifying the next best use.

*Civil Procedure > Class Actions > Compromises*
*Civil Procedure > Class Actions > Judicial Discretion*
*Estate, Gift & Trust Law > Trusts > Charitable Trusts*
[HN12]The cy pres doctrine developed in the context of testamentary charitable trusts. Where a trust would otherwise fail, a court would attempt to fulfill the testator's charitable intent as near as possible. The same basic notion is now employed in class action settlements.

**COUNSEL:** For Simon Beardmore, Szuzanna Boros, Thomas Bradley, Jennifer Curran, Valarie Gardano, Bill Goins, Plaintiffs: Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Andrew Hayes, Boies, Schiller & Flexner LLP(Westchester), Armonk, NY; Neville L. Johnson, Johnson & Rishwain, L.L.P., Los Angeles, CA; Eugene A. Spector, Spector, Roseman & Kodroff, Philadelphia, PA.

For Boss Models, Inc., Defendant: Judah S. Shapiro, Judah S. Shapiro, Attorney at Law, New York, NY; Ravi Ivan Sharma, Ravi Ivan Sharma & Associates, New York, NY.

For Barbara Cheeseborough on own behalf and on behalf of a class of similarly situated persons, Plaintiff: Eugene A. Spector, Spector, Roseman & Kodroff, Philadelphia, PA.

For Click Model Management, Inc., Defendant: Joseph A. D'Avanzo, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY; Aaron Richard Golub, New York, NY; Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.,New York, NY.

For Tiffany Connor, Defendant: Jeffrey J. Corrigan, David Felderman, John Macoretta, Eugene A. Spector, Spector, Roseman & Kodroff, Philadelphia, PA; Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., New York, NY.

For DNA Model Management, LLC, Defendant: Joseph A. D'Avanzo, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY; Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.,New York, NY.

For Elite Model Management, Inc., Defendant: Barry J. Brett, Jenkens & Gilchrist Parker Chapin, LLP, New York, NY; Edward R. Curtin, Edward R. Curtin, P.C., New York, NY; Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.,New York, NY.

For Carolyn Fears on own behalf and on behalf of a class of similarly situated persons, Plaintiff: Jeffrey J. Corrigan, John Macoretta, Eugene A. Spector, Spector, Roseman & Kodroff, Philadelphia, PA; Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Ann Moriarty Galvani, Andrew Hayes, Paul R. Verkuil, Boies, Schiller & Flexner LLP(Westchester), Armonk, NY; Neville L. Johnson, Johnson & Rishwain, L.L.P.,

2005 U.S. Dist. LEXIS 7961, *; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

Los Angeles, CA; Brian Rishwain, Johnson & Rishwain, L.L.P., Los Angeles, CA.

For Carolyn Fears, Plaintiff: Brian Rishwain, Johnson & Rishwain, L.L.P., Los Angeles, CA.

For Edmund Flory, Amy Haberman, Consol Plaintiffs: Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Andrew Hayes, Boies, Schiller & Flexner LLP (Westchester), Armonk, NY; Neville L. Johnson, Johnson & Rishwain, L.L.P., Los Angeles, CA; Linda P. Nussbaum, Susan R. Schwaiger, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, NY; Eugene A. Spector, Spector, Roseman & Kodroff, Philadelphia, PA.

For Gerard W Ford, Ford Models, Inc., Defendants: Stuart E. Abrams, Sandor Frankel, M. Breeze McMennamin, Frankel & Abrams, New York, NY; Joseph A. D'Avanzo, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY; Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., New York, NY; Kenneth Richard Logan, Simpson Thacher & Bartlett LLP (NY), New York, NY; Richard Marc Steuer, Mayer Brown Rowe & Maw LLP(Chicago), Chicago, IL; Mitchell M. Wong, Mayer, Brown, Rowe & Maw, New York, NY.

For Donna Gibbs, Sharon Simon, Plaintiffs: Jeffrey J. Corrigan, David Felderman, John Macoretta, Eugene A. Spector, Spector, Roseman & Kodroff, Philadelphia, PA; Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Andrew Hayes, Boies, Schiller & Flexner LLP(Westchester), Armonk, NY; Neville L. Johnson, Johnson & Rishwain, L.L.P., Los Angeles, CA; Linda P. Nussbaum, Susan R. Schwaiger, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, NY; Brian Rishwain, Johnson & Rishwain, L.L.P., Los Angeles, CA.

For Carla Gross on own behalf and on behalf of a class of similarly situated persons, Justin Klentner on own behalf and on behalf of a class of similarly situated persons, Plaintiffs: Eugene A. Spector, Spector, Roseman & Kodroff, Philadelphia, PA.

For IMG Models, Inc., Defendant: Joseph A. D'Avanzo, Fred N. Knopf, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY; Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.,New York, NY.

For Images Management, Defendant: Joseph A. D'Avanzo, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY; Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.,New York, NY; Daniel J. Kornstein, Kornstein, Veisz & Wexler, L.L.P., New York, NY.

For Shoemaker Laura, Eleanora Miller, Virginia Nelson, Alicia Pine, Anne Rogan, Angela Shelton, Todd Snyder, Hillary Sway, Monica Walker, Plaintiffs: Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Andrew Hayes, Boies, Schiller & Flexner, Armonk, NY; Neville L. Johnson, Johnson & Rishwain, L.L.P., Los Angeles, CA; Eugene A. Spector, Spector, Roseman & Kodroff, Philadelphia, PA.

For Amanda Masters on her own behalf and on behalf of a class of similarly situated persons, Lorelei Shellist on own behalf and on behalf of a class of similarly situated persons, Plaintiffs: Eugene A. Spector, Spector, Roseman & Kodroff, Philadelphia, PA.

For Model Management Corporation, Defendant: Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., New York, NY; Richard Marc Steuer, Mayer Brown Rowe & Maw LLP(Chicago), Chicago, IL; Mitchell M. Wong, Mayer, Brown, Rowe & Maw, New York, NY.

For Next Management Company, Defendant: Joseph A. D'Avanzo, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY; Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., New York, NY; David Jaroslawicz, Robert Joseph Tolchink, Jaroslawicz & Jaros, New York, NY.

For Thomas Preston, Consol Plaintiff: Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Andrew Hayes, Boies, Schiller & Flexner, Armonk, NY; Neville L. Johnson, Johnson & Rishwain, L.L.P., Los Angeles, CA; Linda P. Nussbaum, Susan R. Schwaiger, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, NY; Eugene A. Spector, Spector, Roseman & Kodroff, Philadelphia, PA.

For Q Model Management, Defendant: Joseph A. D'Avanzo, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY; Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., New York, NY; Daniel J. Kornstein Kornstein, Veisz & Wexler, L.L.P., New York, NY.

For The MFME Model Management Company, Ltd., Defendant: Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., New York, NY.

For Wilhelmina Model Agency, Inc., Defendant: Joseph A. D'Avanzo, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, NY; Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., New York, NY; Sandor Frankel, Frankel & Abrams, New York, NY; Aaron Richard Golub, New York, NY.

For Zoli Management, Inc., Defendant: Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., New York, NY.

**JUDGES:** [*1] Hon. HAROLD BAER, JR., U.S. District Judge.

**OPINION BY:** HAROLD BAER, JR.

**OPINION**

**OPINION & ORDER**

**Hon. HAROLD BAER, JR., District Judge:** [1]

1    The Court assumes familiarity with the facts and allegations as set forth in Fears v. Wilhelmina Model Agency, Inc., 2004 U.S. Dist. LEXIS 8364, No. 02 Civ. 4911, 2004 WL 1065543 (S.D.N.Y. May 11, 2004) (Pitman, J.) (sanctions); Fears v. Wilhelmina Model Agency, Inc., 2004 U.S. Dist. LEXIS 4502, No. 02 Civ. 4911, 2004 WL 594396 (S.D.N.Y. Mar. 23, 2004) (Baer, J.) (summary judgment); Fears v. Wilhelmina Model Agency, Inc., 2003 U.S. Dist. LEXIS 11897, No. 02 Civ. 4911, 2003 WL 21659373 (S.D.N.Y. Jul. 15, 2003) (Baer, J.) (class certification); Masters v. Wilhelmina Model Agency, Inc., 2003 U.S. Dist. LEXIS 8060, No. 02 Civ. 4911, 2003 WL 21089073 (S.D.N.Y. May 13, 2003) (Pitman, J.) (strike opposition to class certification); Masters v. Wilhelmina Model Agency, Inc., 2003 U.S. Dist. LEXIS 7143, No. 02 Civ. 4911, 2003 WL 1990262 (S.D.N.Y. Apr. 29, 2003) (Baer, J.) (motion to dismiss); Masters v. Wilhelmina Model Agency, Inc., 2003 U.S. Dist. LEXIS 698, No. 02 Civ. 4911, 2003 WL 145556 (S.D.N.Y. Jan. 17, 2003) (Baer, J.) (motion to dismiss); and will not repeat them here.

[*2] Following the December 20, 2004 Fairness Hearing, Plaintiffs move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for: (1) approval of the final proposed settlement, including incentive awards and distribution to claimants; (2) attorneys' fees and expenses; and, (3) distribution of residual funds. For the following reasons, Plaintiffs' motion is GRANTED in-part and DENIED in-part.

**I. SETTLEMENT APPROVAL**

**A. LEGAL STANDARD**

[HN1]Pursuant to Fed. R. Civ. P. 23(e), a district court is required to approve any class action settlement once it is shown to be "fair, adequate, and reasonable, and not a product of collusion." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005). In making this assessment, courts consider:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class [*3] action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and,] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Wal-Mart Stores, 396 F.3d at 117 (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974)). In addition, [HN2]"there are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation," Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982), and "a strong presumption of fairness attaches to proposed settlements that have been negotiated at arm's length." Thompson v. Metro. Life Ins. Co., 216 F.R.D. 55, 61 (S.D.N.Y. 2003) (Baer, J.); see also Denney v. Jenkens & Gilchrist, 2004 U.S. Dist. LEXIS 26041, No. 03 Civ. 5460, 2005 WL 388562, at *8 n.75 (S.D.N.Y. Feb. 18, 2005).

2005 U.S. Dist. LEXIS 7961, *3; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

## B. SETTLEMENT APPROVAL

### 1. Terms of the Settlement

The final proposed Settlement Agreement ("Agreement") [*4] provides for the creation of a $ 21,855,000 Settlement Fund ("Fund") plus interest, to be paid collectively by the "Settling Defendants," [2] and injunctive and equitable relief set forth in the Agreement and this Court's February 15, 2005 Order. (Dckt. 452). In addition, as part of its plan of reorganization, Elite Model Management, Inc. will contribute to the Fund in an amount comparable to the settlement amounts paid by defendants of similar size, culpability and financial resources (the "Elite Settlement"). See In Re EMMC, No. 04-10845 (Bankr. S.D.N.Y. 2004). [3]

> 2    The term, "Settling Defendants," include Boss Models, Inc., Click Model Management, Inc., DNA Model Management, LLC, Ford Models, Inc., Gerard Ford, Images Management, IMG Models, Inc., Next Management Co., Wilhelmina International Ltd., and Zoli Management, Inc.
>
> 3    Elite New York's reorganization plan (the "Reorganization Plan") provided "that in satisfaction of each Class 4 Model Litigation Claim, the Model Representative shall be deemed to have an allowed unsecured claim of $ 2,575,000, and shall receive its pro rata share of distributable cash on account of such claim, provided that the amount of the Allowed Model Claim will be reduced by the allowed amounts of claims asserted by Elite S.A. and Alan Kittler, the president of Elite, S.A. Based upon an estimated distribution of between 50-60% on account of allowed unsecured claims, it is anticipated that the Model Representative will receive a cash distribution on Account of the Allowed Model claim of between $ 847,000 and $ 1,673,750." (Ltr. from Eckstein, Att'y for Elite Model Mgm't Corp., to Judge Baer, dated Mar. 29, 2005.) In the Confirmation Order, In re EMMC, No. 04-10845, at *12 (Bankr. S.D.N.Y. Apr. 8, 2005), Judge Drain "concluded that the proposed settlement [], pursuant to [Federal Rule of Bankruptcy Procedure] 9019, between the Debtor and . . . (b) the Holders of the Model Litigation Claims . . . are fair, reasonable and in the best interest of the Debtor's estate and creditors." Accordingly, "when Elite settled as part of its plan of

reorganization," it agreed to contribute to the fund in an amount "comparable with the amounts paid to settle the Fears Action by other defendants in that action," and, thus, it would increase the total settlement fund of $ 21,855,000. With regards to the Elite, New York's contribution, while review of the substantive fairness of the settlement between plaintiffs and Debtor is unnecessary in accordance with Judge Drain's Confirmation Order and Fed. R. Bank. P. 9019, the Elite, New York Reorganization Plan provides that this Court shall approve and direct the allocation of the proceeds of the Elite, New York settlement among the plaintiffs in the Fears action.

[*5] The non-monetary portion of the Agreement may prove more valuable to the models than the monetary settlement and should not be overlooked in any analysis of the success of this lawsuit. In particular, the Agreement provides for a more transparent process between settling model and agent, not only for these claimants, or even the class, but also for all those men and women who enter the modeling profession through contracts with the Settling Defendants:

> For a period of ten years from the date the Court enters the Final Judgment Order for the Settling Defendant, each of the Settling Defendants . . . will disclose to any and all Settling Defendant's all compensation received by it on all bookings made for that model, including but not limited to, the service charge(s), mother agent fee(s), the gross fee received for the booking, and any other charge(s) or deduction(s) from the model's compensation.

Agreement, P B.7(c). To ensure an expedited and inexpensive resolution of model contract disputes, the Agreement creates an alternative dispute resolution mechanism that will be incorporated into all model contracts:

> From the date the Court enters the Final Judgment [*6] Order for the Settling Defendant, each of the Settling Defendants . . . will include in its contracts with models an initial alternative dispute resolution procedure of non-binding mediation (no longer than three (3) hours

2005 U.S. Dist. LEXIS 7961, *6; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

[in] duration, unless agreed to the contrary in writing), to try to resolve disputes regarding the interpretation of, or the parties' obligations under, the contracts, with the fees of the mediator to be borne equally by the parties to the mediation, except that Next Management Co., Ford Model Management, LLC, Images Management and Zoli Management, Inc. shall pay up to $ 1,000, with any fees in excess of that amount to be shared equally by the parties, and with both parties paying their own attorneys' fees and costs, provided that nothing shall limit the ability of the parties to include additional dispute resolution procedures in those contracts; other traditional remedies are not obviated by this provision.

Agreement, P B.7(e). Models will also be provided with clear notice of the percentage commission charged by the Settling Defendants:

> For a period of ten years from the date the Court enters the Final Judgment Order for the Settling Defendant, [*7] each of the Settling Defendants . . . during the negotiation of any oral Model Contract or written Model Contract . . ., will advise its models that the percentage commission charged the models on bookings for them (as a contractual term) is a negotiable term.

Agreement, P B.7(f).

Class members are a notoriously peripatetic group. Consequently, to ensure proper administration of the Agreement, following Court approval of the Agreement, the Court appointed claims administrator, Hefler, Radetich & Saitta (the "Claims Administrator"), will maintain a record of payments to class members, including whether checks have been cashed. (See Ltr. from Hayes, Att'y for Pl., to Judge Baer, dated Apr. 5, 2005.) In particular, the Claims Administrator will maintain a database that contains all relevant information about each claimant, including name, address, tax identification number, amount of claim, and the claimants former agency. To ensure receipt of payment, each un-cashed check will "be traced back to a particular claimant" and "if a check has not been cashed after three

months, the Administrator will check the address again and send the claimant a reminder." (Ltr. from Hayes, [*8] Att'y for Pl., to Judge Baer, dated Apr. 13, 2005.) After a reasonable time, if the Claim Administrator's reminder fails, and the claimant has not deposited the funds, "the claimant will be contacted by phone to see if he or she has moved, has been traveling abroad, has been unable to check mail, lost the check, or something else." Id. If all else fails, and the claimant fails to cash payment, "the Administrator will also use a claimant's social security number to trace a potential change of address." Id.

To ensure proper payment of claims, Class counsel will also "submit periodic reports to the Court on the administration of the Settlement, including receipt of final payments from each settling defendant . . . any appeals, and any further submissions from class members who did not file timely claims." (See Ltr. from Hayes, Att'y for Pl., to Judge Baer, dated Apr. 5, 2005.) This is not without cost. To date, the Claims Administrator has incurred $ 25,000 in expenses, and has estimated an additional $ 50,000 to $ 75,000 in reimbursable fees and expenses related to the distribution of funds, tracking the issuance and deposits of checks to class members, and preparation of [*9] interim and final reports. (See Ltr. from Hayes, Att'y for Pl., to Judge Baer, dated May 2, 2005.)

### 2. Incentive Awards

The Agreement also provides for the distribution of the Fund on a pro rata basis to general class members. The Agreement includes incentive awards in the amount of $ 25,000 for each named plaintiff who was deposed (Carolyn Fears and Tiffany Connor), and $ 15,000 for each trial witness (Sheila Johnson and Mary Anne Fletcher) and each class representative (Donna Gibbs, Ann Rogan, Monica Walker, Carol Alston, Laura Shoemaker, Rachel Shea, Sharon Simon, and Angela Shelton). See Denney v. Jenkens & Gilchrist, 2004 U.S. Dist. LEXIS 26041, No. 03 Civ. 5460, 2005 WL 388562, at *31 n.248 (S.D.N.Y. Feb. 18, 2005); RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 2003 U.S. Dist. LEXIS 8239, No. 94 Civ. 5587, 2003 WL 21136726, at *2 (S.D.N.Y. May 15, 2003) (" $ 25,000 incentive award requested for [Plaintiff] is reasonable"). The amount of the incentive award is related to the "personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit."

Dornberger v. Metro. Life Ins. Co., 203 F.R.D. 118, 124 (S.D.N.Y. 2001); [*10] see Sheppard v. Consol. Edison Co. of N.Y., Inc., 2002 U.S. Dist. LEXIS 16314, No. 94 Civ. 403, 2002 WL 2003206, at *6 (E.D.N.Y. Aug. 1, 2002) (citing cases approving incentive awards ranging from $ 336.00 to $ 303,000, with most awards being in the $ 10,000 to $ 50,000 range).

### 3. Overall Agreement Approval

This case involves an alleged price-fixing scheme in the modeling industry by some of the industries' most powerful agencies. The issues were thoroughly investigated and aggressively litigated. Plaintiffs' success was never assured and, if the case had continued, plaintiffs would have had to prove a complex conspiracy to artificially fix the commission structure in the modeling industry. See, e.g., In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003) ("The complexity of federal antitrust law is well known"). Settlement negotiations were conducted over months, at arm's length, and between experienced and skilled attorneys with frequent pretrial conferences and motion practice.

Based on all these findings, the Agreement is reasonable.

## II. ATTORNEYS' FEES

### A. FUNDS AVAILABLE vs. FUNDS CLAIMED

[*11] Before determining the appropriate attorneys' fees, it is important to determine whether class counsel are entitled to a fee award based on Funds claimed or the Funds available. Currently, there is a split in the circuits "on how to deal with the arguable necessity of a rational connection between the size of the actual distribution to the class and the amount of requested attorneys' fees." In re Arakis Energy Corp. Sec. Litig., 2001 U.S. Dist. LEXIS 19873, No. 95 Civ. 3431, 2001 WL 1590512, at *15 (E.D.N.Y. Oct. 31, 2001).

The Ninth Circuit, in Williams v. MGM-Pathe Commun. Co., 129 F.3d 1026 (9th Cir. 1997), and the Eleventh Circuit, in Waters v. International Precious Metals Corp., 190 F.3d 1291 (11th Cir. 1999), have held that attorneys' fees should be calculated as a percentage of the total fund, [4] however, decisions within this Circuit prohibit the "allowance of attorneys' fees in an amount greater than the sum actually claimed by the class." In re

Arakis, 2001 U.S. Dist. LEXIS 19873, 2001 WL 1590512, at *15. [5] Indeed, court authorization of what can be analogized as a windfall to the attorneys would violate the "express goal of Grinnell" and the Second Circuit's [*12] clear intention to avoid such awards. See Goldberger v. Integrated Res., Inc., 209 F.3d 43, 49 (2d Cir. 2000).

4   The alternative approach, expressed by the Ninth Circuit in Williams v. MGM-Pathe Commun. Co., 129 F.3d 1026 (9th Cir. 1997) and the Eleventh Circuit in Waters v. International Precious Metals Corp., 190 F.3d 1291 (11th Cir. 1999), requires the distribution of attorneys' based upon the funds available to eligible claimants, whether claimed or not. In Williams, the Ninth Circuit held that the district court abused its discretion by basing the fee on the dollar amount of the claims made against the fund rather than on a percentage of the entire fund. Williams, 129 F.3d at 1027. In particular, the district court should have calculated attorneys' fees as "one-third of the entire $ 4.5 million settlement fund, for a fee of about $ 1.5 million, rather than calculating it as one-third of the class members' claims against that fund, for a fee of only $ 3,300." Williams, 129 F.3d at 1027. Similarly, the Eleventh Circuit affirmed a fee award that was nearly twice the amount actually claimed by the class from the fund. Waters, 190 F.3d 1291 at 1295.

[*13]

5   The Second Circuit is not alone. Courts in both the Fifth and Sixth Circuits have authorized district courts to award attorneys' fees based upon actual claims, rather than funds available. See, e.g., Strong v. BellSouth Telecomms., Inc., 137 F.3d 844, 852 (5th Cir. 1998) (affirming a district court's decision to base a fee award on actual payout rather than reversionary funds); Wise v. Popoff, 835 F. Supp. 977 (E.D. Mich. 1993) ("Although the Supreme Court has authorized courts to award attorney's fees based on the entire fund . . . the Court notes that such a method is not mandated. The Court determines that a more reasonable fee results from calculating a percentage of the actual recovery.") (emphasis added). See also Charles Alan Wright & Arthur R. Miller, 7B Fed. Prac. & Proc. Civ. 2d § 1803.1 (2004) (recognizing the split in the Circuits).

2005 U.S. Dist. LEXIS 7961, *13; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

Moreover, while this Court is loath to speculate as to how the Supreme Court may resolve the issue, at least one justice indicated her view. When the Supreme Court denied certiorari in Waters, [*14] Justice O'Connor at least hinted at her view when she wrote that the Court has "had no occasion . . . to address whether there must at least be some rational connection between the fee award and the amount of the actual distribution to the class." Int'l Precious Metals v. Waters, 530 U.S. 1223, 147 L. Ed. 2d 265, 120 S. Ct. 2237 (2000).

While the Agreement here is not the product of a securities class action, the Private Securities Litigation Reform Act of 1995 ("PSLRA") provides insight into Congress's views with respect to the relationship between total funds claimed in a class action and attorneys' fees. See PSLRA, Pub. L. 104-67, 109 Stat. 737 (Dec. 22, 1995). The PSLRA dictates that attorneys' fees reflect actual damages paid to claimants:

> (6) RESTRICTIONS ON PAYMENT OF ATTORNEYS' FEES AND EXPENSES. -- Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.

15 U.S.C. § 78u-4(a)(6) (emphasis added). See In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3rd Cir. 2005). [*15]

Congressional intent is also pretty clear in the more recent Class Action Fairness Act ("CAFA"). See Class Action Fairness Act of 2005, Pub. L. 109-2 (Feb. 18, 2005). There, the language used urges the calculation of attorneys' fees based on a percentage of the class claims. The legislation evidenced congressional desire to reform the tort system and limit exorbitant attorneys' fees. Congressional action was unequivocal; it expanded federal diversity jurisdiction, addressed unfair class settlements, inflated attorneys' fees, and state court class action abuses:

> Class actions were originally created to efficiently address a large number of similar claims by people suffering small harms. Today they are too often used to efficiently transfer the large fees to a small

number of trial lawyers, with little benefit to the plaintiffs.

151 Cong. Rec. H723, H725 (2005) (statement of Rep. Sensenbrenner (Rep.-R), Chair., H.R. Comm. on the Jud.). Members of both political parties shared this sentiment. See 151 Cong. Rec. H723, H727 (2005) (statement of Rep. Boucher (Rep.-D), H.R. Comm. on the Jud.). Consequently, an award of attorneys' fees in excess of the claims made [*16] by the class would contradict the clear public policy of awarding settlement funds to claimants and not attorneys.

Here, the total common fund will likely be in excess of $ 21,855,000 and, as of March 23, 2005, the number of claims preliminarily certified by the Claims Administrator comes to $ 9,338,958.29. (Aff. of Chiango, Claims Administrator, at P 3, dated Mar. 23, 2005.) [6] In short, attorneys' fees here will be calculated so as to bear a relationship to funds claimed by class members, rather than a percentage of the entire Fund. To do otherwise would not only be inequitable, but may provide an incentive for attorneys to be less aggressive in their attempts to attract class members to submit claims.

> 6   The total projected claims made by Class members will increase $ 60,000 as a result the April 29, 2005 mediated resolution between Marry Ann Fletcher ("Fletcher") and IMG Models. The funds paid to Fletcher will come from the IMG Models contribution to the Fund.

## B. REASONABLE ATTORNEYS [*17] ' FEES

### 1. Legal Standard

"As [HN3]in every class action, there are a number of factors that enter into the Court's decision with respect to fees." Thompson, 216 F.R.D. at 71. In particular, and pursuant to Goldberger and its progeny, a reasonableness assessment requires the Court to evaluate: (1) the time and labor expended by counsel, (2) the magnitude of the litigation, (3) the risk of the litigation, (4) the quality of representation, (5) the requested fee in relation to the settlement, and (6) public policy considerations. Goldberger, 209 F.3d at 50. The ultimate determination of a reasonable fee award is within the district court's sound discretion. Id. at 47.

### 2. Attorneys' Fees Analysis

According to plaintiffs' counsel, a fee award of 33.3% of the Fund, plus reimbursements of actual expenses, is fair, reasonable, and in accordance with the Second Circuit's decision in Grinnell. In contrast, Defense counsel maintains that such an award is "shamefully high" and vigorously oppose such an award. (Ltr. from Gotkin, Att'y for Next, to Judge Baer, dated Feb. 11, 2005.)

### a. The Time and [*18] Labor Expended by Counsel

[HN4]The first Goldberger factor, and "the traditional criteria in determining a reasonable common fund fee," requires consideration of the time and labor expended by counsel. Goldberger, 209 F.3d at 50. In total, eight firms, including partners, associates, paralegals and support staff, represented the class. Andrew Hayes served as lead counsel for the plaintiffs in this litigation. He is a partner at Boise, Schiller & Flexner, LLP ("Boise Schiller"). (Hayes Decl. at P 1.) Boise Schiller logged a total of 18,834.7 hours on this matter. (Hayes Decl. at P 4.) [7] At its current rates, approximately $ 500.00 per hour for Andrew Hayes, the firm estimates the total lodestar amount for professional time spent is $ 5,540,571.00, plus $ 714,333.98 in unreimbursed expenses. (Hayes Decl. at P 4; Hayes Suppl. Decl. at P 3.) [8]

> 7 This calculation also omits "335 professional hours from four additional counsel who had assisted on specific discovery tasks." (Supp. Decl. Hayes at P 5.)
>
> 8 Lodestar is the "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433, 76 L. Ed. 2d 40, 103 S. Ct. 1933(1983); Green v. Torres, 361 F.3d 96, 98 (2d Cir. 2004); Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999).

[*19] The other firms and individuals involved in this litigation claim less fees. Anthony Bolognese and the law firm of Bolognese & Associates, LLC, logged 3,083.50 hours on this matter. (Bolognese Decl. at PP 1, 5.) Calculated at its present rates, the lodestar calculation for professional time spent by Bolognese & Associates is $ 1,084,343.75, plus $ 129,937.64 in unreimbursed expenses.. (Bolognese Decl. at P 5, 6.) Merrill Davidoff and the law firm of Berger & Montague, logged 4,034.55 hours on this matter. (Davidoff Decl. at PP 1, 5.)

Calculated at its present rates, the lodestar calculation for professional time spent by Berger & Montague is $ 1,591,621.00, plus $ 244,749.48 in unreimbursed expenses. (Davidoff Decl. at P 5.) Marc Edelson and the law firm of Hoffman & Edelson, LLC, logged 120.9 professional hours on this matter. (Edelson Decl. at PP 1, 4.) Calculated at its present rates, the lodestar calculation for professional time spent by Hoffman & Edelson is $ 49,107.50, plus $ 130.25 in unreimbursed expenses. (Edelson Decl. at PP 4, 5.) Michael E. Criden and the law firm of Hanzman & Criden P.A., logged 43.10 professional hours on this matter. (Criden Decl. at PP 1, 4.) Calculated [*20] at its present rates, the lodestar calculation for professional time spent by Hanzman & Criden is $ 18,714.50, plus $ 72.03 in unreimbursed expenses. Linda Nussbaum and the firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., logged 126 professional hours on this matter. (Criden Decl. at PP 1, 4.) Calculated at its present rates, the lodestar calculation for professional time spent by Cohen, Milstein is $ 50,638.75, plus $ 315.05 in unreimbursed expenses. (Nussbaum Decl. at PP 4,5.) Ira Neil Richards and the law firm of Trujillo Rodriguez & Richards, LLC, logged 45 professional hours on this matter. (Richards Decl. at PP 1, 4.) Calculated at its present rates, the lodestar calculation for professional time spent by Trujillo Rodriguez is $ 16,922.50, plus $ 30.80 in unreimbursed expenses. (Richards Decl. at PP 4,5.) Brian A. Rishwain and the law firm of Johnson & Rishwain, LLP, logged 1,216.35 professional hours on this matter. (Rishwain Decl. at PP 1, 5.) Calculated at its present rates, the lodestar calculation for professional time spent by Johnson & Rishwain is $ 464,356.00, plus $ 64,791.05 in unreimbursed expenses. (Richards Decl. at PP 5, 6.)

According to lead counsel for plaintiffs, [*21] Andrew Hayes, when taken together, the attorneys logged approximately 28,000 professional hours on this matter. (Hayes Decl. P 91.) The lodestar calculation for professional time expended by Plaintiffs' counsel was estimated at $ 8,816,275, plus $ 1,590,164.65 in unreimbursed expenses. In addition, according to Hayes, if you include in the total lodestar the 335 additional professional hours from the four additional counsel who worked on specific discovery tasks, "the total lodestar is estimated at $ 9,112,160.00." (Supp. Decl. Hayes at PP 3, 5.) Because I have concluded to award fees on a claims made basis, the lodestar calculation is primarily for crosscheck purposes. See Wal-Mart Stores, 396 F.3d at 121.

Page 10

2005 U.S. Dist. LEXIS 7961, *21; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

### b. The Magnitude of the Litigation

Plaintiffs filed this antitrust class action lawsuit in June 2002. After briefing and argument, I decided that the statute of limitations limited any recovery to four years and dated back to June 25, 1998 and, thereafter, Plaintiffs alleged that over the succeeding four years "defendants agreed upon uniform practices on several fronts -- all with the motive to quash competition and preclude objection or dissent." Fears, No. 02 Civ. 4911, 2004 U.S. Dist. LEXIS 4502, 2004 WL 594396, [*22] at *1.

Plaintiffs alleged that Defendants "through their membership in or association with others who were or had been members of the modeling industry's trade association, IMMA (now called MMC), had the opportunity to -- and indeed did -- fix prices (of both models' commissions and clients' service fees), terms and conditions of models' employment, and the manner in which to structure their businesses (as management companies rather than employment agencies)." Id. According to Plaintiffs, the Defendants colluded "with an intention and plan collectively to evade the licensing requirements and fee restrictions imposed by New York state law." Id. As a result of this alleged scheme, Plaintiffs sought "to recover damages from defendants' alleged price-fixing conspiracy to fix, at an inflated rate, the service fee charged to clients (those who hired models), based on a theory that clients would have been more willing to pay plaintiffs a higher rate for their services had they not been charged an inflated fee by defendants." 2004 U.S. Dist. LEXIS 4502, 2004 WL 594396, at *15.

The class was denominated by the plaintiffs to consist of fashion models "who now work or have worked at some [*23] point over the past three decades for one or more of the defendant modeling management companies." Id. The Defendants include some of the most venerable names in the modeling industry, including Ford Models, Inc., Wilhelmina Models, Inc., Elite Model Management Corp., Next Management Co., IMG Models, Inc., Click Model Management, Inc., Que Management, Inc., Images Management, and Model Management Corp.

### c. The Risk of the Litigation

[HN5]"Contingency risk and quality of representation must be considered in setting a reasonable

fee." Goldberger, 209 F.3d at 54; see In re Medco Health Solutions, Inc., Pharm. Benefits Mgmt. Litig., 2004 U.S. Dist. LEXIS 28606, No. 03 MDL 1508, 2004 WL 1243873, at *11 (S.D.N.Y. May 25, 2004).

Plaintiffs' success was never a sure thing. During the course of the litigation, Plaintiffs' counsel defended against various motions to dismiss (Dckt. No. 21, 29, 34, 39, 43, 45, 47, 52, 62, 66, 99, ect.), an order to show cause (Dckt. No. 66), and summary judgment motions (Dckt. 211, 227, 247, 248, 251, 263, ect.). Discovery began in 2002, continued throughout the litigation and up to the commencement of trial in June 2004, and included at least [*24] 24 discovery conferences before Magistrate Judge Henry Pitman.

Due to the contingent nature of the lawsuit, had the trial continued, and Class Plaintiffs were unsuccessful, Plaintiffs' counsel would have received no compensation. As the litigation evolved, Class Counsel advanced tens of thousands of dollars in disbursements. See In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 488 (S.D.N.Y. 1998) [HN6]("Risk, of course, must be judged as it appeared to counsel at the outset of the case, when they committed their capital (human and otherwise)"); see also Harman v. Lyphomed, Inc., 945 F.2d 969, 976 (7th Cir. 1991).

Accordingly, the manner in which this case unfolded demonstrates the significant possibility that Class Counsel could have failed to achieve any recovery at all and, consequently, no compensation.

### d. The Quality of Representation

The fourth Goldberger criterion covers the "quality of representation." Goldberger, 209 F.3d at 55. [HN7]The "quality of representation" factor is designed to reward "particularly resourceful" legal work that "secures a substantial benefit . . . with a minimum of time invested, [*25] " or to decrease "the objectively determined fee where the benefit produced does not warrant awarding the full value of the time expended." In re "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1296, 1313 (E.D.N.Y. 1985) (Weinstein, J.) (citing to Merola v. Atl. Richfield Co., 515 F.2d 165, 168-69 (3d Cir. 1975)). To determine the "quality of the representation," courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit. See In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 467 (S.D.N.Y. 2004). [9] "It is also reasonable

to give some weight to the quality of opposing counsel." In re Austrian & German Bank Holocaust Litig., 2003 U.S. Dist. LEXIS 2440, No. 98 Civ. 3938, 2003 WL 402795, at *7 (S.D.N.Y. Feb. 21, 2003). Oftentimes, the quality of representation prong of the Goldberger test is utilized to praise plaintiffs' counsel, their administration of the case, their willingness to work with their adversary, and ability to recover a settlement on behalf of the plaintiffs. [10]

9    But see Blum v. Stenson, 465 U.S. 886, 898-99, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984); accord Pa. v. Del. Valley Citizens' Council, 478 U.S. 546, 565, 92 L. Ed. 2d 439, 106 S. Ct. 3088 (1986).

[*26]

10    See Denney v. Jenkens & Gilchrist, 2004 U.S. Dist. LEXIS 26041, No. 03 Civ. 5460, 2005 WL 388562, at *28 (S.D.N.Y. Feb. 18, 2005) ("this case was well litigated by very skilled lawyers"); In re Alloy, Inc. Sec. Litig., 2004 U.S. Dist. LEXIS 24129, No. 03 Civ. 1597, 2004 WL 2750089, at *3 (S.D.N.Y. Dec. 2, 2004) ("Plaintiffs' counsel has represented plaintiffs and the Settlement Class *more than adequately*." (emphasis added); In re AMF Bowling Sec. Litig., 334 F. Supp. 2d 462, 468 (S.D.N.Y. 2004) ("From what I observed, the lawyers . . . performed at *a highly professional and competent level*.") (emphasis added); In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 467 (S.D.N.Y. 2004) ("The quality of legal services provided . . . also supports the fee award."); In re WorldCom, Inc. ERISA Litig., 2004 U.S. Dist. LEXIS 20671, No. 02 Civ. 4816, 2004 WL 2338151, at *10 (S.D.N.Y. Oct. 18, 2004) ("Lead Counsel has *performed an important public service* in this action and has done *so efficiently and with integrity*." (emphasis added); Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd., 2003 U.S. Dist. LEXIS 7869, No. 01 Civ. 11814, 2004 WL 1087261, at *7 (S.D.N.Y. May 14, 2004) ("The Court has witnessed first hand *the quality of services rendered* by lead counsel in prosecuting this Action.") (emphasis added); In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003 ("*The excellence of the representation of plaintiffs*, especially in light of the very high quality of opposing counsel, cannot seriously be debated.") (emphasis added);

Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini, 258 F. Supp. 2d 254, 264 (S.D.N.Y. 2003) ("The class were represented by counsel who are well versed in complex securities litigation and have achieved an excellent result."); Rogers v. Sterling Foster & Co. (In re Sterling Foster & Co.), 238 F. Supp. 2d 480, 488-89 (E.D.N.Y. 2002) ("The Court agrees that there was *great quality* in their representation.") (emphasis added); In re Twinlab Corp. Sec. Litig., 187 F. Supp. 2d 80, 86 (E.D.N.Y. 2002) ("There was *great quality* in the representation." (emphasis added); In re Arakis Energy Corp. Sec. Litig., 2001 U.S. Dist. LEXIS 19873, No. 95 Civ. 3431, 2001 WL 1590512, at *15 (E.D.N.Y. Oct. 31, 2001) ("This Court recognizes the *high level* of quality of representation that was present in this litigation and finds that the results achieved by counsel for the class were impressive.") (emphasis added); In re Fine Host Corp. Sec. Litig., 2000 U.S. Dist. LEXIS 19367, No. 97 Civ. 2619, 2000 WL 33116538, at *4 (D. Conn. Nov. 8, 2000) ("The magnitude and complexities of the litigation *and the quality of representation by plaintiffs' counsel* weigh in favor of a percentage award within a close range of the one-third award requested.") (emphasis added).

[*27]   Upon review of plaintiff counsels' resumes and achievements, and with due consideration both to the $ 21,855,000 Fund and the formidable opposition from nationally-recognized and respected law firms, the quality of representation appears to be satisfactory. Furthermore, in my view, in having brought this lawsuit, the plaintiffs' lawyers performed a valuable public service for which they are to be commended.

All that having been said, praise for Plaintiffs' counsel must be tempered by certain conduct in which class counsel engaged during the discovery phase of this litigation. That conduct prompted Defendants, Click Model Management and Next Management Company, to move for sanctions pursuant to Fed. R. Civ. P. 26, 37(b) and 41(b) for Plaintiffs' failure to properly respond to interrogatories. See Fears, 2004 U.S. Dist. LEXIS 8364, No. 02 Civ. 4911, 2004 WL 1065543, (S.D.N.Y. May 11, 2004) (Pitman, J.). In his decision, the magistrate judge condemned plaintiffs' counsels' behavior throughout the discovery process, mentioned two prior sanction orders, which imposed fines of Two [*28] Hundred Fifty

Dollars ( $ 250.00) and Five Thousand Dollars ( $ 5,000.00), and went on to sanction counsel $ 25,000 dollars plus reasonable attorneys' fees as follows:

> Plaintiffs have unnecessarily made the straightforward task of responding to interrogatories a difficult and grueling process. I am left with the firm conclusion that plaintiffs' counsel determined they were going to provide discovery in the manner that they saw fit, notwithstanding the requirements of the Federal Rules of Civil Procedure and not withstanding my prior Orders. Such a tactic is, of course, unacceptable and richly deserves the imposition of a sanction.

> Counsel's conduct is particularly disturbing because their failure to respond appropriately to interrogatory answers here is not an isolated event. I have had to sanction plaintiffs' counsel on two prior occasions for discovery shortcomings. Despite these prior sanctions, it appears that plaintiffs' counsel's [sic] still unwilling to comply with the Federal Rules of Civil Procedure and my Orders implementing those rules.

2004 U.S. Dist. LEXIS 8364 [WL] at *6 (Pitman, J.). Considering Judge Pitman's language, it would be unreasonable for me not to consider this behavior [*29] in my decision and this despite defendants' representation that they would agree not to oppose a motion to vacate. Settling parties sometimes makes strange bedfellows.

[HN8]I am obligated to review the quality of plaintiffs' counsels' representation, and that review must "eschew any rubber stamp approval," put another way, attorneys' conduct throughout the litigation must be factored into the quality of representation analysis. Thompson, 216 F.R.D. at 61 (citing to Grinnell, 495 F.2d at 462).

Accordingly, I have reduced the sought for fee award to include and emphasize my concern on this score.

### e. The Requested Fee In Relation to the Agreement

To date, and absent the Elite, New York's

contribution, the total Fund is $ 21,855,000. Plaintiffs' counsel seeks a fee award of 33.33% of the Fund or, to date, $ 7,285,000, plus expenses of $ 1,590,164.65, or $ 8,875,164.65. As of now, Plaintiffs' requested fee award represents over 40% of the total Fund. The Plaintiffs' lodestar calculation, combined with their expense claim, totals $ 10,702,324.65 or substantially more than the total claims filed which come to $ 9,338,958.29. (Aff. of Chiango at P 3.)

[*30] As already discussed, see supra 2004 U.S. Dist. LEXIS 8364 [WL] at 6-8, in both this district and others, courts have recognized that [HN9]attorneys' fee awards should not dwarf funds claimed by class members. [11] For example, the parties reached a settlement agreement that created a $ 24 million settlement fund In re Arakis Energy Corp., 2001 U.S. Dist. LEXIS 19873, 2001 WL 1590512, at *4 (E.D.N.Y. Oct. 31, 2001). The total amount of actual claims made by class members was estimated at $ 7.2 million and the attorneys sought a fee award of $ 8 million, or 33.33% of the total fund. 2001 U.S. Dist. LEXIS 19873 [WL] at *13. The district court rejected the attorneys' fee request, cautioned against an award of attorneys' fees that was not related to the amount actually claimed by the class from the fund, and awarded $ 6 million in attorneys' fees. Id.

11   See In re Interpublic Secs. Litig., 2004 U.S. Dist. LEXIS 21429, No. 02 Civ. 6527, 2004 WL 2397190, at *11 (S.D.N.Y. Oct. 26, 2004) (setting the fee award at 12% of the Gross Settlement Fund distributed in stock and cash, or $ 96.4 million, where plaintiffs' counsel had sought 17%); In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503 (E.D.N.Y. 2003) (setting fee award at 6.5% of the "Net Settlement Funds," or $ 220.2 million, where plaintiffs' counsel sought 18% or $ 609 million); In re Indep. Energy Holdings PLC Sec. Litig., 2003 U.S. Dist. LEXIS 17090, No. 00 Civ. 6689, 2003 WL 22244676 (S.D.N.Y. Sep. 29, 2003) (setting fee award at 20% of net expenses, or $ 10.7 million where plaintiffs' counsel sought 25% or $ 11.6 million); In re Twinlab Corp. Sec. Litig., 187 F. Supp. 2d 80 (E.D.N.Y. 2002) (setting fee award at 12% of common fund, or $ 3.17 million, where plaintiffs' counsel sought 25% or $ 6.6 million); In re Dreyfus Aggressive Growth Mut. Fund Litig., 2001 U.S. Dist. LEXIS 8418, No. 98 Civ. 4318, 2001 WL 709262, at *7 (S.D.N.Y. Jun. 22,

2001) (setting fee award at 15% of the settlement fund, or $ 2,775,000 million, where plaintiffs' counsel sought 30% or $ 5,817,453.41 plus interest); In re Fine Host Corp. Sec. Litig., 2000 U.S. Dist. LEXIS 19367, No. 97 Civ. 2619, 2000 WL 33116538, at *6 (D. Conn. Nov. 8, 2000) (setting fee award at 17.5% of the settlement fund, or $ 3,106,250, million where plaintiffs' counsel sought 33.3% or $ 5,916,666.67).

[*31] Similarly, while not controlling here, the Fifth Circuit's decision in Strong v. Bell South, 137 F.3d 844 (5th Cir. 1998), is instructive. In Strong, Appellants, former plaintiffs' counsel, argued, inter alia, that the district court erred when it awarded attorneys' fees in proportion to the actual amount claimed by the class members rather than in proportion to the entire common fund. See Id. at 851. In a decision that affirmed the district court's attorneys' fee award, the Fifth Circuit held that the district court acted well within its discretion when it awarded attorneys' fees in proportion to the actual claims filed rather than the total common fund. Id. at 852.

### f. Public Policy Considerations

As already discussed, see supra at 6-8, public policy is easily constructed from an analysis of the PSLRA and the Class Action Fairness Act of 2005, along with much case law. Taken together, they provide clarity into congressional intent with respect to the way in which attorneys' fees should be awarded in class actions, and that insight is that [HN10]attorneys' fees in class actions are to be crafted so as to be related to [*32] the claims filed. It is in this fashion that I have awarded attorneys fees and believe it to be fair to all concerned.

### III. RESIDUAL FUNDS

The Agreement requires the Court to distribute any residual or unclaimed funds as follows: [12]

> If the sum of the Total Recognized Losses of all Authorized Claimants who submit valid and timely proof of claim forms is less than the amount of the Net Settlement Fund, then the Court shall, in its discretion, determine the disposition of the amount representing the differences between the two figures, after hearing the views of the parties hereto as to such disposition.

Agreement, P D.2.(b)(4) (emphasis added). Most Defendants, following my inquiry, voiced concerns about the models being awarded any more than the amount of money arrived at by the agreed upon formula for their claim and some sought to have money returned to their clients, they then went on to suggest preferred charitable contributions.

> 12  As of May 5, 2005, there is something more than $ 6 million available for distribution.

[*33] This approach was utilized when consumers brought a class action like this against vendors of merchandise sold at professional stock car races. There, the court rejected defendants' request, as I have here, to have the excess settlement funds returned to defendants on a pro rata basis because, as the court wrote, "the Defendants' argument that they are somehow deprived of the benefit of their bargain [was] unavailing." In re Motorsports Merch. Antitrust Litig., 160 F. Supp. 2d 1392 at 1395. In particular, the court determined that:

> Settlement not only compensated those Plaintiffs who made claims to the fund, but also relieved Defendants of liability from Plaintiffs' individual claims. Presumably, the cost of avoiding even longer and more protracted litigation was also factored into the settlement agreement.

Id. The court held that "where no legal claim to settlement benefits exists, a court can exercise its equitable powers to distribute the remaining funds" and "attempted to identify charitable organizations that may at least indirectly benefit the members of the class. . . ." Id. at 1393, 1395. In that case, the court opted to distribute residual funds to ten [*34] different (and unrelated to the lawsuit) charities including the Make-A-Wish Foundation, the American Red-Cross, Children's Healthcare of Atlanta, the Atlanta Legal Aid Society, and the Lawyers Foundation of Georgia. Id. at 1396 - 1398.

Similarly, in another antitrust case where, as here, the settlement agreement provided the court with discretion to distribute residual funds, the court concluded that cy pres principles permitted the distribution of residual funds to a wide range of

2005 U.S. Dist. LEXIS 7961, *34; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

charitable organizations:

> While use of funds for purposes closely related to their origin is still the best cy pres application, the doctrine of cy pres and courts' broad equitable powers now permit use of funds for other public interest purposes by educational, charitable, and other public service organizations, both for current programs or, where appropriate, to constitute an endowment and source of future income for long-range programs to be used in conjunction with other funds raised contemporaneously.

Superior Beverage Co. v. Owens-Illinois, 827 F. Supp. 477 at 479; see Id. at 477.

Having adopted the charitable route for these funds, it is my view that wherever possible, the cy pres [*35] doctrine should be invoked. See Weber v. Goodman, 1998 U.S. Dist. LEXIS 22832, No. 97 Civ. 1376, 1998 WL 1807355, at *5 (E.D.N.Y. 1998) (emphasis added); see also Pyke v. Cuomo, 209 F.R.D. 33, 38 (N.D.N.Y. 2002). [13] [HN11]Use of the doctrine depends of course, among other considerations, on the type of individual that makes up the class and the degree of difficulty in identifying the "next best use." Here, while there are any number of appropriate, or at least helpful, causes that benefit women generally, the task is more complicated when we try to zero in on models who, by the way, are not exclusively female. [14] In concert with the suggestions of the parties, the Court investigated into most, if not all, the suggested projects and entities. While this has consumed significant time, it has provided the Court with a wealth of information not otherwise likely to come my way. [15]

[13] "The words 'cy pres' come from the French expression, 'cy pres comme possible,' which means 'as near as possible.' . . . [HN12]The cy pres doctrine developed in the context of testamentary charitable trusts. Where a trust would otherwise fail, a court would attempt to fulfill the testator's charitable intent 'as near as possible'. . . . The same basic notion is now employed in class action settlements such as this one." In re Holocaust Victim Assets Litig., 311 F. Supp. 2d 407, 415-416 (E.D.N.Y. 2004).

[*36]

[14] Indeed, according to the Claims Administrator, a random sample of class members' data indicates that approximately 60% of the class is female, 40% reside in the tri-state area (New York, New Jersey, and Connecticut), another 18% in California and the rest reside throughout the United States and overseas. (See Ltr. from Hayes, Att'y for Pl., to Judge Baer, dated May 2, 2005.)

[15] On April 26 and 29, 2005, the Court met with representatives from organizations designated by the parties, and others, to determine whether they, at the very least, indirectly benefit the members of the class. The Court emphasized that the funds focus on the type of services that may be utilized by the uninsured and women. At the same time, to provide the most efficient use of the distributed funds, the Court sought to limit or eliminate administrative costs. To limit administrative costs, projects which provide or implement actual research programs and services were favored over "umbrella" or "funder" organizations, e.g. those which raise and distribute money.

Pursuant to the terms of the Agreement, in [*37] accordance with Second Circuit precedent and, after analysis of the suggestions submitted by the parties, beginning in the first week of January 2006, if not before, and assuming no legal impediments, the parties will receive residual funds as detailed below ("Residual Fund Distributions"). [16] After the initial distribution, additional distributions will be contingent upon achievement. Each entity will provide the Court in an annual report, with information detailing what the project has accomplished and the Court will retain jurisdiction over this aspect of the lawsuit. The available funds (after all claimant dollars, attorneys' fees, and expenses have been disbursed) will be deposited by the Administrator with the Clerk of Court and placed in the Court Registry Investment System, Interest Bearing Account. Second year funds, where there is a second year, will only be released on authorization from the Court and based on the progress reported in the annual report for the first year. The annual report will be forwarded to the Court eleven (11) months after the date of the initial distribution. Where the disbursement is in two installments, the second installment will include any accumulated [*38] interest. Any funds not allotted to any entity for failure to achieve reasonable progress or expansion, or for any

2005 U.S. Dist. LEXIS 7961, *38; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

other reason, shall be awarded to one of the remaining projects.

16   The Court reserves the right to amend the Residual Fund Distributions before, during, or after the disbursement depending on the availability of these funds.

Other nonprofit or charitable organizations are undeniably deserving, but the organizations to receive the funds under this Agreement have certain characteristics worth mentioning. Each has stipulated to little or no administrative costs. Each, where appropriate, will include a broader outreach program aimed at reaching more women. An emphasis will be placed on the uninsured and, in at least one project, women of color. The recipients of Residual Fund Distributions are: (A) Beth Israel Medical Center's Continuum Women's Cardiac Care Network, (B) Columbia Presbyterian Medical Center's Eating Disorders Program, (C) Columbia Presbyterian Medical Center Division on Substance Abuse, [*39] (D) Columbia Presbyterian Medical Center's Ovarian Cancer Repository, (E) New York University Medical Center, specifically for two cardio vascular projects directed towards heart disease in women, (F) the Civil Division of the Legal Aid Society, and (G) Heart Truth.

## A. Beth Israel Medical Center's Continuum Women's Cardiac Care Network

The Continuum Women's Cardiac Care Network (the "Network") based at Beth Israel Medical Center, First Avenue at 16th Street, New York, NY, 10003, will receive over 2 years $ 1,000,000 and any accumulated interest. Launched just last year in response to overwhelming evidence that heart disease is the greatest health threat to women, the primary aim of the project is to provide early identification and treatment for women who are at risk for, or have a history of, cardiovascular disease. While headquartered at Beth Israel Medical Center in Manhattan, the Network includes physicians and the program extends to St. Luke's Hospital, Roosevelt Hospital, and Long Island College Hospital.

Dedicated to increasing knowledge and awareness about heart disease in women through training of medical fellows, community outreach, [*40] research, and professional education for physicians and nurses, the Residual Fund Distribution will support the Network's endeavor to establish a citywide, quality-controlled, heart disease program for women, with an emphasis on education and recognition of disease potential. The Network will utilize the money to expand the program's services generally, to increase outreach to minority women through a multilingual program, and the dissemination of heart disease information through a variety of media including the Internet, videos for hospital rooms and waiting areas, and written material. To encourage broader participation by low-income and special needs participants, the Network will assist with child-care and provide transportation to visit a physician. The funds will also be used to defray costs associated with integral cardiac rehabilitation services, such as group support and stress management, which are not usually covered by insurance.

The Residual Fund Distribution will be considered as unrestricted support for the Continuum Women's Cardiac Care Network to be disbursed at the discretion of the Director of the Network, Dr. Suzanne Steinbaum, D.O., to advance and expand the [*41] Network's reach and services. A maximum of 10% of the contribution will be deducted for administrative, handling, overhead, or similar charges of any type. The contribution will be in two installments and, as with the other projects, continued funding in the second year will be contingent upon an annual progress report submitted by Beth Israel Medical Center's Continuum Women's Cardiac Care Network, and approved by Dr. Steinbaum, D.O., regarding the progress of the research supported by these funds e.g., the increase in the number of individuals that received treatment and how they fared.

## B. Columbia Presbyterian Medical Center's Eating Disorders Program

The Eating Disorders Program of the Columbia University Medical Center (the "Program"), 1051 Riverside Drive (Unit 98), New York, NY 10032, will receive over 2 years $ 1,000,000 and any accumulated interest. Established in 1979, the Program aims to advance the understanding of Anorexia Nervosa, Bulimia Nervosa, and related conditions, and to provide treatment for individuals with these disorders -- maladies that primarily, but not exclusively, effect women and oftentimes members of this class. The Program [*42] receives substantial support from New York State Psychiatric Institute and from grants from the National Institutes of Health, provides extensive inpatient and outpatient services, and conducts research to enhance

2005 U.S. Dist. LEXIS 7961, *42; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

knowledge of these enigmatic disorders and to develop improved treatment methods.

The Residual Fund Distribution will be considered as unrestricted support for the Eating Disorders Program to be disbursed at the discretion of the Director of the Eating Disorders Research Unit, Dr. Timothy Walsh, M.D., to advance and expand in- and out-patient treatment for individuals with eating disorders who have limited financial means. No administrative, handling, overhead, or similar charges of any type will be deducted from the funds provided. The contribution will be in two installments and, as with the other projects, continued funding in the second year will be contingent upon an annual progress report submitted by Columbia University Medical Center, and approved by Dr. Walsh, regarding the progress of the research supported by these funds e.g., the increase in the number of individuals that received treatment and how they fared.

### C. Columbia Presbyterian Medical [*43] Center's Division on Substance Abuse

The Division on Substance Abuse at Columbia University Medical Center (the "Division"), 1051 Riverside Drive, Unit 66, New York, NY 10032, will receive over 2 years $ 500,000 and any accumulated interest. Founded in 1992, the Division has become one of the leading substance abuse centers in the country and has been named in the top 5 such programs in the US News & World Report's annual issue on medical schools and specialty programs.

The Residual Fund Distribution will support the Buprenorphine Program. Since its inception in September 2003, this Program has treated some 250 individuals, half of whom were addicted to prescription opioids, currently the fastest growing drug problem in the United States. Approximately half of these individuals were men, usually between 20 and 45 years of age. However, because the Buprenorphine Program receives no outside funding, without the Residual Fund Distribution, the Program could continue to treat only those individuals able to pay or who have insurance coverage. The Residual Fund Distribution will provide treatment at no charge to those who are unable to pay and will increase the [*44] research component of the program.

The Residual Fund Distribution will be considered as unrestricted support for the Buprenorphine Program to be disbursed at the discretion of the Director of the Division

on Substance Abuse, Dr. Herbert Kleber, M.D. No administrative, handling, overhead, or similar charges of any type will be deducted from the funds provided. The contribution will be in two installments and, as with the other projects, continued funding in the second year will be contingent upon an annual progress report submitted by Columbia University Medical Center, and approved by Dr. Kleber, regarding the progress of the research supported by these funds e.g., the increase in the number of individuals that received treatment and how they fared.

### D. Columbia Presbyterian Medical Center's Ovarian Cancer Repository

The Ovarian Cancer Repository of the Columbia University Medical Center (the "Ovarian Cancer Repository"), 1051 Riverside Drive, New York, NY 10032, is headed by Dr. Carmel Cohen, M.D., an innovative pilot program, it was chosen in consultation with the Ovarian Cancer Research Foundation, and will receive over 2 years $ 1,000,000 and any [*45] accumulated interest. Ovarian cancer is the most lethal of the gynecologic cancers. Currently, there is no cure but with early detection, the chances of survival, as with other cancers, increase. Conversely, left undetected, ovarian cancer quickly progresses and spreads from the ovaries to other sites, requires surgery, chemotherapy and carries a much lower survival rate. Therefore, the need for an effective means of early detection is acute.

The Residual Fund Distribution will be used to identify screening techniques to improve the possibility of early diagnosis. Specifically, an ovarian cancer tumor repository of samples that are precisely profiled by multiple molecular characteristics will enable researchers to identify new methods for earlier detection and targeted treatment. These accomplishments, it is hoped, will lead to improved detection and treatments. In addition, the repository will be a major resource to this community and, in time, to the nation.

The Residual Fund Distribution will be considered as unrestricted support for the Ovarian Cancer Repository to be disbursed at the discretion of the Director of the Ovarian Cancer Repository, Dr. Cohen. No administrative, handling, [*46] overhead, or similar charges of any type will be deducted from the funds provided. The contribution will be in two installments and, as with the other projects, continued funding in the second year will be contingent upon an annual progress report submitted by Columbia University Medical Center,

2005 U.S. Dist. LEXIS 7961, *46; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

and approved by Dr. Cohen, regarding the progress of the research supported by these funds.

### E. New York University Medical Center

New York University Medical Center, 550 First Avenue PRK-9, New York, NY, 10016, will receive over 2 years $ 1,000,000 and any accumulated interest and use it for two specialized cardiovascular programs. Even though heart disease kills more women annually than cancer, women have not received the same attention as men. Most medical knowledge of the heart and cardiovascular disease is based on studies and experiments with men. This money will be used specifically for two studies aimed at learning more about the conditions which affect women's hearts and how to provide better cardiovascular care to women.

The first program, Gender Differences of the Heart, will study the ways that the hearts of men and women differ and develop techniques to measure [*47] these differences. The study will provide an improved set of normal data for men and women which will help physicians develop a better informed data bank to be used for the treatment of women with heart disease. In addition, new software that will allow rapid assessment and provide quantitative measurement of how the hearts of women and men respond to various treatments will be developed. This specialized software will then be made available to hospitals throughout the country.

The second program, Ballooning of the Heart Muscle, will study Left Ventricular Apical Ballooning, a recently discovered affliction, which affects women almost exclusively. This syndrome is characterized by chest pain brought on by sudden emotional distress with a characteristic ballooning of the heart muscle. The cause is unknown and effective therapies do not exist. This will be the first clinical trial to rigorously explore the pathophysiology of heart ballooning through mental stress testing and myocardial perfusion imaging. Women will be enrolled at the NYU Medical Center, a tertiary care private hospital and, also, at Bellevue Hospital, a tertiary care public hospital which treats an underserved population [*48] including uninsured patients. There will be no cost to patients for participation in the study and all patients will receive usual care for heart disease during the trial. The funds will cover the costs of studies, blood tests and salaries for medical personnel.

With regards to both projects, the Residual Fund

Distribution will be considered as unrestricted support, to be disbursed at the discretion of the Director of Gender Differences of the Heart, Dr. Leon Axel, M.D., and Directors of Ballooning of the Heart Muscle Program, Drs. Harmony Reynolds, M.D. and Rachel Berger, M.D., respectively. No administrative, handling, overhead, or similar charges of any type will be deducted from the funds provided. The contribution will be in two installments and, as with the other projects, continued funding in the second year will be contingent upon an annual progress report submitted by New York University Medical Center, and approved by the Director of the programs, Dr. Axel and Drs. Reynolds or Berger, regarding the progress of the research supported by these funds e.g., the increase in the number of individuals that received treatment and how they fared.

### F. Civil Division [*49] of the Legal Aid Society

The Civil Division of the Legal Aid Society, 199 Water Street, New York, NY 10038, will receive over 2 years $ 1,000,000 and any accumulated interest. "The nation's oldest and largest provider of legal services to the indigent," the Legal Aid Society is a private, not-for-profit, law firm "dedicated to eliminating injustice by extending equal protection of the law and providing free, quality legal services to those who cannot afford an attorney." The Legal Aid Society, "Summary of Services," *available at* http://www.legal-aid.org (last visited Apr. 28, 2005). The money will be earmarked for specific Civil Division programs, i.e., those directed towards children, seniors, persons with disabilities, immigrants, uninsured families, persons moving from welfare to work, the homeless, persons with HIV/AIDS and, specifically, to insure the continuation and expansion of the Safe Family Project.

The contribution will be in two installments and, as with the other projects, continued funding in the second year will be contingent upon an annual progress report by the Legal Aid Society, and approved by the President of the Society, Peter Cobb, and the Attorney [*50] in Chief, Steven Banks, regarding the progress of the activities supported by these funds e.g., the increase in staff and in the number of individuals that received assistance.

### G. The Heart Truth

In addition to the aforementioned charitable organizations that will receive annual contributions, the Heart Truth campaign will receive a single, $ 250,000,

2005 U.S. Dist. LEXIS 7961, *50; 2005-1 Trade Cas. (CCH) P74,783
Fed. Sec. L. Rep. (CCH) P95,718

contribution. The "Heart Truth" is a national education campaign for women about heart disease sponsored by the National Heart, Lung, and Blood Institute, National Institutes of Health, 31 Center Drive, MSC2490, Bethesda, MD 20892. Launched in September 2002, the campaign's goal is to raise awareness among women that heart disease is the # 1 killer, motivate them to find out their risk, and take action to lower it. Since the campaign's launch, the "Heart Truth" has been reaching American women with heart health messages through partners, including significant support from America's fashion industry -- including leading models, international model agencies and designers -- to launch and promote the issue's symbol for awareness, the Red Dress.

The funds allocated to the "Heart Truth" will be utilized to reach medically [*51] underserved women, especially minorities, through execution of a multi-city road show in partnership with the American College of Cardiology. This tour will include: free heart health screenings and materials; information on local resources for uninsured women to receive free or low-cost health services; on-site volunteer cardiologists; and, educational events. The program will take place in cities with populations at high risk for heart disease, including minority women who bear a disproportionate burden of heart disease and lag behind in awareness about their risk. The program is currently funded by a $ 200,000 grant from the Guidant Foundation, enough for only two of the projected five cities. The Residual Fund Distribution will enable the "Heart Truth" road show to reach over the envisioned cities. No administrative, handling, overhead, or similar charges of any type will be deducted from the funds provided and fully 100 percent of the residual fund contributed dispersed will be applied to program delivery.

## IV. CONCLUSION

Having carefully reviewed this matter, and the significant aspects of the Agreement many of which are in my view more important than the dollars amassed [*52] for settlement purposes, I conclude that a fair and appropriate fee is 40% of the claimed Funds, including the midiated steelement between Fletcher and IMG Models. If translated into a percentage of the entire Fund this would equal 17.2%, or $ 3,759,583.16 [17] In addition, Class Counsel is entitled to all claimed expenses which come to $ 1,590,164.65 and brings the total fee, including expenses, to $ 5,349,747.81. [18] Other expenses, i.e., the cost of fund administration has been estimated at an additional $ 75,000 to $ 100,000 which the Court finds to be within acceptable limits

> 17  Any contribution from Elite, New York and Elite, S.A., may also increase the total amount in the Fund.
>
> 18  See note 11.

In accordance with the aforementioned reasoning, the settlement, attorney's fees and expenses, and Residual Fund Distribution, are hereby approved and the Court will retain jurisdiction over the implementation, enforcement, and performance of the settlement, including the administration of the settlement [*53] and distribution of the settlement funds.

**IT IS SO ORDERED**

New York, New York

May 5, 2005

Harold Baer, Jr.,

U.S.D.J.