# Exhibit G

LEXSEE

Caution
As of: Feb 04, 2009

IN RE: DREYFUS AGGRESSIVE GROWTH MUTUAL FUND LITIGATION

98 cv 4318 (HB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2001 U.S. Dist. LEXIS 8418; Fed. Sec. L. Rep. (CCH) P91,505

June 21, 2001, Decided
June 22, 2001, Filed

**DISPOSITION:** [*1] Counsel's motion for costs and expenses granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs petitioned the court for approval of a proposed settlement in a class action involving securities laws. While the settlement worked out between the parties was acceptable, the request for attorneys' fees was not. Counsel moved for attorneys' fees equaling 30 percent of the settlement.

**OVERVIEW:** The court found that the Grinnell factors weighed heavily in favor of the settlement, and there were no objectors. The court concluded that the settlement was fair, adequate, and reasonable. Thus, the motion to approve the proposed settlement was granted. As to counsel's fees, the court concluded that 15 percent was a reasonable fee. Counsel undertook risk in taking the case and prosecuted the action in a professional manner. The determination that 15 percent was a reasonable fee tracked the emerging trend within the circuit of awarding attorneys considerably less than 30 percent of common funds in securities class actions. There was no recent, relevant case support for awarding a percentage as high as 30 percent, particularly in a case where 30 percent represented more than twice counsel's billings. Lodestar analysis confirmed the appropriateness of a 15 percent award.

**OUTCOME:** The settlement was approved, attorneys' fees were granted in an amount equal to 15 percent of the settlement, and counsel's motion for costs and expenses was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Class Actions > Compromises*
*Civil Procedure > Class Actions > Voluntary Dismissals*
*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN1]Fed. R. Civ. P. 23(e) requires that any settlement or dismissal of a class action be approved by the court. In determining whether to approve a class action settlement, the district court must determine whether it is fair, adequate, and reasonable, and not a product of collusion. In so doing, the court must eschew any rubber stamp approval yet simultaneously stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case. Judicial discretion should be exercised in light of the general policy favoring settlement.

Page 1

Case 0:06-cv-01216-JMR-FLN   Document 399-7   Filed 02/04/09   Page 3 of 12

2001 U.S. Dist. LEXIS 8418, *1; Fed. Sec. L. Rep. (CCH) P91,505
Fed. Sec. L. Rep. (CCH) P95,718

*Civil Procedure > Class Actions > Compromises*
*Civil Procedure > Class Actions > Prerequisites > General Overview*
*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN2]The United States Court of Appeals for the Second Circuit has identified nine factors (Grinnell factors) that courts should consider in assessing the fairness of a proposed settlement: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN3]Courts should analyze the negotiating process in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves. A strong presumption of fairness attaches to proposed settlements that have been negotiated at arms-length.

*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN4]It is well settled that the reaction of the class to the settlement is probably the most significant factor to be weighed in considering its adequacy.

*Civil Procedure > Class Actions > Class Counsel > Fees*
*Civil Procedure > Class Actions > Judicial Discretion*
*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
[HN5]Class action attorneys who create a "common fund" are entitled to a reasonable fee -- set by the court -- to be taken from the fund. The determination of "reasonableness" is within the discretion of the district court. There are two methods by which the district court may calculate reasonable attorneys' fees in class action cases, the lodestar method and the percentage method. Both lodestar and percentage of the fund methods are permitted. Under either method, attention should be paid to the following factors: the time and expertise required of counsel, the magnitude and complexities of the litigation, the risks involved in the litigation, the quality of representation, the requested fee in relation to the settlement, and public policy considerations.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN6]According to the lodestar method, the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed and then multiplies that figure by an appropriate hourly rate. Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier based on "other less objective factors" such as the risk of the litigation and the performance of the attorneys and the result achieved.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN7]In determining attorney fees under the percentage method, the court sets some percentage of the recovery as the fee. In determining what percentage to award, courts have looked to the same "less objective" factors that are used to determine the multiplier for the lodestar.

*Civil Procedure > Settlements > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN8]Contingency risk is the principal, though not exclusive, factor courts should consider in their determination of attorneys fees.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN9]District courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

**COUNSEL:** For MICHAEL KOH, plaintiff: Ralph M. Stone, James P. Bonner, Lee S. Shalov, Shalov Stone & Bonner, New York, NY.

Case 0:06-cv-01216-JMR-FLN   Document 399-7   Filed 02/04/09   Page 4 of 12

2001 U.S. Dist. LEXIS 8418, *1; Fed. Sec. L. Rep. (CCH) P91,505
Fed. Sec. L. Rep. (CCH) P95,718

For MICHAEL KOH, plaintiff: Jeffrey L. Kodroff, Anthony Chu, Spector & Roseman, P.C., Philadelphia, PA.

For MICHAEL KOH, ERIC GOLDIE, IRA FBO PAUL J. MARCIK, BESSIE GROSSMAN, WALTER F. HANAU, ROBERT HOUGH, SR., plaintiffs: Mark C. Gardy, Abbey, Gardy, L.L.P., New York, NY.

For AUDREY C. BERNSTEIN, BERNARD PUTTER, ARTHUR HECHT, LAINIE KROSSER, JOHN T. LANG, ROSE E. LANG, MAURICE BONIME, DANIEL S. WEISBERG, HERMAN ROSZLER, consolidated plaintiffs: Mark C. Gardy, Abbey, Gardy, L.L.P., New York, NY.

For MAURICE BONIME, consolidated plaintiff: Jay P. Saltzman, Schoengold & Sporn, P.C., New York, NY.

For DANIEL S. WEISBERG, consolidated plaintiff: Daniella Quitt, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY.

For HERMAN ROSZLER, consolidated plaintiff: Joseph H. Weiss, Mark David Smilow, Weiss & Yourman, New York, NY.

For HERMAN ROSZLER, consolidated plaintiff: Kevin J. Yourman, Weiss & Yourman, Los Angeles, CA.

For THE DREYFUS CORPORATION, MICHAEL L. SCHONBERG, defendants: [*2] Mark Holland, Clifford Chance Rogers & Wells, New York, NY.

**JUDGES:** Harold Baer, Jr., U.S.D.J.

**OPINION BY:** Harold Baer, Jr.

**OPINION**

**OPINION & ORDER**

**Hon. Harold Baer, Jr., District Judge:**

Plaintiffs petitioned the Court for approval of a proposed settlement in a class action involving the securities laws. While the settlement worked out between the parties is acceptable, the request for attorneys' fees is not. Counsel requested attorneys' fees equaling 30% of the settlement. For the reasons discussed below attorneys' fees are granted in an amount equal to 15% of the settlement, and plaintiffs' request for costs and expenses is granted.

**BACKGROUND**

Plaintiffs represent a class of investors who purchased shares in two of many mutual funds of the Dreyfus Corporation ("Dreyfus"), the Premier Aggressive Growth Fund ("Premier Fund") and the Aggressive Growth Fund ("Aggressive Growth Fund") (collectively, "the Funds") between October 1, 1995 and June 8, 1998 (the "class period"). The Funds are open-end management investment companies that invest a sizable portion of their assets in publicly-traded equities. The Funds received advisory and managerial services from Dreyfus [*3] and were principally managed by Michael Schonberg ("Schonberg") from July 1995 until April 8, 1998.

The first of several class action complaints were filed on June 19, 1998 alleging violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77k and 77l(a)(2), the Investment Company Act of 1940 ("ICA" or "1940 Act"), 15 U.S.C. §§ 80-a et seq., and state laws in connection with alleged misrepresentations and nondisclosures about the Funds. By an order dated October 2, 1998, this Court consolidated the lawsuits, and on November 12, 1998 the plaintiffs filed a consolidated amended complaint asserting claims against Schonberg, Dreyfus Corp., the Funds, and two other Dreyfus funds (collectively, "defendants"). Defendants moved to dismiss, and on January 5, 2000 this Court dismissed the claims brought under the ICA, but declined to dismiss the 1933 Act claims. Plaintiffs subsequently repleaded the ICA claims in their Second Amended Complaint.

The Second Amended Complaint asserted that defendants made actionable misrepresentations about (i) Schonberg's so-called "front running" ("front-running claims"); (ii) [*4] the criteria employed in selecting the Premier Fund's investments ("micro cap claims"); (iii) the research and analysis involved in selecting those investments ("research and analysis claims") and; (iv) the characteristics and prospects for the Premier Funds ("Fund prospects claims"). At the core of plaintiffs' action was the allegation that Schonberg was "front running," -- i.e., buying securities on behalf of the Funds that he had previously acquired himself without adequate regard for the financial fundamentals of the securities. It is undisputed that Schonberg was front-running, and that

Case 0:06-cv-01216-JMR-FLN Document 399-7 Filed 02/04/09 Page 5 of 12

2001 U.S. Dist. LEXIS 8418, *4; Fed. Sec. L. Rep. (CCH) P91,505
Fed. Sec. L. Rep. (CCH) P95,718

the Funds performed dreadfully over a period of time when the financial markets were generally at their zenith. 1 Subsequent to the filing of this action, the Securities and Exchange Commission ("SEC") fined Schonberg and suspended him from the securities industry.

> 1 "The Fund lost 15.8% in 1997 and 36.7% in 1998, placing it at the bottom percentile of its group, according to Morningstar Inc., which tracks mutual funds." Danny Hakim, Dreyfus to Pay $ 2.9 Million after Investigation of Fund, N.Y. Times, May 11, 2000, at C11.

[*5] On September 20, 2000 the Court certified the class and appointed the law firms of Stull, Stull & Brody, Spector, Roseman & Kodroff, P.C., and Shalov, Stone & Bonner as Co-Lead Counsel for the class, and approved the creation of an executive committee comprising three other firms (collectively, "Counsel"). Defendants filed an appeal to the Second Circuit of the Court's certification decision, but withdrew the appeal on November 20, 2000 after the parties reached a tentative settlement. On January 30, 2001, the parties executed the Stipulation of Settlement, and following court approval plaintiffs sent out 65,000 notices to class members. There were no objections filed and only seven class members opted out. On May 30, 2001, the Court held a joint settlement hearing with Justice Cahn of the New York State Supreme Court who has jurisdiction over a closely related state action. The Court had urged the consolidation of the state and federal actions to conserve judicial time and reduce expense to the parties.

## THE PROPOSED SETTLEMENT & REQUEST FOR ATTORNEYS' FEES

The proposed settlement ("settlement") provides for a total cash settlement amount of $ 20.5 million, of which $ [*6] 18.5 million ("Purchaser Cash Settlement Amount") and the interest thereupon ("Gross Purchaser Settlement Amount") would be paid first to administration expenses, attorneys' fees/expenses and taxes on interest, with the remainder ("Net Purchaser Settlement Amount") to be paid to members of the federal class on a pro rata basis, determined by the class member's "Total Purchase Loss" compared to the "Total Purchase Losses" of all class members. The "Total Purchase Loss" equals the "Purchase Loss" for every share of the Fund purchased during the period October 1, 1995 through June 8, 1998. The "Purchase Loss" is calculated as: (1) the purchase price of the funds; (2) minus either the sales price or the price as of June 8, 1998 if the security was still held as of the that date, the close of class period; (3) minus dividend / capital gains distributions. The opportunity to opt-in to the settlement remains open until June 27, 2001, so there is no definitive number of participants. At the time of the hearing some 6500 members had filed proofs of claim.

Counsel request an award of attorneys' fees of 30% of the Gross Purchaser Settlement Amount -- or $ 5,550,000 plus interest --, and [*7] additional expenses of $ 267,453.41.

## DISCUSSION

I. Settlement Agreement

**Rule 23(e)**

[HN1]Rule 23(e) of the Federal Rules of Civil Procedure requires that any settlement or dismissal of a class action be approved by the court. In determining whether to approve a class action settlement, the district court must determine whether it is *"fair, adequate, and reasonable, and not a product of collusion."* Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000) (emphasis added). In so doing, the court must "eschew any rubber stamp approval" yet simultaneously "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974). Judicial discretion should be exercised in light of the general policy favoring settlement. See Weinberger v. Kendrick, 698 F.2d 61, 73 (2nd Cir. 1982).

[HN2]The Second Circuit has identified nine factors ("Grinnell factors") that courts should consider in assessing the fairness of a proposed settlement: (1) the complexity, expense and likely duration of the litigation; (2) the reaction [*8] of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. Grinnell Corp., 495 F.2d at 463.

2001 U.S. Dist. LEXIS 8418, *8; Fed. Sec. L. Rep. (CCH) P91,505
Fed. Sec. L. Rep. (CCH) P95,718

Further, the [HN3]court should analyze the negotiating process in light of "the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." Malchman v. Davis, 706 F.2d 426, 433 (2d Cir. 1983) (internal citations omitted). A strong presumption of fairness attaches to proposed settlements that have been negotiated at arms-length. See Chatelain v. Prudential-Bache Sec., 805 F. Supp. 209, 212 (S.D.N.Y. 1992).

**Rule 23(e) analysis**

Plaintiffs argue that Grinell factors weigh heavily [*9] in favor of the settlement: (1) the case involves complex legal and factual issues and would require the involvement of expensive experts; (2) no class member objected to the settlement and only seven individuals opted out; (3) plaintiffs conducted extensive discovery (including, they say, reviewing 100,000 pages of documents and taking 16 depositions); (4) defendants would assert credible arguments that the representations were too conclusory to be actionable; (5) defendants had extensive "loss causation" defenses arising from the difficulty of proving that defendants' misrepresentations and Schonberg's front-running caused the Funds to decline in value, as opposed to other market forces; (6) there was some risk that defendants' appeal of the class certification could have succeeded; (7) [plaintiffs did not make a factor "7" argument since Dreyfus is capable of paying far more than required by the proposed settlement]; (8) the range of the settlement is reasonable given that the settlement amounts to 24% of the total losses suffered by those investors who would likely submit proofs of claim; and (9) the 24% recovery is significant given that the defendants' experts would testify [*10] that market trends caused all of plaintiffs' losses, not defendants' wrongdoing. Plaintiffs also argue that the settlement resulted from an arms-length negotiation that extended over two years.

Plaintiffs' argument is convincing. It is particularly notable that there were no objectors, see In re American Bank Note, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001)(McMahon) ("[HN4]it is well settled that the reaction of the class to the settlement is probably the most significant factor to be weighed in considering its adequacy"), and that plaintiffs performed extensive discovery before reaching settlement. Further, the settlement amount, represented to be 24% of the trading losses of the class members likely to submit proofs of claim, is an achievement. See Kurzweil v. Philip Morris Cos., 1999 U.S. Dist. LEXIS 18378, *4 (S.D.N.Y. 1999). 2 There are, however, several reasons why the 24% figure requires qualification. First, plaintiffs' expert calculated the percentage, and therefore it can't be taken at face value. See Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 55-56 (2nd Cir. 2000). Second, the 24% figure presumes that only 65% of the [*11] class will submit proofs of claim, which may or may not prove to be the case, and in any event indirectly implies that Counsel represents only those members of the class that are likely to file proofs of claim. 3 Third, 24% presumes that damages are limited to "trading losses" --i.e., the difference between what investors paid for the securities and the eventual market value -- and does not include other compensatory damages. 4 Such presumption may not be warranted since benefit-of-the-bargain damages, the equivalent of consequential damages in contract law, can be awarded where they can be established with reasonable certainty. See Osofsky v. Zipf, 645 F.2d 107, 114 (2d. Cir. 1981); Panos v. Island Gem Enterprises, Ltd., 880 F. Supp. 169 (S.D.N.Y. 1995). 5 However, even given the foregoing qualifications, this Court finds that the settlement is "fair, adequate, and reasonable." Thus, the motion to approve the proposed settlement is granted.

   2   "The recovery in this case is approximately 25% of the recognized damages of class members, which plaintiff's counsel estimates is between three and five times the usual recovery in class actions. Even if that estimate of the superiority of this recovery is high, independent research discloses that recoveries in securities class actions tend to fall in the 7% to 15% range, well below the recovery here." Kurzweil, 1999 U.S. Dist. LEXIS 18378, at *4.

[*12]

   3   Counsel's expert, R. Alan Miller, stated:

   We believe the average recovery per dollar of loss for each claimant will probably be approximately 24% (before a reduction for fees and expenses). This is so because a) we estimated the total amount of losses incurred by members of the Class in connection with their investments in the Funds to be $ 117,317,821 and b) claims should

Case 0:06-cv-01216-JMR-FLN   Document 399-7   Filed 02/04/09   Page 7 of 12

2001 U.S. Dist. LEXIS 8418, *12; Fed. Sec. L. Rep. (CCH) P91,505
Fed. Sec. L. Rep. (CCH) P95,718

> be about 65% of the total damages taking into account the length of time since purchasers bought their shares, the usual claims returns percentages, and the high quality of the recovery for claimants.

Miller Aff. at P 5.

4   In the Second Amended Class Action Complaint, plaintiffs sought "compensatory damages in ... an amount to be determined at trial." Id. at 62.

5   The parties have not briefed the issue of what damages are recoverable in this action, and the Court need not resolve the issue here.

II. Attorneys Fees

**30% fee request**

[HN5]The attorneys who create a "common fund" are entitled to "*a reasonable fee -- set by the court -- to be taken from the fund.*" Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2nd Cir. 2000) [*13] (emphasis added). The determination of "reasonableness" is within the discretion of the district court, Id. There are two methods by which the district court may calculate reasonable attorneys' fees in class action cases, the lodestar method [6] and the percentage method. [7] See Goldberger, 209 F.3d at 50 (holding that both lodestar and percentage of the fund methods are permitted). Under either method, attention should be paid to the following factors: the time and expertise required of counsel, the magnitude and complexities of the litigation, the risks involved in the litigation, the quality of representation, the requested fee in relation to the settlement, and public policy considerations. See Id. at 50.

6   **Lodestar Method**: [HN6]According to the lodestar method, the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed and then multiplies that figure by an appropriate hourly rate. Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier based on "other less objective factors" such as the risk of the litigation and the performance of the attorneys and the result achieved.

[*14]

7   [HN7]**Percentage Method**: The court sets some percentage of the recovery as the fee. In determining what percentage to award, courts have looked to the same "less objective" factors that are used to determine the multiplier for the lodestar.

Counsel's [8] request that the Court use the percentage method is consistent with the trend in the Circuit. In re American Bank Note, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) ("Although the law in the Circuit has not been uniform, the trend of the district courts in this Circuit is to use the percentage of the fund approach to calculated attorneys' fees.") (citing cases). Courts favor the percentage of the fund method because lodestar "created an unanticipated disincentive to early settlements," tempted lawyers to run up their hours, and "compelled district courts to engage in a gimlet-eyed review of line-item fee audits." Goldberger, 209 F.3d at 48-49; see In re American Bank Note, 127 F. Supp. 2d at 41. [9] For the same reasons, this Court adopts the percentage of the fund method, but will analyze the [*15] documentation of hours submitted by Counsel as a "cross-check" on the reasonableness of the requested percentage, as recommended by Goldberger. Goldberger, 209 F.3d at 50.

8   For purposes of the attorneys' fees and expenses analyses, I will refer to "Counsel," rather than "plaintiffs" because in this matter the interests of the class and their counsel are inexactly aligned. See Goldberger, 209 F.3d at 52 ("the adversary system is typically diluted -- indeed, suspended -- during fee proceedings").

9   For a more positive spin on the advantages of the percentage of the fund system, see In re American Bank Note, 127 F. Supp. 2d at 41 ("the percentage method is attractive because it directly aligns the interests of the Class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." Id.

In my view, 30% of a common fund is at the far [*16] end of the reasonableness spectrum for securities class actions. While I am cognizant of the traditional arguments urging high percentage fees in securities class actions -- i.e., that actions for violations of the securities law are often viable only through the economies of scale of a class action, and that quality attorneys would not

Case 0:06-cv-01216-JMR-FLN   Document 399-7   Filed 02/04/09   Page 8 of 12

2001 U.S. Dist. LEXIS 8418, *16; Fed. Sec. L. Rep. (CCH) P91,505
Fed. Sec. L. Rep. (CCH) P95,718

assume the risks inherent in such actions absent the promise of large returns -- I am not persuaded that meritorious cases would go unlitigated or poorly litigated but for the hope of a 30% fee. Frankly, a persuasive argument may be made that prospective class members having read and indeed come to realize that many times the recovery for them is in pennies may conclude that its time to kill the goose and the golden eggs with it. Further, Counsel have not brought any empirical data to my attention that would support such a conclusion, nor am I aware of any. What empirical data does exist indicates that all but a small percentage of class actions settle, thereby guaranteeing counsel payment of fees and minimizing the risks associated with contingency fee litigations. [10] To my knowledge, rare indeed is the securities class action that doesn't feature [*17] multiple plaintiffs firms vying for the status of lead counsel, co-lead counsel, executive committee member, etc. Moreover, the public policy claim underpinning Counsel's fee request -- that plaintiffs' counsel in securities class actions serve an invaluable sole role -- is under sustained attack, particularly since the enactment of the Private Litigation Securities Litigation Reform Act ("PSLRA"). [11] In sum, it seems to hardly likely that at a time when law sum, it seems to hardly likely that at a time when law school are minting J.D.'s at an unprecedented rate, quality counsel will forsake worthy securities class actions that do not offer the prospect of a big payday.

> 10 See S. Rep. No. 104-98, at 9 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 687 (estimating that approximately 300 securities lawsuits are filed each year and that 93% of these cases reach settlements averaging $ 8.6 million).
>
> 11 Among the reasons why sentiment has shifted against securities class actions are: 1) data suggests that in 96% of cases the deterrent effect of class actions with regard to future corporate conduct is undercut because plaintiffs' counsels agree to settlements within the defendant's insurance coverage; 2) these actions typically lead to small settlements; 3) large payouts penalize innocent shareholders rather than the employees who committed the securities violations; and 4) the net result of these cases is that attorneys collect fortunes, investors recover pennies, and businesses are devastated. See James Cox, Making Securities Fraud Class Actions Virtuous, 39 Ariz. L. Rev. 497 (1997), Michael G. Dailey, Preemption Of State Court Class Action Claims ("Anecdotal evidence establishes that [securities class actions] also exact a significant toll on the time of managers of the defendant companies. A survey of venture capital supported companies showed that, for those in business for ten or more years, one in six had been sued and that the suits cost the companies an average of 1,055 hours of management time. These costs, both financial and time, contributed to Congress's adoption of the PSLRA.").

[*18] In Goldberger, the Second Circuit affirmed an attorneys' fees award of 4% of the common fund and criticized courts who have used 25% (less than the 30% requested here) as a benchmark for attorneys' fees, largely because that percentage presumes "a substantial contingency risk in every common fund case." Goldberger, 209 F.3d at 52. "Anecdotal evidence tends to confirm the conclusion of an empirical study that "there appears to be no appreciable risk for non-recovery" in securities class actions. Id. ("Our nagging suspicion is that attorneys in these cases are routinely overcompensated for such things as contingency risk."). The Second Circuit admonished courts to pay homage to the "overarching concern for moderation," id. at 53, and directed that they set the attorneys' fees percentage primarily according to the actual contingency risk. See id. at 54 ("[we] have historically labeled the risk of success as perhaps the foremost factor to be considered in determining whether to award an enhancement").

Here, Counsel strenuously argued that the contingency risk was significant, principally because plaintiffs would have difficulty [*19] proving that their trading losses were attributable to defendants' alleged misstatements and omissions. At oral argument, Counsel argued that if the case went to trial, a jury might well award modest damages in reliance upon the testimony of defendants' loss causation expert. Counsel's concerns may be warranted, but they are not immediately relevant to "contingency risk." Since plaintiffs have already survived a motion to dismiss and obtained expert testimony on the factual issue of trading losses, loss causation goes to damages, not liability. The principal risk in this case then is not that plaintiffs won't recover; rather that the awarded damages might be less than hoped for. In other words, the real risk here was that Counsel wouldn't collect a high premium over and above their time and expenses. Query whether that is the kind of "contingency risk" that courts

Case 0:06-cv-01216-JMR-FLN   Document 399-7   Filed 02/04/09   Page 9 of 12

2001 U.S. Dist. LEXIS 8418, *19; Fed. Sec. L. Rep. (CCH) P91,505
Fed. Sec. L. Rep. (CCH) P95,718

worry about when considering the effect of fee awards on the willingness of law firms to initiate securities class actions.

In fact, the merits of this case were promising from the outset. It was public knowledge that Schonberg was front-running and that the Funds had performed terribly during the class period. [12] Before [*20] the filing of the first class action complaint, Schonberg's alleged misdeeds had been widely discussed in the investment community. [13] By the time plaintiffs filed the Consolidated Amended Class Action Complaint in November 1998, it was widely known that Schonberg had been placed on administrative leave by Dreyfus and that he was "being investigated by both Federal and New York State regulators" in connection with various suspected misconduct, including his self-interested trades and failure to advise investors that the Funds consisted of high risk "micro-cap" companies. See Niamh Ring, New Fund Industry Scandal Viewed As An Isolated Incident, The Amer. Bankr., July 17, 1998. Indeed, the investigations by the FBI, New York State Attorney General ("NY AG") and the SEC had been ongoing for years. [14] As a result of those investigations, in May 2000 (before this Court's certification of the class) the SEC suspended Schonberg from the securities industry and Dreyfus settled with the NY AG and the SEC, paying substantial fines. At oral argument, Counsel deflected questions about the sundry government investigations and stated that they had not relied upon information obtained from [*21] such investigations, which were focused on different kinds of claims, and that this was not a case of private litigants swooping in like vultures after the government had done their work for them. Counsel's argument misses the mark. There was substantial overlap between the government's investigations and the plaintiffs' claims. [15] More importantly, it was evident when the first class action complaints were filed in this action that Schonberg and Dreyfus had engaged in misconduct with respect to Schonberg's management of the Funds.

 12   In their Second Amended Class Action Complaint ("SAC") plaintiffs stated that in the first half of 1998 "Schonberg's front running and other misconduct in connection with his management of the Funds began to come under public scrutiny." SAC P 217. Plaintiffs then cited to various newspaper articles that discussed Schonberg's front running, conflicts of interest, and dismissal from Dreyfus later in the year. Id. at PP 218-221.

 13   An Asensio & Company report, republished in the PR Newswire on June 12, 1998 ("Asensio & Company Dreyfus Fund Manager Engaged in Fraudulent Activities") stated:

> "Upon discovering Mr. Schonberg's fraudulent activities related to his Chromatics stock purchases Asensio & Company initiated an investigation of the Dreyfus Funds' other holdings. We received reports on a total of 19 companies that are highly suspicious. Each of these companies is or has been overvalued as a result of stock promotions. We also found two companies where Mr. Schonberg purchased shares in private transactions before he used Dreyfus Funds' money to buy stock in the open market."

[*22]

 14   See Danny Hakim, Dreyfus to Pay $ 2.9 Million after Investigation of Fund, N.Y. Times, May 11, 2000, at C11. In July 1998, Business Week reported:

> "The New York probe could be particularly thorny for Dreyfus. The state regulators, who have both civil and criminal jurisdiction, are conducting a wide-ranging probe that began in December, 1996, as an investigation into Dreyfus' advertising of the two funds. According to a source close to the probe, the investigation subsequently broadened to an examination of the funds' stock purchases -- which have included a host of thinly traded penny stocks -- and later to encompass the allegations of conflict of interest. Dreyfus declined to comment on the investigations. Andrew Kandel, head of the Attorney General's office of investor protection,

Case 0:06-cv-01216-JMR-FLN Document 399-7 Filed 02/04/09 Page 10 of 12

2001 U.S. Dist. LEXIS 8418, *22; Fed. Sec. L. Rep. (CCH) P91,505
Fed. Sec. L. Rep. (CCH) P95,718

commented on the general issue by noting pointedly that mutual funds that 'choose to dabble in these highly speculative and manipulation-prone securities and market them to Main Street investors must make specific public disclosure and employ the most thorough supervision of fund managers and fund activities.'"

Gary Weiss, Dubious Dealings Before Dreyfus, Business Week, July 13, 1998, at 18.

[*23]

15 Plaintiffs' other claims -- the micro cap claims, research and analysis claims and Fund prospects claims -- were largely derivative of, or related to, those of Schonberg's activities focused upon by the government investigations.

Counsel identify additional contingency risks in support of their request for fees, including class certification complications and the absence of clear law governing suits involving mutual funds, but these "risks" do not make Counsel's case. First, the risk that the Court would certify some plaintiffs but not others again goes to the size of Counsel's recovery, not its likelihood. Second, plaintiffs' legal theories were well established and did not turn on whether the case concerned mutual funds or individual securities. Here, the contingency risk was real, but not unusually high for these kinds of cases, and hardly sufficient to warrant a 30% fee. [16]

16 The parties entered into settlement discussions in November 1998, almost immediately after the filing of the class action complaint.

[*24] [HN8]

Contingency risk is the principal, though not exclusive, factor courts should consider in their determination of attorneys fees. See id. at 50. ("these factors, however, do not always compel enhanced fees"). [17] In support of their fee request, Counsel generally echo the arguments used to support the settlement agreement (see supra section "I") and emphasize the high quality of the representation received by the class. After reviewing Counsel's written work product, I tend to concur with their self-assessment. Certainly, the class was ably represented and the ensuing settlement is commendable.

17 Of course, no matter which method is chosen, [HN9]district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation. . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." Id. at 50 (quoting In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig., 724 F. Supp. 160, 163 (summarizing Grinnell opinions).

[*25] Applying the "principles of moderation" urged upon me by the Goldberger Court, I conclude that 15% is a reasonable fee in this case. Counsel undertook risk in taking the case and prosecuted the action in a professional manner. The determination that 15% is a reasonable fee tracks the emerging trend within the Circuit of awarding attorneys considerably less than 30% of common funds in securities class actions, even where there is considerable contingency risk. See Goldberger, at 54 (lodestar award equal to 4% of the common fund); Varljen v. H.J. Meyers & Co., 2000 U.S. Dist. LEXIS 16205 (S.D.N.Y. 2000) (20%), In re Fine Host Corp., 2000 U.S. Dist. LEXIS 19367 (S.D.N.Y. 2000) (17.5%); In re American Bank Note Holographics, Inc., 127 F. Supp. 2d 418 (S.D.N.Y. 2001) (rejecting a 30% claim and awarding 25%); c.f. In re Blech Sec. Litig., 2000 U.S. Dist. LEXIS 6920 (S.D.N.Y. 2000) (awarding 30%, but only where the 30% represented a negative multiplier of the lodestar); Auction Houses, 2001 U.S. Dist. LEXIS 1989 (S.D.N.Y. 2001) (lodestar award equal to less than 4% of the common fund); compare Steiner v. Williams, 2001 U.S. Dist. LEXIS 7097, [*26] *19 (S.D.N.Y. 2001) (awarding 30% because plaintiffs' argument was "novel and risky" and because "counsel took a tremendous risk that, in the end, nothing would be recovered"). There is no recent, relevant case support for awarding a percentage as high as 30%, particularly in a case such as this one where 30% represents more than twice Counsel's billings. [18]

18 Goldberger, 209 F.3d at 52.

> "The point is that plaintiffs in common fund cases typically are not fully informed. Nor are they able to negotiate collectively, or at

Case 0:06-cv-01216-JMR-FLN   Document 399-7   Filed 02/04/09   Page 11 of 12

2001 U.S. Dist. LEXIS 8418, *26; Fed. Sec. L. Rep. (CCH) P91,505
Fed. Sec. L. Rep. (CCH) P95,718

arm's length. This is why we emphasized in Grinnell, I, as we rejected a 15% fee, that awards in these cases are proper only "'if made with moderation.'" 495 F.2d at 469 (emphasis added) (quoting [Trustees v.] Greenough, 105 U.S. [527,] at 536, [26 L. Ed. 1157, 15 Otto 527 (1882)]). As Grinnell II instructs, the court is to act "as a fiduciary who must serve as a guardian of the rights of absent class members." [Detroit v. Grinnell Corp.,] 560 F.2d [1093] at 1099 [(2d Cir. N.Y. 1977)] (internal quotation marks omitted)."

"We appreciate that fixing a reasonable fee becomes even more difficult because the adversary system is typically diluted -indeed, suspended - during fee proceedings. Defendants, once the settlement amount has been agreed to, have little interest in how it is distributed and thus no incentive to oppose the fee. See [In re] Continental Illinois [Sec. Litigation], 962 F.2d [566] at 572 [(7th Cir. Ill. 1992)]. Indeed, the same dynamic creates incentives for collusion - the temptation for the lawyers to agree to a less than optimal settlement, "in exchange for red-carpet treatment on fees."

[*27] **lodestar "cross-check"**

Lodestar analysis, which the Goldberger Court encouraged as a "cross-check" on the reasonableness of the requested percentage, Goldberger, 209 F.3d at 50, confirms the appropriateness of a 15% award, 30%, Counsel's requested award, is equal to the aggregated dollar value of their time multiplied by 2.03. There are several reasons why this computation raises red flags. First, the award of such a multiplier would be swimming against the current, as post-Goldberger courts have generally refused multipliers as high as 2.03. See Goldberger, at 54 (no multiplier); In re Auction Houses, 2001 U.S. Dist. LEXIS 1989 (S.D.N.Y. 2001) (no multiplier); Varljen v. H.J. Meyers & Co., 2000 U.S. Dist. LEXIS 16205 (S.D.N.Y. 2000) (refusing to award 1.6 multiplier); compare In re: Fine Host Corp., 2000 U.S. Dist. LEXIS 19367 (S.D.N.Y. 2000) (using a 2.6 multiplier for a "cross check" where the court awarded 17.5% of the settlement amount, and noting other cases where multipliers of 1.5-1.72 were used). [19] Counsel cites to a number of cases in support of the 2.03 multiplier, all of which pre-date Goldberger [*28] . It is not my view that this case poses substantially higher contingency risks than those aforementioned cases in which courts used sub-2.03 multipliers.

> [19] On June 15, 2001, the New York Law Journal reported that an arbitral panel awarded $ 59.9 million, or 1.2% of the common fund, to the lawyers who negotiated the $ 5 billion Holocaust Fund on behalf of the families of Holocaust families. And, while the panel awarded one lawyer, New York University law professor Burt Neuborne, a 2.0 lodestar multiplier, it awarded no multiplier to others of the lead counsel. See Daniel Wise, $ 60 Million In Fees Awarded To Lawyers Who Negotiated $ 5 Billion Holocaust Fund, N.Y. Law Journal, June 15, 2001, at 1.

Second, the time documentation indicates that Counsel's lodestar of $ 2,724,089.56 is excessive, not because Counsel ran up their time, but, rather because Counsel calculated the lodestar using senior partner billing rates for every hour worked by a partner, irrespective of whether a more junior attorney or [*29] in some cases a paralegal could have performed the work at a fraction of the price. Indeed, senior partners performed virtually all of the work on behalf of plaintiffs, and calculated the lodestar using their hourly rates of between $ 375 and $ 600. Of the $ 2,724,089.56, only a very small percentage represents associate or paralegal work. For example, $ 949,031.25 of the lodestar represents the work of the three named partners in one firm, Shalov, Stone & Bonner ("SSB"). Stone billed at $ 375, Shalov billed at $ 434, and Bonner billed at $ 375. Put another way, no one at that firm charged time to this case at a rate of less than $ 375 an hour. Of the $ 390,001.25 lodestar chargeable to the firm of Spector, Roseman & Kodroff, the work of a named partner, Jeffrey Kodroff, constitutes more than 50%. Similarly, the attorney who did the lion's share of the work at Abraham & Paskowitz (lodestar = $

2001 U.S. Dist. LEXIS 8418, *29; Fed. Sec. L. Rep. (CCH) P91,505
Fed. Sec. L. Rep. (CCH) P95,718

304,351,25) charged his time at $ 495 per hour. Howard Longman of Stull, Stull & Brody performed $ 461,295 of his firm's $ 516,726.25 at a rate of $ 510 per hour. The four firms listed above represent $ 2,160,109 of the $ 2,724,089.56 lodestar claim.

Among the activities for which Counsel seek [*30] rates of $ 375 an hour and above are: reviewing SEC filing, reading news reports, document review, investor correspondence, making charts, talking to investors on the phone and basic legal research. [20] For a variety of reasons -- lack of staff, unwillingness to delegate, conscientiousness -- partners chose to do all the legal work, clearly much of which could, and typically is, assigned to junior associates. Counsel invited the Court to approve their rates based, in part, on the fact that partners at the largest New York City firms charge comparable sums. However, at most such firms partners play a largely supervisory role, while the basic work on the case is performed by more junior staff who bill at lower rates. The argument, voiced at the settlement hearing, that associates, per se, can't be entrusted with responsibility of any kind is contrary to reason and practice.

20 See (Shalov Aff., Compendium of Exh., tab 15, PP 2-3).

> SSB played a lead role in all aspects of the litigation. At the inception of the case, we conducted extensive factual investigation and prepared the initial complaint. Thereafter, SSB filed one of the two motions for appointment of lead plaintiffs and Co-Lead Counsel in the litigation. During that process, we spoke to literally hundreds of investors regarding the litigation and their possible role in the case.

> Once appointed as Co-Lead Counsel . . . . we spent many hours researching and drafting the allegations and claims asserted in the Amended Complaint. This entailed, among other things, a thorough and painstaking review of SEC filings, analyst reports and newspaper articles . . . .

[*31] Were I to use the lodestar methodology to award fees (rather than as a cross-check), I would set a lodestar considerably smaller than the $ 2,724,089.56 figure submitted by Counsel. In my view, $ 2,724,089.56 constitutes a reasonable lodestar as adjusted by a not insubstantial multiplier. Thus, this Court's decision to award fees of 15% of the $ 18.5 million settlement, which is equal to $ 2,775,000, does appropriately reward Counsel for the contingency risks they undertook and the quality of their representation.

III. Expenses & Costs

Counsel's motion for reimbursement of $ 267,453.41 is granted.

## CONCLUSION

For the aforementioned reasons, the settlement is approved, attorneys' fees are granted in an amount equal to 15% of the settlement, and Counsel's motion for costs and expenses is granted. The Clerk of the Court is directed to close the case.

**New York: NY**

**Dated: June 21, 2001**

Harold Baer, Jr.

U.S.D.J.