**Exhibit H
Part 2**

2008 U.S. Dist. LEXIS 84708, *64
Fed. Sec. L. Rep. (CCH) P95,718

reasonable. 15 U.S.C. § 78u-4(a) (3) (B) (v) (The properly selected lead plaintiff, [16] presumably the plaintiff with the greatest losses and usually a sophisticated, institutional investor, "shall, subject to the approval of the court, select and retain counsel to represent the class."); 15 U.S.C. § 78u-4(a)(6)("Total attorney's fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of any damages and prejudgment interest actually paid to the class.); Declaration of Charles Silver, # 5906 at 6-9. This Court agrees with the Third Circuit Task Force Report on *Selection of Class Counsel,* 208 F.R.D. 340, 425-26 (2002), that

> deference to the empowered plaintiff's choice of counsel in PSLRA cases should extend to the ex post review of the fee agreement in those cases. The PSLRA establishes a model of client control that extends not only to appointment of counsel but also to monitoring of counsel and negotiation of the fee. [17] The Task Force concludes, therefore, that strict scrutiny of the fee agreement is inconsistent with the client-driven litigation model established [*65] in the PSLRA. . . . The fee reached by agreement between the "most adequate" plaintiff and counsel should be accepted by the court unless 1) it is clearly excessive; 2) it has been rendered unfair by unforeseen developments; or 3) it is found in an *ex post* review that the fee was not reached by arm's length negotiation between lead plaintiff and counsel.

16    The PSLRA requires the selection of the "most adequate plaintiff," the one "most capable of adequately representing the interests of class members," 15 U.S.C. § 78u-4(a) (3)(B)(I), the one who "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements" of Fed. R. Civ. P. 23. 15 U.S.C. § 78u-4(a) (3) (B) (ii) and (iii)(I)(bb) and (cc).

17    The role of lead plaintiff under PSLRA is distinctively different from that in most class actions, wherein the first attorney to file suit is usually named lead counsel and basically controls the litigation.

Indeed, numerous district courts in this Circuit have applied the percentage method alone in awarding attorneys' fees in common fund cases under the PSLRA. *See, e.g., Shaw v. Toshiba America Information Systems,* 91 F. Supp. 2d 942, 966-67 (E.D. Tex. 2000)(listing [*66] twenty district court cases in the Fifth Circuit utilizing the percentage approach). Recently, in *In re Dynegy, Inc. Securities Litig.,* H-02-1571, Order Awarding Attorney's Fees and Reimbursement of Expenses, # 5817 (Compendium of Exhibits), Ex. C at 1, which was brought under the PSLRA, Judge Lake expressly "adopt[ed] the percentage-of-recovery method of awarding attorneys' fees" under *Boeing,* 444 U.S. at 478, and *Blum v. Stenson,* 465 U.S. at 900 n.16, in a common fund securities action. Judge Lake stated that "the Supreme Court has indicated that computing fees as a percentage of the common fund recovered is the proper approach," and awarded fees in the amount of 8.725% of the common fund in accord with the fee percentage [18] negotiated by Lead Plaintiff with Lead Counsel (also Coughlin Stoia) prior to their appointment by the Court. *See also Schwartz v. TXU Corp.,* 3:02CV2243-K, 2005 U.S. Dist. LEXIS 28453, *13 Order Awarding Attorneys' Fees and Reimbursement of Expenses, (N.D. Tex. Nov. 8, 2005)(awarding percentage fee negotiated between Lead Plaintiffs and Co-Lead Counsel," 22.2% of $ 149,740,000 settlement fund, and recognizing a "presumption that a 22.2% fee is . . . reasonable" and that a "fee [*67] structure . . . which provides a higher percentage fee for increasing levels of recovery is entitled to deference because it was designed to incentivize counsel to achieve the maximum result possible for the class"), # 5817 (Compendium of Exhibits # 5817, Ex. D at 2-3).

18    Expert Professor Charles Silver's report provides a chart demonstrating the breakdown of the fee in accordance with the graduating percentages agreed to by the parties and approved by Judge Lake. # 5822 at 32. The increasing fee schedule is similar to that in *Newby.* Lead Plaintiff and Lead Counsel in *Dynegy* were also The Regents and Milberg Weiss, respectively.

## 4. Common Fund Cases

In addition to the PSLRA, whether the percentage is appropriate here depends on the existence of a common fund. Although opining in *Strong* (not a PSLRA

securities suit, but an antitrust action) that the Fifth Circuit generally uses the lodestar method to assess an attorney's fee award in class actions, the Fifth Circuit distinguished that case by noting that the settlement in *Strong* had not produced "a traditional common fund"; specifically the panel highlighted the fact that the district court had "voiced concern that the $ 64 million 'common [*68] fund' figure was 'illusory' and refused to award anything in fees." 137 F.3d at 852, 848. Recognizing that the United States Supreme Court applied the percentage method to determine fees in a common fund class action in *Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980)(holding that as an exception to the American Rule that each litigant should bear his own attorney's fees, "an attorney who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from that fund as a whole, [19] including the unclaimed portion"), the Fifth Circuit questioned whether *Boeing* "has any application to a case such as this one, which uses the lodestar method," but declined to resolve that question. 137 F.3d at 852. Since there was no traditional common fund, the panel observed that "several courts have advocated the use of the lodestar method in lieu of the percentage of fund method precisely in the situation where the value of the settlement is difficult to ascertain, reasoning that there is a strong presumption that the lodestar is a reasonable fee." *Id.* at n.5. It thus implied that the percentage method might be proper or more appropriate where [*69] each member of the class had an "undisputed and mathematically ascertainable claim to part of a judgment." *Id.* at 852, *quoting Boeing*, 444 U.S. at 479.

> [19]   As noted earlier, the rationale for this equitable common fund doctrine or "common benefit" doctrine is that the successful class members who benefitted from the lawsuit would be unjustly enriched if their attorneys were not compensated by the fund created for these litigants. *Boeing*, 444 U.S. at 478; 4 Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 13:76 (4th ed. 2002). Specifically in a common fund case, charging the fund as a whole for the fees is justifiable since the costs of the litigation can be "shifted with some exactitude to those benefitting":
>
> > [E]ach member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf. Once the class representatives have established the defendant's liability and the total amount of damages, members of a class can obtain their share of the recovery simply by proving their individual claims against the judgment fund. This benefit devolves with certainty upon the identifiable persons whom the court has certified [*70] as members of the class. Although the full value of the benefit to each absentee member cannot be determined until he presents his claim, a fee awarded against the entire judgment fund will shift the costs of litigation to each absentee in the exact proportion that the value of the claim bears to his total recovery.
> >
> > *Boeing*, 444 U.S. at 479.

In several post-*Strong* cases, the trial judges have followed the suggestion in *Strong* that the Fifth Circuit may recognize the propriety of applying the percentage method where "each member of the class has an 'undisputed and mathematically ascertainable claim to part of [a] judgment.'" *Shaw*, 91 F. Supp. 2d at 967-68, *quoting Harrah's*, No. Civ. A. 95-3925, 1998 U.S. Dist. LEXIS 18774, 1998 WL 832574, *3-4 (*quoting Strong*, 137 F.3d at 852)(*quoting Boeing Co.*, 444 U.S. at 479).

In contrast to the unusual situation in *Strong*, in the *Newby* settlement the requested fees would come from a traditional common fund in which each member of the class has an "undisputed and mathematically ascertainable claim to part of a judgment." *Id.* Thus under *Strong*, using a percentage method in this common fund case would appear to be proper.

## 5. Hybrid Approach

Yet the Fifth Circuit has several times come [*71] out with blanket pronouncements that it uses the lodestar method to assess attorneys' fees in class action suits, without mentioning a common fund or applying it to a PSLRA case. *See, e.g., Strong*, 137 F.3d at 850; *High*

*Sulfur*, 517 F.3d at 228. As noted, none of these cases was a securities class action under the PSLRA.

In the wake of this uncertainty, some lower court in this Circuit, as well as the Tenth and Eleventh Circuit Courts of Appeals, have applied a hybrid approach, using some combination of a percentage and a "lodestar check." *See, e.g., In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litigation*, 447 F. Supp. 2d 612, 629 (E.D. La. 2006)("Under Fifth Circuit law, the Court has the flexibility to calculate fees based on the percentage method as long as it combines its determination with some analysis under the lodestar method."); *In re Bayou Sorrel Class Action*, No. 6:04CV1101, 2006 U.S. Dist. LEXIS 80924, 2006 WL 3230771, *3-4 (W.D. La. Oct. 31, 2006)(using percentage fee award within *Johnson* framework); *Shaw v. Toshiba America Information Systems, Inc.*, 91 F. Supp. 2d 942, 968 (E.D. Tex. 2000); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 500 (N.D. Miss. 1996). [*72] [20]

> 20   Here Lead Plaintiff has proposed the fee should be the approximately $ 688 million plus interest, the same as that set out in the fee agreement, states that the lodestar for work up until December 15, 2007 was $ 131,971,583.20, and under this formula, seeks a multiplier of 5.2.

The purpose of a lodestar cross-check of the results of a percentage fee award is to avoid windfall fees, i.e., to "ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple." *In re Cendant Corp. Sec. Litig.* ("Cendant I"), 264 F.3d 201, 285 (3d Cir. 2001); *In re Cendant Corp. Sec. Litig.*("Cendant II"), 404 F.3d 173, 188 (3d Cir. 2005). "A cross-check is performed by dividing the proposed fee award by the lodestar calculation, resulting in the lodestar multiplier." *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006). "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y.). Since the multiplier can then be "adjusted to account for particular circumstances, such as the [*73] quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved," if the court considers the multiplier too great, it should reduce the award. *Id.* at 164 & n.4. It can also upwardly adjust the

multiplier in rare and exceptional cases where such a modification is justified by specific evidence in the record and detailed findings by the court. *Id.* The "multiplier need not fall within any predefined range, provided that the District Court analysis justifies the award." *Rite Aid*, 396 F.3d at 307. "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award. Even when the lodestar method is used only as a cross-check, 'courts must take care to explain how the application of a multiplier is justified by the facts of a particular case.'" *Id.*, at 306, *quoting In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3d Cir. 1998); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001).

It may be appropriate [*74] for the court to consider multipliers used in comparable cases. *Rite Aid*, 396 F.3d at 307 n.17. The Third Circuit observed that "'[m]ultiples from one to four are frequently awarded in common fund cases when the lodestar method is applied.'" *PRIDES*, 243 F.3d at 742, *quoting Prudential*, 148 F.3d at 341, *quoting in turn* 3 Herbert Newberg & Alba Conte, Newberg on Class Actions, § 14.03 at 14-15 (3d ed. 1992). In the Rite-Aid litigation, the district court ultimately awarded a lodestar multiplier of 6.96. *In re Rite Aid Corp. Secs. Litig.*., 362 F. Supp. 2d 587 (E.D. Pa. 2005)(awarding 25% of the settlement fund of $ 126,800,000 and 6.96 multiplier). *In Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002), the Ninth Circuit performed a survey of multipliers and found "a range of 0.6-19.6, with most (20 of 24, or 83%) from 1.0 and 4.0 and a bare majority (13 of 24, or 54%) in the 1.5-3.0 range." Nevertheless, insisting that the court must consider all relevant circumstances in determining the amount of a fee award, the Ninth Circuit affirmed the district court' increase of the standard benchmark of 25% to 28% in the fee award because of exceptional results, high risk, the wide-spread [*75] benefits of the litigation, and the market rate. *Id.* at 1048-49.

The Third Circuit is lenient in the kind of cross-check required: "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *Rite Aid*, 396 F.3d at 306-07. The

Second Circuit has also concluded, "[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000), *citing In re Prudential Ins. Co. Am. Sales Litig.*, 148 F.3d 283, 342 (3d Cir. 1998). Instead, the court can measure the claimed lodestar by its own familiarity with the case. *Goldberger*, 209 F.3d at 50. [21] The Fifth Circuit has never indicated that it would relax a lodestar calculation, so this Court has performed a detailed examination in spot checks of the records, though not exhaustive examination of each entry, relying also on the affidavits and declarations submitted by Class Counsel, and has used the *Johnson* factors endorsed by the Fifth Circuit.

[21] this Court does not think [*76] that the Fifth Circuit would go so far as to accord a presumption of reasonableness to a fee request based on a fee or retainer agreement between a properly-selected lead plaintiff and lead counsel, discussed *infra*, but would more likely require some consideration of the fee agreement for reasonableness under the *Johnson* factors. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001). The Fifth Circuit does presume that a calculated lodestar is a reasonable fee, yet it, too, must be examined accordingly. *Walker v. Dept. of HUD*, 99 F.3d 761, 771 (5th Cir. 1996).

As a variation on the percentage calculation, some district judges first establish a benchmark and then adjust it down or up based on analysis of the *Johnson* factors. *Shaw*, 91 F. Supp. 2d at 968. *See, e.g., Harrah's*, 1998 U.S. Dist. LEXIS 18774, 1998 WL 832574 (setting a benchmark fee of twenty-five percent and adjusting it according to Johnson factors, including time expended); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 447-48 (S.D. Tex. 1999)(25% benchmark). A few Circuit Courts of Appeals utilize a percentage of fund method with a lodestar cross-check to evaluate a fee request in a common fund case. *See, e.g., In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006) [*77] [22]; *United States v. 8.0 Acres of Land*, 197 F.3d 24, 33 (1st Cir. 1999). *See also Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007)(affirming district court's percentage of fund method cross-checked by application of the lodestar method to determine reasonable fee award, but also permitting courts to use the lodestar approach alone in

common fund cases); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047, 1050 (9th Cir. 2002)(concluding that the district court has the discretion to choose either the percentage or the lodestar method and proving the district court's application of the lodestar method as a cross-check of the percentage method).

[22] Moreover, a number of courts applying the percentage of fund method have used the Third Circuit's seven-factor-test for determining the percentage, set out in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000): (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration [*78] of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) awards in similar cases. *See, e.g., Di Giacomo v. Plains All American Pipeline*, Nos. Civ. A. H-99-4137 and H-99-4212, 2001 U.S. Dist. LEXIS 25532, 2001 WL 34633373, *9 (S.D. Tex. 2001)(Rosenthal, J.)(applying *Gunter* factors to determine percentage and then the *Johnson* factors as a lodestar cross-check to ensure the percentage fee award is not unreasonably high).

**6. Megafund Rule**

Some courts have recognized a "megafund rule" requiring a fee percentage to be capped at a low figure when the recovery is quite high, but the appellate courts that have examined such an approach have rejected it as a blanket rule. *See, e.g., In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (court must award counsel at the market rate for legal services); *Rite Aid Corp.*, 396 F.3d at 303-03 & n.12 (while Third Circuit has held that "it may be appropriate for percentage fees awarded in large recovery cases to be smaller in percentage terms than those with smaller recoveries . . . [b]ut there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable [*79] fund"; endorsing instead a fact-intensive analysis). A mechanical, a per se application of the "megafund rule" is not necessarily reasonable under the circumstances of a case. The Fifth Circuit does not appear to have addressed the issue of capping attorney's fees in a

2008 U.S. Dist. LEXIS 84708, *79
Fed. Sec. L. Rep. (CCH) P95,718

megafund class action, no less a post-PSLRA megafund securities class action, but the megafund rule is contrary to the Fifth Circuit's approach that the district court scrutinize each case for the particular facts that will determine what constitutes a reasonable fee award. *See also Rite Aid*, 396 F.3d at 302 ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund. Put simply, the declining percentage concept does not trump the fact-intensive . . . analysis. We have generally cautioned against overly formulaic approaches in assessing and determining the amounts and reasonableness of attorney's fees."). A firm charging a higher fee may earn proportionally more for the class than one that charges less. *See, e.g., Third Circuit Task Force Report*, 208 F.R.D. 340, 373 (2002). [23] A number of district courts have also rejected a rule requiring decreasing [*80] the fee percentage as the recovery grows larger. *See, e.g., Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212-13 (S.D. Fla. 2006) (and cases cited therein); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ. A. 03-4578, 2005 U.S. Dist. LEXIS 9705, 2005 WL 1213926, *9-10 (E.D. Pa. May 19, 2005) (rejecting formulaic application of declining reduction to award of attorneys' fees).

> [23]   Coughlin Stoia seek a higher percentage fee than most attorneys have been granted in the last few megafund securities cases with the exception of *Tyco* (14.5%), but 9.52% is still a low percentage in comparison with those in security class actions generally and over a longer time period. Moreover, as will be discussed, the Court finds that the firm obtained exceptional results that justify such a fee, and their results demonstrate why the firm is so highly respected and feared in the securities field.

## 7. Reasonable Hourly Rate

As noted, the lodestar is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rate in the community for such legal services rendered by attorneys of comparable skill, experience, and reputation. *Alberti v. Klevenhagen*, 896 F.2d 927, 936, *vacated* [*81] *in part on other grounds*, 903 F.2d 352 (5th Cir. 1990)(vacating its own reversal of district court's enhancement of the hourly rate for case undesirability and affirming as reasonable that enhancement to attract qualified counsel); *Heidtman v.*

*County of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999) A reasonable hourly rate should be in accord with rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895-96 n.11, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984). "A reasonable hourly rate is determined with reference to the prevailing market rate in the relevant legal community for similar work. . . . While the hourly rate must be 'adequate to attract competent counsel,' the 'measure is not the rates which lions at the bar may command.'" *Coleman v. Houston Independent School District*, 202 F. 3d 264 (5th Cir. 1999) (Table) (available on Westlaw), *citing Leroy v. City of Houston*, 906 F.2d 1068, 1079 (5th Cir. 1990). The relevant legal community is the one in which the district court sits, no matter how much of the work is done elsewhere. *Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 662 (5th Cir. 2002), *abrogated* [*82] *on other grounds, Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). In addition to the community rate, the district court must also consider the attorneys' regular rates. *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir. 1995). There is a strong presumption that the lodestar is a reasonable fee, and the fee applicant bears the burden of demonstrating that an adjustment by application of the *Johnson* factors is necessary to calculate a reasonable fee. *Walker v. Dept. of HUD*, 99 F.3d 761, 771 (5th Cir. 1996).

## 8. *Johnson* Factors and the Multiplier

The twelve *Johnson* factors are (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional [*83] relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19.

While the lodestar is relevant to determining a fee award, it is not the sole basis for determining that award; the *Johnson* factors are applicable to deciding whether the lodestar is reasonable, as well as to adjusting that

Page 25

award by a multiplier once the lodestar is calculated. *Abrams v. Baylor College of Medicine*, 805 F.2d 528, 536 (5th Cir. 1986) ("The time and hours spent on a case are a necessary ingredient in determining a fee award, but they should not be the sole basis for determining a fee. The *Johnson* factors govern the determination of reasonableness itself; they are not merely factors to be considered in adjusting the award once the lodestar is calculated."), *citing Johnson v. Georgia Highway Express*, 488 F.2d at 717.

Compensable hours, reasonably spent, are determined from the attorney's time records. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). Usually courts require the applicant to provide contemporaneous time or billing records or other documentation which the district court must examine and discern which hours are compensable and which are not. *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir.), [*84] cert denied, 516 U.S. 862, 116 S. Ct. 173, 133 L. Ed. 2d 113 (1995). Counsel must "exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary . . . *Id.* The fee applicant bears the burden of showing that the hours claimed were reasonably expended. *Hensley*, 461 U.S. at 437. *See also Saizan v. Delta Concrete Products Company*, 448 F.3d 795, 799 (5th Cir. 2006)(" [P]laintiffs seeking attorney's fees are charged with the burden of showing the reasonableness of the hours billed and, therefore, are also charged with proving they exercised billing judgment. Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant. The proper remedy for omitting evidence of billing judgment does not include a denial of fees but, rather, a reduction of the award by a percentage intended to substitute for the exercise of billing judgment. [footnotes omitted]"). *See also Louisiana Power*, 50 F.3d at 324-25 ("[T]he documentation must be sufficient for the court to verify that the applicant has met its burden. . . . [A] district court may reduce the number of hours awarded if the documentation is *vague or incomplete*. . . . Failing to provide contemporaneous [*85] billing statements does not preclude an award of fees per se as long as the evidence produced is adequate to determine reasonable hours."); *Saizan*, 488 F.3d at 799, 800 (billing judgment requires documentation of the hours charged and of the hours written off as duplicative, unproductive or excessive finding the district court did not commit clear error in finding a failure to produce evidence of billing

judgment nor abuse its discretion by imposing a ten percent reduction in the lodestar because of that failure).

Furthermore, "[i]f more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do may be obviously discounted." *Abrams*, 805 F.2d at 535. "[H]ours . spent in the passive role of an observer while other attorneys perform" are usually not billable. *Flowers v. Wiley*, 675 F.2d 704, 705 (5th Cir. 1982), *quoted in Coleman*, 202 F.3d at 264 (Table; available on Westlaw). "Litigants take their chances when submitting fee applications" without adequate information for the court to determine the reasonableness of the hours expended [*86] or with vaguely described tasks such as "review pleadings," "correspondence," or documents. *Louisiana Power*, 50 F.3d at 327.

The hourly rate for attorneys should not be applied to clerical, secretarial or administrative work, since these are part of office overhead. *Reyes v. Spur Discount Store No. 4*, Civ: A. No. 07-2717, 2007 U.S. Dist. LEXIS 65477, 2007 WL 2571905, *3 & nn.19-20 (E.D. La. Aug. 31, 2007); *Abrams*, 805 F.2d at 536 (court should consider whether the work performed was "'legal work in the strict sense,' or was merely clerical work that happened to be performed by a lawyer."), *quoting Johnson v. Georgia Highway Express*, 488 F.2d at 717. ""[Investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers, but which a lawyer may do because he has no other help available . . . may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it." *Id.* at 535. Work by paralegals may only be recovered to the extent that it is similar to that typically performed by attorneys; otherwise it is an unrecoverable overhead expense. *Coleman*, 202 F.3d 264, *citing Allen v. United States Steel Corp.*, 665 F.2d 689, 697 (5th Cir. Unit B 1982).

Generally [*87] in the Fifth Circuit the determination of a reasonable hourly rate for attorneys in a particular community is established by affidavits of other attorneys of similar caliber practicing in that community. *Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir. 1993); *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002). "The evidence to support an hourly rate entails more than an affidavit of the attorney performing

2008 U.S. Dist. LEXIS 84708, *87
Fed. Sec. L. Rep. (CCH) P95,718

the work but must also address the rates actually billed and paid in similar lawsuits." *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 784 (S.D. Tex. 2007).

As noted, based on one or more *Johnson* factors, the court may apply a multiplier to adjust the lodestar up or down if that factor or factors are not already taken into account by the lodestar, itself. *Strong*, 137 F.3d at 850. An adjustment may only be made if the *Johnson* factor has not already been accounted for in the lodestar. *In re Fender*, 12 F.3d 480, 487 (5th Cir.), *cert. denied*, 511 U.S. 1143, 114 S. Ct. 2165, 128 L. Ed. 2d 888 (1994); *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir.)("[T]he district court must be careful . not to double count a *Johnson* factor [*88] already considered in calculating the lodestar when it determines the necessary adjustments."), *cert. denied*, 510 U.S. 991, 114 S. Ct. 548, 126 L. Ed. 2d 450 (1993).

Four of the *Johnson* factors are presumably included in the lodestar calculation: the novelty and complexity of the issues, the special skill and experience of counsel, quality of representation, and the results obtained from the litigation. *Blum v. Stenson*, 465 U.S. 886, 898-99, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984); *Shipes*, 987 F.2d at 320. [24] "Although upward adjustments of the lodestar figure based on these factors are still permissible, such modifications are proper only in certain rare and exceptional cases supported by specific evidence on the record and detailed findings by the lower courts." *Id.*; see also *Walker*, 99 F.3d at 771, *citing Alberti v. Klevenhagen*, 896 F.2d 927, 936 (*citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air* ("*Delaware Valley I*"), 478 U.S. 546, 564-65, 106 S. Ct. 3088, 92 L. Ed. 2d 439 (1986))(*quoting Blum v. Stenson*, 465 U.S. 886, 898-900, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984); *Dehoyos v. Allstate Corp.*, 240 F.R.D. 269, 323-24 (W.D. Tex. 2007). The Fifth Circuit has also held that two other factors, time limitations imposed by the client or the circumstances and preclusion of other employment, are generally [*89] subsumed in the lodestar calculation, too. *Shipes*, 987 F.2d at 321-22; *Heidtman v. City of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999). Increasing the fee award based on the eighth factor (the amount involved and the results obtained) is only proper when the applicant shows that "it is customary in the area for attorneys to charge an additional fee above their hourly rates for an exceptional result . . . ." *Shipes*, 987 F.2d at 322. The *Shipes* panel did state that "enhancement due to the results obtained may

be warranted." *Id.* at 321.

[24] For example, in *Shipes*, the Fifth Circuit reviewed a district court's enhancement of the "lodestar amount based on the novelty and difficulty of the case because it found that there were over three hundred plaintiffs, an entire spectrum of employment decisions was being challenged, the case was complex and highly technical, and Trinity's obstinate conduct caused additional difficulties." 987 F.2d at 321. The panel opined,

> These factors--not so uncommon in much present-day litigation--simply do not render a case "rare" or "exceptional" for purposes of enhancing the lodestar amount. All counsel competent to handle a case such as this one are expected to [*90] be able to deal with complex and technical matters; this expertise is reflected in their regular hourly rate, based on fees for counsel of similar experience and ability. Still further, the difficulty in the handling of the case is adequately reflected in the number of hours billed-hours for which the attorney is compensated in the lodestar amount. Similarly, obstinate conduct by opposite counsel is compensated for the additional number of hours that are required to prevail over such obstinacy.

*Id.*

**9. Enhancement:** *City of Burlington v. Dague* and **Fee-Shifting- Statute versus Common-Fund Cases**

Relating to the sixth *Johnson* factor, whether the fee is fixed or contingent, in *City of Burlington v. Dague*, 505 U.S. 557, 567, 112 S. Ct. 2638, 120 L. Ed. 2d 449 (1992), the Supreme Court has held that enhancement of the lodestar by a multiplier based on the contingent nature of a fee is not allowed when fees are awarded to plaintiffs' counsel under fee-shifting provisions of statutes.

Several Circuit Courts of Appeals and some district

courts that have examined the language in *Dague* and the policy behind its holding have concluded that because of key differences between fee-shifting and common-fund cases, *Dague* does not apply to common-fund [*91] class action settlement cases. The leading case is *Florin v. Nationsbank, N.A.*, 34 F.3d 560. 564-65 (7th Cir. 1994). This Court is persuaded by the reasoning in *Florin* and progeny.

In *Dague*, the Supreme Court reiterated its earlier rulings that in typical federal statutory fee-shifting cases there is a "strong presumption" that the lodestar by itself represents a "reasonable fee" and that an applicant seeking more money must establish that "'such an adjustment is *necessary* to the determination of a reasonable fee.' ". 505 U.S. at 562, *citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S. Ct. 3088, 92 L. Ed. 2d 439 (1987), and *Blum v. Stenson*, 465 U.S. at 898. Opining that "an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar, the high court noted that the risk of losing a case is the product of two factors: the relative legal and factual merits of the claim and the difficulty of demonstrating those merits. *Id.* at 562. The latter factor is usually subsumed in the lodestar, either in the number of hours expended on the suit or in the hour rate of the attorney adequately skilled and experienced to prove those merits. [*92] *Id.* The first factor is not subsumed in the lodestar, but the Supreme Court found good reason it should not be used to enhance the lodestar figure. *Id.* Because relative merits are a factor in every case since no claim has a 100% chance of success, "computation of the lodestar would never end the court's inquiry in contingent-fee cases." *Id.* Furthermore,

> the consequence of awarding contingency enhancement to take account of this 'merits' factor would be to provide attorneys with the same incentive to bring relatively meritless claims as relatively meritorious ones. Assume, for example, two claims, one with underlying merit of 20%, the other of 80%. Absent any contingency enhancement, a contingent-fee attorney would prefer to take the latter, since he is four times more likely to be paid. But with a contingency enhancement, this preference would disappear: the enhancement for the 20%

claim would be a multiplier of 5 (100/20), which is quadruple the 1.25 multiplier (100/80) that would attach to the 80% claim. Thus, enhancement for the contingency risk posed by each case would encourage meritorious claims to be brought, but only at the social cost of indiscriminately encouraging nonmeritorious [*93] claims to be brought as well.

*Id.* at 563.

Previously, in *Delaware Valley*, 483 U.S. at 725, in a "closely related" argument that the *Dague* Court expressly adopted, 505 U.S. at 567, Justice White had insisted that because contingency enhancement is based on the weakness of the plaintiff's case, it "penalizes the defendants who have the strongest case; and in theory, at least, would authorize the highest fees in cases least likely to be won and hence encourage the bringing of more risky cases. . . ." The *Dague* Court's commented that the fee-shifting statutes were not intended to act "'as a form of economic relief to improve the financial lot of lawyers.'" *Id.* at 563 [citation omitted].

Instead, discussing reasons why contingency enhancement is incompatible with typical fee-shifting statutes, the Supreme Court in *Dague* observed that the fee-shifting statutory language usually limits fee awards to "prevailing," or substantially prevailing, parties, and thus bars a prevailing plaintiff from recovering fees on claims on which he lost; therefore "it should bar a prevailing plaintiff from recovering for the risk of loss." *Dague*, 505 U.S. at 565, *citing Hensley v. Eckerhart*, 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40, and *Delaware Valley*, 483 U.S. at 719-20. [*94] An attorney working on a contingency basis usually pools the risks of his various cases and relies on those in which he is successful to pay for the time he risked on those which were not. Therefore, under a fee- shifting statute, enhancing a lodestar for risk "would in effect pay for the attorney's time (or anticipated time) in cases where his client does not prevail." *Id.* The Supreme Court, noting that it has "generally turned away from the contingent-fee model . . . shifting statutes, concluded that engrafting a contingency enhancement onto a lodestar model would result in "a hybrid scheme that resorts to the contingent-fee model to increase a fee award but not to reduce it. Contingency enhancement is therefore not

2008 U.S. Dist. LEXIS 84708, *94
Fed. Sec. L. Rep. (CCH) P95,718

consistent with our general rejection of the contingent-fee model for fee awards, nor is it necessary to the determination of a reasonable fee." 505 U.S. at 565-66.

In *Florin*, brought under the Employee Retirement Income Security Act ("ERISA") and relying heavily on *Skelton v. General Motors Corp.*, 860 F.2d 250 (7th Cir. 1989), the Seventh Circuit focused on a fee award to be paid, under equitable principles, out of a common fund created by a settlement of a class action [*95] suit, and not under ERISA's fee-shifting provision, 29 U.S.C. § 1132(g). .34 F.3d at 563. At issue was whether the district court had abused its discretion by failing to award appellants a multiplier for risk. *Id.* The district court had calculated a lodestar using counsel's usual hourly rate and the hours documented by the attorneys, but found that there was "no compelling reason" to apply a risk multiplier requested by the attorneys. Acknowledging that *Dague* "has been interpreted to preclude generally the use of risk multipliers in fee-shifting cases," the Seventh Circuit concluded that "*Dague*, by its terms, applies only to statutory fee-shifting cases, and its reasoning is largely based on the statutory language of fee-shifting provision"; moreover the policy considerations informing the *Dague* decision "have little force in common fund cases." *Id.* at 564. Earlier, in *Skelton*, the Seventh Circuit opined that in statutory fee-shifting cases, awarding risk multipliers to prevailing plaintiffs may unfairly burden defendants because the risk multipliers have a tendency to penalize those with the strongest defenses, which increase the risk for the attorney bringing the suit. *Skelton*, 860 F.2d at 253. [*96] In a common fund case this inequitable burden on defendants will not exist because the plaintiff class is responsible for compensating its attorneys by sharing in its recovery. *Id.* Furthermore, in the fee-shifting context, "assessing risk multipliers against losing defendants in effect requires these defendants to 'subsidize' plaintiffs' lawyers for their unsuccessful lawsuits against other defendants. In statutory fee-shifting cases, this is 'manifestly inconsistent with Congress' intent to award attorney's fees only to prevailing parties.'" *Id.* at 253-54, citing *Pennsylvania Valley Citizens' Counsel for Clean Air*, 483 U.S. 711, 720, 107 S. Ct. 3078, 97 L. Ed. 2d 585 (1987). In *Florin*, the Seventh Circuit panel pointed out that unlike in fee-shifting cases, in common-fund actions because a fee award with compensation for risk is ultimately charged against the plaintiffs' common fund, because the defendant has been released from liability in return for establishing the fund, and because the defendant's liability is therefore limited to the amount in that fund, there is no direct or immediate danger of unduly burdening the defendant with a multiplier to compensate for risk. 34 F.3d at 565. Nor can the defendants in common-fund [*97] cases be seen as subsidizing unsuccessful lawsuits against other defendants. *Id.* Finally, the panel observed that in pre-*Dague* cases, the Seventh Circuit had required that a risk multiplier be used if the court found that counsel "'had no sure source of compensation for their services' particularly acute in class action suits. The lawyers for the class receive no fee if the suit fails, so their entitlement to fees is inescapably contingent.'" *Id.* at 555, citing *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 569 (7th Cir. 1992).

In *McLendon v. Continental Group, Inc.*, 872 F. Supp. 142 (D.N.J. 1994) (agreeing with *Florin*), Judge H. Lee Sarokin, then United States Judge for the Third Circuit Court of Appeals, sitting by designation in the United States District Court for the District of New Jersey, agreed with the analysis in *Florin*:

> This court is persuaded by this line of reasoning. First, it is unlikely that attorneys will find sufficient incentive to bring even highly meritorious suits that are also complex, innovative, and lengthy if they will at best recover merely their regular hourly rates if they prevail, and nothing if they do not. Second, numerous differences between statutory [*98] fee and common fund cases render much of the reasoning in the statutory fees cases inapplicable to the common fund context. Third, as noted in *Florin*, defendants' interests are amply protected in common fund settlements.

*McLendon*, 872 F. Supp. at 155-56. Judge Sarokin noted that the argument that enhancing an award for contingency would disproportionally penalize the defendants with the best cases is inapplicable when the plaintiffs rather than the defendants pay the fees. *Id.* at 156. He highlighted the different rationales behind the two types of fee awards: "Fee-shifting provisions are designed 'to encourage private enforcement of statutory substantive rights'" by imposing payment of plaintiffs' costs on defendants who violated those rights and allowing those plaintiffs to obtain counsel and not have

Page 29

their awards diminished by the expense of obtaining counsel [25]; "in contrast common-fund awards are 'based on the equitable notion that those who have benefitted from the litigation should share in its costs.'" *Id.*, citing *Task Force Report*, 108 F.R.D. at 250, and *Skelton*, 860 F.2d at 252. Moreover Judge Sarokin further distinguished fee-shifting cases, in which the right to fees belongs [*99] to the successful plaintiff, from common-fund cases, in which the attorney has the right to claim a portion of the fund. *Id.*

> 25   Fee-shifting statutes often apply to causes of action that result in nonmonetary relief or very modest monetary recoveries that are inadequate to provide a reasonable percentage fee. Thus to attract lawyers to represent plaintiffs and deter wrongdoing in such causes of action, the United States Supreme Court endorsed the use of the lodestar method, which is based on reasonable hours expended multiplied by prevailing market rates, adjusted for factors like delayed payment, partial success, etc., to be paid by nonprevailing defendants. Alba Conte, 1 Attorney Fee Awards § 2:5 (3d ed. Database updated May 2007). In application of the lodestar method under a fee-shifting statute, fee awards are not limited to the amount of money recovered for the plaintiffs and do not need to be proportional, unlike common-fund fee awards, which are paid proportionally by each class member. *Id.*

Progeny of Florin include *In re Washington Public Power Supply System Securities Litig.*, 19 F.3d 1291, 1299-1301 (9th Cir. 1994)("[B]ecause we find *Dagues's* reasoning inapposite in the common [*100] fund context, we hold that district courts have discretion to use risk multipliers to enhance the lodestar in common fund cases."); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 308 (1st Cir. 1995)(permitting court to decide which method, percentage or lodestar, best fits common fund cases and rejecting application of *Dague* to common fund cases; "*Dague*, fairly read, does not require abandonment of the POF [percentage of fund] method typically used in common fund cases"); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516-17 (6th Cir. 1993)(in common fund case allowing court to decide whether to use POF method, which "more accurately reflects the results achieved," or the lodestar method, which "better accounts for the amount of work done"); *Cook v. Niedert*,

142 F.3d 1004, 1014-15 (7th Cir. 1998); *Swedish Hosp. Corp. v. Shalala*, 303 U.S. App. D.C. 94, 1 F.3d 1261, 1267-70, 1273 (D.C. Cir. 1993); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 329-30 (W.D. Tex. 2007); *In re Bausch & Lomb, Inc. Sec. Litig.*, 183 F.R.D. 78, 86-87 (W.D.N.Y. 1998)(agreeing with *Florin* and *Washington Public Power Supply*); *Dubin v. E.F. Hutton Group, Inc.*, 845 F. Supp. 1004, 1014 (S.D.N.Y. 1994)(in [*101] the absence of any ruling by the Second Circuit, holding that risk multipliers are appropriate in common fund cases as long as the court examines the action to avoid rewarding attorneys for bringing cases of "dubious merit" and determines "as a matter of public policy, it is the type of case worthy of judicial encouragement"), *citing In re "Agent Orange" Prod. Liability Litig..*, 818 F.2d 226, 234, 236 (2d Cir. 1987) ("equitable fund cases may afford courts more leeway in enhancing the lodestar, given the absence of any legislative directive"). *See also 1 Alba Conte, JD, Attorney Fee Awards* § 2:10, Ch. 2 ("Common Fund-Fee Awards") (3d ed. 2007). [26] While the Fifth Circuit has not directly addressed the issue, in a post-*Dague*, but pre-PSLRA, case, *Longden v. Sunderman*, 979 F.2d 1095, 1099 (5th Cir. 1992), a common-fund case, it used the lodestar approach with multipliers, including one for risk, to determine a fee award.

> 26   *But see two cases that have applied Dague* to common funds: *In re Bolar Pharmaceutical Co. Inc. Sec. Litig.*, 800 F. Supp. 1091 (E.D.N.Y. 1992), and *Nensel v. Peoples Heritage Financial Group*, 815 F. Supp. 26 (D. Me. 1993).

This Court notes that under the reasoning [*102] of Florin and progeny, the *Dague* opinion is not inconsistent with earlier Supreme Court opinions. In *Blum v. Stevenson*, a 1984 opinion, in dicta the Supreme Court observed, "Unlike the calculation of attorney's fees under the 'common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under [the fee-shifting statute before the Court] reflects the amount of attorney time reasonably expended in the litigation." 465 U.S. at 900 n.16. In *Boeing*, issued in 1980, the Supreme Court had affirmed a fee award decided by the percentage method in a common fund case. 444 U.S. 472, 100 S. Ct. 745, 62 L. Ed. 2d 676. *See Swedish Hospital*, 1 F.3d at 1267-68.

This Court agrees with the reasoning of *Florin* and concludes that, as a matter of law, the holding in *Dague* does not apply to a common-fund case.

### 10. Enhancement Requirements

To enhance a lodestar, the court "'must explain with a reasonable degree of specificity the findings and reasons upon which the award is based, including an indication of how each of the *Johnson* factors was applied.'" *Id.*, *quoting Shipes*, 987 F.2d at 320. "[O]f the *Johnson* factors, the court should give special heed to the time and labor involved, [*103] the customary fee, the amount involved and the result obtained, and the experience, reputation and ability of counsel." *Migis v. Pearle Vision*, 135 F.3d 1041, 1047 (5th Cir. 1998), *citing Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990); *Saizan v. Delta Concrete Products Co.*, 448 F.3d 795, 799 (5th Cir. 2006). "The most critical factor in determining an attorney's fee award is the 'degree of success obtained.'" *Singer v. City of Waco, Texas*, 324 F.3d 813, 829 (5th Cir.), *quoting Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983); *Saizan*, 448 F.3d at 800 & n.19. "This factor is particularly crucial when, as in this case, a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims." *Jason D.W. by Douglas W. v. Houston Indep. Sch. Dist.*, 158 F.3d 205, 209 (5th Cir. 1998), *citing Hensley*, 461 U.S. at 434.

In 7B *Federal Practice & Procedure Civ.* 3d § 1803.1 (Database current through 2008), in discussing what factors may be taken into account to adjust a lodestar, Charles Alan Wright also identified as the most significant one, the benefit (monetary or otherwise) conferred. Wright further observed,

> In addition to the benefit conferred, the district court should [*104] make a qualitative appraisal of the petitioning lawyer's professional services under each of the categories of work reflected in the time records. This might include the following series of inquiries, First, to what extent do the petitioning attorney's credentials and legal experience mark the attorney as someone above the qualitative medium of those of comparable age practicing in the community? Second, what was the quality of the work the attorney actually performed in the case? Third, how efficient was the petitioning attorney in processing the lawsuit? This factor can only be considered by a careful

examination of the novelty of the issues presented by the matter and the lawsuit's overall complexity. . . . Fourth, what responsibility did the petitioning attorney assume in the development and management of the case? . . . . All of these factors should help the court in evaluating the quality of the representation.

*Id.* Regarding enhancement of the lodestar because of a contingency element, Wright emphasized that in class action litigation, the plaintiff's attorney does not receive compensation until the lawsuit is concluded, and only then if he successfully obtains a judgment or settlement [*105] for the class. *Id.* Thus the court should not merely "guess-timate" ex post facto the likelihood of the plaintiff's ultimately succeeding, but "should look at the costs and impact on the lawyers of undertaking the case on a contingency basis, inquiring into the extent to which it required significant resources to be allocated to the case. An important consideration in this regard is the length of time that elapsed between the commencement of the litigation and the fee award, as well as whether it was foreseeable that the litigation would be protracted." *Id.* Moreover in appraising the risk, the court should "evaluat[e] the character of the defense," i.e., focus on the "degree to which the protraction in the case is attributable to the tactical maneuvers of the defendants" and "the professional quality of the defense." *Id.*

### 11. Burden of Proof

Lead Counsel bears the burden of demonstrating that the requested fee award is reasonable, of adequately documenting the attorney's time records, and producing evidence, such as affidavits, declarations, etc. to demonstrate the rates are in accord with "those prevailing in the community for similar services by lawyers of reasonably comparable skill, [*106] experience, and reputation." *Purdie v. ACE Cash Express, Inc.*, No. Civ. A. 301CV1754L, 2003 U.S. Dist. LEXIS 22547, 2003 WL 22976611, *8 (N.D. Tex. Dec. 11, 2003)(and cases cited therein). Evidence of the reasonableness of a proposed hourly rate must include an affidavit of the attorney performing the work and information about rates actually billed and paid in similar lawsuits. *Blum*, 465 U.S. at 896 m.11. Appropriate rates can be determined through direct or opinion evidence about what local attorneys charge under similar circumstances. *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292

(11th Cir. 1998).

### 12. Compensating for Delay in Payment

One accepted method of compensating for a long delay in paying for attorneys' services is to use their current billing rates in calculating the lodestar. *Missouri v. Jenkins*, 491 U.S. 274, 283-84, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989). *See also Islamic Center of Mississippi, Inc. v. City of Starkville, Miss.*, 876 F.2d 465, 473-74 (5th Cir. 1989)(alternatively, calculate the lodestar using historical billing rates and compensate by increasing the lodestar by the rate of inflation from the time services were provided to the date of judgment or, if the attorneys' rates have not changed over time, [*107] compensate for lost time-value by granting a delay enhancement with an explanation how it recompenses counsel for that lost-time value), *impliedly abrogated on other grounds, City of Burlington v. Dague*, 505 U.S. 557, 112 S. Ct. 2638, 120 L. Ed. 2d 449 (1992).

### 13. Non-Class Counsel, The Common Fund Doctrine, and The PSLRA

The Third Circuit, in a very thoughtful and persuasive opinion, has directly addressed the issues of (1) whether the Court in its discretion may award fees from the common fund to non-class counsel who provided legal services to the class action, and (2) as the only appellate court to do so, whether or to what extent the common fund doctrine survives the enactment of the PSLRA. *Cendant II*, 404 F.3d 173 (3d Cir. 2005). The equitable and flexible common fund doctrine "'provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation including attorney's fees.'" *Id.* at 187, *citing In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 n.39 (3d Cir. 1995), and *Boeing*, 444 U.S. at 478-79. The panel commented,

> The cases are [*108] unanimous that simply *doing* work on behalf of the class does not create a right to compensation; the focus is on whether the work provided a benefit to the class. . . . No-lead counsel will have to demonstrate that their work conferred a benefit on the class *beyond* that conferred by lead counsel. Work that is duplicative of the efforts of lead

> counsel--e.g., where non-lead counsel is merely monitoring appointed lead counsel's representation of the class, or where multiple firms, in their efforts to become lead counsel, filed complaints and otherwise prosecuted the early stages of the litigation--will not normally be compensated.

*Id.* at 191. [27]

[27] The Third Circuit opined,

> If a hundred lawyers each perform admirable but identical work on behalf of a class before the appointment of the lead plaintiff, the court should not award fees to each of the lawyers, as this would overincentivize duplicative work. Instead, while all of lead counsel's work will likely be compensable, . . . other attorneys who merely duplicated that work--however noble their intentions, and however diligent their efforts, and however outstanding their product--will not be entitled to compensation. Only those who confer [*109] an independent benefit upon the class will merit compensation.

404 F.3d at 197.

Emphasizing the effect of the PSLRA, the Third Circuit panel noted that the statute "creates an exclusive mechanism for appointing and compensating class counsel in securities class actions." *Id.* at 189. "[S]hift[ing] the balance of power away from plaintiffs' attorneys, who traditionally controlled the common fund cases, to the institutional plaintiffs who now supervise securities class actions," the PSLRA authorizes the lead plaintiff, selected by the court under criteria set forth in 15 U.S.C. § 78u-4(a)(3)(B) (i) and (B)(iii) (I), to choose and retain lead counsel, also subject to court approval under 15 U.S.C. § 78u-4(a) (3) (B)(v). *Id.* at 193, 192.

Observing "significant tension" between the common fund doctrine and the PSLRA, the appellate court pointed

out that it had previously held that "the PSLRA vests authority over counsel selection and compensation in the lead plaintiff--not in the court, and certainly not in entrepreneurial counsel who attempt to appoint themselves as representatives of the class." *Id.* at 193. The appellate court opined that the common fund doctrine remains intact during the [*110] period prior to appointment of lead plaintiff, i.e., "from the accrual of the cause of action to the appointment of lead plaintiff" (which might include legal services involving "discover[ing] possible fraud at the issuer, investigating] that possible fraud, determin[ing] whether it warrants filing of a complaint, mak [ing] strategic decisions about the form and content of the complaint, draft[ing] the complaint, fil[ing] it, issuing] notice to class members, and navigat[ing] the PSLRA's lead-plaintiff procedures"). *Id.* at 193-93, 194. "If an attorney creates a substantial benefit for the class in this period--by, for example, discovering wrongdoing through his or her own investigation, or by developing legal theories that are ultimately used by lead counsel in prosecuting the class action-- then he or she will be entitled to compensation whether or not chosen as lead counsel, " and " [t] he **court**, not the lead plaintiff, must decide for itself what firms deserve compensation for work done on behalf of the class prior to the appointment of the lead plaintiff." *Id.* at 195 [emphasis added by the Court] . During the preappointment period, the court may substantially defer to lead plaintiff's [*111] determination of what work created the benefits to the class, but it may also consider any objections of counsel who have not been funded. *Id., citing Bank One Shareholders Class Actions,* 96 F. Supp. 2d 780, 790 & n.13 (N.D. Ill. 2000). The Third Circuit concluded that the filing of a complaint by attorneys not subsequently appointed lead counsel should best be viewed as "entrepreneurial efforts" and should not be compensable because

> each firms's complaint is the price of admission to a lottery that might result in it being named lead counsel. If the firm wins the lottery, it stands to make significant fees at multiples of its lodestar. Compensating a firm for filing a complaint and not being named lead counsel would offer free tickets to the lead-counsel lottery, and would thus create incentives for redundant filings.

*Id.* at 196. Nor was the appellate court convinced "that

the mere filing of complaints in securities class action ordinarily confers much benefit on the class. Such complaints are as often spurred by news reports or press releases disclosing wrongdoing--or by reports that other firms have filed complaints--as by independent investigation." *Id.* Indeed the PSLRA was enacted [*112] in "reaction against a race-to-the-courthouse model of securities litigation in which attorneys appointed themselves class representatives and chose their own figurehead plaintiffs who had no power to select or oversee 'their' lawyers." *Id.* On the other hand, if non-class counsel do their own investigations and discover distinct grounds or new theories for a suit that are later used and not from public reports, they should usually be compensated out of the class's recovery. *Id.* at 196-97. In the unlikely case that the lead counsel do not request fees for these attorneys' work on which lead counsel relied, "we expect that the court will nonetheless reward earlier attorney's work on behalf of the class." Id. at 197.

Once a lead plaintiff is appointed, "the primary responsibility for compensation shifts from the court to that lead plaintiff, subject of course to ultimate court approval. The PSLRA lead plaintiff is the decisionmaker for the class, deciding which lawyers will represent the class and how they will be paid." 404 F.3d at 197.

The Third Circuit concluded that the court should accord a presumption of reasonableness to any fee petition made under a retainer agreement that was entered [*113] into at arm's length between properly selected lead plaintiff and lead counsel. 404 F.3d at 199. [28] That presumption can then be rebutted by a showing that the original agreement has been materially altered by unforeseen developments or by the objectors making a *prima facie* case that such an award is "clearly excessive" [29] and should be reviewed under traditional standards. *Id.*

---

28   In accord *In re Cardinal Health, Inc. Sec. Litig.,* 528 F. Supp. 2d 752, 758-59 (S.D. Ohio 2007); *In re EVCI Career Colleges Holding Corp. Sec. Litig.,* No. 05 Civ 10240, *et al.,* 2007 U.S. Dist. LEXIS 57918, 2007 WL 2230177 (S.D.N.Y. 2007); *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 466 (S.D.N.Y. 2004)("[I]n class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable"); *In re*

*Lucent Technologies, Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 432 (D.N.J. 2004)("Under PSLRA a fee[] award negotiated between a properly-appointed lead plaintiff and properly-appointed lead counsel as part of a retainer agreement enjoys a presumption of reasonableness.").

29   The *Cendant* court listed the *Gunter* factors (see footnote [*114] 22 of this opinion) as guidelines for determination on rebuttal of whether the fee is clearly excessive. 243 F. Supp. 2d at 171.

Furthermore, since the goal of the PSLRA is to give the lead plaintiff, and not the court, control over lead counsel, non- lead counsel that seek compensation from the class recovery must submit their request to the lead plaintiff. *Id.* Since the PSLRA "significantly altered the landscape of attorney's fee awards in securities class actions" and because the "lead plaintiff is now the driving force behind the class counsel decisions," the Third Circuit recommended that a presumption of correctness should thereafter be accorded to the lead plaintiff's decision that a non-lead counsel's work, not made pursuant to an agreement between lead counsel and lead plaintiff, is not entitled to fees to be paid out of the common fund. *Id.* at 180, 181, 199.

As this Court previously stated, it does not believe that the Fifth Circuit would go so far as to accord a presumption of correctness, but would certainly give the Lead Plaintiff's determination considerable weight here, given how effectively it fulfilled the statutory intent of the PSLRA in controlling and monitoring the [*115] Enron litigation.

The Third Circuit opined that presumption of correctness for the denial of such fees to non-lead counsel by the lead plaintiff, or, in this case, the weight that might be accorded the decision of a properly selected and effective Lead Plaintiff by the Fifth Circuit, not to cover non-counsel's fees, could be countered in two ways if non-lead counsel meets a very high standard to justify why the court's usual deference to lead plaintiff's managerial decisions should not be exercised: non- lead counsel must show (1) that lead plaintiff has failed in its fiduciary representation of the class (mandated by the PSLRA) because the decision was motivated by some factor other than the best interests of the class or the lead plaintiff did not carefully consider and reasonably

investigate non-lead counsel's request; or, even if lead plaintiff has fulfilled its fiduciary duties of loyalty and care, (2) that the denial of fees was erroneous by clearly demonstrating that (a) non-lead counsel reasonably performed the work on behalf of the class, (b) they did so with some reasonable expectation of compensation out of the class's common-fund recovery, and (c) they can and do specifically [*116] identify the benefits they independently provided to the class that would not have been provided by the services of lead counsel. *Id.* at 199-200. For 2(a), non-lead counsel must show that (i) they spent hours prosecuting the claim, (ii) lead plaintiff or lead counsel requested the assistance of non-lead counsel, and (iii) non-lead counsel had a reasonable expectation of compensation out of the class's recovery, based on lead counsel's or the court's acquiescence in non-lead counsel's services. *Id.* at 200 & n.15. For 2(c), non-lead counsel must provide specific proof as to what their efforts were, how they created the benefit, and why the benefit would not have been created absent its efforts. *Id.* at 200. Neither mere monitoring by non-lead counsel of the work of lead counsel nor keeping abreast of the case on behalf of and informing their individual clients are compensable. *Id.* at 201-02.

## II. Findings of Fact:

### A. Fee Agreement and Percentage Method

The percentage method is properly applied here as a matter of law and the fee agreement observed under the PSLRA because the Court finds that the blended 9.52% fee agreed to by Lead Plaintiff and Lead Counsel at the beginning of the *Newby* litigation [*117] (1) is fair and reasonable, (2) is substantially lower than fees awarded in other comparable class actions at the time the agreement was made, [30] and (3) should be enforced for the additional reasons indicated below.

> 30   *See* Declaration of H. Lee Sarokin, # 5819 at 13-14 (declaring after reviewing a compilation of fees awarded in the largest securities class action cases that Lead Plaintiff's blended 9.52% request "is not only fair and reasonable when compared to other awards, it is conservative").

> *See* also for comparative rates Expert Report of Professor Charles Silver, # 5822 at 56-66 (demonstrating that percentage fee agreement between the Regents and Lead Counsel was low compared with the fee requested or awarded in

other class actions).

**1. 9.52% Fee Agreement**

The *ex ante* fee agreement here weighs heavily in support of awarding Lead Counsel 9.52% of the net settlement fund. As indicated, the PSLRA authorizes Lead Counsel to select and retain Lead Counsel. As Judge Marbley observed,

> The benefits of an ex-ante agreement between lead plaintiffs and class counsel at the outset of litigation are substantial. In setting fees ex-post, the Court's evaluation of the risk of recovery, the skill [*118] of the attorneys, the complexity of the case, and the merit of the settlement or award are infected with hindsight bias. So long as lead plaintiff and lead counsel are of equal bargaining power and they negotiate at arm's length, an ex-ante agreement can more accurately reflect the market value of an attorney's services as applied to the particular facts. Further, agreeing to a fee at the outset will align the interests of the class and the attorneys throughout the litigation. Thus the PSLRA places lead plaintiff, at least ex-ante, in the best position to fix the compensations of lead counsel.

*Cardinal Health*, 528 F. Supp. 2d at 758, *citing Cendant*, 264 F.3d at 282.

As explained by the Honorable H. Lee Sarokin, who independently reviewed the petition for award of attorneys' fees here and has provided a Declaration in support of Lead Counsel's fee request, contingent percentage fee arrangements are typical in class actions for three reasons: "First contingent percentage fees align the interests of claimants and lawyers by rewarding superior performance. Second they minimize the need to monitor attorneys and to evaluate the reasonableness of their efforts, both of which are time consuming [*119] and often difficult to do. Third, they insure that the burden of financing the lawsuit is borne by class counsel rather than the class members. And, as demonstrated in this case, litigation costs can be enormous." # 5819 at 7. He points out that "the contingency arrangement is meant to compensate counsel for the risk undertaken and the

result achieved." *Id.*

The Court finds that the fee agreement was negotiated at arm's length between Lead Counsel and General Counsel Office of the Regents of the University of California, a highly sophisticated investor with a substantial stake in the litigation and strong motivation to maximize the recovery for the class (under the fee agreement, over 90% of the settlement fund [31]). The fee agreement served to attract and challenge, by means of an increasing-percentage fee schedule at a lower-than-common contingency fee rate for such cases, one of the top, most experienced, and formidable securities law firms in the country to undertake the largest and most complex securities fraud litigation thus far in the United States. *See also* Supplemental Declaration of the Regents of the University of California in Support of Its Motion for Appointment as Lead [*120] Plaintiff and in Response to Surreply of The New York City Pension Funds and The Florida State Board of Administration, Feb, 6, 2002 (Christopher M. Patti), # 252 at 1-2. [32] There is no evidence to the contrary.

> 31  In contrast, in *WorldCom* approximately 80% of the recovered funds were distributed to debt claimants with Securities Act claims. # 5930 at 4.
> 32  Patti's Supplemental Declaration makes clear that the Regents was fully aware of the difficulties and unprecedented challenges facing counsel and that the Regents' goal was to achieve the maximum possible recovery for the class if the Regents and Milberg Weiss were named Lead Plaintiff and Lead Counsel, respectively:

>> To achieve that overriding objective, we adhered to several principles. First, we sought to negotiate fee percentages that would be substantially lower than those that are commonly agreed to or awarded so that the portion of the total recovery going to the class members would be maximized. At the same time, we recognized that this suit would likely be the largest, most complex, and most difficult securities class action in history. Accordingly, our second principle recognized that the fee agreement had to provide a

2008 U.S. Dist. LEXIS 84708, *120
Fed. Sec. L. Rep. (CCH) P95,718

sufficient [*121] fee to create an adequate incentive for counsel to commit the necessary resources to litigate this difficult case, Finally, we recognized that, given Enron's pending bankruptcy, there is no single source of recovery that is likely to be able to provide an acceptable level of compensation for the class and that achieving recovery above certain levels would become increasingly challenging. Therefore, our third principle held that there should be a modest increase in the marginal fee percentage as the recovery increased to provide counsel an adequate incentive to pursue additional sources of recovery. We believe that the fee agreement we have executed meets these criteria and creates the proper incentives for counsel to maximize the class recovery.

As stated, at the time the agreement was negotiated (2000-01), the 9.52 percentage was lower than that awarded in most securities class actions. Helen Hodges' Declaration, # 5818 at P 26, *citing* Michael Orey, *Cashing in On Shareholder Suits-Class Actions are Mounting and So Are Payouts, As Deep Pockets Get Tapped; Should You File?*, Wall St. J., Apr. 25, 2002 (copy in Lead Counsel's Compendium, # 5817, Ex. E)("[E]ig investors have become increasingly [*122] active, using their clout to drive down attorneys' fees and increasing the payment available for shareholders large and small. The Regents of the University of California, for example, are the lead plaintiffs for claims against Enron; their law firm, Milberg Weiss Bershad Hynes & Lerach, is seeking 8% to 10% of any recovery--about one-third of the customary take."). *See also* Paul S. Atkins, Speech by SEC Commissioner: Remarks before the U.S. Chamber Institute for Legal Reform (Feb. 16, 2006)(Compendium, # 5817, Ex. F)("When talking about the importance and effectiveness of the lead plaintiff provision of the PSLRA, Chairman [Christopher] Cox likes to point to the Enron class action suits. . . . In the Enron litigation, the court chose the Regents of the University of California as the lead plaintiff. One of the

first moves made by the UC Regents was to negotiate a significantly reduced legal fee that resulted in hundreds of millions more dollars for injured investors."); 4 Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 14.6 and n.9 (4th ed., Database updated June 2007)("In the normal range of common fund recoveries in securities and antitrust suits, common fee awards [*123] fall in the 20 to 33 per cent range."). *See also Schwartz v. TXU Corp*, Nos. 3:02-CV-2243-K, et al., 2005 U.S. Dist. LEXIS 27077, 2005 WL 3148350, *27 (N.D. Tex. Nov. 8, 2005)(finding fee award of 22.2% of the common fund under PSLRA "consistent with and, in fact, significantly less than awards made in similar cases" and providing an extensive list of other cases with higher percentage awards).

Not only were the Regents' negotiators (James Holst, John Lundberg, and Lloyd Lee) experienced lawyers, but the Regents had competent in-house counsel (over 35 at the time the agreement was negotiated, now over 60) [33] with extensive experience in complex litigation, including securities and tobacco actions, as reflected in their submissions in support of the Regents' request to be named Lead Plaintiff. James Holst declared that in December 2001, when the Regents applied for appointment as Lead Plaintiff in this action, "[T]he Office of the General Counsel, on behalf of The Regents, carefully considered the choice of Lead Counsel, and in doing so reviewed the qualifications and resources of a number of class action specialist firms." # 5824 at 2. In the highly competitive arena of securities fraud litigation, in which "firms [*124] compete fiercely for opportunities to represent large investment funds," [34] class action expert Professor Charles Silver proclaimed that the Regents is very knowledgeable about prevailing fee rates and not motivated to offer higher fees than the market rate. *See. e.g.*, Expert Report of Professor Charles Silver (# 5822 at 82-83; Declaration of H. Lee Sarokin (# 5919 at 6-7). [35] Furthermore, the structure of the increasing fee schedule here indicates that the Regents and Lead Counsel were aware of the risks and costs of this litigation and that they considered the possibility of a recovery over $ 2 billion, but also the enormous obstacles that had to be overcome (*see infra*). The graduated formula in the fee agreement has served the best interests of the class in inspiring counsel to continued zealousness, tenacity, and substantial investment of its own funds, resources, and legal services over this lengthy period even up to and after the United States Supreme Court issued its decision in *Stoneridge Investment Partners,*

Page 36

*LLC, v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008), indeed ongoing today. [36] See *infra*.

33  Expert Report of Charles Silver, # 5822 at 35.
34  See Expert Report of Professor [*125] Charles Silver (# 5822) at 47- 54 (the Regents' decision to hire Lead Counsel "was reasonable because Lead Counsel offered a superior combination of quality and price" in a deep, competitive market).
35  In agreement with Professor Silver, the Court further points to the Declaration of James E. Hoist (# 5824 at 3-4) about the intentions of the Regents in the arm's length negotiations with Lead Counsel over the fee agreement in the Regents' effort "to maximize the eventual recovery for the ultimate benefit of the Class":

> First, we concluded that a fee based on a percentage of the class recovery would more effectively align the incentives of counsel with the interests of the class than a so-called lodestar-based fee calculation. Second, we sought to negotiate a fee percentage that was substantially lower than the prevailing awards in such cases so that the portion of the total recover going to the Class would be enhance. Third, we recognized that in light of the complexity and difficulty of the litigation, the fee percentage would have to be sufficient to create adequate incentives for the firm to dedicate the substantial resources, possibly over a long period of time, needed to maximize [*126] the Class recovery. Finally, we recognized that, given Enron's bankruptcy, there was no single source of recovery that was likely to be able to provide an acceptable level of compensation for the Class and that achieving recovery above certain levels would become increasingly challenging. We also want to avoid a fee structure that would create an incentive for

> quick, cheap settlements. Therefore, we concluded that the agreement should provide for a modest increase in the marginal fee percentage as the recovery increased to provide counsel an adequate incentive to pursue additional sources of recovery.

36  Lead Counsel has submitted the Declaration of Jonathan W. Cuneo (# 5828), Managing Partner of Cuneo Gilbert and LaDuca, LLP (successor to The Cuneo Law Group, PC) and during this litigation designated by Lead Plaintiff as "Washington Counsel," serving as co-counsel with Lead Plaintiff for the proposed class for Washington D.C.-based services, but directed by Lead Counsel, from December 2001-now. # 5828 at PP 2, 19, 23

Moreover, under the agreement between Lead Counsel and the Regents, expenses were to be "netted" (deducted from the whole recovery) before applying fee percentages for fee [*127] award to Lead counsel. Holst's Declaration, # 5824, P9. Several objectors, including that of Mr. Brian Dabrowski through his attorney, Lawrence Schonbrun, have questioned whether the fees are based on the gross or net recovery and complained that the fees were based on the gross recovery. In its Reply, Lead Counsel clarifies that the fee percentage is applied to the "net," not the "gross" recovery:

> Total recoveries of $ 7,227,390,000 are first reduced by estimated expenses of $ 45,000,000 for a net recovery of $ 7,182,390,000. Applying 8% to the first billion, 9% of the second billion and 10% of the balance results in a fee of $ 688,239,000. See Hodges Decl. P3 & n.7. $ 588,239,000 divided by the gross recoveries of $ 7,227,390,000 generates 9.52%. Thus while for ease of reference, the fee is expressed as a total percentage of the recovery, it is, in reality, calculated on the net. Reimbursement of Lead Counsel's expenses is not part of this motion. The Court has previously approved six expense reimbursement

motions and awarded a total of $ 39 million to plaintiffs' counsel. [37] Counsel estimates that an additional $ 6 million has been incurred and will be the subject of future reimbursement [*128] requests. In sum, Lead Counsel requests the Court award an attorney fee of $ 688,239,000 plus interest thereon at the same rate that has been earned on the funds recovered for the Class.

# 5907 at 2-3, citing 15 U.S.C. § 78u-4(a)(6)("Total attorneys' fees and expenses awarded . . shall not exceed a reasonable percentage of the amount of any damages **and prejudgment interest** actually paid to the class [emphasis added].").

37   The six partial reimbursements approved by the Court are instruments # 2366, 4083, 4741, 5172, 5367, and 5761.

This litigation has been ongoing since the fall of 2001, over six years, and the record attests to a long, difficult fight that justifies honoring the fee agreement's 9.52%.

Helen Hodges' Declaration [38] presents a chart accurately demonstrating significant stages of Coughlin Stoia's prosecution of this litigation. [39] # 5818, P 16 at 10. See also Lead Counsel's proposed findings of fact and conclusions of law (# 5908) at PP 3-22. Ms. Hodges' Declaration summarizes in great detail most aspects of the firm's work on the Enron litigation. # 5818, PP 28-210. The record in this action, which is composed of approximately 6,000 entries at this time, also speaks to [*129] the vast amount of service performed by all Class Counsel. The Court will not repeat the extensive case history and refers the parties to these sources for a summary.

38   Helen Hodges, an attorney at Coughlin Stoia, has worked steadily on this litigation since its inception and has shown herself to be a reliable and credible attorney and officer of the court.

39   Indeed the record speaks to the extraordinary efforts made by counsel: as of the end of April 2008, there were 5,961 entries in the *Newby* case alone.

The two consolidated class action complaints [40] that were filed by Lead Counsel on behalf of the proposed

class, charging eighty-two different defendants including multiple Financial Institutions (some of the largest banks in the world), accountants, law firms, and Enron's inside and outside directors, set out, in this Court's view, astonishingly detailed and informed allegations, especially in light of the complicated structured financial transactions, [41] the intricate accounting concealing the fraud, and the inability of Lead Plaintiff to perform formal discovery because of the stay under the PSLRA, 15 U.S.C. § 78u-4. The First Consolidated Complaint (# 441) demonstrates that Lead [*130] Counsel had diligently investigated and prepared for this proposed class action before its filing.

40   The original *Newby* class action complaint was filed on October 22, 2001. The First Consolidated Complaint (# 441) was filed on 4/08/02; the First Amended Consolidated Complaint (# 1388) was filed on 5/14/03

41   Examples of these complicated off-the-books transactions, detailed in Lead Plaintiff's complaints and other briefing, to conceal Enron's true debt include prepays (loans disguised as commodity transactions), FAS 125/140 (off-balance-sheet sales of unsalable assets to Enron-controlled Special Purpose Entities ("SPEs"), minority interests (borrowed funds from minority-owned subsidiaries reported as equity investments by minority investors or cash flow from operations), share trust transactions, tax transactions, related-party transactions, forest products transactions, and the Nigerian Barge transaction.

Attorney Jonathan W. Cuneo, whose firm worked with Lead Counsel on Washington D.C.-based aspects of the Enron litigation and on collecting ands forwarding information, monitoring the SEC and Congress, attending a very long list of Congressional Enron hearings, and assisting in the [*131] preparation of *amici* briefs submitted in the *Stoneridge* case, as well as convincing numerous significant entities and individuals to file *amicus curiae* briefs supporting scheme liability, described the intricate web of deceit as follows:

The Enron fraud and the financial transactions were bewilderingly complex,

2008 U.S. Dist. LEXIS 84708, *131
Fed. Sec. L. Rep. (CCH) P95,718

deliberately designed toil be difficult to understand, and multifarious in that they involved large numbers of different types of transactions here and offshore with different names, participants, structures, dates and specific purposes and implicating different highly nuanced principles of financial accounting. Although nearly six years later the players and archetypes and patterns seem familiar, they have become accessible in part through repetitive analysis and exposition.

# 5828 at P 28.

## 2. Size and Diversity of the Undertaking

The sheer size, the diversity of Enron securities and investors, and the risks posed by a lengthy duration of such a complex litigation were daunting, especially because under the fee agreement Lead Counsel agreed to advance all costs and to look only to an uncertain recovery for reimbursement of expenses and payment of attorneys' fees in what was bound [*132] to be a long and difficult litigation.

At the time this Court appointed the Regents as Lead Plaintiff and approved its selection of Lead Counsel, the fee agreement, which was submitted to the Court as part of the application process, appeared very reasonable. In its February 15, 2002 memorandum and order this Court wrote,

> Higher fees can be warranted by superior services, but the fees in this class action must be reasonable in light of the circumstance and in compliance with the PSLRA's policy to preserve the substantial portion Of any recovery for the Plaintiffs. Given the magnitude and complexity of this litigation, the geographical and temporal expanse it covers, the number of governmental and private investigations occurring, and the necessary involvement with the bankruptcy proceeding in New York, the selection of competent, experienced and committed Lead Counsel

has even greater import than in normal securities class actions. In reviewing the extensive briefing submitted regarding the Lead Plaintiff/Lead Counsel selection, the Court has found the submissions of Milberg Weiss Bershad Hynes and Lerach LLP stand out in the breadth and depth of its research and insight, Furthermore, [*133] Mr. Lerach has justifiably "beat his own drum" in demonstrating the role his firm has played thus far in zealously prosecuting this litigation on Plaintiffs' behalf.

*In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 458 (S.D. Tex. 2002). Lead Counsel has not disappointed the Regents nor this Court, and the fee agreement clearly motivated Lead counsel to obtain a superb result. It should be honored.

Among Lead Counsel's many legal services, not to mention effective leadership and organization in this litigation on behalf of the class, were spearheading the establishment and coordination of a document depository, the creation of the Deposition Scheduling Committee, and developing a deposition scheduling protocol for oral depositions of fact witnesses, creation of a website for economical and swift service of process and communication among the enormous number of attorneys that appeared in this action, interviews of innumerable witnesses (former Enron, bank, and Arthur Andersen employees and third parties), performance of massive discovery, the taking of more than 370 fact depositions and over 50 expert depositions in a concentrated and orderly fashion, [42] the subpoenaing, gathering and review [*134] of over seventy million documents, the submission of extensive briefing on countless issues, many without, or with minimal, precedent or regarding which courts were in substantial conflict, responding to approximately 420 complex motions to dismiss, addressing issues of class certification (for which Lead Counsel participated in a two-day hearing), answering motions for summary judgment, retaining and taking depositions of top-level experts (Defendants alone had 40; Coughlin Stoia had 12 [43]) and generating expert reports on numerous issues, and, finally, extensive trial preparation. *See, e.g.*, Declaration of Helen Hodges, # 5818, PP 211-28, at 118-28. At least twelve of Coughlin Stoia's lawyers worked full-time on (this litigation at every stage. *Id.* at 6.

42   The Declaration of Helen Hodges, # 5818, 169 at 92-100, states that the parties took 420 fact depositions, lists them, and identifies the Coughlin Stoia attorney(s) in attendance at each.

43   Hodgeis' Declaration, # 5818, P7 at 11.

Moreover Class Counsel had to cover several venues. For the benefit of the proposed class, Lead Counsel, with the help of bankruptcy experts Genovese, Joblove & Battista, participated in the parallel Enron [*135] bankruptcy proceedings in the Southern District of New York, moving for appointment of a trustee, then negotiating for the selection of Neal Batson to serve as the Enron Bankruptcy Examiner, whose resulting reports were of great value to the *Newby* plaintiffs in prosecution of this action, and obtaining a lift of the stay of discovery so documents could be retrieved from Enron. Declaration of Johri H. Genovese (# 5826) at PP 8-26; Declaration of Helen Hodges (# 5818) at P 8, PP 229-37. [44] In still another

44   Lead has Counsel has provided evidence to show that it did not merely rely on other investigations to prosecute this case. In her sworn Declaration, Helen Hodges maintains that Coughlin Stoia did not merely rely on Batson's evidence to prosecute this action. After negotiations which resulted in Batson's appointment,

> Batson used our Consolidated Complaint as a "road map" for his investigation. After Batson gathered evidence, the banks asked Judge Gonzalez to deny us access to the evidence and Judge Gonzalez granted that motion. In the meantime, we moved Judge Harmon for and were granted access to the evidence which Batson gathered and which the banks and Enron had. While we used Batson's [*136] evidence to streamline our depositions, we didn't stop there. We gathered evidence far beyond what Batson had from the banks, from third parties such as rating agencies and stock analysts, and most notably, from Andrew Fastow . . .

# 5818 at P 8, 6-7. *See also* Lead Counsel's Memorandum (# 5816 at 63)

In John H. Genovese's Declaration (# 5826 at 10-11, 11 24-25), after describing his firm's work in getting Neal Batson appointed as the Enron Bankruptcy Examiner, Genovese points out,

> While the Examiner Reports in many respects served to validate and confirm the Lead Plaintiff's allegations, the existence of the Reports added further credibility to the Lead Plaintiff's allegations and were of use in a number of ways including, of course, negotiations leading to the Recoveries.,

> At a minimum, as observed by this Court, the use of deposition transcripts and sworn statements obtained by the Examiner would streamline depositions and provide impeachment tools in this litigation. While it is hard to quantify the savings obtained in coordinating discovery, the amount spent by the Enron bankruptcy estate to investigate the Enron fraud and provide factual support for Lead Plaintiff's allegations reflected [*137] in the Examiner's analysis, documents, discovery and sworn statements can be quantified. Batson and his firm received payment of fees and reimbursement of costs totaling approximately $ 85 Stated another way, work product useful to the Lead Law Firm was produced at a cost to Enron's bankruptcy creditors and not the Class, thereby significantly reducing the lodestar in this litigation.

*See also* Declaration of Professor John Coffee, # 5821 at 24 n.4 ("Undoubtedly, both Batson and Lead Counsel proved useful to the other, and Lead Counsel's consolidated complaint provided a

'roadmap' for Batson's investigation. But Batson's findings carried no collateral estoppel impact, and defendants also sought to exclude Batson's report from any trial. Moreover, Lead Counsel went far beyond the testimony developed by Batson, for example by deposing witnesses that Batson never interviewed, including Andrew Fastow, credit ratings agencies, and securities analysts. Even if Batson made a contribution to the outcome, he never focused on Lead Counsel's 'scheme to defraud,' theory nor had the impact of a prior determination that plaintiffs could rely on for its collateral estoppel impact.").

venue, Genovese, [*138] Joblove & Battista also filed a proof of claim and an adversary complaint on behalf of the Regents and the proposed class in the bankruptcy proceedings of LJM2 in Dallas, Texas and obtained a recovery of $ 51.9 million from the debtor's estate (twice as much as the other claimants) even though debtor was bankrupt. Genovese Declaration (# 5826) at PP 33-50. Lead Plaintiff also participated persistently in settlement negotiations, including mediation a number of times with different mediators. Declaration of Helen Hodges, # 5818, PP 238-55. After the Fifth Circuit decertified the class on March 19, 2007, Coughlin Stoia pursued the issue of scheme liability under § 10(b) and Rule 10b-5(a) and (c) to the Supreme Court, both in its petition for certiorari in this action and in the *Stoneridge* case. Lead Counsel also worked for substantial time on a plan of allocation for the settlement fund, a difficult task given the diverse Enron securities involved, some of which lacked pricing data and/or trade volume data. Declaration of Helen Hodges, # 5818, PP 282-89 at 154-57.

### 3. Evaluation by Professor Coffee

The Court, from its own experience in presiding over this litigation for more than six years, [*139] fully concurs with some of the highly qualified experts' assessments of Lead Counsel's remarkable prosecution of this action. In particular, the opinion of Columbia University Professor John C. Coffee, Jr., a prominent authority in the field of class actions and securities litigation, who has often been negatively critical of the performance of plaintiff's attorneys in class actions, particularly securities class actions, over the past twenty five years, [45] has impressed the Court as very instructive and persuasive.

45  *See, e.g.*, John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation*, 106 Colum. L. Rev. 1534 (2006).

Professor Coffee identifies as "the two most critical factors in an optimal fee award determination: (1) How successful were plaintiffs' counsel when measured against the best possible outcome? and (2) How high a level of risk did they face?" Decl. of John C. Coffee Jr., # 5821 at P 26. Professor Coffee continues, "Put simply, this is a litigation that can only be described in superlatives. To begin with, it represents the largest recovery ever in any class action--not just securities class actions but all class actions," [*140] despite the fact that "from the outset, Enron was in bankruptcy and Arthur Andersen was on the brink of insolvency," certification of the class was unresolved until granted by this Court in 2006, and was then reversed by the Fifth Circuit [46]; and the unparalleled amount of the settlement fund "strongly suggests that Lead Counsel performed with an extraordinary level of skill and negotiating prowess." *Id.* at P 2.

46  *Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1120, 169 L. Ed. 2d 957 (2008).

Professor Coffee also observes that the fact that three large financial institution defendants "held out" and did not settle "only underlines that the risk was real." *Id.* at P 3. As for Lead Counsel's negotiations with those that did settle for over $ 2 billion each in what "was arguably the highest stakes legal poker game ever played," Professor Coffee comments, "Few, if any, other plaintiffs' counsel in my judgment could have pulled off such a tour de force" and the achievement "is attributable in almost equal measure to its credibility, creativity and the intensity of its commitment to this case. In my judgment, Lead Counsel [*141] is the adversary most feared today by the defense bar in securities litigation, and that reputation played an important role here." *Id.* at P 4. [47] In an "extraordinary investment for one firm to make," Lead Counsel "risk(ed) its own time and money on a novel legal theory, with little precedent to support it, in a case that initially seemed both financially unpromising and difficult to settle," in advancing over $ 45 million in expenses and 280,000 hours of time. [48] *Id.* at P 5. Moreover, "Lead Counsel was literally litigating against