# Exhibit H
# Part 3

the cream of the American corporate law bar" which "vastly outnumbered" Plaintiffs' counsel, [49] and "defendants had retained many of the leading authorities as their expert witnesses," making plaintiffs' burden "also exceptional." *Id.* The Court concurs with all these observations. Professor Coffee concluded, "To sum up, in my judgment, few other counsel (and perhaps no other) could have obtained this degree of success." # 5821 at 6. In addition, Professor Coffee praises the litigation as "illustrat[ing] the best practices in class action," "a model of transparency" in the negotiation of a fee formula, which would "incentivize their counsel to assume the [*142] enormous risks in this case over a potentially indefinite period," by a sophisticated, public, and politically accountable body, the Regents of the University of California, which continues to voice its satisfaction with the arrangement. *Id.* at P 6.

47    *See also* Expert Report of Charles Silver, # 5822 at 49-51.

48    *See also* Declaration of James E. Hoist, now General Counsel Emeritus of the Regents (# 5824 at 2), which states about the Regents' selection of Lead Counsel: "The objective of this process was to retain outside counsel possessing the financial resources, skill, experience, and track record to obtain optimum results for the Class. The Regents selected [Lead Counsel] . . . on the basis of the extensive experience of that firm's attorneys in securities litigation, the resources the firm had available to prosecute the case, and the aggressiveness it had already demonstrated in doing so." He further states that the Regents also selected Lead Counsel for the Dynegy litigation before Judge Lake because "we had acquired extensive experience working with Lead Counsel and had observed first-hand the skill and determination of Lead Counsel and their dedication to the best interests of the [*143] class. We had developed an extremely effective working relationship with Lead Counsel, and our role in supervision and management of every aspect of the Enron litigation had been welcomed by them." *Id.*

49    The Court notes that among the many excellent firms involved in the *Newby* litigation were Akin Gump; Boies, Schiller; Cadwalader Wickersham & Taft, LLP; Cleary Gottlieb; Clifford Chance US; Cravath, Swaine & Moore, LLP; Davis Polk; Jones Day; King & Spalding;

Keker & Van Nest, LLP; Latham & Watkins, LLP; Mayer Brown LLP; O'Melveny & Myers, LLP; Paul Weiss, Rifkind, Wharton & Garrison LLP; Shearman & Sterling, LLP; Sidley Austin; Simpson Thatcher & Bartlett, LLP; Sullivan & Cromwell, LL;, Susman Godfrey, LLP; Weil Gotschal and Manges; White & Case, LLP; and Williams & Connolly.

## 4. Comparable Litigation Fee Awards

Professor Coffee's Declaration contains charts and data that demonstrate the dates, settlement funds, and percentage awarded as attorneys' fees in securities and other kinds of class actions reported in various studies to compare the results in the *Newby* litigation. He demonstrates that many more factors must be examined than the amount of the recovery and the percentage of that [*144] recovery represented by the fee. He proffers a chart of the largest class action settlements involving "mega-fund" case recoveries of more than $ 100 million since 1990 and the fee award expressed as a percentage of that recovery. # 5821 at P 22. He concludes that when the settlement funds are below $ 1 billion, fee awards of 20-25% have been awarded by many courts, although others allow only single digit fees. When the recovery is over the $ 1 billion line, the percentage of the fee awards decline significantly. *Id.* at P 23. Then he points to the importance of the unexpressed facts underlying the figures.

For instance, in *WorldCom*, the securities class action litigation closest to *Newby* in the amount of recovery, Professor Coffee reports that the plaintiffs recovered $ 6.133 billion and that the fees ($ 336.1 million) amounted to 5.5% of the recovery. # 5821 at P 22. But Professor Coffee distinguishes the two cases: in the *WorldCom* litigation, counsel recovered only 2.9% of the decline in market capitalization, for a total of $ 6.133 billion; Lead Counsel in *Newby* not only recovered $ 7.23 billion, 1.1 billion more than in *Newby*, but in percentage of market capitalization loss, 8.3% [*145] versus 2.9%. # 5821 at PP 27-28, including Table 4, chart entitled Comparative Settlement Recoveries/Fee Awards. Professor Coffee calculates that only 20.9% of the recovery in *WorldCom* was distributed to shareholders, with the rest (79.1%) going to note purchasers based on Sections 11 and 12(a)(2) claims under the Securities Act of 1933 against the underwriter defendants. *Id.* at P 29 & n.3. Thus the *WorldCom* claims were largely strict

liability claims. In contrast, the Newby Lead Counsel recovered almost six times as much for shareholders, with claims largely under § 10(b), in the face of higher risk where the issuer, Enron, was bankrupt. *Id.* He explains that most of the claims in *WorldCom* were under Sections 11 and 12(a)(2), which "essentially shift the burden of proving non-negligence to the defendants and require no allegation of scienter," while *Newby* was "essentially a Rule 10b-5 action" in which the scienter of each defendant had to be pleaded with particularity and plaintiff must prove reliance. [50] *Id.* at P 30. He also found that "the fraud in *WorldCom* was simple," as was the accounting, while *Newby* "involved the murkiest depths of contemporary accounting theory," allowing secondary [*146] defendants to "more plausibly assert that they had not known of the fraud and could not be expected to have discovered it." *Id.* Each bank defendant involved different facts and different transactions. [51] Moreover, he points out that in the *Dynegy* litigation (H-02-1571, Order Awarding Attorney's Fees and Reimbursement of Expenses, # 5817 (Compendium of Exhibits), Ex. C at 1), Judge Lake approved essentially the same type of 8% to 9% to 10% increasing percentage-of-the-recovery fee formula to the same firm as that requested in this case. # 5821 at PP 22, 44.

> 50   Lead Counsel points out that only one bank, Citigroup, faced § 10(b) liability in *WorldCom*. *See, e.e.*, # 5931 at 4.
>
> 51   Lead Counsel explains that this factor affected staffing, requiring "a separate team complete with senior lawyer leadership for each bank." # 5907 at 59.

Professor Coffee comments, "Ultimately, the role of an expert witness in a class action fee determination is modest. The ultimate decision belongs to the Court. But expert testimony can inform the court by pointing out relevant comparisons and empirical data." # 5821 at P 7. He fulfills that role not just in his *WorldCom/Newby* comparison, but with objective evidence [*147] to demonstrate why Lead Counsel's fee request is reasonable.

First Professor Coffee relies on the "most complete analysis of fee awards in securities class actions" by National Economic Research Associates ("NERA"), an economics consulting firm, to determine whether the percentage agreed to by Lead Plaintiff and Lead Counsel was reasonable at the time the agreement was made. *Id.* at PP 14-17, citing Frederick C. Dunbar, Todd S. Foster, Vinita K. Juneja, Denise N. Martin, Recent Trends III: What Explains Settlements in Shareholder Class Actions? (NERA, June 1995)("Nera Study"). That NERA study concluded, "Regardless of case size, fees average approximately 32 percent of the settlement." *Id.* at PP 16-17 (and supporting Table). [52] He also reports the results of a study by Vincent O'Brien, A Study of Class Action Securities Fraud Cases, 1988-1996(1996)("the O'Brien Study"), which found the average fee to be 32%, and reported some other studies finding as much as 40%. In paragraph 22 of his Declaration, Professor Coffee presents a table of lodestar multiplier data in recent mega-fund litigation since 1990, with recoveries over $ 100 million, expressed as percentages that ranged from 1.7% [*148] to 30%. In P 24 he produces a table of the largest antitrust class action recoveries, with fee awards ranging from 6.5% to 35.1% In P 27, he reports comparative settlement recoveries, the percentage of market capitalization recovered, and the percentage that constituted the fee award (for class actions including *WorldCom, AOL Time Warner, Nortel I, Royal Ahold, Dynegy, Raytheon, Waste Management,* and *Global Crossing*, with fee percentages ranging from 6% to 21.4%.

> 52   This study has been updated. *See* Denis M. Martin, et al., *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions,*: 5 Stan. J.L. Bus. & Fin. 121, 141 (1999). It also concluded that fee awards averaged approximately 32% of the settlement.

The following chart can be found in the Declaration of Helen Hodges, # 5818; 292-94 and Exhibit 5. [53] It lists post-PSLRA securities fraud class action cases with settlements at or above $ 400,000,000, listed in order of the highest settlement to the lowest, before Enron and demonstrates that shows that Lead Counsel's requested 9.52% fee falls below the middle range of other percentage awards, which vary from 1.73% to 21.4%, with the average percentage being 11.61%. [*149]

> 53   A shortened version of this chart, including only the top cases, was submitted by Financial Counselors for Enron Plans with their objections to the fee request, # 5869 at 5. The information and these cases are discussed in *In re Tyco International Ltd. Multidistrict Litigation*, 535 F. Supp. 2d 249, (D.N.H. 2007)(page numbers not

2008 U.S. Dist. LEXIS 84708, *149
Fed. Sec. L. Rep. (CCH) P95,718

yet available). In four of the five most recent megafund settlement cases there are lower percentage fee awards, but Tyco stands out in contrast.

TOP SECURITIES SETTLEMENTS

| Case Name | Settlement Amount | Lodestar | Fee Award | Fee Award % |
|---|---|---|---|---|
| WorldCom | $ 6,133,000,000 | $ 83,183,238.70 | $ 336,100,000.00 | 5.48% |
| Tyco | $ 3,200,000,000 | $ 172,069,355.65 | $ 464,000,000.00 | 14.5% |
| Cendant | $ 3,186,000,000 | $ 8,000,000.00 | $ 55,000,000.00 | 1.73% |
| AOL/Time Warner | $ 2,650,000,000 | $ 39,973,056.76 | $ 147,500,000.00 | 5.57% |
| Nortel I | $ 1,142,000,000 | $ 16,655,971.00 | $ 34,283,259.29 | 3.00% |
| Nortel II | $ 1,039,811,504 | $ 17,429,370.30 | $ 83,184,920.32 | 8.00% |
| Royal Ahold | $ 1,088,732,241 | $ 50,858,606.25 | $ 130,647,868.95 | 12.00% |
| McKesson | $ 960,000,000 | $ 31,160,000.00 | $ 74,784,000.00 | 7.79% |
| Cardinal Health | $ 600,000,000 | $ 18,378,123 | $ 107,580,000 | 18% |
| Lucent | $ 517,000,000 | $ 20,244,296.58 | $ 87,890,000.00 | 17.00% |
| Bankamerica | $ 484,551,469 | $ 28,805,990.75 | $ 86,416,085.14 | 17.83% |

2008 U.S. Dist. LEXIS 84708, *149
Fed. Sec. L. Rep. (CCH) P95,718

| | | | | |
|---|---|---|---|---|
| Dynegy | $ 474,000,000 | $ 10,162,041.75 | $ 41,359,818.00 | 8.73% |
| | | | | |
| Raytheon | $ 460,000,000 | $ 13,160,578.00 | $ 41,400,000.00 | 9.00% |
| Waste Mgmt. II | $ 457,000,000 | $ 6,842,457.00 | $ 36,240,100.00 | 7.93% |
| Adelphia | $ 455,000,000 | $ 33,686,468.00 | $ 97,370,000.00 | 21.40% |
| | | | | |
| Global Crossing | $ 448,000,000 | $ 28,242,915.18 | $ 72,470,000.00 | 16.04% |
| | | | | |
| Freddie Mac | $ 410,000,000 | $ 35,353,394.50 | $ 82,000,000.00 | 20.00% |
| | | | | |
| Qwest | $ 400,000,000 | $ 18,547,453.65 | $ 60,000,000.00 | 15.00% |
| | | | | |
| Totals | $ 24,105,095,214 | $ 632,753,317 | $ 2,038,226,051 | |
| Average | $ 1,339,171,956 | $ 35,152,962 | $ 113,234,781 | 11.61% |

| Case Name | Stage of Case Upon Settlement | Pages of Documents Reviewed | Depos |
|---|---|---|---|
| WorldCom | Various Class | 10,000,00 | 41 |
| Tyco | Cert state Class | 83,500,000 | 220 |
| Cendant | Cert state | 1,000,000 | 0 |
| AOL/Time Warner | Merits discovery Class | 15,500,000 | 0 |
| Nortel I | Cert state Class | 2,000,000 | 12 |

2008 U.S. Dist. LEXIS 84708, *149
Fed. Sec. L. Rep. (CCH) P95,718

| | | | |
|---|---|---|---|
| Nortel II | Cert | 10,000,000 | 0 |
| | stage | | |
| | Class | | |
| Royal Ahold | Cert | 15,000,000 | 0 |
| | stage | | |
| McKesson | Merits | 2,000,000 | 65 |
| | discovery | | |
| Cardinal | Merits | 7,200,000 | 0 |
| Health | discovery | | |
| | Class | | |
| Lucent | Cert | 3,000,000 | 0 |
| | stage | | |
| | expert | | |
| Bankamerica | disc | 1,500,000 | 75 |
| | completed | | |
| | expert | | |
| Dynegy | disc | 1,200,000 | 19 |
| | completed | | |
| Raytheon | Trial | 1,000,000 | 45 |
| Waste | Motion to | 700,000 | 12 |
| Mgmt. II | Dismiss | | |
| Adelphia | Amended | 1,500,000 | 0 |
| | Complaint | | |
| Global | Merits | 270,000 | 0 |
| Crossing | Discovery | | |
| | Class | | |
| Freddie Mac | Cert | 6,700,000 | 78 |
| | stage | | |
| | Class | | |
| Qwest | Cert | 9,000,000 | 60 |
| | stage | | |
| Totals | | 171,070,000 | 627 |
| Average | | 9,503,888 | 37 |

| | | | | |
|---|---|---|---|---|
| Enron | $ 7,227,390,000 | $ 127,000,000.00 | $ 688,000,000.00 | 9.52% |

| (proposed) | | | | |
|---|---|---|---|---|

| Enron | Various | 70,000,000 | 370 |
|---|---|---|---|
| (proposed) | | | |

The [*150] Court finds that this chart makes clear that a number of quite variable factors are relevant to the issue of reasonableness, not merely the actual amount of the fee or the percentage of the settlement fund it constitutes, but also considerations such as the stage of the litigation, the number of documents reviewed, and the number of depositions taken. These in turn are affected by factors not on the chart, including the number of parties involved, the number of causes of action and their legal complexity, the length of the class period, and the variety of different kinds of securities covered. The comparison justifies the requested fee award in a number of categories: the unmatched size of the recovery ("the most critical factor"), the late stage of the litigation, and the extensive document and deposition review.

In addition, there are copies of orders of fee awards in these top securities cases attached to the Hodges Declaration as Exs. A-0. She also provides a chart comparing settlements in non-securities class actions, where the percentage ranges from 6.51 to 35%. *Id.* at P 294. Again, Lead Plaintiff's requested 9.52% is not out of the range of reasonableness.

In sum, the Court finds [*151] that Lead Plaintiff has met its burden to demonstrate that the 9.52 % fee is fair and reasonable in comparison with those awarded in similar litigation. [54]

[54]  This Court further observes that in *Shaw v. Toshiba Info. Sys., Inc.*, 91 F. Supp. 2d 942, 972 (E.D. Tex. 2000), Judge Heartfield wrote,

Empirical studies show that, regardless whether the percentage method of the lodestar method is used, fee awards in class actions average around one-third of the recovery. The evidence concerning fee awards in mega-fund cases is more limited since there are fewer such cases to study. However, this court is aware that awards of fifteen percent (15%) of the recovery or more are frequently awarded in these cases. Several mega-fund settlements in the Fifth Circuit and Texas have involved fees of fifteen percent (15%) or more. *See In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993)(eighteen percent (18%) of $ 170 million); *In re Combustion*, 968 F. Supp. 1116 (W.D. La. 1997)(thirty-six percent (36%) of $ 127 million); *In re Lease Oil Antitrust Litigation (No. II)*, 186 F.R.D. 403 (S.D. Tex. 1999)(twenty-five percent (25%) of more than $ 190 million); *Weatherford Roofing Co. v. Employers National [*152] Insurance Co.*, No. 91-0563 7- F, 116th Judicial District (Dallas)(thirty percent (30%) of $ 140 million); *see also In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998)(awarding fee of fourteen percent (14%) of $ 1 billion). Given these guiding principles and the size of the class settlement at issue in this case this Court concludes that fifteen percent (15%) is the appropriate percentage for application of the percentage method in this case.

## B. Alternatively, Lodestar Cross-Check

As noted, the Court believes that the percentage method is the proper one for determining a fee award in a common fund case under the PSLRA where a properly chosen Lead Plaintiff at the beginning of the case has negotiated an arm's length fee agreement with Lead Counsel. Furthermore, all the policy reasons for utilizing the percentage method in common fund cases apply with extra force here where the billing records of Class Counsel firms for more than six years are voluminous.

Nevertheless, should this Court's determination be appealed and should the Fifth Circuit decide that the lodestar method should have been used, as either a cross-check or as the only means by which to determine a [*153] reasonable fee award, this Court provides the following analysis. The Court's review of the *Johnson* factors not only supports the requested award under the lodestar method, but also the reasonableness of the fee under the agreement.

## 1. The Lodestar

For purposes of a lodestar determination (*id.*, PP 295-96), the Declaration of Helen Hodges also presents two charts: (1) one summarizing the time expended by attorneys and para-professionals at Coughlin Stoia in this litigation (248,803.91 hours resulting in a firm lodestar of $ 113,251,049)(*Id.*, Ex. 1); and (2) one summarizing the time spent by Lead Counsel and co-counsel, as well as each firm's total lodestar, collectively 289,593.35 hours for an overall lodestar of $ 131,971,583.20, over six years (Ex. 2). Moreover, pursuant to a Court order, Lead Counsel has filed, in two parts, a Compendium of Time Records (# 5959 and 5960, with an Addendum, # 5991), which Lead Counsel states are contemporaneous and not reconstructed. [55] To these records several supplemental objections have been filed (# 5962 (Lawrence Schonbrun on behalf of Brian Dabrowski), # 5963 (Peter Carfagna on behalf of Rita Murphy Carfagna & Peter A. Carfagna Irrevocable Charitable [*154] Lead Annuity Trust U/A DTD 5/31/96), # 5967 (Rinis Travel Service Inc. Profit Sharing Trust U.A. 06/01/1989 and Michael J. Rinis, IRRA), # 5964 (George S. Bishop, Jill R. Bishop, Lon Wilkens, and Betty Willkens)), and Lead Counsel has filed a response (# 5974) to these additional challenges. Co-counsel [56] have also submitted Declarations in support of their fee and expense requests. *See*, e.g., # 5799, 5800, 5813, 5825, 5826, 5827, 5828, 5829, 5830, 5831, 5832, 5833, 5834, 5835. This Court does not profess to have scrutinized every entry in the records, but has scanned them, focusing on various specific parts, to get a general idea of counsel's billing practices in this litigation.

[55] *See* # 5974 at 1.

[56] Lead Counsel's aggregate fee request includes fees submitted by the following: Berger & Montague, P.C.; Joseph A. McDermott, III; Beirne, Maynard & Parsons, LLP; Law Offices of Bernard M. Gross, P.C.; Schwartz, Junell, Greenberg & Oathout, LLP; Scott + Scott LLP; The Bilek Firm; Cuneo Gilbert & LaDuca; Genovese Joblove & Battista; Wolf Popper; and Shapiro Haber & Urmy LLP. See Hodges Declaration, # 5818, Ex. 2 for chart identifying hours and lodestar of each firm. Each of the firms has [*155] filed some form of a fee petition with supporting documentation.

The requested average or blended hourly rate for Coughlin Stoia is $ 456 per hour. # 5818, P 296. To compensate for delay in receiving fees, counsel have properly used their current billing rates. *Missouri v. Jenkins*, 491 U.S. at 283-84. They seek fees for 289,593.35 hours, for a lodestar of $ 131,971,583.20, and a multiplier of 5.2.

As evidence demonstrating this hourly rate is in accord with prevailing market rates for big firms in this forum, the Declaration of Lead Counsel's attorneys' fee expert, Kenneth Moscaret, who has served as a fee consultant and expert witness on the reasonableness of legal fees and the propriety of attorney billing practices since 1991 and advised on over 150 large fee disputes, [57] relying on December 2007 survey of the *National Law Journal* ("*NLJ*") [58] (# 5911 at 14-17 and Ex. F), presents a chart (*id.* at 15-16) that Mr. Moscaret created showing the rates charged by the big firms in the Houston/Dallas area that were listed in the annual survey. [59]

| NAME OF LISTED LARGE TEXAS | PARTNER RATES | ASSOCIATE |
| --- | --- | --- |

| LAW FIRM (Houston/Dallas) | 2007 | RATES 2007 |
|---|---|---|
| Andrews Kurth | $ 400-$ 795 | $ 210-$ 460 |
| 396 attorneys/Houston | | |
| Gardere Wynne Sewell | $ 350-$ 715 | $ 220-$ 425 |
| 284 attorneys/Dallas | | |
| Locke Liddell & Sapp | $ 375-$ 900 | $ 190-$ 390 |
| 421 attorneys/Dallas | | |
| (now Locke Lord Bissell | | |
| Liddell) | | |
| Strasburger & Price | $ 225-$ 560 | $ 200-$ 395 |
| 178 attorneys/Dallas | | |
| Thompson & Knight | $ 370-$ 730 | $ 205-$ 370 |
| 414 attorneys/Dallas | | |
| Winstead | $ 345-$ 620 | $ 180-$ 360 |
| 306 attorneys/Dallas | | |
| OVERALL AVERAGE RATE | $ 344-$ 720 | $ 200-$ 400 |
| RANGES AMONG LISTED | | |
| FIRMS | | |
| Coughlin Stoia Rate | $ 335-$ 725 [60] | $ 195-$ 505 |
| Ranges | (partners/of | (associates/contract |
| | counsel) | attorneys) |

Moscaret [*156] maintains that this chart [61] shows that (I) Lead Counsel's partner/of counsel rates fit squarely within the prevailing rates at big firms in Houston/Dallas; and (ii) Lead Counsel's associate/contract attorney rates are within the range of reasonableness for prevailing associates at big firms in Houston/Dallas. Mr. Moscaret explains that he included some of Lead Counsel's "of counsel" attorneys in the same category as partners because these attorneys had partner-level skills and law practice experience. *Id.* at 15. Moreover, with few exceptions, the vast majority of its contract attorneys in this case had associate-level skills and experience, so he placed them in the associate rate category. [62] *Id.*

57  # 5911 at 1-8.
58  Mr. Moscaret explains that the *NLJ*, "perhaps the leading legal newspaper in the U.S.," issues this survey annually and he considers it "the most

authoritative survey of its kind in the legal marketplace." # 5903 at 14. (Mr. Moscaret's qualifications, detailed in his Declaration, demonstrate to the Court that he is highly qualified to testify about attorneys' fees and market rates.) He states, that it is "the *only* published survey in the country, to my knowledge that identifies [*157] specific big law firms by *name* in specific cities, and discloses their specific rates for partners and associates." *Id.*

Among other courts that this Court has found that have relied in part on one of these annual *NLJ* surveys as evidence of prevailing hourly rates in their community for similar services by lawyers of reasonably comparable skill, experience and reputation are the following: (1) *Yurman Designs, Inc. v. PAJ, Inc.*, 125 F. Supp. 2d 54, 58 (S.D.N.Y. 2000), *aff'd*, 29 Fed. Appx. 46 (2d Cir. 2002); (2) *Yamanouchi Pharmaceutical Co., Ltd.*

2008 U.S. Dist. LEXIS 84708, *157
Fed. Sec. L. Rep. (CCH) P95,718

*v. Danbury Pharmacal, Inc.*, 51 F. Supp. 2d 302, 305 (S.D.N.Y. 1999), *dismissed under Fed. R. App. P. 42*, 230 F.3d 1377 (Fed. Cir. 2000)(Table, Text in Westlaw, No. 99-1521. 99-1522); (3) *Howes v. Medical Components, Inc.*, 761 F. Supp. 1193, 1196 (E.D. Pa. 1990); (4) *Harb v. Gallagher*, 131 F.R.D. 381, 386 (S.D.N.Y. 1990); (5) *Purdy v. Security Savings & Loan Ass'n*, 727 F. Supp. 1266, 1272 (E.D. Wis. 1989); and *Padgett v. Com'rs, Somerset County*, No. Civ. HAR-85-3190, 1989 U.S. Dist. LEXIS 5096, 1989 WL 49159, *6 n.5 (D. Md. May 2, 1989).

In their Reply (# 5907), Lead Counsel cite the following opinions by courts finding that the *NLJ* "is a reliable and appropriate source in assessing [*158] reasonable hourly rates: *Entertainment Software Ass'n v. Granholm*, No. 05-73634, 2006 U.S. Dist. LEXIS 96429, at *7-8 (E.D. Mich. Nov. 30, 2006); *Chin v. DaimlerChrysler Corp.*, 520 F. Supp. 2d 589, 608-09 (D.N.J. 2007); and *Citizens Ins. Co. of America v. KIC Chemicals, Inc.*, 2007 U.S. Dist. LEXIS 73201, at *18-19 (D. Mich. Oct. 1, 2007).

59  These law firms are the only large firms in Houston and Dallas that were listed in the 2007 survey.

60  Mr. Moscaret did not include "William Lerach's 'superstar' $ 900 per hour" (1) because Moscaret "considered it an aberration compared to the rest of Lead Counsel's partner rates in this case" even though that rate might be "Lerach's true market rate in 2007 in the securities class action litigation field" and (2) because Moscaret assumed [but did not know] that "the *NLJ* survey's big firm partner rates were based upon the hourly rates charged by the *vast majority of partners* in those listed firms." # 5903 at 16 n.15.

61  As another source of comparison in addition to Mr. Moscaret's *NLJ*-based chart of the hourly rates of top Texas firms, the Court has examined the submissions of the Houston, Texas Co-Class Counsel in support of their fee requests. The [*159] rates of Coughlin Stoia, though acting as Lead Counsel rather than local counsel and although a larger firm, are not very different, indeed generally within the same range. The Bilek Law Firm, L.L.P., reports hourly partner rates ranging from $ 400 to $ 600, while an associate charges $ 200 per hour and a paralegal rate is $

125. # 5827 at 6. Federman & Sherman requests attorneys' fees ranging from $ 375 to $ 550 per hour, and paralegal fees at $ 145.00. # 5835, Ex. 1. Schwartz, Junnell, Greenberg & Oathout, LLP, requests partner fees between $ 495 and $ 595 per hour, associates between $ 225 and $ 275 per hours, and paralegals, $ 150 per hour. # 5830, Ex. A. Beirne, Maynard & Parsons, LLP's attorneys appear to request from $ 225 to $ 350 per hour, while the paralegal bills $ 165-$ 170 per hour. While these local counsel firms are highly respected, none provides "services by lawyers of reasonably comparable skill, experience and reputation" as Coughlin Stoia. *Blum v. Stenson*, 465 U.S. at 895-96 n.11.

62  Lead Counsel represent their average hourly rate for partners is $ 630; for associates, $ 437; for of counsel and special counsel, $ 643; for contract attorneys, $ 346; with an average [*160] rate for lawyers of all levels of experience and paralegals, $ 456. Exhibit 1 of Helen Hodges's Declaration states that $ 18,109,738 of the claimed lodestar was generated by contract attorneys. Ex. F to # 5875. The Bishop Objectors speculate, without evidence, that most of these contract attorneys presumably worked in the case-specific Houston litigation center, with no continuing education, mentoring or other investment by the firm in their professional development. Objectors also complain that rates for several associates and contract attorneys are substantially higher than the rates for certain partners. Three partners billed at rates of less than $ 400 per hour, while fourteen associates and four contract attorneys billed at rates of $ 400 per hour or higher. The Court finds that Mr. Moscaret's Declaration explains and justifies these rates.

For example, Mr. Moscaret points to the following contract attorneys as very skilled, experienced, partner-level attorneys who had previously worked as associates at Coughlin Stoia and who did not require as much supervision as younger contract attorneys.

First, Shawn Hays, admitted to the California bar in 1988 and had previous trial experience, [*161] took more than thirty fact depositions in the underlying case and took some of defendants' experts' depositions. # 5911 at 40; see also # 5909 (Supplemental Declaration of Helen Hodges) at 4, 22-23; see also Lead Counsel's

Reply, # 5907 at 27.

Second, Rajesh Mandlekar, admitted to the California bar in 1998, was initially in solo practice, where he represented plaintiffs in several class actions, then became an associate with the firm from September 2001-05, and then rejoined the firm on a contract basis to work on the *Enron* litigation. # 5911 at 40; # 5909 (Supplemental Declaration of Helen Hodges) at 4-5; # 5907 at 27. Mandlekar had jury trial experience in a securities fraud class action against a Fortune 500 company in 2004, moved to Lead Counsel's Houston office for this litigation, prepared opposition briefs to defendants' summary judgment motions in 2006, worked on settlement strategy with some defendants, and was listed in the joint pretrial order as second or third chair on Lead Counsel's trial team. # 5911 at 40; # 5903 at 40; # 5907 at 27; # 5909 at 4-5.

Another contract attorney, Jerrilyn Hardaway, a Texas-licensed, former antitrust litigator in Houston, proficient in computer [*162] systems and technology, with Coughlin Stoia partner Paul Howes created Lead Counsel's internal document/deposition management protocols for the dozens of law firms participating in the case around the country, and built and managed the ESL website for service on all participating law firms. # 5903 at 45; # 5909 at 23-25. She also drafted and negotiated what became the Document Discovery Order, participated substantially in document review and organization, and prepared for, took and defended depositions. *See also* # 5909 (Supplemental Declaration of Helen Hodges) at 4-5; see also # 5907 at 26-27.

Helen Hodges identifies another contract attorney in the New York Office of Milberg Weiss, Allen Hobbes, who worked on this case at the beginning, reviewing SEC filings, media reports, the Powers Report and Congressional hearing transcripts. # 5909 at 5. He worked with Lead Counsel attorneys in San Diego and New York, analyzing facts regarding the structure of investment banks and researching anticipated legal issues; he then drafted discovery requests to the investment banks and to the Enron board of directors and prepared witness files for depositions. *Id.* He also researched and drafted oppositions [*163] to motions to dismiss, worked on the document database with partner Paul Howes and Ms. Hardaway, worked on a parallel case against JP Morgan Chase in Judge Rakoff's court in New York. *Id. See also* # 5907 at 27-28.

Mr. Moscaret also explains that the great majority of Lead Counsel's contract attorneys were recent graduates from the University of Houston Law Center, who all passed the Texas Bar exam and were recruited, interviewed and hired directly by Coughlin Stoia partner Paul Howes, and thus were junior associates who required and were accorded extensive supervision and control, especially by Mr. Howes. # 5903 at 40-44 (describing in detail Mr. Howes' supervision and mentoring of these attorneys in Lead Counsel's Houston office), 45-47. [63]

[63]  In their Reply, # 5907 at 25-26, Lead Counsel states,

In the middle of intensive document review and depositions, but prior to expert depositions, ten of the contract attorneys, each of whom billed 1900 or more hours, were added to the team prosecuting the case. They were hired and directly supervised by Coughlin Stoia partner Paul Howes in the Houston trial office. They performed the same tasks that associates with their level of experience did. [*164] They reviewed and analyzed documents to assist in fact depositions. They researched issues of law for briefs and trial preparation. They pulled documents requested by our experts. They took turns attending the Lay/Skilling criminal trial and researched evidence issues under the supervision of Roger Adelman, who is a very senior trial attorney brought in to assist in trial preparation. They researched and drafted portions of the pre-trial motions, including the in *limine* motions. Throughout their time as contract attorneys, they responded to requests for assistance from Paul Howes and from the rest of the "core" team of attorneys who were in San Diego. . . . The only difference between them and regular associates with the firm

2008 U.S. Dist. LEXIS 84708, *164
Fed. Sec. L. Rep. (CCH) P95,718

was that they were hired for a limited time--specifically to prepare the *Enron* case for trial.

*Id.*, citing Hodges Supp. Decl. P 7.

This Court notes that the hiring of a contract or temporary attorney is a common practice in law firms today. [64] *See, e.g., Takeda Chemical Industries, Ltd.,* Nos. 03 CIV 8253(DLC), 04 CIV 1966(DLC), 2007 U.S. Dist. LEXIS 19614, 2007 WL 840368, *7 (S.D.N.Y. March 21, 2007)(Cotes, J.)("In complex litigation, contract attorneys are routinely used by well-established [*165] law firms who supervise their work."). A contract attorney is one hired "to work on a single matter or a number of different matters, depending upon the firm's staffing needs and whether the temporary attorney has special expertise not otherwise available to the firm. Economics is the principle reason for emergence of lawyer 'temping' because it permits a firm to service client needs during particularly busy periods by engaging an experienced attorney, without incurring the expense of hiring a permanent employee." George C. Rockas, Lawyers For Hire and Associations of Lawyers: Arrangements that Are Changing the Way Law is Practiced, 40 DEC B. B.J. 8 (November/December 1996). One who objects to their use should analyze "the types of tasks they performed in this case and whether their use in fact resulted in efficiencies. [objector] has failed to show that it was inappropriate for [plaintiff's] counsel either to use contract professionals in this case or to use them to the extent it did.". *Takeda,* 2007 U.S. Dist. LEXIS 19614, 2007 WL 840368, at *7. The Court finds that the objectors here failed to do so.

> 64    Debra Lee Silverio (# 5849),Peter Carfagna's Objections on Behalf of the Rita Murphy Carfagna & Peter A. Carfagna [*166] Irrevocable Charitable Lead Annuity Trust U/A DTD 5/31/96 (# 5852, 5963), and George S. Bishop, Jill R. Bishop, Lon Wilkens, Betty Willkens (# 5875) complain at length about the use of contract attorneys and support staff and the inclusion of their hours in the lodestar and multiplier calculations.

The Court further finds that Lead Counsel has provided specific factual evidence that demonstrates that a number of its contract attorneys were experienced, skillful counsel, on the level of partner or senior or junior

associate, and that the others were carefully supervised and mentored while engaged in legal work. Thus the Court finds that the objections by George S. Bishop, Jill R. Bishop, Lon Wilkens, Betty Willkens (# 5875), Peter Carfagna (# 58520), and Debra Silverio (# 5849) to Lead Counsel's use of contract attorneys and the inclusion of their fees in the lodestar are without merit.

Furthermore, "[t]oday it is not uncommon for an employing law firm to pay the temporary lawyer at one rate and charge that lawyer's services to the client at a higher rate that covers overhead and a contribution to firm profits." Kathryn M. Fenton, Use of Temporary or Contract Attorneys. 13-FALL Antitrust [*167] 23, 24 (1998). *See also* Moscaret Declaration, # 5903 at PP 66-68. As for the complaints that Coughlin Stoia charged a higher rate for contract attorneys than it paid them, under ABA Formal Opinion No. 00-420, an attorney may bill the contract attorney's charges to the client as fees rather than costs when "'the client's reasonable expectation is that the retaining lawyer has supervised the work of the contract lawyer or adopted that work as her own.'" *In re Wright,* 290 B.R. 145, 153 (Bkrtcy. C.D. Cal. 2001), citing ABA Formal Opinion No. 00-420. Here Lead Counsel has presented evidence that the "associate-level" contract attorneys, all of whom were licensed to practice by the relevant bar, were very carefully supervised, especially those who were newly licensed in Houston. -

While there is not much case law addressing the question whether the charges of contract lawyers and paralegals may be billed separately as attorney's fees at a higher rate than the law firm pays them, [65] the reasoning in the Supreme Court's interpretation of 42 U.S.C. § 1988, [66] a fee-shifting statute, in *Missouri v. Jenkins,* 491 U.S. 274, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989)(affirming in a desegregation case the district court's compensation [*168] of "the work of paralegals, law clerks [67] and recent law graduates at market rates for their services, rather than at their cost to the attorneys"), appears to this Court to support an affirmative answer for any reasonable fee award in a common fund case if the particular facts regarding their services justified such billing. Justice Brennan, writing for the majority, observed that it is "self-evident" that "reasonable attorney's fee" as used in § 1988 "should compensate the work of paralegals, as well as the of attorneys." *Id.* Given the established rule that a reasonable attorney's fee is "one calculated according to prevailing market rates in

the relevant community," i.e., "'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation,'" Justice Brennan opined that the same principle should apply to the "'increasingly widespread custom of separately billing for the services of paralegals and law students who serve as clerks." *Id.* at 285-86. The high court noted that "separate billing appears to be the practice in most communities today." *Id.* at 289 & n.11. See also *In re Tyco International, Ltd.*, 535 F. Supp. 2d 249, at 272, Memorandum and Order, (D.C.N.H. 2007) [*169] (Compendium, # 5817 at Ex. P)("An attorney, regardless of whether she is an associate with steady employment or a contract attorney whose job ends upon completions of a particular document review project, is still an attorney. It is therefor appropriate to bill a contract attorney's time at market rates and count these time charges toward the lodestar."); *Sandoval*, 86 F. Supp. 2d at 609 (fees of contract attorneys and paralegals are separately compensable based on prevailing market rates for the kind and quality of their services, and included in the lodestar, *citing Missouri v. Jenkins*, 491 U.S. 274, 109 S. Ct. 2463, 105 L. Ed. 2d 229; *DeHoyos*, 240 F.R.D. at 325 (fees for legal assistants, paralegals, investigators and non-secretarial support staff are included in the lodestar). Regardless of whether the attorney includes the paralegal's charges in his own hourly rate or bills them separately, the court must examine those charges against the prevailing market rate for comparable paralegals' services. 491 U.S. at 286. *See also Sandoval v. Apfel*, 86 F. Supp. 2d 601, 610 (N.D. Tex. 2000)(discussing *Missouri v. Jenkins* and stating, "The determining [*170] factor for whether law clerk and paralegal fees can be compensated at separately-billed market rates depends on the practice of the relevant market). Finally, and important here, the Supreme Court "reject [ed] the argument that compensation for paralegals at rates above 'cost' would yield a 'windfall' for the prevailing attorney." *Missouri v. Jenkins*, 491 U.S. at 286. It noted that no one who "ever suggested that the hourly rate applied to the work of an associate attorney in a law firm creates a windfall for the firm's partners or is otherwise improper under § 1988 merely because it exceeds the cost of the attorney's services. If the fees are consistent with market rates and practices, the 'windfall' argument has no more force with regard to paralegals than it does for associates." *Id.* Moreover, "[b]y encouraging the use of lower cost paralegals rather than attorneys wherever possible, permitting market-rate billing of paralegal hours

"encourages cost-effective delivery of legal services . . . ." *Id.* at 288. The Court finds that the same reasoning applies to contract attorneys and that prevailing counsel can recover fees for their services at market rates rather that at [*171] their cost to the firm.

65    Lead Counsel's average hourly rate for contract attorneys is listed as $ 346. Exhibit 1 of Helen Hodges's Declaration states that $ 18,109,738 of the claimed lodestar was generated by contract attorneys. Ex. F to # 5875.

The Bishop Objectors argue that contract attorneys are typically paid between $ 25-45 by their employers, who in turn bill the client law firms approximately $ 50 per hour per attorney. According to Exhibit F, the hourly rate requested by Lead Counsel for the listed contract attorneys ranged from $ 195 to $ 500, adding up to $ 18,109,738 of the claimed lodestar. The Bishop Objectors maintain that only the actual cost of these contract attorneys should be billable to the class, that these costs should be "expenses," not included in the lodestar and not subject to a multiplier.

66   Section 1988 provides in relevant part,

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 [20 U.S.C. § 1681, et seq.], . . [or] title VI of the Civil Rights Act on 1964 [42 U.S.C. § 2000d et seq.], . . . the court, in its discretion, may allow the prevailing party, other than the [*172] United States, a reasonable attorney's fee as part of the costs

67   The "law clerks" in *Missouri v. Jenkins* were "generally law students working part time." 491 U.S. at 277. Moreover, the Supreme Court referred to law clerks and paralegals collectively as "paralegals." *Id.* at 284.

Mr. Moscaret also investigated why the upper end of Lead Counsel's associate/contract attorney rate range ($ 505) was higher than the average upper-end rate ($ 400)

Case 0:06-cv-01216-JMR-FLN    Document 399-10    Filed 02/04/09    Page 14 of 24

2008 U.S. Dist. LEXIS 84708, *172
Fed. Sec. L. Rep. (CCH) P95,718

for associates at big firms in Houston and Dallas, although still, in his opinion, within the range of reasonableness. *Id.* at 16-17. He reports,

I discovered the following facts:

(a) there were 16 Lead Counsel associates/contract attorneys overall who billed at rates in excess of $ 400, which was less than one-in-three (i.e., 28%) of the total group of 57;

(b) there were 11 Lead Counsel associates/contract attorneys who billed at rates from $ 300-$ 400 per hour, or about one- in-five (i.e., 19%) of that total group of 57;

(c) however, of greatest significance to me, there were 30 Lead Counsel associates/contract attorneys who billed at rates from **only** $ 200-$ 300 per hour, which was **more than half** (i.e., 53%) of that overall group of 57. . . . From the [*173] above data, it was clear that nearly three-fourths of all Lead Counsel associates/contract attorneys (i.e., billed at rates **below** the average upper-end rate of $ 400 per hour for associates at big firms in Houston/Dallas . . . . More importantly, **over half** of all Lead Counsel associates/contract attorneys actually billed at the **lower** end (i.e., from $ 200-$ 300 per hour) of the big-firm associate rate range for Houston/Dallas . . . .viewed broadly, Lead Counsel's associate/contract attorneys rates were reasonable in relation to the big-firm Houston/Dallas market. . . .

*Id.* at 17.

Moscaret also examines the fee request for "efficient" case staffing, i.e., using as few attorneys as necessary doing as much of the legal work on a case as possible. # 5903 at 23. In a large complex case like this one, he looks for "a tight compact litigation team of attorneys doing the majority of the work on the case," i.e., "core" attorneys billing at least 75% of the hours on the case. *Id.* at 24. His investigation found that 67.4% of . the total attorney hours (204,687.06) were performed by a "core" Coughlin Stoia litigation team of 14 partners,

associates and contract attorneys, "close enough" to the 75% [*174] threshold for him to recommend that Lead Counsel be given the benefit of the doubt regarding reasonableness and efficiency of its overall case staffing. Id. at 24-25. He also identifies and discusses in detail other indicia demonstrating reasonableness and efficiency of overall staffing in this litigation, including an appropriate mix of attorneys for the demands of a complex litigation, reasonable delegation of work flow, continuity of case staffing, the hiring, use, supervision and control of contract attorneys. *Id.* at 25-47.

As noted, the lodestar is calculated by multiplying number of hours reasonably expended by an appropriate, reasonable hourly rate in the community for such legal services rendered by attorneys of comparable skill, experience, and reputation. The lodestar may then be adjusted by application of the Johnson factors. As observed earlier, "novelty and complexity of the issues," "the special skill and experience of counsel", the "quality of the representation," and "the results obtained" from the litigation are presumably already encompassed in the lodestar and therefore should generally not be used to enhance the award; the Fifth Circuit has held that "[e]nhancements [*175] based upon these factors are only appropriate in rare case supported by specific evidence in the record and detailed findings by the courts.'" *Walker*, 99 F.3d at 771, *citing Alberti v. Klevenhagen*, 896 F.2d 927, 936 (enhancements based on these four factors are only appropriate in rare cases supported by specific evidence in the record)(citing *Pennsylvania v. Delaware Valley Citizens' Council* for Clean Air ("Delaware Valley I"), 478 U.S. 546, 564-65, 106 S. Ct. 3088, 92 L. Ed. 2d 439 (1986))(quoting *Blum v. Stenson*, 465 U.S. 886, 898-900, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)). See also *Dehoyos v. Allstate Corp.*, 240 F.R.D. 269, 323-24 (W.D. Tex. 2007)("[I]t is permissible to adjust a lodestar by *Johnson* factors considered within the original lodestar calculation if the case is rare and exceptional and if 'supported by both specific evidence on the record and detailed findings by the lower courts.'")(citing *Shipes*, 987 F.2d at 320).-

## 2. Application of the Johnson Factors

### a. time and labor required

*Johnson v. Georgia Highway Express, Inc.* instructs, "The trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities." Before becoming

a judge, this Court had twelve and [*176] a half years of trial experience involving complex oil and gas and energy litigation at Exxon Corporation. Subsequently the Court served as a state court judge for one and a half years, and has been on the federal bench for eighteen and a half years. While a District Judge, the Court has also sat by designation on the Fifth Circuit Court of Appeals several times. During its tenure as a federal judge, this Court has presided over numerous complicated cases in varied areas of law, including patent, construction contract, criminal RICO, Constitutional issues, and federal securities violations. This Court has personally overseen this entire litigation, and because of its experience as both a lawyer and a judge, for purposes of a reasonable fee award the Court believes it is competent and in a unique position to assess the time, staffing, skill, and commitment that was necessary to bring this complex, highly contentious, securities-fraud lawsuit involving highly qualified lawyers representing very sophisticated individuals and entities, including seven of the largest financial institutions in the world.

Helen Hodges' Declaration, # 5818 at PP 18, 18. 295, 296 and Exs. 1 & 2, states that [*177] up to and including December 15, 2007, Coughlin Stoia expended 248,803.91 hours, which, added to the hours expended by co-class counsel, equaled 289,593.35, multiplied by the requested hourly rate of $ 456, yields an overall lodestar of $ 131,971,583.20. The Court finds that Ms. Hodges' Declaration accurately details the progression of this action. *Id.*

Although this litigation has been ongoing for over six years, the substantial record (demonstrated by approximately 6,000 entries on the *Newby* docket sheet as of this time), the sheer number of responses to motions to dismiss and motions for summary judgment, often addressing cutting edge legal issues, the extensive briefing and demanding, heightened standards applied to each, not to mention the multitude of other motions, and the technical and factual complexity of the issues demonstrate that Lead Counsel has vigorously, tenaciously, and efficiently prosecuted this suit. Lead Counsel also expended enormous energy and effort on class certification issues on the district court level, before the Fifth Circuit, and before the United States Supreme Court in both this action and the related *Stoneridge* case. Moreover, it was preparing for imminent [*178] trial when the Fifth Circuit decertified the Newby class. Those delays that have occurred have been occasioned not by

Lead Counsel, but by the numerous related criminal prosecutions of Defendants or by the Court and its small staff's being overwhelmed by the submissions of so many highly competent attorneys on behalf of so many and such varied Defendants regarding such a vast array of complicated issues, many with little or no precedent.

Coughlin Stoia reports that its lawyers and support staff spent over 247,000 hours prosecuting this case. Hodges Decl., # 5818 at P 17. Among their many diligent and skilled efforts in pursuing as large a recovery as possible for the proposed class, the Court notes that they drafted two massive consolidated class action complaints that thoroughly impressed this Court in the detail, breadth and depth, of their allegations, reflecting extraordinary investigatory effort, especially in light of the stay on formal discovery and the complexity of the scheme. They timely responded to numerous, complex motions to dismiss and motions for summary judgment from varied defendants with very different concerns and defenses and prevailed on most. Needless to say, [*179] the fact and expert discovery in this action was extensive, but was tightly controlled and was expertly and professionally handled by nearly all participating counsel. Lead Counsel played a significant role in organizing that discovery, coordinating the Deposition Scheduling Committee, establishing the deposition scheduling protocol, and establishing document depositories in Houston and in New York, where the Enron bankruptcy proceedings were also monitored.

Coughlin Stoia represents under oath that it did not "over-staff" the case, with just one attorney attending most of the fact depositions. Hodges Declaration, # 5818 at P 169 (charting all depositions and Coughlin Stoia attorneys attending them). [68] Nor did they duplicate work already done in the government's and Bankruptcy Examiner Neal Batson's investigations, but instead used those results to streamline their depositions and reduce the number of hours they otherwise would have spent. Genovese Decl. at P 25. *See also* Declaration of Kenneth M. Moscaret (# 5903 at 43-44, P 77(e))(Lead Counsel's expert on reasonableness of attorneys' fees and propriety of billing practices)("I saw Lead Counsel usually sent only **one** attorney, less [*180] often two attorneys, to virtually every one of the several hundred fact depositions taken in the case. This kind of lean deposition staffing showed impressive restraint by Lead Counsel. Because fact depositions were such a costly, time-consuming aspect of this case, the lean deposition

Case 0:06-cv-01216-JMR-FLN   Document 399-10   Filed 02/04/09   Page 16 of 24

2008 U.S. Dist. LEXIS 84708, *180
Fed. Sec. L. Rep. (CCH) P95,718

staffing was one strong indicia to me of generally acceptable litigation management practices and a reasonable attitude toward billing on the part of Lead Counsel."). See also Hodges Decl., # 5818 at PP 169, 214; Lead Counsel's Reply, # 5907 at 19 (of the 472 depositions listed in Helen Hodges' Declaration, "there are only **two** where three lawyers appeared" and "no depositions where more than three attorneys from Lead Counsel appeared," while **only one** attorney from Lead Counsel appeared at most of them.").

68    Objectors Larry Fenstad and Dorothy McCoppin assert that "it was apparently not uncommon for three or more attorneys from Lead Counsel to attend each deposition. # 5868 at 10 (all objections made by Fenstad and McCoppin are joined by class member Nasser Pebdani, # 5877). Ms. Hodges lists the hundreds of depositions taken (# 5818 at 92-100 and 119-20), of which only two were attended by three Coughlin [*181] Stoia attorneys; most were attended by only one firm attorney. Lead Counsel labels as "simply false" the statement by Objectors Larry Fenstad and Dorothy McCoppin objection. # 5907 at 19, citing Hodges Declaration, # 5818 at PP 169 (including chart of all depositions), P 214 (chart of expert depositions).

This Court finds that in this six-plus-year, complex litigation, it would have been impossible to prosecute this action without a large number of attorneys, sometimes with multiple attorneys, appearing at the same court hearings or depositions. Indeed the number of counsel appearing for the Defendants was substantially higher, proportionately, at these events. Lead Counsel inevitably used a number of professional staffers, but the evidence reflects it was a well organized group, a "core" team that followed the litigation through, avoiding having to bring newcomers "up to speed," and distributed work appropriate to different levels of experience and expertise. Given the sophisticated and complex nature of this action, the Court finds that Lead Counsel's heavy use of experienced and skilled partner- level attorneys was appropriate. [69] The Court finds that the evidence does not indicate [*182] overstaffing, but instead reflects a most efficient use of staff.

69    Objector Debra Lee Silverio (# 5849) complains that over 37% of time billed by

Coughlin Stoia was incurred by only five senior partners (Box, Hodges, Howes, Lerach and Park) whose rates ranged from $ 600 to $ 900 per hour. The Court finds that the complexity of this litigation required substantial involvement of experienced and knowledgeable attorneys. Moreover, as discussed, the use of a core group of attorneys throughout the litigation was cost-efficient.

Judge Sarokin, who has had significant experience in such matters, commented, "I would have expected the lodestar amount to be significantly higher, which to me, demonstrates Lead Counsel was extremely efficient in handling this case, for which they should be rewarded-not penalized" by a reduction in the requested multiplier. Sarokin Decl., # 5819 at P 33. This Court agrees that Lead Counsel has achieved a top quality result with speed, efficiency, skill, and vigorous advocacy in a litigation of extraordinary complexity and risk, and that the lodestar request is reasonable.

The time-and-labor factor is usually encompassed within the lodestar and therefore not used [*183] to enhance the lodestar. Nevertheless, that factor under the facts here certainly does support as reasonable an award in accord with the 9.52% agreement made at the beginning of the litigation.

*b. novelty and difficulty of the issues*

It is undisputed, and the record of this case demonstrates clearly, that the issues here, both factual and legal, were extremely complex and very frequently novel or had minimal precedent, and that what authority existed was frequently in conflict. Such difficulties "generally require more time and effort on the attorney's part. . . . [H]e should not be penalized for undertaking a case which may 'make new law.' Instead, he should be appropriately compensated for accepting the challenge." *Johnson*, 488 F.2d at 717. Moreover, in the course of this litigation, various binding, higher-court decisions on issues such as causation, pleading, or proof at the class certification stage made Lead Plaintiffs' pursuit of a recovery, and indeed, individual investors' securities actions under the PSLRA generally, increasingly difficult. The most obvious example is the main theory of the case under § 10(b) and Rule 10b-5(a) and (c), scheme liability based on conduct of mostly [*184] secondary parties, the only deep pockets available here. That the viability of this theory, which was supported by the SEC

and thirty-three State Attorneys General, was challenged all the way to the Supreme Court in the Stoneridge case, where it was resolved by a 5-3 split in favor of defendants, with Justice Breyer not participating and with a strong dissent written by Justice Stephens, reflects the uncertainty and the significance of the issue. The number and nature of amicus curiae briefs that were filed in *Stoneridge* by prominent authorities, experts, and public servants, including the thirty-three State Attorneys General, attest to the considerable disagreement regarding the reach of the statute and Rule 10b-5 and demonstrate that Lead Plaintiff's was not a frivolous pursuit. Though only partially successful, Lead Counsel are to be commended for their zealousness, their diligence, their perseverance, their creativity, the enormous breadth and depth of their investigations and analysis, and their expertise in all areas of securities law on behalf of the proposed class. The difficulty and the risk, to be discussed *infra*, warrant a substantial fee award.

c. *skill required to perform* [*185] *legal services properly*

"The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson*, 488 F.2d at 718.

Leaving aside the complexity of the legal and factual issues, to which the record in this case attests, and the heightened pleading standards imposed on these securities claims, the Court finds that the fraud here was so skillfully concealed by Defendants that it took years for top experts to unravel the complicated transactions and obfuscations. Moreover, the extraordinary number and variety of parties and witnesses involved, spread across the country if not the world, required yeoman efforts to investigate, locate, interview, and depose. Of course the size of the recovery, $ 7.227 billion, almost entirely from secondary-actor banks because of the bankruptcy of Enron and, in essence, the dissolution of Arthur Andersen LLP, speak to extraordinary litigating and negotiating skill, perseverance, power, and influence of Class Counsel. Furthermore, they had to litigate against a large number of the best firms in the country for multinational financial institutions, which [*186] had essentially unlimited resources.

The Court finds that in the face of extraordinary obstacles, the skills, expertise, commitment, and tenacity

of Lead Counsel in this litigation cannot be overstated. Not to be overlooked are the unparalleled results, $ 7.2 billion in settlement funds, which demonstrate counsel's clearly superlative litigating and negotiating skills. These qualities, constantly challenged by highly experienced and skilled defense attorneys from the best firms in the country, are subsumed in the lodestar. Nevertheless, counsel's skill in conjunction with the eighth Johnson factor, the amount involved and results obtained, support as highly reasonable the 9.52% percentage fee in the agreement.

d. *preclusion of other employment*

Lead Counsel states that the time spent on this case could have been devoted to other matters. As observed by Judge Sarokin, "[B]ased on the time commitment of plaintiff's counsel, as evidenced by the hours they have provided and the quality of the attorneys involved, it is apparent that Lead Counsel and their co-counsel were committed. With the time commitment involved, it would have been virtually impossible not to forego other work in order to [*187] prosecute this case with the vigor that is evidenced in the pleadings and declarations I have read." # 5819 at 16.

This factor supports the requested percentage fee here. Nevertheless, for purposes of the lodestar check, the Court finds that this factor is subsumed in the lodestar, with the exception of one area: the substantial financial burden on Lead Counsel, pursuant to the agreement with the Regents, to advance what became $ 40 million in expenses [70] without any guarantee of recovery of fees for such an extended period, had to affect the firm's ability to take and subsidize other cases. This substantial risky financial commitment supports use of a multiplier.

70   Regarding expenses, between August 2004 and November 2007, years into the litigation, Lead Counsel requested and the Court approved, as reasonable and necessary, partial expense reimbursements of approximately $ 39.5 million from "Expense Funds" established within the overall settlement fund for Lead Counsel's and co-counsel's ongoing expenses, such as investigators, court reporters, hotels, transportation, document storage, etc. # 2366, 4083, 4741, 5172, 5367, and 5761.

e. *customary fee*

A customary fee pursuant to a fee agreement [*188] in an action brought under the PSLRA that results in a common fund is a "reasonable" percentage of the recovery. The Court has determined from the evidence that the negotiated 9.52% was a reasonable fee in a securities class action at the time the agreement was made, indeed lower than that awarded in most contingency class actions.

As for a lodestar cross-check, the Fifth Circuit has opined, "A reasonable hourly rate is determined with reference to the prevailing market rate in the relevant legal community for similar work. . . . While the hourly rate must be 'adequate to attract competent counsel,' the 'measure is not the rates which lions at the bar may command.'" *Coleman v. Houston Independent School District*, 202 F.3d 264 (5th Cir. 1999) (Table) (available on Westlaw), citing *Leroy v. City of Houston*, 906 F.2d 1068, 1079 (5th Cir. 1990). The Court has found the requested hourly rate reasonable under the prevailing rate in the Houston legal community based on evidence provided by Mr. Moscaret and local Co- Counsel. From its own familiarity with the litigation as well as its perusal of the billing records submitted by Lead Plaintiff, it also finds the lodestar reasonable, given evidence [*189] in the record of lean staffing and efficient distribution of tasks to appropriate level staff. The Court, like Judge Sarokin, expected a higher lodestar.

This Court considers Coughlin Stoia "a lion" at the securities bar on the national level. Lead Counsel's outstanding reputation, experience, and success in securities litigation nationwide were a major reason why the Regents selected the firm. While that factor may not support increasing the hourly fee beyond prevailing local levels for plaintiffs' lawyers with similar experience and practice, it does serve to justify an upward adjustment if the local customary fees were substantially lower than the fee Coughlin Stoia easily commands in the securities market nationally. This Court finds that there is no comparable Houston firm on par with Coughlin Stoia in securities class action litigation. Because Lead Counsel's fearsome reputation and successful track record undoubtedly were substantial factors in Lead Counsel's obtaining these extraordinary recoveries at a time when the reach of § 10(b) was being challenged by financial institutions and others in courts around the country, the Court finds the customary fee factor warrants application [*190] of a multiplier.

### f. whether the fee is fixed or contingent

Regardless of whether the percentage in the fee agreement is honored or the Court awards a fee under the lodestar method, it is undisputed that Class Counsel have worked on a contingency. If Class Counsel were not successful, they risked losing everything. They invested enormous numbers of hours of service and dollars "up front."

As discussed above, the holding in *Dague*, 505 U.S. 557, 112 S. Ct. 2638, 120 L. Ed. 2d 449, that enhancement of the lodestar by a multiplier based on the contingent nature of a fee is not allowed when fees are awarded to plaintiffs' counsel under fee-shifting provisions of statutes, does not apply to common fund cases.

As discussed *supra*, the contingent fee agreement placed the financial risk, which was substantial, completely on Lead Counsel and their co-counsel. Declaration of H. Lee Sarokin, # 5819 at 15, Indeed, Professor Coffee states that the approximately 280,000 hours expended by the Regents' attorneys and the advancement of over $ 45 million in expenses "[i]n all likelihood . . . represents the largest investment ever made in a single securities class action. More importantly, this investment of time and money was not made by a [*191] broad consortium of plaintiffs' firms all sharing the risk. Rather, of the total lodestar, which I understand to be in excess of $ 127.5 million, the Coughlin Stoia firm (and its predecessors) accounted for over $ 112 million of this amount (or nearly 90%) . . . entirely at its own risk, without any promise or hope of reimbursement unless it was successful in high stakes and high risk litigation." # 5821 at 5. Given the complexity, the uncertainty of the law, the legal hurdles, the number and variety of defendants, the multifarious types of fraud, the size and caliber of the defense, and the length of this litigation, the Court finds that not only is the 9.52% fee request reasonable, but a "deal."

Moreover the Court finds that the exceptional obstacles to recovery that were present here, discussed *infra*, and the remarkable success obtained by Lead Counsel's skill and experience make this a "rare and exceptional" case warranting the application of the requested 5.2 multiplier under a lodestar cross-check or enhancement under a lodestar analysis.

First, there was no obvious deep pocket source

available from which to seek any recovery. Issuer and primary violator Enron Corporation was in [*192] bankruptcy. Professor John C. Coffee points out in his Declaration (# 5821 at PP 2, 30, and 31) that in most of the "mega-fund" class action settlements, the issuer defendants (including Tyco International, Royal Ahold N.V., Nortel, AOL Time Warner, McKesson, HBOC, Lucent, Bank of America, Dynegy, Inc., Raytheon Co., and Waste Management, Inc.) were solvent and able to pay large settlement amounts. He further notes that "securities class actions are seldom filed when the issuer is bankrupt." # 5821 at P 30, citing Cornerstone Research, 2006: *A Year in Review* (2006) at 19 [*193] (reporting that no securities class actions were filed subsequent to the issuer's bankruptcy in 2006 and only 8 such lawsuits were filed in 2005). Furthermore, Enron's auditor, Arthur Andersen, LLP, was criminally prosecuted and convicted, and despite the Supreme Court's reversal of that conviction based on jury instructions, was ultimately reduced to a small operation unable to pay any significant amount for the recovery. Numerous individual officers and directors of Enron were also criminally prosecuted and their assets seized by the government, eliminating additional potential recovery. Others had limited resources.

Enron's D&O policies were "wasting" insurance policies: they covered directors and officers for defense and litigation costs as they were incurred, as well as for payment of any settlement or judgment against them. Under such policies, as the litigation goes on, payment of defense costs can drain the fund, leaving little or no money for coverage of settlements or judgments against these defendants. [71] Enron's D&O liability insurance policy coverage was $ 350 million dollars, but that amount was significantly depleted by competing demands for legal defense fees for its [*194] officer and director defendants, many of whom were also sued by the SEC, by Enron's estate in the Bankruptcy Court, and by the government in criminal actions, not to mention by the *Tittle* ERISA plaintiffs. Indeed these competing actions further threatened to reduce the recovery from any defendant by the *Newby* plaintiffs. Recovery under these insurance policies was additionally hampered by the policies' exclusions from coverage of "deliberate and dishonest acts." As a result of all these factors, third parties were the only remaining sources for a significant recovery.

[71] *See, e.g., Liles v. Del Campo*, 350 F.3d 742,

745 (8th Cir. 2003)(in a wasting policy "the value of the policy diminishes as funds are paid out . . . . Ongoing defense costs will continue to deplete the policy, and continued litigation threatens to drain the fund completely"); *IPSCO Steel (Alabama), Inc. v. Blaine Const. Corp.*, 371 F.3d 141, 144 (3d Cir. 2004)(in a wasting policy, the "costs of defending legal actions could be deducted from the total amount of available coverage").

Moreover, the PSLRA and recent court interpretations of the statute made the risk of dismissal substantial, even from the initial pleading [*195] and from pre-discovery motions to dismiss. *See generally* Declaration of H. Lee Sarokin, # 5819 at 12-13.

The heightened pleading standards of the PSLRA incorporate Rule 9(b)'s fraud pleading standard (the plaintiff must specify the alleged fraudulent statement, the speaker, when and where the statements were made, and why they are fraudulent), require the complaint to identify each misleading statement and explain why it is misleading, and, if the allegation is made on information and belief, to assert with particularity all facts on which that belief was founded. 15 U.S.C. § 78u-4(b)(1); *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir. 2002). In addition to these heightened pleading requirements and increasing the difficulties of bringing suit, the PSLRA, 15 U.S.C. § 78u-4(b)(3)(B), mandates a stay on "all discovery and other proceedings" with narrow exceptions until after resolution of motions to dismiss. The plaintiff must also plead particular facts establishing a strong inference of scienter, i.e., intent to deceive or severe recklessness. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 407, 408 (5th Cir. 2001). While these heightened pleading requirements apply to any securities [*196] case, they were unusually difficult to meet here in light of the complex accounting and sophisticated transactions that characterized Enron's fraudulent scheme and which took experts years to unravel. Pleading challenges (and ultimately burden of proof) increased during the course of this litigation with the Supreme Court's opinions in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)(it is insufficient to allege that the price of the securities was inflated on the day of purchase; plaintiff must allege facts showing loss causation, i.e., that the defendant's material misrepresentation caused the plaintiff's actual economic loss), and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 168 L. Ed.

2d 179 (2007)(to plead a strong inference of scienter the plaintiff must not only plead with factual particularity, but also consider competing inferences and show that a strong inference of scienter is more than merely plausible or reasonable, indeed cogent and at least as compelling as any opposing inference).

Lead Plaintiff's ability to demonstrate liability of secondary actors was severely restricted by the Supreme Court's holding in *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994), [*197] that there is no aiding and abetting liability under § 10(b). [72] Given this bar, Lead Plaintiff pursued and fought zealously for a novel theory of scheme liability under § 10 (b) and Rule 10b-5(a) and (c) against the financial institutions based on acts and conduct of scheme participants, not only on material misrepresentations and omissions where there is a duty to disclose. This scheme liability theory was recognized by a few courts, i.e., the Ninth and Third Circuits and district courts in the Second Circuit and the Fifth Circuit, but not by the Fifth Circuit, itself, which had limited the reach of § 10(b) and Rule 10b-5 to a material misrepresentation or omission where there is a recognized duty to disclose. [73] *See, e.g., Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040 (9th Cir. 2006), *vacated and remanded for further proceedings sub nom. Avis Budget Group, Inc. v. California State Teachers' Retirement Sys.*, 128 S. Ct. 1119, 169 L. Ed. 2d 945 (2008), *vacated and remanded for further proceedings pursuant to Stoneridge, Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008); *Benzone v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 610 (6th Cir. 2005); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005); [*198] *In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y.); *SEC v. Hopper*, No. Civ. H-04-1054, 2006 U.S. Dist. LEXIS 17772, 2006 WL 778640, *11-12 (S.D. Tex. Mar. 24, 2006). It was also supported by the SEC. Moreover, the number of *amicus curiae* briefs in support of this theory submitted by prominent individuals and groups to the Supreme Court in the *Stoneridge* case indicates it was not a frivolous argument. *See, e.g.,* Declaration of Jonathan Cuneo (# 5828) at PP 56, 57, 59 (stating that *amicus curiae* briefs in support of scheme/conduct liability were filed in the *Stoneridge* litigation by (1) 30 State Attorneys General under joint leadership of the Texas Republican Attorney General and the Ohio Democratic Attorney General; (2) the North American Securities Administrators Association

("NASAA"), a national organization of state SEC's; (3) the Council of Institutional Investors, "the most important, prestigious investors' organization in the world, representing 130 pension funds with $ 3 trillion in assets"; (4) the American Association of Retired Persons ("AARP"); [74] (5) House Financial Services Chairman Barney Frank and Judiciary [*199] Committee Chairman John Conyers, Jr.; (6) a bi-partisan group of former SEC officials, including President Bush appointees Chairman William Donaldson and Commissioner Harvey Goldschmid and President Clinton appointee Chairman Arthur Levitt, Jr.; and (6) although rejecting a request from the SEC to file such a brief after White House intervention, when the Solicitor General did file an *amicus* brief, it "adopted our view of fraudulent scheme liability," "said the Courts of Appeals, the Fifth and Eighth Circuit, were wrong on this liability issue," but "urged that 'eyeball' reliance by the victims on the conduct of the behind-the-scenes schemer was necessary for recovery.").

72   *See also* Expert Report of Professor Charles Silver, # 5822 at 55 ("The vast majority of the money comes from secondary defendants, the hardest parties to reach.").

73   *See, e.g., Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007) ("'[D]eception' within the meaning of § 10(b) requires that a defendant fail to satisfy a duty to disclose material information to a plaintiff."), *cert. denied*, 128 S. Ct. 1120, 169 L. Ed. 2d 957 (2008); *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657, 661 (5th Cir. 2004), at 661 [*200] ("'To state a private securities fraud claim under § 10(b) and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of material fact, (3) made with scienter (4) *on which plaintiff relied* (5) that proximately caused [the plaintiff's] injury.'"), *quoting Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001)(emphasis in original).

74   Attorney Helen Hodges reports that thirty-three State Attorneys General participated in the *amicus curiae* brief. # 5818 P 14, at 9. She declares that Coughlin Stoia worked hard and successfully to persuade NASAA, the Council of Institutional Investors, and Change to Win (a major labor organization), the AARP, the

Consumer Federation of America, and several other large public pension funds and investor organizations to file *amicus* briefs in support of the defrauded investors. # 5818, P 14 at 9.

The United States Supreme Court in *Stoneridge Investment Partners, LLC, v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008), examined the issue of "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a [*201] duty to disclose but does participate in a scheme to violate § 10(b)." 128 S. Ct. at 767. The Supreme Court concluded, "Conduct itself can be deceptive"; there need not be "a specific oral or written statement before there could be liability under § 10(b) or Rule 10b-5." *Id.* at 769. It did not totally reject the scheme liability theory based on conduct, but suggested that to satisfy the reliance and causation elements of a § 10(b) claim, the deceptive conduct must have been disclosed to the public, and investors must have relied on it in purchasing or selling their securities. *Id.* at 770 (concluding that in the case before it, "respondents' deceptive acts, . . . which were not disclosed to the investing public, are too remote to satisfy the reliance requirement." *Id.*

As an additional substantial hurdle for Lead Counsel in deciding to pursue this case, the Fifth Circuit is a difficult venue in which to plead and prosecute securities class actions based on § 10(b) claims. For example, unlike many other courts the Fifth Circuit has rejected the group pleading doctrine. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363-65 (5th Cir. 2004)(group pleading doctrine "cannot [*202] withstand the PSLRA's specific requirement that the untrue statement or omissions be set forth with particularity as to each defendant" and "conflicts with the scienter requirement"). Many of the Financial Institution Defendants issued analysts' reports. The Fifth Circuit has made pleading § 10(b) liability based on such reports very difficult: to hold a corporation liable for such a report, the plaintiff must allege particular facts demonstrating not only why the statements in the report are false, but facts raising a strong inference of scienter (intent to deceive, manipulate, or defraud, or severe recklessness) in the individual who wrote the report. *Southland*, 365 F. 3d at 366. As another example, despite the United States Supreme Court's long established rule that courts cannot "conduct a preliminary inquiry into the merits of a suit" on class certification, [75] in order to

invoke a fraud-on-the-market presumption of reliance and to satisfy the loss causation element, the Fifth Circuit has decided that by the class certification stage of the litigation, the plaintiff bears the burden of demonstrating by a preponderance of all admissible evidence that the stock price actually moved [*203] because of the defendants' alleged misrepresentation or corrective disclosure. *See, e.g., Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 269, 264-66 (5th Cir. 2007)(at class certification for plaintiffs arguing for a presumption of reliance under the fraud on the market theory, "[w]e now require more than proof of a material misstatement; we require proof that the misstatement *actually moved* the market."), *citing Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657, 663, 665, 666 (5th Cir. 2004)("to trigger the presumption [of reliance] plaintiffs must demonstrate that . . . the cause of the decline in price is due to the revelation of the truth and not the release of unrelated negative information," i.e., they must show that the stock price actually moved because of the defendant's alleged misrepresentation or corrective disclosure); *Unger v. Amedisys, Inc.* 401 F.3d 316, 323 (5th Cir. 2005)(requiring "a complete analysis of fraud-on-the-market indicators" at class certification stage, including proof of market efficiency relating to the following nonexhaustive list of factors: the average weekly trading volume expressed as a percentage of total outstanding [*204] shares; the number of securities analysts following and reporting on the stock; the extent to which market makers and arbitrageurs trade in stock; the company's eligibility to file SEC registration Form S-3; empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price; the company's market capitalization; the bid-ask spread for stock sales; and float, the stock's trading volume without counting insider-owned stock.); *Natheson v. Zonagen*, 267 F.3d 400, 414 (5th Cir. 2001). Furthermore, in *Greenberg*, the plaintiff must not only show that the stock's price was affected by revelation of the falsity of earlier false statements, but also "(1) that the negative 'truthful' information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline." 364 F.3d at 666.

75   *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156,

177, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974).

Furthermore, certification of a class was an uphill battle [*205] from the start in the Fifth Circuit, even though securities fraud actions are frequently viewed as appropriate for class prosecution. The Fifth Circuit is wary of the power of class actions and requires a plaintiff to prove more at pretrial stages of the litigation, as summarized in its recent pronouncements in *Oscar Private Equity*, 487 F.3d at 267 ("We cannot ignore the *in terrorem* power of certification, continuing to abide the practice of withholding until 'trial' a merit inquiry central to the certification decision, and failing to insist upon a greater showing of loss causation to sustain certification, at least in the instance of simultaneous disclosure of negative news. . . . [A] district court's certification order often bestows upon the plaintiffs extraordinary leverage, and its bite should dictate the process that precedes it."). 76 In decertifying the class in *Newby*, the Fifth Circuit stated, "The necessity of establishing a classwide presumption of reliance in securities class actions makes substantial merits review on a Rule 23(f) appeal inevitable," *inter alia* because "class certification may be the backbreaking decision that places 'insurmountable pressure' on a defendant [*206] to settle, even where the defendant has a good chance of succeeding on the merits." 482 F.3d at 393. Indeed, the Fifth Circuit's decertification of the *Newby* class and rejection of the scheme liability theory make even more remarkable the exceptional settlement recovery through the litigating and negotiating skills and hard work of Coughlin Stoia. *See* Declaration of Judge Sarokin, # 5819 at 16 ("The adverse class certification ruling by the Fifth Circuit demonstrates the outstanding nature of the $ 6.6 billion recovery against [Citigroup, JP Morgan Chase, and CIBC] given that [the fraudulent scheme/conduct liability] theory was rejected by the appellate court.").

76   As evidenced in the record, the appellate court reversed this Court's certification of the *Newby* class, ruling that there was no *Affiliated Ute* presumption of reliance on the bank defendants' behavior or omissions because the banks had no duty to investors to disclose the allegedly fraudulent nature of their transactions, and there was no fraud-on-the-market presumption of reliance because plaintiffs did not allege that the bank defendants made any public and material misrepresentations. *Regents of University of California v. Credit Suisse First*

*Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007), [*207] *cert. denied*, 128 S. Ct. 1120, 169 L. Ed. 2d 957 (2008). It concluded that plaintiffs had only alleged aiding and abetting in asserting that the banks' transactions allowed Enron to commit fraud by misstating its financial condition. *Id.* at 386. It further rejected as too broad the rule of the SEC adopted by this Court that primary liability attaches to any party that engages in a transaction with the principal purpose and effect of creating a false appearance of revenues. *Id.* at 386-87.

Another legal risk-related deterrent to taking on this action, especially given the involvement of so many parties in the Enron debacle, is the PSLRA's judgment reduction/proportionate liability provisions for § 10(b) claims. 15 U.S.C. § 78u-4(f). Section 78u-4(f)(2)(B) limit damages against a defendant "solely for the portion of the judgment that corresponds to the percentage of responsibility of that [defendant]" unless he knowingly violated the law, under which circumstance he would be jointly and severally liable for all the damages (§ 78u-4(f)(2)(A). Moreover, in effect it provides non-settling defendants with a judgment credit from the proportionate share formula. § 15 U.S.C. § 78u-4(f)(7)(B). The evidence required [*208] to establish first which parties are primarily liable, to which plaintiffs each defendant is liable, whether the defendant knowingly violated the law, then proportionate liability where plaintiffs do not show a knowing violation, and then judgment reductions would be extensive and make prosecution extremely difficult. 77

77   The Court finds a remarkable commitment by Lead Counsel, especially when the view of commentators across the country that the class was unlikely to recover more than a few cents on the dollar. *See, e.g.*, Expert Report for Professor Charles Silver, # 5822 at 42-43.

In sum, the risk factor not only supports the reasonableness of the 9.52% fee agreement, but warrants application of a significant multiplier for a lodestar analysis.

g.   *time limitations imposed by client or the circumstances*

While the Court is not aware of time limitations imposed by the Regents, given the number, nature, and size of the Defendants in this

consolidated-and-coordinated-case litigation the Court itself imposed a very tight and demanding docket control schedule in this case, from the filing of the complaints, two rounds of motions to dismiss and responses in opposition, discovery and the Deposition [*209] Protocol. Lead Counsel performed admirably throughout.

### 8. *amount involved and the results obtained*

It is undisputed that the $ 7.2 billion recovery for the benefit of the class is the largest in a securities class action, indeed of any class action, in history. *See, e.g.,* Declaration of H. Lee Sarokin, # 5819 at 14.

The United States Supreme Court and the Fifth Circuit have held that "'the most critical factor' in determining the reasonableness of a fee award is the degree of success obtained." *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992), *quoting Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998)(". . . . Where recovery of private damages is the purpose, . . . consideration to the amount of damages awarded as to the amount sought represents the primary means to evaluate that concern.").

Thus the Court finds that the extraordinary recovery under extremely challenging circumstances not only supports the reasonableness of a 9.52% fee award, but also justifies, for a lodestar calculation, application of a significant multiplier.

### 9. *The experience, ability, and reputation of the attorney*

The experience, ability, and reputation of the [*210] attorneys of Coughlin Stoia is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country. Indeed that factor was the main reason why the Regents hired Class Counsel. Coughlin Stoia's track record of significant victories is unparalleled and justifies the high hourly fees which they charge. After noting the extraordinary amount of time and money invested by Lead Counsel in an action based "on a novel legal theory, with little precedent to support it in a case that initially seemed both financially unpromising and difficult to settle," Professor Coffee proclaimed,

> [E]ven if other counsel could have developed the same original legal theory

(and this is uncertain), only a law firm with Lead Counsel's reputation for zealous advocacy could have convinced the defendants that this case would be carried to trial (at whatever cost it took) and represented too great a risk for them not to settle. In addition, Lead Counsel was litigating literally against the cream of the American corporate law bar. . . . To sum up, in my judgment, few other counsel (and perhaps no other) could have obtained this degree of success.

Coffee Declaration, [*211] # 5821 at 5-6, P 5.

Here too, the Court finds that the ninth *Johnson* factor supports the reasonableness of the 9.52% fee agreement.

### 10. *undesirability of the case*

The quantity of lawsuits relating to Enron filed, the number of highly qualified law firms filing them, the enormous publicity surrounding the Enron debacle, and the support of the suit by the community locally and nationally, other than big business, attest to the desirability of the newsworthy *Newby* litigation. So do the number of class members and attorneys that applied for appointment as Lead Plaintiff and Lead Counsel, respectively.

Nevertheless, the risk of little or no recovery was high in the absence of any deep pocket defendant that had made a material misrepresentation or omission and the Lead Plaintiff's reliance on a novel theory for liability under § 10(b) and Rule 10b-5(a) and (c). Furthermore the cost of pursuing the named Defendants for such a long period was too great to be born by many firms.

The undesirability or financial risk supports the reasonableness of the fee agreement.

### 11. *nature and length of the professional relationship with the Regents*

Before the Regents retained Coughlin Stoia in December 2001, Lead [*212] Plaintiff had never worked with Coughlin Stoia, but their joint efforts on this case were so effective and smooth that the Regents hired Coughlin Stoia to serve as Lead Counsel on the subsequent *Dynegy* litigation, where the fee agreement

was structured similarly to the one here, at a slightly lower percentage (7.752%) for a much less complex action, and which Judge Lake enforced. The Regents also hired Coughlin Stoia to represent the Regents in an individual securities suit against AOL Time Warner, in which the Regents negotiated a 14.5% fee and received $ 200 million net of the fees. This increasing relationship evidences the Regents' satisfaction with Lead Counsel's work and supports the reasonableness of the fee request.

### 12. awards in similar cases

The result of a comparison of this case with others depends on how comprehensive a view one takes of post-PSLRA securities class actions, in particular of megafund class actions.

A review of more than just the five most recent mega-fund cases demonstrates that the requested fee award is below those standardly granted in this area of law. In addition to the evidence previously cited in this opinion, see, e.g., [*213] In re Charter Communications, Inc. Sec. Litig., No. MDL 1506, 4:02-CV-1186 CAS, 2005 U.S. Dist. LEXIS 14772, 2005 WL 4045741, *13-14 (E.D. Mo. June 30, 2005) (and cases cited therein) (20% fee falls below the average of fee awards and many megafund fee awards have exceeded 20% in securities class actions). Through experts and citations to various cases, Lead Counsel has presented evidence that in the broad or long view, the percentage of the settlement fund requested for fees in this case is not only reasonable, but well below most of those awarded in securities class actions generally.

Professor Coffee submits a chart of the largest class action settlements involving "mega fund" recoveries (over $ 100 million) since 1990, with their fee awards expressed as a percentage of recovery, to demonstrate that the agreed to 9.52% here is not only within the range, but quite low, and therefore very reasonable. Coffee Declaration, # 5821 at 16-18, Table 2. Professor Coffee also discusses a well known study, Stuart J. Logan, Dr. Jack Moshman, & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Reports 167-234 (March-April 2003) ("Logan Study"), in which the authors' data on fee awards in all class actions generally [*214] suggested that there had been an increase in the average percentage awarded as fees: in 1990 in their first study they found that in 404 cases the average percentage awarded was 14.8%, while in 2003, including those original 404 cases they found the average

percentage to be 18.4%. # 5821 at 20. See also Cardinal Health, 528 F. Supp. 2d at 765 & n.11. [78]

[78]   In Cardinal Health, in 2007 Judge Marbley summarized the Logan study:

> The authors undertook a survey of the common benefit fee awards entered by state and federal courts between 1973 and the present, in 1120 cases. The authors also parsed the common benefit fee awards by size of recovery, type of case, and time of award. Among other things the authors found that: (1) when measured as a percentage of the total recovery, common benefit awards (including both fees and expenses) averaged: (a) 18.4% across all 1,120 cases, (b) 15.1% across the 64 cases where the recovery exceeded $ 100 million, and (c) 16.1% across the 10 mass tort cases.

528 F. Supp. 2d at 765. Judge Marbley looked to other post-PSLRA cases as a guide to determine a reasonable percentage of the fund for an attorneys' fee award and concluded that an appropriate fee would [*215] be between 15% to 20% of a $ 600 million settlement fund that provided a high percentage recovery for shareholders. Id.

Professor Coffee also addresses use of a lodestar cross-check to insure that a percentage fee award is reasonable. Observing that if we take the cumulative lodestar asserted here, over $ 127.5 million, and divide it into the requested fee award of approximately $ 688 million, the resulting lodestar multiplier would be 5.39%. Professor Coffee concludes that this number is "only marginally higher than the 4.50 average multiplier in settlements over $ 100 million." # 5821 at P 32. He further reports that in Logan, Moshman & Moore, Jr., "Attorney Fee Awards in Common Fund Class Actions," 24 Class Action Reports 169 (March-April 2003), in cases where recovery was over $ 100 million, 4.5 was the average multiplier. Id. Moreover "multipliers above 4 have become relatively common over the last dozen years." Id. In support, in P 33 in "Table 5: Recent Multipliers," he lists cases in which multipliers ranged