**Exhibit H
Part 4**

from 3.97 to 9.3. *Id.* at P 34 (and cases cited therein). Furthermore, "there has been a general recognition that multipliers in the range of 3 to 4.5 have become relatively [*216] 'common'" in cases with recoveries over $ 1 billion. *Id.*, citing *In re NASDAQ Market-Makers Antitrust Litig..*, 187 F.R.D. 465, 489 (S.D.N.Y. 1999)(awarding a 3.97 multiplier and finding fee awards of 3 to 4.5 to be "common"); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1998)(awarding a 27.5% fee on $ 134.6 million commodities fraud settlement and finding a 3 to 4.5% multiplier to be common); *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003)(approving a 3.5 multiplier in a multi-billion dollar settlement that remains the largest antitrust class action settlement on record); and *Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 368-69 (S.D.N.Y. 2002)(finding a multiplier of 4.65 to be within the standard range in the Second Circuit.). Given the extraordinary risk in this case, he recommends that a multiplier in the 5-6 range would be justified, especially since "defendants have successfully resisted plaintiffs' attempts to reach trial." *Id.* at P 35. [79]

> 79  This Court observes that Judge Marbley in *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d at 768, thoughtfully applied a multiplier of six:
>
> > In this case, however, [*217] the Court is not uncomfortable with deviating from the normal range of lodestar multiplier, at least to some extent. Given the outstanding settlement in this case and the noticeable skill of counsel, a lodestar multiplier greater than the average would not be unwarranted or unprecented. . . . Though [a multiplier of six times] is significantly above average, the Court finds this award reasonable under the circumstances.

In Lead Counsel's Memorandum (# 5816 at 60 n.47), Lead Counsel cites several cases, copies of unpublished opinions included in the Compendium, where multipliers greater than 5 have been approved: *Waste Management, Inc. Sec. Litig.* ("*Waste Management I*"), H-99-2183, slip op. at 64 (noting the award of 7.9% of the settlement fund

as fees was pursuant to parties' agreement and substantially lower than fees regularly awarded in the Fifth Circuit and approving a multiplier of 5.3)(Ex. B); *In re Cardinal Health*, 528 F. Supp. 2d 752, at 768 (S.D. Ohio 2007)(award of 18% and multiplier of 6)(Ex. Q); *In re Charter Communications, Inc. Sec. Litig.*, No. 4:02-CV-1186 CAS, 2005 U.S. Dist. LEXIS 14772, *56 (E.D. Mo. June 30, 2005)(20% of $ 146,250,000 settlement fund and [*218] multiplier of 5.6); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 198 (S.D.N.Y. 1997)(16.66% of $ 115 million common fund and multiplier of 5.5); and *In re RJR Nabisco, Inc. Sec. Litig.*, No. 88 Civ. 7905, 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992) (awarding 30% of $ 72.5 million with multiplier of 6.0). *See also Di Giacomo*, 2001 U.S. Dist. LEXIS 25532, 2001 WL 34633373, at *10 (30% of $ 29.5 million fund and multiplier of 5.3).

The Court also notes that the Third Circuit in *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005), remanded the case for determination of an attorney's fee award after a partial settlement of a securities fraud action. The district court subsequently 'awarded a fee constituting 25% of the settlement fund, approximately $ 31.7 million, and found it reasonable even though it resulted in a lodestar multiplier of 6.96, because it involved the largest recovery on record against an auditor in a securities fraud action ("a historic victory"), because counsel obtained unprecedented results without relying on the product of any official investigation, because the case was extremely complex and "victory at trial would have been, at best, remote and uncertain," and because counsel [*219] performed with great skill. *In re Rite Aid Corp. Secs. Litig..*, 362 F. Supp. 2d 587, 590 (E.D. Pa. 2005). Here, the amount recovered is greater, Lead Counsel has proffered evidence that it provided a roadmap for Bankruptcy Examiner Neal Batson's investigation in the Enron bankruptcy and contributed substantially to it, the case was even more complex, and counsel's representation was of the highest caliber.

Another of Lead Counsel's experts, Professor Silver, provides a chart showing the sliding scales (tying higher percentages to higher levels of recovery) agreed to in other cases prosecuted by Lead Counsel or one of its predecessors; they range from 14% to 27%, considerably higher percentages than that agreed to here. # 5822 at 57-58 (Table 5). He also submits a Table of Fees agreed to by institutional investors in other cases which objectors have cited as having reasonable fees; in all but

one, the percentages promised exceed those agreed to by the Regents and Lead Counsel. *Id.* at 58-59 (Table 6). In addition Professor Silver cites two academic studies of post-PSLRA class actions in support of his view that the Regents' promised fee is not only reasonable, but "well below average for [*220] cases led by public institutional investors"): (1) Stephen J. Choi, Jill E. Fisch, and A.C. Pritchard, *Do Institutions Matter? The Impact of the Lead Plaintiff Provision of the Private Securities Litigation Reform Act*, 83 Washington U. L. Quarterly 869 (2005)(finding that fees averaged 30% of recovery in cases led by investors and private institutions and 25% in cases led by public institutions); and (2) Michael A. Perino, Markets and Monitors: *The Impact of Competition and Experience On Attorneys' Fees in Securities Class Actions*, St. John's University School of Law, Legal Studies Research Paper Series, Paper # 05-0034 (Dec. 2005)(studying "a random sample of 244 post-PSLRA securities fraud class actions entered into between April 1997 and May 2005, inclusive" and finding a mean fee of 20% in cases with public pension funds as lead plaintiffs). *Id.* at 59-60. Professor Silver also proffers a chart of fee awards in class actions generally, only some of which are securities suits, with settlements exceeding $ 100 million; the fee award percentages range from 25% to 36%. *Id.* at 62 (Table 7). Finally Professor Silver discusses two empirical studies of class actions generally: (1) Thomas [*221] E. Willging, *et al.*, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 16 (1996)("Willging Study"); and (2) Theodore Eisenberg and Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27. 75 (2004)("E&M Study"). The Willging Study at 69 reported a remarkably consistent median fee award in class actions ranged from 27-30%. # 5822 at 63. The E&M Study, which included a larger, more diverse, and more recent group of cases, found that as the recoveries increased in size, fee percentages declined. *Id.* at 64. Professor Silver provides diagrams of fee awards, excluding expenses, from that study that demonstrate (1) in cases involving recoveries of $ 84 million or more, the average fee award equals slightly less than 20% of the recovery, with the rage defined by the first standard deviation extending upward to 27%; and (2) in cases with recoveries over $ 190 million, the mean is above 10% and a first standard deviation extends above 20%. Lead Counsel's requested 9.52% falls below the mean that the E&M Study reports for the largest class settlements using either [*222] of these datasets. *Id.* at 65-66." [80]

[80]    This Court observes that in *In re Cabletron Systems, Inc, Sec, Litig.*, 239 F.R.D. 30 (D.N.H. 2006), in a thoughtful discussion of different methods of awarding attorneys' fees, Judge Smith examined the same five statistical analyses of attorneys' fee awards in complex class actions, in particular in securities class actions (the Logan Study, the NERA Study, the Willging Study, the E&M Study, and the O'Brien Study). Although professing that he was "without the technical expertise or time to [fully] parse the available data," Judge Smith determined that the Logan Study found that "on average, attorneys' fees (plus judicially awarded expenses) equaled 18.4 percent of the settlement fund"; that the NERA Study "concluded that fee awards averaged approximately 32 percent of the settlement"; that the Willging Study "indicated that the mean and median fee award was between 24 and 30 percent of the net monetary distribution to the class"; that the O'Brien Study concluded that from April 1993 to September 1996 "the average fee award to plaintiffs' counsel in securities cases amounted to 32 percent of the settlement fund"; and that the E&M Study, which "compiled [*223] and analyzed data contained in all previous studies of class action awards," "determined that the median fee in securities class actions is 25 percent, while the median fee in non-securities common fund cases is 30 percent." *Cabletron*, 239 F.R.D. at 41-42. Judge Smith decided to follow the Seventh Circuit's "market-oriented approach" and "craft a fee award approximating the result of an arm's length negotiation in real market conditions," and he used these percentages as part of his review to "arrive at a POF fee award that is well grounded in market-based information and it is therefore reasonable." *Id.* at 40-41.

This Court notes that Lead Counsel's requested 9.52%, without expenses included, is far below these percentages.

Arguing that public policy supports granting the requested fee award in *Enron*, Professor Coffee quotes from Judge Denise Cote, *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005), and argues that her "comments apply at least as well here,

where in my judgment, the risk was substantially higher":

> Public policy also supports the approval of this fee request. The size of the recovery achieved for the class which has been praised even by several objectors-could [*224] not have been achieved without the unwavering commitment of Lead Counsel to this litigation. Several of the lead attorneys for the Class essentially devoted years of their lives to this litigation, with the personal sacrifices that accompany such a commitment. If the Lead Plaintiff had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class. In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives. After all, this litigation was conducted on an entirely contingent fee basis, and Lead Counsel paid millions of dollars to fund the litigation. While some significant recovery in a case of this magnitude may seem a foregone conclusion now, the recovery achieved here was never certain. It is only the size of the Citigroup and Underwriters' Settlements that make this recovery so historic, and it is likely that less able plaintiffs' counsel would have achieved far less.

*Id.* at P 48. This Court finds these comments highly applicable to the [*225] instant case.

The Honorable H. Lee Sarokin, having independently reviewed Lead Plaintiff's and the attorneys working with the firm demonstrating that they spent approximately 280,000 hours at a time cost of $ 127 million and incurred expenses of approximately $ 45 million, found that "the hours spent on the case were necessary and reasonable in light of its complexity, importance, novelty, amount of motion practice, discovery and work involved in prosecuting a case for almost six years. . . . These figures are entirely appropriate in a complex and protracted case of this

magnitude. In fact, I would have expected the lodestar amount to be significantly higher, which, to me, demonstrates Lead Counsel was extremely efficient in the handling of this case, for which they should be rewarded-not penalized." # 5819 at 14.

Moreover, as Professor Charles Silver remarked,

> The possibility that Lead Counsel exceeded The Regents' expectations by recovering $ 7 billion does not make the fee unreasonable. It just shows that the recovery is outstanding, which presumably delights all investors, and that Lead Counsel's outstanding work, which The Regents repeatedly acknowledge, will generate a superior [*226] fee. This is how contingent fee arrangements are supposed to work: lawyers who do better for their clients also do better for themselves.

# 5822 at 46. He quotes Judge Easterbrook in *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001), in urging against capping fees in megafund cases at 10%: "Private parties would never contract for such an arrangement because it would eliminate counsel's incentive to press" for greater recoveries and would encourage cheap settlements. # 5822 at 67.

This Court notes that while some commentators argue that as the settlement recovery gets larger, the fee award percentage should decrease "because the magnitude of the recovery in many instances is due to the size of the class and 'has no direct relationship to the efforts of counsel,'" [81] Judge Barbadoro in the Tyco litigation presented the other side of the public policy coin on such a downward sliding scale with regard to the case before him:

> In this case, countervailing public policy considerations weigh against any reduction of the POF award. This was an extraordinarily complex and hard-fought case. Co-Lead Counsel put massive resources and effort into the case for five long years, accumulating [*227] nearly $ 29 million in yet-to-be reimbursed expenses and expending more than 488,000 billable hours (constituting a

lode-star of over $ 172 million) on a wholly contingent basis. But for Co-Lead Counsel's enormous expenditure of time, money, and effort, they would not have been able to negotiate an end result so favorable for the class. Because Co-Lead Counsel's continued, dogged effort over the past five years is a major reason for the magnitude of the recovery, and because this case could not have reached a similarly satisfactory resolution earlier, public policy favors granting counsel an award reflecting that effort.

*Tyco*, 535 F. Supp. 2d at 249 [16]. [82] Judge Barbadoro added,

> Without a fee that reflects the risk and effort involved in this litigation, future plaintiffs' attorneys might hesitate to be similarly aggressive and persistent when faced with a similarly complicated, risky case and similarly intransigent defendants. [83] . . . But for cases like this one, in which a satisfactory settlement only became possible after years of hard-fought motion practice and searching discovery, it would be against public policy for me to set an unreasonably low POF award that would encourage [*228] future plaintiffs' attorneys to settle too early and too low. Additionally, approving this fee award is unlikely to open the floodgates to ever-higher levels of attorney compensation. Few cases will involve the combination of incredible legal and factual complexity, high risk, massive lodestar, and multi-billion-dollar recovery that characterized this case. Accordingly, I find it would be inappropriate to artificially reduce the percentage award based on the size of the recovery alone.

*Id.* This Court finds the same rationale is applicable to Class Counsel's extraordinary commitment here, where the complexity, duration, and risk were even higher than in *Tyco*.

81   *In re Tyco International Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007)(page numbers not yet available for pin citation), *citing*

*In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions*, 148 F.3d 283, 339 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114, 119 S. Ct. 890, 142 L. Ed. 2d 789 (1999), and *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 (3d Cir. 2005).

82   Page numbers not yet available for pin citation. Slip opinion is available at Compendium, # 5817 Ex. P.

83   Lead Plaintiff's expert on economic analysis of litigation and settlement, [*229] Professor Bebchuk, opines,

> [A] sliding [decreasing[]] schedule has it backwards. A sliding schedule provides counsel with a higher percentage of those initial settlement dollars that are relatively easy to obtain--and with a lower percentage of those dollars at high settlement levels that are relatively more difficult to extract. The sliding schedule thus concentrates the "firepower" of incentives in exactly the wrong places. Most importantly, a sliding schedule "under-spends" compensation dollars on providing counsel with incentives to obtain extra dollars beyond the easy-to-obtain settlement sums, thereby failing to attain some of the extra dollars that more effective incentives could produce.

# 5820 at 11. He concludes that "the goal of inducing investments by counsel would best be served by an increasing schedule . . . [which] spends more compensation dollar on additional settlement dollars at higher settlement values that are relatively more difficult to achieve and for which stronger incentives can make a significant difference." *Id.* at 11-12.

Even from a narrow view of only the five most recent mega-fund cases, the percentage fee award in the *Tyco* litigation (14.5%) was greater [*230] than the 9.52% requested here. Moreover, in Tyco the company and the accountants were available and able to pay a judgment, so counsel did not have to pursue secondary

actors through novel theories, making the risk here much greater. Lead Counsel has also shown that here there were more than 150 depositions over the number taken in *Tyco*. In addition, unlike this litigation in which Coughlin Stoia shouldered most of the economic risk of prosecuting the case, three firms shared such a burden in *Tyco*. *See, e.g.*, # 5907 at 60. Similarly, the Court has previously compared this case with *WorldCom* and identified the greater difficulties and the greater success here for shareholder class members.

In sum, in its lodestar cross check of the 9.52% fee agreement, the Court finds that while there are no other "similar" cases when one examines all the circumstances of the litigation, the requested lodestar is reasonable for this efficiently prosecuted case and a multiplier of 5.2 is warranted, given the unmatched size of the recovery, the obstacles and risks faced by Coughlin Stoia from the beginning, and the skill and commitment exhibited by counsel.

### III. Remaining Objections From Class Members and [*231] Attorneys

#### A. Non-Objector Public Pension Funds

Lead Counsel points out that in other mega-cases, public pension funds have objected to the attorney fees request. Lead Counsel's Reply, # 5907 at 1 and n.2 (listing examples). Here, however, it is remarkable that not a single pension plan fund has objected to the fee request. Furthermore, only one institutional investor, the Fiduciary Counselors acting on behalf of the Enron Savings Plan and the Enron Stock Option Plan ("ESOP"), has voiced objections (discussed *infra*) to the fee request. *Id.* at 1. This Court finds that general acceptance of the requested fee amount by all the pension funds and all but one institutional investor strongly supports the reasonableness of enforcing the fee agreement.

#### B. Objections To Issues Not Previously Addressed

##### 1. General Objections Made by Multiple Parties
[84]

> [84] A number of objectors have made conclusory complaints, e.g., that the requested fees are excessive or the multiplier too high, without offering any specific reasons, comparisons or established standards by which to measure the objection. For example, Mr. Fenstad and Ms.

McCoppin assert the size of Lead Counsel's fee request "should shock the conscious [*232] [*sic*] of this court." # 5868 at 7.

The Court addresses only those objections that are specific, not previously addressed, and supported by evidence or authority.

Several objections to the failure of counsel to provide time records have been cured. Lead Counsel have submitted their billing records (# 5959 and 5960) [85] pursuant to Court order and the objectors have had an opportunity to review them and to file additional objections.

> [85] Supplemented by an Addendum (# 5991) with the time records of Chitwood Harley Harnes LLP and Cunningham Darlow LLP. Under these firms' agreement with Lead Counsel, their fees will be awarded from the amount the Court grants Lead Counsel and will not increase the burden on the class.

A few letters from class members have complained of the small amount of money they will receive per share compared with the price they paid when they bought their Enron securities. In comparison to that small recovery, they find the amount of Lead Counsel's request for fees and expenses excessive.

Although the estimated losses to the Class exceed $ 40 billion, the Court finds that the settlement fund ($ 7.2 billion, and for Plaintiff class members, an average of at least $ 6.79 per [*233] share according to the disclosure in the Notice to the Class, [86] of their Enron investments) is remarkable in the face of the great obstacles to any recovery in this litigation. The typical recovery in most class actions generally is three-to-six cents on the dollar. *See, e.g.*, *Cardinal Health*, 528 F. Supp. 2d at 764, *citing* Elaine Buckberg, *et al.*, *Recent Trends in Shareholder Class Action Litigation: Bear Market Cases Bring Big Settlements*, 8 (NERA, Feb. 2005). Thus despite significant impediments, the individual recovery here is beyond that range. Moreover 90% of the common fund here goes to the class members. Thus the Court overrules the objection.

> [86] As pointed out by counsel, that number "assumes that everyone who can submits a claim. Given the number of different types of securities covered by the plan of allocation and the number

of individuals and entities in the Class (about 1.5 million) it is highly unlikely that 100% of those eligible will make claims. Necessarily, the average distribution per share will go up under these circumstance[s]. But the math aside, the bottom line is that, given the risks and complexities in this case, the recovery is historic." # 5907 at 49.

## 2. [*234] Individual Objections

### a. Debra Lee Silverio

Debra Lee Silverio (# 5849) objects to Lead Counsel's average hourly rate of $ 457 per hour for all participants, including paralegals and associates.

The Court would point out that a blended hourly rate of all the firm's legal staff is commonly used in preparing fee requests. *See, e.g., Rite Aid*, 396 F.3d at 306 and nn. 14 and 15 (the billing rate should be a "blended billing rate that approximates the fee structure of all the attorneys who performed legal work on the case"; *In re Cabletron Systems, Inc, Sec. Litig.*, 239 F.R.D. 30, 37 (D.N.H. 2006)("The lodestar method multiplies the hours reasonably spend by counsel by either a single blended hourly rate or several such representative rates for partners, associates, and paralegals . . . ."); *Fisher Scientific Inter., Inc. v. Modrovich*, No. Civ. A H-03-0467, 2005 U.S. Dist. LEXIS 40481, 2005 WL 3348901, *10 (S.D. Tex. 2005)(using blended rate for core team of senior partners, junior or mid-level partners, experienced associates, associates, and legal assistants).

Furthermore, Lead Counsel has also pointed out that the average hourly rate results from at least two factors: the rates charged and the staffing decisions made [*235] based on the complexity of the case. # 5907 at 60. Thus a rate "reflects the level of expertise and staffing mix required to achieve success in the face of the effort required and the complexity of that specific case." *Id.* The Court agrees with Lead Counsel that here the substantial risks, identified earlier, and the unquestioned complexities of this litigation, not to mention the high caliber teams of defense attorneys, required more experienced and specialized staffing and prosecution than the usual case, inevitably reflected in a higher hourly rate than in some other cases. As discussed previously, the Court finds Lead Counsel has adequately justified the rates that were charged for different members of the team.

Silverio, along with others, cites *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Albany*, 484 F.3d 162, 169, 164 (2d Cir. 2007),(abandoning the term "lodestar" in favor of "presumptively reasonable fee," determined by considering all relevant factors including the *Johnson* factors and finding a reasonable hourly fee, i.e., "the rate a paying client would be willing to pay", amended and superseded on denial of rehearing, 493 F.3d 110 (2d Cir. 2007), *amended and superseded*, [*236] 522 F.3d 182, 184, 192 (2d Cir. 2008)(touchstone inquiry is "what a reasonable, paying client would be willing to pay," noting "the Supreme Court's emphasis on the need to use the approximate market rate for an attorney's service in calculating the presumptively reasonable fee," and opining that "the district court (unfortunately) bears the burden of disciplining the market, stepping into the shoes of the reasonable paying client, who wishes to pay the least amount necessary to litigate the case effectively"). [87]

[87] Larry Fenstad and Dorothy McCoppin, joined by class member Nasser Pebdani, # 5877, also argue the fee should be reduced under *Arbor Hill.*

The Court responds that *Arbor Hill* was not a contingency-fee case in which risk and choice of a more qualified and expensive attorney that might optimize the likelihood of success must be assessed ex ante and not in hindsight; *Arbor Hill* was a "prevailing" party statutory-fee case based on the Voting Rights Act of 1965, 42 U.S.C. § 1973c, and reasonable fees under 42 U.S.C. § 1983, in which an attorney was granted fees based on only the claims on which he prevailed at the going market rate. This Court has discussed at length the different [*237] factors and rationales informing the two types. *See also infra* discussion of Bishop Objectors. Moreover, Silverio has not cited, nor has the Court found, any court in the Fifth Circuit that followed *Arbor Hill.*

### b. Peter Carfagna's Objections on Behalf of the Rita Murphy Carfagna & Peter A. Carfagna Irrevocable Charitable Lead Annuity Trust U/A DTD 5/31/96 (# 5852, 5963)

Peter Carfagna complains that Coughlin Stoia and all class counsel failed to include information about the identities of those submitting time requests, i.e., whether they were partners, associates, law clerks, paralegals, secretaries, contract attorneys, etc. Billing rates or total charges are not provided for some, while others are listed only by initials. Thus it is impossible to determine

whether time claimed should be included in the lodestar calculations.

Lead Counsel finds this criticism "just plain wrong" and points to the relevant submissions: # 5818 (Hodges) at Ex. 1; # 5827 (Bilek)at 6; # 5835 (Federman) at Ex. 1; # 5828 (Cuneo) at Ex. B; # 5826 (Genovese); # 5835 (Greenberg) at A; # 5831 (Gross) at Ex. 1; # 5825 (Shapiro and Finkel) at Ex. 1; and # 5833 (McDermott) at Ex. 1 and # 5834 (Savitt), both for Berger [*238] & Montague, PC. *See also* # 5932 (Tartt) at Ex.B. The Court agrees. *See also* # 5909 (Hodges' Supplemental Declaration).

Carfagna challenges a few specific entries. [88] There are two entries on the first time sheet (at $ 240 per hour) for two hours each on the same day (August 13, 2001) for "printing SEC documents" # 5959 (2001 records) for T. Ron Gosling. Carfagna charges that these entries are an example of duplication, and he questions how often this occurs later in the records if it occurs in the first entry.

88   Plaintiff's cursory dismissal of Carfagna's "criticisms of specific time entries by specific time keepers," as "display[ing] a stunning lack of knowledge about the myriad tasks required (and the amount of time it takes to perform them) to manage and effectively prosecute a case of this magnitude", was not helpful to a lodestar examination. # 5974 at 13.

The Court finds this charge of duplication is pure speculation and emphasizes that the SEC played a central role in this litigation, in other related securities class actions, and in SEC enforcement cases against Defendants in this class action, and that the Court's test for scheme liability came largely from the SEC. There would [*239] necessarily be numerous documents to be examined and a determination of, which would be relevant and should be copied. The objection is overruled.

On page 1 of tab 2, of Coughlin Stoia's 2001 records, Carfagna objects to entries by Darren J. Robbins, whom Carfagna presumes is a partner since he billed at $ 650 per hour, [89] who claims to have spent four hours on September 12, 2001, 6 hours on September 13, 2001, and 6.5 hours on September 14, 2001, 6.75 hours on September 18, 2001, and 5.25 hours on September 19 in reviewing "first call" "media" and "SEC." Carfagna characterizes 29.50 hours on reviewing media "a bit excessive." # 5963 at 3. The Court- disagrees. Numerous

commentators began questioning Enron as a "secretive black box" early in 2001. After Jeffrey Skilling's abrupt resignation and the return of Kenneth Lay as CEO of Enron in August 2001, a flood of information addressing Enron's financial condition came out through the media. Moreover, as noted, the SEC was central to the development of Lead Counsel's case. Throughout this litigation the parties have frequently cited key articles in various major journals from 2000-2002, raising key questions about concealed financial [*240] information regarding Enron and providing unsettling disclosures about Enron's conduct that led to its collapse and bankruptcy.

89   The Court notes that the records reflect that Darren J. Robbins was a partner at Milberg Weiss and participated in the litigation when Mr. Lerach, from the same firm, entered the fray.

Carfagna also complains that Robbins then spent 34.75 hours on September 24-27, 2001 drafting the Complaint against Enron. *Id.* at 2. Carfagna asks whether it is reasonable for a person to spend almost 65 hours doing this work at $ 650 per hour; with the requested 5.4 lodestar, this amounts to $ 228,150 for a draft of a complaint that was later reviewed by others who incurred additional charges. The Court disagrees and points out, as reflected in so many of its orders, how extremely difficult it is to plead a viable complaint under § 10 (b) without any discovery and with the heightened standards of the PSLRA, not to mention the complexity and secrecy of Enron's fraudulent scheme, and that attorneys highly skilled in securities fraud class actions would be required. It also explains the necessity of Robbins' researching media articles to obtain more facts.

As another example, although [*241] Coughlin Stoia states that "time expended by certain Coughlin Stoia shareholder relations personnel who have spent a substantial amount of time responding to Enron Shareholder inquiries over the past six years was not included in the lodestar submitted with the January 4, 2008 filing, the time of those shareholder relations personnel is in the time records at tab 2 and the summary at tab 1." Compendium at n.2. In the time record there is an entry on both January 5 and on 6, 2004 for Rick Nelson for exactly one hour ($ 240 each) of "shareholder calls." Tab 2 at 7. Carfagna questions whether Nelson spent exactly one hour on each of the two days on these calls. Carfagna further suggests that if actually expended,

such time should be the cost of doing business at the firm and should not be included in lodestar calculations. The Court believes that most attorneys charge fees for the hours spent in consulting with their clients, and any firm filing a securities class action against Enron would have many of them in this class action, with a number of class representatives that required even more than usual contact. Two hours in consultation with shareholder/class members is hardly excessive [*242] on its face. This objection appears frivolous and petty to this Court and it is overruled.

Carfagna also questions the expenditure of even hourly amounts of time and seemingly duplicative hours and work of Michelle Ciccarelli and Patrick W. Daniels during September and October of 2001. # 5963 at 4. He complains the Ms. Ciccarelli repeatedly (7 times) documented hours calling clients to discuss the factual and legal basis of the case and calls to the custodian and attorneys to determine loss and analyze damages. Given the size and complexity of this action, and the fact that counsel were struggling to gather enough information to file a securities fraud class action, the Court overrules this objection. Carfagna further complains the Mr. Daniels made on two days for exactly twelve hours each day an entry for "prepar[ing] a chart on Enron Insider Trading; prepar[ing] and drafting] Complaint on Enron; meeting with clients in LA and Burlingame Re: Enron," and two more days for twelve hours each "research[ing] and compil[ing] Insider Trading; review 10Q and 10K's: prepare Insider Trading detail request; meeting with potential clients to discuss and explain case." Again the Court finds these [*243] objections meritless. Carfagna suggests in addition that if these two are contract attorneys, their time should be included as an expense and not included in the lodestar calculation and thus not subject to a multiplier. The Court has previously addressed the issue of contract attorneys.

Out of six years of contemporaneous time records submitted by Coughlin Stoia, Carfagna targets five entries that he characterizes as secretarial or ministerial functions that should not be included in the lodestar calculation and that make him question the entire submission. The Court has reviewed records for that year, as well as others, and concludes that Carfagna's few targeted entries, which are vague, are very atypical of the vast number of entries in the time records which nearly always provide very specific identification of the matters being addressed. Carfagna points to an entry on January

6, 2004 when Frantz Michaud billed a quarter of an hour for "processed mail, docketed, diaried case information and dates into the M.A." at $ 185 per hour, to be included in the lodestar calculation ($ 999 with multiplier). The Court finds this service to be sufficiently legal in nature to qualify for inclusion [*244] in the lodestar. On June 7, 2004, Rory C. Dowd billed four hours at $ 135 per hour ($ 2,916 with multiplier) for stapling and chronicling documents. Chronicling documents could well require legal knowledge. On June 12, 2004, Desiree L. Gilbert billed 3 hours at the rate of $ 240 per hour ($ 3,888 with multiplier) for "batch printing of PDF files." The Court is unable to find such an entry and therefore overrules the objection. On January 29, 2004 Risa Castro billed 5 hours at $ 240 per hour ($ 6480 with multiplier) for organizing and putting away plaintiff's documents. Such a task would require legal knowledge and skill so the Court overrules this objections. Carfagna does highlight that on April 26, 2004, Bradley P. Louis charged one hour at $ 210 for "mov[ing] boxes" ($ 1,134 with multiplier). The Court cannot see any justification for including this entry in the lodestar, no less for it to be subject to a multiplier, and Lead Counsel has offered none. Thus the Court concludes that the lodestar should be reduced by one hour and $ 210 and the requested total fee with multiplier should be reduced by $ 1,134.00. Because the Court is applying a lodestar check to evaluate the percentage [*245] fee under the fee agreement, and not a lodestar analysis, this amount, by itself, is too small to be significant.

Carfagna also argues that Jerrilyn Hardaway's time records suggest that she "has little, if any, need for sleep, nourishment, or bathroom breaks" because her June 2004 report indicates she worked extremely long days for a total of 392 hours, billing the Class, with multiplier, $ 166,600. # 5963 at 6. A review of Coughlin Stoia's June 2004 time records, # 5959 and 5960, tab 2 at 369-455, reveals that a number of crucial depositions of representatives of the financial institutions, Enron and Arthur Andersen occurred during that month. See also Helen Hodges' Decl., # 5818 at P 169. The record further indicates that Jerrilyn Hardaway was a key player in this litigation and in these depositions. Her billing entries (tab 2 at 371, 374 378-79, 380, 384, 387, 390-92, 395-96, 398-99, 403-04, 406, 409-10, 412, 417, 423, 424, 426, 433, 434, 440, 441, 448, 449) are often for "long" days (a number for 16-18 hours), and they are very specific as to what she spent the time on. In addition to extensive and constant work on the website and databases, she was

deeply involved in preparation [*246] for very large number of depositions and discussions about them with both Coughlin Stoia and outside counsel. None of the entries with the number of hours claimed strike this Court as unreasonable. Thus the Court overrules this objection.

As for redundant attorney time, Carfagna points to the single deposition of Billy Bauch of CIBC on June 9, 2004, regarding which G. Paul Howes billed $ 17,915 (with multiplier) for 16.5 hours, Anne L. Box billed $ 45,360 (with multiplier) for 14 hours, and John Lowther billed $ 34,047 (with multiplier) for 13 hours, for a total of $ 137,000. # 5963 at 6.

The Court observes that in this objection Carfagna is trying to turn on its head Lead Counsel's express declaration, as evidence of its lean staffing, that of the 472 depositions taken, "there are only *two* where three lawyers appeared" and "no depositions where more than three attorneys from Lead Counsel appeared," while *only one* attorney from Lead Counsel appeared at most of them." Lead Counsel's Reply, # 5907 at 19, citing Helen Hodges' Declaration, # 5818 at P 169 (chart of all depositions taken and Coughlin Stoia attorneys attending), 214. A review of Lead Counsel's time records, Tab 2 at 393, 394, [*247] 400, 401, demonstrates that Ann Box attended only a portion of the first day of the two-day deposition of Bauch because for part of her billing on that day she also reviewed documents and prepared for the deposition of Jennifer Bishko, an employee of Citigroup, which Ann Box **took alone** during the next two days; indeed she may have needed some part of the Bauch deposition to prepare for Bishko's. *Id.* at 394; Helen Hodges' Declaration, 5818 at P 169. The billing entries of Paul Howes (Tab 2 at 393, 401) and John Lowther (*id.* at 394, 400), reveal that Lowther was assisting Howes, in particular for pulling and providing the numerous documents that Howes would need during the deposition. The claims against the financial institutions, were complex and sophisticated, and Coughlin Stoia might reasonably have decided that the rare combined presence in this litigation of two or more attorneys at a deposition was necessary. The Court overrules the objection.

Finally Carfagna targets the first page of time records (covering November 12-21, 2001) submitted by Schwartz, Junell, Greenberg & Oathout, LLP [90] for over $ 54,000 (with multiplier) of time spent by "RBG" relating to whether the firms should [*248] get involved

in this case, attempting to find appropriate plaintiffs, and other pre-engagement activities that should not be compensable. He maintains time-keeping should begin when a firm is retained, not in trying to find a client and determine what role it might play in the litigation. # 5963 at 6-7.

90   Tab 3 of the time records for non-Lead co-counsel, # 5960.

A review of the record makes clear that Roger Greenberg's early billings for his and his firm's (now Schwartz, Junell, Greenberg & Oathout, LLP's) services are related to one of the deluge of suits filed in the wake of disclosures of Enron's financial distress in October-November 2001 and the genesis of what became the *Newby* class action. *Newby* was filed on November 22, 2001 by attorneys from Cunningham, Darlow, LLP and Shapiro, Haber & Urmy, LLP as the first action arising out of the Enron collapse, and thus for purely procedural reasons became the "lead case" for subsequently filed actions that were consolidated into it. The top page of Greenberg's time records (# 5960 at Tab 3) expressly states the hours he claims are related to the Amalgamated Bank matter, i.e., which shortly became a separate Enron-related class action [*249] which Greenberg filed on December 4, 2001, *Amalgamated Bank, Individually and on Behalf of All Others Similarly Situated v. Lay, et al.,* H-01-4198, in this district. It, along with numerous other Enron-related actions, was consolidated with *Newby* on December 12, 1001. # 23 in H-01-4198; # 17 in H-01-3624. Bill Lerach and James Jaconnette, both of Milberg Weiss, were admitted by court order to appear as attorneys of record, with Greenberg, for representation of Plaintiff Amalgamated Bank on behalf of the putative class on December 17, 2001. # 40 in H-01-3624. (The contested time records, Tab 3 at 2-3, reference frequent communications between Greenberg and Milberg Weiss attorneys in November and early December 2001.) A number of motions for appointment as Lead Plaintiff were filed as early as December 21, 2001, including one by Amalgamated Bank and the Regents of the University of California with other Movants (# 67). In February, the Regents was appointed as Lead Plaintiff and Milberg Weiss was approved as Lead Counsel, # 294, with Schwartz Junell serving as Co-Liaison Counsel for Milberg Weiss in the putative class action. Thus Roger Greenberg's work went directly into investigating [*250] and developing what became the Newby class action with the firm that then

became Lead Counsel, Milberg Weiss, for Lead Plaintiff and the proposed class. His fees for services that benefitted the class are therefore compensable. Indeed on December, 5, 2001, in H-01-4198, Greenberg, on behalf of Amalgamated Bank, filed an *ex parte* motion for temporary restraining order and show cause why a preliminary injunction [91] should not be entered (1) freezing and/or imposing a constructive trust over insider trading proceeds of twenty-nine individual Enron defendants from their sales of Enron stock from October 19, 1998 to November 27, 2001 to prevent dissipation or concealment of those profits and to preserve them to satisfy any future equitable award entered by the court, (2) requiring an accounting of these insider trader proceeds, and (3) permitting limited expedited discovery under § 21D(b)(3) of the PSLRA, 15 U.S.C. § 78u-4(b)(3)(B) (# 7 in H-01-4198), that was joined by a number of other plaintiffs and parties. Although the Court ultimately denied the request for an injunction because evidence in the record thus far was not sufficient to support imposing one, it did conclude in the class's [*251] favor that the Court has the authority to issue such a prejudgment restraint on Defendants' assets since Plaintiff's complaint had sought both legal damages and equitable restitutionary remedies of constructive trust, accounting, and disgorgement for breach of fiduciary duty and because Amalgamated Bank's complaint had asserted a cognizable claim. # 111 in H-01- 3624.

91   Roger Greenberg's original declaration, # 5830 at 2, explains that he

was intimately involved in this litigation from the initial stages, seeking an injunction on behalf of the putative plaintiffs (Amalgamated Bank, then Regents) as the initial attempt to protect the interests of the putative class, . . . in seeking a freeze on the transfer of bank funds and a prohibition against document destruction, all of which was occurring *instanter*. This required urgent and late night meetings with Lead Counsel, drafting pleadings "on the fly," public document review and / research, followed by numerous emergency depositions and hearings. The breadth of the

case was not totally known at this point but would, in short time, become apparent and appalling.

The first page of his billing records, Tab 3 to # 5960, clearly refers to this [*252] intense investigation leading up to filing the *Amalgamated Bank* action and then motion for the TRO, involving research, news media disclosures about Enron, discussions with attorneys about types of claims that could be brought and possible plaintiffs for representation, the status of other cases being filed, generally relating to preparation for filing suit and strategy. That investigation, according to Lead Counsel, revealed evidence of fraud massive insider selling by Enron officials before material adverse information about Enron was disclosed to the public in October 2001. Thereafter the filing of the request for a TRO (1) freezing and imposing a constructive trust over insider trading proceeds, (2) requiring an accounting of insider trader proceeds, and (3) permitting limited expedited discovery (because of the stay imposed by the PSLRA) of suspected offshore partnerships and illicit straw entities used to effectuate fraud (# 7 in H-01-4198), subsequently resolved in *Newby*, was of great importance for the class. Helen Hodges discusses it in her Declaration, # 5818 at 26-28.

The test for payment of legal fees incurred by non-Lead Counsel before appointment of Lead Plaintiff and [*253] approval of its choice of Lead Counsel under the common fund doctrine is whether the attorney's services provided an independent benefit to the class beyond that conferred by Lead Counsel. *Cendant II*, 404 F.3d at 191. Here, however, Greenberg's work, in conjunction with Milberg Weiss, which became Lead Counsel, fed into and was essential to building the *Newby* action case representation of the class. Thus the common fund doctrine ("that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees") is the applicable law and the hours reported by Greenberg are compensable if reasonable. *Cendant II*, 404 F.3d at 187.

Carfagna asks the Court to sustain his objections, have another hearing on attorneys' fees and expense

reimbursement, permit "a full range of discovery, including depositions, as to the propriety of these fees and expenses." The Court, in its discretion, not only does not find that additional procedures necessary, but they would add to the costs and prolong this litigation even more.

**c. Brian Dabrowski's [*254] Objections (# 5856, duplicated in 5872; 5890; 5891; and 5962)**

Mr. Dabrowski, through his attorney Lawrence Schonbrun, wants the Court to appoint (1) a guardian to protect the class's interest by investigating in detail all the circumstances surrounding the fee agreement and the engagement of experts Coffee, Silver, Bebchuk, and Sorkin, (2) expert (auditor/forensic accountant), and (3) a magistrate or special master to oversee the fee proceeding, etc. Carfagna's supplemental objections to Lead Counsel's compendium of records requests that Lead Counsel provide additional information, or that the Court appoint a special master to review the time sheets, or for additional time for Objectors to review the time records. Larry Fenstad and Dorothy Lancaster McCoppin (# 5868) ask the Court to refer the lodestar data to an independent firm for analysis, audit, and review.

Lead Plaintiff's response argues that it is not beyond the objecting class's ability, and certainly not beyond this Court's ability, aided by its familiarity with all phases of this litigation, to examine the records and, using Helen Hodges' Declaration as a guide, to determine whether the fee request is reasonable. Furthermore [*255] Lead Plaintiff urges that Carfagna's and all the other objectors' "request for more time to nit pick the time records submitted, unaccompanied by a specific basis or even any description of what efforts they undertook to review the records in the time allotted, should be denied." # 5974 at 13. The Court agrees. Judges standardly review motions for approval of attorneys' fees and time records. The Court further finds that Lead Plaintiff has submitted more than sufficient information for a determination of a reasonable fee.

Moreover, while Federal Rule of Civil Procedure 23 (h) (4) permits the Court in class actions to refer issues relating to the amount of a fee award to a special master or magistrate judge in accordance with Rule 54(d)(2)(D), it is discretionary with the Court. The same is true for a guardian.

This Court does not find appointment of a guardian,

accountant or special master necessary here, since the Court's personal oversight of all aspects of this case provides a strong basis for evaluating counsel's fee request. More important, the Court points out that under the structure of the PSLRA, the Lead Plaintiff itself serves the role of guardian for the class members' interests, [*256] from choosing and "retaining" class counsel, with Court approval, to monitoring Lead Counsel and all action in the litigation. As observed by Professor Silver, appointment of a guardian is "at odds with the PSLRA" and would "undermine the Lead Plaintiff by empowering someone else to second guess its judgments." # 5906 at 10-11. The evidence submitted by Lead Counsel provides sufficient detail about the arm's length fee agreement between sophisticated and competent parties and demonstrates that the Regents amply and vigorously fulfilled their role as protector of the class from the beginning to this point in this litigation. Indeed, in this Court's oversight of this litigation for more than six years it has been continually impressed by the Regents' informed and full involvement in all aspects of the case. Moreover, this Court also serves as a fiduciary of the class in determining attorneys' fees and acts to protect the class. *Rite Aid*, 396 F.3d at 307-08, *citing Cendant*, 264 F.3d at 231 ("[T]he District Court acts as a fiduciary guarding the rights of absent class members[.]"), *Gunter*, 223 F.3d at 201 n.6, and *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1297 (9th Cir. 1994); [*257] *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280-81 (7th Cir. 2002) ("We and other courts have gone so far as to term the district court in the settlement phase of a class action suit a fiduciary of the class, who is subject thereto to the high duty of care that the law requires of fiduciaries."); *Third Circuit Task Force Report*, 108 F.R.D. at 251 (The court "must monitor the disbursement of the fund and act as a fiduciary for those who are supposed to benefit from it, since typically no one else is available to perform that function."); *Cendant*, 264 F.3d at 255 (Because of the conflict between class members who want to maximize their recovery and class counsel who seek to maximize their fees, "an agent must be located to oversee the relationship . . Traditionally that agent has been the court."). Moreover, such an appointment would not only be redundant, but would further increase costs and delay distribution to the class. *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 481 (S.D.N.Y. 1998)(denying Schonbrun's request for appointment of a special class guardian), *citing In re Intelligent Electronic Sec. Litig.*, No. 92-CV-1905, 1997 U.S. Dist. LEXIS

2008 U.S. Dist. LEXIS 84708, *257
Fed. Sec. L. Rep. (CCH) P95,718

19191, 1997 WL 786984, *10 (E.D. Pa. Nov. 26, 1997)("The [*258] appointment of a class guardian would only further increase costs, extend indefinitely the time before distribution to the class and further needlessly complicate the procedures."); *In re WorldCom, Inc. Sec. Litig.*, 02 Civ. 3288 (DLC), 2004 U.S. Dist. LEXIS 22992, *75-76 (S.D.N.Y. Nov. 12, 2004)("There is certainly no need to retain an independent guardian to undertake a further review of Lead Counsel's time records. Such an appointment would further reduce the amount of money available to distribute to the class, would be redundant of the work already performed by Lead Plaintiff, and is of little value in light of . . . the retainer agreement which is the basis for calculating this award."). [92]

> [92]    In his supplemental amended objection (# 5890 & 5891), Dabrowski goes into greater detail about the investigations he wants the class guardian to perform. Because the Court does not find such an appointment necessary, nor such detailed investigations warranted, it does not discuss these proposals further.

As for an auditor, there is no statutory requirement that an auditor be appointed. Professor Silver has declared that he knows of no case in which a violation of due process has been found [*259] because an auditor was not appointed (*id.* at 4 n.2), nor has this Court found one. Moreover, because the Regents and Lead Counsel entered into a contingent percentage fee agreement, which the Court considered when it evaluated and approved Lead Plaintiff's choice of Lead Counsel, it finds that an auditor is not necessary. Furthermore Lead Counsel has hired a recognized fee expert, Mr. Moscaret, to review the fee request in detail. Mr. Moscaret concluded that Lead Counsel's hourly billing rates "are *comparable* to prevailing attorney rates in 2007 for large law firms in the Houston/Dallas 'forum' legal marketplace" and thus reasonable, and that is "staffing, mix of attorneys, and delegation of work by senior attorneys to junior attorneys" were "reasonable, customary, and consistent with generally-acceptable billing practices by law firms in major, complex litigation." Moscaret Declaration, # 5911 at PP 25, 28. As for expenses, Professor Silver points out sensible reasons why Lead Counsel is incentivized to be especially thrifty: (1) because contingent fee lawyers forfeit their expenses if they lose, they tend to be frugal; (2) the fee agreement discouraged wasteful spending by requiring [*260] Lead

Counsel to advance all expenses; and (3) the Regents had the experience and capacity to review Lead Counsel's expenses internally and did so. *Id.* at 5.

Indeed, Helen Hodges, in her sworn Supplemental Declaration # 5909 at 1), points out,

> Because we are a plaintiffs' firm paid only on a contingency basis--*i.e.*, only if we win--we have consistently maintained "lean" staffing. We simply can't afford to over- staff cases. Nor can we afford to duplicate work. Unlike most defense firms, our billable hours do not necessarily result in getting paid. We are paid for getting results. And it is in our own self interest to get results with the least outlay of resources in terms of attorney time because we are paying our attorneys as we go.

Ms. Hodges then explains in detail the firm's staffing during the course of the litigation, identifying and explaining when and why additional staff had to be added and their role, but pointing out that a core group of attorneys worked almost exclusively on the case throughout the six years, providing the firm with the advantage of "institutional" knowledge and avoiding having to bring newcomers "up to speed on an ever-burgeoning case" while battling attorneys [*261] from large firms with no restrictions on the number of counsel representing defendants. # 5905. See also Moscaret Declaration, # 5911 at 1$ 47-50, 61-65. The Court finds the continuity of staffing through this core group of attorneys contributed substantially to the efficient prosecution of this litigation. Moreover, its review of Lead Counsel's time records convinces the Court that hours spent were quite reasonable in light of the size, complexity, and length of this litigation.

Mr. Dabrowski also maintains that special rules apply to billion-dollar recoveries. Where extraordinarily large recoveries of more than $ 75 million are had, he argues, courts must stringently weigh the economies of scale in fixing an appropriate percentage, and fee awards of 6-10% are common in this large scale context. H. Newberg, *Newberg on Class Actions*, Common Fund Fee Awards (3d. 1992)(§ 20.9 "Deviation in Exceptional Cases," at 95). Dabrowski also cites the "increase-decrease" rule in the Third Circuit Task Force