# Exhibit H
# Part 5

Case 0:06-cv-01216-JMR-FLN   Document 399-12   Filed 02/04/09   Page 2 of 14

2008 U.S. Dist. LEXIS 84708, *261
Fed. Sec. L. Rep. (CCH) P95,718

Report, 108 F.R.D. at 256 (fee awards that involve a sliding scale dependent on the ultimate recovery for which the percentage of the funds devoted to attorneys' fees will decrease as the size [*262] of the funds increases).

As this Court has indicated, while a few courts have adopted the view that the percentage of fee awards should decrease as the recovery increases, especially in mega-fund cases, this is not the majority view. Nor is there any prohibition of an ex ante agreement with an ascending fee schedule to incentivize counsel or an increased award by the court. See, e.g., Rite Aid, 396 F.3d at 303 ("'This position [that the percentage of recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply.'"), quoting In re Cendant, 264 F.3d at 284 n.55; In re Ikon Office Solutions, Inc., Sec. Litig., 194 F.R.D. 166, 196 (E.D. Pa. 2000)(court saw "no principled basis for reducing the requested award by some arbitrary amount" simply because of the size of the recovery "when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent"; a sliding scale fee schedule, "by which counsel is awarded ever diminishing [*263] percentages of ever increasing common funds . . . tends to penalize attorneys who recover large settlements"). This Court finds, based on evidence submitted by Lead Counsel and its own research, that the 9.52% fee requested here, based either on the fee agreement or on an enhancement of the lodestar, is within the range of reasonableness and is warranted by Class Counsel's reasonable number of hours expended and extraordinary success against extremely difficult odds in a lengthy litigation challenged by top-level defense counsel.

Dabrowski further claims there is no pre-Enron case supporting a fee using an ascending scale of percentages other than dictum in In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166 (E.D. Pa. 2000). 93 The Court points out that there are several such cases in the last few years, however. See, e.g., In re Auction Houses Antitrust Litig., 197 F.R.D. 71, 80-81, 84 n.55 (S.D.N.Y. 2000)(a pre-Enron case)(discussing advantages and disadvantages of decreasing and increasing fee schedules and concluding that an increasing schedule was more appropriate in that case); and two post-Enron cases,

Schwartz v. TXU Corp., Nos. 3:02-CV-2243-K, et al., 2005 U.S. Dist. LEXIS 27077, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005)(after [*264] a lodestar cross-check applying Johnson factors, enforcing a graduated fee arrangement resulting in a 22.2% fee for a recovery of $ 149,750,000 under PSLRA); and In re Dynegy, Inc. Securities Litig., H-02-1571, Order Awarding Attorney's Fees and Reimbursement of Expenses, # 5817 (Compendium of Exhibits), Ex. C at 1, which has been cited frequently in the briefing.

> 93  Dabrowski cites several cases that support a descending sliding scale as the amount of settlement grows. See, e.g., VISA U.S.A., Inc. and MasterCard International, 396 F.3d at 122-23; In re Bristol-Myers Squibb Sec. Litig., 361 F. Supp. 2d at 233, 235.

Dabrowski additionally complains that no mention is made of the allocation of attorneys' fees among the thirteen law firms that are seeking fees from this award and objects to allowing class counsel to receive a lump sum and then to secretly decide how the fee will be divided. 94

> 94  He seeks information about agreements or understandings regarding the sharing of fees among the 13 law firms comprising Class Counsel, some of whom are charging hourly rates as high as $ 607. # 5890 at 38.

Dabrowski also complains that there is no information on the terms of the separation agreement [*265] between William Lerach and Lead Counsel that affect what becomes of the fee award here. Jeannette Dreisbach has also complained about awarding fees to convicted criminal William Lerach. # 5873 at 2-3.

Lead Counsel has responded with what the Court finds is more than adequate briefing demonstrating the propriety of any fee sharing with Mr. Lerach before and after he left the firm and after his indictment, guilty plea, and sentencing. See # 5864 (Statement by Coughlin Stoia), # 5867 (Supplemental Statement of the Regents), 5904 (Declaration of James C. Harrison), 5905 (Declaration of Professor Roy D. Simon), # 5918 (Affidavit of Vincent Johnson), and # 5907 at 68-75. No one has submitted a brief controverting Lead Plaintiff's submissions.

Case 0:06-cv-01216-JMR-FLN   Document 399-12   Filed 02/04/09   Page 3 of 14

2008 U.S. Dist. LEXIS 84708, *265
Fed. Sec. L. Rep. (CCH) P95,718

In response to this complaint of non-disclosure of the fee arrangement, Lead Counsel points out that its request for an aggregate fee award, to be divided by lead counsel among co-counsel is the same procedure that the Fifth Circuit approved in *Longden v. Sunderman*, 979 F.2d at 1101, which affirmed the district court's granting the petition of class counsel, Susman Godfrey, on behalf of all class counsel, for fees benefitting the class as a whole ("district [*266] court acted well within its discretion in awarding an aggregate sum to the Susman Attorneys that was based on their collective efforts, leaving apportionment of that sum to the Susman Attorneys themselves.") [95]; *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 824-25 (5th Cir. 1996). Here thirteen firms involved in the representation of Lead Plaintiff have joined together in the fee request. Coughlin Stoia states that Coughlin Stoia is responsible for more than 85% of the time expended and its contribution, alone, generates a multiplier of less than six. # 5974 at 9, citing Declaration of John C. Coffee Jr. (# 5821 at P 35: "Thus, whether or not a multiplier in the 5-6 range would be justified in most cases, it is justified in this case . . . .").

   95   In *High Sulfur Content Gasoline*, 517 F.3d at 227 the Panel wrote,

   In this circuit, a district court can in its discretion appoint a committee of plaintiffs' counsel to recommend how to divide up an aggregate fee award. *Cf. Longden v. Sunderman*, 979 F.2d 1095 (5th Cir. 1992). But the appointment of a committee does not relieve a district court of its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys [*267] recommending the allocation have a financial interest in the resulting awards.

Nevertheless, even with deference due to Lead Plaintiff and Lead Counsel's decisions under the PSLRA in this class action, this Court ultimately has an obligation not only to ensure that the fees are reasonable, but to see that they are "divided up fairly among plaintiffs' counsel." *High Sulfur Content Gasoline*, 517 F.3d at 227-28 ("The court's duty to review attorneys' fees is no less compelling in common fund cases, like this case, where a separate fund to pay attorneys' fees is created as part of the class action settlement."). This Court observes that when one of the attorneys in *Longden* objected to Susman's, calculations and filed her own petition for fees, the district court awarded her a separate sum, although less in amount than she requested, to be taken out of the lump-sum award for all attorneys. [96] *Longden*, 979 F.2d at 1101; *High Sulfur Content Gasoline*, 517 F.3d at 233 ("*Longden* highlights the district court's duty to scrutinize the allocations of a fee award *when an attorney objects to his co-counsel's fee award recommendations*. It does not stand for the proposition that courts can delegate [*268] their duty to allocate a fee award to a committee of interested attorneys who have reached no agreement among themselves and then approve the allocation after a perfunctory review. [emphasis added by the Court]").

   96   In *Longden*, the Fifth Circuit affirmed, holding that the district court acted well within its discretion in both awards. *Longden*, 979 F.2d at 1101; *High Sulfur Content Gasoline*, 517 F.3d at 233.

Lead Plaintiff, in its response to supplemental objections (# 5974 at 9), argues, "Since the 13 firms have joined together in requesting a percentage-of-the fund recovery, the allocation of such award has no relevance to the award itself." The Court would further point out that each of the other Co-Class Counsel firms has provided information about their attorneys, their hourly rates, and their lodestars for this litigation (# 5825-35) and contemporaneous records. Furthermore no objector has submitted any evidence of secretive or ex parte conduct here. Co-Class Counsel were permitted to file any objections and to speak freely about the fee allocation at the Fairness Hearing. Thus given the transparency and due process provided here, the Court finds Dabrowski's objection of non-disclosure [*269] lacks merit.

Dabrowski urges that if the Court uses the percentage approach, Lead Counsel should not be allowed to make any additional fee requests. The Court concludes that if Lead Counsel succeed in obtaining any further settlements, they are entitled to request fees from that additional common fund, too.

Dabrowski presents a laundry list of objections, summarized *infra*, but provides no authority that Lead Counsel is required to provide detailed information relating to each of his demands or ignores the evidence in

Page 78

Case 0:06-cv-01216-JMR-FLN   Document 399-12   Filed 02/04/09   Page 4 of 14

2008 U.S. Dist. LEXIS 84708, *269
Fed. Sec. L. Rep. (CCH) P95,718

the record. Dabrowski also objects that there is no description of the extensive arm's length negotiation, despite substantial evidence in the record that this Court has already cited; that prior to *Newby* the Regents had never acted as a representative plaintiff in a securities class action, but ignores the experience the Regents has generally in sophisticated litigation; that there is no mention of any consultants or experts who assisted the Regents in negotiating the fee; that there is no mention of efforts made by Lead Plaintiff in management and oversight of billing practices, staffing practices, and work allocation practices of Lead Counsel and co- counsel [97]; that [*270] there is no mention of the background, education or experience of the individuals who negotiated the fee (Hoist, Lundberg, and Lee) [98] or of the expectations of the University about the size of the recovery, the duration of the litigation, or how the figures of the sliding scale were determined; that there is no information on how the Regents decided to seek Lead Plaintiff status, how the Regents became involved with Milberg Weiss, and who decided to select Milberg Weiss without competitive proposals from other firms [99]; that there is no explanation of how the agreement, which required Lead Counsel to advance all funds necessary to cover expenses, was changed to allow them to be reimbursed for their expenses and not collect their fees from various settlements that comprise the settlement fund; that there is no mention of how retired Judge Lawrence Irving came initially to be retained to monitor the litigation or the circumstances under which he thereafter joined Coughlin, Stoia; that there is no mention of the twelve co-counsel firms that are seeking fees despite the Regents' claim that one of their criteria for selecting Milberg Weiss was to have a single law firm handling the case; [*271] that there no mention of why the Milberg Weiss law firm was retained without any agreement as to the fee it would charge (Hodges Decl., Ex. 3, Letter of 12/18/01); that there is no explanation why Lead Counsel can charge current rates when they chose to delay receiving their fees from settlements obtained as early as 2003 [100]; that there is no discussion of fee agreements between other plaintiffs and law firms who sought to become the representative plaintiff; that there is no explanation for the accuracy of the *Dynegy* fee scale and the inaccuracy of the *Newby*; and that there is no explanation of how the Regents determined the amount of money that would provide necessary incentive to ensure that Lead Counsel would devote sufficient resources to the litigation. The Court finds these "picky" objections are largely to matters for which proof is not required or for which it has been provided and addressed in this order. Moreover, as indicated earlier in this opinion, Lead Counsel has adequately demonstrated that the Regents was a sophisticated Lead Plaintiff with substantial legal expertise who entered into an arm's length agreement with a renowned securities class action firm that incentivized [*272] counsel to push through a extremely complicated, long, and risky litigation, with constant and competent oversight by the Regents, to achieve a highly successful result for the benefit of the class.

97   See Supplemental Declaration of Helen Hodges, # 5909 at 7-28, providing substantial background and areas of focus of Lead Counsel's attorneys.

98   This charge is unfounded. *See, e.g.*, Expert Report of Professor Charles Silver, # 5822 at 37-45, for information regarding these and others involved in the negotiations.

99   This allegation is also incorrect. As noted *supra*, James Holst's Declaration states that in December 2001, when the Regents applied for appointment as Lead Plaintiff in this action, "[T]he office of the General Counsel, on behalf of The Regents, carefully considered the choice of Lead Counsel, and in doing so reviewed the qualifications and resources of a number of class action specialist firms." # 5824 at 2.

100   As noted earlier, one established method of compensating for a long delay in paying for attorneys' services is to use their current billing rates in calculating the lodestar. *Missouri v. Jenkins*, 491 U.S. 274, 283-84, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989).

Dabrowski insists that calculating a multiplier [*273] based on time expended preparing arguments without legal merit for a trial that never took place, i.e., the time between the last settlement and the Fifth Circuit decision reversing class certification, should not be included in the lodestar. The Court notes that until the Supreme Court issued *Stoneridge*, there was no certainty that Lead Plaintiff's scheme liability would or would not be recognized as viable. Moreover, the fact that it was drastically limited by the high court only demonstrates the risk and highlights the success of Lead Counsel in obtaining the settlements that it did. A multiplier is used to reward exceptional success and skill in the face of high risk and difficulty.


2008 U.S. Dist. LEXIS 84708, *273
Fed. Sec. L. Rep. (CCH) P95,718

Dabrowski further complains that the fee award should not be paid in its entirety before the class receive their settlement distributions. Larry Fenstad and Dorothy McCoppin object that the fees should be paid in installments, until completion of the administrative process and payment of all claims to the class members and submission of all administrative reports to the court. [101] # 5868 at 11. The Court finds these objections lack merit. *In re AT&T Corp.*, 455 F.3d 160, 175 (3d Cir. 2006)(rejecting objection [*274] that a portion of the attorneys' fees should be withheld pending payment of claims to all members because there is no evidence that thus far diligent class counsel would stop working on behalf of the class once their fees were paid).

> [101] Objectors do not cite to authority that would support installment payments under the circumstances here. Professor Silver, Lead Counsel's expert, calls the argument "odd":
>
> > In my experience, class counsel's fees have been delayed when the value of a settlement could not be known. That would be true, for example, in a "claims made settlement where it was not known how may claims would be allowed or in a coupon settlement where it is not known how may coupons would be cashed. No such uncertainty exists here. The settling defendants paid cash for their releases, and class members will receive all the money that remains in the fund after fees and expenses are paid. Unclaimed funds, should there be any, will not revert to the defendants. . . . . If there is some need to incentivize Lead Counsel to assist with claim filing (unusual in securities fraud causes) or to motivate the Claims Administrator (also unusual), the Court has the power to do this. However, [*275] I am not sure what the need is since no Objector has identified a compelling one.
>
> Supplemental Expert Report, # 5906 at 15-16, P 7.

**d Objections by Rinis Travel Service Inc. Profit Sharing Trust U.A. 06/01/1989 and Michael J. Rinis, IRRA ("Rinis Objectors")(# 5866, 5967)**

The Rinis Objectors urge the Court to take judicial notice of data collected by the United States Department of Justice, known as the *Laffey Matrix*, [102] as evidence of prevailing market rates for attorneys and paralegals/law clerks of varying experience in the Washington D.C. area from 2003-2008 for determining "reasonable" fee: http://www.usdoj.gov/usao/dc/ Divisions/Civil Division/Laffey Matrix 7.html. Under that matrix, the current market billing rates in the District of Columbia and, adjusted for the locality, in the Los Angeles area are as follows:

| Experience | 2007-08 in D.C. | in L.A. |
|---|---|---|
| 20+ years | $ 440 | $ 455 |
| 11-19 years | $ 390 | $ 404 |
| 8-10 years | $ 315 | $ 326 |
| 4-7 years | $ 255 | $ 264 |
| 1-3 years | $ 215 | $ 222 |
| Paralegals and Law Clerks [103] | $ 125 | $ 129 |

Applying these data, the Rinis Objectors calculate that William Lerach's hours (8,513.60) times the hourly rate of $ 455 would result in lodestar of $ 3,873,688,

Case 0:06-cv-01216-JMR-FLN   Document 399-12   Filed 02/04/09   Page 6 of 14

2008 U.S. Dist. LEXIS 84708, *275
Fed. Sec. L. Rep. (CCH) P95,718

approximately half of the claimed lodestar. [*276] The claimed lodestar was thus already doubled to get the $ 900/hour rate, and if the Court applies an additional 5.4 multiplier, it would result in an actual multiplier of 10.8. The Rinis objectors concede that any fee should reflect the risk of no recovery, but insist that risk also limits the multiplier to the risk factor, i.e., a 50% chance of recovery implies a multiplier of 2, a 75% chance of recovery implies a multiplier of 1.5, and so on. The multiplier sought here implies that a chance of recovery was less than 20% (a 1 in 5 chance), which they maintain is highly unlikely or Coughlin Lerach would not have taken on the case. They further object that the requested fee does not take into account the economies of scale in mega-fund cases.

102 The *Laffey* Matrix originated in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *rev'd on other grounds*, 241 U.S. App. D.C. 11, 746 F.2d 4 (1984). The matrix is a chart compiled each year (all the way back to 1981) by the Civil Division of the United States Attorney's Office in the District of Columbia and presents a schedule of hourly rates for attorneys of different levels of experience in the Washington D.C. area. It is [*277] used by federal courts, particularly in that district, to determine reasonable attorneys' fees awards in cases where there is a statutory entitlement. It provides rates for five different levels of experience, corresponding to "junior associates" (1-3 years after law school graduation), "senior associates" (4-7 years), "experienced federal court litigators" (8-10 and 11-19 years), and "very experienced federal court litigators" (20 years or more). *See generally Lively v. Flexible Packaging Ass'n*, 930 A.2d 984 (D.C. Aug. 23, 2007)(accepting *Laffey* Matrix as one of a number of legitimate ways of calculating attorney's fees where a prevailing party is statutorily entitled to attorneys' fees). It is available at http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_7.html. Under the Laffey Matrix, the current market billing rates in the District of Columbia and Los Angeles area are as follows:

| Experience | $ 2007-08 in D.C. | $ in L.A. |
|---|---|---|
| 20+ years | $ 440 | $ 455 |
| 11-19 years | $ 390 | $ 404 |
| 8-10 years | $ 315 | $ 326 |
| 4-7 years | $ 255 | $ 264 |
| 1-3 years | $ 215 | $ 222 |
| Paralegals and Law Clerks | $ 125 | $ 129 |

*See, e.g., In re Chiron Corp. Sec. Litigation*, No. C-04-4293 VRW, 2007 U.S. Dist. LEXIS 91140, 2007 WL 4249902, *6-7 (N.D. Cal. Nov. 30, 2007).

103 The [*278] Bishop Objectors argue that the rates charged for paralegals should be in line with rates in their local legal markets as well as with the *Laffey* Matrix. Lead Counsel billed work by paralegals at $ 160-$ 270 per hour; noting the requested amounts were out of sync with the *Laffey* Matrix, Bishop Objectors argue that a reasonable rate would be $ 130 per hour, for a lodestar of $ 2,891,187, constituting $ 2,526,527 less than the requested lodestar for paralegals. The Bishop Objectors also contend that Lead Counsel has failed to meet its burden of proof to demonstrate what the prevailing market rate for attorneys is and that their requested hourly rate is reasonable for attorneys of their size, specialty and background in this District. They complain that Coughlin Stoia's requested hourly rates are above those indicated in the *Laffey* Matrix and should at minimum be reduced to the levels of

2008 U.S. Dist. LEXIS 84708, *278
Fed. Sec. L. Rep. (CCH) P95,718

those established in *Chiron*.

Lead Counsel's expert, Mr. Moscaret, insists that the *Laffey* Matrix, supported by some objectors, should not be used to determine reasonable rates here. # 5903 at 20-25. Not only has the Fifth Circuit never adopted the Laffey Matrix to determine reasonable attorney's fee rates, [*279] but he cites federal court decisions declining to apply it. *Id.* at 21, citing *Perez v. Cozen & O'Connor Group Long Term Disability Coverage*, No. 05cv0440 DMS (AJB), 2007 U.S. Dist. LEXIS 53996, (S.D. Cal. May 27, 2007)((*Laffey* Matrix approach here would be contrary to Ninth Circuit law requiring the court to use the rate prevailing in the community for similar work performed by attorneys of comparable skill, -experience and reputation, none of which does the *Laffey* Matrix take into account); *Housing Rights Ctr. v. Sterling*, No. CV 03-859 DSF (Ex), 2005 U.S. Dist. LEXIS 31872, at *10-11 (D.D. Cal. Nov. 2, 2005)("The *Laffey* Matrix also does not comport with the reality of Los Angeles firm billing practices" because it sets a single rate for several years' experience while "[t]here is much more variance from year to year in Lost Angeles"). Moscaret makes important points in arguing that the *Laffey* Matrix is too simplistic, with its "one-rate-fits-all" approach, for major, complex litigation for several reasons. It "lumps all attorneys with 20-plus years of experience into the same rate bracket, and assigns the *same* uniform rate to each attorney in that bracket," despite significant disparities [*280] in experience and status. *Id.* at 21-22. He also contends that the *Laffey* Matrix is also contrary to federal case law in lodestar cases, which requires the district court to award to the petitioning attorney fees in accordance with the prevailing rate that other attorneys of comparable skill, experience and reputation would charge for similar work in the relevant market place. *Id.* at 22. Last, Mr. Moscaret asserts that the "one-rate-fits-all" approach is especially inequitable for paralegals, who are all awarded the same rate, regardless of whether a paralegal has one or twenty years of experience, or whether he worked in routine litigation versus major, complex litigations, or whether the paralegal is certificated. He points out that the judge in *Chiron*, on which objectors rely, stated as a key reason why he used the *Laffey* Matrix that counsel did not produce evidence showing that its requested rates were representative of the relevant market or systematically compiled. *In re Chiron Corp. Sec. Litig.*, No. C-04-4293 VRW, 2007 U.S. Dist. LEXIS 91140, at *18 (or 2007 WL 4249902)(N.D. Cal. Nov. 30, 2007).

This Court observes that this not a statutory fee-shifting case, the type to which [*281] the *Laffey* Matrix applies. Moreover, this Court agrees that not only is there no case in the Fifth Circuit that has applied the *Laffey* Matrix to determine reasonable fees, but the Fifth Circuit has clearly endorsed an alternative approach, the twelve-factor *Johnson* test, for that purpose. It also requires the fee petitioner to produce evidence demonstrating the reasonable hourly rate in the community for such legal services rendered by attorneys of comparable skill, experience, and reputation. *Alberti v. Klevenhagen*, 896 F.2d at 936.

Rinis Objectors also challenge Lead Counsel's argument of risk, and point out that the Defendants had settled before the Fifth Circuit dismissed Deutsche Bank. Even earlier a partial settlement had with negotiated with Defendant Arthur Andersen Worldwide Societe Cooperative (AWSC) and some of its member firms, with the stipulation dated August 29, 2002, approved by the Fifth Circuit in *Newby v. Enron Corp.*, et al., 394 F.3d 296 (5n Cir. 2004). Part of that settlement provided that $ 15 million be set aside to pay for future litigation expenses--that fund greatly reduced the risk to class counsel in pursing this litigation, and therefore the multiplier should [*282] be adjusted downward. As the Court discussed *supra*, risk is measured at the start of the litigation and not in hindsight.

In their supplemental objections (# 5967), accompanied by a motion for and order directing counsel to file and serve within two weeks a summary by law firm of what software was used by each firm to track and generate the time or billing records submitted, and CDs or DVDs of the data in electronic format with the metadata stripped, objectors reiterate their earlier objections and complain that it is unclear whether Coughlin, Stoia used time tracking software [104] and whether time was reconstructed on a spread sheet.

> 104   Lead Counsel responds that it is not sure what is meant by "time tracking software" but states that it uses a program called "Elite" to record and maintain time records. # 5974 at 14.

As noted, Coughlin Stoia has made clear that their time records were contemporaneous, not reconstructed. Lead Counsel objects to their request for software, DCs or DVDs because they provide no reason why they need this information, no discussion of their review of the records that were filed, nor any explanation why they

Case 0:06-cv-01216-JMR-FLN    Document 399-12    Filed 02/04/09    Page 8 of 14

2008 U.S. Dist. LEXIS 84708, *282
Fed. Sec. L. Rep. (CCH) P95,718

need the additional information. Lead Plaintiff states [*283] that the time records were entered into the Court's docket and on www.es13624.com in .pdf format, and the vast bulk of the records are searchable in that format. A number of programs are available to the objectors to convert the .pdf to a different format, such as spreadsheets. The Court agrees that Lead Plaintiff has made the records sufficiently available to render the objectors' complaint meritless.

**e. Objections of the Enron Savings Plan and the Enron Stock Ownership Plan (# 5869, duplicated # 5879, supported by Declaration of Marc I. Machiz, # 5881)**

Fiduciary Counselors, acting on behalf of the Plans, submits a "Mega Settlements Chart" identifying the settlement amount, the fee award, the % of the settlement that the fee represents, the multiplier, the hours, and the average hourly rates in the recent mega fund cases, listed in order of largest to smallest recovery: *WorldCom, Tyco, Cendant, AOL, Nortel (2007), Royal Ahold, and Nortel (2006).* [105] # 5869 at 5. The Court refers the parties to the Declaration of Helen Hodges (# 5818, Ex. 5) which has the same and additional mega settlements, gives more information about stage, number of documents reviewed, depositions taken, and a broader [*284] view in an attempt to justify the higher fee; it is included in this opinion at pages 84-86 and the Court has discussed it and the variety of factors that create the final lodestar and multiplier, as well as comparisons among the various mega-fund cases.

> 105  *In re WorldCom Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007)(Ex. 3 to # 5869); *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02 Civ. 5575 (SWK), 2006 U.S. Dist. LEXIS 78101 (S.D.N.Y. Sept. 28, 2006); *In re Nortel Networks Corp. Sec. Litig.* ("Nortel 2006"), No. 05-mdl-1659, 2006 U.S. Dist. LEXIS 93390, slip op. (S.D.N.Y. Dec. 26, 2006)(Ex. 4 to # 5869); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 2006 U.S. Dist. LEXIS 85722 (D. Md. 2006); and *In re Nortel Networks Corp. Sec. Litig.* ("Nortel 2007"), No. 01-CV-1855 (RMB), slip op. (S.D.N.Y. Jan 29, 2005)(Ex. 5 and Ex. A to # 5869).

At the same time Fiduciary Counselors states that it "believes that it is more useful to compare Coughlin Stoia's rates with rates charged by other attorneys specializing in complex [*285] litigation . . . given Coughlin Stoia's experience" than to use that in the relevant legal market. # 5869 at 11 n.14. Nevertheless, this Court notes that the Fifth Circuit uses the relevant local legal market.

**f. George S. Bishop, Jill R. Bishop, Lon Wilkens, and Betty Willkens' ("Bishop Objectors'") Objections (# 5875, 5964)**

Dabrowski, the Bishop Objectors, and the Wilkens Objectors argue that it is axiomatic that time spent pursuing unsuccessful claims should be excluded. *Hensley*, 461 U.S. at 439. Thus counsel's effort to reverse the Fifth Circuit's opinion in *Regents*, 482 F.3d 372, and to influence the outcome in the *Stoneridge* appeal to the United States Supreme Court had nothing to do with the current settlements, came years afterward, produced nothing of value to the settlement class, and should not be reimbursed.

The Court finds Lead Counsel's reply to be on point: "They ignore the fact that pursuit of what they characterized as a 'flawed theory' resulted in the vast bulk of the recovery here and that the. SEC, 33 Attorneys General and the Ninth Circuit agreed with the 'flawed theory.' Moreover, it was the diligent and creative prosecution against *all* the banks that made the record [*286] result possible." # 5907 at 24. Furthermore Lead Counsel provides a reasonable explanation why it did not stop the fee clock from running once the settlements here were negotiated:

> . . . [T]he $ 6.6 billion in settlements from three banks that were approved by this Court in 2006 were not final until October 25, 2007, when the Davis appeal was resolved. And Silvercreek's appeal from the BofA settlement was briefed in 2007 and will likely be heard in April 2008. Moreover, during 2007 and continuing to today, Lead Counsel has been working on the plan of allocation and other issues related to the prior settlements. The fact-intensive work on plaintiff's damages analyses which commenced during the fact-discovery

Case 0:06-cv-01216-JMR-FLN   Document 399-12   Filed 02/04/09   Page 9 of 14

2008 U.S. Dist. LEXIS 84708, *286
Fed. Sec. L. Rep. (CCH) P95,718

phase and continued in 2006 in expert discovery and 2007 in trial preparation, was the foundation for the plan of allocation. . . . Furthermore, even in fee-shifting cases, courts compensate the prevailing party for unsuccessful claims that arose from a core set of common facts. . . .

# 5907 at 24.

This Court first would point out a key distinction between awards based on fee-shifting statutes and awards based on a common fund. In *Hensley*, the Supreme Court addressed a fee award in [*287] a civil rights action under 42 U.S.C. § 1988, which, like many fee-shifting statutes, gives the court discretion to award reasonable attorney's fees to a "prevailing party," *Hensley*, 461 U.S. at 438-40. The Supreme Court wrote,

> We hold that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988. Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Id.* at 440.

With regard to a fee award for successful, but not for unsuccessful, claims, this Court believes that the distinction between an award under a fee-shifting statute and one under a common fund is important. The fee-shifting [*288] statutes were intended to "encourag[e] the private prosecution of certain favored actions, by requiring defendants who have violated plaintiffs' rights to compensate plaintiffs for the costs they incurred to enforce those rights." *See, e.g., Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 562-63, (7th Cir. 1994), citing *Skelton v. General Motors Corp.*, 860 F.2d 250, 251-53 (7th Cir. 1989). In contrast, under the common fund doctrine, the fee award is not punitively imposed upon the defendant, but taken from a common fund "to avoid the unjust enrichment of those who benefit from the fund who otherwise would bear none of the litigation costs." *Report of the Third Circuit Task Force: Court Awarded Attorney Fees* 108 F.R.D. 237, 250 (1986)("based on the equitable notion that those who have benefited from the litigation should share its costs."); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79, 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980)(a litigant or an attorney who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole)); *Skelton*, 860 F.2d at 252 (the common fund doctrine is based on the idea that not one plaintiff, but all "those [*289] who benefitted from litigations should share its costs"). Logically, therefore, the amount in the fund itself is the evidence of and the result of a successful claim; where the plaintiff's attorney does not prevail, he fails to add to that recovery. Therefore any recovery from it is for success in obtaining the settlements that comprise the common fund; the only issue is whether the amount of the fee award is reasonable.

Even under fee-shifting statutes, however,

> [T]here is ample authority for the proposition that a partially prevailing party may recover all reasonably incurred attorney fees, even though the party did not prevail on all claims, as to all defendants, or as to all issues in a matter. . . . When the plaintiff has prevailed as to some claims and failed as to others, the key is whether the successful and unsuccessful claims are based upon the same facts and legal theories, i.e., whether the claims are related. . . . When the successful and unsuccessful claims involve a "common core of facts" or are based on related legal theories," then attorney fees incurred in the presentation of unsuccessful claims are recoverable on the theory that they contributed to the plaintiff's [*290] ultimate success. . . Similarly, a prevailing party may not recover for hours devoted solely to claims

Case 0:06-cv-01216-JMR-FLN   Document 399-12   Filed 02/04/09   Page 10 of 14

2008 U.S. Dist. LEXIS 84708, *290
Fed. Sec. L. Rep. (CCH) P95,718

against defendants as to whom the plaintiff did not prevail. . . . "But when claims against multiple parties share a common core of facts or related legal theories, a fee applicant may claim all hours reasonably necessary to litigate those claims." [citations omitted]

*Coleman v. Houston ISD*, 202 F.3d 264, 1999 WL 1131554, *5 (5th Cir. 1999), *citing Hensley*. 103 S. Ct. at 1940, and *Kellstrom*, 50 F.3d at 327. This Court finds that such is the case here, where Lead Counsel's central theory of the case was based on scheme liability. Moreover, a common core of facts is shared by all claims in this litigation. *See, e.g., City of Riverside v. Rivera*, 477 U.S. 561, 570-73, 106 S. Ct. 2686, 91 L. Ed. 2d 466 (1986)(Brennan, J., writing for plurality)(finding not clearly erroneous the district court's decision to allow total compensation under 42 U.S.C. § 1988 where plaintiffs had not prevailed on all original claims against the thirty-one defendants because the claims were based on a common core of facts and the amount of the damage award did not imply limited success; indeed success was evident in the excellent [*291] results achieved in a highly complex case).

The Bishop Objectors also complain that Lead Counsel misrepresented the status of certain attorneys as "of counsel," (specifically James D. Baskin, Roger M. Adelman, [106] Sol Schreiber at Milberg Weiss after Coughlin Stoia parted from that firm, and John Pierce, Exs. H-K) listed on Exhibit F, when they are actually practicing law independently.

> 106  For details on the work of James Baskin and Roger Adelman, see Supplemental Declaration of Helen Hodges, # 5909 at 25-26, 27.

Lead Counsel explains that these attorneys were viewed and treated as "of counsel" for the purpose of this litigation: they had offices in the firm's Houston trial office; they spent significant time in Houston working on the case; the firm paid their expenses including the cost of their apartments in Houston; they directly supervised the work of the associates and contract lawyers; and the were integral members of the Enron team. Even if not designated "of counsel," they could have submitted separate fee declarations for the same lodestar request. Lead Counsel also states that Adelman and Baskin have had and continue to have substantial relationships with the firm. This explanation [*292] appears reasonable to the Court and the objectors have not provided any evidence that is not accurate. Lead Counsel agrees that whether they are designated "of counsel" is irrelevant as their time spent on legal services in this litigation is compensable from the common fund. # 5907 at 30.

The Bishop Objectors also contend that Lead Counsel inflates the lodestar by improperly including $ 6,168,358 which should be categorized as "expenses" generated by forensic accountants, economic analysts, investigators, and document clerks.

In their Supplemental Objections (# 5964), filed after Lead Counsel's Compendium of time records was submitted, the Bishop Objectors comment that although two weeks is not a sufficient time to examine the Compendium of Lead Counsel's records, their "cursory review" (*id*. at 1) found that the records "illustrate the enormous difference that application of the lodestar principles [as opposed to the "pre-arranged compact"] would have on the amount of a reasonable fee." *Id*. at 3. They re-emphasize that the bulk of the settlements were reached by mid- 2005, that the Citibank, JP Morgan and CIBC settlements (totaling $ 6.6 billion) were announced in June and August of [*293] 2005, and thus the risk of non-recovery disappeared at that point. According to the totals submitted by Coughlin Stoia in its time records, from 2001-mid-2005, their total lodestar was $ 59.4 million, all that should be subject to a multiplier; fees after that time, while compensable, may not be enhanced by a multiplier since there was no longer any risk to Class Counsel. [107] Nevertheless, argue the Bishop Objectors, under Fifth Circuit case law, the lodestar must be limited to the hours spent obtaining the settlements that serve as the predicate for the fee request; post-settlement hours spent on unsuccessful litigation are not "reasonably expended." # 5964 at 5-6. They also complain that much of the post-settlement time was spent on extraneous matters, such as the work on the *Stoneridge* case, perhaps as much as $ 30 million of the time they are now claiming. They concede that Lead Counsel should be compensated for work after the settlements that was spent on settlement-related tasks such as settlement approval proceedings, the plan of allocation, and claims administration, but no multiplier should be applied because Lead Counsel was guaranteed full compensation for every hour worked [*294] once the $ 6.6 billion of settlement from the three financial institutions was achieved, Thus the Court should review all of the

Page 85

Case 0:06-cv-01216-JMR-FLN   Document 399-12   Filed 02/04/09   Page 11 of 14

2008 U.S. Dist. LEXIS 84708, *294
Fed. Sec. L. Rep. (CCH) P95,718

post-summer 2005 time records to cull out what hours were spent litigation against non- settling defendants or on political strategy to influence the outcome of *Stoneridge.*

> 107  Bishop Objectors state, "For purpose of [lodestar] cross-checking the parties' negotiated fee, it is perhaps reasonable to count every hour that Lead counsel spent pursuing any and every defendant in this case, and even hours spent trying to influence the outcome of other cases. The Regents hired Lead Counsel to pursue each of those defendants, and presumably it would be willing to give Lead Counsel credit for all of the hours worked, even those spent on unsuccessful cases and strategies." # 5964 at 5.

Lead Counsel responds that multiplier is not only based on risk, but is a multi-factor determination, as this Court has indicated earlier. Furthermore, the risk is assessed at the commencement of the case, not at the time of the fee application. *See* Professor Charles Silver's Expert Report, # 5822 at 32-34, citing inter alia *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001)("when [*295] deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services in light of the risk of nonpayment and the normal rate of compensations at that time"). This Court agrees. *See also Florin*, 34 F.3d at 565 ("The court must assess the riskiness of the litigation by measuring the probability of success of this type of case at the outset of the litigation."); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005)("Although it is impossible to know ex post exactly what terms would have resulted from arm's length bargaining ex ante, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions.").

Lead Counsel, in response to the Bishop Objectors' contention that the risk ended with the settlements in mid-2005, maintains that the risk continued: the settlements were not approved by the Court until May 2006; an appeal relating to those settlements was resolved only in October 2007, just before Lead Counsel filed its motion for preliminary approval of the plan [*296] of allocation in November 2007; and Silvercreek's November 15, 2005 (# 4165) appeal from the Bank of America settlement was briefed in 2007 and heard in April 2008, but is still not resolved. In addition, the plan of allocation is based on Plaintiffs' damages analyses, which began during the fact discovery phase, continued in 2006 in the expert discovery, and in 2007 in trial preparation. See Helen Hodges' Declaration (# 5818, PP 282-89).

As for Bishop Objectors' contention that time spent pursuing non-settling defendants should not be counted, Lead Counsel points out that Judge Denise Cotes rejected the same argument under similar circumstances in *In re WorldCom, Inc. Sec. Litig.*, 02 Civ. 3288 (DLC), 2004 U.S. Dist. LEXIS 22992, *74-75 (S.D.N.Y. Nov. 12, 2004)(rejecting as "meritless" an objection that including in the lodestar cross-check time spent on pursuing defendants after the settlement improperly skewed the claimed multiplier and rejecting as "not persuasive" the objection "that no multiplier is appropriate for certain work such as . . . work performed after the settlement with the Citigroup Defendants since no risk of recovery remained.").

Furthermore this Court notes that [*297] it is established that post-settlement legal work performed on behalf of the class's interests, but not for work on a fee application [108] for the attorneys' interests, is compensable. *Mautner v. Hirsch*, 32 F.3d 37, 39 (2d Cir. 1994). The areas of post-settlement services identified and submitted for fees by Lead Counsel full satisfy this criterion. Lead Counsel has made clear it has not requested fees for work relating to its petition for fees. Furthermore, since a reasonable attorney's fee is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" (*Hensley*, 461 U.S. at 433), the determination is not based on "whether hindsight vindicates an attorney's time expenditures, but whether at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1002), cert. denied sub nom *Bethlehem Steel Corp. v. Grant*, 506 U.S. 1053, 113 S. Ct. 978, 122 L. Ed. 2d 132 (1993). Surely litigating appeals of the settlements, developing a plan of allocation to compensate absent class members for their *pro rata* share of losses caused by the unlawful actions of all defendants, justifying Lead Counsel's continuing [*298] efforts against the others, and addressing claims administration concerns, all on behalf of the class, fit this standard.

Case 0:06-cv-01216-JMR-FLN Document 399-12 Filed 02/04/09 Page 12 of 14

2008 U.S. Dist. LEXIS 84708, *298
Fed. Sec. L. Rep. (CCH) P95,718

108 In response to supplemental objections (45974 at 10), Lead Counsel stated about billing judgment in regard to time records and the fee application:

> Persons very familiar with the litigation reviewed the time records and where there were issues with the amount of time recorded or the description of the time entry, those persons exercised their informed judgment, sought explanations or clarifications, and reduced or eliminated the time or clarified the entry. It is a little hard to understand the basis for this complaint [that Lead Counsel used "unexplained methodolog[ies]" with respect to the exercise of billing judgment] by Dabrowski/Schonbrun since it only had the effect of *reducing* the lodestar. No hours were increased. The same is true of time devoted to matters related to the fee application. Lead Plaintiff's counsel, based on a review of the time records and their knowledge of the application effort, made a conservative (i.e., high) estimate of the time committed and deducted it from the aggregate lodestar reported in the briefing in support of the fee agreement. [*299] Again there is no mystery to the "methodology."

In a footnote, Bishop Objectors claim that when the Court performs the mandatory review of the time records, it should exclude the pre-litigation charges of Jonathan Cuneo of Cuneo Gilbert & LaDuca in twelve consecutive entries of precisely six hours each starting on 12/21/01 and ending 1/1/02 for "monitoring Congressional reports and proceedings and media reports." # 5964 at 7 n.5. They object that Congress was not in session during this period and that it is highly unlikely that Cuneo worked exactly six hours on each of twelve consecutive days. Moreover it suggests there are probably other similar questionable items that this Court should identify and exclude in its more extensive review.

Lead Counsel responds that Cuneo's charges were not "pre-litigation" since they were incurred two months after the *Newby* case was filed, not to mention more than a couple of weeks after *Amalgamated Bank* was filed. Second the Court is not required to perform a detailed review of the time records for a percentage award or for a lodestar cross check. *Di Giacomo*, 2001 U.S. Dist. LEXIS 25532, 2001 WL 34633373, at *10 ("This court will not conduct a detailed analysis of charged hours [*300] and hourly rates. To do so would undermine the utility of the percentage fee method."). The Court notes that other courts are in accord when the lodestar method is used as a cross-check. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000)("[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."), citing *In re Prudential Ins. Co. Am. Sales Litig.*, 148 F.3d 283, 342 (3d Cir. 1998); *see also Rite Aid*, 396 F.3d at 300. Instead, the court can measure the claimed lodestar by its own familiarity with the case. *Goldberger*, 209 F.3d at 50. Because the Fifth Circuit appears to hold a stricter standard of review, this Court has conducted a substantially more specific review of the time records. Finally Lead Counsel points out that if the Bishop Objectors had reviewed the Declaration of Jonathan W. Cuneo (# 5828 at 15) and his firm's time records in early December 2001, they would know that his colleagues attended the Congressional hearings while Cuneo was in trial, and that after his trial concluded, he reviewed media, Congressional testimony and other materials in preparation for coming hearings. [*301] The Court finds the objection lacks merit.

Bishop Objectors conclude that if one applies the requested multiplier of 5.4 to all pre-settlement time, the resulting fee would be $ 320 million. If one assumes half of all post-settlement time was related to settlement approval and claims administration process, and if no multiplier is applied, an additional $ 30 million would be added to the $ 320 million, resulting in a fee award of $ 350 million. The enormous difference between this result and the $ 695 million fee under the contract that may be awarded under the PSLRA should force this Court to decide whether the PSLRA or Fifth Circuit lodestar jurisprudence should prevail.

Because the Fifth Circuit has not addressed the issue since the enactment of the PSLRA, thus far there is no

Case 0:06-cv-01216-JMR-FLN   Document 399-12   Filed 02/04/09   Page 13 of 14

2008 U.S. Dist. LEXIS 84708, *301
Fed. Sec. L. Rep. (CCH) P95,718

existing conflict. For reasons explained throughout this opinion, the Court has concluded that the fee agreement deserves deference under the PSLRA, but that a lodestar cross check might also be appropriate to meet Fifth Circuit concerns. Thus it does enforce the fee agreement that it has found reasonable under the circumstances when it was made, but in the event of an appeal and a decision by the Fifth Circuit [*302] that a lodestar cross check would be necessary, the Court has provided, to save time, such an analysis.

As for the objections to including contract attorneys' services in the fee award, this Court noted previously, professional staff other than attorneys are included in the lodestar. *See, e.g., Sandoval*, 86 F. Supp. 2d at 609 (fees of contract attorneys and paralegals are separately compensable, based upon prevailing market rates for the kind and quality of their services, and included in the lodestar). In a sworn supplemental declaration (# 5909 at 3), Ms. Hodges states that Lead Counsel included in their lodestar paralegals, forensic accountants and investigators, but excluded secretaries, librarians, and clerical personnel. *See, e.g., DeHoyos*, 240 F.R.D. at 325 (fees for legal assistants, paralegals, investigators, and non-secretarial support staff are included in lodestar). There is no dispute that accounting and auditing issues were at the heart of this case. [109] The forensic accountants helped Lead Counsel draft the accounting allegations in the Consolidated Complaint and subsequent pleadings, document requests, document review, analyzing the many transactions at issue, preparing [*303] for depositions of fact and expert witnesses, and analysis of various defendants' abilities to pay. # 5909 at 6. They also examined Enron's SEC filings, and financial records and Andersen's audit workpapers, contributed to preparation for depositions of Andersen auditors, as well as applied accounting rules to the complicated issues in this litigation. The economic analysts assisted the attorneys in gathering and analyzing complex information about the numerous securities at issue here, loss causation, and the damages suffered by the Class. Indeed, when the Court appointed the Regents to be Lead Plaintiff, one factor was its employment of Coughlin Stoia because of its "team of two dozen lawyers, investigators, forensic accountants and corporate governance experts" already at work on this litigation. *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 454 (S.D. Tex. 2002). Ms. Hodges further declared that Coughlin Stoia's document clerks and in-house investigators performed tasks like those of paralegals (gathering and organizing data for lawyers), but at rates lower than a lawyer's rates. # 5909 at 6. This Court finds the inclusion of these professionals' fees within the lodestar is appropriate. [*304] Moreover, a comment by Judge Cotes in the *WorldCom* litigation is applicable here: "[E]xtensive use of contract attorneys was justified by the need to review [millions of] pages of documents and was a far more efficient way of proceeding than giving the task to more highly compensated counsel. There is little danger of padded hours in this case given the volume of work that has been done and the pace of the litigation." *In re WorldCom*, 2004 U.S. Dist. LEXIS 22992, at *76.

[109] response in her sworn Supplemental Declaration, # 5909, Helen Hodges explains that these in-house accountants, who were all Certified Public Accountants with years of experience in accounting and auditing, were essential to successful prosecution of this suit, contributing their knowledge and expertise to assist the lawyers in drafting the allegations in the Consolidated Complaint and subsequent complaints, drafting document requests, reviewing documents, analyzing the myriad transactions at issue, preparing for depositions of fact and expert witnesses, and analyzing for settlement purposes the ability of various defendants to pay. *Id.* at 6. They also reviewed Enron's SEC filings and financial records, Andersen's [*305] audit workpapers, explained application of account rules to the complex facts here, identified document to be used in deposition of Andersen auditors, and attended some of these depositions to additionally assist the lawyers. *Id.*

Helen Hodges also states that their in-house economic analysts applied their knowledge and expertise for the benefit of the class by asserting that they helped the lawyers gather and analyze information, especially regarding damages suffered by the class and related causal issues. *Id.* at 6.

Regarding the document clerks and in-house investigators, Ms. Hodges states that they performed services similar to those of paralegals, gathering and organizing data for lawyers at rates lower than those charged by lawyers. Investigators, under the direction of lawyers, coordinated activities with the outside

Case 0:06-cv-01216-JMR-FLN   Document 399-12   Filed 02/04/09   Page 14 of 14

2008 U.S. Dist. LEXIS 84708, *305
Fed. Sec. L. Rep. (CCH) P95,718

investigation firm to locate and interview witness and review prior case files for relevant information. # 5905 at 6-7.

### g. Amicus Curiae Brief of the Texas Attorney General (# 5930)

Greg Abbott, the Attorney General for the State of Texas, objects to the amount of the fee request as excessive and claims that not only has he previously filed *amicus curiae* briefs in this [*306] litigation, but that under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1711-15, he is authorized to review the proposed settlement of claims and request for attorneys fees. # 5930 at 2 n.1 (listing previous *amicus curiae* briefs). He argues that the agreed-to fee is a windfall to the attorneys, that compared with fees in other mega-settlements it is way too high, that Lead Counsel has mechanically applied the *Johnson* factors, that a 5.4 lodestar should not be used to justify otherwise excessive compensation. He notes the objections of others and urges the Court to appoint a special master or some other person to determine the propriety and accuracy of the information used to calculate the lodestar.

The Court agrees with Lead Counsel's response. Lead Counsel notes that CAFA applies only to cases filed after February 18, 2005, and not to this one, filed in October 2001. Moreover, basically the Texas Attorney General reiterates claims made by other objectors. Lead Plaintiff has shown that the 9.52% fee is less than awards made in other mega-fund cases and that the average megafund award is 11.61%. See Top Securities Settlement chart, taken from Ex. 5 to Hodges Declaration (# 5818), [*307] this opinion at 84-86. In his "windfall" argument, the Attorney General disregards cases where similar and higher lodestar multipliers have been awarded in mega-fund cases. *See, e.g., In re Waste Management, Inc.*, No. 99-2183, sl. op. at 64 (S.D. Tex. May 10, 2002), in Lead Counsel's Compendium. # 5817, Ex. B)(multiplier of 5.296 awarded); Cardinal Health (multiplier of 5.9); *In re Charter Communications* (multiplier of 5.6); # 5930 (Lead Counsel's Response) at 3 n.4, listing a number of cases with few awarding multipliers above 5.4). As this Court has explained previously, it finds no "windfall" here, but a reasonable fee earned by an extraordinary group of attorneys who achieved the largest settlement fund ever despite the great odds against them.

### III. Court's Rulings

Accordingly, because this Court has concluded that the blended 9.52% fee in the *ex ante* fee agreement is fair and reasonable and should be enforced here as a matter of law under the PSLRA, the Court

ORDERS that Lead Counsel's motion for an award of attorney's fees (instrument # 5815) of 9.52% of the recovery, or approximately $ 688 million, plus interest accrued, pursuant to and in accordance with a fee agreement negotiated [*308] with Lead Plaintiff the Regents of the University of California at the outset of this litigation, is GRANTED. The Court further

ORDERS that Peter Carfagna's motion for additional information and for appointment of special master or enlargement of time for review (# 5963) and the Rinis Objectors' motion for and order directing counsel to file and serve within two weeks a summary by law firm of what software was used by each firm to track and generate the time or billing records submitted, and CDs or DVDs of the data in electronic format with the metadata stripped (# 5967) are DENIED. The Court further

ORDERS that Plaintiff Class Member/Objector Brian Dabrowski's unopposed request to file supplemental objection (# 5890) is GRANTED. In ruling on the motion for reimbursement, the Court has reviewed Mr. Dabrowski's supplemental objection (# 5891). Finally, Chitwood Harley and Cunningham Darlow LLP's partial objection to Lead Counsel's motion for award of fees and their separate motion for attorney's fees and reimbursement of expenses (# 5858) have been withdrawn (# 5990).

**SIGNED** at Houston, Texas, this 8th day of September, 2008.

/s/ Melinda Harmon

MELINDA HARMON

UNITED STATES DISTRICT JUDGE