# Exhibit I
# Part 1

Westlaw.

Slip Copy
Slip Copy, 2008 WL 682174 (D.Minn.), Prod.Liab.Rep. (CCH) P 17,938
(Cite as: 2008 WL 682174 (D.Minn.))

Page 1

United States District Court, D. Minnesota.
In re GUIDANT CORP. IMPLANTABLE DEFIBRILLATORS PRODUCTS LIABILITY LITIGATION.
This Document Relates to All Actions.
MDL No. 05-1708 (DWF/AJB).

March 7, 2008.

Charles S. Zimmerman, Ronald S. Goldser, Zimmerman Reed, PLLP, Gale D. Pearson, Pearson, Randall & Schumacher, PA, Mpls, MN, Elizabeth J. Cabraser, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA, Richard J. Arsenault, Neblett, Beard & Arsenault, Alexandria, LA, Seth R. Lesser, Locks Law Firm, PLLC, New York, NY, Charles T. Schimmel, Hill, Beam-Ward, Kruse, Wilson & Wright, LLC, Overland Park, KS, for Plaintiffs.
Timothy A. Pratt, Shook Hardy & Bacon LLP, Kansas City, MO, Joseph M. Price, Faegre & Benson LLP, Stephen J. Randall, Pearson, Randall & Schumacher, PA, Mpls, MN, V. Scott Williams, Hazelwood & Weber, LLC, St. Charles, MO, for Defendants.
Jay H. Henderson, Houston, TX, pro se.
Paul R. Hannah, Kelly & Berens, PA, Mpls, MN, Gene F. Price, Frost Brown Todd LLC, Louisville, KY, for Intervenors.

**MEMORANDUM OPINION AND AMENDED ORDER REGARDING DETERMINATION OF THE COMMON BENEFIT ATTORNEY FEE AMOUNT AND REASONABLE ASSESSMENT OF ATTORNEY FEES**

DONOVAN W. FRANK, District Judge.
*1 This matter is before the Court on the Plaintiffs' Steering Committee's Request Pursuant to Section II.K of the Master Settlement Agreement for a Determination of the Common Benefit Attorney Fee Amount ("the PSC's request").[FN1] Four separate groups of Plaintiff attorneys submitted written objections to the Plaintiffs' Steering Committee's ("PSC") Request.[FN2] Oral argument was heard on January 23, 2008. On February 15, 2008, the Court issued a Short Order granting in part and denying in part the PSC's request, indicating that a Memorandum Opinion and Order would follow.[FN3] (MDL No. 05-1708 (DWF/AJB), Doc. No. 2603.)

FN1. Although "the PSC's request" was signed by only the four members of the LCC, and although some of the PSC members joined in an opposition filed to the request, the Court refers to the request as "the PSC's request" and refers to the assertions and arguments made therein as made by the PSC for the sake of consistency and simplicity throughout this Opinion.

FN2. The four separate submissions are: (1) the Opposition by Certain PSC Members and other Attorneys and Firms with State and Federal Cases to the Request of the Plaintiffs' Lead Counsel Committee for Payment of Attorneys Fees and Costs Above the Court Approved Assessment Amount Set Forth in Pre Trial Order No. 6 ("the Opposition"); (2) the Texas State Court Plaintiffs' Objection to the Plaintiffs' Steering Committee's Request Pursuant to Section II.K of the Master Settlement Agreement for a Determination of the Common Benefit Attorney Fee Amount ("the Texas Objection"); (3) Beasley, Allen, Crow, Methvin, Portis & Miles, PC's Objections to the Plaintiff's Steering Committee's Request Pursuant to Section II.K of the Master Settlement Agreement for a Determination of the Common Benefit Attorney Fee Amount ("the Beasley, Allen Objection"); and (4) the January 22, 2008 letter from Thomas J. Farmer to the LCC ("the Farmer Objection"). In addition, on February 8, 2008, Hissey Kientz, L.L.P. submitted an Objection to and Brief in Opposition to Plaintiffs' Steering Committee's Common Benefit Fee Request ("the Hissey Kientz Objection"). The Court finds the Hissey Kientz Objection untimely. The Court notes, however, that even if the objection were timely, the arguments that Hissey Kientz set forth are either the same as those already put forth by other

objectors, or meritless (*i.e.,* promissory estoppel, violation of ethics and fiduciary duties, violation of ABA Model Rules).

FN3. At the January 23, 2008 hearing, the Court offered to rule on the PSC's request via a Short Order within an expedited time period, with a Memorandum Opinion to follow, in order to allow for the settlement process to proceed pursuant to the Master Settlement Agreement. All counsel present at the hearing agreed to proceed in this manner.

Based upon the submissions of the parties, including the pleadings, records, and arguments of counsel, and for the reasons stated herein, the Court grants in part and denies in part the PSC's request and adheres to the Court's February 15, 2008 Order to the extent it is not inconsistent with this opinion and amends it as explained below.

**BACKGROUND**[FN4]

FN4. This Background section provides only a summary of some of the relevant occurrences throughout this litigation. It in no way encompasses all of the decisions made, orders issued, or work completed in this MDL.

This multi-district litigation ("MDL") commenced in November 2005 when the Judicial Panel on Multidistrict Litigation consolidated certain actions and transferred them to the District of Minnesota for pre-trial proceedings against Defendants Guidant Corporation, Guidant Sales Corporation, and Cardiac Pacemakers, Inc. (collectively, "Guidant"). These actions were brought by individual Plaintiffs for injuries alleged to have been caused by certain defective implantable defibrillator devices and pacemakers manufactured by Guidant.

On December 19, 2005, and January 6, 2006, respectively, the Court designated four individuals to serve on the Plaintiffs' Lead Counsel Committee ("LCC") and 19 to serve on the Plaintiffs' Steering Committee ("PSC").[FN5] At that time, the Court also ordered the LCC to establish an electronic document repository, set forth the protocol for status conferences,[FN6] which included setting monthly status conferences starting in February 2006, and approved the Plaintiff's Fact Sheet. Then, on January 31, 2006, the Court established a procedure to identify representative bellwhether cases to be tried [FN7] and the Court set the deadlines for discovery and early dispositive motions on those bellwhether cases. The Court set the trial ready date for the expedited cases as March 15, 2007, and ordered Plaintiffs' Fact Sheets to be completed within 30 days. The Court also ordered lead counsel for each party to confer with Magistrate Judge Arthur J. Boylan for the purpose of explaining their positions regarding early settlement efforts.

FN5. The Court designated the following individuals to serve on the LCC: Richard Arsenault, Esq., of Neblett, Beard & Arsenault; Elizabeth Cabraser, Esq., of Lieff, Cabraser, Heimann & Bernstein, LLP; Seth R. Lesser, Esq., of Locks Law Firm, PLLC; and Charles S. Zimmerman, Esq., of Zimmerman Reed. The Court also designated Mr. Zimmerman to serve as Plaintiffs' Liaison Counsel.

The Court designated the following individuals to serve on the PSC: William M. Audet, Esq. of Alexander, Hawes & Audet, LLP; Daniel E. Becnel, Esq., of the Law Offices of Daniel E. Becnel, Jr.; John R. Climaco, Esq., of Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A.; C. Brooks Cutter, Esq., of Kershaw, Cutter & Ratinoff, LLP; Lance A. Harke, Esq. of Harke & Clasby LLP; Irwin B. Levin, Esq., of Cohen & Malad, LLP; Richard A. Lockridge, Esq., of Lockridge Grindal Nauen, PLLP; Ramon R. Lopez, Esq., of Lopez, Hodes, Restaino, Milman & Skikos; Tobias L. Millrood, Esq., of Schiffrin & Barroway, LLP; Stacey L. Mills, Esq., of Heins, Mills & Olson, PLC; Timothy M. O'Brien, Esq., of Levin Papantonio, Thomas, Mitchell, Echsner & Proctor, P.A.; Paul J. Pennock, Esq., of Weitz & Luxenberg, P.C.; Christopher A. Seeger, Esq., of Seeger Weiss LLP; Hunter J. Shkolnik, Esq., of Rheingold, Valet, Rheingold, Shkolnik & McCartney LLP; Thomas M. Sobol, Esq., of Hagens Berman Sobol Shapiro, LLP; Silvija A. Strikis, Esq., of Kellogg, Huber, Hansen,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

> Todd, Evans & Figel, PLLC; Teresa Toriseva, Esq., of Hill Toriseva & Williams, PLLC; Sol Weiss, Esq., of Anapol, Schwartz, Weiss, Cohan, Felman and Smalley, PC; and Justin Witkin, Esq., of Aylstock, Witkin & Sasser, PLC. On August 1, 2006, the Court appointed Nicholas J. Drakulich, Esq., of Jennings & Drakulich, LLP to the PSC, replacing John Climaco, Esq., who had resigned.

FN6. The Court set monthly status conferences commencing in February 2006.

FN7. Later, in Pretrial Order ("PTO") 8, dated March 23, 2006, the Court established a consultation and submission process regarding the selection of the representative bellwether cases consistent with the trial ready date of March 2007. At this time, class certification was still an issue.

In PTO 6, dated February 15, 2006, the Court established a common benefit fund and set forth protocols to compensate and reimburse attorneys for services performed and expenses incurred for MDL administration and otherwise for Plaintiffs' general benefit. PTO 6 states, in part, as follows:

> All plaintiffs and their attorneys who either agree or have agreed to settle, compromise, dismiss, or reduce the amount of a claim or, with or without trial, recover a judgment for monetary damages or other monetary relief, including compensatory and punitive damages, with respect to any Guidant defibrillator and/or pacemaker claims are subject to an assessment of the "gross monetary recovery," as provided herein.

*2 ....

> ... For all cases whose counsel have agreed within 90 days of this Order to cooperate with the MDL by signing an appropriate agreement ..., the assessment in such cases shall be two percent (2%) as fees and two percent (2%) as costs (a total of four percent (4%)) of the "gross monetary recovery." ...Two percent (2%) shall be deemed fees to be subtracted from the attorneys' fees portions of individual fee contracts, and two percent (2%) shall be deemed costs to be subtracted from the client portion of individual fee contracts....

> ... Following the 90-Day period in the preceding paragraph, any counsel who files for the first time a case involving a personal injury claim relating to Guidant defibrillator or pacemaker that becomes part of this MDL shall have 45 days from the date of initial filing of the claim to cooperate with the MDL by signing an appropriate agreement ..., and the assessment in such cases shall be two percent (2%) as fees and two percent (2%) as costs (a total of four percent (4%)) of the "gross monetary recovery." ...Two percent (2%) shall be deemed fees to be subtracted from the attorneys' fees portions of individual fee contracts, and two percent (2%) shall be deemed costs to be subtracted from the client portion of individual fee contracts.

....

> ... Other than as identified in paragraph A(1)(f)(2)(a) above, following the initial 90-day period to permit counsel to consider the 90-Day Participation Option, Counsel who sign an appropriate agreement ... shall be assessed on all Guidant defibrillator and/or pacemaker cases now pending, or later filed in, transferred to, or removed to, this court and treated as part of the coordinated proceeding known as *In re: Guidant Defibrillator Products Liability Litigation,* MDL No. 1708, as well as unfiled or tolled cases, in the amount of the "gross monetary recovery" established and agreed to by the LCC. This amount shall exceed the 4% assessment under the full participation option. Such counsel shall also be assessed in the same amount of the "gross monetary recovery" such as shall be established by the LCC on any other cases filed in any state court, and on clients whose cases are as yet unfiled, or whose cases are later remanded to state court; unless these percentages are modified by agreement of counsel or by the Court upon showing of good cause.

(February 15, 2006 Order ("PTO 6").)

The attached Agreements (both the 90-day participation option and the post 90-day assessment option), which were incorporated into PTO 6 by reference, state as follows:

> It is understood and agreed that the LCC, the PSC

Case 0:06-cv-01216-JMR-FLN    Document 399-13    Filed 02/04/09    Page 5 of 7

Slip Copy                                                                                                                    Page 4
Slip Copy, 2008 WL 682174 (D.Minn.), Prod.Liab.Rep. (CCH) P 17,938
**(Cite as: 2008 WL 682174 (D.Minn.))**

and Common Benefit Attorneys may also apply to the Court for class action attorneys' fees (including any multiplier) and reimbursement of expenses[/costs], if appropriate, and this Agreement is without prejudice to the amount of fees or [/and] costs to which the LCC, the PCS and Common Benefit Attorneys may be entitled to in such an event.

*3 (PTO 6, Exhs. A and B.)

On May 26, 2006, the Court issued PTO 12, which acknowledged that the parties had submitted an agreed upon Complaint by Adoption form, and ordered that any individual could use the Complaint by Adoption form to adopt relevant portions of the Master Consolidated Complaint. And on July 24, 2006, later amended by an Order dated November 17, 2006, the Court issued PTO 15, which established the protocol for discovery and testing of Plaintiffs' devices in their possession.

On November 28, 2006, in PTO 25, the Court set forth a scheduling order [FN8] for the first bellwether case and amended the trial-ready dates for all of the bellwether cases. The trial start dates were later amended again on March 18, 2007, as follows: (1) the bellwether trial for Leopoldo Duron, Jr. (explant without complications) was set to start on July 30, 2007; (2) the bellwether trial for Eugene Clasby (explant with complications) was set to start on August 27, 2007; (3) the bellwhether trial for Leland Braund (explant without complications) was set to start on September 24, 2007; (4) the bellwether trial for Stanley Beranek (non explant/psychological injury) was set to start on October 22, 2007; and (5) the bellwhether trial for Joyce Valls (non-explant/psychological injury) was set to start on November 27, 2007.

> FN8. The Court modified the schedule in its February 20, and March 19, 2007 Orders. The Court issued scheduling orders for the remaining bellwhether cases in PTO 31, dated April 2, 2007.

In a March 27, 2007 letter, the Court established a procedure for dealing with time-sensitive issues whereby the parties were allowed to file letter briefs and oppositions on a weekly basis. The Court then agreed to conduct Tuesday morning on-the-record telephone conference calls to rule on the issues raised in the letter briefs. Then, after months of discovery, motion to dismiss briefing, argument, and rulings, summary judgment briefing, argument, and rulings,[FN9] *Daubert* briefing, argument, and rulings,[FN10] pre-trial preparation, motion *in limine* briefing, briefing resulting in a multitude of other pre-trial orders, and months of negotiations adroitly overseen by Magistrate Judge Boylan and Special Master Pat Juneau, the parties entered into a proposed settlement on July 12, 2007. As a result, a term sheet was signed. The total settlement fund negotiated was $195,000,000.00, and that amount included payment for both claimants' recoveries and common benefit attorney fees.

> FN9. The parties filed and argued, and the Court issued Orders on ten summary judgment motions. The motions for summary judgment were (1) Plaintiffs' Motion for Partial Summary Judgment on Defendants' Claims Related to the VENTAK PRIZM 2 DR Model 1861 Based on Federal Preemption; (2) Guidant's Motion for Summary Judgment on Plaintiff's Claims Based on Federal Preemption; (3) Guidant's Motion for Summary Judgment Based on Lack of Injury Caused by Malfunction; (4) Guidant's Motion for Summary Judgment on Plaintiff's Punitive Damage Claim; (5) Guidant's Motion for Summary Judgment on Plaintiff's Unjust Enrichment Claim; (6) Guidant's Motion for Summary Judgment on Plaintiff's Cause of Action for Strict Product Liability; (7) Guidant's Motion for Summary Judgment Based on Lack of Breach of Warranties; (8) Guidant's Motion for Summary Judgment on Plaintiff's Claims Regarding Intentional and Negligent Infliction of Emotional Distress; (9) Guidant's motion for Summary Judgment on Plaintiff's Claims Regarding Unfair and Deceptive Trade Practices; and (10) Guidant's Motion for Summary Judgment on Plaintiff Leopoldo Duron, Jr.'s Failure-to-Warn Claims Based on the Learned Intermediary Doctrine. The Court also ruled on Plaintiff Duron's Motion for Application of Minnesota law.

> FN10. The Court ruled on all *Daubert* issues in both the *Duron* and *Clasby* cases, which

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

included 32 separate issues.

Within the next month, and after more Settlement Consideration Forms than anticipated were submitted, the parties commenced a renegotiation process with the assistance of Magistrate Judge Boylan and Special Master Juneau. The settlement renegotiation lasted approximately four months. The renegotiation contemplated a global settlement covering Plaintiffs from both the MDL and state cases, and included Plaintiffs whose cases had been filed or transferred to the MDL, Plaintiffs whose cases were filed outside the MDL in state court proceedings, and potential Plaintiffs who had not yet filed their cases. This renegotiation process resulted in a new term sheet, whereby the total settlement fund was increased to $240,000,000.00. As before, the total settlement fund included payment for claimants' recoveries and the common benefit attorney fees. On December 10, 2007, a Confidential Master Settlement Agreement ("MSA") was signed by the MDL parties and by several attorneys who had represented Plaintiffs in state court proceedings.[FN11]

> FN11. The Court notes that after the MSA was signed, a claims administrator was appointed, and the claims administration process will continue its progression toward distribution upon the issuance of this Order.

*4 The MSA included a provision, section II.K., stating that the Court would determine the amount of the Common Benefit Payment.[FN12]The PSC asserts that because of this provision in the MSA, they waive any separate fee assessment against the amount paid to individual Plaintiffs as set forth in PTO 6. In the request currently before the Court, the PSC requests $45,250,000.00 [FN13] of the $240,000,000.00 for common benefit fees and asserts that it had "communicated [this] to all involved in the negotiations."(The PSC's Request 6.)

> FN12. MSA Section II.K provides:
>
> **Common Benefit Payment.**The Settlement Fund includes an amount for a requested common benefit payment to Claimants' counsel who would be entitled to such payment. The amount of such common benefit payment shall be determined by MDL Judge Donovan Frank. The LCC shall submit the request for common benefit payment. Guidant shall have no additional financial obligation under the Settlement beyond the amount required by Section II.E.

> FN13. The PSC represents that it would subtract $3,500,000.00 off the originally requested $48,750,000.00 for advanced out-of-pocket costs and expenses. Therefore, the PSC's request for common benefit fees at the time of briefing is $45,250,000.00, which is 18.85% of the $240,000,000.00 settlement fund.

## DISCUSSION

### I. Common Cost Fund

"Counsel in common fund cases may recover those expenses that would normally be charged to a fee paying client." *In re Infospace, Inc.,* 330 F.Supp.2d 1203, 1216 (W.D.Wash.2004) (quotation omitted). Here, the PSC requests reimbursement for their litigation costs from the client fund portion of the Settlement Fund. The LCC provided the Court with cost estimates for the key cost categories. These estimates included expenses incurred to date and projected expenses to be incurred during the winding up of the settlement.

Based on these estimates, the Court orders that $10,000,000.00 of the $240,000,000.00 Settlement Fund is set aside for common costs. Such common costs include but are not limited to settlement administration costs (including the cost for the claims administrator), fees for the Garretson Firm's negotiation of Medicare/Medicaid lien resolution, Special Master fees, and $3,500,000.00 for reimbursement of advanced common benefit costs. This $10,000,000.00 set-aside shall be referred to as "the Common Cost Fund." Any amount from the Common Cost Fund remaining after all common costs have been paid shall be distributed to the claimants on a pro rata basis.

### II. Common Benefit Attorney Fee Fund

An award of attorney fees is committed to the sound discretion of the district court. *Petrovic v. Amoco Oil*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Co., 200 F.3d 1140, 1157 (8th Cir.1999); see also Fed.R.Civ.P. 23(h). However, "the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper." In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 730 (3d Cir.2001) (quoting Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1328-29 (9th Cir.1999)).

Under the "American rule," each litigant pays his or her own attorneys' fees. See, e.g., Alyeska Pipeline Serv. Co., v. Wilderness Soc'y, 421 U.S. 240, 245, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). There are exceptions, however, to this rule. See Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)."For example, when a court consolidates a large number of cases, stony adherence to the American rule invites a serious free-rider problem.... If a court hews woodenly to the American rule under such circumstances, each attorney, rather than toiling for the common good and bearing the cost alone, will have an incentive to rely on others to do the needed work, letting those others bear all the costs of attaining the parties' congruent goals." In re Nineteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig., 982 F.2d 603, 606 (1st Cir.1992) (citation omitted); see also Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) ("[P]ersons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.... Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorneys' fees against the entire fund, thus spreading fees proportionately among those benefited by the suit."); Hall v. Cole, 412 U.S. 1, 5-6, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) (stating that one exception to the American rule "involves cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them'") (quoting Mills v. Elec. Auto-Lite, 396 U.S. 375, 393-94, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)). Therefore, a court supervising mass tort litigation is allowed to "intervene to prevent or minimize an incipient free-rider problem" and may use "measures reasonably calculated to avoid unjust enrichment of persons who benefit from a lawsuit without shouldering its costs." In re Nineteen Appeals, 982 F.2d at 606 (quotations omitted); Hall, 412 U.S. at 5-6 ("To allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense.") (quotations omitted).

*5 Further, "[i]t is now commonly accepted in complex multiparty litigation that a court can and in fact should appoint a committee such as the [PSC and LCC] to coordinate the litigation and ease the administrative burden on the court." In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig., MDL No. 1203, Civ. No. 99-20593, 2002 WL 32154197, at *17 (E.D.Pa. Oct.3, 2002). In addition, responsible case management requires such an appointment to promote efficiencies and to maximize the economies of scale."As a corollary to this appointment, the court must be permitted to compensate fairly the attorneys who serve on such a committee."Id. (citing Vincent v. Hughes Air West, Inc., 557 F.2d 759, 773-74 (9th Cir.1977); In re Air Crash Disaster at Florida Everglades, 549 F.2d 1006, 1014-15 (5th Cir.1977))."[I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation." Id. at 1016.

One measure used by courts (and parties) to avoid unjust enrichment of persons who benefit from a lawsuit without shouldering its costs, and to fairly compensate those attorneys who coordinate the litigation and shoulder the heaviest burden, is to create a common fund from which attorney fees will be paid for those who worked for the common benefit of all plaintiffs. See Bowing, 444 U.S. at 478 ("[T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.") The court's authority to award attorney fees through an application of a common fund, rather than applying the American rule, is derived from its traditional power to do equity. See id.("The common-fund doctrine reflects the traditional practice in courts of equity, ... and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees.") (citation omitted); Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 166, 59 S.Ct. 777, 83 L.Ed. 1184 (1939) (stating that the common benefit doctrine is an application of a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.