**Exhibit N
Part 2**

2007 U.S. Dist. LEXIS 74767, *40; 2007-2 Trade Cas. (CCH) P75,927
Fed. Sec. L. Rep. (CCH) P95,718

**(5) The Possibility of a Cap and a Cy Pres Award Are Proper**

The Court rejects the argument of certain Objectors that the possibility of a cap on individual recovery resulting in a *cy pres* award should defeat approval of the Settlement. Those provisions do not render the Settlement inadequate. The Maximum Payment was a heavily negotiated term of the Settlement. Because the Net Settlement Fund is to be distributed *pro rata* among the Class Members who make a valid claim, the Maximum Payment prevents a small group from receiving a multi-million dollar windfall. This 30% Maximum Payment coincides with Plaintiffs' expert's estimate that the average overcharge resulting from Defendants' alleged conduct was approximately 30% nationwide. The Maximum Payment does not create any benefit for Defendants, as they will not receive any money back if the Maximum Payment and *cy pres* award are implicated. In that event, this Court will determine the recipient of any *cy pres* award of the undistributed funds.

**(6) The Sealed Record Does Not Impact Approval of the Settlement**

The Court rejects the argument by certain Objectors that final approval of the Settlement should be delayed and/or denied on the [*41] ground that the Class was purportedly denied access to the pleadings filed under seal pursuant to a protective order entered by the Court on January 13, 2006 ("Protective Order"). These Objections are moot, untimely, and more importantly, ignore the crucial role served by the Court in the class action settlement approval process. These Objections disregard the fact that, in its role as guardian for the Class, this Court has had access to all of the pleadings filed by the parties, including those under seal pursuant to the Protective Order. The Court's access to and review of these documents throughout the pendency of this Action precludes any contention that this Court is incapable of assessing the fairness, adequacy, and reasonableness of the Settlement. To the contrary, this Court is intimately familiar with facts and legal theories in this matter. *See Newberg* at § 11.25, quoting *Manual for Complex Litigation* (Third) § 30.41 (1995).

The Objections based upon the inaccessibility of documents are untimely. Class Members received notice of the Settlement in early April 2007, and could have acted earlier to obtain access to the materials. Instead, they waited five weeks, until the Objections [*42] were

due, to request a continuance of the Final Approval Hearing to permit a review the sealed documents, or in the alternative, a rejection of the Settlement.

**(7) Class Counsel Has Fulfilled Its Fiduciary Obligation to the Class as a Whole and Is Adequate Under Fed. R. Civ. P. 23**

The Court rejects the argument by one Objector that Class Counsel are inadequate due to a "rift" within McGuireWoods (one of three Class Counsel), allegedly because "one of the partners, Eliot Disner, has filed a brief objecting to the proposed settlement...." This is inaccurate. The brief in question, although apparently drafted by Disner or at his direction, was filed by the Objecting Plaintiffs without the authorization of Class Counsel. Moreover, Disner initially agreed to the Settlement and supported it at the Preliminary Approval Hearing on March 19, 2007. Class Counsel maintains that the viability of the theories espoused in the unauthorized filing by the Objecting Plaintiffs were thoroughly considered by Class Counsel prior to entering the Settlement, with the ultimate decision by Class Counsel as a whole (including Disner) that the Settlement was fair, adequate, and reasonable.

Between the Preliminary [*43] Approval Hearing and the Final Approval Hearing, Disner left McGuireWoods on May 22, 2007. Then, prior to the Final Approval Hearing, Disner filed an Ex Parte Application to Permit Lead Counsel to Speak Freely and, later, an Objection to the Settlement Agreement with the Court. The Court denied the Application and overruled the Objection because Disner was never appointed Class Counsel; McGuireWoods was appointed Class Counsel. Disner was not in a position to object to the Settlement Agreement, as he was only one of at least half a dozen McGuireWoods attorneys who helped negotiate the Settlement Agreement and only one of hundreds of McGuireWoods partners firm-wide. There is no compelling reason for the Court to grant Disner a Settlement Agreement veto. Therefore, the Court finds that Disner's subsequent reversal of position and departure from McGuireWoods is immaterial to the Court's consideration of the fairness, reasonability, and adequacy of the Settlement.

Class Counsel has fulfilled its fiduciary duty to the Class as a whole. The primary responsibility of class counsel is to represent the entire class as it believes appropriate. *See* Advisory Committee Note, Fed. R. Civ.

P. 23(g) [*44] ("Paragraph (1)... articulates the obligation of class counsel to represent the interests of the class, as opposed to the potentially conflicting interests of individual class members."); *see also* Newberg at § 11.65 ("The general rule is that the named plaintiff and counsel bringing the action stand as fiduciaries for the entire class, commencing with the filing of a class complaint."); *Greenfield v Villager Indus., Inc.,* 483 F.2d 824, 832 (3d Cir. 1973) ("[C]lass action counsel possess, in a very real sense, fiduciary obligations to those not before the court."). Class counsel must make their own determinations about the appropriate course of action, taking full account of their fiduciary obligation to the class as a whole. *See Olden,* 472 F. Supp. 2d at 939; *In re "Agent Orange" Prod. Liab. Litig.,* 800 F.2d 14, 18-19 (2d Cir. 1986); *Lazy Oil Co.,* 166 F.3d at 590. The Court finds that Class Counsel fulfilled its fiduciary obligation to the Class as a whole and is adequate under Rule 23.

All other objections are overruled on relevance and other grounds.

## VIII. The Court, in Its Discretion, Declines To Award Incentive Payments to the Class Representatives

### A. The Factors Courts Consider in [*45] Deciding Whether to Award an Incentive Payment and the Purposes for Which Courts Award Incentive Payments

The decision whether to award an incentive payment to a class representative, and the size of that award, is entirely within the trial court's discretion. *See, e.g., In re Mego Fin. Corp. Sec Litig.,* 213 F.3d 454, 458, 462 (9th Cir. 2000). "The criteria courts may consider in determining whether to make an incentive award include: (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation and; (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vraken v. Atl. Richfield Co.,* 901 F. Supp. 294, 299-300 (S.D. Cal. 1995) (approving an award of $ 50,000 (half of the amount requested) to a named plaintiff who actively participated in a litigation that lasted many years, provided "key testimony" at trial, and did not receive great personal benefit from the common fund). Case law from other circuits is in accord. [*46] *See, e.g., Enter. Energy Corp. v. Columbia Gas Transmission Corp.,* 137

F.R.D. 240, 250 (S.D. Ohio 1991) ("Courts in [the Sixth Circuit] review the following factors when considering a request for class representative incentive awards: (1) the action taken by the Class Representatives to protect the interests of Class Members and others and whether these actions resulted in a substantial benefit to Class Members; (2) whether the Class Representatives assumed substantial direct and indirect financial risk; and (3) the amount of time and effort spent by the Class Representatives in pursuing the litigation."); *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998) ("In deciding whether such an award is warranted, relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."). Courts generally evaluate class representative incentive awards individually. *See, e.g., Allapattah Servs., Inc. v. Exxon Corp.,* 454 F. Supp. 2d 1185, 1220-22, 1234-38 (S.D. Fla. 2006) (granting a reduced incentive award to a named [*47] plaintiff who entered into an improper fee sharing agreement with his attorney after finding that the conflict of interest created by it warranted partial forfeiture of the otherwise warranted award); *In re Heritage Bond Litig.,* 2005 WL 1594403, at *18, 2005 U.S. Dist. LEXIS 13555, at *57 (C.D. Cal. 2005) (awarding different amounts to different named plaintiffs).

The purposes for which courts award incentive payments are threefold. First, incentive awards compensate class representatives for work done by them on behalf of the class under a quantum meruit theory. *See Enter. Energy Corp.,* 137 F.R.D. at 251; *see also, Financial Arrangements in Class Actions and the Code of Professional Responsibility,* 20 FORDHAM URB. L.J. 831, 834-835 (1993) ("*Financial Arrangements in Class Actions*"). This is the same reason attorneys' fees, expert fees, and other costs of litigation are generally deducted from the common fund - to prevent a windfall to the class. Second, incentive awards are used to compensate class representatives for risks undertaken by them in bringing the class action. *See, e.g., In re Continental Ill. Sec. Litig.,* 962 F.2d 566, 571 (7th Cir. 1992). These risks include retaliation [*48] resulting in personal or financial harm, discrimination, trouble finding employment, and significant financial risk. *See, e.g., Cook,* 142 F.3d at 1016 (workplace retaliation); *Allapattah Servs.,* 454 F. Supp. 2d at 1220-21 (financial retaliation); *Women's Comm for Equal Employment Opportunity v. Nat'l Broad.*

*Co.*, 76 F.R.D. 173, 181 (S.D.N.Y. 1977) (discrimination); *Glass v. UBS Fin. Servs.*, Slip Copy, 2007 WL 221862, at *16, 2007 U.S. Dist. LEXIS 8476, at *52 (N.D. Cal. Jan. 26, 2007) (trouble finding employment); *Enter. Energy Corp.*, 137 F.R.D. at 251 (significant financial risk). Third, some courts award incentive awards to class representatives in recognition of their willingness to act as a private attorney general. *See, e.g., In re Continental/Midlantic Shareholders Litig.*, 1987 WL 16678, at *7, 1987 U.S. Dist. LEXIS 8070, at *12-13 (E.D. Pa. Aug. 29, 1987).

**B. The Court Considered the Relevant Factors and the Purposes for Which Courts Award Incentive Payments in Deciding Not to Award Incentive Payments**

**(1) The Risk to the Class Representative in Commencing Suit**

None of the Class Representatives faced substantial risks in bringing this suit. All seven of their retainer agreements [*49] provided that Class Counsel would front all fees and costs in bringing the litigation, and seek reimbursement for those fees and costs as part of any settlement or judgment. *Cf. Enter. Energy Corp.*, 137 F.R.D. at 251 (finding there was a significant financial risk where class members were contractually obligated to pay all expenses incurred in the pursuit of the litigation if they were not otherwise paid, amounting to hundreds of thousands of dollars). There is no indication the Class Representatives were threatened with financial or personal harm in retaliation for their having brought this suit, and there was no risk of being discriminated against. Plaintiffs' argument that the Class Representatives here faced some risk to their careers, citing *Glass v. UBS Financial Services, Inc.*, is unavailing. 2007 U.S. Dist. LEXIS 8476, 2007 WL 221862, at * 16. In *Glass*, the class representatives were securities brokers still currently employed in the securities industry and had "placed something at risk by putting their names on a complaint against one of the largest brokerage houses in America." 2007 U.S. Dist. LEXIS 8476, [WL] at *16. There is no indication that Class Representatives face inordinate or significant risks to their professional reputations [*50] as lawyers as a result of suing a publishing company and test provider for whom they have never worked and for whom it is not likely that they would consider working. Furthermore, this Court finds it hard to believe that any potential legal employer would

consider it a negative for an attorney to be litigious. Thus, this factor weighs against awarding incentive payments.

**(2) The Notoriety and Personal Difficulties Encountered by the Class Representatives**

Although the Class Representatives likely received some notoriety in bringing this lawsuit, they received a significant amount of positive press also. This Court is aware of no personal difficulties of consequence encountered by the Class Representatives. Accordingly, this factor weighs against awarding incentive payments.

**(3) The Amount of Time and Effort Spent by the Class Representatives**

The incentive award amounts requested by Plaintiffs are unreasonable: (1) in light of the time and effort spent by the Class Representatives in furtherance of this litigation; (2) after analyzing the value of the work done; and (3) when compared to the recovery of the unnamed Class members pursuant to the Settlement Agreement. In their Motion for Incentive [*51] Awards to Class Plaintiffs, the three Objecting Plaintiffs requested $ 75,000 each; the four Settling Plaintiffs requested $ 25,000 each. At the first Final Approval Hearing on June 18, 2007, the Court ordered Class Counsel to provide documentation for each of the Class Representatives indicating his/her time spent working on the litigation, and the value of such time, using a lodestar-type calculation. In response, each of the Class Representatives filed declarations with the Court and Class Counsel filed briefs arguing in support of the requested amounts. As part of the Settlement Agreement, Defendants agreed not to oppose the Class Representatives incentive award requests up to $ 25,000 and, thus, filed nothing in response to Plaintiffs' papers.

The time and effort spent by the Class Representatives does not justify the huge incentive awards requested. The Class Representatives' declarations contain extensive entries for interpersonal communications, including emails and telephone calls, meetings with reporters and photographers, and several hours spent reviewing news articles about the case. Three of the Class Representatives "billed" their time in .10 hour increments. A substantial [*52] portion of these billings were amassed between January 1, 2007 and June 23, 2007. Even assuming all of the hours claimed are justified, the amount of time and effort spent by the Class Representatives does not justify an incentive award in the

tens of thousands of dollars. Just because the Class Representatives in this case happen to be attorneys does not mean that the time they spent working as Class Representatives in furtherance of this litigation should be charged to the rest of the Class at $ 250 an hour. *See Newberg* at § 15:22 (4th ed. 2002) (collecting case law indicating that attorneys who wish to represent the class in a class action should not also act or be paid as class counsel); *Gilbert v. Master Washer & Stamping Co.*, 87 Cal. App. 4th 212, 221, 104 Cal. Rptr. 2d 461 (2001); *Bruno v. Bell*, 91 Cal. App. 3d 776, 788, 154 Cal. Rptr. 435 (1979).

Class Counsel cites *Glass, Bradburn, and In re Insurance Brokerage Antitrust Litigation* as recent opinions that support the amounts requested here. In fact, these cases are easily distinguishable and reveal just how unreasonable the amounts requested in this case really are. *Glass*, 2007 U.S. Dist. LEXIS 8476, 2007 WL 221862, at *17; *Bradburn Parent Teacher Store, Inc. v. 3M (Minn. Mining and Mfg. Co.)*, Slip Copy, 2007 WL 1468847, at *19, 513 F. Supp. 2d 322, 2007 U.S. Dist. LEXIS 35899, at *57-58 (E.D. Pa. May 14, 2007); [*53] *In re Ins. Brokerage Antitrust Litig.*, Slip Copy, 2007 WL 1652303, at *10-11, 2007 U.S. Dist. LEXIS 40729, at *68-69 (D.N.J. June 5, 2007). In *Bradburn*, the court approved a $ 75,000 award to a small business that served as a named class representative from a total settlement of $ 39,750,000. The *Bradburn* representatives worked closely with their class counsel for over four years, undergoing nine depositions and providing testimony at the class certification hearing while preparing to attend and give testimony at the trial. 2007 U.S. Dist. LEXIS 35899, 2007 WL 1468847, at *17-19. Significantly, there were no objections to the award. 2007 U.S. Dist. LEXIS 35899, [WL] at *19. In the instant matter, three of the Class representatives are requesting individual awards of $ 75,000 - an amount that was awarded based on the collective efforts of several representatives of a small business in *Bradburn*. *Id.* Further, the representatives in *Bradburn* were involved in litigation spanning four years, more than double the time involved in this case. *Id.* Finally, while there were no objections to the award requested by the class representative in *Bradburn*, the Court has received several objections by Class Members to the amounts requested by the Class Representatives [*54] in this matter. *Id.*

*Glass* is likewise distinguishable. 2007 U.S. Dist. LEXIS 8476, 2007 WL 221862, at *16-17. In that case, the court approved $ 25,000 from a settlement of $ 45 million to each of the four named plaintiffs out of a class of 13,000 members. *Id.* In approving the awards, the court relied on the class counsel's declaration that the named plaintiffs provided a great deal of informal discovery and insight into the policies and practices of the defendant, and took into account the risk they faced suing a major employer in their industry. 2007 U.S. Dist. LEXIS 8476, [WL] at 16-17. Here, the Class Representatives provided no such insights and faced no such risk, yet three of them seek three times the amount requested by the class representatives in *Glass*. While in *Glass* there was only one objection to the incentive awards amounts requested, here, a number of Objectors vehemently oppose the incentive award payments, some even filing briefs addressing the issue. *Id.* Finally, in *Glass*, the court noted that the settlement provided for a maximum of $ 100,000 in incentive awards, subject to court approval. 2007 U.S. Dist. LEXIS 8476, [WL] at 16. Here, Defendants agreed only not to oppose incentive award requests for $ 25,000 for each of the Class Representatives.

In [*55] *In re Insurance Brokerage Antitrust Litigation*, the court awarded an incentive payment of, only $ 10,000 to each of fifteen named plaintiffs in an antitrust class action that resulted in a $ 121 million settlement fund. Slip Copy, 2007 U.S. Dist. LEXIS 40729, 2007 WL 1652303, at *1, 10-11. The duration of the litigation in that case was approximately the same as in this case, just under two years. 2007 U.S. Dist. LEXIS 40729, [WL] at *1. Also, the court noted that there was only one objection to the amount requested and that the objection "lacked any supporting case law or a thorough explanation as to why [the amount requested] should be considered excessive." 2007 U.S. Dist. LEXIS 40729, [WL] at *11. Here, the Class Representatives seek bigger awards for the same type of litigation, lasting about the same amount of time, that resulted in a smaller settlement fund. Also, in this case, there are a number of outspoken Objectors who make valid and well-reasoned arguments regarding the value of the work done by the Class Representatives and the impropriety of the Incentive Agreement which five of them signed.

Most problematic, however, is the value to the litigation of the time and effort spent by the Class Representatives. Although they are all attorneys, the Class Representatives [*56] were not Class Counsel and

it was unnecessary for them to have done work duplicative of that of the attorneys representing the Class. The Class Representatives' declarations reflect that they spent much of their time on this case researching case law and extensively reviewing documents produced in discovery, pleadings, and deposition transcripts. The Class is already paying for those services, and Class Counsel is being compensated for those services, through the Court's grant of Class Counsel's Motion for Attorneys' Fees and Reimbursement of Costs. Again, none of the Class Representatives are current or former employees of any of the Defendants in this case, so they could not provide extensive "informal discovery" or "insight" into the practices of Defendants, as did the class representatives in *Glass*. 2007 U.S. Dist. LEXIS 8476, 2007 WL 221862, at *17. Indeed, the fact that most of the Class Representatives contracted in advance the amount of the incentive award that Class Counsel would request on their behalf, based solely on the amount of recovery, leads the Court to believe that there is no correlation whatsoever between the amount of work done, or the value of the work done, and the amount requested.

Finally, [*57] it is estimated that each Class Member who files an appropriate claim against the Settlement Fund will receive about $ 125. The Settling Plaintiffs are requesting an amount approximately 200 times that amount; the amount the Objecting Plaintiffs seek is approximately 600 times the amount each Class Member is expected to receive. Such a large discrepancy is inherently suspicious and weighs against a finding that incentive awards are warranted. *See Staton v. Boeing Co.,* 327 F.3d 938, 975 (9th Cir. 2003) (finding a "serious concern[] as to fairness, adequacy and reasonableness" that the named plaintiffs would receive, on average, sixteen times greater damages than each of the unnamed class members). Therefore, this factor weighs against awarding incentive payments.

**(4) The Duration of the Litigation**

Fourth, the duration of this litigation was relatively quick, given that antitrust litigation often spans many years, the Complaint in this case was filed only two years before the Settlement Agreement was reached, and the Class Representatives were not actively involved in trial preparations. *See Bradburn,* Slip Copy, 2007 U.S. Dist. LEXIS 35899, 2007 WL 1468847, at *57-58 (awarding a $ 75,000 incentive payment to a small [*58] business that served as a class representative in class action

antitrust lawsuit and worked closely with their class counsel for over four years, undergoing nine depositions and providing testimony at the class certification hearing while preparing to attend and give testimony at the trial). Thus, this factor weighs against awarding incentive payments.

**(5) The Personal Benefit Enjoyed by the Class Representative**

This factor weighs neither for or against an award of incentive payments.

After carefully considering the factors courts consider in deciding whether to award incentive payments, and the purposes for which courts award incentive payments, the Court declines to award any of the Class Representatives incentive payments in this case.

**B. The Incentive Agreement is Inappropriate and Contrary to Public Policy**

Additionally, the Court declines to award incentive payments to the five Class Representatives who signed the Incentive Agreement [3] because that agreement is inappropriate and contrary to public policy. This appears to be the first case in which a class representative entered into a contingency fee-type contract with class counsel from the outset whereby class counsel agreed to request [*59] a particular incentive award on behalf of the class representative based on the amount of the ultimate recovery. However, some commentators have opined that such agreements might be acceptable. *See* Clinton A. Krislov, *Scrutiny of the Bounty. Incentive Awards for Plaintiffs in Class Litigation,* 78 ILL. B.J. 286, 290 (1990). ("While the plaintiff's attorney cannot promise the plaintiff an award in advance, there would seem to be no reason to question the attorney's commitment in the initial engagement agreement to request an incentive award if the primary claim is successful."). The Court strongly disagrees. These contracts: (1) lead to an improper request of the court; (2) create the appearance of impropriety; (3) fail to correlate the amount requested to any reasonable forecast of costs or risk incurred; (4) run afoul of the California Rules of Professional Conduct; and (5) encourage "figurehead" lawsuits or "bounty hunting" by potential class action plaintiffs.

3 The Court recognizes that, of the five Class Representatives who signed the Incentive Agreements, only the three Objecting Plaintiffs

are requesting the $ 75,000 award pursuant to the terms of the Incentive Agreement. The two [*60] Settling Plaintiffs who signed the Incentive Agreements, Plaintiffs Frailich and Brazeal seek $ 25,000, the same amount as the other two Settling Plaintiffs and the amount that Defendants agreed not to oppose in the Settlement Agreement.

### (1) The Incentive Agreement Leads to an Improper Request of the Court

The Incentive Agreement leads to an improper request of the Court, as it completely ignores the factors courts should (and do) take into account when deciding whether to award incentive payments. *See, e.g., Van Vraken,* 901 F. Supp. at 299-300. Under Federal Rule of Civil Procedure 11, claims, defenses, and other legal conclusions presented to the court must be warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. Fed. R. Civ. P. 11. It is disingenuous, improper, and a violation of the Federal Rules, for class counsel to request and argue for an arbitrary, contractually-obligated incentive award that is not reflective of the factors courts consider in granting such requests.

### (2) The Incentive Agreement Creates the Appearance of Impropriety

The Incentive Agreement itself creates at least the [*61] appearance of impropriety and can cloud the proceedings. Under the terms of the agreement, Class Counsel will request an incentive award on behalf of the Class Representatives based on the amount ultimately recovered, not on the amount of work to be done, the amount of time spent, the value of work done, or the risks undertaken in bringing the lawsuit. The contract essentially aligns the financial interests of the Class Representatives and Class Counsel in seeking the highest amount of monetary recovery possible in the shortest amount of time or for the least amount of work. Such an agreement runs afoul of the rule forbidding class counsel and class representatives from being the same person or otherwise having identical interests. *See, e.g., In re Cal. Micro Devices Sec. Litig.,* 168 F.R.D. 257, 260 (N.D. Cal. 1996) ("[A]n attorney may not serve as both class representative and class counsel."); *Turoff v. May Co.,* 531 F.2d 1357, 1360 (6th Cir. 1976) ("[T]he roles of class representative and class attorney cannot be played by the same person."); *Susman v. Lincoln Am. Corp.,* 561

F.2d 86,90-92 (7th Cir. 1977) ("Courts have also expressed fear as to the danger of champerty because of [*62] the close relationship between the putative class representative and counsel.").

Contracts such as these act to undermine class action settlement agreements. Even if it is not actually the case, courts (the ones charged with the responsibility of determining fairness, adequacy and reasonableness under Federal Rule 23) "fear that a class representative who is closely associated with the class attorney would allow settlement on terms less favorable to the interests of absent class members." *Susman,* 561 F.2d at 91. Likewise, class members, who are generally not involved in settlement negotiations, justifiably fear collusion, especially when other remedies, such as injunctive relief, are minimal or nonexistent. Although the Court finds there was no collusion in this case, many of the Objectors understandably expressed these concerns in briefs and at the Final Approval Hearings. Further, when the defense counsel agrees not to oppose incentive award requests in line with the terms of the contract between the class counsel and the class representatives, it appears as if the class representatives were "bought off" by defense counsel. This is especially true where, as here, defense counsel uncovered [*63] the terms of the Incentive Agreement through discovery before settlement negotiations even began. In this case, at least five different groups of Objectors argued that the $ 75,000 award requests for the Objecting Plaintiffs represent an attempt to "buy them off."

### (3) The Incentive Agreement Fails to Correlate the Amount Requested to a Reasonable Forecast of Costs or Risk Incurred

The Incentive Agreement is also improper because it fails to correlate the amount requested to a reasonable forecast of costs or risk incurred. This invalidates the contract for the same reasons the common law and state statutes disapprove of liquidated damages provisions that are not a reasonable forecast of damages in the event of a breach - it undermines the purpose of allowing the clauses and the policy against penalties. Liquidated damages provisions that are not a reasonable forecast of damages in the event of breach of contract at the time the contract was made or, in some circumstances, not reasonable in light of actual damages, are generally invalid. *See, e.g.,* Cal. Civ. Code § 1671 (2007) (anticipated); Cal. Com. Code § 2718 (2007) (anticipated

or actual).

Here, the Incentive Agreement was negotiated [*64] before this case was even filed. The contract requires the Class Representatives to "cooperate fully in the investigation and pursuit of the matter" and perform the other duties of a class representative before Class Counsel would seek any incentive payment. However, if the Class Representatives did so, the sliding scale obligates Class Counsel to make a greater incentive payment request for a greater monetary recovery, not for doing more work or facing heightened risk. Indeed, had the case settled for more than $ 10 million dollars only a month after it had been filed, before discovery had even commenced, Class Counsel would still have been contractually obligated to seek an incentive payment of $ 75,000 per Class Representative. Thus, the incentive award agreement provisions were never a reasonable forecast of costs or risks the Class Representatives would incur. For the reasons discussed above, nor are they reasonable in light of the actual costs incurred.

**(4) The Incentive Agreement Runs Afoul of the California Rules of Professional Conduct**

Incentive award agreements such as the one at issue here are also inappropriate because they violate the California Rule of Professional Conduct [*65] prohibiting fee-sharing with clients and fee-sharing among lawyers. [4] Cal. R. Prof. Conduct 2-200 (Financial Arrangements Among Lawyers); [5] Cal. R. Prof. Conduct 1-320 (Financial Arrangements with Non-Lawyers). [6]

[4] "[T]he Central District of California has adopted the 'State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto' as the standard of professional conduct in the district. Local Rule Ch. VI., R. 1.2." *San Gabriel Basin Water v. Aerojet-General Corp.,* 105 F. Supp. 2d 1095, 1101 (C.D. Cal. 2000).

[5] "(A) Neither a member nor a law firm shall directly or indirectly share legal fees with a person who is not a lawyer...." Cal. R. Prof. Conduct 1-320.

[6] "(A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless: (1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term [*66] is defined in rule 4-200; (B) Except as permitted in paragraph (A) of this rule or rule 2-300, a member shall not compensate, give, or promise anything of value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in employment of the member or the member's law firm by a client. A member's offering of or giving a gift or gratuity to any lawyer who has made a recommendation resulting in the employment of the member or the member's law firm shall not of itself violate this rule, provided that the gift or gratuity was not offered in consideration of any promise, agreement, or understanding that such a gift or gratuity would be forthcoming or that referrals would be made or encouraged in the future." Cal. R. Prof. Conduct 2-200.

The Incentive Agreement violates the ethics rule against fee-sharing with non-lawyers because it, in essence, promises the client a fee (over which the attorney has some control) for having brought the case. *See Financial Arrangements in Class Actions,* 20 FORDHAM URB. L.J. at 839 (noting that solicitation of clients using the promise of an [*67] incentive award to encourage plaintiffs to bring a lawsuit would violate professional disciplinary rules regarding solicitation and fee-splitting). The Incentive Agreement noted that the award was contingent on the approval of the Court. However, the contingency fee-like arrangement demonstrates that the Class Representatives believed they would be compensated for serving as named representatives and that Class Counsel had some control over the amount they would receive. Otherwise, they would not have contractually obligated Class Counsel to request a specific amount on their behalf. Class Counsel, for their part, agreed to seek the fee, regardless of whether or not it was actually warranted, to ensure they would be selected by Plaintiffs to bring the case. Furthermore, the plain language of the contract indicates that it was the parties' understanding that the incentive award request would be "rubberstamped" by the Court. The relevant section of the contract is titled

"Incentive/Compensation to Clients" and repeatedly states that a certain amount "will be paid" depending on the amount of the recovery. [7]

> 7    Indeed, the promise of an incentive award undermines the purpose for which attorneys [*68] inform clients and prospective clients of the possibility of the court granting an incentive award request - to encourage the class representative's participation throughout the litigation. *See In re W. Union Money Transfer Litig.,* 2004 U.S. Dist. LEXIS 29377, at *53 (E.D.N.Y. Oct. 19, 2004).

Even though the fee is not paid directly by the lawyer, because both the attorneys fees and the incentive payments are deducted from the Settlement Fund and Class Counsel requests the incentive payment on the Class Representatives' behalf, this is indirect fee sharing. *See, e.g., In re Gould Secs. Litig.,* 727 F. Supp. 1201, 1209 (N.D. Ill. 1989) (refusing to grant an incentive award request that was not made pursuant to a contractual agreement because it "borders on permitting a lay plaintiff to share in the attorneys' fees award."). Pursuant to the California Rules of Professional Conduct 1-320, attorneys are not permitted to pay incentive awards to class representatives out of the attorneys' fees award. *See Campbell v. Fireside Thrift Co.,* 2004 Cal. App. Unpub. LEXIS 216, at *36-38 ("Thus, when a class representative receives an incentive award as part of a settlement, it may either be paid from a [*69] common fund, if the settlement creates one, or directly by the defendant, as an addition to the other amounts to be under the settlement.") (citations omitted). Likewise, the Incentive Agreement is an attempt at improper fee sharing between an attorney and a client. To find otherwise would allow attorneys to skirt the ethics rule governing client solicitation. Cal. R. Prof. Conduct 1-400.

Furthermore, as Class Counsel and the Class Representatives in this case are all attorneys, the Incentive Agreement also violates the ethics rule prohibiting fee-splitting among lawyers. Cal. R. Prof. Conduct 2-200 ("[A] member shall not compensate, give, or promise anything of value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in employment of the member or the member's law firm by

a client."). Here, Class Counsel promised it would seek an incentive payment for the Class Representatives from the Court. This promise certainly has some value because it is the first step in getting the request granted. Also, the Class Representatives admittedly researched the claims they [*70] would bring against Defendants themselves prior to agreeing to serve as named plaintiffs in this class action. Surely they believed the case was worth a lot of money and wanted to share in the ultimate recovery, even though they did not have the experience handling class actions and complex litigation or knowledge of the applicable law to bring the case themselves. Fed. R. Civ. P. 23(g)(1). This is why they made the Incentive Agreement prior to agreeing to serve as a named plaintiff. Thus, the Incentive Agreement is also an attempt at improper fee-splitting among lawyers.

**(5)  Incentive Agreements Such as This One Encourage Figurehead Cases and Bounty Payments**

Incentive award agreements such as the one in this case are contrary to public policy because they encourage figurehead cases and bounty payments by potential class counsel. Courts routinely disapprove of figurehead lawsuits brought by plaintiffs too closely associated with the attorneys bringing the lawsuit and anticipating large fee awards. *See, e.g., Susman v. Lincoln Am. Corp.,* 561 F.2d 86, 95 (7th Cir. 1977) (finding that an attorney's brother could not serve as a class representative); *Shroder v. Suburban Coastal Corp.,* 729 F.2d 1371, 1375 (11th Cir. 1984) [*71] (finding that a named plaintiff who was class counsel's employee could not represent the class); *Turoff v. May Co.,* 531 F.2d 1357, 1360 (6th Cir. 1976) (finding that the attorneys who were part of the firm appointed as class counsel (and their wives) were too closely associated with class counsel to represent the class). This is due to the risk that the class representative would be more interested in maximizing the attorneys fees award than in aggressively representing the class. *See, e.g., Susman,* 561 F.2d at 95; *Shroder,* 729 F.2d at 1375; *Turoff,* 531 F.2d at 1360. When allowed to proceed, figurehead lawsuits often unnecessarily encourage litigation, drive up attorneys fees awards, and give the proceedings the appearance of impropriety. *See, e.g., Turoff,* 531 F.2d at 1360 (explaining that, when the class representatives are too closely associated with class counsel it causes "manufactured litigation" and a "cloud" on the proceedings).

Much like the figurehead lawsuits discussed above,

2007 U.S. Dist. LEXIS 74767, *71; 2007-2 Trade Cas. (CCH) P75,927
Fed. Sec. L. Rep. (CCH) P95,718

the Class Representatives here are too closely associated with Class Counsel. Because both the Incentive Agreement and the Retainer Agreement between Class Counsel and the Class Representative are contingency [*72] fee arrangements, their interests are aligned in obtaining the highest financial recovery possible. When the ultimate amount of recovery determines both the attorneys fees and the incentive awards, there is a real fear that the class representatives are more interested in working with the class counsel only to maximize that award, rather than in aggressively representing the class. As evidenced by the oral arguments and briefing of some of the Objectors, the Incentive Agreement did in fact give the proceedings the appearance of impropriety. Thus, this relationship is contrary to public policy.

Likewise, courts and legislatures often disapprove of arrangements in which a bounty is paid to a plaintiff by an attorney to encourage the plaintiff to bring suit. *See, e.g., In re Gould Sec. Litigation,* 727 F. Supp. 1201, 1209 (N.D. Ill. 1989) (relating incentive awards to bounty payments). The payment of bounties to named plaintiffs violates public policy because it unnecessarily encourages litigation and creates class actions in which the lead plaintiff is unlikely to undertake a meaningful counsel selection process, engage in effective bargaining over lead counsel's fee, or adequately monitor [*73] lead counsel's performance. *See, e.g., In re Cendant Corp. Litig.,* 264 F.3d 201, 255 (3rd Cir. 2001) (noting also that lead counsel often select lead plaintiff rather than vice versa). Such arrangements can also lead to "bounty hunting" whereby prospective plaintiffs incite a bidding war between prospective class counsel. *See Financial Arrangements in Class Actions,* 20 FORDHAM URB. L.J. at 839-40 (noting that an undesirable consequence of promising incentive awards is that it will lead to bidding wars to attract plaintiffs, prompting plaintiffs to sign up with those who promise the highest amount); *In re Gould Secs. Litig.,* 727 F. Supp. at 1209 ("The real danger [of incentive awards] is a potentially undesireable precedent where every named plaintiff would expect a 'fee' or 'bounty' for the use of his or her name to create a class action. It is not difficult to envision a scenario ... of prospective named plaintiffs becoming involved in a bidding war ... with prospective class counsel.").

The usual grant of an incentive award request is not considered a bounty payment by most courts. *See, e.g., Deloach v. Philip Morris Cos., Inc.,* 2005 WL 1528783, at *3, 2005 U.S. Dist. LEXIS 13032, at *11-12 (M.D.N.C. June 29, 2005) [*74] (citing a number of cases in which courts have awarded incentive payments to named plaintiffs or class representatives and rejecting the argument that payment of incentive awards in class action litigation constitutes a bounty payment). However, the Incentive Agreement makes the present case very different. Because the contract was negotiated in advance, with the understanding that the class representatives "will be paid" a specified amount correlated to a specified settlement or litigated victory amount and not to the amount or value of the work to be done by the class representative, the agreement represents a bounty payment. Indeed, if these arrangements were permitted, a rational plaintiff seeking counsel would be financially motivated to select his or her counsel based on which agreed to seek the largest incentive payment on his or her behalf. Also, counsel competing for named plaintiffs would be encouraged to contract to seek bigger and bigger awards on the plaintiff's behalf. In fact, because three of the Class Representatives did not join the lawsuit until after the initial complaint was filed, it appears as if Plaintiffs Brazeal, Nesci, and Gintz were recruited into the lawsuit [*75] by Class Counsel with the promise of incentive awards. Thus, in this case, granting the incentive award request would violate the public policy against bounty payments.

## C. The Incentive Agreement Creates a Conflict of Interest Between the Contracting Class Representatives and the Unnamed Class Members

Most problematic, however, is the conflict of interest between the Class Representatives and the unnamed Class Members created by the Incentive Agreement. By entering into a contingency fee-type agreement with Class Counsel that correlated the incentive request solely to the settlement or litigated victory amount, the Class Representatives disaligned their interests with the interests of the Class. They no longer had the same interests as the Class in seeking injunctive relief or adequate compensation for alleged wrongs, or their continuing effects, for all Class Members. *See* Jerold S. Solovy et al., *The Head of the Class,* NAT'L LAW JOURNAL, Aug. 27, 1990, at 13 ("The primary difficultly with incentive awards is that they raise the specter that named plaintiffs may 'sell out' the interest of the class they purport to represent."). Worse, once a settlement offer of greater than $ 10 million [*76] was made, the Class Representatives had no financial incentive whatsoever in seeking injunctive relief or a

larger settlement amount, as a settlement in that amount ensured a request for the contractually-capped incentive payment. *See Financial Arrangements in Class Actions,* 20 FORDHAM URB. L.J. at 840 (noting that "incentive awards could encourage collusion and 'suboptimal' class settlements, because plaintiffs with something extra to gain are not motivated to hold out for higher awards for the rest of the class."). Indeed, at the Final Approval Hearings, the Objecting Plaintiffs did not argue that the lawsuit should not be settled or that it provided insufficient injunctive relief, but only that Defendants should pay more.

Furthermore, once the threshold cash settlement amount was met, the Class Representatives had no incentive to go to trial. In fact, it created a strong *disincentive* to proceed to trial, as it put the Class Representatives in the position of risking $ 75,000 if they rejected any settlement amount over $ 10 million, for little potential return to themselves. A trial might return a much larger aggregate sum to the class, but would increase individual returns, including [*77] those of the Class Representatives, only marginally, if at all. A loss at trial would eliminate the incentive award, but a win would not increase it. Thus, there was a disconnect between the interests of the Class Representatives and the unnamed Class Members, and a consequent conflict of interests.

Although the notice and judicial approval requirements provide safeguards against conflicts of interest and unreasonable settlements, here the parties did not disclose their agreement to the Court from the outset and the agreement was never disclosed to the Class. *See Financial Arrangements in Class Actions,* 20 FORDHAM URB. L.J. at 840. In fact, although apparently the Incentive Agreement was provided to Defendants in April of 2006, no one informed the Court of the Incentive Agreement until well after the Preliminary Approval Hearing, when the incentive award requests were made. The failure to disclose this agreement to the Court violates the class representatives' fiduciary duties to the class and duty of candor to the Court. *See Sipper v. Capital One Bank,* 2002 WL 398768, at *4 & n.8, 2002 U.S. Dist: LEXIS 3881, at *13 & n.8 (C.D. Cal. 2002) (citing other relevant cases and finding that [*78] the failure to disclose the existence of a business relationship between class counsel and the named plaintiff constituted a conflict of interest that destroyed the adequacy of the plaintiff's representation).

Class Members could not have consented to the conflict because they were never told about the Incentive Agreement, as it was not included in the Notice sent to the Class Members which described the incentive award requests. [8] Thus, the safeguards of notice and judicial approval could not operate to prevent the conflict of interests here. The Court must now act to remedy the conflict by declining to award incentive payments.

8   The relevant section of the Notice reads: "All costs, fees, and expenses related to this lawsuit are to be paid out of the proceeds of the Settlement Fund. From the inception of the lawsuit, Class Counsel have not received any payment for their services in prosecuting the case, nor have they been reimbursed for any out-of-pocket expenses. Class Counsel will apply to the Court for an award of attorneys' fees of 25% of the Settlement Fund and reimbursement of expenses advanced in the litigation ("Fee Petition"). Moreover, an application will be made to the Court [*79] for an incentive award of $ 25,000 for Plaintiffs Frailich, Brazeal, Brewer and Rimson, and $ 75,000 for Plaintiffs Rodriguez, Nesci and Gintz to compensate them for their participation in, and prosecution of, this case on behalf of the Class, which included, among other things, producing documents, providing written discovery, consulting with Class Counsel and members of the Class, and appearing for depositions ("Incentive Award Petition"). Class Counsel will file the Fee Petition and the Incentive Award Petition with the Clerk fo the Central District of California, at the United States District Courthouse, 312 N. Spring Street, Los Angeles, California, 90012 on or before May 7, 2007. The petitions will be available for inspection during normal business hours at the office of the Clerk." Notice of Proposed Settlement of Class Action and Hearing Regarding Settlement at 3.

The conflict of interests here was not simply potential. Indeed, in this case there was an actual manifestation of conflicting interest. The Objecting Plaintiffs claim that Class Counsel threatened to not request incentive payments on their behalf pursuant to the Incentive Agreement if they did not agree to the Settlement. [*80] This demonstrates that the Objecting Plaintiffs recognized that their own interests diverged from those of the Class. Although the Objecting Plaintiffs

2007 U.S. Dist. LEXIS 74767, *80; 2007-2 Trade Cas. (CCH) P75,927
Fed. Sec. L. Rep. (CCH) P95,718

argue that there is no actual conflict of interests because they continue to object to the Settlement, the Objecting Plaintiffs have never taken a position that jeopardizes their $ 75,000 incentive award request because they do not object to the settlement with Kaplan. The $ 13 million settlement with Kaplan alone exceeds the $ 10 million provision in the Incentive Agreement which contractually requires Class Counsel to request a $ 75,000 incentive payment on their behalf.

Thus, for the reasons discussed above, the Court declines to award any incentive awards to any of the Class Representatives. Giving awards in this situation would be a violation of the Court's duty in overseeing class actions and against the public interest.

## VI. Attorneys Fees

The Court finds that Class Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses is proper and grants the Motion.

## VI. Conclusion

For the reasons set forth above,

(1) The Court grants Plaintiffs' Motion for an Order Granting Approval of Class Action Settlement;

(2) The Court denies Plaintiffs' [*81] Motion for Incentive Awards to Class Plaintiffs;

(3) The Court grants Class Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses.

IT IS SO ORDERED.

DATED: September 10, 2007.

MANUEL L. REAL

UNITED STATES DISTRICT JUDGE