# Exhibit O

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2009 WL 18143 (Del.Ch.)
**(Cite as: 2009 WL 18143 (Del.Ch.))**

**H**Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Walter E. RYAN, Jr., and Donna Conrad, in the
Right and for the Benefit of Maxim Integrated Prod-
ucts, Inc., Plaintiffs,
v.
John F. GIFFORD, Carl W. Jasper, Tunc Doluca,
Michael J. Byrd, James R. Bergman, B. Kipling
Hagopian, A.R. Frank Wazzan, Eric P. Karros, and
M.D. Sampels, Defendants,
and
Maxim Integrated Products, Inc., Nominal Defen-
dant.
**Civil Action No. 2213-CC.**

Submitted: Dec. 23, 2008.
Decided: Jan. 2, 2009.

Norman M. Monhait, of Rosenthal, Monhait & God-
dess, P.A., Wilmington, Delaware; of counsel:
Edward F. Haber, Thomas G. Shapiro, Michelle H.
Blauner, and Robert E. Ditzion, of Shapiro Haber &
Urmy LLP, Boston Massachusetts; Clinton A. Kris-
lov and Jeffrey M. Salas of Krislov & Associates,
Ltd., Chicago, Illinois, Attorneys for Plaintiffs.
Peter J. Walsh Jr., Timothy R. Dudderar, and Scott B.
Czerwonka, of Potter Anderson & Corroon LLP,
Wilmington, Delaware; of counsel: John M. Potter,
of Quinn Emanuel Urquhart Oliver & Hedges, LLP,
San Francisco, California, Attorneys for Defendants
Tunc Doluca, Michael J. Byrd, James R. Bergman, B.
Kipling Hagopian, A.R. Frank Wazzan, Eric P. Kar-
ros, and M.D. Sampels.
Gregory P. Williams, Lisa A. Schmidt, and Kelly E.
Farnan, of Richards, Layton & Finger, P.A., Wil-
mington, Delaware, Attorneys for Defendant John F.
Gifford.
Kevin G. Abrams and Nathan A. Cook, of Abrams &
Laster LLP, Wilmington, Delaware; of counsel:
Steven M. Bauer, Robert E. Sims, David M. Fried-
man, and Heather Thompson, of Latham & Watkins
LLP, San Francisco, California, Attorneys for Carl

W. Jasper.
"J" Jackson Shrum, of Archer & Greiner, P.C., Wil-
mington, Delaware; of counsel: Michael J. Ioannou
and Lita M. Verrier, of Ropers, Majeski, Kohn &
Bentley, San Jose, California, Attorneys for Nominal
Defendant Maxim Integrated Products, Inc.
Joel Friedlander of Bouchard Margules & Fried-
lander, P.A., Wilmington, Delaware; of counsel:
Darren J. Robbins, Travis E. Downs III, Randall J.
Baron, Benny C. Goodman III, and Lucas F. Olts, of
Coughlin Stoia Geller Rudman & Robbins LLP, San
Diego, California; Shawn A. Williams and
Christopher M. Wood, of Coughlin Stoia Geller
Rudman & Robbins LLP, San Francisco, California;
Eric L. Zagar, Robin Winchester, and James H.
Miller, of Schiffrin Barroway Topaz & Kessler, LLP,
Radnor, Pennsylvania, Attorneys for Objector Elias J.
Corey.

*MEMORANDUM OPINION*

CHANDLER, Chancellor.
**\*1** This case, precipitated by a March 18, 2006 article
in *The Wall Street Journal,* is a derivative action al-
leging that defendants breached their fiduciary duties
by granting backdated stock options for the purchase
of millions of shares of common stock. On Septem-
ber 16, 2008, after years of litigation and several
opinions by this Court, the parties entered into a
stipulation of settlement (the "Settlement"), which is
alleged to be the second highest recovery among all
of the numerous backdated options derivative actions
that have been brought and settled throughout the
country.[FN1]The parties now present the Settlement for
court approval pursuant to Court of Chancery Rule
23.1. For the reasons stated below, I approve the Set-
tlement.

FN1. Pls.' Br. in Support of Fees at 2.

**I. BACKGROUND**

*A. The Parties and the Procedural History*

Maxim Integrated Products, Inc. ("Maxim" or the
"Company"), a publicly held Delaware corporation,
is a technology leader in design, development, and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2009 WL 18143 (Del.Ch.)
(Cite as: 2009 WL 18143 (Del.Ch.))

manufacture of linear and mixed-signal integrated circuits used in microprocessor-based electronic equipment.

Plaintiffs Walter E. Ryan Jr., a Maxim shareholder since April 11, 2001, and Donna Conrad, a Maxim shareholder since October 29, 1997, (collectively "plaintiffs" or "Ryan plaintiffs") brought this derivative action on behalf of Maxim, alleging that certain of Maxim's officers and directors had granted backdated stock options for the purchase of millions of shares of the Company's common stock .[FN2] Plaintiffs charged that in doing so, defendants breached their fiduciary duties to Maxim and were unjustly enriched.

> FN2. The defendants named in this action are John F. Gifford, Carl W. Jasper, Tunc Doluca, Michael J. Byrd, James R. Bergman, B. Kipling Hagopian, A.R. Frank Wazzan, Eric P. Karros, and M.D. Sampels.

On August 2, 2006, defendants and Maxim moved to dismiss the action or to stay it in deference to derivative actions filed in state and federal court in California alleging similar claims concerning the Company's option practices.[FN3] On February 6, 2007, I denied the motion to dismiss or stay, except as to claims arising before the April 11, 2001 date when Ryan became a Maxim shareholder.[FN4]

> FN3. Maxim shareholders have brought actions in California in the United States District Court for the Northern District of California (the "California Federal Action") and Santa Clara County, California (the "California State Action," and collectively, with the California Federal Action, the "California Actions").

> FN4. *Ryan v. Gifford,* 918 A.2d 341, 346 (Del. Ch.2007).

Elias J. Corey ("Objector Corey") is a plaintiff in the California Federal Action. Corey has been a continuous shareholder of Maxim since 1988 and objects to the Settlement.

*B. The Facts*

On May 22, 2006, Merrill Lynch published an analysis of options grant timing that pointed out that the companies in the study, including Maxim, were remarkably effective at timing options pricing events. This action, largely based on that article, was commenced on June 12, 2006.

Maxim's shareholder-approved stock option plan (the "Plan") filed with the Securities and Exchange Commission required that the exercise price of the stock options granted be no less than 100% of the fair market value of the Company's common stock on the date the grant was approved, or the prior day, except in limited circumstances not applicable in this case. Under the Plan, fair market value of Maxim common stock as of any date when there exists a public market for Maxim common stock is "the closing sale price of the Common Stock for the last market trading day prior to the date of the determination or on the date of the determination."[FN5] The Plan prohibited the repricing of stock options, except in limited circumstances not applicable in this case, and on August 23, 2001, the Plan was amended to prohibit any repricing.[FN6]

> FN5. Pls.' Br. in Support of Settlement Ex. 26 ¶ 2(r)(i).

> FN6. *Id.* at ¶ 4(b)(vii)-(viii)

*2 On June 14, 2006, Maxim established a special committee, comprised of a single director, Peter De Roetth, which was charged with investigating the Company's stock option grants and practices (the "Special Committee").[FN7] Maxim's February 1, 2007 public announcement of the Special Committee's findings largely exonerated the directors for any wrongdoing. Maxim's non-public report provided to NASDAQ, however, was more forthcoming. It concluded, in part, that:

> FN7. The Special Committee was not an independent Special Litigation Committee under *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.1981). De Roetth retained Orrick Herrington & Sutcliffe LLP as the Special Committee's counsel, and it was Orrick that conducted the investigation with forensic accounting assistance from LECG Corporation. Together, Orrick and LECG conducted extensive interviews and collected and ana-

lyzed volumes of electronic and paper material.

• The Special Committee's review of Maxim's stock option grants to directors and rank-and-file employees between 1996 and the third quarter of fiscal year 2006 revealed a number of misdated option grants. Among the director grants reviewed, such misdated options included (1) grant dates that appeared to have been selected after the grant date; (2) occasions on which a grant date was selected and later changed to a date with a lower price; (3) grants at relatively low market prices which lacked contemporaneous evidence of grant selection and (4) utilization of the "one day lookback" provision in the 1996 Plan, which allowed the Interim Options Committee to select as the grant date either the day on which the grant was made or the prior day.

• The Special Committee's review of the thirty-eight quarterly grants to existing rank-and-file employees made between the first fiscal quarter of 1996 through the third fiscal quarter of 2006 revealed that grant dates fell at market prices that were uniquely low. The evidence also revealed the existence of general process issues, including (1) grant lists that were not entirely finalized until after the selection of the grant date; and (2) post-grant-date changes by Mr. Gifford to the number of shares recommended to particular employees.

• The Special Committee was unable to locate contemporaneous documentation of a number of the grant-date selections. Some grant dates appeared to have been selected after the grant date and on some occasions a grant date appeared to have been selected and later changed to a date with a lower price.

• In 1999, the Company employed a part-time program through which options would be granted to employees as of the date they became a part-time employee. In some cases, it appeared that individuals were granted options as part-time employees prior to starting work at Maxim, or part-time start dates were memorialized after the start date, or the grant date was changed from the part-time date to a lower-priced full-time start date.

The Special Committee found that the employees most involved in the selection of grant dates were Gifford, Maxim's former Chief Executive Officer, and Jasper, who served as Maxim's Chief Financial Officer from April 1999 until January 2007. The Special Committee concluded that Gifford and Jasper had knowledge of and participated in the selection of grant dates for director, rank and file, and new hire employees either with hindsight or prior to completion of the formal grant-approval process. In contrast, the Special Committee found no documentary or testimonial evidence that the Company's independent directors were aware of any attempts to backdate or to otherwise select a favorable grant date and had no reason to believe that the accounting or other disclosures were inaccurate.

*3 Not content to rely on the findings of the Special Committee, plaintiffs engaged in extensive discovery, which included review of hundreds of thousands of pages of documents and numerous depositions. After this discovery, plaintiffs concluded that option backdating occurred with respect to grants to (1) outside directors, (2) rank and file employees, and (3) new hires. In contrast, plaintiffs contend that they were unable to uncover sufficient probative evidence that options were backdated to the Company's officers because, unlike the grants to outside directors, rank and file employees, and new hires, all grants to Maxim's officers were approved by Maxim's compensation committee. These findings are supported by the findings of the Special Committee, which concluded that (1) the compensation committee acted independently of management in granting options and (2) although the "one day lookback" provision FN8 was used, there was no evidence that any of the directors serving on the compensation committee engaged in any wrongdoing or malfeasance with respect to any of the stock option grants.

FN8. The Special Committee found that this "lookback" provision was approved by the Company's shareholders, was reviewed by the Company's auditors, and was not identified by those auditors as problematic at any time during the period that was the subject of the Special Committee's investigation.

On September 30, 2008, Maxim published a restatement of its financial statements for the Company's fiscal years ended in 1997 through 2005 to reflect additional stock-based compensation charges. The

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2009 WL 18143 (Del.Ch.)
**(Cite as: 2009 WL 18143 (Del.Ch.))**

restatement resulted in total pre-tax adjustments of over $700 million related to stock based compensation for the fiscal years 1997 through 2005.

*C. The Settlement*

The parties explored the possibility of settlement on numerous occasions throughout this litigation, including three failed mediations and an independent settlement effort without the assistance of a mediator, before finally reaching agreement after a fourth mediation in April 2008. The first mediation, which included only parties to this action and defendants' insurance carriers, with Retired United States District Judge Lourdes Baird, was held on June 6-7, 2007. The second mediation was conducted with Antonio Piazza on June 16, 2007 and included counsel for the plaintiffs in the California Actions, including counsel for Objector Corey (the "Piazza Mediation"). During July and August 2007, the parties to this action tried to resurrect settlement negotiations, which culminated in a meeting in Boston, Massachusetts on August 10-11, 2007. The third mediation, conducted by Retired United States District Judge Stanley Sporkin, was held on August 30, 2007, and a fourth mediation was conducted on April 12, 2008 by Retired California State Court Judge Daniel Weinstein. The third and fourth mediations were among only parties to this action and defendants' insurance carriers. It was only after the fourth mediation, and with significant assistance from Judge Weinstein, that the parties were able to agree to the stipulation of settlement on September 16, 2008.

After the Settlement was submitted to the Court for approval, Objector Corey filed notice of his objection, sought and obtained expedited discovery, sought and obtained certain documents previously claimed as privileged, filed a brief detailing his objection to the Settlement, appeared and argued at the settlement hearing, and made additional arguments to the Court in letters sent after the settlement hearing.

*1. The Settlement Terms*

**\*4** Under the Settlement, defendants' insurance carriers and defendants Gifford, Wazzan, Bergman, and Hagopian agreed to pay the Company $28,505,473 in cash. Maxim's insurance carriers agreed to severally pay on behalf of the released persons, which includes all Maxim officers and directors named as defendants in this or any other derivative action, each of their respective portion of $21,000,000. Even though Gifford was covered by insurance, he agreed to make his own cash payment of $6,000,000 to Maxim.

Defendants Wazzan, Bergman and Hagopian agreed to each make cash contributions to Maxim as follows: (1) $497,613 from Wazzan; (2) $379,929 from Bergman; and (3) $627,931 from Hagopian. According to plaintiffs, the cash contributions from Wazzan, Bergman, and Hagopian represent the entire amount that they were alleged to have benefitted from the exercise of backdated stock options.

Additionally, Gifford, Wazzan, Bergman, Hagopian, and Jasper agreed to cancel, re-price, or surrender claims with respect to stock options they hold. As part of the Settlement, Gifford agreed to cancel all of his outstanding stock options,[FN9] and Wazzan, Bergman, and Hagopian agreed to re-price all of their backdated options based on the correct measurement dates. According to plaintiffs, when the option re-pricing is combined with their cash contributions, Wazzan, Bergman, and Hagopian will have returned 100% of plaintiffs' unjust enrichment claims against them.

> FN9. According to plaintiffs, as of November 20, 2008, the Black-Scholes value of Gifford's option remediation was $5,497,154. I am aware that the Black-Scholes valuation of options may not always be an appropriate measure in determining the adequacy of a settlement. Accordingly, my approval of the Settlement is not based on this or any other particular fact, but rather the adequacy of the entire recovery provided by the Settlement. *See generally In re Coleman Co. S'holders Litig.,* 750 A.2d 1202, 1208 n. 13 (Del. Ch.1999); *Lewis v. Vogelstein,* 699 A.2d 327, 331-32 (Del. Ch.1997).

Before the Settlement, defendant Jasper asserted a claim to receive proceeds from the goodwill payments, whereby Maxim offered to buy-back certain then-outstanding and vested stock options that were expiring during the blackout period (the "Jasper Buy-Back Claim").[FN10] Under the Settlement, Jasper agreed to surrender a portion of the Jasper Buy-Back Claim, represented by 97,363 vested, unexercised

Not Reported in A.2d
Not Reported in A.2d, 2009 WL 18143 (Del.Ch.)
**(Cite as: 2009 WL 18143 (Del.Ch.))**

stock options that were granted to Jasper on June 17, 1998.[FN11]In addition, plaintiffs allege that the Settlement and the pendency and prosecution of this action were substantial and material causal factors contributing to Jasper's decision to surrender voluntarily his rights to certain unvested options, restricted stock units, and other employee benefits in January 2007.

> FN10. The goodwill payments were essentially a buy-back of options that could not be exercised during the blackout period that ran from September 2006 until October 2008, in exchange for the profit that the employees would have received if they had been able to exercise the options during the blackout period.

> FN11. Plaintiffs and Maxim believe that Maxim has substantial defenses to liability on Jasper's Buy-Back Claim, in which case Jasper's agreement to surrender a portion of that claim would have nominal value. Plaintiff's note, however, that if this judgment proves incorrect, then Jasper's agreement to surrender a portion of his Buy-Back claim will save Maxim $1.8 million.

As part of the Settlement, Maxim also agreed to implement significant corporate governance changes. Among other things, these governance reforms are designed to: 1) overhaul Maxim's stock option grant process; 2) change the structure of its board and committees thereof; 3) ensure director independence; and 4) generally strengthen its internal controls. These reforms directly target the problems that occurred at Maxim and are designed to ensure that Maxim's option granting process is transparent and that all options are appropriately dated and approved by the board of directors or the compensation committee.

Under the Settlement, plaintiffs, plaintiffs' counsel, Maxim, and each and every Maxim shareholder release all claims that have been or could have been asserted on behalf of Maxim, whether based upon state or federal law, which arise out of or are related to Maxim's stock option practices. Thus, the Settlement terms purport to release the claims asserted in the California Actions as well as those asserted in this action. Under the Settlement, Maxim and defendants reserved certain claims related to indemnification and contribution.

**\*5** The Settlement did not include an agreement between Maxim and plaintiffs' counsel with respect to payment of attorneys' fees. The Settlement provides that plaintiffs' counsel can apply to the Court for fees of not more than $15 million plus reimbursement of expenses of no more than $500,000. Maxim retained the right to object to these amounts but agreed to pay the fee ultimately awarded by the Court. Plaintiffs' counsel also agreed to apply to the Court for compensation to plaintiffs Ryan and Conrad of up to $5,000 to be paid from the fee awarded to plaintiffs' counsel.

## II. LEGAL ANALYSIS OF THE SETTLEMENT

### A. The Legal Standard

Delaware law favors the voluntary settlement of contested issues.[FN12]Derivative suits and class actions, however, are fiduciary in nature, and the Court must approve the settlement of such cases to ensure that the interest of the absent shareholders has been fairly represented.[FN13]In reviewing the settlement of a derivative suit, the Court must determine, using its business judgment, whether the settlement terms are fair, reasonable, and adequate.[FN14] In making this determination, the Court should look to the legal and factual circumstances of the case, the nature of the claims, and any possible defenses.[FN15]The proponents of a settlement bear the burden of showing that it is fair and reasonable.[FN16]

> FN12. *Rome v. Archer,* 197 A.2d 49, 53 (Del.1964).

> FN13. Ct. Ch. R. 23(e), 23.1; *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1283 (Del.1989); *Rome,* 197 A.2d at 53.

> FN14. *See Barkan,* 567 A.2d at 1284; *Prince v. Bensinger,* 244 A.2d 89, 93 (Del. Ch.1968).

> FN15. *Polk v. Good,* 507 A.2d 531, 535 (Del.1986).

> FN16. *Barkan,* 567 A.2d at 1285-86.

In balancing the policy in favor of settlement and the

concern for fairness to all shareholders, the Court considers six factors:

> (1) the probable validity of the claims, (2) the apparent difficulties in enforcing the claims through the courts, (3) the collectibility of any judgment recovered, (4) the delay, expense and trouble of litigation, (5) the amount of the compromise as compared with the amount and collectibility of a judgment, and (6) the views of the parties involved, pro and con.[FN17]

> FN17. *Polk,* 507 A.2d at 536.

The Court can also consider other factors, including "the diligence of plaintiff in investigating the claims, and whether the proposed settlement is supported by mutual consideration."[FN18]

> FN18. *Off v. Ross,* C.A. No. 3468-VCP, 2008 WL 5053448, at *6 (Del. Ch. Nov. 26, 2008) (citations omitted).

While these factors guide my decision, the Supreme Court of this state has emphasized that "the Court of Chancery's most important yardstick of a settlement's fairness is its business judgment."[FN19] Additionally, although the Court must conduct "more than a cursory scrutiny" of the issues, a settlement is not a rehearsal of a trial, and "there is no requirement that opportunity be given the parties to hold a trial as to the issues."[FN20] Thus, rather than attempting to determine contested facts, I must only "evaluate[ ] the claims and defenses on the discovery record to achieve a sense of the relative strengths of the parties' positions."[FN21]

> FN19. *Barkan,* 567 A.2d at 1284.

> FN20. *Rome,* 197 A.2d at 53; *see Prince,* 244 A.2d at 93.

> FN21. *In re Caremark Int'l. Inc. Deriv. Litig.,* 698 A.2d 959, 961 (Del. Ch.1996).

*B. The Factors Applied*

After applying the relevant factors, I have determined, in the exercise of my business judgment, that the Settlement is fair, reasonable, and adequate. The Settlement was reached after vigorous arms-length negotiations following meaningful discovery. There has been significant, hard fought motion practice before this Court, and the parties participated in several failed mediation sessions before finally reaching an agreement after a mediation session with Judge Weinstein. The diligence with which plaintiffs' counsel pursued the claims and the hard fought negotiation process weigh in favor of approval of the Settlement.

**\*6** Objector Corey, pointing to a few emails sent by plaintiffs' counsel, argues that plaintiffs inappropriately rushed to settle this action. These emails, however, suggest only that the parties should work quickly, with the assistance of Judge Weinstein, to ensure that an agreement could be reached. In contrast to Objector Corey's characterization of the process, the multiple failed mediations demonstrate that the Settlement was reached only after intensive arms-length negotiations between the parties. The mere fact that plaintiffs and defendants both wanted to reach a settlement is not convincing evidence that there was an inappropriate rush to settlement.

Additionally, settling parties are not required to pursue all possible discovery related to the litigation in every forum. When a case is settled, the proceedings necessarily come to an end before they otherwise would. Thus, in any settlement it could be said that the plaintiffs could have conducted more discovery or pursued the claims further. If this alone were reason to reject a settlement, however, then this Court would rarely be able to approve settlements and any efficiency gains from the voluntary settlement of contested issues would be lost.

1. *The Claims and Defenses and the Difficulty of Enforcing Claims*

a. The Delaware Claims

Plaintiffs brought this action against defendants for breach of fiduciary duty and unjust enrichment related to allegedly wrongful backdating and re-pricing of stock options and the deception related to those practices. In the event of trial, plaintiffs would argue that intentional backdating of stock options to employees, new hires, and outside directors were actionable breaches of fiduciary duty that harmed Maxim.

Not Reported in A.2d
Not Reported in A.2d, 2009 WL 18143 (Del.Ch.)
**(Cite as: 2009 WL 18143 (Del.Ch.))**

Under the business judgment rule, Delaware law presumes "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[FN22]This presumption can be rebutted upon a showing "that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith. If that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders."[FN23]

> FN22. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984).

> FN23. *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 52 (Del .2006).

Delaware law and the facts uncovered in this case suggest that at least some of plaintiffs' fiduciary duty claims, especially as to Gifford and Jasper, are strong. In a previous decision in this case, this Court stated "that the intentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitute conduct that is disloyal to the corporation and is therefore an act in bad faith."[FN24]Based on the evidence uncovered in this case, it is possible, though not certain, that plaintiffs would be able to make a showing that would support a finding of bad faith conduct by Gifford and Jasper.

> FN24. *Ryan v. Gifford,* 918 A.2d 341, 358 (Del. Ch.2007).

**\*7** Plaintiffs have also asserted claims for unjust enrichment against Maxim's officers and directors who received backdated stock options issued in violation of the Plan. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[FN25]Plaintiffs allege that it is possible for a defendant to be unjustly enriched with respect to their receipt of backdated options even if they had no role in the backdating scheme. Indeed, the Court in *Schock v. Nash* stated that a defendant may be liable "even when the defendant retaining the benefit is not a wrongdoer" and "even though he may have received [it] honestly in the first instance."[FN26]

> FN25. *Schock v. Nash,* 732 A.2d 217, 232 (Del.1999) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1062 (Del .1988).

> FN26.*Id.* at 232-33.

Although some of plaintiffs' claims have merit, if the case were to proceed to trial, defendants would undoubtedly raise defenses that would make any recovery by Maxim uncertain. Defendants could, and likely would, assert that they are exculpated from liability by the § 102(b)(7) provision in Maxim's certificate of incorporation.[FN27]Thus, plaintiffs will have to prove that defendants violated their fiduciary duty of loyalty or committed an act not in good faith or which involves knowing misconduct. Defendants would argue that, to the extent they did not personally benefit from the conduct, they have not violated their duty of loyalty to the corporation. If this argument were successful, plaintiffs would be left to show that the directors acted in bad faith or engaged in intentional misconduct. Conduct constituting bad faith "is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)."[FN28] This Court has stated that "intentional violation" of a shareholder approved stock option plan and "fraudulent disclosures" regarding these violations would constitute bad faith.[FN29]In order to recover at trial, however, plaintiffs would be required to meet their burden of proof at to these issues, a task that should not be underestimated when a party is required to show intent or fraud. This burden may be even more difficult given that defendants may emphasize that the Special Committee did not find any evidence that the outside directors or the directors serving on the compensation committee engaged in any wrongdoing or malfeasance with respect to the stock option grants.

> FN27. Section 102(b)(7) allows companies to adopt a provision in their certificate that eliminates the personal liability of directors for monetary damages for breach of fiduciary duty as a director, except for, among other things, breaches of the duty of loyalty and acts or omissions not in good faith or which involve intentional misconduct.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                        Page 8
Not Reported in A.2d, 2009 WL 18143 (Del.Ch.)
**(Cite as: 2009 WL 18143 (Del.Ch.))**

FN28. *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del.2006).

FN29. *Ryan v. Gifford*, 918 A.2d 341, 358 (Del. Ch.2007).

Additionally, at least some defendants could assert defenses to the unjust enrichment claims by arguing that these claims should fail because the stock options plan constituted an express, enforceable contract that governed the relationship between the parties.[FN30]Defendants may also allege, as some of them did in briefing a motion for summary judgment in this case, that the unjust enrichment claims are time-barred and that there is nothing "unconscionable" about allowing some of the defendants to retain the shareholder-approved compensation that they earned for services rendered to Maxim.

FN30.*See ID Biomedical Corp. v. TM Techs., Inc.*, C.A. No. 13269, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) ("Courts developed unjust enrichment, or quasi-contract, as a theory of recovery to remedy the absence of a formal contract. A party cannot seek recovery under an unjust enrichment theory if a contract 'is the measure of [the] plaintiff's right.'") (quoting *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del.1979)) (citations omitted).

**\*8** I need not determine the facts or decide the ultimate issues in this case. I have reviewed the claims and defenses under Delaware law and have briefly outlined their relative strengths and weaknesses. This review has shown that although evidence has been uncovered that suggests that plaintiffs are entitled to some recovery, there is uncertainty in litigation of this nature and any claims would likely be vigorously contested by defendants. Additionally, the calculation of damages is particularly difficult to predict in backdating cases, and any significant monetary recovery for Maxim remains speculative.

b. The California State and Federal Action Claims

The Settlement purports to release all derivative claims that have been or could have been asserted on behalf of Maxim, whether based on state or federal law, which could arise out of Maxim's stock option practices. This Court can release claims not before the Court, including claims that could not have been brought because the plaintiff lacked standing or because the claims were outside this Court's jurisdiction.[FN31]This Court can even authorize the release of exclusively federal claims.[FN32]

FN31.*See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 380-86 (1996); *In re Union Square Square Assocs. Sec. Litig.*, C .A. No. 11028, 1993 WL 513232, at *5 (Del. Ch. Nov. 29, 1993); *In re MCA, Inc.*, 598 A.2d 687, 691 (Del. Ch.1991).

FN32. *In re MCA*, 598 A.2d at 691.

While I must consider the value of the claims brought in the California Actions, I need not, and will not, attempt to resolve the issues under California or federal law. I must only evaluate these claims to gain "a sense of the relative strengths of the parties' positions."[FN33]After reviewing the claims under California and federal law, I have determined, in the exercise of my business judgment, that the consideration received by Maxim in the Settlement is fair, reasonable, and adequate. A short review of some of the claims asserted in the California Actions may be instructive.

FN33. *In re Caremark*, 698 A.2d at 961.

Among the claims asserted in the California Actions are derivative federal securities claims under the Securities Exchange Act of 1934 (the "Exchange Act") and California state law insider trading claims. As I have already noted, based on the facts uncovered in this case, it is likely that Maxim is entitled to recovery from at least some of the defendants for their role in Maxim's options granting practices. As with the Delaware claims, however, recovery under the claims brought in the California Actions requires meeting a burden of proof and overcoming any defenses. As a result, any significant recovery is speculative.

To recover for claims under § 10(b) and Rule 10b-5 of the Exchange Act, for example, plaintiffs must show: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance, or transaction causation; (5) economic loss; and (6) loss causation.[FN34] Making the required showing as to these elements-particularly scienter and reliance-poses challenges for

any plaintiff pursuing a derivative claim. Additionally, to recover under § 14(a) of the Exchange Act, a plaintiff must show: (1) that defendants acted at least negligently in making a material misrepresentation or omission in a proxy statement and (2) that the proxy statement was the transactional cause of the harm of which plaintiff complains.[FN35]

> FN34. *Dura Pharm, Inc. v. Broudo,* 544 U.S. 336, 341 (2005); *In re Maxim Integrated Prods., Inc., Deriv. Litig.,* 574 F.Supp.2d 1046, 1061 (N.D.Cal.2008).

> FN35. *In re Maxim,* 574 F.Supp.2d at 1065-66.

**\*9** In addition to the challenges of proving liability under the federal securities law, the recovery available in the California Federal Action may be limited by statutes of limitation and repose. Indeed, the Court in the California Federal Action has already ruled that plaintiffs' § 10(b) claims may not be based on any allegedly false statements made before May 22, 2001 and that plaintiffs' § 14(a) claims are barred to the extent they are based on false proxy statements filed with the SEC before May 22, 2003.[FN36]

> FN36.*Id.* at 1071-72.

I need not recite the elements or decide the merits of each and every claim brought in the California Actions.[FN37]In approving the Settlement I have considered all the claims that will be released by the Settlement. The outcome of a trial in this case is uncertain, and recovery based on any of these claims is speculative. Uncertainty is costly to Maxim and its shareholders, and by entering into the Settlement, Maxim's shareholders have obtained a significant *and certain* recovery. Although it is possible that there could have been a larger recovery after a trial, it is also possible that any recovery would have been smaller than the recovery under the Settlement. Additionally, continued pursuit of this action is costly to the Company, and ending this protracted litigation will result in significant savings to the Company and its shareholders.

> FN37. *Kahn v. Sullivan,* 594 A.2d 48, 61-62 (Del.1991) ("In weighing the validity of the claims and the benefits provided by the Settlement, it was neither necessary nor desir-

able for the Court of Chancery to try the case or to definitely decide the merits of any of the issues.").

2. *The Delay and Expense of Further Litigation*

This litigation has been and, if not for the Settlement, would continue to be extremely costly to the Company and its shareholders. In addition to providing substantial recovery to the Company, the Settlement will free Maxim of much of the mounting costs associated with this action and the California Actions. Litigation can be distracting, and the Settlement will allow the Company's directors, officers, and employees to focus their attention on Company business. Additionally, absent the Settlement, this complex litigation would continue to cost Maxim millions of dollars in legal and other professional fees. Any cost savings as a result of the Settlement directly benefit Maxim and its shareholders, just as a monetary judgment would, and these savings are properly considered by the Court when deciding whether a settlement is fair, reasonable, and adequate. Should the litigation proceed, any potential recovery would be diminished by the cost of achieving the judgment.

3. *The Collectability of a Judgment*

Before the settlement hearing, Maxim confirmed that all of the approximately $28.5 million in cash called for under the Settlement has been deposited and is in escrow.[FN38]Thus, there is no doubt as to the collectability of the Settlement proceeds. If this case were to proceed to trial, however, the ultimate collectability of a judgment is less certain, and while the probability of collecting at least some part of a later judgment may be high, it is surely less certain than the collectability of the Settlement proceeds that are already in escrow.

> FN38. Ioannou Aff. ¶ 26.

4. *The Amount of the Compromise Compared to the Amount and Collectability of a Judgment*

**\*10** As I have explained above, while the claims in this action and in the California Actions have merit, there are significant barriers to the ultimate collection of a judgment based on these claims. The defendants in all the actions will present vigorous defenses, and

any recovery from a judgment would likely be years away. Any future judgment must be considered in light of the time it will take to recover, the costs to the Company of pursuing the action, and the risk that the ultimate recovery will be smaller than the amount recovered pursuant to the Settlement.

In contrast, the Settlement provides benefits to Maxim that are substantial and certain. Maxim will receive a substantial cash recovery-approximately $28.5 million. This money is already in escrow and will be available for Maxim much sooner than any potential judgment if this case proceeded to trial. Additionally, under the Settlement, many of the defendants agreed to cancel, re-price, or surrender thousands of stock options.

As part of the Settlement, Maxim will also receive the benefit of substantial corporate governance changes designed to address the problems that led to the backdating of options. These changes are designed to assure that Maxim's options grant process is transparent and properly monitored, while still providing Maxim with the flexibility to use options to incentivize its employees. It is difficult to place a value on such non-pecuniary benefits; however, such governance reforms can provide substantial benefits and are appropriately considered by the Court when evaluating a proposed settlement.

In light of the immediate and substantial benefits of the Settlement, and taking into account the delay and uncertainty of any future judgment and the significant cost to Maxim of continued litigation, the amount of the Settlement compares favorably with the amount of a possible future judgment.

*5. Views of the Parties Involved*

Plaintiffs, defendants, and Maxim strongly support the Settlement and have strenuously argued for its approval. Notice of the settlement was sent to more than 12,000 Maxim shareholders and published on Maxim's website.[FN39] The time for filing objections to the Settlement has passed, and as of November 21, 2008, only one shareholder had objected to the Settlement-Objector Corey. That only one shareholder filed an objection to the Settlement lends support to plaintiffs' argument that the Settlement is fair, reasonable, and adequate.

FN39. Ioannou Aff. ¶ 4-10, 12.

I have already addressed Objector Corey's arguments regarding the merits of the claims in this action and in the California Actions. The bulk of Objector Corey's remaining arguments are that plaintiffs in this action failed to properly value the claims and that the claims are potentially worth far more than the benefit provided by the Settlement. For example, Objector Corey argues that the Settlement is inadequate because: (1) the Settlement could result in a net loss for Maxim; (2) the Settlement releases claims against persons who are not part of this action and who are not contributing anything under the Settlement; and (3) the Settlement releases claims that could not have been pursued in this action.[FN40] These arguments, like many of Objector Corey's other arguments, are either exaggerated or fail to account for the nature of a negotiated settlement of potentially meritorious yet unproven claims.

FN40. Objector Corey's Objection to Stipulation of Compromise and Settlement at 24, 30-37.

*11 In arguing that the Settlement could result in a net loss for Maxim, Objector Corey assumes that: (1) the $21 million from the insurance carriers is not paid; (2) Gifford and Jasper are wholly successful in their buyback claims against the Company for $10.5 million; and (3) the Company pays an attorneys' fee of $15 million. Objector Corey then uses these numbers to conclude that the Settlement could result in a net liability to Maxim of over $18 million. This claim is unconvincing. First, the $21 million is already in escrow, and as explained below, Maxim will not have to pay the full $15 million attorneys' fee. Second, to the extent Gifford and Jasper have claims against Maxim, they were not given to defendants as part of the Settlement, and Maxim has retained all defenses against these claims. Rather than resulting in a net liability to Maxim, the Settlement offers a substantial recovery for the Company, and by ending this costly and distracting litigation, will allow the Company to properly focus on operating its business.

Objector Corey also argues that the Settlement is inadequate because it releases claims not asserted in this action and claims against persons not subject to jurisdiction in this Court. It is within the power of this Court to approve a settlement that releases claims

that are not pending before it and claims over which it would not have jurisdiction. In determining the adequacy of the Settlement, the Court does not need to determine whether there is adequate consideration for the release of each individual claim, rather the Court must determine whether the value provided by the Settlement is adequate in light of all the released claims. Accordingly, the release of claims not asserted in this action is not sufficient reason to deny approval of the Settlement in light of the substantial benefit provided by the Settlement and the challenges to recovering based on the claims not asserted in this action.

Additionally, plaintiffs assert that all but two of the defendants in the California Actions who are not part of this action are being sued only because they received backdated options. Plaintiffs' counsel concluded that there was not sufficient evidence to conclude that the options granted by the compensation committee were backdated in violation of the Plan, a conclusion supported by the findings of the Special Committee. Plaintiffs' counsel also concluded that it was in the best interest of Maxim to gain the benefit of the Settlement, including the insurance contributions, rather than to seek personal contributions from employees who were not officers of the Company at the time they received the challenged option grants and who had no role in the backdating scheme. This conclusion is reasonable, and as a practical matter, the waiver of claims not asserted in an action is often necessary to achieve the benefits of the voluntary settlement of derivative suits.

The Court need not decide the merits of the damages issues or calculate what theoretical damages would be recoverable if the actions proceeded to trial. While it is possible that Maxim could ultimately recover a greater judgment at trial, that possibility comes at the expense of delay, uncertainty, and increased costs to Maxim. These concerns are properly considered by the parties in reaching a settlement and by this Court in evaluating the adequacy of a settlement.

**\*12** I have considered Objector Corey's arguments on their merits; however, I should also note that there is evidence that Objector Corey's opposition to the settlement may not be motivated solely by a desire to achieve what is best for Maxim. During the settlement hearing, counsel for Objector Corey asserted that they were left out of the settlement discussions because defendants preferred to negotiate only with the Ryan plaintiffs. After this assertion, it was revealed that the plaintiffs in the California Federal Action had signed a memorandum of understanding ("MOU") during the Piazza Mediation that was identical to an agreement signed by the Ryan plaintiffs, except that it provided for a payment of 260,000 to 280,000 shares of Maxim stock as fees to counsel for the federal plaintiffs. While not directly relevant to the fairness or adequacy of the Settlement, the terms of the MOU may place in context Objector Corey's dissatisfaction with the Settlement.

The agreement contemplated during the Piazza Mediation would have settled this action and the California Actions in exchange for: (1) a $20 million contribution from an insurance carrier (Arch), subject to reservation of rights; (2) corporate governance reforms; (3) cancellation of stock options by Gifford and Jasper; (4) re-pricing of all unexercised outstanding options held by the outside directors; and (5) the right to pursue claims against Chubb (an insurance carrier). In addition, defendants agreed to support a fee application by the Ryan plaintiffs of $7 million and not oppose a fee application of up to $10 million. The MOU signed by the federal plaintiffs incorporated identical terms and provided that counsel to the federal plaintiffs would receive a fee award of 260,000 to 280,000 shares of Maxim stock, a fee that the Ryan plaintiffs assert was worth between $8.5 million and $10 million at the time. The Settlement that was ultimately reached in this case provides for: (1) payment of approximately $28.5 million to Maxim from the insurance carriers and from Gifford, Wazzan, Bergman, and Hagopian; (2) corporate governance reforms; (3) the cancellation of all outstanding options held by Gifford; and (4) the re-pricing of all unexercised stock options held by Wazzan, Bergman, and Hagopian.[FN41] Notably, the Settlement does not provide for the payment of any fees to counsel for Objector Corey.

> FN41. Additionally, in January 2007, Jasper surrendered the right to certain stock options and restricted stock units.

Following the settlement hearing, plaintiffs and Objector Corey presented arguments regarding the value of the settlement contemplated under the MOU and the reasons that the Piazza Mediation did not result in a final settlement agreement. For example, Objector

Corey argues that the consideration provided Maxim under the MOU would have been greater than the consideration provided by the Settlement because, among other reasons, the MOU preserved claims against Chubb. Plaintiffs have argued that the Settlement consideration is greater than the consideration that would have been provided under the MOU because, among other reasons, the cash payment contemplated in the MOU was subject to a reservation of rights and could have allowed Arch to seek reimbursement of the entire $20 million. I need not decide these issues or determine whether the Settlement or the MOU provide for a greater benefit to Maxim; I included a description of the MOU to provide the context for the positions taken by plaintiffs and counsel for Objector Corey. To the extent the MOU sheds light on the motivations of counsel for Objector Corey, the MOU speaks for itself.

### III. ATTORNEYS' FEES

**\*13** Plaintiffs' attorneys have requested that the Court award them fees of $13,500,000 and reimbursement of expenses of $398,100.79. Plaintiffs' counsel have also sought permission to allocate from the fee awarded to them a payment of $5,000 to each of plaintiffs Ryan and Conrad. While the parties have not reached an agreement as to the payment of attorneys' fees, Maxim agreed to pay the attorneys' fee and expense award granted by the Court. Maxim retained the right to object to the fee award sought by plaintiffs' counsel, but elected not to exercise that right.

In light of the substantial benefit achieved for Maxim and the extensive and skilled work plaintiffs' attorneys have invested in this case, in the exercise of my discretion, I award plaintiffs' counsel a total of $9,500,000, which is inclusive of the right to pay $5,000 each to plaintiffs Ryan and Conrad and $398,100.79 in expenses.

*A. The Legal Standard*

The award of attorneys' fees and expenses and the determination of the amount of an award are committed to the sound discretion of the Court.[FN42] The principal factors the Court examines in determining an appropriate fee, often referred to as the *"Sugarland* factors" include "(1) the benefit achieved in the action; (2) the contingent nature of the undertaking;

(3) the difficulty of the litigation and the efforts of counsel; (4) the quality of the work performed; and (5) the standing and ability of counsel."[FN43] Additionally, Delaware courts recognize that time is a relevant inquiry in determining an appropriate fee award.[FN44]

> FN42. *In re Abercrombie & Fitch Co. S'holders Deriv. Litig.,* 886 A.2d 1271, 1273 (Del.2005).

> FN43. *Franklin Balance Sheet Inv. Fund v. Crowley,* C.A. No. 888-VCP, 2007 WL 2495018, at \*12 (Del. Ch. Aug. 30, 2007) (*citing Sugarland Indus., Inc. v. Thomas,* 420 A.2d 142, 149-50 (Del.1980)).

> FN44. *Abercrombie & Fitch,* 886 A.2d at 1273.

*B. The Sugarland Factors Applied*

*1. The Benefit Achieved*

The benefit achieved for the Company and the shareholders should be accorded the greatest weight in determining the fees to be awarded.[FN45] In this case, the significant benefit achieved by the Settlement militates in favor of a substantial fee award for plaintiffs' counsel. The efforts of plaintiffs' attorneys have resulted in a significant benefit for Maxim and its shareholders. Indeed, according to plaintiffs, the recovery under the Settlement is the second highest recovery among all of the numerous backdated options derivative actions that have been brought and settled throughout the country.[FN46] In addition to the cash recovery of over $28 million, the Settlement provides for the cancellation, re-pricing, and surrender of thousands of stock options and for significant corporate governance reforms designed to prevent future wrongful option grants. Such non-monetary recovery is properly considered by the Court in determining a fee award and in the past has served as the sole basis for a fee award.[FN47]

> FN45. *See In re Golden State Bancorp Inc. S'holders Litig.,* C.A. No. 16175, 2000 WL 62964, at \*3 (Del. Ch. Jan. 7, 2000); *In re Maxxam Group, Inc. S'holders Litig.,* 1987 WL 10016 at \*11 (Del. Ch. Apr. 16, 1987).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2009 WL 18143 (Del.Ch.)
**(Cite as: 2009 WL 18143 (Del.Ch.))**

FN46. Pls.' Br. in Support of Fees at 2.

FN47.*See* *Tandycrafts, Inc. v. Initio Partners,* 562 A.2d 1162, 1165 (Del.1989); *Sugarland,* 420 A.2d at 148.

### 2. *The Contingent Nature of the Undertaking*

This Court has recognized that an attorney may be entitled to a much larger fee when the compensation is contingent than when it is fixed on an hourly or contractual basis. Plaintiffs' attorneys undertook this case on an entirely contingent basis and faced the possibility of receiving no consideration for their efforts if they were not successful in obtaining a recovery for Maxim.

### 3. *The Difficulty of the Litigation and the Efforts of Counsel*

**\*14** From its outset, this case has posed novel and difficult issues of corporate law and has resulted in several opinions from this Court that helped define the consequences of backdating under Delaware law. Plaintiffs' attorneys have expended significant time in pursuit of this complex and difficult litigation, and have, among other things: (1) researched and drafted the complaint and the amended complaint; (2) opposed motions to dismiss in deference to the California Actions and for lack of jurisdiction; (3) conducted extensive discovery, including substantial motion practice; (4) briefed a motion for partial summary judgment; and (5) negotiated and argued for approval of the Settlement. As of November 20, 2008, plaintiffs' counsel claim to have spent over 7,780 hours of attorney time in the prosecution of this action over the past two years.[FN48]

FN48. Pls.' Br. in Support of Fees at 6-7. After accounting for expenses of $398,100.79 and payment to plaintiffs of $10,000, plaintiffs' counsel are receiving approximately $9,091,899 in fees. Assuming 7,780 total hours, this

### 4. *The Quality of the Work Performed and the Standing and Ability of Counsel*

Plaintiffs' attorneys are highly skilled and experi-

enced lawyers in the field of shareholder litigation. Their vigorous pursuit of this action resulted in a significant recovery for Maxim. At every stage of this litigation the attorneys for all the parties produced excellent legal work and skillfully represented the interests of their clients. These facts weigh in favor of a substantial fee award for plaintiffs' counsel.

### IV. CONCLUSION

For the reasons stated and in the exercise of my business judgment, I find that the Settlement is fair, reasonable, and adequate. Therefore, I grant the application for approval of the Settlement. Additionally, I grant plaintiffs' attorneys a total fee of $9,500,000, which is inclusive of the right to pay $5,000 each to plaintiffs Ryan and Conrad and reimbursement for $398,100.79 in expenses.

An Order has been entered that implements this Memorandum Opinion.

Del.Ch.,2009.
Ryan v. Gifford
Not Reported in A.2d, 2009 WL 18143 (Del.Ch.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.