# Exhibit P

1   BORIS FELDMAN, State Bar No. 128838
    DOUGLAS J. CLARK, State Bar No. 171499
2   IGNACIO E. SALCEDA, State Bar No. 164017
    BETTY CHANG ROWE, State Bar No. 214068
3   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
4   650 Page Mill Road
    Palo Alto, CA 94304-1050
5   Telephone:  (650) 493-9300
    Facsimile:  (650) 565-5100
6
    Attorneys for Nominal Defendant Rambus Inc.
7

8                  UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11

12   IN RE RAMBUS INC. DERIVATIVE          )   CASE NO.:  C-06-3513 JF
     LITIGATION                            )
13                                         )   **NOMINAL DEFENDANT RAMBUS
                                           )   INC.'S _AMENDED_ MOTION TO
14   _____  )   TERMINATE DERIVATIVE
                                           )   LITIGATION PURSUANT TO THE
15   This Document Relates To:             )   REPORT OF THE SPECIAL
                                           )   LITIGATION COMMITTEE**
         All Actions.                      )
16                                         )
     _____  )   Date:    January 16, 2009
17                                         )   Time:    9:00 a.m.
                                           )   Judge:   Hon. Jeremy Fogel
18   _____  )

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

AMENDED NOTICE OF MOTION AND MOTION ................................................ 1

ISSUES TO BE DECIDED (Civil Local Rule 7-4(a)(3)) .................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    A.    Rambus's Audit Committee Investigation ................................. 3

    B.    The Shareholder Derivative Lawsuits ........................................ 4

    C.    The Formation Of Rambus's Special Litigation Committee ................... 4

    D.    The SLC Investigation .................................................................. 6

    E.    The Conclusions Of The SLC ..................................................... 7

        1.    Ed Larsen ........................................................................ 8

        2.    Robert Eulau, Gary Harmon, Geoff Tate, and David Mooring ................ 8

        3.    The Other Individual Defendants Named in the Complaints ................ 8

    F.    Developments Following the Issuance of the SLC Report ........................ 9

ARGUMENT ............................................................................................................. 9

I.    THE SLC, NOT PLAINTIFFS, IS ENTITLED TO MANAGE THIS DERIVATIVE LITIGATION UNDER DELAWARE LAW ............................. 9

II.    THE STANDARD OF REVIEW ................................................................ 11

    A.    THE BUSINESS JUDGMENT RULE ...................................... 12

    B.    THE ZAPATA STANDARD OF REVIEW ............................. 12

        1.    THE SLC IS INDEPENDENT ................................... 13

        2.    THE SLC ACTED IN GOOD FAITH AND CONDUCTED A THOROUGH INVESTIGATION ............................... 15

        3.    THE SLC HAD REASONABLE BASES FOR ITS CONCLUSIONS .................................................. 17

    C.    THE SLC'S REPORT SHOULD BE ADOPTED BY THE COURT UNDER STEP TWO OF THE ZAPATA TEST, IF APPLIED ........................... 18

CONCLUSION ........................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbey v. Computer & Commc'ns Tech. Corp.*, 457 A.2d 368 (Del. Ch. 1983) ........................... 10

*Abramowitz v. Posner*, 672 F.2d 1025 (2d Cir. 1982) .............................................. 10, 11

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm
      v. Eisne*r, 746 A.2d 244 (Del. 2000)........................................................... 12, 14

*Burks v. Lasker*, 441 U.S. 471 (1979) .................................................................... 9

*Carlton Inv. v. TLC Beatrice Intern. Holdings, Inc.*, No. CIV.A. 13950, 1997 WL
      305829 (Del. Ch. May 30, 1997) ........................................................... 17

*Furman v. Walton*, No. C06-3532 SBA, 2007 WL 1455904 (N.D. Cal. May 16,
      2007)...................................................................................................... 11

*Genzer v. Cunningham*, 498 F. Supp. 682 (E.D. Mich. 1980) .............................. 16

*Grafman v. Century Broad. Corp.*, 762 F. Supp. 215 (N.D. Ill. 1991) .................... 10, 14, 15, 17,
                                                                                                                                                             18

*In re Boston Scientific Corp. Shareholders Litig.*, No. 02 CIV 247 AKH, 2007 WL
      1696995 (S.D.N.Y. June 13, 2007) ...................................................... 9, 10-12

*In re Oracle Corp. Deriv. Litig.*, 808 A.2d 1206 (Del. Ch. 2002) ........................ 10

*In re Oracle Sec. Litig.*, 852 F. Supp. 1437 (N.D. Cal. 1994)................................ *passim*

*Johnson v. Hui*, 811 F. Supp. 479 (N.D. Cal. 1991) .............................................. *passim*

*Kaplan v. Wyatt*, 484 A.2d 501 (Del. Ch. 1984), *aff'd*, 499 A.2d 1184 (Del. 1985) ........ 11, 12, 13
                                                                                                                                                               14, 18

*Katell v. Morgan Stanley Group, Inc.*, No. CIV.A. 12343, 1995 WL 376952 (Del.
      Ch. June 15, 1995)................................................................................... 14, 15,
                                                                                                                                                               17, 18

*Kindt v. Lund*, No. CIV.A. 17751-NC, 2003 WL 21453879 (Del. Ch. May 30,
      2003)...................................................................................................... 14, 16,
                                                                                                                                                               17

*Scalisi v. Grills*, No. CV 04 5513, 2007 WL 2319079 (E.D.N.Y. July 26, 2007) ........... 10, 15, 16

*Strougo v. Bassini*, 112 F. Supp. 2d 355 (S.D.N.Y. 2000)...................................... *passim*

*White v. Panic*, 783 A.2d 543 (Del. 2001) .......................................................... 10

*Zapata v. Maldonado*, 430 A.2d 779 (Del. 1981) .................................................. 10, 11,
                                                                                                                                                               12, 13

| 1 | **STATUTE** |
|---|---|

8 Del. C. § 102 (b)(7) ........................................................................................... 9

8 Del. C. § 141(a) ................................................................................................. 9

NOM. DEF. RAMBUS'S AM. MOTION TO
TERMINATIVE DERIVATIVE LIT. PURSUANT TO
SLC REPORT; CASE NO. C-06-3513

**AMENDED NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on January 16, 2009 at 9:00 a.m., before the Honorable Jeremy Fogel, United States District Court for the Northern District of California, San Jose, California, nominal defendant Rambus Inc. ("Rambus" or the "Company") will, and hereby does, move for an order terminating the Amended Consolidated Derivative Shareholder Complaint pursuant to the Report of the Special Litigation Committee of the Board of Directors of Rambus.

This Motion is based on this Amended Notice of Motion and Motion; the Memorandum of Points and Authorities; the Declaration of Ignacio E. Salceda;[1] all pleadings and papers filed herein; oral argument of counsel; and any other matter that may be properly submitted at the hearing.

**ISSUES TO BE DECIDED (Civil Local Rule 7-4(a)(3))**

1.    Whether the derivative actions should be terminated pursuant to the Report of the Special Litigation Committee of the Board of Directors of Rambus.

2.    Whether the Court should approve the proposed settlement.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Pending before this Court are the motion of the Special Litigation Committee ("SLC") of the Rambus Board of Directors to terminate the action as well as plaintiffs' motion to approve the proposed settlement of this action.  As part of the settlement, the derivative plaintiffs have agreed not to oppose this amended motion to terminate.  *See* Stipulation of Settlement at 4.[2]  As discussed below, the SLC's motion should be granted because it is in the best interests of Rambus and the Court should approve the proposed settlement.

---

[1] References to "Ex. _" are exhibits to the Salceda Declaration, filed in support of the initial motion to terminate.

[2] Plaintiffs are separately filing a motion for approval of the proposed settlement.

1    The SLC was composed of two independent members of the Rambus Board. As

2  reflected in its 64-page report filed with the Court,[3] the SLC undertook a detailed examination of

3  claims asserted in this action against eighteen of the Company's current and former officers and

4  directors.  Following that examination, the SLC concluded that it is in the best interest of

5  Rambus to pursue the claims asserted against defendant Ed Larsen, the former Vice President for

6  Human Resources.

7    The SLC also concluded that it is in Rambus's best interest to settle the claims asserted

8  against defendants Robert Eulau and Gary Harmon (former Chief Financial Officers), Geoff Tate

9  (former Chief Executive Officer) and David Mooring (former President) for an aggregate value

10  to Rambus in excess of $28.5 million.  Those amounts include cash payments by three of these

11  individuals totaling $4.46 million, the conveying to the Company of 163,333 shares of Company

12  stock, and the relinquishing by Mr. Tate of any rights he may have to all options that he had not

13  exercised as of the time of his resignation from the Board.  The SLC valued those options as in

14  excess of $22 million.  These settlement agreements are conditioned, however, upon the

15  termination of the derivative actions against the respective individuals.

16    Lastly, the SLC determined that it is in the best interest of the Company to terminate the

17  derivative actions against the remaining defendants because, among other things, the SLC found

18  that the claims lack merit and would fail for lack of evidentiary support.

19    Following the filing of the SLC's Report, the parties in this action, as well as the related

20  *Francl v. PricewaterhouseCoopers LLC* matter, reached a settlement.  Among other things, the

21  settlement would effectuate the SLC's recommendations and end all of the derivative litigation

22  involving Rambus.  The extensive benefits to Rambus from approval of the SLC's motion are

23  discussed below.  On the other hand, continued litigation is costly and risky for the Company.

24  For example, because of indemnification obligations, Rambus would face not only the costs it

25  incurred in connection with ongoing litigation but also the defense costs for the individual

26  _____

27    [3] The report was filed with the Court on October 5, 2007 as Exhibit A to the declaration
   submitted in support of the initial motion to terminate.  The Report was also previously filed
28  with the Court on August 24, 2007, as Exhibit A to the Joint Case Management Conference
   Statement, in anticipation of the Case Management Conference held on September 7, 2007.

1    defendants.  Under these circumstances, it cannot be said that continuing the derivative litigation

2    will benefit Rambus on whose behalf the derivative claim is presented.

3        For the reasons described below, the Court should grant the SLC's amended motion to

4    terminate and approve the settlement

5                           **STATEMENT OF FACTS**

6    **A.    Rambus's Audit Committee Investigation**

7        On May 30, 2006, Rambus announced that the Audit Committee of its Board of Directors

8    had commenced an internal investigation of past option grants and other potentially related

9    issues.  Rpt. at 5.  The Audit Committee was composed of independent directors J. Thomas

10   Bentley, Abraham D. Sofaer and Sunlin Chou.  Each of these directors had joined the Board of

11   Directors and the Audit Committee after January 1, 2005.  The Audit Committee retained Heller

12   Ehrman LLP as independent legal counsel, and that firm engaged the outside accounting firm of

13   Ernst & Young LLP ("E&Y") to assist in the investigation.  *Id*. at 5-6.[4]  Over the ensuing

14   months, the Audit Committee conducted a factual investigation and accounting analysis with

15   respect to the Company's stock option grants for the period beginning on May 14, 1997 (the date

16   of Rambus's initial public offering) through May 30, 2006 (the "Review Period").  *Id*. at 13-17.

17       On October 19, 2006, Rambus announced that the Audit Committee had substantially

18   completed the investigation and publicly disclosed the principal findings.  *Id*. at 6-7.  In short, the

19   Audit Committee determined that a significant number of Rambus stock option grants were not

20   correctly dated and accounted for, with the vast majority of the incorrectly dated grants occurring

21   between 1998 and 2001.  *Id*. at 6.  Rambus also disclosed that the results of the Audit

22   Committee's investigation confirmed its previous conclusion that certain of Rambus's financial

23   statements for prior fiscal years should no longer be relied upon and would be restated.  *Id*. at 7.

24

25

26
───────────────────────
27    [4] Since the dissolution of Heller Ehrman, the lead partner on the engagement, Norman
      Blears, has joined Hogan & Hartson.  For simplicity, we will continue to refer to the Audit
28    Committee and SLC counsel as Heller Ehrman.

1    **B.    The Shareholder Derivative Lawsuits**

2        On May 31, one day after the disclosure of the Audit Committee investigation, the first of

3    several shareholder derivative complaints was filed in this Court.[5]  Other derivative suits were

4    filed in Santa Clara County Superior Court and Delaware Chancery Court.[6]  Following the

5    consolidation and appointment of lead plaintiffs and counsel, plaintiffs filed a consolidated

6    complaint in this Court on October 2, 2006.  Plaintiffs then filed the Amended Consolidated

7    Derivative Shareholder Complaint ("Complaint") on November 3, 2006.

8        The Complaint alleged sixteen instances of improperly dated stock option grants issued

9    between November 5, 1998 and October 8, 2001, and asserts claims purportedly on behalf of

10   Rambus against eighteen current and former officers and directors.  Plaintiffs sought recovery

11   against some or all of the defendants for alleged violations of §§ 10(b), 14(a) and 20(a) of the

12   Securities Exchange Act of 1934 and SEC Rules 10b-5 and 14a-9 (Counts I, II and III); an

13   accounting (Count IV); breach of fiduciary duty and/or aiding or abetting breach of fiduciary

14   duty (Count V); abuse of control (Count VI); gross mismanagement (Count VII); constructive

15   fraud (Count VIII); corporate waste (Count IX); unjust enrichment (Count X); rescission (Count

16   XI); breach of contract (Count XII); violations of California Corporations Code § 25402/25502.5

17   (Count XIII); and breach of fiduciary duties for insider selling and misappropriation of

18   information (Count XIV).

19   **C.    The Formation Of Rambus's Special Litigation Committee**

20       Immediately upon completion of the Audit Committee's investigation, on October 18,

21   2006, the Rambus Board of Directors established the SLC to evaluate potential claims or other

22   actions arising from the stock option granting activities. Rpt. at 9. The Board empowered the

23   SLC to conduct an independent evaluation of the merits of the derivative suits and to determine,

24

25   [5] *See Chu v. Hughes, et al.*, No. C-06-3513-JF (filed May 31, 2006).  Other shareholder
     derivative complaints followed. *See Bibeau v. Hughes, et al.*, No. C-06-3921-FJ (filed June 23,
26   2006); *Ruggieri v. Hughes, et al.*, No. C-06-4153-RMW (filed July 5, 2006). The Court
     consolidated these cases for all purposes on August 10, 2006.

27   [6] The Superior Court action was dismissed by order of the Court on October 20, 2006, in
28   deference to the action pending before this Court.  The Delaware action was voluntarily
     dismissed.

1    in its sole discretion, the Company's best interests regarding the derivative lawsuits. *See* Ex. D.

2    The SLC was not bound by any determinations or conclusions that the Board or any committee

3    thereafter had or might reach regarding such matters. Rpt. at 13. In addition, the SLC was

4    authorized to avail itself of any and all information prepared or collected by management,

5    employees or agents of Rambus, by the Board or any committee thereof. *Id.*; *see also* Ex. D.

6         The Board appointed J. Thomas Bentley and Abraham D. Sofaer, two independent

7    directors, to comprise the SLC. *Id.* at 9. Messrs. Bentley and Sofaer were active members of the

8    Audit Committee that had investigated the timing of past option grants and other potentially

9    related issues and thus, have personal knowledge of that investigation and its findings. *Id.*

10   ***J. Thomas Bentley.***  Mr. Bentley co-founded the mergers and acquisitions firm SVB

11   Alliant in 1990 and served as its Managing Director until October 2005. He holds a B.A. in

12   Economics from Vanderbilt University and Masters of Science in Management from MIT.

13   Mr. Bentley joined the Rambus Board in March 2005, well after the alleged misconduct

14   occurred. Prior to joining the Board, he had no professional, personal or familial ties to Rambus

15   or any of the defendants that would create a conflict of interest under Delaware law and

16   continues to have no such ties. *Id.* at 9-10.

17   ***Abraham D. Sofaer.***  Mr. Sofaer has been the George P. Shultz Distinguished Scholar

18   and Senior Fellow at the Hoover Institution since 1994. He was previously a partner at Hughes,

19   Hubbard & Reed and served as the chief legal advisor to the U.S. Department of State. From

20   1979 to 1985, Mr. Sofaer served as a United States District Judge for the Southern District of

21   New York. Prior to that, Mr. Sofaer was a professor at the Columbia University School of Law

22   and an Assistant U.S. Attorney in the Southern District of New York. Mr. Sofaer graduated with

23   a B.A. in history from Yeshiva College. He earned his law degree from the New York

24   University School of Law, before beginning clerkships with the U.S. Court of Appeals for the

25   District of Columbia Circuit and Justice William J. Brennan, Jr. of the U.S. Supreme Court.

26   Mr. Sofaer joined the Rambus Board in May 2005, well after the alleged misconduct occurred.

27   Prior to joining the Board, he had no professional, personal or familial ties to Rambus or any of

28

1   the defendants that would create a conflict of interest under Delaware law and continues to have

2   no such ties. *Id.* at 10-11.

3        The SLC retained Heller Ehrman as its independent legal counsel to assist with its

4   investigation. *Id.* at 9.  Heller Ehrman had not represented Rambus in any significant matter in

5   the last five years, and never represented Rambus in any matter in which any of the facts alleged

6   in the derivative actions were in issue. *Id.* at 11.  Heller Ehrman had assisted the Audit

7   Committee in its investigation of stock option grants. *Id.*

8        **D.    The SLC Investigation**

9        In the connection with their work on the Audit Committee's investigation, the members

10  of the SLC and their independent advisors collected and reviewed a vast amount of email and

11  other documents relevant to option grants and the conduct of the individuals named as

12  defendants in the Complaint.  In sum, the Audit Committee reviewed all of the Company's stock

13  option grants during the Review Period, which encompassed approximately 210 separate stock

14  option granting actions relating to approximately 49 million underlying shares. *Id.* at 17.  The

15  Audit Committee also:

16   •  identified, collected and reviewed over 1.5 million electronic documents and
        hundreds of thousands of pages of hard-copy files from 39 current and former
17      employees and directors.

18   •  collected hard copy files from the Company's finance, legal, stock administration and
        human resource departments, as well as from individual custodians.
19

20   •  collected hard copy corporate governance documents, including Unanimous Written
        Consents, Board of Directors meeting minutes, Compensation Committee meeting
        minutes, Stock Option Committee approval memoranda and SEC forms 3, 4 and 5.
21      The Audit Committee also collected electronic versions of these documents.

22   •  imaged and searched the hard drives of 27 individual custodians.

23   •  imaged and searched documents from the shared drives of the Company's human
        resources, finance and legal departments.
24

25   •  analyzed the metadata attributes of documents to determine when they were created
        and to discover any other pertinent history or modifications.

26   •  collected and analyzed data from the Company's Equity Edge database, which was
        used to track and manage stock option grants.
27

28   •  interviewed 56 individuals who potentially had relevant knowledge, as identified in
        the SLC Report.  In some instances, the Audit Committee members themselves
        conducted the interviews.

1

2     • met on numerous occasions, both in person and by telephone, interacted closely with
        its independent counsel, reviewed documents, attended interviews and asked
        questions of witnesses.

3

4   *Id.* at 14-17.

5        The SLC not only reviewed and analyzed a significant amount of pertinent evidence

6   collected through the Audit Committee investigation, it took additional actions in order to

7   determine how to proceed with regard to the named defendants.  The SLC:

8     • participated or reviewed memoranda of interviews of numerous current or former
        Rambus personnel, including virtually all of the individual defendants.

9

10    • conducted numerous additional targeted document searches to further research facts
        regarding the individual defendants' conduct.

11    • met with counsel for several of the individual defendants to hear those defendants'
        respective positions on the facts alleged in the claims against them.

12

13    • met on at least 20 occasions, either in person or via telephone.

      • met with its independent counsel on more than 20 occasions regarding the factual and
14       legal aspects of the investigation.

15    • reviewed the specific facts regarding each individual defendant and his/her role in the
        underlying events against the backdrop of the legal, procedural and evidentiary rules
16      applicable to the claims against them, as well as how any particular course of action
        would affect the Company.

17

18  *Id.* at 17-18.

19  **E.     The Conclusions Of The SLC**

20       On August 23, 2007, the SLC issued a 64-page report regarding its investigation, findings

21  and conclusions on how to proceed with the claims asserted in the derivative actions.  In making

22  its determinations, the SLC was guided by a number of factors, including the merits of the

23  claims; the likelihood of recovery on those claims; the Company's obligations regarding

24  indemnification and advancement of defense costs; the Company's insurance coverage; the

25  Company's current and future business; and the Company's other litigation risks.  *Id.* at 13.

26  Based on those considerations, the SLC, in the exercise of its business judgment, concluded that

27  it is in the best interest of the Company to take certain actions with respect to each defendant

28  named in the derivative litigation.

1        **1.**     **Ed Larsen.** Mr. Larsen was Rambus' Vice President, Human Resources

2    from September 1996 until December 1999 and then served as Senior Vice President,

3    Administration until his retirement in 2004. The SLC concluded that it was in the best interest of

4    Rambus to pursue the claims against Mr. Larsen. The SLC sought to control any further

5    litigation of those claims. *Id.* at 19.

6        **2.**     **Robert Eulau, Gary Harmon, Geoff Tate, and David Mooring.** The

7    SLC entered into settlement agreements with these defendants, each a former officer of Rambus.

8    Mr. Eulau was CFO from May 2001 through February 2006. *Id.* at 19. Mr. Harmon served as

9    CFO from March 1993 until the middle of 2001. *Id.* at 22. Mr. Tate was CEO from May 1990

10    to January 2005 and a member of the Board until August 2006. Mr. Tate was also the sole

11    member of the Stock Option Committee from May 1997 to October 2003. *Id.* at 20.

12    Mr. Mooring served as Vice President of several Rambus business units from 1991 through

13    December 1999, President from December 1999 until January 2004, and a director from

14    December 1999 through May 2006. *Id.* at 37. The SLC concluded that the settlements with

15    these defendants, which are conditioned upon the dismissal of the derivative actions against

16    them, are in the best interest of the Company. *Id.* at 2. The SLC believed that the aggregate

17    value of these settlements exceeded $6.5 million in cash and cash equivalents at the time the

18    settlements were agreed upon *plus* substantial additional benefit to Rambus relating to Mr. Tate's

19    relinquishment of claims to over 2.7 million stock options, valued over $22 million. *Id.*

20        **3.**     **The Other Individual Defendants Named in the Complaints.** With

21    respect to the remaining individual defendants the SLC concluded that it was not in the best

22    interest of the Company to pursue the claims against these defendants. As discussed in the

23    SLC's Report, the claims against these individuals would fail for a number of reasons, including

24    that, depending on the individual, these defendants were not affiliated with Rambus at the time

25    of the events at issue, there is no evidence that they were involved in any of the relevant

26    activities or engaged in improper behavior. *Id.* at 2, 23-36, 44-49. Moreover, for those

27

28

1  defendants who served on the board of directors, the exculpatory provision in the Company's

2  articles of incorporation would defeat the claims asserted against these defendants.[7] *Id.* at 2.

3  **F.    Developments Following the Issuance of the SLC Report.**

4      On October 5, 2007, Rambus filed a motion to terminate this lawsuit based on the SLC

5  Report.  Thereafter, on November 12, 2007, plaintiffs propounded a request for the production of

6  documents on Rambus and responsive documents were produced.  Rambus granted several

7  extensions of time requested by plaintiffs to file an opposition to the motion to terminate

8  (initially due on December 28, 2007) so that plaintiffs had a full opportunity to review the

9  produced documents and decide on a course of action.  Following the production of documents,

10  the parties engaged in settlement discussions and ultimately reached a proposed settlement for

11  which Court approval is now sought.

12                                    **ARGUMENT**

13  **I.    THE SLC, NOT PLAINTIFFS, IS ENTITLED TO MANAGE THIS DERIVATIVE**
      **LITIGATION UNDER DELAWARE LAW**

14

15      It is a cardinal precept of Delaware corporate law that directors, not shareholders, manage

16  the business and affairs of the corporation.[8]  Derived from 8 DEL. C. § 141(a),[9] the board of

17  director's managerial power includes the power and authority to make decisions regarding

18  

_____

19      [7] Delaware law provides that a corporation's certificate of incorporation may eliminate the
    personal liability of a director for monetary damages for breach of fiduciary duty provided such

20  provision does not eliminate or limit a director's liability for breach of the duty of loyalty, bad
    faith, intentional misconduct, knowing violation of law and the like.  8 DEL. C. § 102(b)(7).

21  Rambus' articles of incorporation contain such an exculpatory provision.  *See* Ex. E at § IX.A.

22      [8] Because Rambus is a Delaware corporation, this litigation is controlled by Delaware law.
    *Burks v. Lasker*, 441 U.S. 471, 478 (1979) ("'Corporations are creatures of state law,' and it is

23  state law which is the font of corporate directors' powers."); *In re Boston Scientific Corp.
    Shareholders Litig.*, No. 02 CIV 247 AKH, 2007 WL 1696995, at *4 (S.D.N.Y. June 13, 2007)

24  ("*BSC*") ("Because BSC is a Delaware corporation, Delaware law governs the substantive
    judicial review of BSC's decision to pursue or not pursue the suit that Plaintiffs have filed on its

25  behalf."); *Strougo v. Bassini*, 112 F. Supp. 2d 355, 361 (S.D.N.Y. 2000) ("A special litigation
    committee has the power to terminate a derivative action to the extent allowed by the state of

26  incorporation.").

27      [9] Section 141(a) states, in pertinent part, "[t]he business and affairs of a corporation . . . shall
    be managed by or under the direction of a board of directors except as may be otherwise

28  provided in this chapter or in its certificate of incorporation."  8 DEL. C. § 141(a).

1    corporate litigation. *See, e.g., White v. Panic*, 783 A.2d 543, 550 (Del. 2001); *Zapata v.*

2    *Maldonado*, 430 A.2d 779, 782 (Del. 1981) ("Directors of Delaware corporations derive their

3    managerial decision making power, which encompasses decisions whether to initiate, or refrain

4    from entering, litigation, from 8 Del. C. § 141(a)"). Such control is particularly appropriate in

5    derivative litigation because, unlike a claim a plaintiff brings on his own behalf to enforce a

6    personal right, a derivative claim is brought *on behalf of* a corporation. The corporation – not the

7    individual shareholder plaintiff – is the real plaintiff, and "any recovery obtained goes to the

8    corporation." *Zapata*, 430 A.2d at 784. In this action, all of the claims asserted are derivative in

9    nature. AC ¶ 98. Thus, Rambus is the real party in interest here and any claim that exists

10   belongs to Rambus.

11          The landmark decision of *Zapata* established that the board of directors may delegate its

12   authority to control derivative litigation to a special litigation committee. *Zapata*, 430 A.2d at

13   785-86. The power of a special litigation committee to decide on the course of derivative

14   litigation has been firmly engrained in Delaware corporate law for more than twenty years[10] and

15   is well recognized by federal courts applying Delaware law.[11]

16

17

18

---

19          [10] *See, e.g., Zapata*, 430 A.2d at 785 ("it must be clear that an independent committee
       possesses the corporate power to seek the termination of a derivative suit."); *In re Oracle Corp.*
20   *Deriv. Litig.*, 808 A.2d 1206, 1210 (Del. Ch. 2002) (special litigation committee is "empowered
       to decide whether and in what manner a derivative suit should proceed."); *Abbey v. Computer &*
21   *Commc'ns Tech. Corp.*, 457 A.2d 368, 375-76 (Del. Ch. 1983) (purpose of the special litigation
       committee is "to determine whether or not a derivative plaintiff's pending suit brought on behalf
22   of the corporation should be maintained").

23          [11] *See, e.g., Johnson v. Hui*, 811 F. Supp. 479, 482 (N.D. Cal. 1991) ("Delaware law endows
       [defendant-company] with the power to form a special litigation committee (SLC) of the board
24   of directors, and to either terminate or assume prosecution of the suit based upon the SLC's
       review and recommendation"); *see also Abramowitz v. Posner*, 672 F.2d 1025, 1034 (2d Cir.
25   1982) (affirmed lower court's termination of derivative suit based on unanimous refusal of
       corporation's disinterested directors to prosecute suit); *BSC*, 2007 WL 1696995, at *1
26   (dismissing derivative suit upon recommendation of independent committee of directors);
       *Scalisi v. Grills*, No. CV 04 5513, 2007 WL 2319079 (E.D.N.Y. July 26, 2007) (upholding
27   special committee's recommendation to dismiss derivative action); *Grafman v. Century Broad.*
       *Corp.*, 762 F. Supp. 215, 221 (N.D. Ill. 1991) (granting summary judgment motion in
28   defendants' favor on derivative claims based on report of independent committee).

1    **II.     THE STANDARD OF REVIEW**

2            A SLC's motion to terminate is neither a motion to dismiss under Federal Rule of Civil

3    Procedure 12(b) nor is it a motion for summary judgment under Rule 56. *Strougo*, 112 F. Supp.

4    2d at 361 (applying Delaware law). Rather, it is "hybrid summary judgment motion for

5    dismissal." *Zapata*, 430 A.2d at 787. Such motion is "analog[ous] to a settlement in that there is

6    a request to terminate litigation without a judicial determination of the merits." *Id.* at 779.

7            The basis of the motion is "the best interests of the corporation, as determined by the

8    [special litigation] committee." *Kaplan v. Wyatt*, 484 A.2d 501, 506 (Del. Ch. 1984), *aff'd*, 499

9    A.2d 1184 (Del. 1985). When considering an SLC's motion to terminate a derivative suit, courts

10   have applied one of two standards of review, depending on whether the case is one in which

11   demand was made or whether it is a case where demand was excused.[12]

12           Where, a litigation demand on the board was made, courts apply the deferential business

13   judgment rule to an SLC's motion to terminate. *Zapata*, 430 A.2d at 784 & n.10; *Abramowitz*,

14   672 F.2d at 1031 ("Where demand upon the corporation has been made and refused, a court will

15   defer to the company's business judgment to forgo litigation unless the shareholder can show

16   that the directors acted wrongfully") (analyzing Delaware law); *BSC*, 2007 WL 1696995, at *4

17   ("when demand on a board has been made and refused, review under Delaware law is governed

18   by the business judgment rule."); *Furman v. Walton*, No. C06-3532 SBA, 2007 WL 1455904, at

19   *2 (N.D. Cal. May 16, 2007) ("If a demand is made and rejected, the board rejecting the demand

20   is entitled to the presumption of the business judgment rule") (applying Delaware law).

21           If, on the other hand, the case is one in which demand is excused, then the two-step

22   standard of review articulated in *Zapata* applies. *Zapata*, 430 A.2d at 787-89. The SLC believes

23   that, under either standard, its motion should be granted.

24

25   _____

26   [12] Under Delaware law, shareholders seeking to assert a claim on the company's behalf are
     required to first exhaust intracorporate remedies by making a demand on the directors to obtain
     the action desired, or to plead with particularity why demand is excused. *See, e.g., Zapata*, 430

27   A.2d at 783. The demand requirement is a recognition that the shareholder's ability to institute
     an action on behalf of a corporation inherently impinges on the directors' powers to manage the

28   affairs of the company.

**A.    THE BUSINESS JUDGMENT RULE**

The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Under this standard, the Court's inquiry is limited to a "review [of] the good faith and reasonableness of the board's investigation, for 'the challenge under Delaware law must be not to the underlying transaction, but to the board's decision not to bring the lawsuit.'" *BSC*, 2007 WL 1696995, at *4 (citation omitted).

The parties to this action disagreed on whether the business judgment standard applied to the SLC's motion. The SLC's initial motion argued that the July 14, 2006, letter to Rambus by counsel for one of the lead plaintiffs constituted a demand. *See* Ex. B. Plaintiffs disagreed with this assertion. If the court were to apply the business judgment rule, the SLC's decision to terminate this derivative litigation for the reasons stated in its Report should be upheld as there is nothing in the record to suggest that either Mr. Sofaer or Mr. Bentley, each an independent director, acted with self-interest or in bad faith. Accordingly, if it were to consider this under the business judgment standard, the Court should grant the motion pursuant to the SLC's Report. *See BSC*, 2007 WL 1696995, at *5-6 (upholding under the business judgment rule recommendation of an independent committee of the board to dismiss derivative lawsuit).

**B.    THE *ZAPATA* STANDARD OF REVIEW**

The motion would also properly be granted if the Court were to apply the two-step analysis articulated in *Zapata*. Under the first, mandatory, step, the Court "should inquire into the independence and good faith of the committee and the bases supporting its conclusions." *Zapata*, 430 A.2d at 788. The movant bears the burden of proving the independence, good faith and reasonableness of the SLC's review. *Id.* The Court's review, under this step, does not reach the merits of the underlying claims. Rather, it is limited only to whether the SLC was independent, proceeded in good faith and had a reasonable basis for its conclusions. *See Kaplan*,

1   484 A.2d at 519 ("it is the Special Litigation Committee which is under examination at this first-

2   step stage of the proceedings, and not the merits of the plaintiff's cause of action").

3       If the company satisfies its burden under step one, the Court may take one of two actions.

4   It may grant the motion to enforce the SLC's conclusions or, alternatively, the Court may, *in its*

5   *discretion*, proceed to the second, optional step in which the Court applies its own "independent

6   business judgment" in reviewing the SLC's conclusions. *Zapata*, 430 A.2d at 789; *Kaplan*,

7   484 A.2d at 508. This second step is to be applied only in unusual or "egregious" circumstances,

8   where the SLC's recommendations, if followed, "would simply prematurely terminate a

9   stockholder grievance deserving of further consideration in the corporation's interest." *Zapata*,

10  430 A.2d at 789; *see also Kaplan*, 499 A.2d at 1192.

11              **1.    THE SLC IS INDEPENDENT**

12      An SLC is independent if its members are "in a position to base [their] decision on the

13  merits of the issue rather than . . . extraneous considerations or influences." *Kaplan*, 499 A.2d at

14  189. To determine whether the SLC acted independently, the Court must review "the totality of

15  the circumstances." *Johnson*, 811 F. Supp. at 486.  Courts generally examine six factors to

16  determine whether a committee's members are independent: (1) the director's status as a

17  defendant, and potential liability; (2) the director's participation in or approval of alleged

18  wrongdoing; (3) the director's past or present business dealings with the corporation; (4) the

19  director's past or present business or social dealings with the individual defendants; (5) the

20  number of directors on the SLC; and (6) "structural bias" of the SLC. *In re Oracle Sec. Litig.*,

21  852 F. Supp. 1437, 1441 (N.D. Cal. 1994); *Johnson*, 811 F. Supp. at 486.  A review of the

22  totality of the circumstances does not require the complete absence of any of these factors.

23  Rather, the Court only needs to satisfy itself that the members of the SLC are capable of reaching

24  an objective conclusion. *Oracle*, 852 F. Supp. at 1442; *Johnson*, 811 F. Supp. at 486; *Strougo*,

25  112 F. Supp. 2d at 362.

26      As to the first factor, while Messrs. Bentley and Sofaer are named as defendants in this

27  case, it is well settled that the mere fact a director is named as a defendant does not establish lack

28  of independence. *Johnson*, 811 F. Supp. at 486 ("Courts have found SLC's independent and

1   unbiased even though a member of the SLC is a nominal defendant or subject to small or indirect

2   liability.").[13]

3       Second, neither Mr. Bentley nor Mr. Sofaer was alleged to have been involved at all in,

4   or approved, the improper granting of stock options.  Indeed, neither has ever served on the

5   Compensation Committee of the Board.  Nor do plaintiffs allege that either received any

6   improper option grants or improperly sold stock.

7       As described above and in the SLC Report, Messrs. Bentley and Sofaer have had long

8   and distinguished careers in business and the law, respectively, completely unrelated to Rambus.

9   Both joined the Rambus Board well after the alleged misdating of options occurred.  *See*

10  *Strougo,* 112 F. Supp.2d at 363-64 (finding SLC members disinterested where they joined the

11  board after alleged wrongdoing occurred).  Nor do Messrs. Bentley and Sofaer have any business

12  or personal links to Rambus or the individual defendants which would defeat their independence.

13  Prior to and since joining the Board, neither gentleman has had any professional, personal or

14  familial ties which would create a conflict of interest to any of the defendants.  *See Johnson,* 811

15  F. Supp. at 486 (finding SLC member independent where he had no identified business or

16  personal relationship with company or defendants); *Kindt,* 2003 WL 21453879, at *3 (finding

17  SLC member independent where only connection with defendants was through service on

18  company's board).  Thus, the third and fourth factors support the finding of independence.  The

19  fifth factor – number of directors on the SLC – does as well.  Delaware courts have accepted

20  committee reports of only one member.  *See Kaplan,* 484 A.2d at 512; *Katell,* 1995 WL 376952

21  at *5; *see also Grafman,* 762 F. Supp. a 219 ("this court cannot see any reason why a one man

22  committee cannot be independent, or is any less independent than a two or multiple member

23  committee.").  Here, the SLC is comprised of two members, which provides further assurance of

24  _____

25  [13] *See also Aronson,* 473 A.2d at 818 (the "bootstrap argument" that directors lack
    independence because they "otherwise would have to sue themselves" "has been made to and
26  dismissed by other courts"); *Kindt v. Lund,* No. CIV.A. 17751-NC, 2003 WL 21453879, at *3
    (Del. Ch. May 30, 2003) ("The fact that Senator Garn was on the board and approved the
27  transactions does not negate his independence.  Nor does his being named as a defendant cause
    [him] to lack independence."); *Katell v. Morgan Stanley Group, Inc.,* No. CIV.A. 12343, 1995
28  WL 376952, at *7 (Del. Ch. June 15, 1995) (the status of sole member of SLC "as a
    Defendant . . . does not render it incapable of deciding whether to pursue this litigation").

NOM. DEF. RAMBUS'S AM. MOTION TO                         -14-
TERMINATIVE DERIVATIVE LIT. PURSUANT TO
SLC REPORT; CASE NO. C-06-3513

1   the independence of the committee. *See Oracle*, 852 F. Supp. at 1441 (finding both members of

2   SLC disinterested); *Johnson*, 811 F. Supp. at 487 (same).

3        Lastly, there was no "structural bias" of the SLC and of its conclusions.  In considering

4   the "structural bias" factor, the Court is to determine whether the "manner in which the SLC was

5   appointed and proceeded was one which was inevitably bound to be empathetic to defendants,

6   and, therefore, biased in favor of terminating the litigation." *Johnson*, 811 F. Supp. at 486.  In

7   this case, Rambus has consistently handled the issue of stock option misdating in a manner that

8   demonstrates a *lack* of bias.  The Audit Committee began its investigation of Rambus's past

9   stock option granting practices before these suits were filed.  The Board promptly approved the

10  formation of the SLC following the completion of the Audit Committee investigation and

11  selected as members two independent outside directors already familiar with the factual findings,

12  demonstrating Rambus's determination to root out culpability, if any, in an efficient and timely

13  manner.  Moreover, in concluding that the derivative claims should be terminated as to certain

14  defendants, settled as to others (at exceptional values), and pursued as to one defendant, the SLC

15  has demonstrated its ability to parse the derivative claims in an impartial manner that is in the

16  best interests of the Company.

17        **2.    THE SLC ACTED IN GOOD FAITH AND CONDUCTED A
                    THOROUGH INVESTIGATION**

18

19        Similarly, the SLC acted in good faith and conducted a reasonable, thorough

20  investigation.  The SLC retained experienced counsel – Heller Ehrman – as independent outside

21  counsel, which is one indicator of good faith and reasonableness of the investigation.[14]

22        With Heller Ehrman's assistance, the SLC built upon the extensive record compiled by

23  the Audit Committee.  *See* Rpt. 14-17.  During the course of the investigation, Messrs. Bentley,

24

25        [14] *See, e.g., Grafman*, 762 F. Supp. at 220 ("another indicia of good faith and reasonableness
          of the investigation is the use of capable counsel"); *Oracle*, 852 F. Supp. at 1442 (fact that SLC
26        retained independent outside counsel was a factor supporting finding of independence and good
          faith); *Scalisi*, 2007 WL 2319079, at *5 (that special committee engaged independent counsel to
27        assist in investigation was one factor supporting a finding that committee investigation was in
          good faith and thorough); *Katell*, 1995 WL 376952, at *10 (good-faith investigation found where
28        SLC "selected capable counsel to assist their investigation and relied heavily on that counsel").

1    Sofaer and Chou, as the Audit Committee, met on numerous occasions (both in person and by

2    telephone), interacted closely with independent counsel, reviewed documents, attended

3    interviews, and asked questions of witnesses. *Id.* at 17.  The Audit Committee reviewed *all* of

4    the Company's stock option grants *from May 17, 1997 through May 30, 2006,* which

5    encompassed approximately *210* separate stock option granting actions relating to approximately

6    49 million shares.  *Id.*  Thus, the Audit Committee's investigation went well *beyond* the options

7    challenged by plaintiffs.  *See Kindt*, 2003 WL 21453879, at *4 (process used by SLC was

8    thorough where, among other things, "SLC also rooted out additional facts not even alleged by

9    plaintiff.").

10          The SLC then took numerous additional steps to determine how to proceed with regard to

11   the individual defendants.  The SLC, among other things, (i) personally participated in or

12   reviewed memoranda of interviews of numerous current or former Rambus personnel, including

13   virtually all of the individuals named as defendants in the derivative actions; (ii) conducted

14   additional targeted document searches to further research facts regarding the individual

15   defendants' conduct; (iii) instructed SLC counsel to meet with counsel for several of the

16   individual defendants to hear those defendants' respective positions on the claims against them;[15]

17   (iv) held in-person or telephonic meetings on at least twenty occasions;[16] (v) held numerous

18   meetings and discussions with SLC counsel regarding the factual and legal aspects of its

19   investigation; and (vi) reviewed and evaluated specific facts regarding each of the individual

20   defendants and his or her role in the underlying events and analysis of the legal, procedural and

21   evidentiary rules applicable to the claims as well as how any particular course of action would

22   affect the Company.  Rpt. at 17-18.[17]

23

24          [15] *See Oracle*, 852 F. Supp. at 1442 (investigation was in good faith where SLC, "directed its
      counsel to conduct extensive interviews of counsel for the parties," among other things).

25          [16] *See Scalisi*, 2007 WL 2319079, at *7 (fact that special committee met in formal sessions
26   on ten separate occasion was "sufficient to satisfy the reasonableness prong of the
      investigation."); *Genzer v. Cunningham*, 498 F. Supp. 682, 694 (E.D. Mich. 1980) (finding
27   sufficient for the reasonableness inquiry that committee met a dozen times).

28          [17] *See Scalisi*, 2007 WL 2319079, at *6 (fact that special committee, through counsel,
      conducted interviews of 19 persons and reviewed over 375,000 pages of documents supported
                                                                                    (continued...)

1          **3.   THE SLC HAD REASONABLE BASES FOR ITS CONCLUSIONS**

2          The record further shows that the SLC had reasonable bases for its conclusions.  It is

3    important to note that "[i]n reviewing the SLC's conclusions, the Court does not take an

4    independent look at the merits of the lawsuit." *Strougo*, 112 F. Supp. 2d at 367; *see also Katell*,

5    1995 WL 376952, at *12 (same); *Carlton*, 1997 WL 305829, at *16 ("The *Zapata* procedure

6    does not require [the court] to adjudicate the correctness of [the SLC's] determination").  Rather,

7    the Court's inquiry is limited to whether "the SLC's consideration of the merits of the claims was

8    reasonable." *Strougo*, 112 F. Supp. 2d at 367; *Katell*, 1995 WL 376952, at *12.  Thus, the

9    relevant question is whether the SLC's review and conclusions were reasonable.  "In making this

10   determination, the *Zapata* rule forces the court to rely upon the record generated by the SLC."

11   *Strougo*, 112 F. Supp. 2d at 367.

12         As the SLC Report makes clear, the SLC carefully distinguished among the various

13   defendants and the specific claims against them.  The SLC also considered the legal obstacles to

14   potential recovery and the effect a given course of action would have on the Company.  With

15   respect to the settlements with four of the defendants, the SLC explained in detail the reasons

16   why it believed the settlements reached are in the best interest of the Company.  *See* Rpt. at 19-

17   23, 37-42.  Such reasons include, among other things, concerns regarding whether the evidence

18   is sufficient to prove the necessary state of mind element of the various causes of action, the

19   percentage of fault, the potential imputation of various facts to the Company, statute of

20   _____

21         (...continued from previous page)
     conclusion that committee's investigation was in good faith and thorough); *Oracle*, 852 F. Supp.
22   at 1442 (SLC investigation held to be proper and in good faith where SLC reviewed large
     numbers of pleadings, transcripts, depositions, filings, corporate documents, and notes of
23   interviews); *Strougo*, 112 F. Supp. 2d at 365 (good faith investigation where SLC reviewed
     36,000 pages of documents and interviewed 11 persons); *Grafman*, 762 F. Supp. at 220 ("The
24   court is satisfied that the investigation was thorough" where report included review of over
     20,000 documents, evaluation of financial transactions and interviews of 20 witnesses); *Kindt*,
25   2003 WL 21453879, at *3-4 (5-month SLC investigation with assistance of independent legal
     and financial advisors was thorough and in good faith where over 26 persons were interviewed,
26   50,000 pages of documents reviewed, and SLC made conservative legal assumptions); *Carlton*
     *Inv. v. TLC Beatrice Intern. Holdings, Inc.*, No. CIV.A. 13950, 1997 WL 305829, at *8 (Del. Ch.
27   May 30, 1997) (good faith investigation where SLC or its counsel reviewed over 100,000 pages
     of documents and interviewed 23 witnesses, in addition to reviewing deposition transcripts and
28   procuring and reviewing supplemental expert analyses).

1  limitations issues, and the ability to prove damages and loss causation. *Id.* at 19-20, 22, 37-38.

2  With regard to each defendant for whom the SLC recommends dismissal, the SLC conducted a

3  good faith factual and legal analysis of the underpinnings of each asserted claim, and concluded

4  that each claim would likely fail due to significant legal deficiencies and lack of evidentiary

5  support. *Id.* at 23-36, 42-64. Given these determinations, and the finding that continuation of

6  meritless claims would be inappropriate and disruptive to the Company,[18] it was reasonable for

7  the SLC to conclude that it is in Rambus' best interest to terminate the derivative actions as to

8  those defendants. *See Johnson,* 811 F. Supp. at 487-88 (SLC's conclusion to terminate had

9  reasonable basis in the record where SLC's conclusions appeared well reasoned and substantially

10  supported by evidence relied on in its Report.).[19]

11      **C.      THE SLC'S REPORT SHOULD BE ADOPTED BY THE COURT UNDER
                   STEP TWO OF THE *ZAPATA* TEST, IF APPLIED**

12

13      If the Court were to engage in the second step of the *Zapata* analysis, the Court must

14  "determine, through the exercise of its independent business judgment, whether the facts and

15  legal authorities placed before the court establish that continuing the derivative litigation will

16  benefit of the corporation on whose behalf the derivative claim is presented." *Johnson,* 811

17  F. Supp. at 490. The answer in this case is a resounding no.

18      As the SLC Report explains, the SLC concluded that the claims against thirteen

19  defendants are deficient on the merits, are largely stale as the result of the passage of time,

20  mostly fall within the Company's exculpatory provisions, are without sufficient evidentiary

21  support, and would be adverse to the Company's business interests if pursued. To the extent

22

23  [18] Disruption of the company's business is a legitimate factor to be considered by an SLC.
    *See Oracle,* 852 F. Supp. at 1443 ("Derivative litigation is unavoidably distracting to corporate

24  officials whose efforts might more profitably be devoted to the company's business."); *Johnson,*
    811 F. Supp. at 489 (recognizing "the disruptive affect of litigation on day-to-day management").

25  [19] *See also Grafman,* 762 F.Supp. at 221 (independent committee's conclusion to terminate

26  was reasonable where there were legal problems associated with any ultimate recovery and
    litigation costs would exceed company's costs in pursuing the action); *Katell,* 1995 WL 376952,

27  at *10 (special committee's recommendation of dismissal had reasonable basis where committee
    concluded that plaintiffs were unlikely to recover money damages on their claims); *Kaplan,* 499

28  A.2d at 1191 (affirming district court's dismissal of derivative suit under *Zapata,* where
    Committee examined all of the allegations in the complaint and submitted a detailed report).

1  some of the claims alleged against four defendants may have merit, the SLC secured settlement

2  agreements that would bring to Rambus over $28.5 million of value.  By any measure, this is an

3  extraordinary result.

4          On the other hand, continued litigation is costly and risky for the Company.[20]  For

5  example, because of indemnification obligations, Rambus would face not only the costs it

6  incurred in connection with ongoing litigation, but also the defense costs for the individual

7  defendants.  Under these circumstances, it cannot be said that "continuing the derivative

8  litigation will benefit" Rambus "on whose behalf the derivative claim is presented." *Johnson*,

9  811 F. Supp. at 490.  Thus, if the Court chooses to exercise its objective second-step review, the

10  Court should conclude that Rambus' motion to terminate the derivative actions pursuant to the

11  SLC's Report should be granted.

## CONCLUSION

12

13          For the reasons stated above and in the SLC's Report, Rambus respectfully requests that

14  the Court grant its amended motion to terminate and (i) dismiss the derivative actions with

15  prejudice against Ms. Stark, Messrs. Bentley, Chou, Danforth, Dunlevie, Eulau, Harmon,

16  Hughes, Mooring, Tate, Toprani, Sofaer and Drs. Davidow, Farmwald, Geschke, Horowitz and

17  Kennedy, (ii) allow Rambus to take control of the process of asserting claims against Mr. Larsen

18  and realign Rambus as the plaintiff in this action, (iii) and approve the settlement of the

19  litigation.

20

21  Dated: January 9, 2009                    WILSON SONSINI GOODRICH & ROSATI
                                              Professional Corporation
22

23                                            By:  /s/   Ignacio E. Salceda
                                                   Ignacio E. Salceda
24
                                              Attorneys for Nominal Defendant Rambus Inc.
25

26          [20] *Strougo*, 112 F. Supp. 2d at 368 ("the Court may review the direct costs and benefits of
    litigation for the corporation under *Zapata's* second step."); *see also Oracle*, 852 F. Supp. at
27  1444 ("The obvious benefit of settlement to the corporation and its shareholders is the
    termination of all subsequent legal fees and other expenses associated with the derivative
28  litigation").