# Exhibit Q
# Part 2

        (e)      Prior to the Company's annual meeting for 2009, the Company shall amend its bylaws to provide that all director nominees must receive the affirmative vote of a majority of votes cast in order to be elected or re-elected.

**Directors**

**E.    Director Independence**

At least three quarters of the members of the Board shall be "independent directors," as defined below.

        (a)      No director shall qualify as "independent" unless the Board affirmatively determines that the director has no material relationship with the Company (either directly or as a partner, shareholder or officer of an organization that has a relationship with the Company). The Company must identify which directors are independent and disclose the basis for that determination.

        (b)      A director is not independent if:

                (i)      The director is, or has been within the last three years, an employee of the Company, or an immediate family member (as defined by NYSE or other applicable exchange rules) is, or has been within the last three years, an executive officer of the Company.

                (ii)      The director has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than $100,000 in direct compensation from the Company, other than director and committee compensation (*e.g.*, fees and equity awards) and pension or other forms of deferred compensation for prior service.

                (iii)     (A) The director or an immediate family member is a current partner of a firm that is the Company's internal or external auditor; (B) the director is a current employee of such a firm; (C) the director has an immediate family member who is a current employee of such a firm and who participates in the firm's audit, assurance or tax compliance (but not tax planning) practice; or (D) the director or an immediate family member was within the last three years (but is no longer) a partner or employee of such a firm and personally worked on the Company's audit within that time.

(iv) The director or an immediate family member is, or has been within the last three years, employed as an executive officer of another company where any of the Company's present executive officers at the same time serves or served on that company's compensation committee.

(v) The director is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, the Company or property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million, or 2% of such other company's consolidated gross revenues.

(c) Independent directors shall be limited to serving on the boards of no more than five public companies, including the Company, unless the other independent directors consent.

**F.    Director Stock Ownership**

The Company shall retain a compensation consultant to advise the Board as to best practices regarding share ownership guidelines for its directors that are designed to align the interests of the Board with those of shareholders, taking into account share ownership guidelines to ensure that Board members have a sufficient stake in the Company to share in the financial fortunes of shareholders, while also considering the appropriate financial planning and needs of individual directors. The Board shall reassess the Company's share ownership guidelines periodically.

**G.    Meetings in Executive Session**

At each meeting of the Board, the Board shall hold an executive session at which employee directors are not present.

**H.    Lead Independent Director**

In the event that the Company does not have a non-Executive Chairman of the Board, the independent members of the Board shall elect an independent director by secret ballot to act in a lead capacity to coordinate the other independent directors, as described below. The holder of the Lead Director position shall rotate at least once every five (5) years (with that period beginning as of the Effective Date of this agreement). The Lead Director shall be responsible for coordinating the activities of the independent directors. In addition to the duties of all Board members (which shall not be limited or diminished by the Lead Director's role), the specific responsibilities of the Lead

Director are to advise the Chairman of the Board to undertake, or otherwise undertake, the following:

    (a)    determine an appropriate schedule of Board meetings, seeking to ensure that the independent directors can perform their duties responsibly while not interfering with the flow of the Company's operations;

    (b)    prepare agendas for the Board and Committee meetings, and request Committee Chairpersons similarly prepare agendas for their Committee meetings;

    (c)    assess the quality, quantity, and timeliness of the flow of information from the Company's management that is necessary for the independent directors to effectively and responsibly perform their duties, including, as appropriate, specific requests of the Company's management for the inclusion of certain materials for the Board;

    (d)    review the retention of consultants who report directly to the Board;

    (e)    ensure that the Governance and Nominations Committee oversees compliance with and implementation of the Company's corporate governance policies and ensures that the Chairman of the Governance and Nominations Committee oversees the process to recommend revisions to the Company's corporate governance policies;

    (f)    ensure that the Audit Committee oversees compliance with an implementation of the Company's Accounting, Internal Audit and Independent Audit policies and procedures and ensures that the Audit Committee chair is qualified to, and properly discharges his or her duties with respect thereto;

    (g)    coordinate, develop the agenda for, and moderate executive sessions of the Board's independent directors, and act as principal liaison between the independent directors and the Chairman of the Board and/or Chief Executive Officer on sensitive issues;

    (h)    evaluate, along with the members of the Compensation Committee and the full Board, the Chief Executive Officer's performance and meet with the Chief Executive Officer to discuss the Board's evaluation; and

    (i)    the Lead Director shall have the authority to retain such counsel or consultants as the Lead Director deems necessary to perform his or her responsibilities.

**I.      Internal Audit Function**

The Company shall continue to maintain an internal audit function or outsource an internal audit function. The Internal Auditor Director, who shall be appointed by the Board or the Audit Committee and who will report to the Audit Committee at least quarterly, shall monitor the Company's compliance with the internal control environment, and have such other responsibilities as directed by the Audit Committee. The Internal Auditor Director shall be responsible for devising an Internal Audit Plan for each fiscal year which will be presented to and approved by the Audit Committee of the Board. The Internal Audit Plan shall include assessment of the internal control environment in order to ensure that appropriate financial reporting procedures are in place and being followed by the Company's employees. Appropriate Company operations, as dictated by the Internal Audit Plan, shall be subject to an internal audit review each year. A written report shall be prepared for each internal audit performed describing the internal audit's findings, opinions and recommendations, if any. As appropriate, after review and comment from potentially impacted operational departments, these written reports (together with any response from potentially affected departments) shall be directed to the Audit Committee.

**Responsible Corporate Practices**

**J.      Insider Trading Controls**

The General Counsel of the Company shall be appointed as the Insider Trading Compliance Officer, responsible for ensuring compliance with the Company's insider trading and confidentiality policy. The Company has adopted, and the Insider Trading Compliance Officer (or a committee consisting of two of the Company's Chief Financial Officer, the Company's General Counsel and outside counsel) shall be responsible for monitoring and updating (with Board involvement and approval), a comprehensive program (the "Trading Compliance Program") designed to ensure compliance with the Company's trading policies. The Insider Trading Compliance Officer will be responsible for direct oversight of the Trading Compliance Program and members of the Board will have direct access to the Insider Trading Compliance Officer, including the opportunity to meet with such officer outside the presence of any other member of management. In addition to the above:

  (a) The Insider Trading Compliance Officer shall be responsible for pre-clearing all transactions by the Company's directors or those employees subject to Section 16 of the Securities Exchange Act (other than transactions pursuant to pre-approved 10b5-1 plans).

  (b) The Company will take reasonable steps to ensure that all directors and officers timely file all trading forms required by the SEC to be filed by them concerning trading by directors, officers, and executive employees of the Company.

  (c) Failure to comply with the Company's trading policy will result in appropriate sanctions, including potential disgorgement by the individual to the Company of all profits from the transaction, termination, or other appropriate disciplinary action as determined by the Board.

  (d) The Company's trading policy shall prohibit any corporate officer or director from, directly or indirectly, "short-selling" the Company's stock, purchasing a put option on the Company's stock or selling a call option on the Company's stock.

  (e) The Company's trading policy shall contain a trading window provision that prohibits directors, officers and certain other employees from engaging in transactions involving the Company's stock from the period beginning on the 15th day of the last month of each fiscal quarter and ending two trading days following the date of public disclosure of the financial results for that quarter.

**K. Policy Regarding Forfeiture of Bonuses and Profits from Stock Sales**

The Board shall implement a policy requiring the Company to seek disgorgement to the Company certain bonus payments and profits under the following circumstances:

  (a) If the Company is required to prepare an accounting restatement on an interim or annual financial statement included in a report on Form 10-Q or Form 10-K, and there is a finding by a majority of the members of the Board at the time of the Restatement that restatement was due to gross recklessness or intentional misconduct of a responsible Chief Executive Officer or Chief Financial Officer causing material noncompliance with any financial reporting requirement under the federal securities laws; and

  (b) Upon a finding by a majority of the members of the Board described in Section K(a) above, the Company shall seek disgorgement of any portion of the bonus or other

incentive-based or equity-based compensation related to such accounting restatement received by the responsible Chief Executive Officer or Chief Financial Officer from the Company during the 12-month period following the first public issuance or filing with the SEC (whichever first occurs) of the financial document embodying such error due to the gross recklessness or intentional misconduct of the responsible executive officer.

**L.    Corporate Ethics, Honesty and Legal Compliance**

The Company shall maintain its Ethics First policy and otherwise comply with the corporate ethics requirements of the NYSE (or such other nationally recognized exchange, if applicable) and rules and regulations promulgated by the SEC.

**M.    Shareholder Proposals**

The Company shall comply with applicable federal proxy rules and the laws of the State of Delaware regarding shareholder proposals.

**N.    Attendance at Shareholder Meetings**

Each member of the Board shall be encouraged to attend each annual shareholder meeting in person.

## IV.  THE STANDARDS FOR PRELIMINARY APPROVAL OF A DERIVATIVE SETTLEMENT

There is a strong policy favoring compromises that resolve litigation, "particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995). The "'[s]ettlements of shareholder derivative actions are particularly favored because such litigation "is notoriously difficult and unpredictable."'" *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) (citations omitted).

Federal Rule of Civil Procedure 23.1 governs a district court's analysis of the fairness of a settlement of a shareholder derivative action. *Wiener v. Roth*, 791 F.2d 661 (8th Cir. 1986). Under Rule 23.1, a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c).

The Ninth Circuit has provided factors which may be considered in evaluating the fairness of a class action settlement:

> The district court's ultimate determination will necessarily involve a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) (citations omitted). *Accord Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

The district court must exercise "sound discretion" in approving a settlement. *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981); *Torrisi*, 8 F.3d at 1375. Therefore, in exercising its discretion, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625. The Ninth Circuit defines the limits of the inquiry to be made by the court in the following manner:

> Therefore, the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators.

*Id.* (emphasis in original).

## V. THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED AND ULTIMATELY FINALLY APPROVED AFTER NOTICE TO MCAFEE SHAREHOLDERS

At the Settlement Hearing, the Court will have before it detailed papers submitted in support of the proposed Settlement and will be asked to make a determination as to whether the Settlement is fair, reasonable and adequate and in the best interest of those whose claims will be extinguished. At this juncture, however, the parties request only that the Court grant preliminary approval of the Settlement. To grant preliminary approval, the Court need only conclude that a settlement of the

1 claims against the Settling Defendants on the agreed upon terms is within the range of possible
2 approval in order to preliminarily approve the Settlement for the purposes of providing notice and
3 holding a future fairness hearing.[4] Federal Plaintiffs respectfully submit that this Court may easily
4 find that the Settlement is "within the range of possible approval." *See In re Juniper Networks*
5 *Derivative Litig.*, No. 5:06-cv-03396-JW, slip op. (N.D. Cal. Sept. 8, 2008) (granting preliminary
6 approval of $22.6 million settlement consisting of stock option repricing and cancellation and
7 corporate governance); *see also In re Activision, Inc. S'holder Derivative Litig.*, No. CV-06-04771-
8 MRP, slip op. (C.D. Cal. July 21, 2008) (granting final approval of $24.3 million settlement
9 consisting of stock option repricings and cancellations and corporate governance enhancements).
10 *See* Exs. A and B to Declaration of Jeffrey D. Light in Support of Motion for Preliminary Approval
11 of Derivative Settlement ("Light Decl."), submitted herewith.

12 Here, the Settlement was reached after extensive arm's-length negotiations between and
13 among counsel for the Plaintiffs in Actions, the individual defendants (other than Samenuk, Roberts
14 and Weiss), McAfee, and the Special Committee, provides substantial benefits to the Company and
15 its shareholders while eliminating the expense, risk and delay inherent in such complex litigation,
16 including the very real risk of no recovery. *See* Declaration of Charles J. Robel In Support of
17 Motion to Approve Settlement ("Robel Decl."), at ¶¶5-6, 12-13.

18 The McAfee Board of Directors approved the Settlement, concluding the settlement of the
19 Actions under the terms set forth in the Stipulation is in the best interest of the Company, and

---

[4] As the *Manual for Complex Litigation* explains:

> If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval, the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement.

*Manual for Complex Litigation* §30.41, at 237 (3d ed. 1995).

confers a substantial benefit to McAfee. *See* Robel Decl., ¶6 ("The Board agrees that the Settlement and each of its terms are in best interests of McAfee.").[5]

Federal Plaintiffs respectfully submit that the Settlement is an excellent result for McAfee and its shareholders. In connection with the settlement of the Actions, McAfee shall adopt a series of significant industry-leading corporate governance enhancements specifically designed to address the governance shortcomings that Plaintiffs alleged contributed to the climate that gave rise to the option backdating alleged in the Actions. In addition, the Settlement includes a direct financial benefit to McAfee with an intrinsic value of approximately $30 million, based on the cancellation of over 1.7 million options held by certain defendants whom Plaintiffs alleged granted and/or received backdated stock option awards. The Settlement further provides for the assignment to McAfee of claims against defendants Samenuk, Roberts and Weiss which will not be released and may be pursued by McAfee, and thus may yield further value for the Company.

McAfee acknowledge that the Plaintiffs and their counsel were a material factor in obtaining substantial benefits for the Company that are described above and in the Stipulation, ¶3.1. As corporate debacles such as Enron, Tyco and WorldCom demonstrate, strong corporate governance is fundamental to a corporation's economic well-being and success. Indeed, "Courts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies." *Cohn*, 375 F. Supp. 2d at 853 (citing cases).

Moreover, reference to some of the factors considered by courts in granting final approval of derivative and class action settlements lends support to the parties' belief that the proposed Settlement is within the range of possible approval. In determining whether a settlement is fair, courts focus on whether the settlement was reached as a result of good faith bargaining at arm's length without collision. *See In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991). As discussed above, the Settlement was extensively negotiated between experienced counsel with a firm

---

[5] In the absence of a disabling conflict of interest and/or good faith, exercise of business judgment by directors traditionally are afforded significant deference by the court. *See Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981).

understanding of the strengths and weaknesses of the claims and defenses asserted, is the product of significant give and take by the settling parties, and was only reached after extensive negotiations between counsel for the Plaintiffs, the individual defendants, McAfee and the Special Committee with the substantial assistance of Judge Phillips.

An evaluation of the benefits of settlement must also be tempered by a recognition that any compromise involves concessions on the part of all of the settling parties. Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Justice*, 688 F.2d at 624 (citations omitted). Although Federal Plaintiffs believe that the claims asserted in the litigation were meritorious, liability was by no means a foregone conclusion. Had Federal Plaintiffs continued to litigate, there was a risk that they would not have been successful on defendants' attacks on the pleadings, a potential motion to terminate by a Special Litigation Committee, and other pre-trial motions designed to eliminate or curtail Federal Plaintiffs' claims.

Even if Federal Plaintiffs were successful and survived defendants' attacks, continued litigation would be extremely complex, costly and of substantial duration. Document discovery would need to be completed, depositions would need to be taken, experts would need to be designated and expert discovery conducted, defendants' expected motions for summary judgment would have to be briefed and argued and a trial would have to be held. Indeed, significant risks remained in getting past defendants' motions for summary judgment and obtaining a favorable judgment after trial. Even if liability was established, the amount of recoverable damages would still have posed significant issues and would have been subject to further litigation. The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery after several more years of litigation, while providing McAfee and its shareholders substantial benefits. *See Officers for Justice*, 688 F.2d at 625. Indeed, the Ninth Circuit in affirming the district court's approval of settlement of a derivative action noted that the "odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).

It is also clear that even a victory at trial is no guarantee that the judgment would ultimately be sustained on appeal or by the trial court. For example, recently in *In re Apollo Group, Inc. Sec.*

*Litig.*, No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008), the court on a motion for judgment as matter of law, overturned a jury verdict of $277 million in favor of shareholders based on insufficient evidence presented at trial to establish loss causation. Add to these post-trial and appellate risks, the difficulty and unpredictability of a lengthy and complex trial – where witnesses could suddenly become unavailable or the fact finder could react to the evidence in unforeseen ways – and the benefits of the Settlement become all the more apparent.

Finally, significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of those affected by the settlement. *Officers for Justice*, 688 F.2d at 625. McAfee, Plaintiffs, and the counsel for each, have independently considered the Settlement and all agree that it is in the best interests of McAfee and its stockholders. Robel Decl., ¶¶ 6, 13. Here, counsel for Federal Plaintiffs not only have extensive experience in the area of shareholder representative litigation, but have been at the forefront of investigating stock option abuses and are involved in the prosecution of numerous actions on behalf of shareholders alleging stock option abuses in courts nationwide. *See, e.g., Juniper Networks*, slip op; *Activision*, slip op.; *In re Apple Computer, Inc., Derivative Litig.*, No. CV-06-04128-JF, slip op. (N.D. Cal. Nov. 2, 2006); *Alaska Hotel & Rest. Employees Pension Trust Fund v. Sehat Sutardja*, No. C-06-03894-RMW, slip op. (N.D. Cal. Aug. 17, 2006). Light Decl., Exs. A-D. As a result of counsel's unparalleled experience in these types of cases, counsel for Federal Plaintiffs have a unique insight into the legal and factual issues presented. Here, counsel used that expertise and experience to effectively and efficiently prosecute the Actions and reach an excellent result for McAfee and its shareholders. Finally, the assistance of a neutral, well respected mediator, Judge Phillips, also assured a sound result for McAfee and its shareholders.

Moreover, the agreed-to amount of attorneys' fees to be paid to Plaintiffs' Counsel by McAfee is reasonable. In recognition of the substantial benefits bestowed upon McAfee as a result of Plaintiffs' Counsel's efforts, McAfee, acting through its Board of Directors, has agreed to pay and counsel have agreed to accept $13.75 million in attorneys' fees and expenses to Plaintiffs' Counsel. The United States Supreme Court has endorsed this type of consensual resolution of attorneys' fees issues in these kinds of cases as the ideal toward which litigants should strive. *Hensley v. Eckerhart,*

461 U.S. 424, 437, 103 S. Ct. 1933, 1941 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee."). Moreover, where there is no evidence of collusion and no detriment to the parties, the court should give "substantial weight to a negotiated fee amount." *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001).

Here, Plaintiffs' Counsel and McAfee agreed to an attorneys' fee to be paid to Plaintiffs' Counsel after the principal terms of the Settlement were agreed upon. Moreover, Judge Phillips oversaw these arm's-length negotiations, which resulted in an expense provision that is within the range of agreed fees paid in other derivative cases.[6]

## VI. PROPOSED SCHEDULE OF EVENTS

In connection with preliminary approval of the Settlement, the parties are requesting the Court to establish dates by which notice of the Settlement will be distributed to McAfee shareholders, dates by which McAfee shareholders may comment on the Settlement, and a Settlement Hearing. As set forth in the [Proposed] Order Preliminarily Approving Derivative Settlement and Providing for Notice ("Notice Order"), submitted herewith, the parties propose the following:

| | |
|---|---|
| Summary Notice published in *Investor's Business Daily* ("Notice Date") | 10 days after Court enters order preliminarily approving Settlement ("Notice Date") |
| Filing of Notice of Proposed Settlement via a Form 8-K with the SEC | 10 days after Notice Date |
| Last day for McAfee shareholders to comment on the Settlement | 14 days prior to the Settlement Hearing |

---

[6] *See, e.g., Esther Sadowsky Testamentary Trust v. Brendsel*, No. MDL 1584, slip op. (S.D.N.Y. Jan. 8, 2007) (awarding fees of $15.25); *City of Pontiac Gen. Employees' Ret. Sys. v. Langone*, No. 2006-cv-122302, slip op. at ¶16 (Fulton County Ga. June 10, 2008) (awarding $14.5 million in fees in connection with settlement of options backdating allegations); *In re BP P.L.C. Derivative Litig.*, No. 3AN-06-11929CL, slip op. (3d Judicial Dist. Anchorage Alaska May 7, 2008) (awarding $12.19 million in fees); *Activision*, slip op. (awarding $10.75 million fee in connection with settlement of options backdating allegations). Light Decl., Exs. E-G, B.

In addition, the parties propose that the Settlement Hearing be scheduled 45 days after the Notice Date. The Settlement Hearing date can be inserted in ¶2 of the Notice Order by the Court. This schedule is similar to those used in numerous derivative and class action settlements and provides due process to McAfee shareholders with respect to their rights concerning the Settlement. *See, e.g., Juniper Networks*, slip op. at 3; *In re Activision, Inc. S'holder Derivative Litig.*, No. CV-06-04771-MRP(JTLx), slip op. at 2 (C.D. Cal. May 13, 2008); *In re Apple Inc. Derivative Litig.*, No. C-06-04128-JF, slip op. at 2 (N.D. Cal. Sept. 8, 2008). Light Decl., Exs. A, H-I.

## VII. CONCLUSION

The Settlement achieved is an excellent result in light of the risks and delays inherent in the litigation and the complexity and expense if the case proceeded to trial, and in fact constitutes one of the strongest and most comprehensive settlements of its kind to date. Accordingly, Federal Plaintiffs and their counsel respectfully submit that the Settlement is fair, reasonable and adequate and should be preliminarily approved.

DATED: October 1, 2008

Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
TRAVIS E. DOWNS III
ELLEN GUSIKOFF STEWART
JEFFREY D. LIGHT
BENNY C. GOODMAN III


        s/ Jeffrey D. Light
        JEFFREY D. LIGHT

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
AELISH M. BAIG
CHRISTOPHER M. WOOD
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

|   |   |
|---|---|
| 1 | |
| 2 | SCHIFFRIN BARROWAY TOPAZ<br>& KESSLER LLP |
| 3 | ERIC L. ZAGAR<br>ROBIN WINCHESTER |
| 4 | JAMES A. MILLER<br>280 King of Prussia Road |
| 5 | Radnor, PA 19087<br>Telephone: 610/667-7706 |
| 6 | 610/667-7056 (fax) |
| 7 | Co-Lead Counsel for Plaintiffs |

S:\Settlement\McAfee.set\BRF PRELIM APPROVAL 00054390.doc

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE
SETTLEMENT AND P&A'S IN SUPPORT THEREOF - 5:06-cv-03484-JF

- 26 -

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 1, 2008.

s/ Jeffrey D. Light
JEFFREY D. LIGHT

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: jeffl@csgrr.com

## Mailing Information for a Case 5:06-cv-03484-JF

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Benjamin B. Au**
  bau@kvn.com,efiling@kvn.com,apicar@kvn.com,alm@kvn.com

- **Aelish Marie Baig**
  AelishB@csgrr.com,khuang@csgrr.com

- **Clay Basser-Wall**
  cbasserwall@wsgr.com

- **Travis E. Downs , III**
  travisd@csgrr.com,e_file_sd@csgrr.com

- **N Scott Fletcher**
  sfletcher@velaw.com,eklager@velaw.com

- **William S. Freeman**
  freemanws@cooley.com,galancr@cooley.com

- **Jo W. Golub**
  jgolub@kvn.com,efiling@kvn.com

- **Sarah A. Good**
  sgood@howardrice.com,bhastings@howardrice.com

- **William M. Goodman**
  wgoodman@kasowitz.com

- **Robert S. Green**
  CAND.USCOURTS@CLASSCOUNSEL.COM

- **Brandon Kimura**
  bkimura@cooley.com,tcarney@cooley.com

- **Elliot Remsen Peters**
  epeters@kvn.com,efiling@kvn.com,aap@kvn.com

- **John Mark Potter**
  johnpotter@quinnemanuel.com,amberburns@quinnemanuel.com,matthewgardner@quinnemanuel.com,westonreid@quinnemanuel.com

- **Joshua A. Reiten**
  jreiten@howardrice.com,aaustin@howardrice.com

- **Avin P. Sharma**
  asharma@vbllaw.com

- **Clara Shin**
  cshin@hrice.com,ccamp@howardrice.com

- **Robert James Slaughter**
  rjs@kvn.com,kjb@kvn.com,efiling@kvn.com,mls@kvn.com

- **DeMaurice Fitzgerald Smith**
  DeMaurice.Smith@lw.com

- **John P. Stigi , III**
  jstigi@sheppardmullin.com,mvanterpool@sheppardmullin.com

- **Gregory Lewis Watts**
  gwatts@wsgr.com,lbeltran@wsgr.com

- **Shawn A. Williams**

shawnw@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

- **Eric L. Zagar**
  ezagar@sbtklaw.com,kpopovich@sbtklaw.com,der_filings@sbtklaw.com,rwinchester@sbtklaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Michael C. Holmes
Vinson & Elkins, L.L.P.
1001 Fannin Street
2500 First City Tower
Houston, TX 77002

Heather M. McPhee
Patton Boggs, LLP
2550 M Street, N.W.
Washington, DC 20037

James H Miller
Schriffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087

Sandra G. Smith
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087
```

**Manual Notice List**

Robert B. Weiser
The Weiser Law Firm, P.C.
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
   610/225-2677
   610/225-2678 (Fax)