**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE UNITEDHEALTH GROUP INCORPORATED SHAREHOLDER DERIVATIVE LITIGATION | Master File No. 06-1216 JMR/FLN |

**LEAD PLAINTIFFS' COUNSEL'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR APPROVAL OF AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..............................................................................................................1

ARGUMENT.....................................................................................................................2

    I.       LEAD PLAINTIFFS' DETAILED COMPLAINT ESTABLISHED
            THE FRAMEWORK FOR THIS LITIGATION, THE SLC'S WORK,
            AND THE SO-CALLED INDEPENDENT COMMITTEE....................................... 2

    II.      LEAD PLAINTIFFS' CENTRAL ROLE IN THIS LITIGATION
            CONTRIBUTED ENORMOUSLY TO THE PROCESS AND TO THE
            FAVORABLE OUTCOME .................................................................................4

    III.     DEFENDANTS INCORRECTLY SUGGEST THAT THE APPROPRIATE
            MEASURE FOR EVALUATING THE FEE HERE IS THE SLC'S WORK
            AND THEY IGNORE THE ROLE OF LEAD PLAINTIFFS AND DEFENSE
            COUNSEL'S APPROACH TO THE LITIGATION..............................................7

    IV.    CORPORATE GOVERNANCE REFORMS ADOPTED BY THE
            COMPANY WERE THE RESULT OF LEAD PLAINTIFFS' PROPOSALS .........11

    V.      THE MODEST MULTIPLIER SOUGHT BY LEAD PLAINTIFFS'
            COUNSEL IS ENTIRELY REASONABLE ....................................................12

CONCLUSION................................................................................................................14

## TABLE OF AUTHORITIES

**Page**

**Federal Cases:**

*Cohn v. Nelson,* 375 F. Supp. 2d 844
    (E.D. Mo. 2005) ................................................................................................ 13

*Evans v. Paulson,*
    479 F. Supp. 2d 1014 (D. Minn. 2007) ............................................................. 12

*In re Patterson Cos. Sec., Deriv. & ERISA Litig.,*
    No. 05-1818 (PAM/JSM), 2007 WL 1541492
    (D. Minn. May 24, 2007) .................................................................................. 12

*Reimel v. MacFarlane,*
    9 F. Supp. 2d 1062 (D. Minn. 1998) ................................................................ 12

**State Cases:**

*Drilling v. Berman,*
    589 N.W.2d 503 (Minn. Ct. App. 1999) ........................................................... 12

*In re Cablevision Sys. Corp. Options Backdating Litig.*
    Index No. 06/12743 (Sup. Ct. N.Y.) ................................................................. 13

*In re Monster Worldwide, Inc. Deriv. Litig.,*
    No. 06-108700 (Sup. Ct. N.Y.) ......................................................................... 13

*Skoglund v. Brady,*
    541 N.W.2d 17 (Minn. Ct. App. 1995) ............................................................. 12

**INTRODUCTION**

What distinguishes this case from other derivative actions is that the Court-appointed Lead Plaintiffs and their counsel worked collaboratively with the special litigation committee (the "SLC") and its counsel to achieve a tremendous recovery for the Company and its shareholders.  This collaborative effort resulted from the Lead Plaintiffs' Counsel's invitation to the SLC to participate in the mediation overseen by former federal Judge Layn Phillips.  From that point forward, although not always seeing eye-to-eye on every issue, Lead Plaintiffs' Counsel and the SLC worked together in a manner that helped result in the historic recovery now before the Court.

What also separates this case from so many other derivative actions is that the Court agreed with Lead Plaintiffs that discovery should proceed, despite the fact that in response to Lead Plaintiffs' compelling 145-page Complaint the Company had appointed both a so-called "independent committee" (which produced the WilmerHale Report) and an SLC.  Through discovery, Lead Plaintiffs and their Counsel:

- Conducted an efficient and closely coordinated analysis and review of more than 16 million pages of documents resulting in findings that the SLC apparently did not make on its own;

- Prepared many detailed analyses and memoranda regarding the evidence against the defendants, which was shared with the SLC as part of the collaborative efforts among the Lead Plaintiffs' Counsel and the SLC; and

- Independently assessed the underlying facts and documents supporting the case, which allowed Lead Plaintiffs and Lead Plaintiffs' Counsel to actively participate in the mediation and settlement of this matter and to prepare for trial in the event that a settlement could not be achieved.

In the face of this, many of the same defendants who were directly involved in the

1

wrongdoing at issue – and who either profited from it or knowingly tolerated it – and

their lawyers now are trying to diminish the significance of the accomplishments in this

case and the central contributions made by the Lead Plaintiffs and their Counsel. As part

of this effort, the individual defendants and their counsel rely on unfounded assertions,

mischaracterizations, and other sharp statements which simply are not correct. Many of

defendants' assertions are directly refuted by Lead Plaintiffs' Counsel's opening papers

about this matter. [Docket Nos. 387-99.] In addition, Lead Plaintiffs' Counsel offers the

following response to defendants' misplaced assertions.

## ARGUMENT

### I. LEAD PLAINTIFFS' DETAILED COMPLAINT ESTABLISHED THE FRAMEWORK FOR THIS LITIGATION, THE SLC'S WORK, AND THE SO-CALLED INDEPENDENT COMMITTEE

It is important to recall that Lead Plaintiffs' Counsel's investigation into the

subject matter of this lawsuit began long before the SLC was appointed and began its

work. Beginning in March 2006, Lead Plaintiffs' Counsel undertook an in-depth

investigation and analysis of the (then unconfirmed) option backdating at UnitedHealth.[1]

Lead Plaintiffs' Counsel worked with investigators, experts, financial analysts, and others

to develop the strongest case possible on behalf of the Company in the interests of

shareholders. Lead Plaintiffs filed initial complaints beginning in late March 2006, and

in September 2006 Lead Plaintiffs filed their amended and consolidated verified

---

[1]    The facts set forth in this memorandum are verified by the supporting Supplemental Declaration of Karl. L. Cambronne, Court-appointed Lead Counsel, (the "Supp. Cambronne Decl.") ¶2.

complaint (the "Complaint") – comprised of over 300 paragraphs of detailed factual allegations.  [Docket No. 134.]  The compelling allegations made by Lead Plaintiffs in their initial complaints and in their consolidated Complaint impacted all that followed in this litigation.  For instance, there would have been no SLC appointed by the Company in 2006 were it not for this litigation, and the same can be said of the "independent" committee.   Before Lead Plaintiffs filed their complaints, the Company and these defendants had for years done nothing to halt the option backdating at UnitedHealth, and certainly there had never been any effort by these defendants (or anyone else at the Company) to appoint an SLC or an "independent" committee before Lead Plaintiffs initiated this litigation.[2]

Furthermore, the review undertaken by the SLC and the "independent" committee no doubt benefited from the analysis and detailed allegations set forth in Lead Plaintiffs' complaints.  The board resolution establishing the SLC confirms that the entire reason for appointing the SLC was so that it could "investigate the Derivative Claim and the claims raised in the Derivative Actions."  *See* Joint Decl. in Supp. of Proposed Settlement of Derivative Action and Award of Attorneys' Fees and Reimbursement of Litigation Expenses [Docket No. 391] ("Joint Decl.") Ex. D.  As such, the SLC's report focuses almost exclusively on the claims initiated and prosecuted vigorously by Lead Plaintiffs

---

[2]   Indeed, five of the defendants opposing Lead Plaintiffs' Counsel's fee request served on the UnitedHealth compensation committee during the time of wrongdoing – defendants William C. Ballard, Jr., James A. Johnson, Thomas H. Kean, Mary O. Mundinger and Robert L. Ryan.  Following initiation of this litigation, four of these individuals (Johnson, Kean, Mundinger and Ryan) did not seek reelection to the UnitedHealth Board.

and their Counsel.  [Docket Nos. 298-99.]  Also, defendants' suggestion that the results of the "independent" committee investigation, including the so-called "voluntary" repricings of options by certain defendants, were unrelated to this litigation is absurd.  It is clear that the "independent" committee and defendants were attempting to remedy the wrongs at issue in this litigation.  As a result, defendants made certain concessions, which were steps in the right direction (albeit insufficient steps) – but those concessions were plainly a result of the derivative litigation brought by the Lead Plaintiffs.

## II.   LEAD PLAINTIFFS' CENTRAL ROLE IN THIS LITIGATION CONTRIBUTED ENORMOUSLY TO THE PROCESS AND TO THE FAVORABLE OUTCOME

In addition to the points detailed above, Lead Plaintiffs' Counsel successfully defeated defendants' attempt to prevent Lead Plaintiffs from moving forward with discovery.  The Court agreed with Lead Plaintiffs' Counsel that discovery should proceed, despite the work of the "independent" committee and the appointment of an SLC.  Lead Plaintiffs' access to the underlying documents put enormous (and well deserved) pressure on defendants, because Lead Plaintiffs' Counsel were able to build on their robust allegations by reference to millions of pages of relevant documents.  As a result, defendants thereafter agreed with Lead Plaintiffs that the parties should attempt to resolve the case through mediation.

Lead Plaintiffs' Counsel then made the ground-breaking decision to invite the SLC and its counsel (months before the SLC issued its report in December 2007) to participate in the mediation in what would become a tripartite mediation – among defendants, Lead Plaintiffs, and the SLC.  Lead Plaintiffs and their Counsel were under

no obligation to invite the SLC to participate in the mediation, and indeed Lead Counsel is unaware of any precedent for this type of a tripartite mediation in the context of a derivative action.  Lead Plaintiffs' Counsel were hopeful that by bringing the SLC to the table perhaps a resolution satisfactory to shareholders, the Court, and the SLC could be achieved without the need to put the Company through a trial or at least further protracted litigation.  The SLC accepted Lead Plaintiffs' invitation to participate in the mediation, and with the able assistance of Judge Phillips, Lead Plaintiffs' Counsel and the SLC began working together toward the common goal of reaching a conclusion that would be in the best interests of the Company and its shareholders.

As part of this process, Lead Plaintiffs' Counsel had hundreds of communications with the SLC and its counsel – including meetings in person, through memoranda, by email, and by telephone.  For instance, a review of Lead Counsel (Karl Cambronne's) time entries alone show at least *108* such communications with the SLC and its counsel, and the other Lead Plaintiffs' Counsel had numerous additional communications with the SLC.  Supp. Cambronne Decl. ¶3.  These were substantive discussions – discussions to which defendants were not privy – about the evidence being developed in the case, the strength of the legal claims asserted, the importance to shareholders of particular matters, strategic issues related to the mediation and defendants' positions, and other related matters.   Lead Plaintiffs' Counsel also prepared memoranda (with supporting attachments) that were shared with the SLC addressing matters such as:   damages attributable to the option backdating; expert reports supporting the allegations at issue;

5

the need for particular corporate governance reforms at the Company; and the culpability

of certain defendants in particular.[3]

Although Lead Plaintiffs' Counsel and the SLC have not always agreed on all

issues, throughout this case Lead Plaintiffs' Counsel and the SLC have worked together

in a professional manner with mutual respect.  For instance, at the arbitration conducted

by Judge Phillips regarding the amount that defendant William Spears would be required

to pay as part of the settlement, counsel for the SLC and Lead Plaintiffs' Counsel made

separate but complementary arguments in favor of a substantial payment to be made by

Spears.  Each counsel emphasized different facts and points, but the arguments were

aimed at achieving the same goal, and they did just that.  (Spears was required to pay

over $7 million for his involvement in the scandal.)  Indeed, even the night before the

SLC released its report, the SLC and Lead Plaintiffs' Counsel were together going over

aspects of the report.  In short, from the time when Lead Plaintiffs' Counsel invited the

SLC to participate in the mediation, this became a collaborative effort among the SLC

and Lead Plaintiffs – and defendants are in no position to challenge that fact.

In addition to the hundreds of communications noted above between the SLC and

Lead Plaintiffs' Counsel, Judge Phillips and Lead Plaintiffs' Counsel also had countless

telephone calls, meetings, emails, and other communications with one another in

connection with their efforts to settle the case.  In addition to Lead Plaintiffs' initial

---

[3]     Of course, defendants never had access to this work product.  Lead Plaintiffs'
Counsel is prepared to produce these materials to the Court for its review on an *in camera*
basis.

mediation statement, Lead Plaintiffs also provided Judge Phillips with supplemental memoranda he requested. These are all additional categories of communications to which defendants were not privy. Nonetheless, defendants allege that Lead Plaintiffs' Counsel "played a minimal role in the global settlement of the derivative actions." Defs.' Mem. at 8. Defendants' allegation should be given no weight, particularly in light of the fact that their counsel has refused to allow Judge Phillips to submit a declaration to the Court about the mediation and settlement process, including the contributions of the various parties. The Dorsey & Whitney firm objected to the filing of a declaration from Judge Phillips about this matter, despite the fact that Judge Phillips' role in this case makes him uniquely qualified to comment on the contributions of the various parties to the outcome here. Defendants' action in this regard speaks volumes about their unfounded assertions against Lead Plaintiffs' Counsel.

**III.   DEFENDANTS INCORRECTLY SUGGEST THAT THE APPROPRIATE MEASURE FOR EVALUATING THE FEE HERE IS THE SLC'S WORK AND THEY IGNORE THE ROLE OF LEAD PLAINTIFFS AND DEFENSE COUNSEL'S APPROACH TO THE LITIGATION**

Defendants' argument that the SLC's fees of approximately $9.2 million should somehow define a reasonable fee for Lead Plaintiffs' Counsel is misplaced for several reasons.

First, Defendants ignore the separate and critical role that Lead Plaintiffs' Counsel played here. In addition to the points discussed in prior sections, Lead Plaintiffs' Counsel also vigorously litigated with defendants over matters that the SLC never needed to be troubled with, such as whether the case should be dismissed or stayed, whether summary

judgment should be granted, whether an injunction should be issued concerning certain of

the defendants' assets, and whether and when defendants should have to produce

documents.  Lead Plaintiffs' Counsel also owed a fiduciary duty to their clients and other

shareholders to undertake an independent review of the strength of the claims at issue and

prepare the case for trial in case it did not settle or the Court did not approve the

settlement.  The SLC did not have to concern itself with these matters.  Rather than

having to litigate with defendants, as Lead Plaintiffs' Counsel did, the SLC generally

obtained the cooperation of defendants and the Company.  The Company and the

individual defendants forced Lead Plaintiffs' Counsel to invest more professional time in

the case than would have been otherwise necessary.  For instance, defendants refused

Lead Plaintiffs' Counsel's reasonable requests for copies of the WilmerHale interview

summaries (which is one reason why deposition summaries were necessary), and the

Company through the Dorsey firm repeatedly refused to produce option summary

information that was readily available to defendants, thereby forcing Lead Plaintiffs to

piece together the information through far less efficient means.

Second, defendants' arguments should be considered in light of the fact that

defendants themselves charged the Company for attorneys' fees many times more than

what the SLC charged, and much more than Lead Plaintiffs' Counsel seek as fees.

Defense counsel in this case have informed Lead Plaintiffs that they long ago burned

through the Company's entire $175 million of directors' and officers' liability insurance.

Any comparison of the fees charged by defense counsel in these actions with the fee

sought by Lead Plaintiffs' Counsel would only show that defendants are in no position to disparage the reasonable fee request of Lead Plaintiffs' Counsel.

Third, defendants have no basis to assert that Lead Plaintiffs' review of the documents was inefficient. In fact, it was tightly coordinated, organized, and highly efficient. Lead Counsel allocated responsibility for reviewing the documents in a manner that avoided duplicated effort, and weekly calls were conducted among counsel to compare findings and to ensure coordination among the reviewers. The millions of pages of documents required a significant effort to complete the review in a timely and useful manner. The Dorsey firm certainly should not be heard complaining about that fact, considering that the firm submitted a declaration earlier informing the Court that "[a] team of over 50 Dorsey & Whitney attorneys are engaged in the review" of the documents at issue. Supp. Cambronne Decl. Ex. C. As discussed further above, the review and analysis of these documents by Lead Plaintiffs' Counsel contributed significantly to the mediation process and the outcome of the case.

Fourth, Lead Plaintiffs' Counsel's review of the depositions was an efficient approach to the depositions. It is important to recall that in December 2007, the Court expressed some concern about whether the settlement in principle was "adequate" [Docket No. 308 at 13], and only on December 19, 2008, just over a year later, did the Court grant preliminary approval of the settlement. [Docket No. 381.] Accordingly, Lead Plaintiffs' Counsel could have insisted on participating in the depositions because of the uncertainty about approval. In the interest of efficiency, Lead Plaintiffs' Counsel instead reviewed the depositions and used them to further evaluate the settlements from

9

Lead Plaintiffs' perspective.   Defendants knew this was Lead Plaintiffs' Counsel's approach at the time, and defendants expressed no objection or concern then.   For these several reasons, defendants have no reason to criticize Lead Plaintiffs' Counsel for finding an efficient approach to the depositions.

Fifth, Defendants' assertions regarding the rates of Lead Plaintiffs' Counsel are misplaced.  This was a national case.  Defendants were represented by firms, in addition to Minnesota firms, such as:  Weil Gotshal & Manges LLP (for defendants other than William McGuire, David Lubben and William Spears), Latham & Watkins LLP (for defendant McGuire); Morrison & Foerster LLP (for defendant Spears); and Foley & Larder LLP (for defendant Lubben).  The SLC was represented both by a Minnesota firm as well as a national firm, Munger & Tolles.  The mediator selected by mutual agreement among the parties (Judge Phillips) does not practice in Minnesota, but instead is based in California and has a national practice.   In short, parties on all sides as well as the mediator were relying on counsel with national practices and rates.  Furthermore, even if one considers the rates of Dorsey & Whitney, it is clear that the rates of Lead Plaintiffs' Counsel are entirely appropriate.  *See* Supp. Cambronne Decl. Ex. A.  Moreover, the standard rates used by Lead Plaintiffs' counsel here have been approved by Courts across the country.

Finally, it is noteworthy that not a single shareholder of the Company or anyone else (other than defendants) has objected to the fee requested by Lead Plaintiffs' Counsel. Particularly in light of their own approach to this case, defendants and their counsel are in no position to criticize Lead Plaintiffs' Counsel for their valuable work on the case.

**IV.   CORPORATE GOVERNANCE REFORMS ADOPTED BY THE COMPANY
WERE THE RESULT OF LEAD PLAINTIFFS' PROPOSALS**

Lead Plaintiffs and their Counsel developed and proposed detailed corporate

governance reforms, many of which have been adopted by the Company.   The

Company's in-house lawyers, outside counsel, and corporate governance experts met in

person with Lead Plaintiffs and their Counsel to analyze these proposals in detail.  (The

individual defendants objecting to Counsel's fee application were not involved in any of

those discussions.)  Many of the proposals advanced by Lead Plaintiffs and their counsel

were ultimately adopted and used by the Company in resolving the PSLRA case.

Defendants' assertions now to the contrary are belied by numerous statements

made to Lead Counsel by the Dorsey firm, including in an August 20, 2008 letter stating:

> We appreciate the time and effort taken to discuss corporate
> governance matters since the filing of the derivative lawsuits.  We
> have taken into consideration the various suggestions made and, as I
> think you know, some of ***the proposals made by your co-counsel
> and clients have aided the Company in resolving the PSLRA
> action***.   Indeed, many of the concerns expressed have been
> addressed through the changes the Company has made since the
> filing of the derivative actions.   We believe that ***these are
> substantial improvements that will benefit the corporation and
> therefore your clients as derivative plaintiffs***.
> . . . .
>
> ***The changes made by UnitedHealth Group address, and were
> responsive to, many of the concerns raised by the derivative
> plaintiffs*** and are fully accounted for as part of the settlement
> achieved in these matters.
> . . . .
>
> Together we can proudly state that no public company has ever
> made such substantial meaningful changes in such a short period of
> time.  We look forward to presenting this to the Courts as we work
> together to obtain final approval of the historic settlements.

Supp. Cambronne Decl. Ex. B (emphasis added).  It is beyond dispute that the Lead

Plaintiffs and their Counsel developed and successfully advocated for the corporate

governance reforms which have been adopted by the Company in response to the

backdating scandal challenged in this derivative litigation.

**V.     THE MODEST MULTIPLIER SOUGHT BY LEAD PLAINTIFFS' COUNSEL IS
         ENTIRELY REASONABLE**

Before this case was pursued, and even deep into the case, defendants claimed that

there was no option backdating at UnitedHealth.  There was no assurance that any

significant recovery could be obtained, and there always was the risk that the Lead

Plaintiffs' case would be stayed indefinitely or dismissed as a result of an attempt by the

SLC to terminate the litigation.  Defendants would like to suggest now that obtaining the

enormous recovery here was always a foregone conclusion; but that simply is not true.

Indeed, shareholder derivative jurisprudence in Minnesota is largely unfavorable to

shareholders.  Minnesota courts routinely dismiss derivative suits on the grounds of

demand futility or because of the appointment of a special litigation committee. *See, e.g.,*

*In re Patterson Cos. Sec., Deriv. & ERISA Litig.*, No. 05-1818 (PAM/JSM), 2007 WL

1541492 (D. Minn. May 24, 2007) (dismissing derivative suit based on special litigation

committee's determination to dismiss); *Evans v. Paulson*, 479 F. Supp. 2d 1014 (D.

Minn. 2007) (dismissing derivative suit for failure to make pre-suit demand); *Reimel v.*

*MacFarlane*, 9 F. Supp. 2d 1062 (D. Minn. 1998) (same); *Drilling v. Berman*, 589

N.W.2d 503 (Minn. Ct. App. 1999) (affirming special litigation committee's

determination to dismiss); *Skoglund v. Brady*, 541 N.W.2d 17 (Minn. Ct. App. 1995)

(same).  The risks here were significant, and the investment made in the case by Lead

Plaintiffs' Counsel was massive.[4]

For the risk assumed in connection with this case, Lead Plaintiffs' Counsel seek a

modest multiplier of approximately 2.95.  (In comparison, the State Derivative Plaintiffs

seek a multiplier of 4.82 and the PSLRA plaintiffs seek a multiplier of approximately

6.0.)  Lead Plaintiffs' Counsel's request is entirely reasonable under the appropriate

standards.  *See Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) (awarding

attorneys' fees amounting to a 2.9 multiplier).

---

[4]     The D&O Diary database, which is cited by defendants and lists 39 instances
where stock option backdating derivative lawsuits were dismissed, further demonstrates
the significant risks undertaken by Lead Plaintiffs and their counsel in this action.
http://69.177.1.186/clients/_blog/optionsbackdatingtable.doc.  Moreover, the recovery in
this action far exceeds the recoveries in the stock option backdating derivative
settlements cited by defendants on page 23 of their opposition memorandum and
described by the D&O Diary.  None of the recoveries cited by defendants exceeds the
recoveries cited by Lead Plaintiffs in their opening memorandum to demonstrate that the
recovery here is several times larger than those recoveries.  *See, e.g., In re Cablevision
Sys. Corp. Options Backdating Litig.*, Index No. 06/12743 (Sup. Ct. N.Y.) (Final Order
and Stipulation of Settlement) (partial settlement valued at $34.4 million) (Joint Decl. Ex.
F); *In re Monster Worldwide, Inc. Deriv. Litig.*, No. 06-108700 (Sup. Ct. N.Y.) (Final
Order and Stipulation of Settlement) (monetary component of partial settlement valued at
$32.3 million) (Joint Decl. Ex. G).  The results obtained in this action reflect the extent of
the defendants' wrongdoing and the excellent results achieved by Lead Plaintiffs'
prosecution of this action, not simply the size of UnitedHealth.  *Cf.* Defs.' Mem. at 26-27.

## CONCLUSION

For the reasons discussed in Lead Plaintiffs' Counsel's opening memorandum and for all of the foregoing reasons, Lead Plaintiffs' Counsel respectfully request the Court grant the Fee Request, which includes reimbursement of reasonable litigation expenses.

Dated:  February 9, 2009                        CHESTNUT & CAMBRONNE, P.A.

                                                By /s/  Karl L. Cambronne
                                                    Karl L. Cambronne #14321
                                                    Jack L. Chestnut #16378
                                                    Jeffrey D. Bores #227699
                                                    3700 Campbell Mithun Tower
                                                    222 South Ninth Street
                                                    Minneapolis, MN 55402
                                                    Telephone: (612) 339-7300
                                                    Fax: (612) 336-2940

BERNSTEIN LITOWITZ BERGER &
   GROSSMANN LLP
Chad Johnson
Beata Farber
Adam Wierzbowski
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Fax: (212) 554-1444

SHAPIRO HABER & URMY LLP
Thomas G. Shapiro
Edward F. Haber
Michelle H. Blauner
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Fax: (617) 439-0134

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
Michael Barry
45 Rockefeller Center, 15th Floor
New York, NY  10111
Telephone: (646) 722-8500
Fax:  (646) 722-8501

RICE, MICHELS & WALTHER LLP
Brian Rice, #14468X
Ann Walther, #21369X
Karin E. Peterson, #185048
206 East Bridge, Riverplace
10 Second Street Northeast
Minneapolis, MN  55413
Telephone: (612) 676-2300
Fax: (612) 676-2319

*Counsel for Lead Plaintiffs*

KLAUSNER & KAUFMAN, P.A.
Robert D. Klausner
10059 N.W. First Court
Plantation, FL  33323
Telephone: (954) 916-1202
Fax: (954) 916-1232

*Additional Counsel for Jacksonville Police
& Fire Pension Fund and Louisiana
Sheriffs' Pension & Relief Fund*