1
2

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

3

------------------------------------------------------------

IN RE:  UNITEDHEALTH GROUP,        Federal Case No.: 0:06-cv-01216
4      INCORPORATED, SHAREHOLDER       State Case No.: 27-cv-068085
       DERIVATIVE LITIGATION
5                                        TRANSCRIPT

6                                           OF

7                                       PROCEEDINGS

8                                  (FINAL SETTLEMENT HEARING)

9      ------------------------------------------------------------

10

11

12             The above-entitled matter came on for hearing

13     before Judge James M. Rosenbaum and Judge George F.

14     McGunnigle, on February 13th, 2009, at the United States

15     District Courthouse, 300 South Fourth Street, Minneapolis,

16     Minnesota 55415, commencing at approximately 11:00 a.m.

17

18

19

20                                  CALIFORNIA CSR NO.:  8674

21                                  ILLINOIS CSR NO.:  084-004202

22                                     IOWA CSR NO.:  495

23                                     RMR NO.:  065111

24

25

1                          <u>APPEARANCES</u>

2                          CHESTNUT & CAMBRONNE, 222 South Ninth Street,

3     Suite 3700, Minneapolis, Minnesota 55402 by JACK L. CHESTNUT

4     and KARL L. CAMBRONNE, Attorneys at Law; and

5                          COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, LLP,

6     655 W. Broadway, Suite 1900, San Diego, California 92101, by

7     RAMZI ABADOU and ANDREW BROWN, Attorneys at Law; and

8                          BERNSTEIN, LITOWITZ, BERGER & GROSSMANN, LLP,

9     1285 Avenue of the Americas, 38th Floor, New York, New York

10    10019, by C. CHAD JOHNSON, Attorney at Law, appeared as

11    counsel on behalf of federal court plaintiffs.

12                         HEAD, SEIFERT & VANDER WEIDE, 333 South Seventh

13    Street, Suite 1140, Minneapolis, Minnesota 55402-2421, by

14    VERNON J. VANDER WEIDE, Attorney at Law; and

15                         GARDY & NOTIS, LLP, 440 Sylvan Avenue,

16    Englewood Cliffs, New Jersey 07632, by MARK C. GARDY,

17    Attorney at Law, appeared as counsel on behalf of state court

18    plaintiffs.

19                         DORSEY & WHITNEY, LLP, 50 South Sixth Street,

20    Suite 1500, Minneapolis, Minnesota 55402-1498, by PETER W.

21    CARTER and KATIE C. PFEIFER, Attorneys at Law, appeared as

22    counsel on behalf of defendants, with the exception of

23    defendants, William C. McGuire, David J. Lubben and William

24    G. Spears.

25

1              APPEARANCES (Continuing)

2                   FELHABER, LARSON, FENLON & VOGT, PA, 220 South

3    Sixth Street, Suite 2200, by DAVID L. HASHMALL, Attorney at

4    Law, appeared as counsel on behalf of defendant, William G.

5    Spears.

6                   BRIGGS and MORGAN, 2200 IDS Center, 80 South

7    Eighth Street, Minneapolis, Minnesota 55402, by RICHARD G.

8    MARK, Attorney at Law, appeared as counsel on behalf of

9    defendant, David J. Lubben.

10                   FLYNN, GASKINS & BENNETT, LLP, 333 South

11   Seventh Street, Suite 2900, Minneapolis, Minnesota 55402, by

12   STEVE W. GASKINS, Attorney at Law, appeared as counsel on

13   behalf of defendant, Dr. William C. McGuire.

14                   KELLY & BERENS, PA, 80 South Eighth Street,

15   Suite 3720, Minneapolis, Minnesota 55402, by BARBARA P.

16   BERENS, Attorney at Law, appeared as counsel on behalf of

17   UnitedHealth Special Litigation Committee.

18

19

20

21

22

23

24

25

1           THE CLERK:  Your Honors, the matter on the

2    calendar is Civil Number 06-1216 on the federal side; on the

3    state side, Court File 27 Civil 068085.

4           Will counsel please stand and state their

5    appearances for the record.

6           MR. CAMBRONNE:  Good morning, your Honors.

7    Karl Cambronne appearing on behalf of plaintiffs.

8           JUDGE ROSENBAUM:  Good morning, Mr. Cambronne.

9           MR. JOHNSON:  Good morning, your Honors.  Chad

10   Johnson of Bernstein, Litowitz on behalf of the St. Paul

11   Teachers' Retirement Fund and five of the other institutional

12   investor lead plaintiffs in the federal derivative action.

13          JUDGE ROSENBAUM:  Counsel.

14          MR. VANDER WEIDE:  Good morning, your Honors.

15   Vern Vander Weide on behalf of the state action plaintiffs.

16          JUDGE McGUNNIGLE:  Good morning to all counsel.

17          MR. CHESTNUT:  Good morning, your Honors.  Jack

18   Chestnut, Chestnut & Cambronne, on behalf of plaintiffs.

19          JUDGE ROSENBAUM:  Mr. Chestnut.

20          MR. GARDY:  Mark Gardy, Gardy & Notis, on

21   behalf of state court plaintiffs.

22          JUDGE ROSENBAUM:  Mr. Gardy.

23          MR. ABADOU:  Good afternoon, your Honors.

24   Ramzi Abadou of Coughlin, Stoia, Geller, Rudman & Robbins on

25   behalf --

1                     JUDGE ROSENBAUM:   You're just a tourist here
2          today.
3                     MR. ABADOU:   I'm sorry, your Honor?
4                     JUDGE ROSENBAUM:   You're just a tourist here
5          today.
6                     MR. ABADOU:   Well, we'll see, your Honor.   We
7          didn't expect to have a dog in this fight, but we'll see what
8          happens.
9                     JUDGE ROSENBAUM:   Thank you.
10                     MS. BERENS:   Barbara Berens of Kelly & Berens
11          on behalf of UnitedHealth Special Litigation Committee.
12                     JUDGE ROSENBAUM:   Is this the first time you've
13          spoken on the record?   No; but close.
14                     MR. CARTER:   Good morning, your Honors.   Peter
15          Carter on behalf of all the defendants, with the exception of
16          Dr. McGuire, Mr. Spears and Mr. Lubben.
17                     JUDGE ROSENBAUM:   Counsel.
18                     MS. PFEIFER:   Good morning.   Katie Pfeifer of
19          Dorsey & Whitney on behalf of the same clients as Mr. Carter.
20                     MR. HASHMALL: Good morning, your Honors.   David
21          Hashmall for Mr. Spears.
22                     MR. MARK:   Good morning, your Honors.   Richard
23          Mark, Briggs and Morgan, on behalf of David Lubben.
24                     MR. GASKINS:   Good morning, your Honors.   Steve
25          Gaskins on behalf of Dr. McGuire.

1                    JUDGE ROSENBAUM:   Greetings to all counsel.

2                    JUDGE McGUNNIGLE:   Good morning, everybody.

3                    JUDGE ROSENBAUM:   I think you may be confident

4        we have read and reviewed the materials we received.   I

5        received an objection literally in last night's e-mails.   I

6        see some heads nodding, so I take it copies have been

7        delivered.   So I've got a copy of that.   Other than that, you

8        may proceed.

9                    MR. CAMBRONNE:   Your Honors, I'd ask Barbara

10       Berens from the SLC to lead off.

11                   MS. BERENS:   Thank you, your Honors.   I would

12       like to deal with the final approval piece of what's before

13       your Honors.   The SLC and the plaintiffs' counsel have joined

14       in a motion for final approval of the settlement that was

15       reached in 2007 in this matter.   Most of the legal arguments,

16       I believe, were set forth in our original preliminary

17       approval hearing.   And in your order granting preliminary

18       approval, you collectively made the findings that I believe

19       are required for purposes of granting final approval of the

20       settlement itself.   I will not be addressing the attorneys'

21       fees issue unless you have some questions.   Mr. Cambronne is

22       going to be handling that.

23                   After the Minnesota Supreme Court answered the

24       certified question that Judge Rosenbaum sent over to the

25       Minnesota Supreme Court, I believe there's little left at

1          this point to be considered, given the findings that were set

2          forth in your joint order of preliminary approval, and I'll

3          just basically reiterate those for the record.   Basically

4          your Honors found that this SLC met both prongs of the test

5          that was set forth by the Minnesota Supreme Court;

6          specifically, that the SLC was disinterested and independent;

7          and that secondly, the SLC procedures were adequate,

8          appropriate and performed in good faith.   And the preliminary

9          approval order set forth the various factors on which the

10         courts relied to make those findings.   And further, the

11         preliminary approval order, I think, dealt with the issue of

12         what, if anything, the state and federal procedural rules had

13         to do with the approval process.   And the preliminary

14         approval order found that the SLC's work was also in full

15         accord with the respective procedural rules, state and

16         federal.   And, finally, I think a key holding in your

17         preliminary approval order was that given that the SLC met

18         both prongs of the test that the governing procedural rules

19         merely required that the settlement be approved after notice

20         to the shareholders.   At this point, shareholder notice has

21         been sent out in accordance with what was set forth in the

22         preliminary approval order.   There has been, as far as we

23         know, the one objection lodged.

24                     JUDGE ROSENBAUM:   And that was a fee objection

25         rather than a substantive objection.

1              MS. BERENS:   Exactly, your Honor.   That's what

2      I was going to say.   It seems to focus solely on the fee

3      petition piece of this and not the underlying settlement with

4      the individuals.

5              JUDGE ROSENBAUM:   How broadly was the notice

6      disseminated?

7              MS. BERENS:   It was disseminated various ways

8      is my understanding.   It was sent out by the company;  there

9      was also two Web sites set up at which various objectors, if

10     there were any, or shareholders could lodge any sorts of

11     objections.   And my understanding is it went out at the

12     appropriate time.   And as of the date of the deadline that

13     was set forth in the original procedures that the court

14     approved, there had been no objection lodged.   Now, I

15     understand that the one objector has said that there was not

16     adequate time in which to respond to the fee petition itself,

17     although in the notice the caps were set forth.   So even

18     though the individual fee petitions had not been publicly

19     disseminated at that point, my understanding is at least the

20     caps were included in that shareholder notice that went out.

21             JUDGE ROSENBAUM:   I thank you.

22             MS. BERENS:   Again, everyone else involved in

23     this settlement process -- other than I know Mr. Abadou may

24     be reserving something for us.   But as I stand here right

25     now, this is a settlement that all the individual defendants

1       have signed off on, all the plaintiffs' counsel have signed

2       off on, the SLC has signed off on, and the company has signed

3       off on.  Given your earlier findings in your order for

4       preliminary approval and your earlier findings, the SLC, and

5       in joint motion with plaintiffs' counsel, ask the courts to

6       grant final approval of the settlement piece.

7                    JUDGE ROSENBAUM:  Thank you.

8                    JUDGE McGUNNIGLE:  Thank you.

9                    MS. BERENS:  Thank you, your Honors.

10                   JUDGE McGUNNIGLE:  Mr. Cambronne, will you be

11      presenting the position of both the counsel for the federal

12      plaintiffs and counsel for the state plaintiffs?

13                   MR. CAMBRONNE:  Just the federal plaintiffs.

14                   JUDGE McGUNNIGLE:  All right.

15                   MR. CAMBRONNE:  May it please the court, I am

16      Karl Cambronne, I am appointed as lead counsel on behalf of

17      the federal derivative plaintiffs in this action.  And I just

18      want to echo and fully, completely support what Barbara

19      Berens just told the court about this being a settlement that

20      we indeed do endorse, we do sign off on.  You've been given a

21      lot of paper telling you about the history of this

22      litigation.  I'm not going to repeat any of that.  I am going

23      to point out, though, that notwithstanding maybe the

24      miscaptioning of that filing of last night, there are no --

25      of all the shareholders in this case, no people who are

1       standing in opposition to the settlement.  I can tell you,
2       also, in response to one of your questions, Judge Rosenbaum,
3       that part of the notice was 1-800 numbers.  And other than
4       getting calls with practical questions -- for instance,
5       "Where do I send the claim form" -- that was a big one --
6       type of thing, there have been -- they were all very -- just
7       interested, asking practical questions.  But nobody stood in
8       opposition to any issue in the phone calls that we received.
9       So I'm confident that every lawyer in this room and everybody
10      here is going to say this is a good settlement and you ought
11      to approve it.  Now, the settlement, of course, is something
12      I want to talk to you a little bit more.  But it's two-phased
13      in the sense that part of it's monetary, part of it's relief
14      that has to do with governance issues -- and I'll get to that
15      in just a moment.  But with that in mind, I don't think there
16      needs to be more discussion on the issue of the settlement
17      per se.  I'm rising now to talk to the court about the matter
18      of fees and --
19                  JUDGE ROSENBAUM:  Let's talk about it for a
20      moment, the numbers of dollars -- greenback dollars that were
21      shipped back to the corporation were how much?
22                  MR. CAMBRONNE:  Well, it varies.  And I have --
23      for instance -- and there was some misunderstanding about
24      that in the filing of last night.  For instance, in
25      Dr. McGuire's case -- and I'm looking at pages 60 and 61 of

1           the SLC report -- for instance, I believe greenback dollars
2           would be returning the 91.3 million-dollar executive
3           retirement plan.   I believe that greenback dollars would be
4           surrender of 8.1 million dollars in executive savings plan,
5           relinquishing various other things, too, that are just sort
6           of that nature.   There was -- Mr. Spears -- I forget the
7           number there, but -- and Mr. Lubben, also -- both paid
8           dollars.   Mr. Lubben, in particular, I think was 20-some
9           million dollars, that type of thing.   I could -- but the
10          actual -- to answer your question, you add them all up,
11          starting at page 60 of the SLC report, you'll see it all
12          broken down.
13                    JUDGE ROSENBAUM:    Thank you.
14                    MR. CAMBRONNE:    Okay.   This has been a
15          three-year fight.   And it's important that you see, I think,
16          certain turning points that occurred during the course of the
17          litigation.   I want to give you a little flavor for some
18          things that had happened here.   Early on in the litigation,
19          after we were given the green light to go ahead and engage in
20          discovery, sought from defendants really information that
21          would have simplified and made more efficient our progress in
22          the case.   It was in the nature of the summaries of
23          interviews, and that type of thing, that had been developed
24          by the company's investigative committee.   Not the SLC, but
25          the investigative committee.   Now, the company made a

1        conscious decision to oppose that request.   They said it's
2        work product.   Magistrate Judge Noel agreed with that
3        argument.   And as a consequence, what we were left to have in
4        this particular case was a big pile of documents.   And by
5        "big pile," I mean millions.   That was a decision made early
6        on by the company and how they would litigate with us, if you
7        will, in this case.   And I'm not criticizing that decision,
8        but I'm noting the irony now, to stand before you and say,
9        "Why did you look at all the documents?"   The SLC was also
10       doing some looking at documents, but they had the benefit of
11       a big efficiency, and that is, instead of serving discovery,
12       it was matter of picking up the phone and asking the company,
13       "I want to talk to Witnesses 'A,' 'B,' 'C' and 'D,' and give
14       me this" --
15                 JUDGE ROSENBAUM:   Well, the company didn't have
16       a right to object to that.   That was their SLC.
17                 MR. CAMBRONNE:   That's right.   That's right.
18       This gets to the point of the comparison I find in the brief
19       in opposition that was filed by the defendants in this
20       matter.   They would like to compare a fee request from the
21       plaintiffs in this matter with what the fees paid to the SLC
22       were and that's like apples and oranges.   You can't tell me
23       that when you have full-blown, absolute complicity, if you
24       will, and cooperation shown the SLC -- and they charged --
25       and they had experts and they charged a certain amount of

1    money.   Then you look at it from the other perspective, where

2    we are in litigation.   That is, we are opposed.   We are

3    filing motions for summary judgment, we are filing motions to

4    compel, we are rolling up our sleeves, looking at documents

5    and only raw data.   That's kind of the cards we were dealt --

6    and that's what normally happens in a piece of litigation.

7    And that's what we did.   So my point is that the comparison

8    of us to the SLC is not apt.   The more likely comparison is

9    how we -- you know, what we had to deal with as litigators in

10   this whole matter.   Long about -- and I don't know the date

11   here -- but we were off an running on discovery -- and it was

12   document discovery initially.   I along with Mr. Carter -- and

13   I believe he would agree with this -- said that, "We're not

14   going to" -- we agree.   "We're not going to start a

15   deposition program of our own."   But the quid pro quo for

16   that is that we're going to engage in mediation.   We're going

17   to try to solve this case as opposed to, you know, doing it

18   the scorched earth fashion.   We could have noted every

19   defendant and everybody else and started that process.   We

20   thought, as officers of the court and good lawyers, that

21   maybe the better approach would be to do something else.

22   That's when we walked into the notion, "Let's get a

23   high-class, good mediator and see if we can solve this

24   problem."   And as the court well knows, we retained the

25   services of Lane Phillips.   One fact that I think is very

1     important, because it's a very expensive thing, the mediation
2     that was conducted in this case was paid for by the
3     plaintiffs' counsel and defendants' counsel.  It wasn't paid
4     for by the SLC.  We advanced the money to have multiple
5     sessions with this very qualified mediator, not anybody else.
6     We started the thing, and we paid for it going on also.  But
7     the important thing here -- and this is new ground, as far as
8     I'm concerned, in derivative litigation -- the other thing we
9     did was I called Barbara Berens, and I said, Barbara, this is
10    what we want to do, we want to start a mediation, and we'd
11    like the SLC to participate in that mediation, because we
12    understand, and respect, 'A,' the power of an SLC from a law
13    point of view in the state of Minnesota, and we certainly
14    respect the individual SLC members in this particular matter
15    and their particular contributions that can be made.  Well,
16    anyway, we make this call.  We invite the SLC in.  They
17    didn't hesitate a bit.  They said, Okay.  Good idea.  Let's
18    do it.  So all of a sudden we have a triparte mediation that
19    lasted a long time, many sessions, and that sort of thing.
20    But it's triparte.  Your Honor, during the course of that
21    process, we're engaged actively.  And I'm just going to hold
22    something up as a visual -- but I'll give it to the court, if
23    you want, for in-camera review -- these are the memos that we
24    sent to the SLC giving them our views of the law, the
25    questions, liability, money, all kinds of things.  It wasn't

1    as if we were just sort of sitting in a corner, kind of

2    watching a process unfold.   We were very active in it.   Not

3    only we as lawyers, but our clients.

4                 JUDGE ROSENBAUM:   Well, let me pick up also --

5    you've got tripartite.   Was one of the parts bifurcated also

6    which reads over to your brother Vander Weide?

7                 MR. CAMBRONNE:   Right.   Right.   And I'll add --

8    I'll comment on that right now.

9                 JUDGE ROSENBAUM:   That's all right.   He knows

10   he ain't going to get a nickel from me.

11                MR. CAMBRONNE:   That's right.

12                JUDGE ROSENBAUM:   That comes over from the

13   other side.   But that's a different issue.

14                MR. CAMBRONNE:   Well, rest assure that by the

15   time this process got rolling, Vern Vander Weide and his

16   colleagues in the state action were involved.   They also had

17   interaction with the SLC.   They were also reviewing

18   documents, that sort of thing.   On the document, for

19   instance, issue, this is all downloaded in some massive

20   computer someplace, and you can segment documents and give

21   them to certain people to review.   Well, Vern and his crew

22   got chunks of documents that was run out of my office.   But

23   everybody got piecemeal chunks of documents -- I shouldn't --

24   it's huge amounts of documents for review.   So they did

25   indeed participate.   But, anyway, we gave up -- not gave up

1          -- but we agreed to postpone the deposition process in this

2          case if we could walk towards a meaningful settlement in this

3          matter.   And, of course, a meaningful settlement is here and,

4          I think, universally agreed to as being the appropriate thing

5          to have done.   About a year ago, we came to the court with

6          these settlements and said we ought to consummate the

7          settlements and start a process of approval at that time.

8          You sought, and we participated in, a process that took us

9          all the way up to the Minnesota Supreme Court.   And they have

10         now pronounced what the law is.   And that's all well and

11         good.   But during that period of time, of course, the PSLRA

12         case is rolling along and they are doing things that happen

13         in litigation -- they're engaging in their own discovery

14         fights, they are taking depositions, and the like.   Now, we

15         could have, we could have -- because we didn't have an

16         approval or even a preliminary approval of a settlement at

17         that time -- decided to piggyback and do depositions with

18         them, ask our own questions, or at least monitor the

19         depositions that were being taken.   We chose not to.   We

20         didn't think that was the proper thing to do.   We did get

21         transcripts as they were developed, all with an eye towards

22         -- in the event this court decided not to preliminarily

23         approve, we wanted to be able to hit the ground -- these

24         people had -- all these defendants have been deposed.   We

25         needed to be able to be in a position to try this case, if it

1       was necessary.   Last December -- a year ago last December, I

2       remember you distinctly, your Honor, Judge Rosenbaum, asking,

3       Well, what if I don't think this settlement is adequate?

4       Well, a fair question.   And that rings in our ears as we go

5       forward, not having a settlement approved or preliminarily

6       approved, for that matter, and therefore -- now we're

7       criticized by counsel for, you know, summarizing depositions.

8       Well, you know, when we are charged with the responsibility

9       of representing our clients, we have to do the job that we're

10      supposed to do when we're supposed to do it.   I can tell you,

11      your Honor, that we assembled a heck of a good team of

12      competent, qualified, experienced lawyers in derivative

13      litigation in this case, and we were opposed by a similarly

14      competent, tenacious, good group of lawyers.   We tried --

15                   JUDGE ROSENBAUM:   Mr. Cambronne, you said you

16      are here to protect your clients.   Who are your clients here?

17                   MR. CAMBRONNE:   The clients, your Honor, who

18      retained us are various institutional shareholders and

19      individuals.   And we are, though, bringing the case -- I'm

20      aware of this -- bringing the case derivatively on behalf of

21      the company.   We say, if I may --

22                   JUDGE ROSENBAUM:   There's an aspect of wheels

23      within wheels here.

24                   MR. CAMBRONNE:   Right.

25                   JUDGE ROSENBAUM:   Your clients are the

1    defendants, at least on some level.  I don't think they were

2    always exactly aligned with you.  And to some extent, then,

3    since they're kin is the SLC, they were sort of your clients

4    too.

5                    MR. CAMBRONNE:  I understand that.  Hence, the

6    unique and why they say complex nature of derivative

7    litigation.  The defendants per se were not our clients but

8    the company.  Trying to accomplish a result for the company.

9                    JUDGE ROSENBAUM:  The company's interest.

10                   MR. CAMBRONNE:  The company's interest, right.

11   And we are mindful of that.

12                   JUDGE ROSENBAUM:  Or shall we say a perfect

13   board of directors that didn't exist until Ms. Berens came

14   along.

15                   MR. CAMBRONNE:  Well, that -- okay.

16                   JUDGE ROSENBAUM:  I cast no personal thing.

17   There's a gentleman with white hair back there.  I don't know

18   what it means when he puts up his finger.  But he stuck his

19   thumb in the air there.

20                   MR. CAMBRONNE:  I think he's a recovering

21   lawyer, if you're looking at the same white-haired man as I

22   am.

23                   JUDGE ROSENBAUM:  I think he's made a fine

24   recovery.  We'll move along.

25                   MR. CAMBRONNE:  Well, in any event, we

1    understand that, and that's why we are walking in a case --

2    you know, Minnesota derivative law has been, may I say, a

3    minefield for years, and we therefore --

4                    JUDGE ROSENBAUM:   We found it a broad avenue

5    brightly lit.

6                    MR. CAMBRONNE:   Well, now it is.   Now it is.   I

7    don't think there's much more discussion to be had after the

8    UnitedHealth decision from our supreme court.   But, in any

9    event, we approached this matter knowing that the SLC --

10   we're working with the SLC.   We are mindful that they're very

11   powerful under Minnesota law -- all SLCs are -- but in this

12   particular case, the SLC, Judge Stringer and Judge Blatz are,

13   you know, just beyond question the people that were the right

14   personalities at the right time, and therefore, you know,

15   what we tried to do is take care of this matter in a way that

16   was efficient.

17                   Now, let me talk about -- I don't want to

18   ignore an elephant in the corner, either.   We've asked you,

19   Judge Rosenbaum, to award a 47 million-dollar fee in this

20   case.   And I'm not going to hide from saying that number.

21   It's a lot of money.   It's real money.   And I'm not going to

22   be naive enough to think that anybody in this courtroom or

23   elsewhere wouldn't think it would be.   It is a situation,

24   your Honor, where we have brought to you, and we'll give you

25   more information, if you want, like our interaction with the

1    SLC, about the types of things that we did here.   The fact of

2    the matter is the SLC was constituted;  the investigatory

3    committee that predated them,  WilmerHale,  was constituted,

4    all as a result of the actions that were initiated -- the

5    derivative actions that were initiated in this particular

6    case.

7              JUDGE ROSENBAUM:   Now,  Mr. Carter can certainly

8    express himself -- he did so zealously -- but let me offer a

9    couple of thoughts,  one is there seems to be a suggestion

10   that you would be seeking some kind of a multiplier for

11   people who either should have been external to you,  some sort

12   of contract employees,  and maybe some of your support

13   mechanisms.   Where are we with that?

14             MR. CAMBRONNE:   Okay.   On the support

15   mechanisms,  your Honor,  there are people that -- I have names

16   like -- and this is -- Chad Johnson from Berstein,  Litowitz

17   is here to talk about that.   They have super-duper paralegals

18   in their office that kind of handle things that are complex

19   and this sort,  and it's a paralegal type of thing where,

20   traditionally,  courts here and elsewhere have awarded fees

21   and multiplers for paralegals.   There are experts,  even,  in

22   those larger New York firms,  like accountants and

23   investigators,  that type of thing,  that are on staff and do

24   help and benefit the collective activities here.   And,  yes,

25   there are some of that there,  but the justification is just,

1    as I said, these people are on staff on a full-time basis to

2    help, if the need arises.

3              The other thing I'd like you to have in mind,

4    your Honors, as we walk down this path is that we as

5    derivative counsel are -- and I'm not saying anything unusual

6    here -- we're the ones that are not paid in this case.  I can

7    tell you this, that there was a hundred and seventy-five

8    million-dollar D & O policy in this case that was burned

9    through long ago by professional fees on the defense side,

10   whether it be accountants or lawyers, that sort of thing.

11   And that all happened on a monthly basis during the course of

12   the last three years.  It didn't happen now or in the future.

13   I don't begrudge that sort of a situation.  I don't begrudge

14   it in the least.  But I think we have to understand that we

15   as plaintiffs' lawyers who approach these matters have an

16   enormous risk facing us in terms of what can happen in a case

17   like this and what the results can be.  And, hence, that's

18   why the things that are unique in this case -- for instance,

19   let's not do discovery, let's try to settle it.  Let's look

20   at summaries of documents as opposed to actually looking at

21   all documents, that sort of thing.  We tried to be efficient.

22   I tried to delegate specific responsibility in my role as

23   lead counsel here.  And to the extent there's inefficiency,

24   I'll take the responsibility for that.  But we tried to be

25   efficient, and I think, for the most part, we have been.

1          Your Honor, I will conclude my remarks by just

2     commenting on what is called an "Objection to the Settlement"

3     that was filed last night.  And the important thing, your

4     Honor, for purposes of your looking at that objection is it's

5     largely duplicative of what has already been said in timely

6     filed papers by Mr. Carter's office.

7          JUDGE ROSENBAUM:  It appears that the author

8     may have read Mr. Carter's brief.

9          MR. CAMBRONNE:  We even know, your Honor, that

10    to complete -- down to misspelled words that were misspelled.

11    There was the Shapiro, Haber & Urmy firm that's part of the

12    lead counsel in this thing.

13         JUDGE ROSENBAUM:  You are not suggesting your

14    brother misspelled something.

15         MR. CAMBRONNE:  Well, one word was misspelled

16    and, fair enough, it happened to make -- the same misspelling

17    finds its way into the objection of last night.  Your Honor,

18    it's hard to stomach, knowing the absolutely intense and

19    arduous fight that has been going on for three years here,

20    for somebody, who I've never heard of, I never even got a

21    phone call from -- the only thing I heard was at 5:42 last

22    night that he's objecting to our fees -- to have really,

23    frankly, the audacity to come in and say -- challenge our

24    effort here and that we ought to be paid in a particular

25    fashion.  We're comfortable leaving to you, with your

1    discretion, the whole matter of fees.

2              I'm also going to say that the attorney -- not

3    Randall Tigue, who's apparently just local counsel in this

4    matter -- the attorney is a fellow by the name of Segal out

5    of Ohio, and he's -- Edward Segal -- and he's no stranger to

6    objecting to these matters.  I'm going to, with the court's

7    permission, hand to your staff a news article from last June

8    that labeled Mr. Segal "One of the nation's most prolific

9    serial objectors."  This is what he does for a living.  And

10   if I may, I'll just hand it to your clerk.

11             That was an article that appeared last June and

12   it talked about, you know, what this fellow's business is

13   doing the sorts of things that happened here.  But the

14   important thing, bringing it all back --

15             JUDGE ROSENBAUM:  This court would not be

16   surprised to get an application for fees from him for the

17   services which he had performed.  I have received them in the

18   past.

19             MR. CAMBRONNE:  I'd be willing to bet on that,

20   your Honor.  I think you're right.  I think you're right.

21             JUDGE McGUNNIGLE:  I didn't get to see that

22   until this morning, when Judge Rosenbaum showed it to me, and

23   that was probably because it was captioned only in the

24   federal action, I believe.

25             MR. CAMBRONNE:  Right.  And I --

1            JUDGE McGUNNIGLE:  So I don't think that he's

2    objecting to Mr. Vander Weide's.

3            JUDGE ROSENBAUM:  It didn't appear.

4            MR. CAMBRONNE:  Yes.  And I asked Mr. Vander

5    Weide this morning if he had gotten anything in the state

6    case and he assured me this morning that he had not gotten

7    anything about it.

8            MR. VANDER WEIDE:  One of the advantages of

9    having a case that's not on the Internet.

10            JUDGE ROSENBAUM:  Enjoy it.  You're in the

11    final moments, counsel.

12            MR. CAMBRONNE:  Your Honor, the bottom line is

13    he makes a number of, as far as I'm concerned, scurrolous

14    accusations about a lot of things.  The underlying claims,

15    though, if you will, are covered in the brief that was filed

16    in the other matter.  This is nothing new, if you will, this

17    objection of last night.  It's sort of me tooing it.  And

18    I'll just leave it at that.

19            With that, your Honor, I ask that you approve

20    the settlement, obviously.  We're here because of that whole

21    matter.  And I think the fee is also worthy of granting.

22    Thank you very much.

23            JUDGE ROSENBAUM:  I thank you, counsel.

24            MR. VANDER WEIDE:  Good morning, your Honors.

25    Vern Vander Weide for the state court plaintiffs.

1              To respond to your first question, Judge

2    Rosenbaum, on the amount of greenback dollars, I don't want

3    to get into the difference between cash accounting and

4    accrual accounting with the court.  I can't go much beyond

5    those two terms before I get totally lost.  But in Attachment

6    Number 1 to the SLC's report, where there is this very handy

7    summary of remediation -- it's Document 350-4 in the federal

8    case, page 16 of 49.  If you look in the heading that's "2007

9    SETTLEMENTS," you'll see on the second line a number for

10   "Employment Benefits Forfeited," which has the number of

11   99.4, and, then, it has "Cash," 20.4.  Both of those numbers

12   Mr. Cambronne alluded to.  Now, as far as I understand their

13   plan, that would have been, over time, paid out in cash.

14   So this is cash saved, not cash contributed.  But it is cash

15   saved in terms of the 99.4.  So if you add those two

16   together, it's approximately -- it's a hundred and twenty

17   million dollars, which the SLC found had economic and

18   accounting value, as did the SLC find, with its accounting

19   experts, that the total value of all of the remediation that

20   can be monetarily measured had a monetary value.  And these

21   numbers appear in UnitedHealth's financial statements, they

22   appear in the income statement.  I don't know what their

23   effect is in the cash-flow statement.  But on the income

24   statement, when they had to restate their earnings, that was

25   1.1 billion dollars.  And believe me, the analysts and the

1    shareholders and everybody else who's interested, including

2    the employees, as well as the board of directors, those are

3    real numbers.  They may not be cash in hand, somebody writing

4    out a check, but they are very real numbers --

5                   JUDGE McGUNNIGLE:  Does the fact that --

6                   MR. VANDER WEIDE:  -- in the scope of things.

7                   JUDGE McGUNNIGLE:  -- something can be

8    monetarily valued make that something a common fund?

9                   MR. VANDER WEIDE:  We believe, your Honor, that

10   it can.

11                  JUDGE McGUNNIGLE:  And I ask that because you

12   are the -- of the counsel who are applying, you are the only

13   one who's asking that the court apply a percentage of common

14   fund rationale.

15                  MR. VANDER WEIDE:  That is correct, your Honor.

16   The cases which decline, criticize or otherwise don't want to

17   go along with awarding attorneys' fees, or very much, or

18   lodestar multiplers, or what have you, saying that, Well,

19   this is really -- it's not a common fund.  It's not cash.

20   It's a non-cash benefit.  Those cases -- for example, the one

21   cited by Mr. Carter in his brief, *Rosenbaum v. Macalester*

22   case --

23                  JUDGE ROSENBAUM:  I can assure you it was not

24   one of mine.

25                  MR. VANDER WEIDE:  I didn't think so, your

1    Honor, but some --

2                   JUDGE ROSENBAUM:  I know I choked.  I got very

3    excited when I saw it.

4                   MR. VANDER WEIDE:   Some distant relative

5    someplace, perhaps --

6                   JUDGE ROSENBAUM:  Who has disavowed me --

7                   MR. VANDER WEIDE:   -- must have been a

8    plaintiff.

9                   JUDGE ROSENBAUM:   -- so many times.  Okay.

10                  MR. VANDER WEIDE:  Must have been a plaintiff.

11   But, in any event, in that case there was a significant

12   amount of corporate governance procedures, the so-called

13   "therapeutic kind of relief," which the court said was not

14   quantifiable.  And it also mentioned it happened not to be

15   not extraordinary.  But, in any event, the cases that are

16   critical of -- or -- don't want to award these multipliers,

17   and what have you, or give an awful lot of credit, have to do

18   with these kinds of things.  Now, those things are present in

19   this case.  But this has not been the basis, certainly, for

20   the state plaintiffs.  And as I read the federal plaintiffs,

21   they're basically basing their fee also on what the monetary

22   value was.  And all of these things have real value.  And

23   part of this comes from the unique nature of a derivative

24   case we're not representing a class, where we're asking for

25   some money because of some fraud damages.

1         JUDGE McGUNNIGLE:   Most of the cases you cite

2    are class actions, though.

3         MR. VANDER WEIDE:   Most of the cases are.

4    There are some that are also derivative actions but had a

5    cash component.   That is correct.   But none of these cases

6    had the extent of monetary remediation.   The problem is with

7    these other things -- corporate benefits, corporate

8    governance procedures -- you cannot put a money number on

9    that like you can on the retirement benefits that were

10   relinquished, on the stock options that were repriced, on the

11   stock options that were canceled.   All those things have real

12   impact on the balance sheet.   And I would submit that while I

13   can't point you to a specific case, this case is

14   extraordinary in a lot of ways.   Mr. Cambronne has already

15   alluded to some of them.   But it truly is extraordinary in a

16   lot of ways.   And in a derivative case, a lot of the recovery

17   will be of this noncash but real monetary, real measurable,

18   real quantifiable value.   And that's what we have here.   It

19   fluctuated.   It even fluctuated on the date because there are

20   two ways to figure these things and then it fluctuated

21   because of what happened in the markets.   But when all is

22   said and done, at the end of the day, as we stand here today,

23   we still have numbers that are real numbers.   They aren't all

24   in cash, that is true.   Some is in cash; some is givebacks in

25   terms of savings; and some is in the form of givebacks that

1   have monetary value.   The *Hawkins* case --

2               JUDGE McGUNNIGLE:   So the answer to my question

3   is "Yes," the fact that something can be monetarily valued

4   makes it a common fund, is that what you're saying?

5               MR. VANDER WEIDE:   We believe it's a -- well,

6   it's a common fund in the sense that it was a benefit.   I

7   mean the commonality here, of course, is not a class.   The

8   commonality is really because it's the recovery on behalf of

9   the corporation.   So there's not a fund that's set up for a

10  class of shareholders, that is correct.   But the benefit that

11  is measurable in real dollar terms, because it's laid out in

12  spades in all of the paper, is a benefit which we believe

13  should be analogized if two common fund cases.   And we cited

14  in our brief some authority for that proposition, where the

15  courts have said that the common fund is not limited to class

16  actions.

17              JUDGE McGUNNIGLE:   Okay.

18              MR. VANDER WEIDE:   It is a device that's

19  available for courts to use in other context.   And one of the

20  advantages that exists with respect to the common fund use of

21  the percentage approach is because it does away with some of

22  these issues about, Well, are you loading up your lodestar so

23  you can run up higher numbers.   I mean, Mr. Carter seems to

24  think that we plaintiffs were guilty of that.   And I want to

25  speak to that in a moment.   But the common fund framework of

1          cases provides that rationale, including even a case

2          Mr. Carter cited, where the court mentioned the advantage of

3          the percentage approach to determining attorneys' fees

4          because it rewards attorneys for their efficiency, for their

5          achievement.  It doesn't reward them for running up a

6          lodestar.

7                    JUDGE McGUNNIGLE:  Okay.  Thank you.

8                    MR. VANDER WEIDE:  On the piece of the -- a

9          couple things I'd like to pick up on -- oh.  On another

10         point, on the multiplier for non-attorneys, that Judge

11         Rosenbaum, you mentioned, I'm not quite sure I understand the

12         problem with that.  In our firm, we don't have that kind of

13         thing, but I know in the firms with me that there are various

14         kinds of people.  A dollar is a dollar is a dollar at risk.

15         These firms, in both the federal and state actions, had to

16         put out real dollars, whether it's to a contract attorney,

17         whether it's to a paralegal, whether it's to a financial

18         analyst.  These are real dollars you pay out.  These firms

19         paid out every week or every two weeks, just like defendants

20         pay out to their people who work on the staff.  But unlike

21         defendants, obviously, in contingent-fee litigation, we're

22         not getting dollars in when we send out a bill.  There's no

23         bill to send out.  In fact, we may never get dollars in.  All

24         too often -- in my humble opinion and in my experience, all

25         too often the dollars never come in.  The case is lost; it's

1        dismissed; it's overturned, what have you.  So the fact that

2        the dollar is not for a professional lawyer as opposed to

3        someone else, it's still a dollar at risk.  And part of the

4        rationale for contingent-fee lodestar and multipliers is to

5        recognize that very real financial and economic risk that law

6        firms that do contingent work take on in every case.  There's

7        no sure thing.  Gotten the idea from Mr. Carter that, my

8        gosh, when these two cases were filed, it was preordained.

9        Somehow it was an inexorable result of the universe that we

10       were going to stand here today with this kind of a

11       settlement.  It wasn't.  When these cases were filed, they

12       were among, I believe, the first of the backdated options

13       cases.  And although there was a Wall Street Journal article

14       about it, and although the SEC said they were going to

15       investigate UnitedHealth, there was absolutely no assurance,

16       "A," that the SLC would find no merit or insufficient merit

17       to proceed with these cases and instead dismiss them, which

18       is what SLCs invariably do.  As I laid out in my affidavit,

19       this is a high-risk proposition.  There were no assurances

20       whatsoever.  And the work that was done, I can tell you, was

21       done in a very coordinated basis, from the standpoint of

22       between the two groups of plaintiffs' counsel working on this

23       case, chunks of documents -- and I laid this out in my

24       affidavit.  I was a little perplexed about why Mr. Carter

25       said there was no evidence at all presented as to --

1                    JUDGE McGUNNIGLE:  You're talking about
2        paragraph 19 of your affidavit.
3                    MR. VANDER WEIDE:  Absolutely, your Honor.
4                    JUDGE McGUNNIGLE:  Okay.  I've read that.
5                    MR. VANDER WEIDE:  That is correct.  And laid
6        out there exactly how Karl Cambronne's firm assigned chunks
7        of documents.  I did not review documents that his lawyers
8        reviewed or that other people in my group reviewed.  I
9        reviewed a set.  And the only time when we had common review
10       was when somebody picked up a document that was particularly
11       interesting and passed it around so that we would all know
12       what we were doing, plus we had the weekly -- or at least
13       scheduled.  It didn't happen every week.  If there was
14       nothing to talk about, we didn't have a phone call -- or -- a
15       conference call.  So there was more coordination in this case
16       among a bigger bunch of lawyers than I think I've ever seen
17       in my experience.  And I say that with all candor to the
18       court.  This was a very well managed litigation at both
19       pieces.
20                   The need for the document discovery while some
21       of the discussions were going on.  Well, as we said in our
22       papers, it's a foolish plaintiff's lawyer who, at the moment
23       of hearing settlement drop from the defendant's lips, bingo,
24       you stop all work.  You don't do that.
25                   Judge McGunnigle, you will recall, I'm sure, in

1    your prior life, where you and I were privileged to be
2    adversaries -- I was privileged to be adversaries with you in
3    a case.
4               JUDGE McGUNNIGLE:   As was I, Mr. Vander Weide.
5               MR. VANDER WEIDE:   Thank you, your Honor.
6    Where early on in that case, the defendants wanted to talk
7    settlement -- which, of course, is always music to a
8    contingent plaintiff's ears.   And we did.   But we didn't stop
9    discovery.   We continued to have our discovery -- very
10   aggressive, some disputes -- even though in this particular
11   case, the local newspaper editorialized that your client
12   ought to pay up.   But that didn't stop us from pursuing the
13   case.
14              JUDGE McGUNNIGLE:   It only encouraged you, as I
15   recall.   Mr. Vander Weide, before you sit down, I do want to
16   have you visit this issue of the value added of the ultra
17   vires claim that you brought in the state court.   And I
18   understand that that -- at least I think that that's part of
19   your argument as to the value to your particular
20   contribution.   I was going through some of my past orders,
21   and a couple years ago, almost to the day, I guess, February
22   6th, I issued an order where I addressed that issue and your
23   reliance on the *Nuvani* case, and so forth.   And I think it
24   would be fair to say I expressed some skepticism.
25              MR. VANDER WEIDE:   Yes, you did, your Honor.

1          JUDGE McGUNNIGLE:    Okay.

2          MR. VANDER WEIDE:    As did, I might say, certain

3    members -- one member of the SLC expressed skepticism with my

4    argument in that regard.

5          Well, I think in terms of the value added, I

6    would like to think that we added more value than just on the

7    ultra vires case.   But we raised that in the statutory

8    context that was, I think, our unique contribution here.   It

9    was picked up later on by the feds.   We happened to be ahead

10   of them.   While they were engaged in this squabble over who

11   ought to run the case, we went forward and we filed the first

12   motion for partial summary judgment.   And we raised it there

13   under 302A.165.   I cannot read the SLC's mind, obviously.

14   And the SLC report, as Judge Rosenbaum has noted on more than

15   one occasion, is silent in terms the precise findings.

16   The SLC did pick up on the ultra vires concept, including

17   under 302A.165 in its report.   And also picked up on the

18   notion in the *Envoy* case we cited as to what the difference

19   is between void and voidable.   We think that in this case

20   particularly -- and I remember your Honor saying, "Well, you

21   could use that in many cases."   I don't think so.   I think

22   that in this case particularly this was a very, very unique

23   and appropriate concept, for the reason that, yes, we had

24   allegations in both cases that the conduct of these

25   defendants was at variance, contradicted their disclosures in

1      their SEC filings.  But that, at bottom, is a fraud case that
2      can be dealt with under the federal securities laws.  But
3      what this also was which made this case both interesting and
4      unique, I think, is the fact that they did this in violation
5      of shareholder-adopted plans, shareholder-approved plans.
6      And I remember at the preliminary hearing Judge Rosenbaum
7      making the statement, something -- if I remember correctly --
8      if I wrote it down right, "The shareholders do own the
9      corporation.  Sometimes that is forgotten."  Well, that's
10     what happened here.  The shareholders who owned the
11     corporation approved a plan, and the plan said -- it laid out
12     specific requirements -- it happened to be dictated by the
13     Internal Revenue Code.  But they laid out these specific
14     requirements about how stock options are to be granted,
15     administered, and so forth.  So that second piece made this
16     conduct not just fraudulent in the conventional sense, it
17     made it ultra vires.  It was conduct that was inappropriate.
18     Not only inappropriate, it was not only overreaching, and all
19     the other good names that we lawyers can put on it -- unjust
20     enrichment -- but it was also ultra vires.  And the unique
21     piece of being ultra vires is it substantially limits what
22     the Board by itself can do with that kind of conduct.
23     Because this, after all, was a shareholder-directed plan and
24     a shareholder-authorized plan.  You just can't willy-nilly
25     ignore that.  So we believe that pushing this in the state

1    action, where we happen to believe that the state court here

2    -- corporate litigation ought to occur in state court.   It

3    certainly does in Delaware a lot, as we all know.   That the

4    state court action was a unique vehicle and a unique form to

5    deal with this highly unique aspect of this case.

6                    JUDGE McGUNNIGLE:   Thank you.

7                    MR. VANDER WEIDE:   I would just mention -- I

8    don't want to go into how extraordinary and historic this is.

9    We've all belabored the court with that in our papers.   But I

10   just wanted to note that this D & O diary that the defendants

11   -- the objecting defendants -- and, by the way, just a word

12   about the objecting defendants I think is in order here.   Of

13   these 17 objectors that we -- I'm not counting now the one

14   that's in the federal case.   But of these 17 objecting

15   defendants, ten -- the company's -- not one of them, as I

16   read Mr. Carter's paper on the cover -- ten of these are, or

17   were, directors on whose watch this whole thing happened.

18   Five of these objecting directors have left the Board and did

19   so under less than optimal -- of these objecting directors.

20   I'm not talking about the others, but I'm talking about these

21   who are objecting -- did so under less than optimal

22   conditions.   Four of these objecting directors were on the

23   compensation committee who had particular charge of what

24   happened here in this case, which has been -- which was

25   brought out by the derivative actions and laid before the

1     public and the court and, then, everything else followed from

2     that.   And the remaining five objecting directors are doing

3     so in their individual capacities.   They don't purport to be

4     acting on behalf of the corporation.   I think that's

5     important to know in light of the fact that no other --

6     again, aside from the one we have in the federal action -- no

7     other institutional or individual shareholder has come

8     forward to criticize either the settlement or the request for

9     attorneys' fees.

10                 JUDGE ROSENBAUM:   Did any of those objectors

11    themselves receive options which were backdated?

12                 MR. VANDER WEIDE:   Well, Mr. Hemsley did.

13                 JUDGE ROSENBAUM:   Okay.

14                 MR. VANDER WEIDE:   He's the prominent one who

15    comes to mind.   But the others were as well.

16                 JUDGE ROSENBAUM:   Okay.

17                 MR. VANDER WEIDE:   I'm only focusing on the

18    directors now, your Honor.   I'm not talking about the officer

19    objectors here.

20                 JUDGE ROSENBAUM:   And I'm focusing on the

21    directors also.

22                 MR. VANDER WEIDE:   Okay.   Yes.   Mr. Hemsley

23    did.   But other than that, I believe the answer would be no.

24                 One last point I'd like to make in terms of the

25    contribution of both actions and that is that, again, because

1          the SLC did not make findings, the conduct by the

2          derivative -- the prosecution of these two cases by the

3          plaintiffs in these two cases provided a crucial independent

4          confirmation of not only the quality of the SLC's work but

5          also the conclusions and recommendations.  Because we were

6          able to look at documents, although not in as efficient a

7          manner as they could, we were given these things lock, stock

8          and barrel literally, with an awful lot of barrel thrown in.

9          By our reviewing the evidence that we were given, we were

10         able to make an independent determination to support our

11         conclusion that the settlement that's before the court -- our

12         independent conclusion that the settlement that's before the

13         court is entitled to the court's approval.  And we did that

14         as a result of all of this work, including doing all this

15         work to be prepared for the possible eventuality that the SLC

16         might find merit but we could not reach a settlement.  I

17         mean, just because settlement discussions started, they went

18         on for some time and there was some pretty tough back and

19         forth, as there always is in settlements of this caliber and

20         of this magnitude, and there was never any assurance that

21         this would happen.  And there was an equal possibility that

22         the SLC would conclude -- or -- we couldn't conclude a

23         settlement with all these people, but the SLC concluded,

24         nevertheless, there should be trials, as it happened in a

25         couple of other backdated options cases, where the SLC has

1       concluded that -- did not reach a settlement but instead

2       concluded that actions -- one or more actions should be

3       pursued against one or more of the defendants.  We had to be

4       prepared for that possibility and that's, again, why the work

5       -- the discovery work was an ongoing activity while the

6       settlement discussion was going on.

7               JUDGE ROSENBAUM:  Have you pretty much hit the

8       high points?

9               MR. VANDER WEIDE:  I think I have, your Honor.

10      Thank you very much.

11              THE COURT:  Mr. Carter.

12              MR. CARTER:  Good morning, your Honors.

13              JUDGE ROSENBAUM:  Yes, it is.

14              MR. CARTER:  For about five more minutes, I

15      believe.  Mr. Cambronne mentioned, I think, a point that he

16      thought ironic and, frankly, I find something ironic as well.

17      This case started with arguments about excessive

18      compensation, and this case is likely going to finish with

19      arguments about excessive compensation.  We think the

20      settlement is historic.  We join in the SLC's motion to have

21      the settlement finally approved.  But we believe the

22      plaintiffs' fee request, in light of the unique circumstances

23      of this case, is excessive.  It's excessive to the extreme.

24      Here both courts recognize the unique role of the Special

25      Litigation Committee.  It is important to note that in

1       response to our motion to you, Judge McGunnigle, and to you,

2       Judge Rosenbaum, the Motion to Dismiss or Stay these actions,

3       in both instances, the motion to stay was granted.

4                        Mr. Vander Weide talked --

5                        JUDGE ROSENBAUM:  The Motion to Stay was mostly

6       granted.

7                        MR. CARTER:  Well, your Honor, you did allow

8       discovery.

9                        JUDGE ROSENBAUM:  I thought I did that.

10                       MR. CARTER:  But the Motion to Stay had to mean

11      something, and I believe --

12                       JUDGE ROSENBAUM:  Well, I want to make sure

13      that I was clear in my mind that you didn't think that I had

14      stayed their work, because I didn't recall that that was

15      exactly what I did.

16                       MR. CARTER:  But you expressly stayed the case

17      in the order, and then you said, discovery can proceed.  It

18      was, I would say, a conundrum.  It was not something --

19                       JUDGE ROSENBAUM:  I thought it was a Gordian

20      knot.  But that's okay.  We'll get there.

21                       MR. CARTER:  Well, whatever word we want to

22      use, your Honor, when you step back and you read that

23      opinion --

24                       JUDGE ROSENBAUM:  Why don't we move past this

25      argument.  I'm okay on this one.  We'll keep going.

1            MR. CARTER:   The point is not that discovery --

2      the point, as you recognized, your Honor, is the role of the

3      SLC.   Both courts recognized the primacy of the SLC, and that

4      under Minnesota law, a duly constituted SLC has the power to

5      determine whether claims go forward.   And that, I agree, your

6      Honor, happened in the context of discovery going forward in

7      the federal case, but they did so in light of this clear

8      statement, this clear recognition of the primacy of the

9      Special Litigation Committee.   Now, if you're plaintiffs'

10     counsel and you receive both Judge McGunnigle's initial order

11     and your Honor's order, I believe that in light of the shoes

12     that they are wearing, the fiduciary duty they hold, the

13     expectation that they would act in the best interests of the

14     corporation, I believe, your Honors, that in that

15     circumstance those orders and the ongoing SLC investigation

16     should serve as a moderating influence on their discovery

17     and on how they proceed.   And one of the things, by the way,

18     I heard from Mr. Cambronne was that he, at some point, came

19     to the defense counsel and said, We won't do discovery if we

20     can have a mediation.   Well, one would, I would think, be

21     able to draw an inference that if derivative counsel is

22     making that sort of offer to the defense, that that means

23     he's perhaps acting in a more prudent manner and not

24     unleashing lawyers reviewing documents by the tens --

25     spending tens of thousands of hours.   One would assume that

1          what that means is he recognizes the SLC is proceeding,

2          they're going to step back, and they're going to try to

3          resolve this in a way which really does benefit the

4          corporation.

5                     JUDGE ROSENBAUM:   As you were protecting your

6          clients' fisc, did you discuss that with him?

7                     MR. CARTER:   Your Honor, I --

8                     JUDGE ROSENBAUM:   Because such an assumption

9          lightly thrown out would just wipe out maybe a third of their

10         fees.   If you were concerned to protect the treasury of the

11         corporation -- I'm not going to invade the conversation --

12         but did you take this subject up and write out an agreement,

13         perhaps?

14                    MR. CARTER:   No, your Honor, we did not write

15         out an agreement.

16                    JUDGE ROSENBAUM:   Oh.

17                    MR. CARTER:   But I don't think it was --

18                    JUDGE ROSENBAUM:   Oh.

19                    MR. CARTER:   I don't think it was unreasonable

20         for us to assume that, in the offer, to say that we're going

21         to stand back and try to mediate, that what they really meant

22         was, We'll mediate with you.   We won't take depositions.   We

23         won't answer your discovery.   We won't serve discovery on

24         you.   But we are going to hire contract lawyers, at several

25         hundred dollars an hour, to review a database filed with

1    documents.

2               JUDGE ROSENBAUM:   Okay.

3               MR. CARTER:   Now, the other point that's

4    important is that because the SLC did have control over these

5    claims, it wasn't clear that, when all was said and done, the

6    SLC, if it had decided claims were to proceed, would have

7    even retained these lawyers.   And that's important.   Because

8    they could have decided to hire Kelly & Berens, they could

9    have decided to hire Munger, Tolles.   And I think the

10   plaintiffs pursuing the discovery as if, in fact, they had

11   been retained, was done at their own risk, frankly.

12              JUDGE ROSENBAUM:   That's what they did when

13   they filed the case, was at their own risk.

14              MR. CARTER:   I agree, your Honor.   And, again,

15   I go back to the fact that under the Minnesota statute and

16   under Minnesota law, it's understood that that claim belongs

17   to the corporation.

18              The other thing, your Honors, is that we

19   believe that the plaintiffs have embellished their role and

20   impact in this case.   First, WilmerHale did not issue its

21   report because of the derivative losses.   That is simply not

22   true.   The repricing of the options on October 15th, 2006 had

23   nothing to do with the plaintiffs' counsel.   The corporate

24   governance reforms announced on October 15th had nothing to

25   do with the plaintiffs' counsel.   The departure of

1      Dr. McGuire and Mr. Lubben, and the retirement of Mr. Spears

2      had nothing to do with the plaintiffs' counsel.   The

3      injunction that precluded certain individuals from exercising

4      options was not litigated.   That was stipulated to.

5                      And on the corporate governance issues, I do

6      stand by the letter that I wrote to Mr. Cambronne.   There's

7      no question that we were having discussions with

8      Mr. Cambronne and the federal plaintiffs.   Mr. Vander Weide

9      was not involved in those discussions.   In the interim, we

10     had a break and we had discussions then with the PSLRA

11     plaintiffs.   And the corporate governance piece ended up

12     being part of the quid pro quo in the PSLRA action.   There's

13     no question that the derivative plaintiffs are beneficiary

14     of the corporate governance changes, but they were not the

15     cause of those changes.   The SLC drove the settlement

16     process; the plaintiffs did not.   Indeed, the defendants

17     would not have participated in the mediation if the

18     defendants had not been approached by the Special Litigation

19     Committee.

20                      JUDGE ROSENBAUM:   Isn't it fair to say they

21     couldn't have?

22                      MR. CARTER:   Yes.   Because the SLC --

23                      JUDGE ROSENBAUM:   The SLC became the Board --

24                      MR. CARTER:   That's absolutely --

25                      JUDGE ROSENBAUM:   -- and the corporation.

1           MR. CARTER:   That's absolutely right, your

2    Honor.   That's absolutely right.

3           JUDGE ROSENBAUM:   So you were a handcuffed

4    volunteer.

5           MR. CARTER:   Well, my point is that --

6           JUDGE ROSENBAUM:   Let me put it this

7    way.   Somebody is nodding their head yes back there.

8           MR. CARTER:   Your Honor, my point is that it

9    wasn't the plaintiffs -- the plaintiffs coming to us and

10   saying --

11          JUDGE ROSENBAUM:   Let me ask you --

12          MR. CARTER:   -- "let's settle" --

13          JUDGE ROSENBAUM:   Let me swing over a little

14   bit.   Your brother raised --

15          MR. CARTER:   -- was words in the wind.

16          THE COURT:   Your brother raised, perhaps

17   uncharming, but it might be an accurate point, that it was a

18   wasting policy, that it was D & O policy.

19          MR. CARTER:   Absolutely -- well, the D & O

20   policy -- there was a hundred and seventy-five million

21   dollars of D & O policy.   That entire policy was devoted

22   entirely to the PSLRA settlement.   As your Honor knows, that

23   matter was settled for 895 million dollars.   The hundred and

24   seventy-five million dollars was used for that case.   In

25   fact, there was no D & O coverage for the derivative actions

1       because of some of the exclusions in the policy.

2                       JUDGE ROSENBAUM:  Okay.

3                       MR. CARTER:  I do want to address the issue of

4       cash.

5                       JUDGE ROSENBAUM:  I thought there was a subtle

6       suggestions that it went to the attorneys' fees.

7                       MR. CARTER:  Which is not true.

8                       JUDGE ROSENBAUM:  Okay.  That's fine.

9                       MR. CARTER:  On that point, the courts have

10      said --

11                      JUDGE ROSENBAUM:  How fair an analogy is it to

12      analogize the attorneys' fees of the derivative-action

13      plaintiffs to the costs and fees of the SLC?

14                      MR. CARTER:  Your Honor, I think it is

15      obviously a fair analogy.  We've made it in our paper.

16                      JUDGE ROSENBAUM:  I know you think obviously it

17      is.

18                      MR. CARTER:  And let me tell you why.

19                      JUDGE ROSENBAUM:  Perhaps you could draw it out

20      a little more.

21                      MR. CARTER:  The SLC is investigating claims,

22      they are interviewing witnesses.  The SLC interviewed here

23      dozens of witnesses, very much like a deposition.  The SLC

24      reviewed millions of pages of documents, much like the

25      plaintiffs would do in prosecuting a claim.  About the only

1      difference, I think, is that the SLC did not have subpoena

2      power whereas the plaintiffs would because they're involved

3      in litigation.

4                    JUDGE ROSENBAUM:   How many motions did you

5      bring to oppose any action by the SLC?

6                    MR. CARTER:   Zero.   Zero.

7                    JUDGE ROSENBAUM:   Okay.

8                    MR. CARTER:   And, your Honor, I think that if

9      the plaintiffs were to provide the detail in their fee

10     petition for all of the time they spent on motions, I think

11     that that's time well spent because, obviously, we were

12     before your Honors at various times and it was hard-fought.

13     My issue is not with the motions.   My issue is not with the

14     time spent on the Minnesota Supreme Court.   My issue relates

15     to --

16                    JUDGE ROSENBAUM:   Probably not for the time --

17                    MR. CARTER:   -- something that the defense

18     said.

19                    JUDGE ROSENBAUM:   -- that they spent advocating

20     in these courtrooms.

21                    MR. CARTER:   That's absolutely right.

22                    JUDGE ROSENBAUM:   Okay.

23                    MR. CARTER:   Let me address the cash issue.

24     There's a lot of confusion in the room about the cash issue.

25     Mr. Vander Weide is absolutely wrong about, Well, the

1    restatement, and this and that.  And it's all just cash and

2    it's all got value.  Remember, the restatement meant the

3    company had to restate.  They had to say, What we said before

4    wasn't the case.  And that was a negative when the company

5    did a restatement.  The settlement, right, the value of

6    somebody giving up options --

7              JUDGE ROSENBAUM:  I don't know if your brother

8    over here thinks that it's sort of neutral.

9              MR. CARTER:  Which brother are we pointing to?

10             JUDGE McGUNNIGLE:  Farthest away from you on

11   the right.

12             JUDGE ROSENBAUM:  Mr. Abadou.

13             MR. CARTER:  The point on value that is

14   attributed to options which are relinquished, that relates to

15   the fact that if I'm an option holder and I could tomorrow go

16   and exercise those options, and have a particular value

17   associated with that exercise, I'm now giving those options

18   back.  So that's a value relinquished.  The cash component of

19   this deal -- it is significant -- but I want to make sure the

20   court is clear in terms of what it is.  Because there is some

21   confusion in the record and, unfortunately, I think I may

22   have been the cause of some of that confusion.  On page eight

23   of our brief there is a typo at the first bullet point in

24   which we are describing Dr. McGuire's supplemental executive

25   retirement and executive savings plan.  And in the brief, it

1       says that was worth 499 million dollars.   That should be 99.4

2       million.   The "4" is apparently right below the dollar sign

3       on the keyboard.   But the 99.4 we learned this morning is

4       actually 91, because 8.1 of that 99.4 is actually stock.   And

5       that 8.1 --

6                       JUDGE ROSENBAUM:   I think --

7                       MR. CARTER:   Is that clear?

8                       JUDGE ROSENBAUM:   I think that's exactly what

9       -- Mr. Cambronne referred to it as 91.3.

10                      MR. CARTER:   Okay.

11                      JUDGE ROSENBAUM:   And he did it this morning.

12                      MR. CARTER:   So 91.3 plus Mr. Lubben's

13      contribution of cash of 20.5 --

14                      JUDGE ROSENBAUM:   By the way, I think it's fair

15      to say -- and all of counsel will recall -- these numbers

16      have been discussed at some length before.   Whether or not

17      they were -- however you put them in there.   I recall on a

18      number of occasions discussing those things, because they

19      were all bound up in the injunction area.

20                      MR. CARTER:   Mr. Cambronne did misspeak when he

21      was describing -- not to any fault of his own.   But I just

22      want it to be clear on the record that the total cash

23      component is a hundred and eleven million point eight.   We

24      have analyzed the lodestar and we believe that it is

25      absolutely excessive on its face.   And it includes a built-in

1     multiplier.   They spent 40,000 hours, totaling 19 million

2     dollars in fees.   The first Complaint was filed the end of

3     March, 2006.   The settlements were signed in early December,

4     2007.   So that's a 20-month time period.   In 20 months, the

5     plaintiffs collectively billed 2,000 hours per month.   That's

6     ten full-time lawyers.

7                 JUDGE ROSENBAUM:   It's 20 man years.   That's

8     what their billing is.

9                 MR. CARTER:   That's right.   Each and every

10    month.   Full-time.   Full-time.

11                JUDGE ROSENBAUM:   No.   The 40,000 hours is 20

12    man years.

13                MR. CARTER:   The database that we --

14                JUDGE ROSENBAUM:   That's if you're billing

15    2,000 a year.

16                MR. CARTER:   That's if you're billing 2,000...

17    The database which the defendants provided -- this is with

18    the millions of pages of documents -- wasn't provided until

19    July of '07.   So that means the bulk of the document review

20    really could not start until that time period.   So between

21    July -- if you look at July to December and you think about

22    the number of hours that would have had to have been devoted

23    to review documents during that time period, it is

24    awe-inspiring.   Now, one of my fundamental objections to that

25    is they had a searchable database.   They had a database that

1    would allow them to write in, you know, whatever search term
2    they wanted and come back get the result.   Mr. Cambronne has
3    taken issue with the defendants using 50 lawyers to review
4    documents in order to produce that database.   But it's
5    important to note that the defendants have a different
6    obligation when producing discovery.   We are required to
7    review every document for attorney-client privilege.   We
8    don't have a choice to just go and hunt-and-peck, especially
9    in a case like this where, frankly, we had all of the servers
10   from the Legal Department of UnitedHealth Group.   I will also
11   tell you that Dorsey & Whitney spent -- and we did all the
12   document review -- we spent 34,000 hours reviewing documents.
13   I will also tell this court that our total fees were less
14   than eight million dollars.   What that means is that our
15   blended rate for doing that work was about $230 an hour.
16   Contrast that to the blended rate we see in their lodestar,
17   which is 450 -- it depends on if we look at the state court
18   action or the federal court action.   But the federal action
19   was $451 per hour, and the state court action's blended rate
20   was $457 an hour.
21             JUDGE ROSENBAUM:   So Dorsey spent eight million
22   dollars on document review?
23             MR. CARTER:   Eight million dollars, total, on
24   the derivative action, your Honor.
25             JUDGE ROSENBAUM:   Okay.   Because I thought you

1     said on the document review.

2                    MR. CARTER:   No.   I appreciate the

3     clarification.

4                    JUDGE ROSENBAUM:   Okay.

5                    MR. CARTER:   In the derivative action defending

6     these claims -- and both your Honors know that we were lead

7     counsel in the derivative action -- total eight million

8     -- actually, it's 7.7.

9                    JUDGE ROSENBAUM:   This is what we call "Close

10    enough for government work," particularly this week.

11                   MR. CARTER:   The other thing, your Honor, that

12    I think is important is we have hourly rates presented which

13    are not market.   I know the court is aware of the *Domino's*

14    *Pizza* case and the *Guidant* case, where courts are capping

15    attorney fees at $400 an hour or rejecting rates for not

16    being commensurate with the rate in the local market.   A few

17    examples -- and these are out of their petitions -- but we've

18    got Mr. Johnson's rate at $750 an hour.   I'm not aware of any

19    lawyer in Minnesota who charges $750 an hour.   Their

20    associates were charging out between 395 and $550 an hour.

21    We've got the Ed Faber firm; partners were charging 680 to

22    $785 an hour.   The Grant, Eisenhofer firm, 650 to $845 an

23    hour.   Even Mr. Cambronne is seeking $650 an hour which,

24    again, is not the rate charged in this market for this type

25    of work.   Indeed, I did a little quiz of my co-counsel here,

1       and our blended partner rate among Mr. Mark, Mr. Hashmall,

2       Mr. Gaskins and myself for this case ranged between 400 and

3       $480 an hour.

4                       JUDGE ROSENBAUM:   Have you examined the hourly

5       rate paid to jurists?

6                       MR. CARTER:   Your Honor, I think you should

7       impose your hourly rate upon this case.   It might...

8                       JUDGE ROSENBAUM:   As long as I do it to all the

9       lawyers, counsel.

10                      MR. CARTER:   I can tell you I think the hourly

11      rates that they're attempting to charge are outrageous.   And

12      one of the problems we have here is that when you -- there is

13      no mechanism for accountability.   In other words, every

14      month, I have to send a bill to a client and a client can

15      pick up the phone and say, "Why are you spending thousands of

16      hours on a document review?   You're in the middle of a

17      mediation that's about to be successful"; or, "Why are you

18      summarizing deposition digests when the settlement was

19      entered into?"   Those are questions we have to ask every day.

20      On the plaintiffs' side, we don't have any of that

21      accountability.   And I think that the lodestar raises serious

22      questions about that kind of staffing.   For example, billing

23      out contract lawyers at $510 an hour frankly is gross.   It's

24      gross because you can hire a contract lawyer for 75 to a

25      hundred dollars an hour in virtually every city in this

1    country and they'll review documents, wherever they are.   And

2    I can tell you that most large law firms do not pass on a

3    margin for that, for precisely the reason which the serial

4    objector identified in the brief, which is you're not dealing

5    with health care and you're not -- and, frankly, clients

6    demand it.   They say, "If that's a direct expense, then we'll

7    pay you that expense, just like we'll pay for photocopies or

8    faxes.   We don't expect you to build in a margin."   And

9    that's exactly what they've done in this fee petition.   The

10   state court plaintiffs take the position that they've

11   properly staffed, but the partners have billed the vast

12   majority of hours.   And, again, if they were sending bills

13   every month to any of us who were charged with monitoring how

14   they proceed, you would say, "Well, wait a minute.   Let's get

15   some work down.   Let's push it down.   We don't want partners

16   reviewing documents."

17                   I want to address one of the things that

18   Mr. Vander Weide said, which was, you know, This was high

19   risk.   We didn't know if we were going to get paid.   This was

20   bad.   On October 15th, UnitedHealth Group -- which was

21   aggressively remediating on its own -- issued that WilmerHale

22   report.   And that WilmerHale report included a fairly

23   significant and fairly, I'll say, explosive statement and

24   that was:   "Stock options had been likely backdated."   And

25   both your Honors heard the plaintiffs come in and say, Look,

1       they said it's likely backdated.

2                       And there's something else that happened,

3       Dr. McGuire left the company.   Now, if the plaintiffs didn't

4       know that they had a live one at that point, if the

5       plaintiffs didn't know that they had a live one at that

6       point, I'd be shocked.   I hate to say this, but this is one

7       of those unique circumstances where the contingency risk was

8       low.   On a related issue, the state court plaintiffs filed

9       their lawsuit second, and it was a lawsuit that I believe was

10      truly identical in every meaningful way to the lawsuit which

11      was filed first in front of Judge Rosenbaum.   Mr. Vander

12      Weide said, Well, we brought great value because we had this

13      unique theory and ultra vires.   That theory was -- I'm not

14      going to say rejected -- but, Judge McGunnigle, you did

15      express skepticism.

16                      JUDGE McGUNNIGLE:   I think I used the word

17      "skepticism."

18                      MR. CARTER:   Yes.   You were skeptical.   I think

19      Mr. Vander Weide admitted that the SLC was skeptical.

20                      JUDGE McGUNNIGLE:   In a sense, though, that

21      confirms his argument that he was at risk, if the court is

22      skeptical about a cause of action.

23                      MR. CARTER:   Well, the one thing I'd say, your

24      Honor, is we don't want to live in a world where we encourage

25      what I'm going to call "tag-along lawsuits."   We don't want

1    to live in a world where somebody sees, Oh, there's one in
2    federal court in Minnesota.  I'm going to file one in state
3    court and see if I can keep it alive; or, I'm going to go
4    file one in Delaware; or, I'm going to go file one -- and I
5    frankly believe that's what we have in the state court
6    action.  The state court action's discovery was stayed.  It
7    was only lifted by stipulation in order to allow the
8    plaintiffs to get comfortable with the settlement which was
9    about to be entered into.  That's why that discovery was
10   lifted.  There were no depositions -- in fact, just to be
11   clear -- and I think it's clear -- no lawyer in this room, in
12   the derivative action, took a single deposition or attended
13   any interview with the SLC.  That did not happen.
14               Mr. Vander Weide also mentioned, Well,
15   Mr. Carter represents some of the defendants.  And last I
16   checked, we have the right to object to attorneys' fees, and
17   I do represent the current chief executive officer of
18   UnitedHealth Group.  And paying lawyers is a function of
19   management.  And sitting in the back of the courtroom are two
20   deputy general counsels from UnitedHealth Group, and if the
21   court wants to get UnitedHealth Group's position, I'm sure
22   UnitedHealth Group would provide that.
23               JUDGE ROSENBAUM:  I trust that they are
24   speaking as a corporation through their counsel.
25               MR. CARTER:  On the common-fund point, Mr. Van

1        Weide has not cited cases that stand for the proposition that

2        in a derivative case a common fund is appropriate.   Courts

3        don't approach derivative actions in that way, for lots of

4        good reasons.   Because you asked about, Well, if I can value

5        something, should a common fund be applied?   The problem with

6        that is someone is always going to be trying to value

7        whatever consideration might exist in a derivative case and,

8        then, the company is going to find itself having to pay out

9        cash to lawyers for something that maybe perhaps didn't

10       really bring in the kind of cash we're talking about.   And

11       Mr. Vander Weide -- the thing that's shocking to me is that

12       the company's recovered a hundred and eleven million dollars.

13       The plaintiffs want to recover more than 50 percent of that.

14       More than half.   The lion's share of that.   There's a policy

15       issue here.   Courts, under Minnesota law, are empowered to

16       create Special Litigation Committees to determine whether

17       claims should be pursued.   And those committees tend to be

18       formed after a lawsuit or a sabre-rattling letter has been

19       sent to the Board.   If courts grant these kind of huge awards

20       to lawyers, what that means, I believe, is that you will have

21       situations in which Special Litigation Committees are trying

22       to do their jobs and determine and decide whether a claim

23       should be brought.

24                    JUDGE ROSENBAUM:   Did you brief this subject?

25                    MR. CARTER:   No, I did not.

1          JUDGE ROSENBAUM:  I didn't think so.   This

2     little darling must have popped into your mind just last

3     night.

4          MR. CARTER:   Your Honor, I've been in trial for

5     three weeks.   So, unfortunately, I may have had some new

6     ideas along the way.

7          JUDGE ROSENBAUM:   Excellent.

8          MR. CARTER:   But, in any event, the SLCs need

9     to be given -- they have the power, they have the authority.

10    If we live in a world where, at the same time that they're

11    considering these claims, you've got plaintiffs' lawyers

12    fomenting litigation, hoping that they're going to be able to

13    come in --

14          JUDGE ROSENBAUM:   "Fomenting litigation"?   Were

15    they the ones who were issuing -- you've got a board of

16    directors that issued those shares.   They didn't foment that.

17    Why don't you move to a different argument.

18          MR. CARTER:   Your Honor, my point is --

19          JUDGE ROSENBAUM:   Finish your point.

20          MR. CARTER:   -- it seems to be entirely

21    inconsistent --

22          JUDGE ROSENBAUM:   I understand.

23          MR. CARTER:   -- entirely inconsistent for the

24    Special Litigation Committee to decide whether or not a case

25    is worth investing in at the same time you're going to have

1          plaintiffs' lawyers deciding, Look, the gates are open.

2          Let's go hire a bunch of contract lawyers to review every

3          document known to human kind because some day we'll be able

4          to come in and make a presentation to this court.

5                      I ask both courts to carefully scrutinize the

6          fee petitions and not just these summaries.  I think this is

7          the kind of thing that requires a month-by-month review.

8          Because I think the courts are going to find that there's a

9          lot of fat in those.  And I do believe that the amount billed

10         by the SLC, the amount billed by Dorsey & Whitney in

11         defending these claims is relevant and ought to be considered

12         as a benchmark.  And if the courts, for whatever reason, are

13         inclined to consider a multiplier, I believe that the

14         lodestar itself that's been presented that has the huge

15         hourly rates and the huge number of hours includes that

16         multiplier.  Thank you.

17                      JUDGE ROSENBAUM:  Thank you, counsel.

18                      JUDGE McGUNNIGLE:  Thank you, counsel.

19                      JUDGE ROSENBAUM:  Anybody else?

20                      MR. HASHMALL:  I have no argument, your Honor.

21                      JUDGE ROSENBAUM:  All right.

22                      MR. MARK:  Your Honor, I have no argument.  But

23         we do obviously support the settlement.

24                      MR. GASKINS:  Your Honor, Steve Gaskins for

25         Dr. McGuire.  We do support the settlement.  I would like to

1      say one thing, if I can, from here, because it's very brief.

2      The one thing I would say I have no dog in the lodestar fight

3      or the hours, nothing like that.  But I think that Karl

4      Cambronne, particularly, aided the settlement process early

5      on by pressing and pushing for mediation and I think that

6      that value should be recognized.

7                    JUDGE ROSENBAUM:  I thank you.

8                    JUDGE McGUNNIGLE:  Thank you, counsel.

9                    JUDGE ROSENBAUM:  We'll take it under

10     advisement.

11                   (Court stood in recess at approximately 12:10

12     p.m., on February 13th, 2009).

13

14

15

16

17

18

19

20

21

22

23

24

25

1      STATE OF MINNESOTA)

2                                    )ss.

3      COUNTY OF HENNEPIN)

4

5             I, Ronald J. Moen, Official Court Reporter for the
       United States District Court, CSR, RMR and a Notary Public in
6      and for the County of Hennepin, in the State of Minnesota, do
       hereby certify:

7             That the said proceeding was taken before me as an
       Official Court Reporter, CSR, RMR and a Notary Public at the
8      said time and place and was taken down in shorthand writing
       by me;
9
              That said proceeding was thereafter under my direction
10     transcribed into computer-assisted transcription, and that
       the foregoing transcript constitutes a full, true and correct
11     report of the transcript of proceedings which then and there
       took place;
12

13            That I am a disinterested third person to the said

14     action;

15            That the cost of the original has been charged to the
       party who ordered the transcript of proceedings, and that all
16     parties who ordered copies have been charged at the same rate
       for such copies.
17
              That I reported pages 1 through 61.
18
              IN WITNESS THEREOF, I have hereto subscribed my hand
19     this 6th day of March, 2009.

20

21                                   s/ Ronald J. Moen
                                     RONALD J. MOEN,
22                                   Official Court Reporter,
                                     CSR, RMR

23

24

25